Terry E. Welch (5819)
Bentley J. Tolk (6665)
Michael S. Wilde (14366)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
mwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment*
*Fund 1, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; and JUSTIN SMITH, <br><br> Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE, FOR WRIT OF PRE-JUDGMENT EXECUTION, OR IN THE ALTERNATIVE, FOR APPOINTMENT OF A RECEIVER** <br><br> **(Oral Argument Requested)** <br><br> Case No. 2:23-cv-000157-JNP <br><br> Judge Jill N. Parrish |

i

## TABLE OF CONTENTS

MOTION, SPECIFIC RELIEF SOUGHT, AND GROUNDS FOR THE RELIEF ...................... 1

FACTS ................................................................................................................................. 2

ARGUMENT ...................................................................................................................... 11

    I.    A Temporary Restraining Order Should Be Entered ........................................ 11

        A.    Plaintiff Has a Substantial Likelihood of Prevailing on the Merits ............... 12

        B.    Plaintiff Will Suffer Irreparable Injury if an Injunction Is Not Issued .......... 16

        C.    Plaintiff's Threatened Injury Outweighs the Injury HSMG Will Suffer Under the Injunction ....................................................................................... 18

        D.    An Injunction Is in the Public Interest ........................................................... 19

        E.    No Bond Should Be Required .......................................................................... 20

    II.    In the Alternative, a Pre-Judgment Writ of Attachment Should Be Issued ...................... 20

    III.    In the Second Alternative, a Receiver Should Be Appointed ........................................... 22

        A.    Plaintiff is Entitled to Appointment of a Receiver Under Rule 66 and Utah Code Ann. § 25-6-303(1)(c)(ii) .................................................................. 22

        B.    Plaintiff is Entitled to Appointment of a Receiver Under the Utah Uniform Commercial Real Estate Receivership Act ..................................... 24

CONCLUSION ................................................................................................................... 24

CERTIFICATION OF COUNSEL ..................................................................................... 25

# **TABLE OF AUTHORITIES**

Cases

*AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265 (D. Utah 2020) .................................. 17

*Allred v. Hinkley*, 328 P.2d 726 (Utah 1958) ............................................................................. 12

*Am. W. Bank Members, L.C. v. State*, 2014 UT 49, 342 P.3d 224 ............................................... 13

*Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238 (W.D.N.Y. 2010) ........................................ 20

*Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, 12 P.3d 580 ............................................. 13

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001) ...... 11

*EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, 2018 WL 5776545 (D. Utah) .................................................................................................................................. 22, 23

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) .. 11

*Envirotech Corp. v. Callahan*, 872 P.2d 487 (Utah Ct.App.1994) ............................................... 16

*Fleet Bus. Credit, L.L.C. v. Wings Restaurants, Inc.*, 291 B.R. 550 (N.D. Okla. 2003) ............. 23

*In re Tri-Valley Distrib., Inc.*, 452 B.R. 837 (Bankr. D. Utah 2011) .................................... 14, 15

*New York Life Ins. Co.*, 755 F. Supp. 287 (E.D. Cali. 1991) ...................................................... 23

*Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231 (D. Utah 2009) .......................... 18

*Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195 (10th Cir. 1992) ........................................................ 17

*S.E.C. v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ................................................... 9, 10

*S.E.C. v. Constantin*, 2013 WL 1828815 (S.D.N.Y. Apr. 25, 2013) ........................................... 11

*Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081 (10th Cir. 2003) ................. 12

*Snow v. Chartway Fed. Credit Union*, 2013 UT App 175, 306 P.3d 868 (cleaned up) ............... 14

*State v. Levin*, 2006 UT 50, 144 P.3d 1096 ................................................................................ 13

*State v. Twitchell*, 832 P.2d 866 (Utah Ct. App. 1992) ............................................................... 12

*Steinberg v. Cmty. Hous. Servs.-Capitol Villa, Ltd.*, 2014 UT App 102, 326 P.3d 673 .............. 12

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986) ...................................................................................................................... 16

*United States v. RaPower-3, LLC*, 325 F. Supp. 3d 1237 (D. Utah 2018) .................................. 17

*Wilcox v. Anchor Wate, Co.*, 164 P.3d 353 (Utah 2007) ............................................................. 18

Statutes

7 U.S.C. § 6(b)(2)(A)-(C) ........................................................................... 9

7 U.S.C. § 6c(b) ......................................................................................... 9

Utah Code Ann. § 25-6-303(1)(c)(ii) .......................................................... 22

Utah Code Ann. § 78B-21-101 ................................................................... 24

Rules

Fed. R. Civ. P. 64 ...................................................................................... 20

Fed. R. Civ. P. 65 ................................................................................... 1, 20

Fed. R. Civ. P. 66 .......................................................................... 22, 23, 24

Utah R. Civ. P. 64A ................................................................................... 20

Utah R. Civ. P. 64C ................................................................................... 20

Other Authorities

Wright & Miller, Federal Practice and Procedure § 2983 ........................... 22

## MOTION, SPECIFIC RELIEF SOUGHT, AND GROUNDS FOR THE RELIEF

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Millrock Investment Fund 1, LLC ("Millrock"), through its undersigned counsel of record, hereby moves for a temporary restraining order and preliminary injunction against defendants Healthcare Solutions Management Group, Inc. ("HSMG"), Healthcare Solutions Holdings Inc. ("HSH"), Landes Capital Management, LLC ("Landes Capital"); Landes and Compagnie Trust Prive KB ("Compagnie"), Joshua Constantin ("Constantin"), and Justin Smith ("Smith") (collectively referred to hereinafter as "Defendants"), and requiring Defendants to deposit $4,642,000 (the "Equipment Funds") into the Court, and enjoining Defendants and their agents from otherwise transferring or disposing of the Equipment Funds.

In the alternative, Plaintiff requests a pre-judgment writ of attachment entitling Plaintiff to seize money from Defendants in the amount of the Equipment Funds.

Alternatively, Plaintiff seeks the appointment of a receiver for the purpose of taking possession of HSMG, HSH, Landes Capital, Compagnie, Constantin and Smith's accounts (or any other person or entity to whom the Equipment Funds were transferred), and accounting for, managing, and protecting assets that have been wrongfully retained by Defendants.

The grounds for the requested relief are as follows: (1) Plaintiff has a substantial likelihood of prevailing on the merits because Defendants have taken of possession of $4,642,000 of Plaintiff's money earmarked for fixtures and equipment at two surgical centers, but have failed to provide the equipment; (2) Plaintiff will suffer irreparable injury because Defendants are dissipating assets and are in financial distress, and failing to identify and trace the Equipment Funds now would deprive Plaintiff of its ability to assert a constructive trust over

the Equipment Funds; (3) Plaintiff's threatened injury outweighs any potential injury Defendants might suffer under the injunction because Defendants have no right or title to the Equipment Funds; and (4) an injunction is in the public interest because it would protect the retirement investment of the ultimate purchasers of the surgical centers and allow the surgical centers to provide medical care to patients.

## FACTS

1.      Plaintiff Millrock Investment Fund 1, LLC ("Millrock") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

2.      Defendant Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware corporation with its principal place of business in Glen Cove, New York.

3.      Defendant Healthcare Solutions Holdings, Inc. ("HSH") is a Delaware Corporation with its principal place of business in Glen Cove, New York, and is a wholly owned subsidiary of HSMG.

4.      Upon information and belief, Defendant Constantin ("Constantin") is a resident of Louisiana and the comptroller and/or head of commercial real estate for HSMG.

5.      Upon information and belief, Defendant Justin Smith ("Smith") is a resident of New York, and the chairman of the board and/or CEO and/or CFO of HSMG.

6.      Landes Capital Management, LLC is a Wyoming limited liability company. Upon information and belief, Smith is the sole member of this entity.

7.      Upon information and belief, Landes and Compagnie Trust Prive KB is a Wyoming corporation. Upon information and belief, Smith controls this entity and/or has an ownership interest therein.

8.    Millrock is an investment and development fund that buys and sells commercial properties and then divides and sells its fee simple title to various tenant-in-common owners (the "TIC Owners"). Declaration of Kevin S. Long, ¶ 4 (hereafter "Long Decl.").

9.    Millrock contracted with non-party Jameson, LLC dba American Development Partners ("ADP") to construct two surgical centers for HSMG or its subsidiaries to lease and operate in Draper, Utah ("Draper Project") and Keller, Texas ("Keller Project") (collectively, the "Surgical Centers"). Long Decl., ¶ 5; Exs. 1 and 2.[1]

10.    In connection with construction of the Surgical Centers, Millrock was required to pay ADP $2.55 million for the Draper Project and $2.55 million for the Keller Project as an equipment allowance (collectively the "Equipment Allowance") to equip each Surgical Center, and ADP was then required to transfer the Equipment Allowance to HSMG. ADP would submit draw requests for the Equipment Allowance at various points throughout the development process, and ADP would transfer those draws to HSMG.  Long Decl., ¶ 6; Exs. 3 and 4.[2]

11.    This equipment allowance was to buy fixtures and equipment necessary to allow the Surgical Centers to operate as such. Declaration of Manny Butera, ¶¶ 9, 12.

12.    During the construction of the Draper Project, draws for the Equipment were made in the amount of $2,310,000. Long Decl., ¶ 7; Ex. 5; Butera Decl., ¶ 11.

13.    During the construction of the Keller Project, draws for the Equipment were made in the amount of $2,332,000. Long Decl., ¶ 8; Ex. 6; Butera Decl., ¶ 11.

14.    HSMG or its affiliated entities, as the lessee, signed the leases for the Surgical

---

[1] All exhibits cited herein are identified in the Long Decl. and submitted as exhibits to that declaration.
[2] The furniture, fixtures, and equipment budget (or FFE) is under the "MISC – ITEMS NOT PRESENT ON SPREADSHEET" line items.

Centers. When one of HSMG's affiliated entities (as opposed to HSMG) signed the lease for one of the ACM Centers or the Surgical Centers, HSMG acted as the guarantor of its affiliated entity's obligations under the lease. Long Decl., ¶¶ 9.

15.     Specifically, the Draper Lease is set forth in an Ambulatory Surgery Center Lease Agreement between ADP, as the landlord, and SARC by HSI – DRAPER, UT Inc., as the tenant, entered into on or about November 12, 2020. Smith signed the Draper Lease purportedly on behalf of SARC by HSI – DRAPER, UT Inc. Long Decl., ¶ 10; Ex. 7.

16.     On or about November 20, 2020, ADP executed a written assignment of all of its rights, interests, and obligations in the Draper Lease to SARC Draper, LLC. Long Decl., ¶ 11; Ex. 8.

17.     On or about January 12, 2021, SARC Draper, LLC assigned all of its rights, interests, and obligations in the Draper Lease to Millrock. Long Decl., ¶ 12; Ex. 9.

18.     On or about April 6, 2022, Millrock assigned all of its rights, title, and interest in the Draper Lease to certain of the TIC Owners. Long Decl., ¶ 13; Ex. 10.

19.     HSMG was the guarantor for the Draper Lease, and Smith also signed the Guaranty on behalf of HSMG. Long Decl., ¶ 14; Ex. 7.

20.     The Keller Lease is set forth in an Ambulatory Surgery Center Lease Agreement between Millrock, as the landlord, and SARC by HSI – KELLER, TX Inc., as the tenant, entered into as of November 18, 2020. Smith signed the Keller Lease purportedly on behalf of SARC by HSI – KELLER, TX Inc. Long Decl., ¶ 15; Ex. 11.

21.     HSMG was the guarantor for the Keller Lease, and Smith also signed the Guaranty on behalf of HSMG. Long Decl., ¶ 16; Ex. 11.

4

22.     From on or about November 19-20, 2020, Millrock assigned its rights and interest in the Keller Lease (and certain associated purchase agreement rights in the Keller Project) to certain of the TIC Owners. Long Decl., ¶ 17; Ex. 12.

23.     Millrock sold its interests in the Surgical Centers to approximately 70 TIC Owners. Long Decl., ¶ 18.

24.     The TIC Owners owning the interests in the Surgical Centers consist of a variety of investors, however, a substantial portion of the TIC Owners invested in the Surgical Centers using retirement funds as a means of providing cash flow in retirement. Long Decl., ¶ 19.

25.     The Surgical Centers, however, never opened and never received a certificate of occupancy. Although the Keller, Texas project was almost completed, HSMG failed to provide the medical equipment specifications to the contractor, even though the contractor spent numerous months requesting the equipment specifications from HSMG. With regard to the Draper, Utah project, Constantin, Smith and HSMG came up with various excuses for not completing the project. Long Decl., ¶ 20.

26.     Starting around December 2021, HSMG failed to pay its rent obligations under the Draper or Keller Leases. Long Decl., ¶ 21.

27.     HSMG represented to Millrock that its difficulties in making the lease payments were the result of cash flow issues. Millrock worked with HSMG to rectify these cash flow issues, up to and including paying the lease payments. Long Decl., ¶ 22.

28.     On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement and Promissory Note (the "Millrock/HSMG Agreement") to provide HSMG cash flow to meet its rent obligations for the Draper and Keller Surgical Centers. Long Decl., ¶ 23; Ex. 13.

29.     Under the Millrock/HSMG Agreement, Millrock loaned HSMG $350,000 with interest at the rate of 6% per annum. *Id*. at p. 2. The Millrock/HSMG Agreement required HSMG to repay the loan starting November 1, 2022 through December 1, 2024. *Id.* If HSMG defaulted on any obligation under the agreement, the principal and interest would become due immediately. *Id.* at p. 3. The Millrock/HSMG Agreement specifically identified HSMG's failure to make any payment due under the agreement an event of default that caused HSMG's obligations to become due immediately. *Id.* at p. 4.

30.     Notwithstanding Millrock's attempts to assist HSMG's alleged cash flow problem, in or about September 2022, HSMG or its subsidiaries stopped making lease payments under each of their lease agreements at the Surgical Centers. Long Decl., ¶ 25.

31.     On November 30, 2022, the manager of Millrock, Kevin Long, and one of Millrock's limited partners, Brent Smith, had a phone call with Constantin. Mr. Long stated that HSMG was either the lessee or a guarantor of the lease payments and therefore liable. During the meeting, Mr. Constantin sought to negotiate a year of free rent for the Surgical Centers. Mr. Long pushed back and indicated the TIC Owners would not be inclined to give free rent and were more likely to pursue the corporate guarantee against HSMG. In response, Mr. Constantin told Mr. Long, in effect: "That has not kicked in yet. You need to tell the owners they need to work with me or I will empty the corporate shell and they will have nothing to come after. This is what I do, I am very good at it." Long Decl., ¶ 26; Brent Smith Decl., ¶ 4.

32.     During the Call, Mr. Long and Brent Smith brought up Millcreek filing a UCC-1 against any equipment that had been purchased with the Equipment Funds for the Draper Surgical Center. In response, Constantin stated that he would do whatever it took to make sure

that HSMG's assets, including equipment, were impossible to get to if Millrock intended to file UCC-1 filings on any equipment purchased with the Equipment Funds. Constantin further stated during the call that HSMG's single purpose subsidiary entities were set up in such a way as to make it very difficult to recover assets. Long Decl., ¶ 27; Brent Smith Decl., ¶ 5.

33.     In December 2022, Millrock set up a zoom call between HSMG and the TIC Owners of the Draper and Keller Surgical Centers to discuss HSMG's obligations under the leases. Long Decl., ¶ 28.

34.     During the call with the Draper TIC Owners (the "Draper Meeting"), Constantin stated that the Equipment Allowance was paid to him as a "development fee" or "project development income," and that Constantin could use as he sees fit. He also stated that any equipment purchased with the Equipment Allowance belonged to HSMG. Constantin further represented during the Draper Meeting that SARC-Draper, and not HSMG, owes money to the TIC Owners. He also represented that HSMG is a minority investor in SARC-Draper. Constantin stated that some equipment was purchased, but that he didn't know what had specifically been purchased. Constantin refused to commit to putting the Equipment Funds in trust. When confronted about past problems with the SEC, Constantin admitted that he "lied under oath" in a deposition. Long Decl., ¶ 29; Ex. 14.

35.     During the call with the Keller TIC Owners (the "Keller Meeting"), Constantin implied that HSH possesses and controls the Equipment Funds as "project development income," and that it can use it as it sees fit. Constantin also represented that any equipment purchased with the Equipment Funds belong to Constantin and/or one of the entities that Constantin controls. Constantin further implied during the Keller meeting that Equipment Funds were pooled with

money from approximately forty other projects in a general strategic reserve account containing over $80M in cash or cash equivalents. Constantin stated that HSMG could not afford to pay rent owed on the Keller Surgical Center, and that if it did, it would bankrupt the company. Long Decl., ¶ 30; Ex. 15.

36.     During the meetings with the TIC Owners, Constantin indicated that HSMG's contract with ADP provided that the FFE funds would be paid to HSMG as a development fee. Millrock was later provided a copy of the contract between ADP and HSMG, and while it does discuss a development fee, the fee is payable *to ADP*. There is no development fee payable to HSMG. Long Decl., ¶ 31; Ex. 16. An ADP representative (Manny Butera) has confirmed, via a declaration submitted herewith, that HSMG was not entitled to a development fee for the Surgical Centers. Butera Decl., ¶¶ 6, 14. To date, HSMG has not delivered the Equipment, and has not returned, or accounted for, the Equipment Funds. Long Decl., ¶ 31

37.     On December 14, 2022, Millrock's attorney sent a Notice of Default and Acceleration of Debt (the "Notice of Default") to HSMG accelerating the amounts due under the Millrock/HSMG Agreement. Long Decl., ¶ 32; Ex. 17.

38.     On or around February 14, 2023, HSMG filed a Form 8-K with the SEC indicating that Smith was removed as a member of the board effective immediately. As part of Smith's "separation" with the company, HSMG agreed to pay Landes Capital Management, LLC and Landes and Compagnie Trust Prive KB $93,933,345.48 in exchange for 1 million shares of HSMG. Long Decl., ¶ 33; Ex. 18.

39.     Based on the HSMG's most recent filing disclosing the same, the company had 92,076,638 shares outstanding, $659,194 in cash, $93,129,332 in total assets, and $14,484,751 in

8

total liabilities. Long Decl., ¶ 34; Ex. 19, PDF pgs. 3, 59.

40.     Smith is listed as a beneficial owner of shares that appear to be legally owned by Landes Capital and Compagnie. Ex. 19, PDF p. 53. HSMG's SEC reporting indicates that Smith had "voting and dispositive control" of the shares apparently held by Landes Capital and Compagnie. *Id.* Ex. 18.

41.     Landes Capital Management, LLC was named as a defendant in a lawsuit styled *Commodity Futures Trading Commission v. Financial Tree et al.*, case no. 2:20-cv-01184 in the United States District Court for the Eastern District of California. In this action, Financial Tree was found liable on claims of Commodity Option Fraud in Violation of 7 U.S.C. § 6c(b), Forex Fraud in violation of 7 U.S.C. § 6(b)(2)(A)-(C), among other claims. In this same action, Landes Capital Management, LLC was found liable on a claim of disgorgement for having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim. Long Decl., ¶ 35; Exs. 20-22.

42.     On April 12, 2013, a Federal Court in New York granted a motion for summary judgment in favor of the SEC and against Constantin on underlying securities claims alleging violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b–5. *See S.E.C. v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013). Among other things, that court found:

- "The litany of misrepresentations that Solomon and Constantin made to their clients is striking." *Id.* at 306.

- "After several clients had invested funds with Windham for purposes of purchasing stock in Leeward, Constantin diverted those funds to his own purposes. He apparently diverted $643,000.00 of client funds to Constantin Resource, which he used to pay personal and business expenses…." *Id.* at 306-307.

- "In addition, both Solomon and Constantin provided clients with misleading documents to cover up the fraudulent nature of their investment scheme. In the case of Balaban, Solomon and Constantin prepared monthly account statements that misleadingly represented Leeward holdings that Balaban did not actually have. The account statements also set forth fictitious account values, which misled Balaban concerning the true value of his investment through Windham. [quotation omitted]. Similarly, in the case of Mier, Constantin produced a fake promissory note in an effort to convince Mier that his investment in Leeward was secure when, in fact, it was not." *Id.* at 307.

- "Taken as a whole, defendants' efforts to lure clients to Windham through false promises about expected returns on investment and about Windham's professional experience; Constantin's misappropriation of client funds, which he diverted to Constantin Resource, DAC, and Windham; Solomon's and Constantin's efforts to mislead clients about their actual account holdings with, among other things, phony account statements; and their distribution of Leeward Group Holdings stock to clients in random amounts not proportionate with clients' respective investments in Leeward, in an apparent effort to cover up defendants' misconduct, all suggest the existence of a wide-sweeping fraudulent investment scheme." *Id.* at 308.

- "It is apparent from the record that Constantin and Solomon each acted knowingly and intentionally to mislead and defraud their clients." *Id.* at 308.

- "As to Constantin's state of mind, we find that the circumstantial evidence strongly suggests that he acted intentionally to defraud Windham's clients. In particular, we note that he directed Solomon to send clients account statements that he knew did not reflect clients' true investment holdings, that he manufactured a fake promissory note to send to Mier, that he told Mier that Leeward's book value was more than seven times the value that he knew it to be, and that he diverted client funds to his own use; all of this lends support to the conclusion that Constantin acted knowingly." *Id.* at 309.

- "[I]t is beyond dispute that [Constantin is] primarily liable for securities fraud under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b–5." *Id.* at 310.

- "As of the date of his deposition on April 20, 2012, Constantin invoked his Fifth Amendment privilege against self-incrimination." *Id.* at 301. Notwithstanding Constantin's invocation of his Fifth Amendment rights, the Court did not rely upon an adverse inference because "the record in this case provides ample circumstantial evidence from which to infer Constantin's state of mind without the need to adopt an adverse inference against him." *Id.* at 309, n. 14.

10

43.     On April 25, 2013, the same federal court in New York entered judgment against Constantin in the amount of $2,492,867.85 relating to the same claims. *S.E.C. v. Constantin*, 2013 WL 1828815, at *4 (S.D.N.Y. Apr. 25, 2013).

44.     November 27, 2013, Constantin was indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment adviser, or from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor or transfer agent. *See* https://www.sec.gov/alj/aljdec/2013/34-70960.pdf.

45.     According to news reports from December 2022 and January 2023, employees of Advance Care Medical (HSMG's brand) in Clarksville, TN and Chattanooga, TN have reported that Advance Care Medical failed to pay them for a period of months. *See* https://www.wsmv.com/video/2022/12/17/advance-care-medical-workers-still-awaiting-pay/; https://www.wsmv.com/2023/01/17/tn-urgent-care-missing-4-months-pay-checks/.

## ARGUMENT

### I.     A Temporary Restraining Order Should Be Entered

District courts possess "equitable discretion" in deciding "whether to grant or deny injunctive relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394, 126 S. Ct. 1837, 1841, 164 L. Ed. 2d 641 (2006). "[S]uch discretion must be exercised consistent with traditional principles of equity." *Id.* A temporary restraining order should issue where a plaintiff demonstrates (1) he has a substantial likelihood of prevailing on the merits; (2) he will suffer irreparable injury if he is denied the injunction; (3) his threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) an injunction would not be adverse to the public interest. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

4877-0693-1541

### A.    Plaintiff Has a Substantial Likelihood of Prevailing on the Merits

To establish a likelihood of success on the merits, Plaintiff need only present a "prima facie case showing a reasonable probability that it will ultimately be entitled to the relief sought." *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003) (brackets omitted). As discussed below, Plaintiff meets this burden.

### 1.    Conversion

Under Utah law, "conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Steinberg v. Cmty. Hous. Servs.-Capitol Villa, Ltd.*, 2014 UT App 102, ¶ 11, 326 P.3d 673 (citation omitted). "Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the goods inconsistent with the owner's right." *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958). "Money may be the subject of conversion when the party charged wrongfully received it." *State v. Twitchell*, 832 P.2d 866, 870 (Utah Ct. App. 1992).

Here, Millrock contracted with ADP for the construction of the Surgical Centers. Fact 9. The contract included $2.55 million for each center's furniture, fixtures, and equipment. Fact 10. These equipment funds were to buy fixtures and equipment necessary to allow the Surgical Centers to operate as such. Fact 11. Millrock paid $4,642,000 in draws specifically for this equipment. Facts 12 and 13. The required equipment was not installed. Fact 25. HSMG has acknowledged receiving the funds but stated that it was income for HSMG and that any equipment purchased with the Equipment Funds belongs to HSMG. Facts 34 and 35. HSMG has falsely claimed that its contract with ADP allowed HSMG to treat the Equipment Money as income. Fact 36.

Millrock contracted and paid for ambulatory surgical equipment and fixtures. HSMG has admitted to receiving this money but has not delivered the underlying equipment, returned the funds, or otherwise sequestered the funds. HSMG is therefore holding money that belongs to Millrock with no lawful justification. Plaintiff is substantially likely to prevail on this claim.

### 2.    Unjust Enrichment

"In order to prevail on a claim for unjust enrichment, three elements must be met. First, there must be a benefit conferred on one person by another. Second, the conferee must appreciate or have knowledge of the benefit. Finally, there must be the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580, 582, *holding modified on other grounds by State v. Levin*, 2006 UT 50, ¶ 13, 144 P.3d 1096.

These elements are met here. Millrock paid $4,642,000 specifically identified as funds for furniture, fixtures, and equipment to operate an ambulatory surgery center. Facts 12 and 13. HSMG admits that it received the funds, and believes the funds are "income" to it. Facts 34 and 35. It would be inequitable to permit HSMG to hold funds in which has no interest and with which it did not purchase the required equipment. Plaintiff is thus substantially likely to prevail on this claim.

### 3.    Breach of Contract

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224, 230–31.

HSMG and Millrock entered into the Millrock/HSMG Agreement on August 5, 2022. Fact

28. Under the terms of the Millrock/HSMG Agreement, Millrock loaned HSMG $350,000. Fact 29. The Millrock/HSMG Agreement required HSMG to repay the loan starting November 1, 2022. *Id.* According to the terms of the Millrock/HSMG Agreement, if HSMG defaulted on any obligation under the agreement, the principal and interest would become due immediately. *Id.* The Millrock/HSMG Agreement specifically identified HSMG's failure to make any payment due under the agreement as an event of default causing HSMG's obligations to become due immediately. *Id.* HSMG's obligations are due, but it has not paid the amounts due and owing.

### 4.    Implied Covenant of Good Faith and Fair Dealing

"As a general rule, every contract is subject to an implied covenant of good faith. Under the covenant, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Snow v. Chartway Fed. Credit Union,* 2013 UT App 175, ¶ 7, 306 P.3d 868, 871 (cleaned up).

As set forth in the facts, HSMG has repeatedly taken actions to prevent Plaintiff from realizing its expected benefits from the Millrock/HSMG contract. HSMG has threatened to empty the corporate shell; has threatened to make the funds unrecoverable through single purpose subsidiary entities; and has apparently transferred all of its assets and none of its liabilities (to entities owned or controlled by insider Smith) in exchange for around 1% of its outstanding shares.

### 5.    Fraudulent Transfer

"To establish a fraudulent conveyance under these sections, a plaintiff must show (1) that the transferor did not receive reasonably equivalent value and (2) that the transferor fit one of several defined financially troubled states (each of which the Court will articulate and discuss more below)." *In re Tri-Valley Distrib., Inc.*, 452 B.R. 837, 845 (Bankr. D. Utah 2011).

14

"Reasonably equivalent value under the Utah statute has been described as a price that a capable and diligent businessman could presently obtain for the property after conferring with those accustomed to buy such property." *Id.* (cleaned up).

There was no reasonably equivalent value for the transfer of over $93 million to Landes Capital and Compagnie in exchange for 1 million shares. Fact 38. According to the most recent public reporting from HSMG, its total assets are approximately $93 million. Fact 39. Thus, this transfer purports to be for all of HSMG's assets in exchange for the return of around 1% of its outstanding shares. Further, the transfer does not account for HSMG's approximately $14 million in liabilities. *Id.* A transfer of all of a company's assets and none of its liabilities in exchange for around 1% of outstanding shares is not reasonably equivalent value.

Defendants also meet the required states of financial trouble. HSMG and its affiliates are liable on both the Draper Lease and Keller Lease. Facts 15 and 20. HSMG was obligated to provide approximate $5 million in fixtures and equipment for the surgical centers and, despite receiving these approximate $4.6 million of these funds, never did so. Facts 11-13, and 25. HSMG or its affiliates failed to pay its/their rent obligations under the Draper Lease or Keller Lease. Fact 26. HSMG represented that its failure to do so was the result of cash flow issues. Fact 27. Millrock entered into the Millrock/HSMG agreement to assist HSMG with its cash flow issues, but even then HSMG defaulted on that agreement. Facts 28-30. HSMG and its affiliates have threatened to empty the corporate shell. Fact 31. HSMG and its affiliates threatened to make HSMG's assets impossible to reach if Millrock filed a UCC statement on the equipment. Fact 32. HSMG and its affiliates represented on a phone call with the TIC owners that they could not afford to pay the rent and that doing so would bankrupt the company. Facts 34-35. The transfer of more than $93 million

– during a state of financial trouble – to Landes Capital and Compagnie appears to have been for all of HSMG's assets, none of its liabilities, and in exchange for around 1% of its shares.

### 6.    Alter Ego

Under Utah law, the court may disregard the corporate entity: (1) where there is "such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals"; and (2) "if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity." *Envirotech Corp. v. Callahan*, 872 P.2d 487, 499 (Utah Ct.App.1994).

Here, there is inseparable overlap between Smith, and Landes Capital and Compagnie. Smith appears to be the sole member of Landes Capital. Smith is listed as a beneficial owner of shares that appear to be legally owned by Landes Capital and Compagnie. Fact 40. HSMG's SEC reporting indicates that Smith had "voting and dispositive control" of the shares apparently held by Landes Capital and Compagnie. *Id.* As part of Smith's separation from HSMG, Smith and HSH entered into a separation agreement wherein $93,933,345.48 was transferred to Landes Capital and Compagnie. *Id.*

### B.    Plaintiff Will Suffer Irreparable Injury if an Injunction Is Not Issued

Plaintiff will suffer irreparable injury if the Court does not issue a temporary restraining order requiring deposit of the Equipment Funds into the Court, because Plaintiff will likely be unable to recover at all, even if it ultimately prevails on its legal claims.

Where there is evidence that a party may dissipate assets in advance of a trial on the merits, courts routinely find that this threat constitutes irreparable harm for purposes of issuing a temporary restraining order. *See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone*

16

*River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury."); *Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195, 1200 (10th Cir. 1992) (showing that party did not possess sufficient assets and suggestions in record of fraudulent conveyance supporting injury necessary to freeze assets in preliminary injunction); *AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1281 (D. Utah 2020) (granting TRO where it appeared likely that disputed funds would rapidly dissipate absent preliminary relief); *United States v. RaPower-3, LLC*, 325 F. Supp. 3d 1237, 1248 (D. Utah 2018) (finding irreparable harm where defendant continued to have unfettered access to improperly obtained funds). During the November 30, 2022 call, HSMG threatened: "You need to tell the owners they need to work with me or I will empty the corporate shell and they will have nothing to come after. This is what I do, I am very good at it." Fact 31. During the same call, when presented with the idea of making UCC filings for the Equipment, HSMG and Constantin threatened to do whatever it took to make sure that HSMG's assets, including the Equipment Funds, were impossible to reach and stated that HSMG's single purpose entities were set up to make it difficult to recover assets. Fact 32.

HSMG's threats (as communicated through Constantin) should not be taken lightly. A New York Federal District Court Judge has previously found that Constantin diverted $643,000 of client funds to pay his personal and business expenses. Fact 42. Landes Capital has similarly had funds disgorged by a federal court for receiving funds from parties found liable of commodity option and forex fraud. Fact 41. Most critically, Defendants have already begun making good on their threats to empty the corporate shell by transferring all of HSMG's assets, and none of its liabilities, to Smith or his entities in exchange for less than 1% of outstanding shares. Facts 38-39.

In addition to concerns about dissipation of assets and collectability, Millrock will also

suffer irreparable harm because failing to freeze the Equipment Funds may jeopardize its constructive trust of the Equipment Funds. To obtain a constructive trust of property under Utah law, a party must show: (1) a wrongful act; (2) unjust enrichment; and (3) specific property that can be traced to the wrongful behavior. *Wilcox v. Anchor Wate, Co.*, 164 P.3d 353, 362 (Utah 2007). It is likely that Millrock will presently be able to meet these requirements, and specifically the third requirement – the ability to trace the Equipment Funds to HSMG's wrongful conduct. If the funds are not frozen or segregated, however, it may become difficult or impossible for Millrock to trace the Equipment Funds to HSMG's wrongful behavior as HSMG continues to transfer, commingle, and otherwise dissipate the Equipment Funds. *See Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1256–57 (D. Utah 2009) (finding irreparable harm and imposing TRO where, even though amount of money damages could be calculated, a later judgment against party that has spent, transferred, and commingled disputed funds may prevent moving party from imposing constructive trust for failure to trace specific funds).

In addition to the facts showing a likelihood that HSMG will dissipate funds, it has also refused to put the Equipment Funds in trust and has stated that the Equipment Funds have been pooled with the funds from multiple other projects, and has now begun transferring the funds to third parties. Facts 34-35 and 38-39. If the Court does not grant a temporary restraining order, it is likely to deprive Millrock of its constructive trust remedy – even if Millrock prevails in the litigation. Thus, Millrock will suffer irreparable harm if a TRO is not put in place.

### C. Plaintiff's Threatened Injury Outweighs the Injury HSMG Will Suffer Under the Injunction

As an investment fund, Millrock's fundamental purpose is to facilitate the development and construction of commercial real estate for its clients, the TIC Owners. Consequently, while

18

any amounts recovered in this litigation will be legally recovered by Millrock, it is effectively acting on behalf of the TIC Owners by recovering their investment into the Surgical Centers. Upon recovery, Millrock intends to dispose of the Equipment Funds at the direction of the TIC Owners, whether finding another potential tenant with equipment needs, or returning the funds to the TIC Owners if replacement equipment expenditures are not required. The sooner Millrock is able to recover the funds, the sooner the TIC owners will be able to convert the Surgical Centers into productive properties providing income to them and services to the community. Many of the TIC Owners invested retirement savings into the Surgical Centers, and the potential loss of those savings has forced a change in living standards until income can be realized from the investment.

On the other hand, Defendants are unlikely to be affected by the TRO. As discussed above, HSMG has no legal right or title to the Equipment Funds. It cannot be harmed by freezing assets it does not own. Even if HSMG had a debatable claim to the Equipment Funds, it would still not be harmed by a TRO. HSMG indicated in its call with the Keller TIC Owners that it keeps the Equipment Funds in a general strategic reserve account containing over $80 million in cash or cash equivalents, and this account has apparently been transferred to Smith and his entities. Facts 35 and 38. HSMG will not be harmed by escrowing $4.6 million from over $80 million in funds. Plaintiff's injury from no TRO would far outweigh any injury to HSMG from granting it.

### D.  An Injunction Is in the Public Interest

Similarly, granting a TRO under these circumstances would be beneficial to the public. Millrock and the TIC Owners developed the Draper and Keller locations to operate as ambulatory surgical centers. The loss of the Equipment Funds will delay, if not prevent, that realization. The public interest is not served by undermining the development of surgical centers. Additionally, the

4877-0693-1541

theft of retirees' savings with no legal justification is not beneficial to the public interest.

### E.    No Bond Should Be Required

Federal Rules of Civil Procedure Rule 65 provides that a court may issue a preliminary injunction or a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In this instance, no security, or a security of $0, is proper. Plaintiff is not requesting that this Court enjoin Defendants from conducting their business as usual, or that this Court force Defendants to disgorge any monies which do not rightfully belong to Plaintiff. Plaintiff seeks an order compelling the Defendants to pay into the Court the Equipment Funds such that Plaintiff's right to impose a constructive trust over the Equipment Funds will be protected pending a final adjudication in this matter. The motion for an injunction seeks to maintain the status quo pending a final resolution. *See Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010) (injunction maintaining status quo does not require bond). There is no risk of harm, and Plaintiff should not be required to post security.

### II.    In the Alternative, a Pre-Judgment Writ of Attachment Should Be Issued

In the event that Defendants fail to pay the Equipment Funds into the Court, Plaintiff seeks a pre-judgment writ of attachment permitting Plaintiff to seize money in the amount of the Equipment Funds in Defendants' possession.

Fed. R. Civ. P. 64 permits the Court to apply Utah law regarding writs of attachment. The court therefore looks to Rules 64A and 64C of the Utah Rules of Civil Procedure for the standard for entering such a writ. The combined requirements of these two rules include: (1) that the property [to be attached] is not earnings and not exempt from execution; (2) that the writ is not

sought to hinder, delay or defraud a creditor of the defendant; (3) a substantial likelihood that the plaintiff will prevail on the merits of the underlying claim; (4) that the defendant is indebted to the plaintiff; (5) that the action is upon a contract or is against a defendant who is not a resident of this state or is against a foreign corporation not qualified to do business in this state or the writ is authorized by statute; and (6) one of the following: (a) that the defendant has assigned, disposed of or concealed, or is about to assign, dispose of or conceal, the property with intent to defraud creditors; (b) that the defendant has fraudulently incurred the obligation that is the subject of the action; (c) that the property will materially decline in value; (d) that the plaintiff has an ownership or special interest in the property; and (e) probable cause of losing the remedy unless the court issues the writ.

Those elements are each satisfied. First, the Equipment Funds do not constitute earnings and are not exempt from execution. Second, Plaintiff is seeking the writ to ensure the recoverability of the Equipment Funds, not to hinder, delay or defraud a creditor of the defendant. Third, as discussed in section I(A) above, Plaintiff is substantially likely to prevail on the merits of the underlying claims. Fourth, as discussed in section I(A) above, Defendants are indebted to Plaintiffs for the Equipment Funds. Fifth, this action is against defendants who are not residents of this state or qualified to do business here. Sixth, Defendants have both threatened and actually disposed of assets with the intent to defraud Plaintiff; Plaintiff has an ownership interest in the Equipment Funds; and Plaintiff may lose its ability to impose a constructive trust if a writ is not issued.

Plaintiffs are therefore entitled to a pre-judgment writ permitting it to seize money in the amount of the Equipment Funds.

### III.     In the Second Alternative, a Receiver Should Be Appointed

In the event that Plaintiffs do not deposit the Equipment Funds and Plaintiff is unable to recover them with a pre-judgment writ, Plaintiff requests that the Court appoint a receiver to take possession of the accounts of HSMG, HSH, Constantin and Smith (or any other person or entity to whom the Equipment Funds were transferred), and accounting for, managing, and protecting all of Plaintiff's assets that have been wrongfully retained by Defendants.

### A.     Plaintiff is Entitled to Appointment of a Receiver Under Rule 66 and Utah Code Ann. § 25-6-303(1)(c)(ii)

Plaintiff requests appointment of a receiver. "The appointment of a receiver by a federal court may be sought by any person or class having an interest in property that a statute or one of the general principles of equity authorizes the court to protect by this remedy." Wright & Miller, Federal Practice and Procedure § 2983.

Federal Rule of Civil Procedure 66 recognizes and governs an action in which a receiver is appointed. Federal law and equitable principles govern the appointment of a receiver. *See EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, 2018 WL 5776545 (D. Utah) (citing Fed. R. Civ. P. 66). The receivership should "accord with the historical practice in federal courts or with a local rule." *Id.* at *5.

"The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Id.* (internal quotations omitted). The factors for considering the appointment of a receiver under Fed R. Civ. P. 66 include: "(1) the validity of the claim of the party seeking a receiver; (2) the probability that fraudulent conduct has occurred or will occur to frustrate that claim; (3) imminent danger that property will be concealed, lost, or diminished in value; (4) inadequacy of legal remedies; (5) lack of less drastic remedy; and (6) the

likelihood that appointing a receiver will do more harm than good." *Id.* While all the factors do not need to be present, the Court has broad discretion to consider factors when deciding whether to appoint a receiver. *See e.g., New York Life Ins. Co., 755 F. Supp. 287, 292 (E.D. Cali. 1991); Fleet Bus. Credit, L.L.C. v. Wings Restaurants, Inc., 291 B.R. 550, 556 (N.D. Okla. 2003).*[3]

Here, the relevant factors favor appointing a receiver. First, as discussed above, Plaintiff's claims against Defendants are valid and likely to be determined in Plaintiff's favor. Second, fraudulent conduct has already occurred. Third, Defendants have both threatened to and actually moved the Equipment Money with the intent of making it more difficult to track and/or recover the funds. Constantin has previously been found to have misappropriated client funds by another Federal court. Landes Capital has been found liable of disgorgement for receiving funds from an entity liable for options and forex fraud. Fourth, Plaintiff will suffer irreparable harm if the Equipment Funds are not paid into the Court or separately escrowed, which is unlikely to occur without the appointment of a receiver. Fifth, it will become much more difficult, if not impossible, for Plaintiff to recover the specific Equipment Funds under a constructive trust theory if Defendants are allowed to remain in possession of the Equipment Funds and are free to commingle and dissipate those funds. Sixth, Plaintiff seeks the appointment of a receiver to protect its legal claim to the Equipment Funds. Defendants have no right or title to the funds and therefore, will suffer no harm from having these funds paid into the Court or otherwise escrowed pending further order of the Court. Under these conditions, appointment of a receiver will result only in "good" and there will be no "harm." Thus, a receiver should be appointed.

---

[3] In addition to Rule 66, Utah Code Ann. § 25-6-303(1)(c)(ii) provides that in an action for relief against a fraudulent transfer, a receiver may be appointed "subject to principles of equity and in accordance with applicable rules of civil procedure…." This analysis is therefore the same as under Rule 66.

### B.     Plaintiff is Entitled to Appointment of a Receiver Under the Utah Uniform Commercial Real Estate Receivership Act

In addition to Rule 66, Utah Code Ann. § 78B-21-101 et seq. provides an alternate and independent basis to appoint a receiver. Under that statute, the Court may appoint a receiver "before judgment, to protect a party that demonstrates an apparent right, title, or interest in real property that is the subject of the action, if the property or the property's revenue-producing potential:… is being subjected to or is in danger of waste, loss, dissipation, or impairment." *Id.* at § 106. The statute applies "to a receivership for an interest in real property and any personal property related to or used in operating the real property." *Id.* at § 104.

The equipment here qualifies as real or personal property related to or to be used in operating the Surgical Centers. The Equipment Funds are also subjected to danger of dissipation or impairment because Defendants have both threatened to and actually dissipated the funds and have previously been found to have misappropriated client funds. Facts 31-32, 38-42. Consequently, a receiver should also be ordered under the Utah Uniform Commercial Real Estate Receivership Act with all the powers provided by that statute.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a temporary restraining order and preliminary injunction requiring deposit of the Equipment Funds. In the alternative, Plaintiff requests that the Court issue a pre-judgment writ of attachment for the Equipment Funds, or that the Court appoint a receiver. A proposed order is submitted herewith.

### REQUEST FOR ORAL ARGUMENT

Pursuant to DUCivR 7-1(g), Plaintiff respectfully requests oral argument on this Motion. Good cause exists for oral argument because Plaintiff is seeking injunctive relief, or a writ of pre-

4877-0693-1541

judgment execution, or the appointment of a receiver.

**CERTIFICATION OF COUNSEL**

Plaintiff's undersigned counsel of record represents that Plaintiff has used the following addresses/email addresses when communicating with Defendants prior to the filing of this lawsuit: Healthcare Solutions Management Group, Inc.: (1) 26 Reynolds St., Springhill, LA 71075; (2) 100 Crescent Ct., Dallas, TX 75201; and (3) 3 School St., Ste. 303, Glen Cove, NY 11542; Josh Constantin: (1) 26 Reynolds St., Springhill, LA 71075, (2) 238 Solomon Dr., Slidell, LA 70458; and (3) Josh@hshmedical.com, j@smsgroup.nyc; and Justin Smith: (1) 3 School Street, Suite 303, Glen Cove, NY 11542; and (2) jsmith@hshmedical.com. Although Plaintiff did not communicate with HSH, Landes Capital or Compagnie prior to the filing of this lawsuit, Plaintiff will use the following addresses of the registered agents and/or publicly available contact information: HSH – Healthcare Solutions Holdings, Inc., c/o Harvard Business Services, Inc.: (1) 16192 Coastal Hwy, Lewes, DE 19958; (2) 26 Reynolds St. Springhill, LA 71075; (3) 100 Crescent Ct, Dallas, TX 75201; and (4) jon@hshmedical.com; Landes Capital - Landes Capital Management LLC, c/o Registered Agents Inc.: (1) 30 N Gould St Ste R, Sheridan, WY 82801; and (2) justin.landes@gmail.com; and Compagnie- Landes And Compagnie Trst Prive KB, c/o Registered Agents Inc.: (1) 30 N Gould St Ste R, Sheridan, WY 82801; and (2) landestrust@gmail.com. Immediately after the filing of this motion, the undersigned's assistant will email (if an email address is available) and mail the complaint, motion and supporting documents to each of the addresses/email addresses listed above. Due to the numerous exhibits to the motion, the undersigned's assistant will email (if an email address is available) and mail a copy of the pleadings/filings with a cover letter providing a link to the exhibits.

Dated this day 7th of March, 2023.

PARR BROWN GEE & LOVELESS

By: /s/ Bentley J. Tolk
        Terry E. Welch
        Bentley J. Tolk
        Michael S. Wilde

Attorneys for Plaintiff

26