# EXHIBIT 1



**American Development Partners Development Contract**

This agreement is made on the date written above our signatures between

**DEVELOPER Name:** JAMESON LLC DBA American Development Partners (DEVELOPER) and

**OWNER Name:** MILLROCK INVESTMENT FUND 1 LLC

**DEVELOPER**

**Address:** 8618 Shortleaf Court, College Grove TN 37046

**Work Phone Number:** (615) 818-6982

**Email Address:** manny@americandevelopmentpartners.com

**DEVELOPER Name:** American Development Partners will be referred to as DEVELOPER throughout this agreement.

**CONTRACTOR INFORMATION:**

**Address: Phone Number:** (615) 330-0629

**Email Address:** llynp@built-more.com

**License Number:** 00057609

**CONTRACTOR Name:** Built-more LLC will be referred to as CONTRACTOR throughout this agreement.

**OWNER**

**OWNER Name:** MILLROCK INVESTMENT FUND 1 LLC

**Address: MILLROCL INVESTMENT FUND 1 LLC** 2100 PLEASANT GROVE BLVD, STE 200

ATT: Kevin Long

**OWNER Name:** MILLROCK INVESTMENT FUND 1 LLC will be referred to as OWNER throughout this agreement:

## 1    Project Description

A.        For a price identified below, DEVELOPER agrees to complete a new commercial building (identified as the Project in this agreement) for OWNER.

B.        For the Contract Price identified below, DEVELOPER agrees to complete a new commercial building consisting of approximately 22468 square feet +/- of air-conditioned space. Draper UT, Ambulatory Surgery Center (identified as the "Project" in this Agreement), for TENANT's use and OWNERS ownership on the Land in accordance with the plans

C.        The term "Total Build Cost" shall mean the aggregate of (1) the Total Project Cost, (2) the Contract Price, (3) the Contingencies of the Project, (4) the cost of the Work and the Extra Work, (5) other costs, charges and fees under this Agreement (collectively, the "Other Agreements") (the Other Agreements shall include but not be limited to any contractor or subcontractor agreements and the cost of all materials and labor).

D.        The term "Budget" shall mean the Total Build Cost less the cost to acquire the Land.

E.        The term "Property" shall mean the Land and all improvements thereon including but not limited to the Project.

F.        Contract Price / OWNERS Cost Cap / Developer

G.        DEVELOPER shall earn in addition to any other charges specified in this agreement, OWNER agrees to pay a 10% development fee for completing the Work described as the Project. DEVELOPER fee is paid off total project cost that includes land / building, construction and all numbers that are used to factor total project cost. The Development Fee shall be included in "Total Build Cost". In addition, Developer will be paid three hundred and fifty thousand ( $350,000.00) within five ( 5) business days of the certificate of occupancy being delivered to seller. The amounts will be split and paid as follows. $100,000.00 paid by MILLROCK INVESTMENT FUND 1 LLC and $250,000.00 paid by SARC DRAPER LLC

H.        Notwithstanding any contrary provision in this Agreement or otherwise, OWNERS maximum monetary liability under this Agreement and for the Project towards all amounts, including but not limited to the Total Build Cost, shall not exceed, and shall be capped at, the sum of: $14,484,690.00. It is understood this number is subject to change once the project is fully bought out and all parties agree to the final project numbers. At that time the final number will be deemed the amount referred to as the OWNERS GROSS MAX). Notwithstanding any contrary provision in this Agreement or otherwise, DEVELOPER shall be solely responsible under this Agreement and to OWNER, for any projects overruns that are above the gross max number provided to OWNER.

## 2    Contract Price

I.        DEVELOPER shall earn, and OWNER agrees to pay a development fee of 10% of total project cost in addition to any other charges specified in this agreement. In addition to any other charges specified in this agreement, OWNER agrees to pay DEVELOPER $1,316,790.00 development fee for completing the Work described as the Project bringing the "Total Build Costs" to $14,484,690.00. It is understood this

number is subject to change once the project is fully bought out and all parties agree to the final project numbers.

## 3 Contingency Budget

II.          It is identified and agreed to by OWNER that DEVELOPER has an estimated budget of 5 % of project cost for "contingencies". CONTRACTOR will submit to DEVELOPER a "change order" for approval by DEVELOPER and OWNER any proposed change order. Contingencies are limited to change orders due to error or omission by a licensed architect after plans were received and reviewed by contractor, all state or federal codes changes that were mandated after contractor received stamped plans and or building permit.

## 4 Scheduled Start of Construction

A.     Work under this agreement will begin within 5 Calendar Days after the following contingencies have been met.

1.     Complete Plans and Specifications have been approved and initialed by both OWNER, DEVELOPER and CONTRACTOR.

2.     OWNER has shown proof of funds or other financing acceptable to DEVELOPER.

3.     DEVELOPER has obtained all architectural approvals from any franchise and or corporate authorities.

4.     OWNER has furnished DEVELOPER with evidence of Ownership of the property satisfactory to DEVELOPER.

        5.     All appropriate building permits have been issued.

6.     DEVELOPER has received written notice from the lien holder or the title company ensuring lien holder's security interest in the property that all documents required to be recorded prior to the commencement of construction have been properly recorded.

7.     The contract has been signed by OWNER, DEVELOPER and CONTRACTOR.

## 5 Scheduled Completion of Construction

A.     Work under this agreement will be Substantially Completed within 180 Calendar Days after the date construction begins however it is understood and will go without penalty for acts that our outside of the control ( force majeure) of the DEVELOPER and CONTRACTOR.

## 6 Documents Incorporated

A.     The Glossary of Terms which follows our signatures is incorporated into this contract as though included in full as part of this agreement.

B.     This agreement incorporates by reference certain documents which define and describe the Work to be done. The following documents are incorporated as though included in full as part of this agreement.

## 7 Ownership of Plans

A.      All Plans, Drawings, Specifications and other documents prepared by or for OWNER for use under this agreement will be paid for and are the property of DEVELOPER and remain the property of DEVELOPER. Plans, Drawings and Specifications, whether in paper or electronic form, prepared for use in construction under this agreement shall not be modified or used on any other project without written consent of DEVELOPER. DEVELOPER shall hold harmless and Indemnify OWNER from and against all Claims, actions, suits, costs, damages, losses, expenses and attorney's fees arising out of use of the Project Plans, Drawings, or Specifications for any purpose other than construction to be completed under this agreement. DEVELOPER, CONTRACTOR and Subcontractors are granted a limited license to use and reproduce applicable portions of the Plans, Specifications and Drawings as required for construction under this agreement. All copies made under this license shall bear a notice showing OWNER as copyright holder. DEVELOPER may retain one record set of the Plans, Drawings and Specifications. All other sets shall be accounted for by DEVELOPER and CONTRACTOR and returned to OWNER. Submittal or distribution of Project Plans, Drawings or Specifications to meet Official Regulatory Requirements is not to be construed as publication in derogation of the rights of OWNER.

## 8 Plans on Site

A.      DEVELOPER and CONTRACTOR will keep a full set of Project Plans available on-site to authorized personnel during the period of construction.

## 9 Documents Supplied to CONTRACTOR

A.      OWNER will furnish to DEVELOPER and CONTRACTOR at no cost (this is part of total project cost)

1.      A full set of Plans and Specifications for all trades in electronic format.

2.      DEVELOPER and CONTRACTOR will distribute Contract Documents as required by Subcontractors.

## 10 Scope of Work

A.      DEVELOPER and CONTRACTOR shall supervise and direct the Work and accepts responsibility for construction means, methods, techniques, sequences and procedures required to complete the Project in compliance with the Contract Documents.

B.      Develop and CONTRACTOR are responsible for coordination of the various trades and deliveries of equipment, materials and supplies to minimize interference which could delay the Work or pose a hazard to life or property. DEVELOPER shall be responsible for allocation of tasks between trades and will be the final authority on location and routing of equipment and storage of materials on the Job Site.

C.      DEVELOPER will ensure that Subcontractors, their agents, and employees adhere to these Contract Documents. DEVELOPER and CONTRACTOR accepts responsibility for all Work performed under this contract, including Work performed by employees of Subcontractors.

D.      CONTRACTOR shall provide on the Job Site during the period of construction a temporary chemical toilet or water closet which shall be serviced no less than weekly. Upon completion of the Project, CONTRACTOR will remove temporary toilet facilities from the site.

E.    DEVELOPER and CONTRACTOR shall provide temporary elevators and lifts as may be required by construction personnel, including Subcontractors, Material Suppliers, Inspectors, and Representatives of OWNER. Elevators and lifts will comply with all federal, state and local Laws and ordinances in effect at the Job Site. Upon completion of the Project, DEVELOPER and CONTRACTOR will dismantle and remove temporary elevators and lifts.

F.    DEVELOPER and CONTRACTOR shall develop and present to OWNER for approval (which shall not be withheld unreasonably), a site logistics plan drawn to scale, showing proposed secure and fenced areas, locations and types of temporary barricades, material storage and staging areas, property entrances used for material deliveries, and special material or equipment storage Requirements. This plan will include a description and proposed location for any temporary office, storage trailer, sanitary facilities, and parking for construction personnel.

## 11 Submittals

A.    Architectural Drawings will indicate in detail all parts of the building components, Installation details, and coordination with Work of other trades or other CONTRACTORS. Architectural Drawings for structural steel, timbers and pre-cast concrete will include engineering calculations, fabrication details and erection Drawings that show physical characteristics, dimensions, shapes, inserts, attaching points and methods, and other information required for manufacture, assembly and erection, in compliance with the Contract Documents.

B.    Approval by OWNER'S Representative does not relieve DEVELOPER and CONTRACTOR of responsibility for compliance with the Contract Documents except as follows: If a Submittal does not comply with Contract Documents, DEVELOPER and CONTRACTOR will attach to the Submittal, prior to approval, a written request for variation showing the change in Contract Price and Contract Time, if any, that will result from the variation. If OWNER'S Representative approves a Submittal which includes a written request for a variation and which requires a change in the Contract Price or Contract Time, OWNER'S Representative will issue a contract Modification confirming the change. If OWNER'S Representative approves a Submittal with a written request for a minor variation which does not require a change in the Contract Price or Contract Time, no contract Modification is needed. A minor variation is anything which does not materially alter the quality or performance of the Work. Approved variations are subject to all terms of this agreement and without prejudice to any rights granted to OWNER'S Representative under a Surety Bond.

C.    DEVELOPER and CONTRACTOR is entitled to expect that corrections to Submittals by OWNER'S Representative be clearly noted and easily understood so that prompt resubmission is possible without further instructions from OWNER'S Representative.

D.    OWNER'S Representative will review Submittals and notify DEVELOPER and CONTRACTOR of approval or rejection within 2 Calendar Days of receipt.

E.    OWNER'S Representative will review Submittals of DEVELOPER and CONTRACTOR for conformance with Requirements of the Contract Documents and will approve or take other appropriate action upon those Submittals. OWNER'S Representative will advise DEVELOPER and CONTRACTOR of any errors or omissions which OWNER'S Representative may detect during this review. Submittals

approved by OWNER'S Representative become additions to the Contract Documents and can be relied on by DEVELOPER and CONTRACTOR in completing the Work. Nothing in any approved Submittal shall be interpreted to limit DEVELOPER and CONTRACTOR in selection of the means, method, technique, sequence or procedure of construction.

## 12 Record Documents

A.    DEVELOPER and CONTRACTOR will note on a record set of Project Drawings any Work done that is not shown on the original Plans and not described in other Contract Documents. The record set of Project documents will be delivered to OWNER at the same time as final payment is requested.

## 13 Job Site Safety

A.    DEVELOPER and CONTRACTOR will always take all reasonable precautions for the safety of employees and the public at the Job Site and will comply with all applicable safety Laws and regulations of federal, state, and local authorities (including building codes) and safety Requirements of OWNER.

## 14    Hazardous Materials Used in Construction

A.    Except as provided elsewhere in the Contract Documents, CONTRACTOR is responsible for all Hazardous Materials brought to the Job Site by CONTRACTOR or Subcontractors.

## 15    Hazardous Materials Discovered on Site

A.    Except as provided elsewhere in the Contract Documents, OWNER is responsible for all Hazardous Materials discovered on the Job Site so long as those materials were not brought on the Job Site by CONTRACTOR, Subcontractors, or anyone directly or indirectly employed by them. Nothing in this paragraph shall relieve DEVELOPER and CONTRACTOR from liability for negligence in handling or removing hazardous materials as required under the terms of this agreement.

B.    Except as provided in the Contract Documents or as agreed by mutual consent, DEVELOPER and CONTRACTOR shall not be required to perform Work relating to asbestos, polychlorinated biphenyl (PCB), radioactive material, toxic mold or any other Hazardous Material.

## 16    Compliance with Law

A.    CONTRACTOR and OWNER mutually commit to use reasonable care to meet the Requirements of state, federal and local Law when discharging their responsibilities under this agreement.

B.    If DEVELOPER and CONTRACTOR observe that Drawings, Specifications, or other Contract Documents do not comply with applicable Law, DEVELOPER and CONTRACTOR shall promptly notify OWNER or OWNER'S Representative of the variance. Any changes made to the Contract Documents because of this notice shall be handled in the form of a Change Order under this agreement.

C.    DEVELOPER and CONTRACTOR shall bear none of the cost of correcting Work completed per Contract Documents but not in compliance with Law if CONTRACTOR did not know that Contract Documents or instructions from OWNER or OWNER'S Representative did not comply with the Law.

D.    If Law enacted after the Contract Date changes the Scope of Work under this agreement, DEVELOPER and CONTRACTOR and OWNER will execute a Change Order adjusting the Contract Price and Contract Time to accommodate the change in the Scope of Work.

## 17    Layout

A.    DEVELOPER and CONTRACTOR shall be responsible for alignment and elevation of the Work and will set grade stakes, batter boards, and other working points, lines and elevations required to complete the Project as described in the Contract Documents.

## 18    Permits and Fees

A.    DEVELOPER and CONTRACTOR shall secure all permits, licenses and renewals required by government authority to complete construction of the Project. If permits are required for Subcontracted Work, Subcontractors will secure those permits. OWNER may request a copy of each permit, license and renewal issued by government authority for the Project. All permits and fees are considered a fee that is enclosed in the project plan.

B.    Project budget will include the building permit fee, Plan check fee, and charges levied by government for testing, Inspection and Re-Inspection of the Project. If a government authority issues or charges an unbudgeted permit or fee, then DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

C.    Except as provided elsewhere in this agreement, Project budget will include all fees and application charges imposed by government authority, including, but not limited to, grading permit fees, drainage permit fees, traffic control charges, thoroughfare charges, impact fees, special district fees, sewer fees, water fees, planning fees, school fees, elevator permit fees, charges for temporary access or use of the public right of way, and charges for document processing, hearings, and certifications. Project budget will also pay all fees and application charges imposed by any association of property OWNERs having authority over the Job Site. If a government authority issues or charges an unbudgeted permit or fee, then DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

D.    Except as provided elsewhere in this agreement, Project budget will include all application fees and connection charges imposed by utility companies or government agencies for bringing service to the Job Site, and for connecting gas, water, electricity, phone, cable, sewer, and drainage lines.

E.    Project that are required by government authority, including planning, easements, remediation, environmental, and zoning approvals.

## 19    Taxes

A.    If any federal, state or local tax rate increases or if any new federal, state or local tax is imposed, whether by Law, regulation, or interpretation, between the Contract Date and Substantial Completion, the Contract Price shall be increased by the additional tax levied on DEVELOPER and CONTRACTOR but only to the extent that the change in rate or new tax could not have been reasonably foreseen on the Contract Date. If a government authority issues or charges an unbudgeted permit or fee, then

DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

## 20    Temporary Utilities

A.    DEVELOPER and CONTRACTOR have budgeted for all costs associated with use of temporary utilities on the Job Site during construction, including application fees, permits, engineering, and metered service for water, electric power, heating and cooling. Temporary utility systems provided by DEVELOPER CONTRACTOR shall be designed and installed to protect the public and construction personnel and conform to applicable Laws and Regulations.

B.    Utility services shall be re-listed in the name of future building occupant on the Calendar Day following Substantial Completion.

## 21    Permanent Utilities

Project budget shall include Installation, connection, and modification of permanent electric, water, phone, cable, sewer and gas service as required for the completed Project. It will not include any deposits that will be paid by building occupant

## 22    Job Cleanup

A.    DEVELOPER and CONTRACTOR shall regularly remove from the Job Site and storage areas all surplus material, waste and debris resulting from the Work. Construction debris shall be removed to a legal refuse collection site with disposal or recycling fees included in Project budget. At completion of the Work, DEVELOPER and CONTRACTOR shall, in addition, remove from the Job Site all tools, equipment and scaffolding brought to the Job Site by DEVELOPER and CONTRACTOR or Subcontractors. At Substantial Completion, exposed finishes of windows, doors, floors, walls, ceilings, fixtures and trim shall be cleaned and free of grime, stains, over spray, dirt and dust.

B.    DEVELOPER and CONTRACTOR shall provide a trash disposal facility on the Job Site for use by construction personnel. The on-site trash facility provided by DEVELOPER and CONTRACTOR shall be of an appropriate size for the Project and placed in a location approved by OWNER. All construction debris shall either be placed in the trash facility provided by DEVELOPER and CONTRACTOR or hauled to a legal disposal site, at the discretion of DEVELOPER and CONTRACTOR. When any trash container provided by DEVELOPER and CONTRACTOR is full, contents shall be removed to a legal disposal facility at the expense of CONTRACTOR.

## 23    Project Sign

A.    DEVELOPER and CONTRACTOR shall have the right to fabricate and erect a Project sign bearing the name of the Project, Prime CONTRACTOR, principal Subcontractors, designers, consultants, lead lender, a short Project description, and expected Completion Date. CONTRACTOR may erect directional signs at the Job Site with approval of OWNER with respect to size, style and location. Directional signs may bear the name of CONTRACTOR and a directional symbol. No other signs will be permitted except by permission of OWNER.

## 24    Project Superintendent

A.    DEVELOPER and CONTRACTOR shall employ a competent Superintendent and any necessary assistants or alternates that will be at the job site from start to finish of project. The Superintendent shall not be changed unless the Superintendent is discharged by DEVELOPER and CONTRACTOR. The Superintendent shall have authority to represent DEVELOPER and CONTRACTOR in all matters relating to the Project. Communications with the Superintendent shall have the same force and effect as direct communication with DEVELOPER and CONTRACTOR.

## 25    OWNER'S Responsibilities

A.    OWNER affirms that OWNER has the right to enter this agreement and has the right to contract for construction of the Project on the Job Site. OWNER shall pay all taxes and assessments due on the Job Site during the period of construction and shall take all reasonable actions required to protect marketable title to the Job Site. OWNER is responsible for all standard responsibilities that a property OWNER / landlord would have.

B.    OWNER will ensure that OWNER'S Representative responds in writing and with reasonable promptness to written requests from DEVELOPER and CONTRACTOR for (1) interpretation of the Plans or Specifications, or (2) other information relevant to completion of the Work. DEVELOPER and CONTRACTOR are authorized to rely on written responses from OWNER'S Representative.

C.    OWNER shall have sole responsibility to secure financing for the Project and shall pay all fees, charges, or other costs of such financing, including Inspection fees charged by any lender. The nonperformance of any lender shall not affect the obligation of OWNER to DEVELOPER and CONTRACTOR. OWNER hereby authorizes and directs any lender on the Project to furnish DEVELOPER and CONTRACTOR with full information on undisbursed proceeds when requested by DEVELOPER and CONTRACTOR. Proof of funds must be made available to DEVELOPER prior to project starting.

D.    OWNER will not interfere with or permit others to interfere with, stop, hinder, or delay completion of the Work by DEVELOPER and CONTRACTOR or Subcontractors except as provided under this agreement.

E.    OWNER may assign their rights to the contract by notifying the co-owner and giving them 7 days' notice. Upon executing the assignment document, the rights would be fully conveyed. If an owner defaults on their responsibilities within this contract the rights will be transferred to the co-owner.

## 26    Construction by Others

A.    OWNER shall neither hire nor retain Separate DEVELOPER and CONTRACTOR, Subcontractors, employees or agents of OWNER to perform Work on the Job Site while Work is being done under this agreement by DEVELOPER and CONTRACTOR.

## 27    Authority of OWNER'S Representative

A.    OWNER'S Representative has authority to administer the contract, make construction decisions on behalf of OWNER, and is the primary authority on issues of compliance with the Drawings and

Specifications, quality of workmanship, materials used, manner of performance, and rate of progress on the Project.

B.    After the Contract Date, OWNER shall make no change in the responsibilities or authority of OWNER'S Representative without consent of DEVELOPER and CONTRACTOR.

C.    OWNER'S Representative shall have the right to visit the Project and view Work in progress at any time. Any Defective Work found or suspected, either as the result of a site visit or otherwise, shall be reported promptly to DEVELOPER and CONTRACTOR. No actions taken or statements made during site visits shall relieve DEVELOPER and CONTRACTOR of obligations described in the Contract Documents.

D.    Communication between DEVELOPER and CONTRACTOR and OWNER shall be initiated through OWNER'S Representative unless direct communication is required by Law or Contract Documents. Unless otherwise authorized by DEVELOPER and CONTRACTOR, communications between OWNER'S Representative and Subcontractors or Material Suppliers shall be through DEVELOPER and CONTRACTOR.

E.    OWNER'S Representative shall have the authority to reject and order removed any portion of the Work which does not conform to the Contract Documents.

F.    OWNER'S Representative shall have authority to conduct Inspections about Beneficial Occupancy and to determine the dates of Substantial Completion.

## 28    Representations by DEVELOPER and CONTRACTOR

A.    DEVELOPER and CONTRACTOR shall use skill and attention to complete the Work in a timely manner consistent with the Contract Documents.

B.    OWNER has reported to DEVELOPER and CONTRACTOR all conditions known to OWNER which may not be apparent to CONTRACTOR and which might significantly increase cost of the Work or delay completion. These concealed conditions include, but are not limited to, hazards on the Job Site, unsuitable soil conditions, prior Defective Work of others, latent Defects in the Plans or Specifications, earlier attempts to do Similar or related Work, and obligations imposed by government.

## 29    Disclaimer by OWNER, Reliance by CONTRACTOR

Intentionally Omitted

## 30    Discrepancy between Plans and Field Conditions

A.    CONTRACTOR is not a Design Professional and have no obligation to find discrepancies between Job Site conditions and representations or Requirements in the Contract Documents.

B.    CONTRACTOR shall not be liable for discrepancies between representations or Requirements in the Contract Documents and conditions at the Job Site unless CONTRACTOR knowingly fails to report a discrepancy, in which case CONTRACTOR shall be liable for additional costs incurred because of failure to give prompt notification.

C.    If any concealed structure, water, power, waste, drain or gas line is uncovered or revealed during construction which is not as indicated in the Contract Documents or is inconsistent with information

provided by OWNER, and DEVELOPER, and CONTRACTOR shall promptly, and before any such structure or line is disturbed or damaged (except in an Emergency), notify OWNER or OWNER'S Representative. and DEVELOPER, and CONTRACTOR shall submit a Claim for a Change Order which covers the additional cost incurred because of such structure, water, power, waste, drain, or gas line uncovered or revealed during construction.

### 31    Use of the Site

A.    OWNER has agreed to furnish all required rights to use the land upon which the Work is to be constructed. OWNER will identify any encumbrances or restrictions related to use of the land furnished and DEVELOPER and CONTRACTOR agrees to comply with those encumbrances or restrictions. If OWNER fails to furnish the land, rights of way, or easements when required, DEVELOPER and CONTRACTOR may make a Claim for extra compensation, additional time, or other relief.

B.    OWNER shall designate a construction entrance which DEVELOPER and CONTRACTOR shall use for all delivery of materials and equipment and which shall be used by all construction personnel.

### 32    Draw Schedule and Developer Compensation

OWNER will pay to DEVELOPER the Contract Price in installments consisting of progress payments and a final payment on completion of the Work. The payment plan on this project will consist of a development standard draw schedule of:

OWNER will pay to DEVELOPER the Contract Price in installments consisting of progress payments and a final payment on completion of the Work. The payment plan on this project will consist of a development standard draw schedule of:

Momentum draw - 10% of the Budget within three (3) Business Days following the closing on land, building or execution of this development contract. Momentum draw will include all developer's pursuit cost, project soft cost, developer fee and necessary local, state and or federal permitting fees to start the project.

Draw 1 - 30% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty (30) days following the commencement of the Work.

Draw 2 - 30% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty (30) days following draw number 1.

Draw 3 - 20% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty (30) days following draw number 2.

Final Draw – 10% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORD, where said request includes a copy of all executed lien releases and final payment affidavits (from CONTRACTOR, Subcontractors and others) being submitted to the clerk of court and recorded in the public records and a copy of the permanent Certificate of Occupancy issued for the Project.

DEVELOPER shall earn in addition to any other charges specified in this agreement, OWNER agrees to pay a 10% development fee for completing the Work described as the Project. DEVELOPER fee is paid off total project cost that includes land / building, construction and all numbers that are used to factor total project cost. The Development Fee shall be included in "Total Build Cost". In addition, Developer will be paid three hundred and fifty thousand ( $350,000.00) within five ( 5) business days of the certificate of occupancy being delivered to seller.

## 2   Contract Price

I.        DEVELOPER shall earn, and OWNER agrees to pay a development fee of 10% of total project cost in addition to any other charges specified in this agreement. In addition to any other charges specified in this agreement, OWNER agrees to pay DEVELOPER $1,316,790.00 development fee for completing the Work described as the Project bringing the "Total Build Costs" to $14,484,690.00. It is understood this number is subject to change once the project is fully bought out and all parties agree to the final project numbers.

DEVELOPER shall earn, and OWNER agrees to pay a development fee of 10% of total project cost in addition to any other charges specified in this agreement. In addition to any other charges specified in this agreement, OWNER agrees to pay DEVELOPER $1,316,790.00 development fee for completing the Work described as the Project bringing the "Total Build Costs" to $14,484,690.00. It is understood this number is subject to change once the project is fully bought out and all parties agree to the final project numbers.


It is agreed by OWNER and or FUNDING SOURCE that all payments will be made to DEVELOPER. DEVELOPER will disburse funds in a timely manner. The afore mentioned budget that is supported by the GMAX clause is considered total project budget and the DEVELOPER will disburse funds per DEVELOPERS discretion. No third-party title company will be granted permission to disburse funds to any company or individual on behalf of funding group. Each application for payment shall be submitted on AIA progression draw form. Developer will submit for payment a notarized AIA Pay application, lien waivers (conditional or full) and request for draw. This along with any other reporting required under this agreement will be considered the full information request approved by OWNER. The GMAX budget will act as the total invoice for the project. It is understood that the GMAX is the total project cost and it is not the total sum of the subcontractor's budgets.

**** Subject to receiving the final set of architectural plans

## 33                    Discharge of Liens and Payment of Subcontractors

1.      DEVELOPER and CONTRACTOR warrants that, upon payment, OWNER shall receive clear title to all Work identified in the application for payment, free and clear of all liens and Claims, including Claims of Subcontractors, employees or Material Suppliers. CONTRACTOR also agrees that this vesting of title in OWNER does not impose any obligation on OWNER or relieve CONTRACTOR from any obligation under this contract. CONTRACTOR shall remain responsible for damage to or loss of both the Work and stored materials until Completion.

2.      DEVELOPER and CONTRACTOR warrants and guarantees that no Work, materials, or equipment covered by a request for payment has been acquired by DEVELOPER and CONTRACTOR or by any other

person performing the Work or furnishing materials or equipment for the Project subject to an agreement under which an interest therein, or an encumbrance thereon, has been retained by seller or otherwise imposed by CONTRACTOR.

3.    DEVELOPER and CONTRACTOR shall furnish, with each application for payment, executed waivers of liens from DEVELOPER and CONTRACTOR and each Subcontractor and Material Supplier to the Project in the amount of the application for payment. Waivers of liens shall be in a form satisfactory to OWNER, title insurer, and lenders.

4.    DEVELOPER shall disburse funds received from OWNER among DEVELOPER and CONTRACTOR, subcontractors and material suppliers in proportion to the work done and materials received for the project during the pay period.

## 34    Interest

A.    Payments due and not paid under the Contract Documents shall bear interest from the date payment is due at a monthly rate of 10 percent.

B.    Payment of interest does not abrogate or replace any other rights DEVELOPER and CONTRACTOR may have under this agreement.

C.    Equity utilized by the OWNER for this project shall earn interest at 10% annually and shall be deducted from the sales price after direct sales costs but before distribution of profits.

## 35    Final Payment

A.    DEVELOPER and CONTRACTOR will apply for final payment and will notify OWNER'S Representative when the work has been completed. OWNER'S Representative will issue a certificate of completion on determination that the Project is complete and in compliance with the Contract Documents. When the certificate of completion is issued, the entire unpaid balance of the contract amount, including any retainage, is payable to DEVELOPER.

B.    Making of final payment constitutes waiver of all Claims by OWNER against DEVELOPER and CONTRACTOR except those Claims previously made in writing and delivered to DEVELOPER and CONTRACTOR and those obligations otherwise provided by this agreement or by operation of Law.

C.    The acceptance of final payment by CONTRACTOR constitutes a complete and unconditional waiver and release of any and all Claims by CONTRACTOR of whatever nature, and regardless of whether they are then known or unknown, and a complete and unconditional release of OWNER, and every person for whom OWNER is responsible, for any and all matters related to the contract or otherwise, except those Claims which have been made in writing and identified by CONTRACTOR as not having been settled at that time.

## 36                                                    Changes in the Work

A.    Except as required by changes in the Prime Contract between OWNER and DEVELOPER, no change to this contract (including Modification, clarification, interpretation or correction of the Plans or Specifications) shall be made without agreement and a written Change Order signed by DEVELOPER and

CONTRACTOR and OWNER identifying the change, the cost of the change, and the effect on Project Schedule, if any.

B.     Any change in Plans, Specifications or Contract Documents necessary to conform to existing or future Laws, codes, ordinances or regulations shall be considered Extra Work.

C.     Changes in the Work required due to defects or inconsistencies in Plans or Specifications or other Contract Documents shall be considered Extra Work.

D.     The charge for Extra Work shall be the normal selling price DEVELOPER and CONTRACTOR charges for similar changes on other jobs.

E.     Failure of DEVELOPER and CONTRACTOR and OWNER to agree on the terms of a Change Order shall be resolved under the provisions of this agreement which cover Claims and disputes.

F.     Should DEVELOPER and CONTRACTOR and OWNER fail to agree promptly on the terms of a Change Order, DEVELOPER and CONTRACTOR shall be paid, pending resolution of the dispute, the portion of the cost of the change not in dispute, including the costs of time and materials required to execute the change. Payments required under this paragraph shall be made as the Work progresses, concurrently with progress payments.

## 37    Cooperation of the Parties

A.     OWNER and DEVELOPER acknowledge that open communication and cooperation will be required to complete the Project on time, as estimated, and in compliance with the Contract Documents. DEVELOPER and OWNER each agree to identify a representative who will be available to resolve minor problems, answer questions and reach mutually acceptable solutions. The individuals identified by DEVELOPER and OWNER shall try to reach informal agreement on problems as they arise but are under no obligation to do so.

B.     Both DEVELOPER and OWNER pledge that their relations will be conducted with courtesy and consideration in an environment characterized by mutual respect. OWNER pledges to respond promptly to requests by DEVELOPER for guidance, assistance and payments when due and agrees to extend to DEVELOPER the deference and latitude a dedicated professional deserves. CONTRACTOR pledges to commit the skill and resources required to complete the Project in a manner that complies with both the letter and spirit of the Contract Documents and enhances the reputation of DEVELOPER and for dependability and professionalism.

## 38    Warranty

DEVELOPER and CONTRACTOR warrant that the Work shall be free of Defects due to faulty material or workmanship for the period specified in this agreement.

A.     General Requirements

1.     Except as otherwise provided in this agreement, the warranty period shall begin from the date of Completion for 12 months.

2.    Work done by CONTRACTOR in compliance with warranty provisions of this agreement does not extend the period of the warranty.

3.    DEVELOPER and CONTRACTOR shall deliver to OWNER all warranties provided by vendors and manufacturers of materials and equipment used to complete the Project. DEVELOPER and CONTRACTOR shall have no obligation under warranties provided by others except to render any assistance that OWNER may require in enforcing the terms of those warranties.

4.    Except as provided in this agreement, and to the extent permitted by Law, DEVELOPER and CONTRACTOR disclaims all warranties, whether express or implied, whether of fitness for purpose, merchantability, habitability or workmanlike completion.

5.    Failure of OWNER to give notice of a breach of warranty within the warranty period constitutes a waiver of the right to repair or replacement by DEVELOPER and CONTRACTOR.

6.    To make a warranty Claim under this agreement, OWNER must send a clear and specific written complaint to DEVELOPER and CONTRACTOR at the following address within 60 Calendar Days of discovering Defects, unless otherwise specified in the list of items covered under this warranty. DEVELOPER and CONTRACTOR shall make repairs, replacements and corrections promptly and at no expense to OWNER.

**Exclusions from Warranty**

1.    The warranty provided by this contract does not cover any of the following items or conditions:

I.    Damages to private property or bodily injury.

II.    Damages or losses that result from soil movement that is covered by insurance or that is compensated for by legislation.

III.    Insect damage.

IV.    Damage or losses that result from overloading of any floor, wall, ceiling, or roof beyond the design capacity.

V.    Damages caused or made worse by:

A.    Changes, additions, deletions, or any other alterations made to any part of the structure by anyone other than DEVELOPER and CONTRACTOR after the warranty term begins.

B.    Loss that results from failure of OWNER to take timely action to mitigate or minimize damage.

2.    DEVELOPER and CONTRACTOR has no liability for incidental or consequential damages from breach of any warranty provided by this agreement insofar as the loss claimed is covered by insurance of OWNER or for which OWNER has a right of recovery from any other party.

C.    Basic Warranty Coverage

1.    It is a breach of warranty if any material or design furnished, or workmanship performed by DEVELOPER and CONTRACTOR or any Subcontractor or Material Supplier, is found to be defective during the first year.

D.    Warranty on Major Structural Damage

1.    It is a breach of the major structural damage warranty where there is actual physical damage to designated load-bearing portions of the structure caused by the failure of such designated portions to perform to their load-bearing functions to the extent that it makes the structure unsafe, uninhabitable, or unsanitary during the first 12 months. The following items are designated load-bearing portions:

I.    Foundation Systems and Footings

II.    Beams

III.    Girders

IV.    Lintels

V.    Columns

VI.    Walls and Partitions

VII.    Floor Systems

VIII.    Roof Framing Systems

## 39    CONTRACTOR Claims

A.    If CONTRACTOR claims that any instruction, Drawing, act or omission of OWNER or any representative of OWNER, DEVELOPER or any agency of government, increases costs to DEVELOPER and CONTRACTOR, requires extra time or changes the Scope of Work, CONTRACTOR shall have the right to assert a Claim for such costs or time.

## 40    Notice of Claims

A.    No Claim by CONTRACTOR shall be considered unless CONTRACTOR provide OWNER, DEVELOPER or OWNER'S Representative with a notice that there will be a Claim for additional compensation or an extension of time. This notice of Claim shall be made no less than 5 Calendar Days after CONTRACTOR recognizes or should have recognized that circumstances exist which support such a Claim. The notice of Claim shall include: (1) The date of the notice, (2) The date the basis for the Claim was discovered, (3) The circumstances that support the Claim, and (4) The estimated additional cost to OWNER and DEVELOPER or additional time required to complete the Project.

B.    If the Claim involves Extra Work, CONTRACTOR shall maintain detailed records which show each expense incurred, including payroll records and receipts for Subcontracted Work, materials and equipment. These detailed records shall be made available to OWNER and DEVELOPER for verification while Work subject to the Claim is being performed.

C.    The amount Claimed by CONTRACTOR shall be calculated in accord with provisions in this contract on charges for Extra Work.

## 41    Arbitration

A.    Any controversy or Claim arising out of or relating to this contract or contract warranty or the breach thereof which cannot be resolved by mediations shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

B.    Two copies of the demand for arbitration and attachments and the related fee shall be filed with the appropriate regional office of the American Arbitration Association. Copies of the demand and attachments shall be given to all other Parties to the dispute. The demand for arbitration shall be made within a reasonable time after the Claim or dispute has arisen, and in no event after the date when institution of legal or equitable proceedings based on such Claim or dispute would be barred by the applicable statute of limitations.

C.    DEVELOPER, CONTRACTOR and OWNER agree to include in each contract for construction or design services on the Project a clause which requires that disputes under that contract be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules.

D.    Any representative of OWNER or consultant to OWNER or DEVELOPER and CONTRACTOR or any Subcontractor to DEVELOPER and CONTRACTOR on the Project shall have the same rights in any arbitration proceeding as are afforded by arbitration rules to DEVELOPER and CONTRACTOR and OWNER. If more than one demand for arbitration is made by a Party with respect to the Project, all such Claims shall be consolidated into a single arbitration unless the Parties otherwise agree in writing.

E.    If a Claimant in arbitration recovers less than 50 percent of the amount demanded in arbitration, DEVELOPER and CONTRACTOR and OWNER agree that the Claimant shall pay all costs in arbitration, including the arbitrator's fees and the attorney's fees of the opposing Party.

## 42    Insurance

A.    Certificates of Insurance

1.    DEVELOPER and CONTRACTOR shall provide to OWNER a certificate of insurance for each insurance policy required by this agreement. These certificates shall list OWNER as the certificate holder.

2.    Certificates of insurance shall be issued on a standard form

3.    DEVELOPER and CONTRACTOR shall permit no Subcontractor to begin Work on the Project until OWNER has received certificates of insurance demonstrating that the Subcontractor has coverage of a like kind and with comparable limits to insurance coverage required of DEVELOPER and CONTRACTOR under this agreement.

B.    Waivers of Subrogation

1. OWNER and DEVELOPER and CONTRACTOR waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance except such rights as may exist to the proceeds from insurance held by OWNER as trustee. DEVELOPER and CONTRACTOR shall require similar waivers in Subcontracts for the Project.

C.    Insurance Details

1.    If insurance policies meeting the Requirements of this contract are not generally available to DEVELOPER and CONTRACTOR. DEVELOPER and CONTRACTOR may provide substantially similar coverage and shall so notify OWNER in writing.

2.    DEVELOPER and CONTRACTOR may satisfy the policy limits set by this contract through any combination of underlying and excess liability (umbrella) insurance so long as the total coverage is not less than the policy limits specified in this contract. Any excess liability (umbrella) insurance coverage provided by CONTRACTOR must be written on an occurrence basis, offer coverage at least as broad as the underlying insurance, and have concurrent effective dates. Excess liability (umbrella) insurance provided by DEVELOPER and CONTRACTOR shall provide additional insured endorsements, blanket contractual coverage, and punitive damages coverage (unless prohibited by Law).

D.    Liability Insurance

1.    As an alternative to including OWNER as an additional insured under a comprehensive general liability policy, DEVELOPER and CONTRACTOR may provide an OWNER'S and CONTRACTOR's Protective Liability Policy. If DEVELOPER and CONTRACTOR are unable to procure the minimum amounts of insurance in a single policy, CONTRACTOR may provide required policy limits through a combination of a primary OCP Policy and one or more excess policies. OWNER shall be the named insured on the Policy and, if applicable, the excess policy. Each policy shall be endorsed to include each Subcontractor of every Tier as the CONTRACTOR designated in the declarations.

2.    Minimum CONTRACTOR's liability coverage shall be: $1,000,000 combined bodily injury and property damage single occurrence limit, annual aggregate limit of $2,000,000, products and completed operations aggregate limit of $1,000,000, personal and advertising injury aggregate limit of $1,000,000.

E.    Builder's Risk Insurance

1.    OWNER DEVELOPER shall provide builder's risk insurance covering property damage to the Project during the construction period. OWNER and DEVELOP. CONTRACTOR accepts the risk of damage to the Work during construction and agrees to Indemnify and hold harmless DEVELOPER and CONTRACTOR and Subcontractors at any Tier from losses resulting from uninsured damage to the Work prior to final payment under this agreement.

2.    Builder's risk insurance shall include a loss payable provision naming OWNER and DEVELOPER as loss payee. OWNER shall have the power to adjust and settle Claims resulting from builder's risk insurance.

3.    Policy limits for builder's risk coverage shall be no less than the completed replacement value of the Project including the value of Change Orders

## 43    Liability for Damages

Intentionally Omitted

## 44    Indemnity

A.    DEVELOPER and CONTRACTOR shall defend, Indemnify, and hold harmless OWNER and all officers, employees, agents, and consultants of OWNER from and against all and any losses, liability,

Claims, costs, damages and economic detriment of any kind whatsoever, or expense (including attorney's fees) that arises out of or results from performance of Work under this agreement provided such loss, liability, costs, damage and economic detriment is attributable to bodily injury, sickness, disease or death, or to injury or destruction of property (other than the Work itself) caused by the negligent acts or omissions of DEVELOPER and CONTRACTOR, a Subcontractor, or anyone directly or indirectly employed by them, or whether caused by or contributed to by OWNER, unless caused by the sole negligence of OWNER.

B.    Indemnification of OWNER is limited to the extent of insurance coverage required to be carried by DEVELOPER and CONTRACTOR under this agreement.

C.    Indemnification under this agreement shall not exceed any limitation on the amount or type of damages, compensation, or benefits payable by or for DEVELOPER and CONTRACTOR or any Subcontractor under workers' compensation acts, disability benefit acts, or other employee benefit acts.

## 45    Interpretation of the Contract

A.    Section headings and paragraph numbers have been included in this contract to refer easier and in no way limit, define, or enlarge the terms, scope, or conditions of this contract.

B.    Except as otherwise provided in this contract, OWNER and DEVELOPER and CONTRACTOR intend that this contract be interpreted in accord with the Restatement of Law, Contracts, published by the American Law Institute. Specifically: All parts of the Contract Documents should be interpreted together and conduct of the Parties should be interpreted as a manifestation of intention, and specific provisions should be interpreted as qualifying the meaning of the general provisions.

## 46    Dealing with Plan Defects

A.    At any time, CONTRACTOR may request an interpretation or clarification of the Contract Documents from DEVELOPER, OWNER or OWNER'S Representative. DEVELOPER, OWNER or OWNER'S Representative shall reply with a written interpretation, clarification, or detailed instructions within a reasonable time.

B.    CONTRACTOR will rely on the Contract Documents as the final authority on what is included in the Project. The Contract Documents were created to identify the labor, material and equipment required for proper completion of the Project. The Contract Documents are defective if a reasonably skilled construction CONTRACTOR doing Similar Work in the community and following generally accepted trade practice could not use the Contract Documents to identify each labor, material and equipment cost required to complete the Project. CONTRACTOR bears no responsibility for defects in the Contract Documents.

C.    Unless CONTRACTOR has asked for and received a written clarification from DEVELOPER or OWNER in time to prevent delay in the Work, any omission or ambiguity in the Contract Documents shall be interpreted as requiring the material or construction technique necessary to produce the greater quantity and better quality of Work.

D.    CONTRACTOR will report promptly to OWNER any design defects likely to result in problems during construction of the Project. However, CONTRACTOR is not a licensed architect or engineer and have no obligation to detect ambiguities, inconsistencies or omissions in the Contract Documents. While acting in

good faith, CONTRACTOR is entitled to rely on the Work of a trained design specialist selected by and responsible to DEVELOPER and OWNER.

E.    CONTRACTOR is entitled to rely on dimensions and descriptions shown in the Contract Documents when ordering materials for Installation.

F.    Ambiguities, inconsistencies and omissions in the Contract Documents are design defects, not errors by CONTRACTOR. The cost of correcting design defects shall be at the expense of DEVELOPER and OWNER.

G.    If inconsistent, approved changes to the Contract Documents take precedence over the original Contract Documents. Subsequent changes to the Contract Documents take precedence over prior changes to the Contract Documents.

H.    If inconsistent, the construction Drawings take precedence over the Specifications.

I.    If anything in the construction Specifications is inconsistent with anything else in the construction Specifications: (1) A product performance Requirement takes precedence over a named product or manufacturer, and (2) Other clauses in the Specifications take precedence over anything incorporated by reference into the Specifications.

J.    If anything in the construction Drawings is inconsistent with anything else in the construction Drawings: (1) Dimensions written in numbers take precedence over scaled measurements, (2) Notes and schedules take precedence over lines on the Drawings, (3) Large scale Drawings take precedence over small scale Drawings, (4) Schedules take precedence over notes or other directions, (5) Specific notes take precedence over general notes, and (6) Bottom elevations of footings take precedence over any general notes.

K.    If inconsistent, other Contract Documents take precedence over any manual, industry standard, recommendation, regulation, and set of guidelines, code, or instructions incorporated by reference into the Contract Documents.

L.    If inconsistent, any portion of the Contract Documents written in longhand takes precedence over anything printed in the Contract Documents.

M.    CONTRACTOR has no liability for any omission, inconsistency or ambiguity in the Contract Documents or for any discrepancy between physical conditions at the Job Site and the Contract Documents, unless CONTRACTOR fails to report the error to DEVELOPER , OWNER or OWNER'S Representative.

## 47    Choice of Venue

A.    The Parties agree that venue for any action related to performance of this contract shall be the appropriate court in Tennessee.

## 48    Entire Agreement

The Contract Documents are the entire agreement and constitute a complete integration of all understandings between DEVELOPER and CONTRACTOR and OWNER about the Project. The Contract

DocuSign Envelope ID: C4GDB374-1C2C-4EB5-B887-3C83E0A85313

Documents supersede all prior negotiations, representations and agreements, whether written or oral. No subsequent notation, renewal, addition, deletion, change or amendment to this contract shall have any force or effect unless in the form of a written Change Order or amendment to this contract.

## 49    Severability

A.    If any provision of this contract is interpreted or rendered invalid and unenforceable, then the remainder of this contract shall remain in full force and effect.

## 50    Cumulative Remedies

A.    All rights and remedies provided to DEVELOPER and CONTRACTOR by the Contract Documents are cumulative and in addition to and not in limitation of rights and remedies available to CONTRACTOR at Law or in equity.

## 51    Materials and Substitutions

A.    When the Specifications refer to materials or equipment by performance standard (such as an ASTM identifier), DEVELOPER and CONTRACTOR may select for Installation any product or equipment meeting that standard. When several products or manufacturers are identified as acceptable in the Specifications, DEVELOPER and CONTRACTOR has the option of using any of the products or selecting any of the manufacturers listed without seeking approval from OWNER or OWNER'S Representative.

B.    Except as stated otherwise in the Specifications, any reference in the Specifications to a brand, make, manufacturer, or model denotes only characteristics of quality, workmanship, economy of operation and suitability for the intended purpose. DEVELOPER and CONTRACTOR may use any substantially equivalent material, equipment, or article if approved in advance of Installation by OWNER or OWNER'S Representative.

C.    All materials and equipment used on the Project shall comply with Specifications in the Contract Documents unless a substitution is approved in advance of Installation by OWNER or OWNER'S Representative. DEVELOPER and CONTRACTOR shall apply to OWNER or OWNER'S Representative for approval of a substitute material when: (1) Any item specified is found to be unusable or unavailable when needed for Installation, or (2) The item specified is considered inferior to an equivalent item which is readily available at a Similar cost. With the application, DEVELOPER and CONTRACTOR shall include documentation: (1) Demonstrating that essential features of the substitute item are equal to or exceed similar features of the item specified, and (2) Listing delivered prices for the substitute item based on Material Supplier quotations. OWNER or OWNER'S Representative may deny any application for substitution if not in the best interest of OWNER. If approved, any savings in cost that result from the substitution will be credited to OWNER. No request for substitution of material shall constitute grounds for extension of the Contract Time. Proposed substitutions shall not be purchased or installed without approval of the substitution by OWNER or OWNER'S Representative.

## 52    Inspections

DEVELOPER and CONTRACTOR shall schedule and coordinate all Inspections required by the Contract Documents and by public authority so as not to delay the progress of the Work or the Work of OWNER or Separate CONTRACTORs. If the Contract Documents require that an Inspection be witnessed or attended by OWNER or OWNER'S Representative, DEVELOPER and CONTRACTOR shall give notice of the time and place of the Inspection. DEVELOPER and CONTRACTOR shall schedule Inspections during regular Workdays and normal business hours, unless mutually agreed by DEVELOPER and CONTRACTOR, OWNER, and Inspector.

B.    Insofar as applicable and except where superseded by other provisions of the Contract Documents or by government regulation, Inspection of the following Work will be required on the Project and delivered to OWNER with Draw requests: (1) Bearing surfaces of excavations before concrete is placed, (2) Reinforcing steel after Installation and before concrete is poured, (3) Structural concrete when poured, (4) Structural framing after erection and prior to being covered or enclosed, (5) Steel welding, (6) Mechanical and plumbing Work following Installation and prior to being covered or enclosed, (7) Electrical Work following Installation and prior to being covered or enclosed, (8) Above-ceiling Work when complete but before the finish ceiling material is installed, and (9) Final Inspections prior to occupancy.

C.    If an Inspection reveals Work of DEVELOPER and CONTRACTOR not in compliance with the Contract Documents or not in compliance with any code or statute, DEVELOPER and CONTRACTOR shall bear the costs of correction, the cost of repeating the Inspection, and any related costs, including reasonable charges by OWNER or OWNER'S Representative for additional services.

## 53    The Construction Schedule

A.    DEVELOPER and CONTRACTOR shall prepare and submit to OWNER for review and approval an estimated progress Schedule for the Work showing completion within the Contract Time. This progress Schedule shall identify expected starting and completion dates for each part of the job and identify tasks critical to timely completion of the Work.

B.    DEVELOPER and CONTRACTOR may select any type of Schedule which: (1) Is suitable for monitoring progress of the Work, (2) Provides easy access to information about the timing of decisions OWNER must make and acts OWNER must perform, (3) Includes sufficient detail to demonstrate adequate planning for the Work, and (4) Presents a practical plan to complete the Work in an acceptable time.

C.    DEVELOPER and CONTRACTOR shall plan, develop, supervise, control, and coordinate the performance of the Work so that job progress, sequence and timing conform to the construction Schedule. If DEVELOPER and DEVELOPER and CONTRACTOR falls materially behind the currently approved construction Schedule, OWNER may require DEVELOPER and CONTRACTOR to prepare and submit for approval, at no cost to OWNER, a plan for completing the Project within the Contract Time. Failure to submit a plan meeting this Requirement shall constitute grounds for termination under the terms of this agreement. Periodic monitoring of this plan shall be reported to OWNER with Draw requests.

D.    The Schedule shall allow for and depict the following: (1) Beginning and Completion Dates of each significant task (Work breakdown structure) in the job, (2) Delivery and approval of each Submittal, Samples and Shop Drawing, (3) Inspections and tests, (4) The Work of Subcontractors and Separate

DocuSign Envelope ID: C4GDB374-1C2G-4EB5-B887-3C83E0A85313

CONTRACTORs, and (5) Order dates and delivery dates of significant equipment and key materials. The construction Schedule shall include a legend which identifies the meaning of each symbol and abbreviation.

## 54   Extension of the Time for Completion

A.    OWNER shall execute a Change Order for Excusable Delay by extending the Contract Time for the period of the delay. Any of the following shall constitute excusable delay for which the Contract Time shall be extended: (1) Strike, boycott, embargo, terrorism, armed rebellion, quarantine, pandemic or other obstructive action by employees, labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or, order of government authority, and (2) Fire, flood, earthquake, tornado, tidal wave, lightning, rain, snow, temperature under 32 degrees, casualty loss, epidemic, or unusually adverse weather, (3) delay in payments from owner or equity.

B.    For delay in delivery of materials, FF&E, equipment or for a shortage of labor that results from unforeseeable circumstances beyond the control and without fault or negligence of either DEVELOPER and CONTRACTOR, or any Subcontractor or Material Supplier of DEVELOPER and CONTRACTOR, OWNER will grant an extension of the Contract Time if: (1) DEVELOPER and CONTRACTOR, notifies OWNER or OWNER'S Representative promptly on discovery of the anticipated shortage, (2) DEVELOPER and CONTRACTOR, substantiates the delay as unavoidable with a detailed chronology of events and all relevant correspondence, and (3) DEVELOPER and CONTRACTOR, provides an estimated date when the material, equipment or labor will be available.

C.    Any Change Order granted for Excusable Delay shall have no effect on a Claim by DEVELOPER and CONTRACTOR, for damage from the same delay for interruption, hindrance, or disruption.

## 55   DEVELOPER and CONTRACTOR Claims for Delay

A.    The Contract Price shall be adjusted for any increase in the cost of performance of this contract caused by suspension, delay or interruption of the Work due to: (1) An error or omission in the Contract Documents, (2) A decision of OWNER to change the Scope of the Work, unless the decision is the result of an error or omission by DEVELOPER and CONTRACTOR,, (3) A decision of OWNER to suspend the Work, unless the decision is the result of an error or omission by DEVELOPER and CONTRACTOR,, (4) A failure by OWNER or OWNER'S Representative to comply with the construction Schedule, (5) Any act or neglect of OWNER or agent of OWNER or any Separate DEVELOPER and CONTRACTOR, (6) Failure of OWNER to yield control of the Job Site to DEVELOPER and CONTRACTOR,, or (7) Failure of OWNER to make payments when due under the terms of this agreement.

B.    Within 3 Working Days after receipt of a notice of Claim for compensation for suspension, delay, or interruption, OWNER shall: (1) Respond with a resolution, remedy, or direction to alleviate the delay, (2) Respond with a notice rejecting the Claim for delay, or (3) Respond with a draft Change Order accepting the Claim for delay. If the issue is not then resolved, DEVELOPER and CONTRACTOR, may request a Change Order.

C.    No change in the Contract Time for completion or the Contract Price shall become part of the Contract Documents without a Change Order.

D.    Compensation to DEVELOPER and CONTRACTOR, for suspension, delay, or interruption of Work shall include direct overhead (Job Site) expense, a proportionate share of unabsorbed indirect (home office) overhead expense, lost efficiency and lost profit taken as 15 percent of total compensable expenses. Direct overhead costs shall include, without limitation: (1) Labor (with taxes, insurance and fringe benefits) for the idle work force, (2) The fair rental cost of idle equipment (such as vehicles, construction tools and equipment), (3) Facilities (such as temporary structures, water, power, phone, and toilets), (4) The additional cost of Bonds and insurance, (5) Similar direct overhead costs of Subcontractors to whom DEVELOPER and CONTRACTOR, is liable for damages that result from the delay, and (6) Demobilization and re-mobilization costs. Unabsorbed indirect overhead costs shall include, without limitation, the proportionate share of office rent, office supplies, office utilities, office equipment, advertising, professional fees, management salaries, technical services, estimating, selling, accounting, bookkeeping and clerical expense, business licenses, taxes (except income taxes), and insurance.

## 56    Liquidated Damages

A.    Time is of the essence about this contract. The Schedule for completion and provisions in this contract for extension of the Contract Time are considered reasonable by OWNER and DEVELOPER and DEVELOPER and CONTRACTOR, any neglect, refusal or failure of DEVELOPER and CONTRACTOR to reach Substantial Completion within the Contract Time, plus approved extensions of that time, will result in damage to OWNER impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, OWNER shall deduct from money due DEVELOPER and CONTRACTOR or which may become due CONTRACTOR the sum of $800.00 as liquidated damages for each Calendar Day that Substantial Completion is delayed beyond the Contract Time, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

B.    Time is of the essence about this contract. The Schedule for completion and provisions in this contract for extension of the time for Completion are considered reasonable by OWNER and CONTRACTOR. Any neglect, refusal or failure of DEVELOPER and CONTRACTOR, to reach Completion within the time provided in this contract, plus approved extensions of that time, will result in damage in the form of inconvenience, loss of opportunities, and higher Inspection, Superintendence, and administrative costs to OWNER. These costs are impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, OWNER shall deduct from money due DEVELOPER and DEVELOPER and CONTRACTOR or which may become due DEVELOPER and CONTRACTOR, the sum of $800.00 as liquidated damages for each Calendar Day that Completion is delayed beyond the time provided in this contract, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

C.    Achieving Substantial Completion sooner than the Contract Time, plus approved extensions of that time, shall earn additional compensation to DEVELOPER and CONTRACTOR of $100.00 for each Calendar Day that Substantial Completion is achieved prior to the Contract Time, plus approved extensions of that time.

D.    DEVELOPER and CONTRACTOR, shall not be charged liquidated damages for any failure, neglect or refusal to complete the Work on Schedule to the extent that the proximate cause of the delay was: (1)

Strike, boycott, embargo, terrorism, armed rebellion, quarantine, or other obstructive action by employees or labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or by order of government authority, (2) Fire, flood, earthquake, tornado, tidal wave, lightning, casualty loss, epidemic, or unusually adverse weather, (3) Any delay of Subcontractors or vendors resulting from items listed in sections 1 or 2 above, or (4) Any act or omission of OWNER or anyone acting on behalf of OWNER.

E.    Except as provided elsewhere in this contract, liquidated damages are the exclusive damage remedy for OWNER for any failure of DEVELOPER and CONTRACTOR to complete Work per Schedule. No damages of any other type or description shall be awarded OWNER for failure of DEVELOPER and CONTRACTOR to comply with the construction Schedule.

## 57    Consequential Damages

A.    DEVELOPER and CONTRACTOR, and OWNER waive all Claims for consequential damages against each other, their respective officers, directors, partners, employees, agents, consultants and Subcontractors, arising out of or relating to this contract or the termination of this contract, except those consequential damages covered by insurance or specifically provided elsewhere in this agreement.

## 58    Right to Stop Work for Non-Payment

A.    If DEVELOPER and CONTRACTOR, is not paid any amount not in dispute within 14 Calendar Days after the date due, CONTRACTOR shall post on the Job Site and deliver to OWNER and all Subcontractors a notice of intention to stop the Work if payments then due are not received in full within 10 Calendar Days. Thereafter, CONTRACTOR may suspend the Work until delinquent payments have been received, pursuant to Tennessee Civil Code § 3260.2.

B.    Neither DEVELOPER and CONTRACTOR, nor Surety of CONTRACTOR, nor any Subcontractor of DEVELOPER and CONTRACTOR shall be liable for delay or damage that OWNER may suffer as a result of suspension of the Work for failure to receive payments due under this agreement so long as: (1) Work was suspended by DEVELOPER and CONTRACTOR in compliance with the terms of this contract and with applicable Law, and (2) There is no good faith dispute that payment is due DEVELOPER and CONTRACTOR, at the time of suspension. A good faith dispute exists if OWNER provides: (1) A list of specific reasons for nonpayment, including labor, materials, or equipment not in compliance with the Contract Documents, and (2) CONTRACTOR is afforded a reasonable opportunity to correct the Defects cited or issue a credit compensating OWNER for Defects that cannot be cured promptly.

## 59    Early Partial Occupancy

A.    Without prior approval of DEVELOPER and CONTRACTOR, OWNER shall not occupy or use any portion of the Work until Substantial Completion of the Project. If OWNER occupies or uses any portion of the Work before Substantial Completion of the Project and without prior approval of DEVELOPER and CONTRACTOR, the portion or portions used or occupied shall be considered complete, finished, accepted and the responsibility of OWNER.

B.     No Partial Use or occupancy of the Work by OWNER shall commence prior to Substantial Completion without a Change Order confirming the responsibility of OWNER for maintenance, utilities, operation of equipment, and security during early Partial Use or occupancy.

C.     If any portion of the Project is used or occupied by OWNER prior to Substantial Completion and if the Project is not completed within the Contract Time, liability of DEVELOPER and CONTRACTOR, for delayed completion shall be reduced by the proportion of the Project used or occupied by OWNER and for the time used or occupied by OWNER prior to Substantial Completion.


**60**                                   **Substantial Completion**

A.     When, in the opinion of DEVELOPER and CONTRACTOR, the Work is Substantially Complete, and a Certificate of Occupancy has been (or can be awarded) DEVELOPER and CONTRACTOR shall prepare a preliminary Punch List of Work remaining to be done and deliver that Punch List to OWNER'S Representative with a request for evaluation of Substantial Completion. If, in the opinion of OWNER'S Representative, items on the preliminary Punch List are consistent with Substantial Completion, OWNER'S Representative shall conduct an Inspection of the Work to evaluate compliance with the Contract Documents.

B. before OWNER takes possession or occupancy of the Project, DEVELOPER and CONTRACTOR, shall receive a comprehensive Punch List of discrepancies to be corrected or Work to be finished by CONTRACTOR and a date for completing this Work. DEVELOPER and CONTRACTOR shall complete and correct items on the Punch List by the designated date.

C. the Punch List given to DEVELOPER and CONTRACTOR, is a complete and final list of Defective or incomplete Work on the Project. OWNER shall be deemed to have accepted Work not on the Punch List. Nothing in this paragraph shall be interpreted as relieving DEVELOPER and CONTRACTOR, of the obligation to meet warranty and call-back obligations.

D.     DEVELOPER and CONTRACTOR shall annotate the Punch List with: (1) A detailed breakdown of the Work required to complete or correct each item, (2) The Subcontractor or trade responsible for the Work, and (3) The dates Work will commence and be finished on each item. No annotation is required for any item on the Punch List which is beyond the control of DEVELOPER and CONTRACTOR. Failure of CONTRACTOR to furnish a detailed completion Schedule for items on the Punch List shall constitute grounds for withdrawing acknowledgment of Substantial Completion.

E.     OWNER'S Representative will prepare a certificate of Substantial Completion for signature by OWNER and DEVELOPER and CONTRACTOR, when the Project or a specific portion of the Project is ready for occupancy. Except as otherwise provided in the Contract Documents, signing of the certificate of completion shall: (1) Transfer to OWNER responsibility for maintenance, safety, utility expense, controlling access at the site, and (2) Begin running of any warranty or call-back period on the Project.

H. after Substantial Completion, DEVELOPER and CONTRACTOR, shall remain responsible for: (1) Damage caused by DEVELOPER and CONTRACTOR, while completing the Work, and (2) Safety of crews when completing the Work.

DocuSign Envelope ID: C4GDB374-1C2C-4EB5-B887-3C83E0A86313

62 Delivery of Notices

A.    Any written notice required by this contract can be: (1) Delivered by hand at the last known address of the addressee, or (2) Delivered by hand to the addressee or representative of the addressee, wherever found. Notice is effective upon delivery.

B.    Any written notice required by this contract can be: (1) Delivered by enclosing in a stamped envelope addressed to the last known address of the intended recipient and either deposited in a United States Postal Service mailbox or given to a USPS employee, or (2) Consigned to a commercial courier service and addressed to the last known address of the intended recipient. Notice is effective upon delivery if proof of delivery is provided; where no proof of delivery is available, notice is effective 5 Calendar Days after mailing or consignment to a courier service.

Signatures

The signatures that follow constitute confirmation by those signing that they have examined and understand the Contract Documents and agree to be bound by the terms of these documents.

DEVELOPER and CONTRACTOR may not begin Work before receiving from OWNER a written notice to proceed. Any Work performed by DEVELOPER and CONTRACTOR before receipt of the notice to proceed shall be done at the risk of DEVELOPER and CONTRACTOR and without obligation of OWNER.

This agreement is entered as of the date written below.

OWNER Name: MILLROCK INVESTMENT FUND 1 LLC

*Kevin G. Long*
E4930D07BB4343E...

_____    11/20/2020
(Signature)                              (Date)

Kevin G. Long                   Manager
_____

(Printed Name and Title)

DEVELOPER Name: Jameson LLC DBA American Development Partners,

*Manny Butera*
A2915E74254F4FE...

_____    11/20/2020
(Signature)                              / /
                                            (Date)

Manny Butera                    Developer
_____

(Printed Name and Title)

DocuSign Envelope ID: C4GDB374-1C2G-4EB5-B887-3C83E0A85313

**Glossary of Terms**

Beneficial Occupancy refers to OWNER'S use of the project premises after Substantial Completion but prior to Final Completion. Beneficial Occupancy may occur when the project or some portion is sufficiently complete and systems operational such that the OWNER could, after obtaining necessary approvals and certificates, occupy and utilize the space for its intended purpose. The time limit for warranties applicable to that portion of the Work begin on the date the OWNER begins Beneficial Occupancy, unless otherwise specified in this Agreement.

Bond means the security offered by a licensed surety company which may be used to satisfy a claim of failure to perform obligations undertaken in this Agreement.

Calendar Day means any day shown on the calendar beginning at midnight and ending at midnight the following day. Contrast the term Workday which excludes Saturdays, Sundays and state-recognized holidays.

Certification of Payment is acknowledgment by someone not a party to this Agreement that CONTRACTOR is entitled to payment for work completed.

Change Order is a written modification of the Contract Price (including all claims for direct, indirect and consequential damages and costs of delay), Time for Completion and Scope of Work under this Agreement. A Change Order, once signed by all parties, is incorporated into and becomes a part of the Contract Documents.

Claim means a demand or assertion by one of the parties to this Agreement seeking, as a matter of right, modification, adjustment or interpretation of contract terms, payment of money, extension of time or other relief.

Code Requirements means all laws, statutes, regulations, building codes, ordinances, rules, and lawful orders of all public authorities having jurisdiction over OWNER, CONTRACTOR, any Subcontractor, the Project, the Job Site, the Work, or the prosecution of the Work.

Contract Completion Date means the day by which the Work must be substantially complete.

Contract Date is the day on which the contract becomes binding between CONTRACTOR and OWNER.

Contract Documents are this Agreement and all documents incorporated by reference into this Agreement.

Contract Price is the amount which will become due in exchange for work performed under this Agreement. Contract Price includes allowances for purchased materials and equipment and may be modified by a Change Order or contract modification. The Contract Price may be paid in one or more installments, including an Initial Payment at or before the start of work, Progress Payments as work is completed, and a Final Payment on final acceptance of the work. Payment Period is the time elapsed

Between applications for progress payments or prior to the first application for progress payment.

Contract Schedule is a graphical representation of a practical plan to complete Work within the Contract Time.

Contract Time means the period between Date of Commencement and the date of Substantial Completion.

CONTRACTOR is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking the execution of the Work under the terms of this Agreement.

Defective Work means construction done under this Agreement that is unsatisfactory, faulty, omitted, incomplete, deficient, or does not conform to the requirements of the Contract Documents, directives of OWNER'S Representative, or the requirements of an inspection, reference standard, test, or approval specified in the Contract Documents.

Design Professional means the person, organization or authorized representative who is responsible to the OWNER for design of the Project through preparation of Drawings and Specifications. The term Design Professional may refer to an architect, designer, engineer or landscape architect.

Drawings (also called plans or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Drawings include plan views, elevation views, transverse and longitudinal sections, large and small-scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed Project. A group of drawings adequate to complete construction of the Project may be referred to as a plan set. Drawings can be either paper or electronic media.

Emergency means an unforeseen event, combination of circumstances, or a resulting state that poses imminent danger to health, life or property.

Excusable Delay means any circumstance which postpones completion of the Work and for which CONTRACTOR is entitled to an adjustment of the Contract Time but not an adjustment to the Contract Price. Contrast Inexcusable Delay which entitles CONTRACTOR to neither an adjustment of the Contract Price nor an adjustment in the Contract Time.

Extra Work means any change, interpretation, clarification or correction in the Contract Documents or in applicable law, ordinance or regulation which would increase or decrease the quantity of work, delay, suspend or interfere with the work, require an addition to or omission from the work, change the character, quality or nature of any part of the work or material used in the work, change levels, lines, positions or dimensions of any part of the work, require demolition or removal of any work completed under this Agreement, extend or amend the normal work day, alter the construction schedule or require completion of any part of the work at a time other than provided by this Contract when originally made.

Final Completion is the date of OWNER'S acceptance of the Work as fully performed per the

Contract Documents.

Furnish means to supply and deliver to the job site.

General CONTRACTOR is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking execution of the Work under terms of a Prime Contract.

Hazardous Materials means radioactive materials, asbestos, polychlorinated biphenyls, petroleum, crude oil, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, and toxic

substances which are restricted, prohibited, or regulated by any agency of government in the manufacture, use, maintenance, storage, Ownership or handling.

Indemnification Financial compensation intended to restore someone to their condition before a loss or damage.

Inspection is any review of the Project, including a visual review of the Work completed to ascertain compliance with Contract Documents, building codes and construction standards.

Inspector is anyone authorized by government or the Design Professional to conduct inspections of contract performance and materials supplied for the Work.

Install means to secure in position in compliance with the Contract Documents and includes unloading materials, supplying all necessary equipment and rigs to do the work and performing functional tests which demonstrate fitness for the intended purpose.

Job Site is the address or location of the Project.

Law means federal or state statutes, municipal ordinances, building codes, regulations adopted pursuant to statute, executive orders, official interpretations, and other rules and directives issued by government.

Material Supplier means any manufacturer, fabricator, distributor, material man or vendor who provides material for the Project but does not provide on-site labor.

Modification is a written amendment to the Contract signed by both parties.

OWNER'S Representative means the person or firm authorized to act and make administrative decisions on behalf of the OWNER during construction. Any notice required to be delivered to the OWNER may be delivered to the OWNER'S Representative. The scope of authority of the OWNER'S Representative is defined in this contract. CONTRACTOR cannot rely on any decision or instruction by OWNER'S Representative that is beyond the representative's defined scope of his authority. Nothing in this contract prevents OWNER from issuing a notice or instructions directly to the CONTRACTOR. The OWNER may change the OWNER'S Representative from time to time and may, if OWNER'S Representative is absent, disabled or otherwise temporarily unavailable, appoint an interim OWNER'S Representative.

Party (to this contract) means a person or business organization which has an obligation to perform under the terms of this contract.

Plans (also called drawings or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Plans include plan views, elevation views, transverse and longitudinal sections, large and small-scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed project. A group of plans adequate to complete construction of the Project may be referred to as a plan set. Plans can be either paper or electronic media.

Prime Contract is a written agreement between CONTRACTOR and OWNER which binds CONTRACTOR to furnish labor, equipment, or materials or perform certain work for a price to be paid by OWNER.

Project means Work to be completed in accord with the Contract Documents. Work at the Job Site may include other projects to be completed by the OWNER or other CONTRACTORs working under other agreements.

Provide means furnish and install and includes connecting, testing, and placing in service for the intended use.

Punch List is a comprehensive list of incomplete, defective or incorrect Work yet to be completed or which does not comply with Contract Documents. A Punch List may be prepared by the CONTRACTOR, Subcontractor, Design Professional or OWNER. An initial Punch List will be prepared before application for Substantial Completion. A Close-out Punch List will be prepared before Final Completion.

Requirements means, in addition to obligations, responsibilities and limitations set out in the Contract Documents, the obligations, responsibilities and limitations imposed by law, rules, orders, ordinances, regulations, statutes, codes and executive orders of governmental authorities or fire rating bureaus.

Retainage is a portion of each progress payment temporarily held back or retained by the OWNER. Accumulated retainage is released to CONTRACTOR on satisfactory completion of the work.

Sample means a physical example of material; equipment or workmanship intended to be representative of some portion of the Work. When approved, samples establish standards for completion of similar work on the Project.

Schedule of Values means the detailed breakdown of cost of materials, equipment and labor necessary to complete the Project as described in the Contract Documents.

Scope of Work means the Work as defined by the Contract Documents.

Separate CONTRACTOR means a person or firm working under a different contract but on the same site

and at the same time as work will be done under this contract.

Shop Drawings are diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data which are prepared by the CONTRACTOR or a Subcontractor, manufacturer, supplier or distributor, and which illustrate or describe some portion of the Work to be completed in compliance with the Contract Documents. Once submitted to the approval authority and approved, Shop Drawings establish standards for completion of work on Project.

Similar means having a like kind, quality and characteristics. Similar is not to be construed as meaning identical or by the same manufacturer.

Specifications (also called specs) are the part of the Contract Documents which provide descriptions of materials, equipment, construction systems, technique and workmanship to be used on the Project. Specifications are both instructions to be followed by the CONTRACTOR and Subcontractors and a reference for the Building Official to evaluate code compliance.

Subcontract is a written agreement between a specialty CONTRACTOR and General CONTRACTOR. Terms of the subcontract require the specialty CONTRACTOR to complete some portion of the work General CONTRACTOR is obligated to perform under another agreement, usually with the OWNER.

Subcontractor is any person or business entity under contract to a general CONTRACTOR to perform some portion of the work general CONTRACTOR is obligated to complete under a contract with the OWNER. Subcontractor is an independent CONTRACTOR performing services for another CONTRACTOR rather than for the OWNER. A person or organization providing supplies or materials for the Project, but no job site labor is not a Subcontractor.

Submittals demonstrate the way by which the CONTRACTOR proposes to conform to the requirements of the Contract Documents. Submittals are shop drawings (diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data) required by the Contract Documents which are prepared for the CONTRACTOR to depict some portion of the Work. Submittals are delivered to the OWNER for approval or disapproval by the OWNER prior to purchase or installation.

Substantial Completion means the Project, or a designated portion of the Project is nearly in compliance with the Contract Documents and is sufficiently complete to be considered fully operational in all its components and is fit for the intended use. Substantial Completion is reached when a limited number of non-conforming or defective items on a Punch List remain to be completed. Normally, a Project or portion of a Project cannot be considered Substantially Complete until (1) all utilities and services are connected and working, (2) all equipment is installed and in acceptable working condition, (3) additional activity by the CONTRACTOR to correct items on the Punch List will not prevent or disrupt use of the facility, and, (4) a certificate of occupancy has been issued by the appropriate authority.

Sub-subcontractor is any person or business entity under contract to a subcontractor or any lower tier subcontractor to perform some portion of the work subcontractor is obligated to complete under a

contract with the prime CONTRACTOR. Sub-subcontractors are independent CONTRACTORs performing services for another CONTRACTOR rather than for the prime CONTRACTOR. A person or organization providing supplies or materials for the Project, but no job site labor is not a Sub-subcontractor.

Superintendent is the representative of the CONTRACTOR at the job site who is authorized to receive instructions from the OWNER or OWNER'S Representative and who is authorized to direct the performance of work on behalf of the CONTRACTOR.

Surety means any qualified individual, firm or corporation other than the CONTRACTOR, which executes a bond to insure its acceptable performance of the contract.

Tier refers to the contractual level of a person or business organization doing work on the Project. A first-tier subcontractor has a contract with the general CONTRACTOR but not the OWNER. A second-tier subcontractor has a contract with another subcontractor but not with the general CONTRACTOR or the OWNER.

Work means all labor, material, equipment, tools, transportation, permanent and temporary utilities, connections, provisions for safety and management services required to complete the Project in

compliance with the Contract Documents. Work may constitute the whole or a part of the Project. Work is to be performed in a safe, expeditious, orderly and professional manner in keeping with current standards of the industry. Work includes everything that is or should be evident to a skilled construction professional after careful examination of the Contract Documents and the Job Site.

Workday means any day, excluding Saturdays, Sundays and state-recognized holidays, shown on the calendar beginning at midnight and ending at midnight the following day.

# EXHIBIT 2



**American Development Partners Development Contract**

This agreement is made on the date written above our signatures between

**DEVELOPER Name:** JAMESON LLC DBA American Development Partners (DEVELOPER) and

**OWNER Name:** MILLROCK INVESTMENT FUND 1 LLC

**DEVELOPER**

**Address:** 8618 Shortleaf Court, College Grove TN 37046

**Work Phone Number:** (615) 818-6982

**Email Address:** manny@americandevelopmentpartners.com

**DEVELOPER Name:** American Development Partners will be referred to as DEVELOPER throughout this agreement.

**CONTRACTOR INFORMATION:**

**Address: Phone Number:** (615) 330-0629

**Email Address:** llynp@built-more.com

**License Number:** 00057609

**CONTRACTOR Name:** Built-more LLC will be referred to as CONTRACTOR throughout this agreement.

**OWNER**

**OWNER Name:** MILLROCK INVESTMENT FUND 1LLC

**Address:** 2100 PLEASANT GROVE BLVD, STE 200

ATT: Kevin Long

**OWNER Name:** MILLROCK INVESTMENT FUND 1 LLC will be referred to as OWNER throughout this agreement.

## 1    Project Description

A.        For a price identified below, DEVELOPER *agrees* to complete a new commercial building (identified as the Project in this agreement) for OWNER.

B.        For the Contract Price identified below, DEVELOPER agrees to complete a new commercial building consisting of approximately 10,260 square feet+/- of air-conditioned space. Keller, TX, Ambulatory Surgery Center (identified as the "Project" in this Agreement), for TENANT's use and OWNERS ownership on the Land in accordance with the plans

C.        The term "Total Build Cost" shall mean the aggregate of (1) the Total Project Cost, (2) the Contract Price, (3) the Contingencies of the Project, (4) the cost of the Work and the Extra Work, (5) other costs, charges and fees under this Agreement (collectively, the "Other Agreements") (the Other Agreements shall include but not be limited to any contractor or subcontractor agreements and the cost of all materials and labor).

D.        The term "Budget" shall mean the Total Build Cost less the cost to acquire the Land.

E.        The term "Property" shall mean the Land and all improvements thereon including but not limited to the Project.

F.        Contract Price/ OWNERS Cost Cap/ Developer

G.        DEVELOPER shall earn in addition to any other charges specified in this agreement, OWNER agrees to pay a 10% development fee for completing the Work described as the Project. DEVELOPER fee is paid off total project cost that includes land / building, construction and all numbers that are used to factor total project cost. The Development Fee shall be included in "Total Build Cost". In addition, Developer will be paid three hundred and fifty thousand ($350,000.00) when the project is 50% complete.

H.        Notwithstanding any contrary provision in this Agreement or otherwise, OWNERS maximum monetary liability under this Agreement and for the Project towards all amounts, including but not limited to the Total Build Cost, shall not exceed, and shall be capped at, the sum of $14,122,657.79. It is understood this number is subject to change once the project is fully bought out and all parties agree to the final project numbers. At that time the final number will be deemed the amount referred to as the OWNERS GROSS MAX). Notwithstanding any contrary provision in this Agreement or otherwise, DEVELOPER shall be solely responsible under this Agreement and to OWNER, for any projects overruns that are above the gross max number provided to OWNER.

## 2    Contract Price

I.        DEVELOPER shall earn, and OWNER agrees to pay a development fee of 10% of total project cost in addition to any other charges specified in this agreement. In addition to any other charges specified in this agreement, OWNER agrees to pay DEVELOPER $1,283,877.98 development fee *for* completing the Work described as the Project bringing the "Total Build Costs" to $14,122,657.79. It is understood this number is subject to change once the project is fully bought out and all parties *agree* to the final project numbers.

### 3 Contingency Budget

11.    It is identified and agreed to by OWNER that DEVELOPER has an estimated budget of 5% of project cost for "contingencies". CONTRACTOR will submit to DEVELOPER a "change order" for approval by DEVELOPER and OWNER any proposed change order. Contingencies are limited to change orders due to error or omission by a licensed architect after plans were received and reviewed by contractor, all state or federal codes changes that were mandated after contractor received stamped plans and or building permit.

### 4 Scheduled Start of Construction

A.    Work under this agreement will begin within 5 Calendar Days after the following contingencies have been met.

1.    Complete Plans and Specifications have been approved and initialed by both OWNER, DEVELOPER and CONTRACTOR.

2.    OWNER has shown proof of funds or other financing acceptable to DEVELOPER.

3.    DEVELOPER has obtained all architectural approvals from any franchise and or corporate authorities.

4.    OWNER has furnished DEVELOPER with evidence of Ownership of the property satisfactory to DEVELOPER.

5.    All appropriate building permits have been issued.

6.    DEVELOPER has received written notice from the lien holder or the title company ensuring lien holder's security interest in the property that all documents required to be recorded prior to the commencement of construction have been properly recorded.

7.    The contract has been signed by OWNER, DEVELOPER and CONTRACTOR.

### 5 Scheduled Completion of Construction

A.    Work under this agreement will be Substantially Completed within 270 Calendar Days after the date construction begins however it is understood and will go without penalty for acts that our outside of the control (force majeure) of the DEVELOPER and CONTRACTOR.

### 6 Documents Incorporated

A.    The Glossary of Terms which follows our signatures is incorporated into this contract as though included in full as part of this agreement.

B.    This agreement incorporates by reference certain documents which define and describe the Work to be done. The following documents are incorporated as though included in full as part of this agreement.

### 7 Ownership of Plans

A.    All Plans, Drawings, Specifications and other documents prepared by or for OWNER for use under this agreement will be paid for and are the property of DEVELOPER and remain the property of DEVELOPER. Plans, Drawings and Specifications, whether in paper or electronic form, prepared for use in construction under this agreement shall not be modified or used on any other project without written consent of DEVELOPER. DEVELOPER shall hold harmless and Indemnify OWNER from and against all Claims, actions, suits, costs, damages, losses, expenses and attorney's fees arising out of use of the Project Plans, Drawings, *or* Specifications for any purpose other than construction to be completed under this agreement. DEVELOPER, CONTRACTOR and Subcontractors are granted a limited license to use and reproduce applicable portions of the Plans, Specifications and Drawings as required for construction under this agreement. All copies made under this license shall bear a notice showing OWNER as copyright holder. DEVELOPER may retain one record set of the Plans, Drawings and Specifications. All other sets shall be accounted for by DEVELOPER and CONTRACTOR and returned to OWNER. Submittal or distribution of Project Plans, Drawings or Specifications to meet Official Regulatory Requirements is not to be construed as publication in derogation of the rights of OWNER.

### 8 Plans on Site

A.    DEVELOPER and CONTRACTOR will keep a full set of Project Plans available on-site to authorized personnel during the period of construction.

### 9 Documents Supplied to CONTRACTOR

A.    OWNER will furnish to DEVELOPER and CONTRACTOR at no cost (this is part of total project cost)

1.    A full set of Plans and Specifications for all trades in electronic format.

2.    DEVELOPER and CONTRACTOR will distribute Contract Documents as required by Subcontractors.

### 10 Scope of Work

A.    DEVELOPER and CONTRACTOR shall supervise and direct the Work and accepts responsibility for construction means, methods, techniques, sequences and procedures required to complete the Project in compliance with the Contract Documents.

B.    Develop and CONTRACTOR are responsible for coordination of the various trades and deliveries of equipment, materials and supplies to minimize interference which could delay the Work or pose a hazard to life or property. DEVELOPER shall be responsible for allocation of tasks between trades and will be the final authority on location and routing of equipment and storage of materials on the Job Site.

C.    DEVELOPER will ensure that Subcontractors, their agents, and employees adhere to these Contract Documents. DEVELOPER and CONTRACTOR accepts responsibility for all Work performed under this contract, including Work performed by employees of Subcontractors.

D.    CONTRACTOR shall provide on the Job Site during the period of construction a temporary chemical toilet or water closet which shall be serviced no less than weekly. Upon completion of the Project. CONTRACTOR will remove temporary toilet facilities from the site.

E.    DEVELOPER and CONTRACTOR shall provide temporary elevators and lifts as may be required by construction personnel, including Subcontractors, Material Suppliers, Inspectors, and Representatives of OWNER Elevators and lifts will comply with all federal, state and local Laws and ordinances in effect at the Job Site. Upon completion of the Project, DEVELOPER and CONTRACTOR will dismantle and remove temporary elevators and lifts.

F.    DEVELOPER and CONTRACTOR shall develop and present to OWNER for approval (which shall not be withheld unreasonably), a site logistics plan drawn to scale, showing proposed secure and fenced areas, locations and types of temporary barricades, material storage and staging areas, property entrances used for material deliveries, and special material or equipment *storage* Requirements. This plan will include a description and proposed location for any temporary office, storage trailer, sanitary facilities, and parking for construction personnel.

## 11 Submittals

A.    Architectural Drawings will indicate in detail all parts of the building components, Installation details, and coordination with Work of other trades or other CONTRACTORS. Architectural Drawings for structural steel, timbers and pre-cast concrete will include engineering calculations, fabrication details and erection Drawings that show physical characteristics, dimensions, shapes, inserts, attaching points and methods, and other information required for manufacture, assembly and erection, in compliance with the Contract Documents.

B.    Approval by OWNER'S Representative does not relieve DEVELOPER and CONTRACTOR of responsibility for compliance with the Contract Documents except as follows: If a Submittal does not comply with Contract Documents, DEVELOPER and CONTRACTOR will attach to the Submittal, prior to approval, a written request for variation showing the change in Contract Price and Contract Time, if any, that will result from the variation. If OWNER'S Representative approves a Submittal which includes a written request for a variation and which requires a change in the Contract Price or Contract Time, OWNER'S Representative will issue a contract Modification confirming the change. If OWNER'S Representative approves a Submittal with a written request for a minor variation which does not require a change in the Contract Price or Contract Time, no contract Modification is needed. A minor variation is anything which does not materially alter the quality or performance of the Work. Approved variations are subject to all terms of this agreement and without prejudice to any rights granted to OWNER'S Representative under a Surety Bond.

C.    DEVELOPER and CONTRACTOR is entitled to expect that corrections to Submittals by OWNER'S Representative be clearly noted and easily understood so that prompt resubmission is possible without further instructions from OWNER'S Representative.

D.    OWNER'S Representative will review Submittals and notify DEVELOPER and CONTRACTOR of approval or rejection within 2 Calendar Days of receipt.

E.    OWNER'S Representative will review Submittals of DEVELOPER and CONTRACTOR for conformance with Requirements of the Contract Documents and will approve or take other appropriate action upon those Submittals. OWNER'S Representative will advise DEVELOPER and CONTRACTOR of any errors or omissions which OWNER'S Representative may detect during this review. Submittals

approved by OWNER'S Representative become additions to the Contract Documents and can be relied on by DEVELOPER and CONTRACTOR in completing the Work. Nothing in any approved Submittal shall be interpreted to limit DEVELOPER and CONTRACTOR in selection of the means, method, technique, sequence or procedure of construction.

## 12 Record Documents

A.    DEVELOPER and CONTRACTOR will note on a record set of Project Drawings any Work done that is not shown on the original Plans and not described in other Contract Documents. The record set of Project documents will be delivered to OWNER at the same time as final payment is requested.

## 13 Job Site Safety

A.    DEVELOPER and CONTRACTOR will always take all reasonable precautions for the safety of employees and the public at the Job Site and will comply with all applicable safety Laws and regulations of federal, state, and local authorities (including building codes) and safety Requirements of OWNER.

## 14    Hazardous Materials Used in Construction

A.    Except as provided elsewhere in the Contract Documents, CONTRACTOR is responsible for all Hazardous Materials brought to the Job Site by CONTRACTOR or Subcontractors.

## 15    Hazardous Materials Discovered on Site

A.    Except as provided elsewhere in the Contract Documents, OWNER is responsible for all Hazardous Materials discovered on the Job Site so long as those materials were not brought on the Job Site by CONTRACTOR, Subcontractors, or anyone direcUy or indirecUy employed by them. Nothing in this paragraph shall relieve DEVELOPER and CONTRACTOR from liability for negligence in handling or removing hazardous materials as required under the terms of this agreement.

B.    Except as provided in the Contract Documents or as agreed by mutual consent, DEVELOPER and CONTRACTOR shall not be required to perform Work relating to asbestos, polychlorinated biphenyl (PCB), radioactive material, toxic mold or any other Hazardous Material.

## 16    Compliance with Law

A.    CONTRACTOR and OWNER mutually commit to use reasonable care to meet the Requirements of state, federal and local Law when discharging their responsibilities under this agreement.

B.    If DEVELOPER and CONTRACTOR obseNe that Drawings, Specifications, or other Contract Documents do not comply with applicable Law, DEVELOPER and CONTRACTOR shall promptly notify OWNER or OWNER'S Representative of the variance. Any changes made to the Contract Documents because of this notice shall be handled in the form of a Change Order under this agreement.

C.    DEVELOPER and CONTRACTOR shall bear none of the cost of correcting Work completed per Contract Documents but not in compliance with Law if CONTRACTOR did not know that Contract Documents or instructions from OWNER or OWNER'S Representative did not comply with the Law.

D.     If Law enacted after the Contract Date changes the Scope of Work under this agreement, DEVELOPER and CONTRACTOR and OWNER will execute a Change Order adjusting the Contract Price and Contract Time to accommodate the change in the Scope of Work.

## 17    Layout

A.     DEVELOPER and CONTRACTOR shall be responsible for alignment and elevation of the Work and will set grade stakes, batter boards, and other working points, lines and elevations required to complete the Project as described in the Contract Documents.

## 18    Permits and Fees

A.     DEVELOPER and CONTRACTOR shall secure all permits, licenses and renewals required by government authority to complete construction of the Project. If permits are required for Subcontracted Work, Subcontractors will secure those permits. OWNER may request a copy of each permit, license and renewal issued by government authority for the Project. All permits and fees are considered a fee that is enclosed in the project plan.

B.     Project budget will include the building permit fee, Plan check fee, and charges levied by government for testing, Inspection and Re-Inspection of the Project. If a government authority issues or charges an unbudgeted permit or fee, then DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

C.     Except as provided elsewhere in this agreement, Project budget  will include all fees and application charges imposed by government authority, including, but not limited to, grading permit fees, drainage permit fees, traffic control charges, thoroughfare charges, impact fees, special district fees, sewer fees, water fees, planning fees, school fees, elevator permit fees, charges for temporary access or use of the public right of way, and charges for document processing, hearings,  and certifications. Project budget will also pay all fees and application charges imposed by any association of property OWNERs having authority over the Job Site. If a government authority issues or charges an unbudgeted permit or fee, then DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

D.     Except as provided elsewhere in this agreement, Project budget will include all application fees and connection charges imposed by utility companies or government agencies for bringing service to the Job Site, and for connecting gas, water, electricity, phone, cable, sewer, and drainage lines.

E.     Project that are required by government authority, including planning, easements, remediation, environmental, and zoning approval.s

## 19    Taxes

A.     If any federal, state or local tax rate increases or if any new federal, state or local tax is imposed, whether by Law, regulation, or interpretation, between the Contract Date and Substantial Completion, the Contract Price shall be increased by the additional tax levied on DEVELOPER and CONTRACTOR but only to the extent that the change in rate or new tax could not have been reasonably foreseen on the Contract Date. If a government authority issues or charges an unbudgeted permit or fee, then

DEVELOPER and CONTRACTOR will immediately notify the OWNER and this fee will be passed onto the OWNER and should be considered part of the contingency budget.

### 20   Temporary Utilities

A.   DEVELOPER and CONTRACTOR have budgeted for all costs associated with use of temporary utilities on the Job Site during construction, including application fees, permits, engineering, and metered service for water, electric power, heating and cooling. Temporary utility systems provided by DEVELOPER CONTRACTOR shall be designed and installed to protect the public and construction personnel and conform to applicable Laws and Regulations.

B.   Utility services shall be re-listed in the name of future building occupant on the Calendar Day following Substantial Completion.

### 21   Permanent Utilities

Project budget shall include Installation, connection, and modification of permanent electric, water, phone, cable, sewer and gas service as required for the completed Project. It will not include any deposits that will be paid by building occupant

### 22   Job Cleanup

A.   DEVELOPER and CONTRACTOR shall regularly remove from the Job Site and storage areas all surplus material, waste and debris resulting from the Work. Construction debris shall be removed to a legal refuse collection site with disposal or recycling fees included in Project budget. At completion of the Work, DEVELOPER and CONTRACTOR shall, in addition, remove from the Job Site all tools, equipment and scaffolding brought to the Job Site by DEVELOPER and CONTRACTOR or Subcontractors. At Substantial Completion, exposed finishes of windows, doors, floors, walls, ceilings, fixtures and trim shall be cleaned and free of grime, stains, over spray, dirt and dust.

B.   DEVELOPER and CONTRACTOR shall provide a trash disposal facility on the Job Site for use by construction personnel. The on-site trash facility provided by DEVELOPER and CONTRACTOR shall be of an appropriate size for the Project and placed in a location approved by OWNER. All construction debris shall either be placed in the trash facility provided by DEVELOPER and CONTRACTOR or hauled to a legal disposal site, at the discretion of DEVELOPER and CONTRACTOR. When any trash container provided by DEVELOPER and CONTRACTOR is full, contents shall be removed to a legal disposal facility at the expense of CONTRACTOR.

### 23   Project Sign

A.   DEVELOPER and CONTRACTOR shall have the right to fabricate and erect a Project sign bearing the name of the Project, Prime CONTRACTOR, principal Subcontractors, designers, consultants, lead lender, a short Project description, and expected Completion Date. CONTRACTOR may erect directional signs at the Job Site with approval of OWNER with respect to size, style and location. Directional signs may bear the name of CONTRACTOR and a directional symbol. No other signs will be permitted except by permission of OWNER.

## 24    Project Superintendent

A.    DEVELOPER and CONTRACTOR shall employ a competent Superintendent and any necessary assistants or alternates that will be at the job site from start to finish of project. The Superintendent shall not be changed unless the Superintendent is discharged by DEVELOPER and CONTRACTOR. The Superintendent shall have authority to represent DEVELOPER and CONTRACTOR in all matters relating to the Project. Communications with the Superintendent shall have the same force and effect as direct communication with DEVELOPER and CONTRACTOR.

## 25    OWNER'S Responsibilities

A.    OWNER affirms that OWNER has the right to enter this agreement and has the right to contract for construction of the Project on the Job Site. OWNER shall pay all taxes and assessments due on the Job Site during the period of construction and shall take all reasonable actions required to protect marketable title to the Job Site. OWNER is responsible for all standard responsibilities that a property OWNER/landlord would have.

B.    OWNER will ensure that OWNER'S Representative responds in writing and with reasonable promptness to written requests from DEVELOPER and CONTRACTOR for (1) interpretation of the Plans or Specifications, or (2) other information relevant to completion of the Work. DEVELOPER and CONTRACTOR are authorized to rely on written responses from OWNER'S Representative.

C.    OWNER shall have sole responsibility to secure financing for the Project and shall pay any fees, charges, or other costs of such financing, including Inspection fees charged by any lender. The nonperformance of any lender shall not affect the obligation of OWNER to DEVELOPER and CONTRACTOR. OWNER hereby authorizes and directs any lender on the Project to furnish DEVELOPER and CONTRACTOR with full information on undisbursed proceeds when requested by DEVELOPER and CONTRACTOR. Proof of funds must be made available to DEVELOPER prior to project starting.

D.    OWNER will not interfere with or permit others to interfere with, stop, hinder, or delay completion of the Work by DEVELOPER and CONTRACTOR or Subcontractors except as provided under this agreement.

## 26    Construction by Others

A.    OWNER shall neither hire nor retain Separate DEVELOPER and CONTRACTOR, Subcontractors, employees or agents of OWNER to perform Work on the Job Site while Work is being done under this agreement by DEVELOPER and CONTRACTOR.

## 27    Authority of OWNER'S Representative

A.    OWNER'S Representative has authority to administer the contract, make construction decisions on behalf of OWNER, and is the primary authority on issues of compliance with the Drawings and Specifications, quality of workmanship, materials used, manner of performance, and rate of progress on the Project.

B.    After the Contract Date, OWNER shall make no change in the responsibilities or authority of OWNER'S Representative without consent of DEVELOPER and CONTRACTOR.

C.    OWNER'S Representative shall have the right to visit the Project and view Work in progress at any time. Any Defective Work found or suspected, either as the result of a site visit or otherwise, shall be reported promptly to DEVELOPER and CONTRACTOR. No actions taken or statements made during site visits shall relieve DEVELOPER and CONTRACTOR of obligations described in the Contract Documents.

D.    Communication between DEVELOPER and CONTRACTOR and OWNER shall be initiated through OWNER'S Representative unless direct communication is required by Law or Contract Documents. Unless otherwise authorized by DEVELOPER and CONTRACTOR, communications between OWNER'S Representative and Subcontractors or Material Suppliers shall be through DEVELOPER and CONTRACTOR.

E.    OWNER'S Representative shall have the authority to reject and order removed any portion of the Work which does not conform to the Contract Documents.

F.    OWNER'S Representative shall have authority to conduct Inspections about Beneficial Occupancy and to determine the dates of Substantial Completion.

## 28    Representations by DEVELOPER and CONTRACTOR

A.    DEVELOPER and CONTRACTOR shall use skill and attention to complete the Work in a timely manner consistent with the Contract Documents.

B.    OWNER has reported to DEVELOPER and CONTRACTOR all conditions known to OWNER which may not be apparent to CONTRACTOR and which might significantly increase cost of the Work or delay completion. These concealed conditions include, but are not limited to, hazards on the Job Site, unsuitable soil conditions, prior Defective Work of others, latent Defects in the Plans or Specifications, earlier attempts to do Similar or related Work, and obligations imposed by government.

## 29    Disclaimer by OWNER, Reliance by CONTRACTOR

Intentionally Omitted

## 30    Discrepancy between Plans and Field Conditions

A.    CONTRACTOR is not a Design Professional and have no obligation to find discrepancies between Job Site conditions and representations or Requirements in the Contract Documents.

B.    CONTRACTOR shall not be liable for discrepancies between representations or Requirements in the Contract Documents and conditions at the Job Site unless CONTRACTOR knowingly fails to report a discrepancy, in which case CONTRACTOR shall be liable for additional costs incurred because of failure to give prompt notification.

C.    If any concealed structure, water, power, waste, drain or gas line is uncovered or revealed during construction which is not as indicated in the Contract Documents or is inconsistent with information provided by OWNER, and DEVELOPER, and CONTRACTOR shall promptly, and before any such structure or line is disturbed or damaged (except in an Emergency), notify OWNER or OWNER'S Representative. and DEVELOPER, and CONTRACTOR shall submit a Claim for a Change Order which covers the additional cost incurred because of such structure, water, power, waste, drain, or gas line uncovered or revealed during construction.

## 31    Use of the **Site**

A.    OWNER has agreed to furnish all required rights to use the land upon which the Work is to be constructed. OWNER will identify any encumbrances or restrictions related to use of the land furnished and DEVELOPER and CONTRACTOR agrees to comply with those encumbrances or restrictions. If OWNER fails to furnish the land, rights of way, or easements when required, DEVELOPER and CONTRACTOR may make a Claim for extra compensation, additional time, or other relief.

B.    OWNER shall designate a construction entrance which DEVELOPER and CONTRACTOR shall use for all delivery of materials and equipment and which shall be used by all construction personnel.

## 32    Draw Schedule and Developer Compensation

OWNER will pay to DEVELOPER the Contract Price in installments consisting of progress payments and a final payment on completion of the Work. The payment plan on this project will consist of a development standard draw schedule of:

OWNER will pay to DEVELOPER the Contract Price in installments consisting of progress payments and a final payment on completion of the Work. The payment plan on this project will consist of a development standard draw schedule of:

Momentum draw -10% of the Budget within three (3) Business Days following the closing on land, building or execution of this development contract. Momentum draw will include all developer's pursuit cost, project soft cost, developer fee and necessary local, state and or federal permitting fees to start the project.

Draw 1 - 30% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty {30) days following the commencement of the Work.

Draw 2- 30% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty (30) days following draw number 1.

Draw 3 - 20% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORDOWNER, where said request shall be no sooner than thirty (30) days following draw number 2.

Final Draw -10% of the Budget within three (3) Business Days following the written request from DEVELOPER to LANDLORD, where said request includes a copy of all executed lien releases and final payment affidavits (from CONTRACTOR, Subcontractors and others) being submitted to the clerk of court and recorded in the public records and a copy of the permanent Certificate of Occupancy issued for the Project.

DEVELOPER shall earn in addition to any other charges specified in this agreement, OWNER agrees to pay a 10% development fee for completing the Work described as the Project. DEVELOPER fee is paid off total project cost that includes land/building, construction and all numbers that are used to factor total project cost. The Development Fee shall be included in "Total Build Cost". In addition, Developer will be paid three hundred and fifty thousand ( $350,000.00) when the project is 50% complete.

H.        Notwithstanding any contrary provision in this Agreement or otherwise, OWNERS maximum monetary liability under this Agreement and for the Project towards all amounts, including but not limited to the Total Build Cost, shall not exceed, and shall be capped at, the sum of $14,122,657.79. It is understood this number is subject to change once the project is fully bought out and all parties agree to the final project numbers. At that time the final number will be deemed the amount referred to as the OWNERS GROSS MAX).  Notwithstanding any contrary provision in this Agreement or otherwise, DEVELOPER shall be solely responsible under this Agreement and to OWNER, for any projects overruns that are above the gross max number provided to OWNER.

It is agreed by OWNER and or FUNDING SOURCE that all payments will be made to DEVELOPER. DEVELOPER will disburse funds in a timely manner. The afore mentioned budget that is supported by the GMAX clause is considered total project budget and the DEVELOPER will disburse funds per DEVELOPERS discretion.  No third-party title company will be granted permission to disburse funds to any company or individual on behalf of funding group. Each application for payment shall be submitted on AIA progression draw form. Developer will submit for payment a notarized AIA Pay application, lien waivers (conditional or full) and request for draw. This along with any other reporting required under this agreement will be considered the full information request approved by OWNER. The GMAX budget will act as the total invoice for the project. It is understood that the GMAX is the total project cost and it is not the total sum of the subcontractor's budgets.

**** Subject to receiving the final set of architectural plans

****NO BUDGET HAS BEEN ADDED IF THE STATE OF TEXAS health review board mandates any changes that were not picked up in the self-certification / peer review

**Draw1**

| | |
|---|---|
| Lease bond | $250,000.00 |
| Design, Architectural Fee's and due diligence | $264,500.00 |
| Contingency | $200,000.00 |
| Development Fee | $1,283,877.98 |
| Taggart and misc. expenses | $5,934.89 |
| Property tax | $95,000.00 |
| HOA and misc. utilities | $9,865.00 |
| Plan Review fee | $6,748.92 |
| FFE | $255,000.00 |
| Construction | $545,623.10 |
| | $2,916,549.89 |

Draw 2 $765,000.00

Draw 2 $1,636,869.30

Total    $2,401,869.30


Draw 3 $765,000.00

Draw 3 $1,636,869.30

Total    $2,401,869.30


Draw 4 $510,000.00

Draw 4 $1,091,246.20

Total    $1,601,246.20


Draw 5 $255,000.00

Draw 5 $545,623.10

Total    $800,623.10

**Total Project cost      $14,122,157.79**

**33                    Discharge of Liens and Payment of Subcontractors**

1.     DEVELOPER and CONTRACTOR warrants that, upon payment, OWNER shall receive clear title to all Work identified in the application for payment, free and clear of all liens and Claims, including Claims of Subcontractors, employees or Material Supplies. CONTRACTOR also agrees that this vesting of title in OWNER does not impose any obligation on OWNER or relieve CONTRACTOR from any obligation under this contract. CONTRACTOR shall remain responsible for damage to or loss of both the Work and stored materials until Completion.

2.     DEVELOPER and CONTRACTOR warrants and guarantees that no Work, materials, or equipment covered by a request for payment has been acquired by DEVELOPER and CONTRACTOR or by any other person performing the Work or furnishing materials or equipment for the Project subject to an agreement under which an interest therein, or an encumbrance thereon, has been retained by seller or otherwise imposed by CONTRACTOR.

3.     DEVELOPER and CONTRACTOR shall furnish, with each application for payment, executed waivers of liens from DEVELOPER and CONTRACTOR and each Subcontractor and Material Supplier to the Project in the amount of the application for payment. Waivers of liens shall be in a form satisfactory to OWNER, title insurer, and lenders.

4.     DEVELOPER shall disburse funds received from OWNER among DEVELOPER and CONTRACTOR subcontractors and material suppliers in proportion to the work done and materials received for the project during the pay period.

### 34     Interest

A.     Payments due and not paid under the Contract Documents shall bear interest from the date payment is due at a monthly rate of 10 percent.

B.     Payment of interest does not abrogate or replace any other rights DEVELOPER and CONTRACTOR may have under this agreement.

C.     Equity utilized by the OWNER for this project shall earn interest at 10% annually and shall be deducted from the sales price after direct sales costs but before distribution of profits.

### 35    Final Payment

A.     DEVELOPER and CONTRACTOR will apply for final payment and will notify OWNER'S Representative when the work has been completed. OWNER'S Representative will issue a certificate of completion on determination that the Project is complete and in compliance with the Contract Documents. When the certificate of completion is issued, the entire unpaid balance of the contract amount, including any retainage, is payable to DEVELOPER.

B.     Making of final payment constitutes waiver of all Claims by OWNER against DEVELOPER and CONTRACTOR except those Claims previously made in writing and delivered to DEVELOPER and CONTRACTOR and those obligations otherwise provided by this agreement or by operation of Law.

C.     The acceptance of final payment by CONTRACTOR constitutes a complete and unconditional waiver and release of any and all Claims by CONTRACTOR of whatever nature, and regardless of whether they are then known or unknown, and a complete and unconditional release of OWNER, and every person for whom OWNER is responsible, for any and all matters related to the contract or otherwise, except those Claims which have been made in writing and identified by CONTRACTOR as not having been settled at that time.

### 36                                              Changes in the Work

A.     Except as required by changes in the Prime Contract between OWNER and DEVELOPER, no change to this contract (including Modification, clarification, interpretation or correction of the Plans or Specifications) shall be made without agreement and a written Change Order signed by DEVELOPER and CONTRACTOR and OWNER identifying the change, the cost of the change, and the effect on Project Schedule, if any.

B.     Any change in Plans, Specifications or Contract Documents necessary to conform to existing or future Laws, codes, ordinances or regulations shall be considered Extra Work.

C.     Changes in the Work required due to defects or inconsistencies in Plans or Specifications or other Contract Documents shall be considered Extra Work.

D.      The charge for Extra Work shall be the normal selling price DEVELOPER and CONTRACTOR charges for similar changes on other jobs.

E.      Failure of DEVELOPER and CONTRACTOR and OWNER to agree on the terms of a Change Order shall be resolved under the provisions of this agreement which cover Claims and disputes.

F.      Should DEVELOPER and CONTRACTOR and OWNER fail to agree promptly on the terms of a Change Order, DEVELOPER and CONTRACTOR shall be paid, pending resolution of the dispute, the portion of the cost of the change not in dispute, including the costs of time and materials required to execute the change. Payments required under this paragraph shall be made as the Work progresses, concurrently with progress payments.

## 37    Cooperation of the Parties

A      OWNER and DEVELOPER acknowledge that open communication and cooperation will be required to complete the Project on time, as estimated, and in compliance with the Contract Documents. DEVELOPER and OWNER each agree to identify a representative who will be available to resolve minor problems, answer questions and reach mutually acceptable solutions. The individuals identified by DEVELOPER and OWNER shall try to reach informal agreement on problems as they arise but are under no obligation to do so.

B.      Both DEVELOPER and OWNER pledge that their relations will be conducted with courtesy and consideration in an environment characterized by mutual respect. OWNER pledges to respond promptly to requests by DEVELOPER for guidance, assistance and payments when due and agrees to extend to DEVELOPER the deference and latitude a dedicated professional deserves. CONTRACTOR pledges to commit the skill and resources required to complete the Project in a manner that complies with both the letter and spirit of the Contract Documents and enhances the reputation of DEVELOPER and for dependability and professionalism.

## 38    Warranty

DEVELOPER and CONTRACTOR warrant that the Work shall be free of Defects due to faulty material or workmanship for the period specified in this agreement.

A.      General Requirements

1.      Except as otherwise provided in this agreement, the warranty period shall begin from the date of Completion for 12 months.

2.      Work done by CONTRACTOR in compliance with warranty provisions of this agreement does not extend the period of the warranty.

3.      DEVELOPER and CONTRACTOR shall deliver to OWNER all warranties provided by vendors and manufacturers of materials and equipment used to complete the Project. DEVELOPER and CONTRACTOR shall have no obligation under warranties provided by others except to render any assistance that OWNER may require in enforcing the terms of those warrantie.s

4.     Except as provided in this agreement, and to the extent permitted by Law, DEVELOPER and CONTRACTOR disclaims all warranties, whether express or implied, whether of fitness for purpose, merchantability, habitability or workmanlike completion.

5.     Failure of OWNER to give notice of a breach of warranty within the warranty period constitutes a waiver of the right to repair or replacement by DEVELOPER and CONTRACTOR.

6.     To make a warranty Claim under this agreement, OWNER must send a clear and specific written complaint to DEVELOPER and CONTRACTOR at the following address within 60 Calendar Days of discovering Defects, unless otherwise specified in the list of items covered under this warranty. DEVELOPER and CONTRACTOR shall make repairs, replacements and corrections promptly and at no expense to OWNER.

### Exclusions from Warranty

1.     The warranty provided by this contract does not cover any of the following items or conditions:

I.     Damages to private property or bodily injury.

II.     Damages or losses that result from soil movement that is covered by insurance or that is compensated for by legislation.

III.     Insect damage.

IV.     Damage or losses that result from overloading of any floor, wall, ceiling, or roof beyond the design capacity.

V.     Damages caused or made worse by:

A.     Changes, additions, deletions, or any other alterations made to any part of the structure by anyone other than DEVELOPER and CONTRACTOR after the warranty term begins.

B.     Loss that results from failure of OWNER to take timely action to mitigate or minimize damage.

2.     DEVELOPER and CONTRACTOR has no liability for incidental or consequential damages from breach of any warranty provided by this agreement insofar as the loss claimed is covered by insurance of OWNER or for which OWNER has a right of recovery from any other party.

C.     Basic Warranty Coverage

1.     It is a breach of warranty if any material or design furnished, or workmanship performed by DEVELOPER and CONTRACTOR or any Subcontractor or Material Supplier, is found to be defective during the first year.

D.     Warranty on Major Structural Damage

1.     It is a breach of the major structural damage warranty where there is actual physical damage to designated load-bearing portions of the structure caused by the failure of such designated portions to perform to their load-bearing functions to the extent that it makes the structure unsafe, uninhabitable, or unsanitary during the first 12 months. The following items are designated load-bearing portions:

I.      Foundation Systems and Footings

II.     Beams

III.    Girders

IV.     Lintels

V.      Columns

VI.     Walls and Partitions

VII.    Floor Systems

VIII.   Roof Framing Systems

## 39   CONTRACTOR Claims

A.      If CONTRACTOR claims that any instruction, Drawing, act or omission of OWNER or any representative of OWNER, DEVELOPER or any agency of government, increases costs to DEVELOPER and CONTRACTOR, requires extra time or changes the Scope of Work, CONTRACTOR shall have the right to assert a Claim for such costs or time.

## 40   Notice of Claims

A.      No Claim by CONTRACTOR shall be considered unless CONTRACTOR provide OWNER, DEVELOPER or OWNER'S Representative with a notice that there will be a Claim for additional compensation or an extension of time. This notice of Claim shall be made no less than 5 Calendar Days after CONTRACTOR recognizes or should have recognized that circumstances exist which support such a Claim. The notice of Claim shall include (1) The date of the notice, (2) The date the basis for the Claim was discovered, (3) The circumstances that support the Claim, and (4) The estimated additional cost to OWNER and DEVELOPER or additional time required to complete the Project.

B.      If the Claim involves Extra Work, CONTRACTOR shall maintain detailed records which show each expense incurred, including payroll records and receipts for Subcontracted Work, materials and equipment. These detailed records shall be made available to OWNER and DEVELOPER for verification while Work subject to the Claim is being performed.

C.      The amount Claimed by CONTRACTOR shall be calculated in accord with provisions in this contract on charges for Extra Work.

## 41   Arbitration

A.      Any controversy or Claim arising out of or relating to this contract or contract warranty or the breach thereof which cannot be resolved by mediations shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof

B.    Two copies of the demand for arbitration and attachments and the related fees shall be filed with the appropriate regional office of the American Arbitration Association. Copies of the demand and attachments shall be given to all other Parties to the dispute. The demand for arbitration shall be made within a reasonable time after the Claim or dispute has arisen, and in no event after the date when institution of legal or equitable proceedings based on such Claim or dispute would be barred by the applicable statute of limitations.

C.    DEVELOPER, CONTRACTOR and OWNER agree to include in each contract for construction or design services on the Project a clause which requires that disputes under that contract be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules.

D.    Any representative of OWNER or consultant to OWNER or DEVELOPER and CONTRACTOR or any Subcontractor to DEVELOPER and CONTRACTOR on the Project shall have the same rights in any arbitration proceeding as are afforded by arbitration rules to DEVELOPER and CONTRACTOR and OWNER. If more than one demand for arbitration is made by a Party with respect to the Project, all such Claims shall be consolidated into a single arbitration unless the Parties otherwise agree in writing.

E.    If a Claimant in arbitration recovers less than 50 percent of the amount demanded in arbitration, DEVELOPER and CONTRACTOR and OWNER agree that the Claimant shall pay all costs in arbitration, including the arbitrator's fees and the attorney's fees of the opposing Party.

### 42    Insurance

A.    Certificates of Insurance

1.    DEVELOPER and CONTRACTOR shall provide to OWNER a certificate of insurance for each insurance policy required by this agreement. These certificates shall list OWNER as the certificate holder.

2.    Certificates of insurance shall be issued on a standard form

3.    DEVELOPER and CONTRACTOR shall permit no Subcontractor to begin Work on the Project until OWNER has received certificates of insurance demonstrating that the Subcontractor has coverage of a like kind and with comparable limits to insurance coverage required of DEVELOPER and CONTRACTOR under this agreement.

B.    Waivers of Subrogation

1. OWNER and DEVELOPER and CONTRACTOR waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance except such rights as may exist to the proceeds from insurance held by OWNER as trustee. DEVELOPER and CONTRACTOR shall require similar waivers in Subcontracts for the Project.

C.    Insurance Details

1.    If insurance policies meeting the Requirements of this contract are not generally available to DEVELOPER and CONTRACTOR. DEVELOPER and CONTRACTOR may provide substantially similar coverage and shall so notify OWNER in writing.

2.    DEVELOPER and CONTRACTOR may satisfy the policy limits set by this contract through any combination of underlying and excess liability (umbrella) insurance so long as the total coverage is not less than the policy limits specified in this contract. Any excess liability (umbrella) insurance coverage provided by CONTRACTOR must be written on an occurrence basis, offer coverage at least as broad as the underlying insurance, and have concurrent effective dates. Excess liability (umbrella) insurance provided by DEVELOPER and CONTRACTOR shall provide additional insured endorsements, blanket contractual coverage, and punitive damages coverage (unless prohibited by Law).

D.    Liability Insurance

1.    As an alternative to including OWNER as an additional insured under a comprehensive general liability policy, DEVELOPER and CONTRACTOR may provide an OWNER'S and CONTRACTOR's Protective Liability Policy. If DEVELOPER and CONTRACTOR are unable to procure the minimum amounts of insurance in a single policy, CONTRACTOR may provide required policy limits through a combination of a primary OCP Policy and one or more excess policies. OWNER shall be the named insured on the Policy and, if applicable, the excess policy. Each policy shall be endorsed to include each Subcontractor of every Tier as the CONTRACTOR designated in the declarations.

2.    Minimum CONTRACTOR's liability coverage shall be: $1,000,000 combined bodily injury and property damage single occurrence limit, annual aggregate limit of $2,000,000, products and completed operations aggregate limit of $1,000,000, personal and advertising injury aggregate limit of $1,000,000.

E.    Builder's Risk Insurance

1.    OWNER DEVELOPER shall provide builder's risk insurance covering property damage to the Project during the construction period. OWNER and DEVELOP. CONTRACTOR accepts the risk of damage to the Work during construction and agrees to Indemnify and hold harmless DEVELOPER and CONTRACTOR and Subcontractors at any Tier from losses resulting from uninsured damage to the Work prior to final payment under this agreement.

2.    Builder's risk insurance shall include a loss payable provision naming OWNER and DEVELOPER as loss payee. OWNER shall have the power to adjust and settle Claims resulting from builder's risk insurance.

3.    Policy limits for builder's risk coverage shall be no less than the completed replacement value of the Project including the value of Change Orders

### 43    Liability for Damages

Intentionally Omitted

### 44    Indemnity

A.    DEVELOPER and CONTRACTOR shall defend, Indemnify, and hold harmless OWNER and all officers, employees, agents, and consultants of OWNER from and against all and any losses, liability, Claims, costs, damages and economic detriment of any kind whatsoever, or expense (including attorney's fees) that arises out of or results from performance of Work under this agreement provided such loss, liability, costs, damage and economic detriment is attributable to bodily injury, sickness, disease or death

or to injury or destruction of property (other than the Work itself) caused by the negligent acts or omissions of DEVELOPER and CONTRACTOR, a Subcontractor, or anyone directly or indirectly employed by them, or whether caused by or contributed to by OWNER, unless caused by the sole negligence of OWNER.

B.    Indemnification of OWNER is limited to the extent of insurance coverage required to be carried by DEVELOPER and CONTRACTOR under this agreement.

C.    Indemnification under this agreement shall not exceed any limitation on the amount or type of damages, compensation, or benefits payable by or for DEVELOPER and CONTRACTOR or any Subcontractor under workers' compensation acts, disability benefit acts, or other employee benefit acts.

## 45    Interpretation of the Contract

A.    Section headings and paragraph numbers have been included in this contract to refer easier and in no way limit, define, or enlarge the terms, scope, or conditions of this contract.

B.    Except as otherwise provided in this contract, OWNER and DEVELOPER and CONTRACTOR intend that this contract be interpreted in accord with the Restatement of Law, Contracts, published by the American Law Institute. Specifically: All parts of the Contract Documents should be interpreted together and conduct of the Parties should be interpreted as a manifestation of intention, and specific provisions should be interpreted as qualifying the meaning of the general provisions.

## 46    Dealing with Plan Defects

A.    At any time, CONTRACTOR may request an interpretation or clarification of the Contract Documents from DEVELOPER, OWNER or OWNER'S Representative. DEVELOPER, OWNER or OWNER'S Representative shall reply with a written interpretation, clarification, or detailed instructions within a reasonable time.

B.    CONTRACTOR will rely on the Contract Documents as the final authority on what is included in the Project. The Contract Documents were created to identify the labor, material and equipment required for proper completion of the Project. The Contract Documents are defective if a reasonably skilled construction CONTRACTOR doing Similar Work in the community and following generally accepted trade practice could not use the Contract Documents to identify each labor, material and equipment cost required to complete the Project. CONTRACTOR bears no responsibility for defects in the Contract Documents.

C.    Unless CONTRACTOR has asked for and received a written clarification from DEVELOPER or OWNER in time to prevent delay in the Work, any omission or ambiguity in the Contract Documents shall be interpreted as requiring the material or construction technique necessary to produce the greater quantity and better quality of Work.

D.    CONTRACTOR will report promptly to OWNER any design defects likely to result in problems during construction of the Project. However, CONTRACTOR is not a licensed architect or engineer and have no obligation to detect ambiguities, inconsistencies or omissions in the Contract Documents. While acting in good faith, CONTRACTOR is entitled to rely on the Work of a trained design specialist selected by and responsible to DEVELOPER and OWNER.

E.    CONTRACTOR is entitled to rely on dimensions and descriptions shown in the Contract Documents when ordering materials for Installation.

F.    Ambiguities, inconsistencies and omissions in the Contract Documents are design defects, not errors by CONTRACTOR. The cost of correcting design defects shall be at the expense of DEVELOPER and OWNER.

G.    If inconsistent, approved changes to the Contract Documents take precedence over the original Contract Documents. Subsequent changes to the Contract Documents take precedence over prior changes to the Contract Documents.

H.    If inconsistent, the construction Drawings take precedence over the Specifications.

I.    If anything in the construction Specifications is inconsistent with anything else in the construction Specifications: (1) A product performance Requirement takes precedence over a named product or manufacturer, and (2) Other clauses in the Specifications take precedence over anything incorporated by reference into the Specifications.

J.    If anything in the construction Drawings is inconsistent with anything else in the construction Drawings: (1) Dimensions written in numbers take precedence over scaled measurements, (2) Notes and schedules take precedence over lines on the Drawings, (3) Large scale Drawings take precedence over small scale Drawings, (4) Schedules take precedence over notes or other directions, (5) Specific notes take precedence over general notes, and (6) Bottom elevations of footings take precedence over any general notes.

K.    If inconsistent, other Contract Documents take precedence over any manual, industry standard, recommendation, regulation, and set of guidelines, code, or instructions incorporated by reference into the Contract Documents.

L.    If inconsistent, any portion of the Contract Documents written in longhand takes precedence over anything printed in the Contract Documents.

M.    CONTRACTOR has no liability for any omission, inconsistency or ambiguity in the Contract Documents or for any discrepancy between physical conditions at the Job Site and the Contract Documents, unless CONTRACTOR fails to report the error to DEVELOPER , OWNER or OWNER'S Representative.

## 47    Choice of Venue

A.    The Parties agree that venue for any action related to performance of this contract shall be the appropriate court in Tennessee.

## 48    Entire Agreement

The Contract Documents are the entire agreement and constitute a complete integration of all understandings between DEVELOPER and CONTRACTOR and OWNER about the Project. The Contract Documents supersede all prior negotiations, representations and agreements, whether written or oral. No subsequent notation, renewal, addition, deletio, nchange or amendment to this contract shall have any force or effect unless in the form of a written Change Order or amendment to this contract.

## 49    Severability

A.    If any provision of this contract is interpreted or rendered invalid and unenforceable, then the remainder of this contract shall remain in full force and effect.

## 50    Cumulative Remedies

A.    All rights and remedies provided to DEVELOPER and CONTRACTOR by the Contract Documents are cumulative and in addition to and not in limitation of rights and remedies available to CONTRACTOR at Law or in equity.

## 51    Materials and Substitutions

A.    When the Specifications refer to materials or equipment by performance standard (such as an ASTM identifier), DEVELOPER and CONTRACTOR may select for Installation any product or equipment meeting that standard. When several products or manufacturers are identified as acceptable in the Specifications, DEVELOPER and CONTRACTOR has the option of using any of the products or selecting any of the manufacturers listed without seeking approval from OWNER or OWNER'S Representative.

B.    Except as stated otherwise in the Specifications, any reference in the Specifications to a brand, make, manufacturer, or model denotes only characteristics of quality, workmanship, economy of operation and suitability for the intended purpose. DEVELOPER and CONTRACTOR may use any substantially equivalent material, equipment, or article if approved in advance of Installation by OWNER or OWNER'S Representative.

C.    All materials and equipment used on the Project shall comply with Specifications in the Contract Documents unless a substitution is approved in advance of Installation by OWNER or OWNER'S Representative. DEVELOPER and CONTRACTOR shall apply to OWNER or OWNER'S Representative for approval of a substitute material when: (1) Any item specified is found to be unusable or unavailable when needed for Installation, or (2) The item specified is considered inferior to an equivalent item which is readily available at a Similar cost. With the application, DEVELOPER and CONTRACTOR shall include documentation: (1) Demonstrating that essential features of the substitute item are equal to or exceed similar features of the item specified, and (2) Listing delivered prices for the substitute item based on Material Supplier quotations. OWNER or OWNER'S Representative may deny any application for substitution if not in the best interest of OWNER. If approved, any savings in cost that result from the substitution will be credited to OWNER. No request for substitution of material shall constitute grounds for extension of the Contract Time. Proposed substitutions shall not be purchased or installed without approval of the substitution by OWNER or OWNER'S Representative.

## 52    Inspections

DEVELOPER and CONTRACTOR shall schedule and coordinate all Inspections required by the Contract Documents and by public authority so as not to delay the progress of the Work or the Work of OWNER or Separate CONTRACTORs. If the Contract Documents require that an Inspection be witnessed or attended by OWNER or OWNER'S Representative, DEVELOPER and CONTRACTOR shall give notice of the time and place of the Inspection. DEVELOPER and CONTRACTOR shall schedule Inspections during regular

Workdays and normal business hours, unless mutually agreed by DEVELOPER and CONTRACTOR, OWNER, and Inspector.

B.      Insofar as applicable and except where superseded by other provisions of the Contract Documents or by government regulation, Inspection of the following Work will be required on the Project and delivered to OWNER with Draw requests: (1) Bearing surfaces of excavations before concrete is placed, (2) Reinforcing steel after Installation and before concrete is poured, (3) Structural concrete when poured, (4) Structural framing after erection and prior to being covered or enclosed, (5) Steel welding, (6) Mechanical and plumbing Work following Installation and prior to being covered or enclosed, (7) Electrical Work following Installation and prior to being covered or enclosed, (8) Above-ceiling Work when complete but before the finish ceiling material is installed, and (9) Final Inspections prior to occupancy.

C.      If an Inspection reveals Work of DEVELOPER and CONTRACTOR not in compliance with the Contract Documents or not in compliance with any code or statute, DEVELOPER and CONTRACTOR shall bear the costs of correction, the cost of repeating the Inspection, and any related costs, including reasonable charges by OWNER or OWNER'S Representative for additional services.

## 53    The Construction Schedule

A.      DEVELOPER and CONTRACTOR shall prepare and submit to OWNER for review and approval an estimated progress Schedule for the Work showing completion within the Contract Time. This progress Schedule shall identify expected starting and completion dates for each part of the job and identify tasks critical to timely completion of the Work.

B.      DEVELOPER and CONTRACTOR may select any type of Schedule which: (1) Is suitable for monitoring progress of the Work, (2) Provides easy access to information about the timing of decisions OWNER must make and acts OWNER must perform, (3) Includes sufficient detail to demonstrate adequate planning for the Work, and (4) Presents a practical plan to complete the Work in an acceptable time.

C.      DEVELOPER and CONTRACTOR shall plan, develop, supervise, control, and coordinate the performance of the Work so that job progress, sequence and timing conform to the construction Schedule. If DEVELOPER and DEVELOPER and CONTRACTOR falls materially behind the currently approved construction Schedule, OWNER may require DEVELOPER and CONTRACTOR to prepare and submit for approval, at no cost to OWNER, a plan for completing the Project within the Contract Time. Failure to submit a plan meeting this Requirement shall constitute grounds for termination under the terms of this agreement. Periodic monitoring of this plan shall be reported to OWNER with Draw reques.ts

D.      The Schedule shall allow for and depict the following: (1) Beginning and Completion Dates of each significant task (Work breakdown structure) in the job, (2) Delivery and approval of each Submittal, Samples and Shop Drawing, (3) Inspections and tests, (4) The Work of Subcontractors and Separate CONTRACTORs, and (5) Order dates and delivery dates of significant equipment and key materials. The construction Schedule shall include a legend which identifies the meaning of each symbol and abbreviatio.n

## 54    Extension of the Time for Completion

A.      OWNER shall execute a Change Order for Excusable Delay by extending the Contract Time for the period of the delay. Any of the following shall constitute excusable delay for which the Contract Time shall

be extended: (1) Strike, boycott, embargo, terrorism, armed rebellion, quarantine, pandemic or other obstructive action by employees, labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or, order of government authority, and (2) Fire, flood, earthquake, tornado, tidal wave, lightning, rain, snow, temperature under 32 degrees, casualty loss, epidemic, or unusually adverse weather, (3) delay in payments from owner or equity.

B.     For delay in delivery of materials, FF&E, equipment or for a shortage of labor that results from unforeseeable circumstances beyond the control and without fault or negligence of either DEVELOPER and CONTRACTOR, or any Subcontractor or Material Supplier of DEVELOPER and CONTRACTOR, OWNER will grant an extension of the Contract Time if: (1) DEVELOPER and CONTRACTOR, notifies OWNER or OWNER'S Representative promptly on discovery of the anticipated shortage, (2) DEVELOPER and CONTRACTOR,  substantiates the delay as unavoidable with a detailed chronology of events and all relevant correspondence, and (3) DEVELOPER and CONTRACTOR, provides an estimated date when the material, equipment or labor will be available.

C.     Any Change Order granted for Excusable Delay shall have no effect on a Claim by DEVELOPER and CONTRACTOR, for damage from the same delay for interruption, hindrance, or disruption.

## 55   DEVELOPER and CONTRACTOR Claims for Delay

A.     The Contract Price shall be adjusted for any increase in the cost of performance of this contract caused by suspension, delay or interruption of the Work due to: (1) An error or omission in the Contract Documents, (2) A decision of OWNER to change the Scope of the Work, unless the decision is the result of an error or omission by DEVELOPER and CONTRACTOR,, (3) A decision of OWNER to suspend the Work, unless the decision is the result of an error or omission by DEVELOPER and CONTRACTOR,, (4) A failure by OWNER or OWNER'S Representative to comply with the construction Schedule, (5) Any act or neglect of OWNER or agent of OWNER or any Separate DEVELOPER and CONTRACTOR, (6) Failure of OWNER to yield control of the Job Site to DEVELOPER and CONTRACTOR,. or (7) Failure of OWNER to make payments when due under the terms of this agreement.

B.     Within 3 Working Days after receipt of a notice of Claim for compensation for suspension, delay, or interruption,  OWNER shall: (1) Respond with a resolution, remedy, or direction to alleviate the delay, (2) Respond with a notice rejecting the Claim for delay, or (3) Respond with a draft Change Order accepting the Claim for delay. If the issue is not then resolved, DEVELOPER and CONTRACTOR, may request a Change Order.

C.     No change in the Contract Time for completion or the Contract Price shall become part of the Contract Documents without a Change Order.

D.     Compensation to DEVELOPER and CONTRACTOR, for suspension, delay, or interruption of Work shall include direct overhead (Job Site) **expense,** a proportionate share of unabsorbed indirect (home office) overhead expense, lost efficiency and lost profit taken as 15 percent of total compensable expenses. Direct overhead costs shall include, without limitation: (1) Labor (with taxes, insurance and fringe benefits) for the idle work force, (2) The fair rental cost of idle equipment (such as vehicles, construction tools and equipment), (3) Facilities (such as temporary structures, water, power, phone, and toilets), (4) The additional cost of Bonds and insurance, (5) Similar direct overhead costs of Subcontractors to whom

DEVELOPER and CONTRACTOR, is liable for damages that result from the delay, and (6) Demobilization and re-mobilization costs. Unabsorbed indirect overhead costs shall include, without limitation, the proportionate share of office rent, office supplies, office utilities, office equipment, advertising, professional fees, management salaries, technical services, estimating, selling, accounting, bookkeeping and clerical expense, business licenses, taxes (except income taxes), and insurance.

### 56    Liquidated Damages

A.    Time is of the essence about this contract. The Schedule for completion and provisions in this contract for extension of the Contract Time are considered reasonable by OWNER and DEVELOPER and DEVELOPER and CONTRACTOR, any neglect, refusal or failure of DEVELOPER and CONTRACTOR to reach Substantial Completion within the Contract Time, plus approved extensions of that time, will result in damage to OWNER impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, OWNER shall deduct from money due DEVELOPER and CONTRACTOR or which may become due CONTRACTOR the sum of $800.00  as liquidated damages for each Calendar Day that Substantial Completion is delayed beyond the Contract Time, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

B.    Time is of the essence about this contract. The Schedule for completion and provisions in this contract for extension of the time for Completion are considered reasonable by OWNER and CONTRACTOR. Any neglect, refusal or failure of DEVELOPER and CONTRACTOR, to reach Completion within the time provided in this contract, plus approved extensions of that time, will result in damage in the form of inconvenience, loss of opportunities, and higher Inspection, Superintendence, and administrative costs to OWNER. These costs are impossible to estimate accurately in advance, and difficult to calculate after the occurrence. In lieu of actual damages for delay, OWNER shall deduct from money due DEVELOPER and DEVELOPER and CONTRACTOR or which may become due DEVELOPER and CONTRACTOR, the sum of $800.00 as liquidated damages for each Calendar Day that Completion is delayed beyond the time provided in this contract, plus approved extensions of that time. This daily rate for liquidated damages is reasonable, is our best estimate of actual damages, and is not a penalty.

C.    Achieving Substantial Completion sooner than the Contract Time, plus approved extensions of that time, shall earn additional compensation to DEVELOPER and CONTRACTOR of $100.00 for each Calendar Day that Substantial Completion is achieved prior to the Contract Time, plus approved extensions of that time.

D.    DEVELOPER and CONTRACTOR, shall not be charged liquidated damages for any failure, neglect or refusal to complete the Work on Schedule to the extent that the proximate cause of the delay was: (1) Strike, boycott, embargo, terrorism, armed rebellion, quarantine, or other obstructive action by employees or labor organizations, discovery of archaeological or paleontological artifacts, act or neglect of a public utility, or by order of government authority, (2) Fire, flood, earthquake, tornado, tidal wave, lightning, casualty loss, epidemic, or unusually adverse weather, (3) Any delay of Subcontractors or vendors resulting from items listed in sections 1 or 2 above, or (4) Any act or omission of OWNER or anyone acting on behalf of OWNER.

E.    Except as provided elsewhere in this contract, liquidated damages are the exclusive damage remedy for OWNER for any failure of DEVELOPER and CONTRACTOR to complete Work per Schedule. No damages of any other type or description shall be awarded OWNER for failure of DEVELOPER and CONTRACTOR to comply with the construction Schedule.

### 57    Consequential Damages

A.    DEVELOPER and CONTRACTOR, and OWNER waive all Claims for consequential damages against each other, their respective officers, directors, partners, employees, agents, consultants and Subcontractors, arising out of or relating to this contract or the termination of this contract, except those consequential damages covered by insurance or specifically provided elsewhere in this agreement.

### 58    Right to Stop Work for Non-Payment

A.    If DEVELOPER and CONTRACTOR, is not paid any amount not in dispute within 14 Calendar Days after the date due, CONTRACTOR shall post on the Job Site and deliver to OWNER and all Subcontractors a notice of intention to stop the Work if payments then due are not received in full within 10 Calendar Days. Thereafter, CONTRACTOR may suspend the Work until delinquent payments have been received, pursuant to Tennessee Civil Code § 3260.2.

B.    Neither DEVELOPER and CONTRACTOR, nor Surety of CONTRACTOR, nor any Subcontractor of DEVELOPER and CONTRACTOR shall be liable for delay or damage that OWNER may suffer as a result of suspension of the Work for failure to receive payments due under this agreement so long as: (1) Work was suspended by DEVELOPER and CONTRACTOR in compliance with the terms of this contract and with applicable Law, and (2) There is no good faith dispute that payment is due DEVELOPER and CONTRACTOR, at the time of suspension. A good faith dispute exists if OWNER provides: (1) A list of specific reasons for nonpayment, including labor, materials, or equipment not in compliance with the Contract Documents, and (2) CONTRACTOR is afforded a reasonable opportunity to correct the Defects cited or issue a credit compensating OWNER for Defects that cannot be cured promptly.

### 59    Early Partial Occupancy

A.    Without prior approval of DEVELOPER and CONTRACTOR, OWNER shall not occupy or use any portion of the Work until Substantial Completion of the Project. If OWNER occupies or uses any portion of the Work before Substantial Completion of the Project and without prior approval of DEVELOPER and CONTRACTOR, the portion or portions used or occupied shall be considered complete, finished, accepted and the responsibility of OWNER.

B.    No Partial Use or occupancy of the Work by OWNER shall commence prior to Substantial Completion without a Change Order confirming the responsibility of OWNER for maintenance, utilities, operation of equipment, and security during ea y Partial Use or occupancy.

C.    If any portion of the Project is used or occupied by OWNER prior to Substantial Completion and if the Project is not completed within the Contract Time, liability of DEVELOPER and CONTRACTOR, for delayed completion shall be reduced by the proportion of the Project used or occupied by OWNER and for the time used or occupied by OWNER prior to Substantial Completion.

**60**                          **Substantial Completion**

A.    When, in the opinion of DEVELOPER and CONTRACTOR. the Work is Substantially Complete, and a Certificate of Occupancy has been (or can be awarded) DEVELOPER and CONTRACTOR shall prepare a preliminary Punch List of Work remaining to be done and deliver that Punch List to OWNER'S Representative with a request for evaluation of Substantial Completion. If, in the opinion of OWNER'S Representative, items on the preliminary Punch List are consistent with Substantial Completion, OWNER'S Representative shall conduct an Inspection of the Work to evaluate compliance with the Contract Documents.

B. before OWNER takes possession or occupancy of the Project, DEVELOPER and CONTRACTOR, shall receive a comprehensive Punch List of discrepancies to be corrected or Work to be finished by CONTRACTOR and a date for completing this Work. DEVELOPER and CONTRACTOR shall complete and correct items on the Punch List by the designated date.

C. the Punch List given to DEVELOPER and CONTRACTOR, is a complete and final list of Defective or incomplete Work on the Project. OWNER shall be deemed to have accepted Work not on the Punch List. Nothing in this paragraph shall be interpreted as relieving DEVELOPER and CONTRACTOR of the obligation to meet warranty and call-back obligations.

D.    DEVELOPER and CONTRACTOR shall annotate the Punch List with: (1) A detailed breakdown of the Work required to complete or correct each item, (2) The Subcontractor or trade responsible for the Work, and (3) The dates Work will commence and be finished on each item. No annotation is required for any item on the Punch List which is beyond the control of DEVELOPER and CONTRACTOR. Failure of CONTRACTOR to furnish a detailed completion Schedule for items on the Punch List shall constitute grounds for withdrawing acknowledgment of Substantial Completion.

E.    OWNER'S Representative will prepare a certificate of Substantial Completion for signature by OWNER and DEVELOPER and CONTRACTOR, when the Project or a specific portion of the Project is ready for occupancy. Except as otherwise provided in the Contract Documents, signing of the certificate of completion shall: (1) Transfer to OWNER responsibility for maintenance, safety, utility expense, controlling access at the site, and (2) Begin running of any warranty or call-back period on the Project.

H. after Substantial Completion, DEVELOPER and CONTRACTOR, shall remain responsible for: (1) Damage caused by DEVELOPER and CONTRACTOR, while completing the Work, and (2) Safety of crews when completing the Work.

62    Delivery of Notices

A.    Any written notice required by this contract can be: (1) Delivered by hand at the last known address of the addressee, or (2) Delivered by hand to the addressee or representative of the addressee, wherever found. Notice is effective upon delivery.

B.    Any written notice required by this contract can be: (1) Delivered by enclosing in a stamped envelope addressed to the last known address of the intended recipient and either deposited in a United States Postal Service mailbox or given to a USPS employee, or (2) Consigned to a commercial courier service

and addressed to the last known address of the intended recipient. Notice is effective upon delivery if proof of delivery is provided; where no proof of delivery is available, notice is effective 5 Calendar Days after mailing or consignment to a courier service.

Signatures

The signatures that follow constitute confirmation by those signing that they have examined and understand the Contract Documents and agree to be bound by the terms of these documents.

DEVELOPER and CONTRACTOR may not begin Work before receiving from OWNER a written notice to proceed. Any Work performed by DEVELOPER and CONTRACTOR before receipt of the notice to proceed shall be done at the risk of DEVELOPER and CONTRACTOR and without obligation of OWNER.

This agree    nt is entered as of the date written below.

OWNER Name: MILLROCK INVESTMENT FUND 1 LLC

_____

(Signature)                              (Date)

_____

(Printed Name and Title)

DEVELOP:        C DBA American Develo;ment•rtners,

_____

(Signature)                              (Date)

_____

(Printed Name and Title)

Manny Butera american development Partners

09 21 21

**Glossary of Terms**

Beneficial Occupancy refers to OWNER'S use of the project premises after Substantial Completion but prior to Final Completion. Beneficial Occupancy may occur when the project or some portion is sufficiently complete and systems operational such that the OWNER could, after obtaining necessary approvals and certificates, occupy and utilize the space for its intended purpose. The time limit for warranties applicable to that portion of the Work begin on the date the OWNER begins Beneficial Occupancy, unless otherwise specified in this Agreement.

Bond means the security offered by a licensed surety company which may be used to satisfy a claim of failure to perform obligations undertaken in this Agreement.

Calendar Day means any day shown on the calendar beginning at midnight and ending at midnight the following day. Contrast the term Workday which excludes Saturdays, Sundays and state-recognized holidays.

Certification of Payment is acknowledgment by someone not a party to this Agreement that CONTRACTOR is entitled to payment for work completed.

Change Order is a written modification of the Contract Price (including all claims for direct, indirect and consequential damages and costs of delay), Time for Completion and Scope of Work under this Agreement. A Change Order, once signed by all parties, is incorporated into and becomes a part of the Contract Documents.

Claim means a demand or assertion by one of the parties to this Agreement seeking, **as a** matter of right, modification, adjustment or interpretation of contract terms, payment of money, extension of time or other relief.

Code Requirements means all laws, statutes, regulations, building codes, ordinances, rules, and lawful orders of all public authorities having jurisdiction over OWNER, CONTRACTOR, any Subcontractor, the Project, the Job Site, the Work, or the prosecution of the Work.

Contract Completion Date means the day by which the Work must be substantially complete.

Contract Date is the day on which the contract becomes binding between CONTRACTOR and OWNER.

Contract Documents are this Agreement and all documents incorporated by reference into this Agreement.

Contract Price is the amount which will become due in exchange for work performed under this Agreement. Contract Price includes allowances for purchased materials and equipment and may be modified by a Change Order or contract modification. The Contract Price may be paid in one or more installments, including an Initial Payment at or before the start of work, Progress Payments as work is completed, and a Final Payment on final acceptance of the work. Payment Period is the time elapsed

Between applications for progress payments or prior to the first application for progress payment.

Contract Schedule is a graphical representation of a practical plan to complete Work within the Contract Time.

Contract Time means the period between Date of Commencement and the date of Substantial Completion.

CONTRACTOR is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking the execution of the Work under the terms of this Agreement.

Defective Work means construction done under this Agreement that is unsatisfactory, faulty, omitted, incomplete, deficient, or does not conform to the requirements of the Contract Documents, directives of OWNER'S Representative, or the requirements of an inspection, reference standard, test, or approval specified in the Contract Documents.

Design Professional means the person, organization or authorized representative who is responsible to the OWNER for design of the Project through preparation of Drawings and Specifications. The term Design Professional may refer to an architect, designer, engineer or landscape architect.

Drawings (also called plans or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Drawings include plan views, elevation views, transverse and longitudinal sections, large and small-scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed Project. A group of drawings adequate to complete construction of the Project may be referred to as a plan set. Drawings can be either paper or electronic media.

Emergency means an unforeseen event, combination of circumstances, or a resulting state that poses imminent danger to health, life or property.

Excusable Delay means any circumstance which postpones completion of the Work and for which CONTRACTOR is entitled to an adjustment of the Contract Time but not an adjustment to the Contract Price. Contrast Inexcusable Delay which entitles CONTRACTOR to neither an adjustment of the Contract Price nor an adjustment in the Contract Time.

Extra Work means any change, interpretation, clarification or correction in the Contract Documents or in applicable law, ordinance or regulation which would increase or decrease the quantity of work, delay, suspend or interfere with the work, require an addition to or omission from the work, change the character, quality or nature of any part of the work or material used in the work, change levels, lines, positions or dimensions of any part of the work, require demolition or removal of any work completed under this Agreement, extend or amend the normal work day, alter the construction schedule or require completion of any part of the work at a time other than provided by this Contract when originally made.

Final Completion is the date of OWNER'S acceptance of the Work as fully performed per the

Contract Documents.

Furnish means to supply and deliver to the job site.

General CONTRACTOR is an individual, partnership, firm, corporation, joint venture, or other legal entity undertaking execution of the Work under terms of a Prime Contract.

Hazardous Materials means radioactive materials, asbestos, polychlorinated biphenyls, petroleum, crude oil, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, and toxic

substances which are restricted, prohibited, or regulated by any agency of government in the manufacture, use, maintenance, storage, Ownership or handling.

Indemnification Financial compensation intended to restore someone to their condition before a loss or damage.

Inspection is any review of the Project, including a visual review of the Work completed to ascertain compliance with Contract Documents, building codes and construction standards.

Inspector is anyone authorized by government or the Design Professional to conduct inspections of contract performance and materials supplied for the Work.

Install means to secure in position in compliance with the Contract Documents and includes unloading materials, supplying all necessary equipment and rigs to do the work and performing functional tests which demonstrate fitness for the intended purpose.

Job Site is the address or location of the Project.

Law means federal or state statutes, municipal ordinances, building codes, regulations adopted pursuant to statute, executive orders, official interpretations, and other rules and directives issued by government.

Material Supplier means any manufacturer, fabricator, distributor, material man or vendor who provides material for the Project but does not provide on-site labor.

Modification is a written amendment to the Contract signed by both parties.

OWNER'S Representative means the person or firm authorized to act and make administrative decisions on behalf of the OWNER during construction. Any notice required to be delivered to the OWNER may be delivered to the OWNER'S Representative. The scope of authority of the OWNER'S Representative is defined in this contract. CONTRACTOR cannot rely on any decision or instruction by OWNER'S Representative that is beyond the representative's defined scope of his authority. Nothing in this contract prevents OWNER from issuing a notice or instructions directly to the CONTRACTOR. The OWNER may change the OWNER'S Representative from time to time and may, if OWNER'S Representative is absent, disabled or otherwise temporarily unavailable, appoint an interim OWNER'S Representative.

Party (to this contract) means a person or business organization which has an obligation to perform under the terms of this contract.

Plans (also called drawings or prints) are scale representations of the shape, location, character and dimensions of Work to be completed under this contract. Plans include plan views, elevation views, transverse and longitudinal sections, large and small-scale sections and details, isometrics, diagrams, schedules, tables, data and pictures which depict the completed project. A group of plans adequate to complete construction of the Project may be referred to as a plan set. Plans can be either paper or electronic media.

Prime Contract is a written agreement between CONTRACTOR and OWNER which binds CONTRACTOR to furnish labor, equipment, or materials or perform certain work for a price to be paid by OWNER.

Project means Work to be completed in accord with the Contract Documents. Work at the Job Site may include other projects to be completed by the OWNER or other CONTRACTORs working under other agreements.

Provide means furnish and install and includes connecting, testing, and placing in service for the intended use.

Punch List **is a** comprehensive list of incomplete, defective or incorrect Work yet to be completed or which does not comply with Contract Documents. A Punch List may be prepared by the CONTRACTOR, Subcontractor, Design Professional or OWNER. An initial Punch List will be prepared before application for Substantial Completion. A Close-out Punch List will be prepared before Final Completion.

Requirements means, in addition to obligations, responsibilities and limitations set out in the Contract Documents, the obligations, responsibilities and limitations imposed by law, rules, orders, ordinances, regulations, statutes, codes and executive orders of governmental authorities or fire rating bureaus.

Retainage is a portion of each progress payment temporarily held back or retained by the OWNER. Accumulated retainage is released to CONTRACTOR on satisfactory completion of the work.

Sample means a physical example of material; equipment or workmanship intended to be representative of some portion of the Work. When approved, samples establish standards for completion of similar work on the Project.

Schedule of Values means the detailed breakdown of cost of materials, equipment and labor necessary to complete the Project as described in the Contract Documents.

Scope of Work means the Work as defined by the Contract Documents.

Separate CONTRACTOR means a person or firm working under a different contract but on the same site


and at the same time as work will be done under this contract.

Shop Drawings are diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data which are prepared by the CONTRACTOR or a Subcontractor, manufacturer, supplier or distributor, and which illustrate or describe some portion of the Work to be completed in compliance with the Contract Documents. Once submitted to the approval authority and approved, Shop Drawings establish standards for completion of work on Project.

Similar means having a like kind, quality and characteristics. Similar is not to be construed as meaning identical or by the same manufacturer.

Specifications (also called specs) are the part of the Contract Documents which provide descriptions of materials, equipment, construction systems, technique and workmanship to be used on the Project. Specifications are both instructions to be followed by the CONTRACTOR and Subcontractors and a reference for the Building Official to evaluate code compliance.

Subcontract is a written agreement between a specialty CONTRACTOR and General CONTRACTOR. Terms of the subcontract require the specialty CONTRACTOR to complete some portion of the work General CONTRACTOR is obligated to perform under another agreement, usually with the OWNER.

Subcontractor is any person or business entity under contract to a general CONTRACTOR to perform some portion of the work general CONTRACTOR is obligated to complete under a contract with the OWNER. Subcontractor is an independent CONTRACTOR performing services for another CONTRACTOR rather than for the OWNER. A person or organization providing supplies or materials for the Project, but no job site labor is not a Subcontractor.

Submittals demonstrate the way by which the CONTRACTOR proposes to conform to the requirements of the Contract Documents. Submittals are shop drawings (diagrams, illustrations, pictures, schedules, performance charts, layouts, schematics, descriptive literature, schedules, performance and test data, and other data) required by the Contract Documents which are prepared for the CONTRACTOR to depict some portion of the Work. Submittals are delivered to the OWNER for approval or disapproval by the OWNER prior to purchase or installation.

Substantial Completion means the Project, or a designated portion of the Project is nearly in compliance with the Contract Documents and is sufficiently complete to be considered fully operational in all its components and is fit for the intended use. Substantial Completion is reached when a limited number of non-conforming or defective items on a Punch List remain to be completed. Normally, a Project or portion of a Project cannot be considered Substantially Complete until (1) all utilities and services are connected and working, (2) all equipment is installed and in acceptable working condition, (3) additional activity by the CONTRACTOR to correct items on the Punch List will not prevent or disrupt use of the facility, and, (4) a certificate of occupancy has been issued by the appropriate authority.

Sub-subcontractor is any person or business entity under contract to a subcontractor or any lower tier subcontractor to perform some portion of the work subcontractor is obligated to complete under a

contract with the prime CONTRACTOR. Sub-subcontractors are independent CONTRACTORs performing services for another CONTRACTOR rather than for the prime CONTRACTOR. A person or organization providing supplies or materials for the Project, but no job site labor is not a Sub-subcontractor.

Superintendent is the representative of the CONTRACTOR at the job site who is authorized to receive instructions from the OWNER or OWNER'S Representative and who is authorized to direct the performance of work on behalf of the CONTRACTOR.

Surety means any qualified individual, firm or corporation other than the CONTRACTOR, which executes a bond to insure its acceptable performance of the contract.

Tier refers to the contractual level of a person or business organization doing work on the Project. A first-tier subcontractor has a contract with the general CONTRACTOR but not the OWNER. A second-tier subcontractor has a contract with another subcontractor but not with the general CONTRACTOR or the OWNER.

Work means all labor, material, equipment, tools, transportation, permanent and temporary utilities, connections, provisions for safety and management services required to complete the Project in

compliance with the Contract Documents. Work may constitute the whole or a part of the Project. Work is to be performed in a safe, expeditious, orderly and professional manner in keeping with current standards of the industry. Work includes everything that is or should be evident to a skilled construction professional after careful examination of the Contract Documents and the Job Site.

Workday means any day, excluding Saturdays, Sundays and state-recognized holidays, shown on the calendar beginning at midnight and ending at midnight the following day.

# EXHIBIT 3

**Advance Care Medicine**
**By: American Development Partners®**
**Construction Bid Form**

| | | | |
|---|---|---|---|
| Project: | SARC Draper | CAP RATE | 9.25% |
| Address: | 13800 S Pony Express Dr.,Draper, UT | Annual Rent | $1,318,613.26 |
| Date: | 12/21/2020 | Monthly Rent | $109,884.44 |
| Contact: | Manny Butera - Developer | | |
| Phone: | 615-368-3412 | | |
| Email: | manny@americandevelopmentpartners.com | | |

| Duration in Calendar Days | 180 |
|---|---|

| Description | | Comments |
|---|---|---|
| **General Conditions** | | |
| **Division 1** | **Supervision & Facilities** | **$189,750.00** | |
| | Supervision | $67,500.00 | |
| | General Liability and Builders Ris | $38,000.00 | |
| | Construction manager | $50,000.00 | |
| | Temp Utilities - Power, water, toilet & phon | $4,750.00 | |
| | Temp Facilities - Office setup, project, signs, trailer, storage & dumpsters | $29,500.00 | |
| **Division 2** | **General Project Requirements and Design / A&E** | **$734,992.56** | |
| | Final Clean Up | $10,000.00 | |
| | Security Fencing | $5,000.00 | |
| | Special Inspection, Surveying | $16,750.00 | |
| | Lease bond | $232,972.84 | |
| | Design, Architectural Fee's and due diligence | $455,959.72 | |
| | Permits, impact fee's, City improvement bonds and connection fe | $14,310.00 | |
| | **TOTAL GENERAL CONDITIONS COST** | **$924,742.56** | |
| | | | |
| **BUILDING AND LAND** | | |
| **Division 3** | **Concrete and Land** | **$4,555,065.00** | |
| | Building | $4,475,460.00 | |
| | Foundation - Do not include any site concrete in this line ite | $27,137.00 | |
| | Slab, Patches, Gypcreate | $52,468.00 | |
| **Division 4** | **Masonry** | **$56,647.00** | |
| | CMU | $56,647.00 | |
| **Division 5** | **Steel** | **$18,756.00** | |
| | Steel - Misc. building stee | $18,756.00 | |
| **Division 6** | **Carpentry** | **$332,012.67** | |
| | Rough Carpentry Labor & Equipmen | $74,500.00 | |
| | Lumber Package and hardware package | $68,248.92 | |
| | Plastic Laminate Cabinets, Tops and Shelves | $189,263.75 | |
| **Division 7** | **Thermal & Moisture Protection** | **$148,904.00** | |
| | Damp and Water Proofing | $1,000.00 | |
| | Building Insulation | $12,400.00 | |
| | EIFS and Metal Panels | $15,278.00 | |
| | Roofing - TPO, flashing, gutters, etc. | $19,026.00 | |
| | Intumescent and Gypsum Board Fire Rating | $101,200.00 | |
| **Division 8** | **Openings** | **$202,714.00** | |
| | Doors and Frames | $107,539.00 | |
| | 18' Stanley Sliding Glas | $20,000.00 | |
| | Aluminum Storefront & Doors | $75,175.00 | |
| **Division 9** | **Finishes** | **$377,109.00** | |
| | Drywall ( includes FRP | $148,520.00 | |
| | Acoustical Ceiling Material & Installatio | $44,912.00 | |
| | Painting | $46,700.00 | |
| | Sheet vinyl and LVP | $136,977.00 | |
| **Division 10** | **Specialties** | **$48,670.00** | |
| | Restroom Accessories | $17,243.00 | |
| | Cubicle Curtains | $19,958.00 | |
| | Metal Lockers | $11,469.00 | |
| **Division 11/12** | **Equipment/Furniture** | **$47,274.00** | |
| | Room Signs | $10,000.00 | |
| | Window Shades | $32,274.00 | |
| | Furniture instal | $5,000.00 | |
| **Division 14** | **Conveying Equipment** | **$116,500.00** | |
| | Elevator | $116,500.00 | |
| **Division 21** | **Fire Suppression** | **$39,975.00** | |
| | Fire Sprinkler | $39,975.00 | |
| **Division 22** | Knox Box | $500.00 | |
| | **Plumbing** | **$0.00** | |
| **Division 23** | **Plumbing - Rough-In & finish out complete ( Included in HVA** | $0.00 | |
| | **HVAC** | **$1,534,940.00** | |
| **Division 26** | HVAC - Labor & Materials | $1,534,940.00 | |
| | **Building Electric** | **$1,329,450.00** | |
| **Division 28** | Building Electrical ( includes Nurse call system | $1,298,000.00 | |
| | Access control system | $8,000.00 | |
| | Low voltage - Conduit, back boxes, pull string, etc | $23,450.00 | |
| | **TOTAL BUILDING COST** | **$8,808,516.67** | |
| | | | |
| **SITE** | | |
| **Division 2** | **Demolition** | **$32,847.50** | |
| | Building Demolition | $23,500.00 | |
| | Site Demolition | $9,347.50 | |
| **Division 31** | **Earthwork** | **$52,656.00** | |
| | SWPPP - Inspections and compliance | $5,000.00 | |

| | | | |
|---|---|---|---|
| | Erosion Control | $4,800.00 | |
| | Earthwork | $42,856.00 | |
| **Division 32** | **Exterior Improvements** | **$130,866.00** | |
| | Asphalt Paving | $24,560.00 | |
| | Site Concrete - Paving, Light Poles, Sidewalks, Curb, ETC | $45,522.00 | |
| | Curb an side walk prep | $27,284.00 | |
| | Landscape | $33,500.00 | |
| **Division 33.01** | **Utilities** | **$45,570.00** | |
| | Sanitary Sewer or septic system & leach field | $16,000.00 | |
| | Storm Drain | $29,570.00 | |
| **Division 33.70** | **Site Electric** | **$3,500.00** | |
| | Telephone/Cable Conduits w/ Pull String | $3,500.00 | |
| | **TOTAL SITE COST:** | **$265,439.50** | |

| | | | |
|---|---|---|---|
| **MISC - ITEMS NOT PRESENT ON SPREADSHEET** | | | |
| | FFE/ WC | $2,550,000.00 | |
| | 8 Months of CAM | $40,000.00 | |
| | 8 Months of Tax | $30,000.00 | |
| | Investor transaction cost ( legal, recording etc | $20,645.37 | |
| | Contingency | $200,000.00 | |
| | | $0.00 | |
| | | $0.00 | |
| | **TOTAL MISC COST:** | **$2,840,645.37** | |

| | |
|---|---|
| TOTAL GENERAL CONDITIONS COST: | $924,742.56 |
| TOTAL BUILDING COST: | $8,808,516.67 |
| TOTAL SITE COST: | $265,439.50 |
| TOTAL MISC COST: | $2,840,645.37 |
| TOTAL COST: | $12,839,344.10 |
| OVERHEAD: | $120,000.00 |
| PAYMENT AND PERFORMANCE BOND: | $0.00 |
| TOTAL | $12,959,344.10 |
| Development Fee | $1,295,934.41 |
| **Total Project Cost** | **$14,255,278.51** |

# EXHIBIT 4

**Advance Care Medicine**

**By: American Development Partners®**                    $5.00

**Construction Bid Form**

| | | | |
|---|---|---|---|
| Project: | **Kelelr TX** | **CAP RATE** | **9.25%** |
| Address: | **1220 Keller Parkway, Keller, TX 76248** | **Annual Rent** | **$1,306,345.85** |
| Date: | **8/15/2021** | **Monthly Rent** | **$108,862.15** |
| Contact: | **Manny Butera - Developer** | | |
| Phone: | **615-368-3412** | | |
| Email: | manny@americandevelopmentpartners.com | | |

| Duration in Calendar Days | 225 |
|---|---|

| Description | | | Comments |
|---|---|---|---|
| **General Conditions** | | | |
| Division 1 | **Supervision & Facilities** | **$273,000.00** | |
| | Supervision | $232,840.00 | |
| | General Liability and Builders Risk | $18,000.00 | $3000 increase |
| | Temp Utilities - Power, water, toilet & phone | $3,200.00 | |
| | Temp Facilities - Office setup, project, signs, trailer, storage & dumpsters | $18,960.00 | |
| Division 2 | **General Project Requirements and Design / A&E** | **$549,500.00** | |
| | Final Clean Up | $5,000.00 | |
| | Security Fencing | $5,000.00 | |
| | Peer review | $25,000.00 | |
| | Lease bond | $250,000.00 | |
| | Design, Architectural Fee's and due diligence | $264,500.00 | |
| | Permits, impact fee's, City improvement bonds and connection fee | $0.00 | subtract $14310 counted twice |
| | **TOTAL GENERAL CONDITIONS COST:** | **$822,500.00** | |
| | | | |
| | **BUILDING AND LAND** | | |
| Division 3 | **Concrete and Land** | **$4,017,988.00** | |
| | Building | $4,000,000.00 | |
| | Foundation - Do not include any site concrete in this line item | $17,988.00 | |
| Division 4 | **Masonry** | **$34,220.00** | |
| | Masonry Block, Brick Veneer, Faux Stone & Nichiha Board | $34,220.00 | |
| Division 5 | **Steel** | **$95,100.00** | |
| | Steel - Misc building steel | $95,100.00 | |
| Division 6 | **Carpentry** | **$99,181.00** | |
| | Plastic Laminate Cabinets, Tops and Shelves | $78,681.00 | |
| | Finish Carpentry | $20,500.00 | |
| Division 7 | **Thermal & Moisture Protection** | **$147,500.00** | |
| | Roofing - remove/ replace, flashing, gutters, etc. | $144,000.00 | |
| | Caulking | $3,500.00 | |
| Division 8 | **Openings** | **$142,200.00** | |
| | Doors and Frames | $108,700.00 | $8,000 increase |
| | Aluminum Storefront & Doors | $33,500.00 | |
| Division 9 | **Finishes** | **$409,758.00** | |
| | Drywall | $205,000.00 | $5,000 increase |
| | Acoustical Ceiling Material & Installation | $66,200.00 | |
| | FRP | $2,400.00 | |
| | Painting | $46,924.00 | $4709 increase |
| | Ceramic Tile | $5,234.00 | |
| | Vinyl Pland Flooring and Base | $84,000.00 | |
| Division 10 | **Specialties** | **$18,130.00** | |
| | Restroom Accessories | $7,500.00 | |
| | Misc. Specialties (fire extinguishers, curtains and track) | $10,630.00 | $300 incfrease |
| Division 11/12 | **Equipment/Furniture** | **$17,500.00** | |
| | Room Signs | $2,500.00 | |
| | Furniture install | $15,000.00 | |
| Division 21 | **Fire Suppression** | **$38,500.00** | |
| | Fire Sprinkler | $38,500.00 | |
| Division 22 | Knox Box | $500.00 | |
| | **Plumbing** | **$843,300.00** | |
| Division 23 | Plumbing - Labor & materials | $843,300.00 | $55,200 increase(medical gasses included) |
| | **HVAC** | **$735,000.00** | |
| Division 26 | HVAC - Labor & Materials | $735,000.00 | $14400 increase |
| | **Building Electric** | **$1,047,000.00** | |
| Division 28 | Building Electrical ( includes Nurse call system ) | $938,000.00 | $26000 increase |
| | Low voltage - Conduit, back boxes, pull string, etc. | $109,000.00 | |
| | **Electronic Safety & Security** | **$18,500.00** | |
| Division 30 | Fire Alarm | $18,500.00 | |
| | **TOTAL BUILDING COST:** | **$8,486,377.00** | |
| | | | |
| | **SITE** | | |

| Division 2 | Demolition | $82,615.00 | |
| | Building Demolition | $47,500.00 | |
| | Site Demolition | $35,115.00 | |
| Division 31 | Earthwork | $1,200.00 | |
| | Termite Treatment | $1,200.00 | |
| Division 32 | Exterior Improvements | $129,987.00 | |
| | Parking lot enahncement | $67,700.00 | |
| | Site Concrete - Paving, Light Poles, Sidewalks, Curb, ETC | $37,050.00 | $2315 increase |
| | Powerwash, Seal & Striping | $10,237.00 | |
| | Landscape | $15,000.00 | |
| | TOTAL SITE COST: | $213,802.00 | |

| MISC - ITEMS NOT PRESENT ON SPREADSHEET | | | |
| | FFE/ WC | $2,550,000.00 | |
| Owner reimbusement | Tagart and misc expesnes | $5,934.89 | |
| Owner reimbusement | Property tax | $95,000.00 | |
| Owner reimbusement | HOA and misc utilties | $9,865.00 | |
| Owner reimbusement | Plan Review fee | $6,748.92 | |
| | Contingency | $200,000.00 | $200,000 contingency |
| | Building and Fire Alarm Permits | $23,019.00 | |
| | Wall and Door Protection | $32,963.00 | |
| | Floor Preparation | $12,000.00 | |
| | Nurses Call/Aiphone System | $60,000.00 | |
| | TOTAL MISC COST: | $2,995,530.81 | |

| | | |
|---|---|---|
| TOTAL GENERAL CONDITIONS COST: | $822,500.00 | |
| TOTAL  BUILDING COST: | $8,486,377.00 | |
| TOTAL  SITE COST: | $213,802.00 | |
| TOTAL  MISC COST: | $2,995,530.81 | |
| TOTAL COST: | $12,518,209.81 | |
| OVERHEAD: (FEE AND GL INSURANCE) | $246,570.00 | $29510 increase |
| PAYMENT AND PERFORMANCE BOND: | $74,000.00 | $4000 increase |
| TOTAL | $12,838,779.81 | |
| Development Fee | $1,283,877.98 | |
| Total Project Cost | $14,122,657.79 | |

Increase of $152,434.00
Contigency $200,000.00
Total - $352,434.00

# EXHIBIT 5



# OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

299 S. Main Street, Ste 120
Salt Lake City, UT 84111
Phone: 801-753-7700 Fax: 866-633-0263

## ESTIMATED
## SETTLEMENT STATEMENT

| | |
|---|---|
| Date: | November 19, 2020 1:49 pm |
| Closing Date: | November 20, 2020 |
| Property Address: | 38 West 13775 South, Units 100, 110, 200, 210, 220 Draper, Utah 84020 |

| | |
|---|---|
| File No.: | 1941482FA |
| Purchasers: | SARC Draper LLC, a Missouri limited liability company |

Property Tax ID(s): 33-01-278-010 and 33-01-278-009 and 33-01-278-005 and 33-01-278-006 and 33-01-278-007

Sellers: Home Builders, LLC, a Utah limited liability company
9069 S. 1300 W.
West Jordan, UT 84088

| | Seller Credits | Seller Charges | Purchaser Credits | Purchaser Charges |
|---|---|---|---|---|
| Sales Price | $4,475,460.00 | | | $4,475,460.00 |
| 2020 Taxes - TIN: 33-01-276-026 | | $75,776.56 | | |
| Estimated 2020 Tax Prorations (111,307  11/20/2020 thru 12/31/2020 sq / 19,853 sq = .1784)  .1784 * $75,776.56 = $13,518.54) | $1,514.37 | | | $1,514.37 |
| Consulting Fee To Sixty West Finance, LLC | | | | $8,950.00 |
| Net Proceeds Payoff To Central Bank | | $3,548,622.21 | | |
| Realtor Commission - 6% To Colliers International | | $268,527.60 | | |
| Acquistion Fee To Caton Commercial Real Estate Group - 3% | | | | $134,263.80 |
| Legal Fees To Holden Law | | | | $2,000.00 |
| Legal Fees To John F. Argoudelis, LLC | | | | $10,000.00 |
| Guarantee Fee to DGY - 1% | | | | $44,754.60 |
| Lending Fees | | | | |
| Origination Fee | | | | $33,566.00 |
| Appraisal Fee | | | | $6,500.00 |
| Flood Fee | | | | $18.50 |
| Title Fees To Old Republic National Title Insurance | | | | |
| Closing Fees | | $1,000.00 | | $1,000.00 |
| Payoff Processing Fee | | $75.00 | | |
| Title Insurance To Old Republic National Title Insurance | | | | |
| Subdivision/Developer | | $7,883.00 | | $0.00 |
| Simultaneous Loan  / $4,724,158.27 | | $0.00 | | $6,041.00 |
| Recording Fees To Old Republic National Title Insurance | | | | |
| Recording - Deed | | | | $45.00 |
| Recording - Atlas Lien Release | | $45.00 | | |
| Recording - Alliance Lien Release | | $45.00 | | |
| Recording - Deed of Trust | | | | $45.00 |
| Earnest Money Released | $575,000.00 | | $575,000.00 | |
| Loan Amount From MRV Banks | | | $4,724,158.27 | |
| Funds Held for Buy Back | | | | $575,000.00 |

| | | | | |
|---|---|---|---|---|
| Sub Totals: | | $4,476,974.37 | $4,476,974.37 | $5,299,158.27 | $5,299,158.27 |
| Net Proceeds Due Seller | $0.00 | | | |
| Funds Due From Buyer | | $0.00 | | |
| Grand Totals: | | $4,476,974.37 | $4,476,974.37 | $5,299,158.27 | $5,299,158.27 |

Signature Page to Follow

## Settlement Statement Signature Page

File No.:     1941482FA

Property:     38 West 13775 South, Units 100, 110, 200, 210, 220
              Draper, Utah 84020

To the best of my knowledge, the foregoing statement is a true and accurate account of the funds which were received and will be disbursed as part of the settlement of this transaction and is approved by me, the undersigned.  I agree to pay my costs, expenses and any other obligations itemized.

Home Builders, LLC a Utah limited liability company

By: Ross Ford

Its: Manager

SARC Draper LLC, a Missouri limited liability company

By: _____

Its:

By: _____

Its:

By: _____

Forest Anthony,
Escrow Officer

Settlement Statement Signature Page

File No.:      1941482FA

Property:     38 West 13775 South, Units 100, 110, 200, 210, 220
              Draper, Utah 84020


To the best of my knowledge, the foregoing statement is a true and accurate account of the funds which were received and will be disbursed as part of the settlement of this transaction and is approved by me, the undersigned.  I agree to pay my costs, expenses and any other obligations itemized.

Home Builders, LLC a Utah limited liability company

_____
By:
Its:


SARC Draper LLC, a Missouri limited liability company

_Stephen W Holden_____
By: Stephen W Holden
Its: Manager

_S. Caton_____
By: Steven Caton
Its: Manager of SARC Draper LLC


By:

_____
Forest Anthony,
Escrow Officer



**REQUEST FOR DISBURSEMENT**

**To:**   Kevin Long                                         **Date:** 1/4/21

**Project:** SARC DRAPER

**Re:**   Draper UT                                          **Draw Request:** Momentum Draw

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 12/28/20, ("<u>Development Agreement</u>"), disburse to developer the following amounts for the construction and project work at the above-referenced site for the period beginning 4/17/20 **and ending** 1/4/21. Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $514,958.00 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $514,958.00 |
| SOFT COSTS (This Application Only): (Complete all that apply) | | |
| _____ (Development Fee) | $1,294,934.41 | |
| _____ (Bond) | $232,972.84 | |
| _____ (Architectural) | $455,959.72 | |
| _____ (FFE) | $255,000.00 | |
| _____ (Permits) | $14,310.00 | |
| _____ (CAM & TAX.) | $70,000.00 | |
| _____ (Investor expense) | $20,645.37 | |
| _____ (Other) | $_____ | |
| _____ (Lessee Fee) | $_____ | |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $2,343,822.34 |
| *TOTAL DEVELOPMENT REQUEST:* | | *$2,858,780.34* |



**REQUEST FOR DISBURSEMENT**

**To:**    Kevin Long                              **Date:** 2/12/21

**Project:** SARC DRAPER

**Re:**    Draper UT                              **Draw Request:** Draw 2

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 12/28/20, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 1/4/21 **and ending** 2/12/21.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

---

HARD COSTS (This Application Only):

General Contractor
    See AIA forms G702 and G703 attached hereto
    And incorporated herein by this reference    $1,586,998.85

    SUBTOTAL OF HARD COSTS:    $_____
    Less Retainage (0%) Withheld    $_____
    Retainage to be Paid    $_____

    **TOTAL HARD COST DRAW:**    $1,586,998.85

SOFT COSTS (This Application Only):
(Complete all that apply)

| | | |
|---|---|---|
| _____ | (Development Fee) | $ |
| _____ | (Bond) | $ |
| _____ | (Architectural) | $ |
| _____ | (FFE) | $720,000.00 |
| _____ | (Permits) | $ |
| _____ | (CAM & TAX.) | $ |
| _____ | (Investor expense) | $ |
| _____ | (Other) | $_____ |
| _____ | (Lessee Fee) | $_____ |

(Attach statement for additional soft costs)

    **SUBTOTAL OF SOFT COSTS**    $720,000.00

    ***TOTAL DEVELOPMENT REQUEST:***    ***$2,306,998.85***

---



**REQUEST FOR DISBURSEMENT**

**To:**    Kevin Long                                    **Date:** 3/15/21

**Project:** SARC DRAPER

**Re:**    Draper UT                                    **Draw Request:** Draw 3

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 12/28/20, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 2/12/21 **and ending** 3/15/21.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $1,586,998.85 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $1,586,998.85 |
| SOFT COSTS (This Application Only): | | |
| (Complete all that apply) | | |
| _____ (Development Fee) | $ | |
| _____ (Bond) | $ | |
| _____ (Architectural) | $ | |
| _____ (FFE) | $720,000.00 | |
| _____ (Permits) | $ | |
| _____ (CAM & TAX.) | $ | |
| _____ (Investor expense) | $ | |
| _____ (Other) | $_____ | |
| _____ (Lessee Fee) | $_____ | |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $720,000.00 |
| ***TOTAL DEVELOPMENT REQUEST:*** | | ***$2,306,998.85*** |



**REQUEST FOR DISBURSEMENT**

**To:**   Kevin Long                                   **Date:** 5/11/21

**Project:** SARC DRAPER

**Re:**   Draper UT                                   **Draw Request:** Draw 4

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 12/28/20, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 3/15/21 **and ending** 5/11/21.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $1,057,999.23 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $1,057,999.23 |
| SOFT COSTS (This Application Only): (Complete all that apply) | | |
| _____ (Development Fee) | $ | |
| _____ (Bond) | $ | |
| _____ (Architectural) | $ | |
| _____ (FFE) | $480,000.00 | |
| _____ (Permits) | $ | |
| _____ (CAM & TAX.) | $ | |
| _____ (Investor expense) | $ | |
| _____ (Other) | $_____ | |
| _____ (Lessee Fee) | $_____ | |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $480,000.00 |
| ***TOTAL DEVELOPMENT REQUEST:*** | | ***$1,537,999.23*** |

# EXHIBIT 6

# ★★★★ OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

299 S. Main Street, Ste 120
Salt Lake City, UT 84111
Phone: 801-753-7700 Fax: 866-633-0263

## FINAL
## SETTLEMENT STATEMENT

| | | | |
|---|---|---|---|
| Date: | November 20, 2020 10:42 am | File No.: | 5141003830 |
| Closing Date: | November 20, 2020 | | |
| Property Address: | 1220 Keller Parkway<br>Keller, TX 76248 | Purchasers: | Millrock Investment Fund 1, LLC, a Utah limited liability company<br>111 Main St., Ste. 2200<br>Salt Lake City, UT 84111 |
| | | | WASATCH FRONT COMMERCIAL PROPERTIES LLC, a Utah limited liability company |
| | | | 1976 DOUGLAS LLC, a Utah limited liability company |
| | | | Happiness LLC, a Utah limited liability company |
| | | | Summit Exchange Services, L.L.C., as 1031 Accommodator for MARK MACHLIS and LADY MIRA BLUE MACHLIS |
| | | | LONESTARBOSS LLC, a Wisconsin limited liability company |
| | | | VSC OF TEXAS LLC, a Wisconsin limited liability company |
| | | | DKG MANAGEMENT INC., a New York corporation |
| | | | JDZ ENTERPRISES INC., a Connecticut corporation |
| | | | THANE SIDDOWAY |
| | | | TRIPLE H LLC, a Utah limited liability company |
| | | | HELLO BELLO LLC, a Utah limited liability company |
| | | | J3 HOLDINGS, LLC, a Delaware limited liability company |
| Property Tax ID: | 42065222 | Sellers: | SCMOB 1220 Keller Pkwy, LLC, a Texas limited liability company<br>550 Bailey Avenue<br>Fort Worth, TX 76107 |

| | | Seller | | Purchaser | |
|---|---|---|---|---|---|
| | | **Credits** | **Charges** | **Credits** | **Charges** |
| Sales Price | | $4,000,000.00 | | | $4,000,000.00 |
| 2020 Taxes | | | $77,603.90 | | |
| Estimated 2020 Tax Prorations | 11/20/2020 thru 12/31/2020 | $8,693.33 | | | $8,693.33 |
| Legal Fees To DLA Piper LLP | | | $9,975.00 | | |
| Advisory Services Fee To Ryan & Bell Realty Partners, LLC | | | $80,000.00 | | |
| Payoff To Frost Bank | | | $2,934,878.75 | | |
| Real Estate Commission To 2MR Capital, LLC | | | $100,000.00 | | |
| Realtor Commission To Colliers International | | | $100,000.00 | | |
| Title Fees To Old Republic National Title Insurance | | | | | |
|    Closing Fees | | | $1,000.00 | | $1,000.00 |
|    Payoff Processing Fee | | | $75.00 | | |

CSS Comb V 3.0

| | | | | |
|---|---|---|---|---|
| Tax Certification | | $59.00 | | |
| Title Insurance To Old Republic National Title Insurance | | | | |
|     Standard Owner | | $18,565.00 | | $0.00 |
| Recording Fees To Old Republic National Title Insurance | | | | |
|     Recording - Special Warranty Deed | | | | $40.00 |
| Earnest Money Released | | $225,000.00 | $225,000.00 | |
| Net Exchange Proceeds | | | $999,940.00 | |
| Sub Totals: | $4,008,693.33 | $3,547,156.65 | $1,224,940.00 | $4,009,733.33 |
| Net Proceeds Due Seller | | $461,536.68 | | |
| Funds Due From Buyer | | | $2,784,793.33 | |
| Grand Totals: | $4,008,693.33 | $4,008,693.33 | $4,009,733.33 | $4,009,733.33 |

Signature Page to Follow

Settlement Statement Signature Page

File No.:     5141003830

Property:    1220 Keller Parkway
             Keller, TX 76248

To the best of my knowledge, the foregoing statement is a true and accurate account of the funds which were received and will be disbursed as part of the settlement of this transaction and is approved by me, the undersigned.  I agree to pay my costs, expenses and any other obligations itemized

SCMOB 1220 Keller Pkwy, LLC, a Texas limited liability company

    By: E-Care Keller, LLC, its sole member

        By:    _William A. Sandhu_
        Name:  WILLIAM A. SANDHU
        Title: MANAGER

Millrock Investment Fund 1, LLC, a Utah limited liability company

_____
By:
Its:

WASATCH FRONT COMMERCIAL PROPERTIES LLC, a Utah limited liability company

_____
By:
Its:

1976 DOUGLAS LLC, a Utah limited liability company

_____
By:
Its:

Happiness LLC, a Utah limited liability company

_____
By:
Its:

LONESTARBOSS LLC, a Wisconsin limited liability company

_____
By:
Its:

VSC OF TEXAS LLC, a Wisconsin limited liability company

_____
By:
Its:

DKG MANAGEMENT INC., a New York corporation

_____
By:
Its:

JDZ ENTERPRISES INC., a Connecticut corporation

_____
By:
Its:

_____
THANE SIDDOWAY

## Settlement Statement Signature Page

File No.:     5141003830

Property:     1220 Keller Parkway
              Keller, TX 76248

To the best of my knowledge, the foregoing statement is a true and accurate account of the funds which were received and will be disbursed as part of the settlement of this transaction and is approved by me, the undersigned. I agree to pay my costs, expenses and any other obligations itemized

SCMOB 1220 Keller Pkwy, LLC, a Texas limited liability company

    By: E-Care Keller, LLC, its sole member

        By: _____
        Name: _____
        Title: _____

Millrock Investment Fund 1, LLC, a Utah limited liability company

By: Kevin G. Long
Its: Manager

WASATCH FRONT COMMERCIAL PROPERTIES LLC, a Utah limited liability company

By: Bill Carrigan
Its: President

1976 DOUGLAS LLC, a Utah limited liability company

By: Steven Schwartz          Daniel Schwartz
Its: p                       Managing Member

Happiness LLC, a Utah limited liability company

By: Gabor Koltai
Its: Owner

LONESTARBOSS LLC, a Wisconsin limited liability company

By: John Bosshard
Its: Managing member

VSC OF TEXAS LLC, a Wisconsin limited liability company

By: George Parke
Its: managing member

DKG MANAGEMENT INC., a New York corporation

By: Doug Goldsmith
Its: manager

JDZ ENTERPRISES INC., a Connecticut corporation

By: Jonathan Zamzok
Its: Owner

THANE SIDDOWAY

TRIPLE H LLC, a Utah limited liability company

*Henry H. Hunter*

By: Henry H. Hunter

Its: President

HELLO BELLO LLC, a Utah limited liability company

*Sam Duke*

By: Sam Duke

Its: President

J3 HOLDINGS, LLC, a Delaware limited liability company

*John Alcantar*

By: John Alcantar

Its: Managing Memeber

Summit Exchange Services, L.L.C., as 1031 Accomodator for MARK MACHLIS and LADY MIRA BLUE MACHLIS

*Ray Beck*

By: Ray Beck

Its: Manager

As Read and Approved by:

*Mark Machlis*

MARK MACHLIS

*Lady Mira Blue Machlis*

LADY MIRA BLUE MACHLIS

By:

*Forest Anthony*

Forest Anthony,
Escrow Officer



### REQUEST FOR DISBURSEMENT

**To:**   Kevin Long                                      **Date:** 9/28/21

**Project:** SARC KELLER

**Re:**   KELLER, TX                                      **Draw Request:** Momentum Draw

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 9/25/21, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 2/17/20 **and ending** 9/28/21.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | |
|---|---|
| HARD COSTS (This Application Only): | |
| General Contractor | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $545,623.10 |
| SUBTOTAL OF HARD COSTS: | $_____ |
| Less Retainage (0%) Withheld | $_____ |
| Retainage to be Paid | $_____ |
| **TOTAL HARD COST DRAW:** | $545,623.10 |
| SOFT COSTS (This Application Only): | |
| (Complete all that apply) | |
| _____ (Development Fee) | $1,283,877.98 |
| _____ (Bond) | $250,000.00 |
| _____ (Architectural) | $264,500.00 |
| _____ (FFE) | $255,000.00 |
| _____ (Permits) | $ |
| _____ (CAM & TAX.) | $ |
| _____ (Investor expense) | $117,548.81 |
| _____ (Contingency) | $200,000.00 |
| _____ (Lessee Fee) | $_____ |
| (Attach statement for additional soft costs) | |
| **SUBTOTAL OF SOFT COSTS** | $2,370,926.79 |
| ***TOTAL DEVELOPMENT REQUEST:*** | ***$2,916,549.89*** |



### REQUEST FOR DISBURSEMENT

**To:**    Kevin Long                                    **Date:** 12/26/21

**Project:** SARC KELLER

**Re:**    KELLER, TX                                    **Draw Request:** Draw 2

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 9/25/21, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 9/28/21 **and ending** 12/26/21.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto | | |
| And incorporated herein by this reference | $1,636,869.30 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $1,636,869.30 |
| SOFT COSTS (This Application Only): | | |
| (Complete all that apply) | | |
| _____ | (Development Fee) | $_____ |
| _____ | (Bond) | $_____ |
| _____ | (Architectural) | $_____ |
| _____ | (FFE) | $765,000.00 |
| _____ | (Permits) | $ |
| _____ | (CAM & TAX.) | $ |
| _____ | (Investor expense) | $ |
| _____ | (Contingency) | $_____ |
| _____ | (Lessee Fee) | $_____ |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $765,000.00 |
| *TOTAL DEVELOPMENT REQUEST:* | | *$2,401,869.30* |



### REQUEST FOR DISBURSEMENT

**To:**   Kevin Long                                    **Date:** 1/23/22

**Project:** SARC KELLER

**Re:**   KELLER, TX                                    **Draw Request:** Draw 3

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 9/25/21, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 12/26/21 **and ending** 1/23/22.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $1,636,869.30 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | $1,636,869.30 | |
| SOFT COSTS (This Application Only): (Complete all that apply) | | |
| _____ | (Development Fee) | $_____ |
| _____ | (Bond) | $_____ |
| _____ | (Architectural) | $_____ |
| _____ | (FFE) | $765,000.00 |
| _____ | (Permits) | $ |
| _____ | (CAM & TAX.) | $ |
| _____ | (Investor expense) | $ |
| _____ | (Contingency) | $_____ |
| _____ | (Lessee Fee) | $_____ |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | $765,000.00 | |
| *TOTAL DEVELOPMENT REQUEST:* | *$2,401,869.30* | |



### REQUEST FOR DISBURSEMENT

**To:**   Kevin Long                                    **Date:** 3/4/22

**Project:** SARC KELLER

**Re:**   KELLER, TX                                  **Draw Request:** Draw 4

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 9/25/21, ("Development Agreement"), disburse to developer the following amounts for the construction and project work at the above-referenced site for the period beginning 1/23/22 **and ending** 3/3/22. Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $1,091,246.20 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $1,091,246.20 |
| SOFT COSTS (This Application Only): | | |
| (Complete all that apply) | | |
| Per dev con. to be paid at 50% complete (Development Fee) | $350,000.00 | |
| _____ (Bond) | $_____ | |
| _____ (Architectural) | $_____ | |
| _____ (FFE) | $510,000.00 | |
| _____ (Permits) | $ | |
| _____ (CAM & TAX.) | $ | |
| _____ (Investor expense) | $ | |
| _____ (Contingency) | $_____ | |
| _____ (Lessee Fee) | $_____ | |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $860,000.00 |
| *TOTAL DEVELOPMENT REQUEST:* | | *$1,951,256.20* |

# APPLICATION AND CERTIFICATE FOR PAYMENT

**CONSTRUCTION MANAGER-ADVISOR EDITION**

AIA DOCUMENT G702/Cma          (Instructions on reverse side)                                    PAGE ONE OF 3 PAGES

| | | | | |
|---|---|---|---|---|
| CONTRACTOR: | Built-More LLC<br>275 Jackson Meadows Dr<br>STE 105<br>Hermitage TN 37076 | PROJECT:<br>Keller TX Surgery center<br>1220 Keller Parkway,<br>Keler, TX 76248 | APPLICATION NUMBER: FOUR<br>PERIOD TO:<br>PROJECT NOS.: 2111 | Distribution to:<br>☐ OWNER<br>☐ CONSTRUCTION MANAGER |
| SUBCONTRACTOR: | | | CONTRACT DATE: 09/13/21 | ☐ ARCHITECT<br>☐ CONTRACTOR |
| CONTRACT FOR: | | VIA CONSTRUCTION MANAGER:<br>VIA ARCHITECT: | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | | |
|---|---|---|---|
| 1. | **ORIGINAL CONTRACT SUM** | | $5,456,231.00 |
| 2. | **Net Change By Change Orders** | | $0.00 |
| 3. | **CONTRACT SUM TO DATE** | (Line 1 +2) | $ 5,456,231.00 |
| 4. | **TOTAL COMPLETED & STORED TO DATE** | | $4,910,607.90 |
| | (Column G on G703) | | |

5. **RETAINAGE:**

| | | |
|---|---|---|
| a. | 10% % of Completed Work | $0.00 |
| | (Columns D & E on G703) | |
| b. | 10% % of Stored Material | $0.00 |
| | (Column F on G703) | |
| | Total Retainage (Line 5a + 5b or | |
| | Total in Column 1 of G703) | $0.00 |

| | | |
|---|---|---|
| 6. | **TOTAL EARNED LESS RETAINAGE** | $4,898,423.90 |
| | (Line 4 less Line 5 Total) | |
| 7. | **LESS PREVIOUS CERTIFICATES FOR PAYMENT** | |
| | (Line 6 from prior Certificate) | $3,819,361.70 |
| 8. | **CURRENT PAYMENT DUE** | $1,079,062.20 |
| 9. | **BALANCE TO FINISH, INCLUDING RETAINAGE** | 545,623.10 |
| | (Line 3 less Line 6) | $ - |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total Approved this Month | | |
| TOTALS | $0.00 | $0.00 |
| NET CHANGES by Change Order | | $0.00 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief, the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

BY: _____ DATE 3-3-22

State of: Tennessee County of: _____
Subscribed and sworn before me this 3 day of March 20 22
Notary Public: _____
My Commission Expires: 3/05

*STATE OF TENNESSEE NOTARY PUBLIC Wilson County*

## CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Construction Manager certifies that to the best of his knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ............................ $ 1,079,062.20

*(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that changed to conform to the amount certified.).*

**CONSTRUCTION MGR:**
By: _____ Date: _____

**ARCHITECT:**
By: _____ Date: _____
This certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

**CONTINUATION SHEET**

AIA DOCUMENT G703 (Instructions on reverse side)

PAGE - 2 OF 3

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use column 1 on Contracts where variable retainage for line items may apply.

APPLICATION NO:          FOUR
APPLICATION DATE:     03/03/22
PERIOD TO:
ARCHITECT'S PROJECT NO:

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| 1 | **Division 1      General conditions** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 2 | Supervision/ Project Manager | $320,000.00 | $224,000.00 | $64,000.00 | | $288,000.00 | | $32,000.00 | $14,400.00 |
| 3 | Insurance | $18,000.00 | $12,600.00 | $3,600.00 | | $16,200.00 | | $1,800.00 | $810.00 |
| 4 | Temp utilities, power,water, toliet an phone | $3,200.00 | $2,240.00 | | | $2,240.00 | | $960.00 | $112.00 |
| 5 | Temp facilities, storage, dumsters, permit, rentals | $41,979.00 | $29,384.00 | $4,198.00 | | $33,582.00 | | $8,397.00 | $1,679.10 |
| 6 | Final clean | $5,000.00 | $3,500.00 | $0.00 | | $3,500.00 | | $1,500.00 | $175.00 |
| 7 | Security | $5,000.00 | $3,500.00 | $0.00 | | $3,500.00 | | $1,500.00 | $175.00 |
| 8 | **BUILDING** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 9 | **Division 3 CONCRETE** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 10 | Foundations | $25,988.00 | $18,186.00 | $5,201.00 | | $23,387.00 | | $2,601.00 | $1,169.35 |
| 11 | **Division 4 MASONRY** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 12 | Block,Brick, stone, Nichiha board | $34,220.00 | $23,954.00 | $6,844.00 | | $30,798.00 | | $3,422.00 | $1,539.90 |
| 13 | **Division 5 STEEL** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 14 | Misc steel | $95,100.00 | $66,570.00 | $28,530.00 | | $95,100.00 | | $0.00 | $4,755.00 |
| 15 | **Division 6 CARPENTRY** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 16 | Rough carpentry | $21,251.00 | $14,875.00 | $0.00 | | $14,875.00 | | $6,376.00 | $743.75 |
| 17 | Lumber Package | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 18 | Trusses | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 19 | Plastic Laminate cabinets, tops, and shelves | $83,000.00 | $58,100.00 | $0.00 | | $58,100.00 | | $24,900.00 | $2,905.00 |
| 20 | finish carpentry | $20,500.00 | $14,350.00 | $0.00 | | $14,350.00 | | $6,150.00 | $717.50 |
| 21 | **DIVISION 7 Thermal Moisture Protection** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 22 | Water proofing | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 23 | building insulation | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 24 | EIFS/ Stucco | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 25 | Roofing | $188,000.00 | $131,600.00 | $56,400.00 | | $188,000.00 | | $0.00 | $9,400.00 |
| 26 | caulking | $3,500.00 | $2,450.00 | $0.00 | | $2,450.00 | | $1,050.00 | $122.50 |
| 27 | **Division 8 OPENINGS** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 28 | Doors and Frames | $108,700.00 | $76,090.00 | $32,610.00 | | $108,700.00 | | $0.00 | $5,435.00 |
| | Wall & door protection | $32,963.00 | $23,072.00 | $9,891.00 | | $32,963.00 | | $0.00 | $1,648.15 |
| 29 | Lead Lined Doors and Frames and Windoes | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 30 | Hardware | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 31 | Aluminum Storefront | $33,500.00 | $23,450.00 | $10,050.00 | | $33,500.00 | | $0.00 | $1,675.00 |
| 32 | **Division 9 FINISHES** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 33 | Metal Stud / drywall | $255,000.00 | $175,000.00 | $80,000.00 | | $255,000.00 | | $0.00 | $12,750.00 |
| 34 | Acoustical Ceilings | $66,200.00 | $46,340.00 | $0.00 | | $46,340.00 | | $19,860.00 | $2,317.00 |
| 35 | FRP | $2,400.00 | $1,680.00 | $0.00 | | $1,680.00 | | $720.00 | $84.00 |
| 36 | Painting | $46,924.00 | $32,844.00 | $0.00 | | $32,844.00 | | $14,080.00 | $1,642.20 |
| 37 | Ceramic tiles | $5,234.00 | $3,661.00 | $0.00 | | $3,661.00 | | $1,573.00 | $183.05 |
| | floor prep | $22,000.00 | $15,400.00 | $2,925.20 | | $18,325.20 | | $3,674.80 | $916.26 |
| 38 | Vinly flooring / base | $84,000.00 | $58,800.00 | $0.00 | | $58,800.00 | | $25,200.00 | $2,940.00 |
| 39 | **Division 10 SPECIALTIES** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 40 | Restroom Accessories | $7,500.00 | $5,250.00 | $0.00 | | $5,250.00 | | $2,250.00 | $262.50 |
| 41 | Misc. Specialties / fire extinguishers, curtain / tracks | $10,630.00 | $7,441.00 | $0.00 | | $7,441.00 | | $3,189.00 | $372.05 |
| 42 | **Division 11/12 Equipment/Furniture** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 43 | Furniture, fixture, equipment  INSTALL | $17,500.00 | $8,250.00 | $0.00 | | $8,250.00 | | $9,250.00 | $412.50 |
| | **TOTALS** | $1,557,289.00 | $1,082,587.00 | $304,249.20 | $0.00 | $1,386,836.20 | | $170,452.80 | $0.00 |

PAGE 3 OF 3

| | TOTALS FROM PREVIOUS SHEET | $1,557,289.00 | $1,082,587.00 | $304,249.20 | $0.00 | $1,386,836.20 | | $170,452.80 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 44 | Windows Shades | $6,840.00 | $4,788.00 | $0.00 | | $4,788.00 | | $2,052.00 | $239.40 |
| 45 | **Division 21 FIRE SUPPRESION** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 46 | Fire Sprinkler | $38,500.00 | $26,950.00 | $11,550.00 | | $38,500.00 | | $0.00 | $1,925.00 |
| 47 | Knox Box | $500.00 | $350.00 | $0.00 | | $350.00 | | $150.00 | $17.50 |
| 48 | **Division 22 PLUMBING** | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| | **Med Gas** | $174,100.00 | $121,870.00 | $0.00 | | $121,870.00 | | | $6,093.50 |
| 49 | Plumbing  turn key/ med gas | $866,200.00 | $606,340.00 | $173,240.00 | | $779,580.00 | | $86,620.00 | $38,979.00 |
| 50 | **Division 23 MECHANICAL** | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 51 | HVAC TURN KEY | $835,000.00 | $584,500.00 | $166,333.00 | | $750,833.00 | | $84,167.00 | $37,541.65 |
| 52 | Dvision 26 BUILDING ELECTRICAL | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 53 | Building electrical turn key | $1,047,000.00 | $732,900.00 | $209,400.00 | | $942,300.00 | | $104,700.00 | $47,115.00 |
| | Nurse call station | $60,000.00 | $42,000.00 | $18,000.00 | | $60,000.00 | | $0.00 | $3,000.00 |
| | Low Voltage | $180,000.00 | $126,000.00 | $54,000.00 | | $180,000.00 | | $0.00 | $9,000.00 |
| 54 | Lighting package | $36,000.00 | $25,200.00 | $10,800.00 | $0.00 | $36,000.00 | | $0.00 | $1,800.00 |
| 55 | Division 28 ELECTRONIC SAFTEY & SECURITY | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 56 | Fire Alarm | $28,500.00 | $19,950.00 | $8,550.00 | | $28,500.00 | | $0.00 | $1,425.00 |
| 57 | **SITE** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 58 | **Division 2 DEMOLITION** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 59 | Building Demolition | $57,500.00 | $40,250.00 | $17,250.00 | | $57,500.00 | | $0.00 | $2,875.00 |
| 60 | Site Dmolition | $35,115.00 | $24,584.00 | $10,531.00 | | $35,115.00 | | $0.00 | $1,755.75 |
| 61 | **Division 31 EARTHWORK** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 62 | SWPPP- Inspections & Compliance | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 63 | Erosion Control | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 64 | Earthwork | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 65 | Termite Treatment | $1,200.00 | $840.00 | $0.00 | | $840.00 | | $360.00 | $42.00 |
| 66 | **Division 32 EXTERIOR IMPROVEMENTS** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 67 | Parking lot enhasment | $87,700.00 | $61,390.00 | $17,540.00 | | $78,930.00 | | $8,770.00 | $3,946.50 |
| 68 | Site Concrete- Paving, Light Poles, Sidewalks, Curbs | $37,050.00 | $25,935.00 | $11,115.00 | | $37,050.00 | | $0.00 | $1,852.50 |
| 69 | Power wash, Seal / Stripe | $10,237.00 | $7,165.00 | $0.00 | | $7,165.00 | | $3,072.00 | $358.25 |
| 70 | Dumpster Gates and Bollards | $3,500.00 | $2,450.00 | $0.00 | | $2,450.00 | | $1,050.00 | $122.50 |
| 71 | Irragation & sleeves | $5,000.00 | $3,500.00 | $0.00 | | $3,500.00 | | $1,500.00 | $175.00 |
| 72 | LandScape | $15,000.00 | $10,500.00 | $3,000.00 | | $13,500.00 | | $1,500.00 | $675.00 |
| 73 | **Division 33.01 UTILITES** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 74 | Domestic Water Line | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 75 | Fire Line,  Hydrants,  FDC/Vault | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 76 | Sanitary Sewer | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 77 | Storm Drainage | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 78 | Gas Line/ Porpane | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 79 | **Division 33.70 SITE ELECTRIC** | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 80 | Site Lighting- conduits, Wire, Poles & Fixtures | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 81 | Secondary Conduits | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 82 | Primary Conduits | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 83 | Telephone/Cable Conduits WTH Pull Strings | | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| 84 | Performance BOND | $74,000.00 | $51,800.00 | $22,200.00 | | $74,000.00 | | $0.00 | $3,700.00 |
| 85 | O & P | $300,000.00 | $217,512.70 | $53,488.00 | | $271,000.70 | | $28,999.30 | $13,550.04 |
| 86 | FFE | $0.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 |
| | **TOTALS** | $5,456,231.00 | $3,819,361.70 | $1,091,246.20 | $0.00 | $4,910,607.90 | 90% | $493,393.10 | $0.00 |



## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

**PROJECT NAME:**     **SARC Keller, TX Draw # 4**

Upon receipt by undersigned of a check from in the sum of $ 1,079,062.20 payable to Built-More, LLC and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through March 3 ,2022   only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name):  Built-More, LLC

BY: _Lynn Mattison Chief manager_

TITLE: _Chief Manager_

DATE:____3/3/2022____

FEDERAL ID#____11-3778508____

TELEPHONE#:_____615-915-2075____

275 Jackson Meadows Dr, Suite 105- Hermitage, TN 37076



**PATH CONSTRUCTION SOUTHWEST**
8281 E. EVANS ROAD, SUITE 101
SCOTTSDALE, AZ 85260
**O:** (480) 816-8441 // **R.O.C. 304792**
WWW.PATHCC.COM

## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

**PROJECT NAME:** ___SARC - Keller – PAY APP FEBRUARY 2022___

Upon receipt by undersigned of a check from __**Built-More, LLC**__ in the sum of $ __**350,634.87**__ payable to __**Path Construction Southwest**__ and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through __02-15-2022__ only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name): __**Path Construction Southwest**__

BY: _____

TITLE: __Division Manager__

DATE: __2/14/2022__

FEDERAL ID #: __81-1461076__

TELEPHONE #: __480-816-8441__



## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

## PROJECT NAME: SARC - Keller – PAY APP FEBRUARY 2022

Upon receipt by undersigned of a check from___Path Construction Southwest_ in the sum of

$_____**$9,855.00**_____ payable to__**A-Fab Industries LLC**____and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through **2-15-2022** only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name):  **A-Fab Industries LLC**_____

BY:____*Scott Anderson*_____

TITLE: _President / PM_____

DATE: **2-4-21**_____

FEDERAL ID #: **56-2366281**_____

TELEPHONE #: **817-337-4776**_____

8330 N Riverside Dr – Fort Worth, TX 76244 – Ph. 817-337-4776



## UNIFIED DOOR AND HARDWARE GROUP, LLC.

1650 SUCKLE HIGHWAY
PENNSAUKEN, NJ 08110
TELEPHONE: (856) 488-8843  FACSIMILE: (856) 665-7239

## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

### PROJECT NAME:  SARC Keller – PAY APP FEBRUARY 2022

Upon receipt by undersigned of a check from __Path Construction, Inc__ in the sum of

$ __8,454.52__ payable to __Unified Door & Hardware Group__ and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through **02-15-2022** only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name):  **Unified Door & Hardware Group**

BY: **Barry Griffies**

TITLE:  **Project Accountant**

DATE:  **02/10/2022**

FEDERAL ID #:  **46-4239910**

TELEPHONE #:  **856-320-4871**

1650 Suckle Hwy – Pennsauken, NJ 08110 – Ph. 856-320-4871

   

**Architectural Hardware Consultants  •  Specification Writers
Distributors of Quality Builder's Hardware  •  Hollow Metal  •  Architectural Wood Doors
Section 10 Specialties**

**S**outhwest;
**C**ommercial
**I**nteriors

P.O. Box 110241
Carrollton, Texas 75011

Telephone (972) 416-6700
Fax (972) 416-1700
www.scirocks.com

## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

**PROJECT NAME:** ___ **SARC - Keller – PAY APP** _____

Upon receipt by undersigned of a check from___ Path Construction, Inc  in the sum of
$ 9,207 00_____ payable to___ **Southwest Commercial Interiors, LP** ʻ and when the
check has been properly endorsed and has been paid by the bank upon which it is drawn,
this document shall become effective to release any mechanic's liens, stop notice or bond
rights that the undersigned has on said Project for the following extent. This release covers a
progress payment for labor, services, equipment, or material furnished through_____
only, and does not cover any retention retained before or after the release date, extras
furnished before the release date for which payment has not been received; extras or items
furnished after said date.

Rights based upon work performed or items furnished under a written change order which
has been fully executed by the parties prior to the release date are covered by this release
unless specifically reserved by the claimant in this release. This release of any mechanic's
lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights
between parties to the contract based upon a rescission, abandonment, or breach of the
contract, or the right of the undersigned to recover compensation for furnished labor,
services, equipment, or material covered by this release if that furnished labor, services,
equipment, or material was not compensated by the progress payment. Before any
recipient of this document relies on it, said party should verify evidence of payment to the
undersigned.

LIEN CLAIMANT (Company Name):  **Southwest Commercial Interiors, LP**

BY: _____

TITLE: **President**_____

DATE:  1/31/2022_____

FEDERAL ID #:  **75-2678662**_____

TELEPHONE #:  **972-416-6700**_____

"Rocks Dallas"

# BBP INDUSTRIES, LLC

**A Commercial Painting Company**
**HUB/WBE CERTIFIED**
*4105 W. Spring Creek Parkway, #604*
*Plano TX 75024*
*972–596–4118/voice*
*972–767–4557/fax*

### CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

**PROJECT NAME:** ___SARC - Keller – PAY APP NOVEMBER 2021_____

Upon receipt by undersigned of a check from__ Path Construction, Inc _ in the sum of
$____5,320.26_____payable to__ BBP Industries LLC ___and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through
_____only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name): **BBP Industries LLC** _____

BY: _____ Mitchell Zivn

TITLE: **Vice President**

DATE: 2 | 1 | 22

FEDERAL ID #: **46-4532295**

TELEPHONE #: **972-596-4118**



SHERRY LOUISE VEGA
Notary Public, State of Texas
Comm. Expires 06-20-2024
Notary ID 130708912

**Burton's Mechanical Inc**
**2305 Fort Worth St**
**Grand Prairie, TX 75050**
**Ph: 972-602-7111 Fax: 972-602-7113**

## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

**PROJECT NAME: ___SARC - Keller – PAY APP NOVEMBER 2021_____**

Upon receipt by undersigned of a check from___ Path Construction, Inc_ in the sum of
$__13,410.00_____ payable to__ **Burton's Mechanical, Inc**___ and when the check has
been properly endorsed and has been paid by the bank upon which it is drawn, this
document shall become effective to release any mechanic's liens, stop notice or bond rights
that the undersigned has on said Project for the following extent. This release covers a
progress payment for labor, services, equipment, or material furnished through **02-15-2022**
only, and does not cover any retention retained before or after the release date, extras
furnished before the release date for which payment has not been received; extras or items
furnished after said date.

Rights based upon work performed or items furnished under a written change order which
has been fully executed by the parties prior to the release date are covered by this release
unless specifically reserved by the claimant in this release. This release of any mechanic's
lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights
between parties to the contract based upon a rescission, abandonment, or breach of the
contract, or the right of the undersigned to recover compensation for furnished labor,
services, equipment, or material covered by this release if that furnished labor, services,
equipment, or material was not compensated by the progress payment. Before any
recipient of this document relies on it, said party should verify evidence of payment to the
undersigned.

LIEN CLAIMANT (Company Name): **Burton's Mechanical, Inc**

BY:

TITLE: **President**

DATE: _02/01/2022_

FEDERAL ID #: **26-1933645**

TELEPHONE #: **972-602-7111**



9970 CR 483 Lavon, TX. 76155

972-360-9893

## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

PROJECT NAME: ___SARC - Keller – PAY APP February 2022_____

Upon receipt by undersigned of a check from __Path Construction Southwest, Inc_ in the sum of $ __36,000_____ payable to __Redline Mechanical___ and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment for labor, services, equipment, or material furnished through 02-15-2022 only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name): Redline Mechanical

BY: Steven Harris- *Steven Harris*

TITLE: Senior Project Manager

DATE: 02/15/2022

FEDERAL ID #: 45-3703521

TELEPHONE #: 214-415-1024

## CONDITIONAL WAIVER AND RELEASE
## UPON PROGRESS PAYMENT

Upon receipt by the undersigned of a check in the sum of: **$59,220.00**

(Amount of Check)

payable to _____ **Reliance Electric, Inc.** _____ and when the check has been properly endorsed and

(Payee or Payees of Check)

has been paid by the bank upon which it is drawn, this document shall become effective to release any
mechanic's lien, stop notice, or bond right the undersigned has on the job of    **Millrock Investment Fund 1, LLC**

(Owner)

located at _____ **SARC Keller** _____ to the following extent.

(Job Description)

This release covers a progress payment for labor, services, equipment, or material furnished to
**Path Construction Southwest** _____ on behalf of Owner through _____ **2/15/2022** _____ only and

(Person with whom undersigned contracted)                                                    (Date)

does not cover any retention's retained before or after the release date; extras furnished before the release date for which
payment has not been received; extras or items furnished after the release date. Rights based upon work performed or
items furnished under written change order which has been fully executed by the parties prior to the release date are
covered by this release unless specifically reserved by the claimant in this release.

This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights,
including rights between parties to the contract based upon a recession, abandonment, or breach of the contract, or the
right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this
release if that furnished labor, services, equipment, or material was not compensated by the progress payment. Before any
recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

Dated: _____ **2/8/2022** _____

(Date)

**Reliance Electric, Inc.**

(Company Name)

_Rebecca Barlow_

(Signature)

**Rebecca Barlow**

(Name)

**A/R Manager**

(Title)



**REQUEST FOR DISBURSEMENT**

**To:**   Kevin Long                                    **Date:** 7/25/22

**Project:** SARC KELLER

**Re:**   KELLER, TX                                **Draw Request:** Draw 5

The undersigned authorized representative of Lessee hereby requests that, pursuant to that certain Development Agreement dated 9/25/21, ("Development Agreement"), disburse to developer  the following amounts for the construction and project work at the above-referenced site for the period beginning 3/3/22 **and ending** 7/25/22.  Lessee has attached substantiation of all of the following hard costs (AIA forms G702 and G703) and soft costs .

| | | |
|---|---|---|
| HARD COSTS (This Application Only): | | |
| General Contractor | | |
| See AIA forms G702 and G703 attached hereto And incorporated herein by this reference | $642,010.94 | |
| SUBTOTAL OF HARD COSTS: | $_____ | |
| Less Retainage (0%) Withheld | $_____ | |
| Retainage to be Paid | $_____ | |
| **TOTAL HARD COST DRAW:** | | $642,010.94 |
| SOFT COSTS (This Application Only): (Complete all that apply) | | |
| _____ (Development Fee) | $_____ | |
| _____ (Bond) | $_____ | |
| _____ (Architectural) | $_____ | |
| _____ (FFE) | $255,000.00 | |
| _____ (Permits) | $ | |
| _____ (CAM & TAX.) | $ | |
| _____ (Investor expense) | $ | |
| _____ (Contingency) | $_____ | |
| _____ (Lessee Fee) | $_____ | |
| (Attach statement for additional soft costs) | | |
| **SUBTOTAL OF SOFT COSTS** | | $255,000.00 |
| ***TOTAL DEVELOPMENT REQUEST:*** | | ***$897,010.94*** |

# EXHIBIT 7

Ambulatory Surgery Center Lease Agreement


**Tenant**

SARC by HSI - DRAPER, UT Inc.


**Lease Guaranty**

Healthcare Solutions Management Group, Inc.




Developed by American Development Partners

## AMBULATORY SURGERY CENTER LEASE AGREEMENT

**THIS AMBULATORY SURGERY CENTER LEASE AGREEMENT** ("Lease") is entered into as of 11/12/20 (the "Effective Date") by and between Jameson, LLC DBA American Development Partners, a Tennessee limited liability company ("Landlord") and SARC by HSI - DRAPER, UT Inc., a Delaware corporation ("Tenant").

### RECITALS

WHEAREAS, Landlord is the owner of, or is under contract to purchase, the land, buildings, and improvements located at 13775 South Pony Express Rd Draper UT 84020a nd more particularly described in attached Exhibit "A" ("Premises"); and

WHEREAS, Landlord desires to lease to Tenant and Tenant desires to lease from Landlord the Premises as a walk-in clinic focused on the delivery of ambulatory care in a dedicated medical facility outside of a traditional emergency room ("Ambulatory Surgery Center").

NOW THEREFORE, for good and valuable consideration, the parties agree as follows:

### SECTION ONE. PREMISES.

Landlord leases to Tenant and Tenant leases from Landlord the Premises on the terms and conditions in this Lease. The Premises is the real property described on the attached Exhibit "**A**", and all improvements belonging to Landlord now or in the future located on the real property (including the Improvements completed pursuant to Section 13 below).

### SECTION TWO. INTIAL TERM OF LEASE/OPTIONS TO RENEW.

(a) <u>Effective/Commencement and Termination Dates of Initial Term.</u>  The initial term of this Lease shall be for twenty (20) years (the "Initial Term").   The term of this Lease (the "Term") shall commence upon the earlier of (i) Landlord's substantial completion of the Improvements in accordance with the Scope of Work (each as defined in Section 13(a) hereof) ("Landlord's Work") and Landlord's receipt of a certificate of occupancy (or equivalent) for the Premises, or (ii) the date upon which Tenant opens to the public for business within the Premises (such earlier date being the "Commencement Date").  The termination date shall be twenty (20) years after the Commencement Date (the "Termination Date"), subject to Section 2(b) below. Should the Commencement Date fall on any day other than the 1st of the month, the Term shall be extended by any partial month thereof.  Promptly following the Commencement Date, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "F". If for whatever reason the construction has not been started on or before 270 days from the date of the building purchase the lease is considered null and void.

(b) <u>Option Periods</u>.  Landlord grants to Tenant options to extend the Term of this Lease for three (3) consecutive five (5) year periods (each, an "Option Period") upon the same terms and conditions set forth in this Lease, at an adjusted Minimum Monthly Rent as determined prior to

the beginning of each Option Period in accordance with Section 4(c) hereof.  Tenant's extension option shall be exercised by Tenant upon written notice to Landlord at least one hundred eighty (180) days but no more than two-hundred seventy (270) days prior to the expiration of the Initial Term of this Lease or any Option Period, as applicable. Notwithstanding the foregoing, the extension options described above shall be null and void and of no further force or effect if any of the following have occurred: (i) Tenant has assigned this Lease or sublet the Premises, notwithstanding the fact Landlord may have consented to such assignment or subletting; (ii) A default has occurred and is continuing, either at the time Tenant exercises the option or at the time the renewal term is scheduled to commence; or (iii) Tenant has vacated the Premises.  In no event shall any Landlord's Work, improvement allowance or other monies or work be required of Landlord in connection with any such Option Period.

## SECTION THREE. DELAY IN POSSESSION

If for any reason Landlord fails to deliver or offer to deliver physical possession of the Premises to Tenant, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from the failure to deliver possession, so long as Landlord has exercised, and continues to exercise, reasonable diligence to deliver possession; provided, however, that rent shall be abated until Landlord delivers physical possession of the Premises to Tenant. Tenant's taking possession of the Premises or any portion thereof shall be conclusive evidence that (i) Landlord's Work is complete, and (ii) the Premises are in the condition required by this Lease and in good order and satisfactory condition.

## SECTION FOUR.  MINIMUM MONTHLY RENT

(a) Partial Rent - Beginning 30 days after the building is purchased the tenant will pay 50% of the scheduled rent payable in advance on the first day of each month at the following address in accordance with the rent schedule below:

(b) Full Rent - Beginning on the date that the tenant receive the full certificate of occupancy and completion of construction the tenant will pay 100% of the scheduled rent payable in advance on the first day of each month at the following address in accordance with the rent schedule below:

Jameson, LLC DBA American Development Partners
PO Box 681982 Franklin, TN 37064
or at another address that Landlord may from time to time designate by written notice to Tenant. Additionally, the Lease Administrator may direct the Tenant to deposit the rent by ACH to a designated bank account

On each anniversary of the Commencement Date through and until the Termination Date of the Initial Term, the Minimum Monthly Rent shall increase annually by 2% as follows:

| YEAR | RENT | ANNUALLY |
|------|------|----------|
| 1 | $111,652.82 | $1,339,833.84 |
| 2 | $113,885.88 | $1,366,630.52 |
| 3 | $116,163.59 | $1,393,963.13 |
| 4 | $118,486.87 | $1,421,842.39 |
| 5 | $120,856.60 | $1,450,279.24 |
| 6 | $123,273.74 | $1,479,284.82 |
| 7 | $125,739.21 | $1,508,870.52 |
| 8 | $128,253.99 | $1,539,047.93 |
| 9 | $130,819.07 | $1,569,828.89 |
| 10 | $133,435.46 | $1,601,225.47 |
| 11 | $136,104.16 | $1,633,249.97 |
| 12 | $138,826.25 | $1,665,914.97 |
| 13 | $141,602.77 | $1,699,233.27 |
| 14 | $144,434.83 | $1,733,217.94 |
| 15 | $147,323.52 | $1,767,882.30 |
| 16 | $150,270.00 | $1,803,239.94 |
| 17 | $153,275.40 | $1,839,304.74 |
| 18 | $156,340.90 | $1,876,090.84 |
| 19 | $159,467.72 | $1,913,612.65 |
| 20 | $162,657.08 | $1,951,884.91 |

Notwithstanding the foregoing rent schedule, the final rent schedule for Minimum Monthly Rent will be calculated by Landlord upon completion of Landlord's Work. Minimum Monthly Rent for Year 1 will be calculated at 9.25% of the total cost of Landlord's Work (the "Final Rent Calculation"), including, but not limited to, the cost of land acquisitions, construction costs, pursuit and due diligence fees, design fees, development fees, and all other hard and soft costs incurred by Landlord, directly or indirectly, in connection with the acquisition and development of the Premises and completion of Landlord's Work. Landlord and Tenant agree that the Final Rent Calculation may not exceed a thirty percent (30%) increase over the Minimum Monthly Rent for Year 1 specified above. Tenant agree that the Final Rent Calculation may not exceed a thirty percent (30%) increase over the Minimum Monthly Rent for Year 1 specified above. Revisions to the schedule of the Minimum Monthly Rent, if any, will be contained in the Commencement Date Agreement.

(a) Minimum Monthly Rent During Option Periods.

(i) First 5-year Option Period: Market Rate (Determined pursuant to Section 5) but in no event, shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the First Option Period.

(ii) Second 5-year Option Period: Market Rate (Determined pursuant to Section 5) but in no event shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the Second Option Period

(iii) <u>Third 5-year Option Period</u>:  Market Rate (Determined pursuant to Section 5) but in no event, shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the Third Option Period.

## SECTION FIVE. MARKET RATE.

(a) <u>Market Rate Definition</u>.  "Market Rate" shall be defined as the bona fide rates, terms and conditions then being paid by tenants in "arm's length" transactions for comparable space, for comparable uses, in comparable buildings in the same geographic submarket as the Premises within the previous six (6) month period.  To determine the Market Rate the parties must also take into consideration the quality, size, design and location of the Premises.

(b) <u>Determination and Appraisal Process</u>.  In the event Tenant exercises a renewal option, to initiate the negotiation, Tenant shall notify Landlord in writing of Tenant's determination of the Market Rate for the applicable Option Period (the "Tenant's Initial Determination"). Landlord shall, within fifteen (15) days following receipt of Tenant's Initial Determination, notify Tenant in writing that it accepts Tenant's Initial Determination or, if it does not, notify Tenant of Landlord's determination of the Market Rate ("Landlord's Initial Determination"). If, within fifteen (15) days after receipt by Tenant of Landlord's Initial Determination, Tenant rejects in writing Landlord's determination, the parties agree to negotiate their differences in good faith within thirty (30) days following Landlord's receipt of Tenant's notice of objection or deemed rejection.  Should the parties be unable to agree upon the Market Rate within such thirty (30) day period, the parties will each appoint a real estate appraiser who is a member of the American Institute of Real Estate Appraisers with at least five (5) years full-time commercial appraisal experience in the geographic area in which the Premises are located to determine the Market Rate.  If either Landlord or Tenant does not notify the other party in writing that it has appointed an appraiser within ten (10) days after the other party has provided written notice of its appointed appraiser, the single appraiser appointed will determine the Market Rate. If two (2) appraisers are appointed, they will meet promptly and attempt to set the Market Rate. If the two appraisers agree upon a Market Rate, such determination shall be final and binding on the parties. If they are unable to agree on the Market Rate within thirty (30) days after the date upon which the second appraiser has been appointed, the two appraisers will appoint, or request that the American Institute of Real Estate Appraisers appoint, a third appraiser meeting the qualifications stated in this paragraph and the appraisers will then notify Landlord and Tenant of such appraiser's name, address and selection within ten (10) days following the failure of the parties to agree upon the Market Rate. Landlord and Tenant will each bear onehalf (1/2) of the cost of the third appraiser. The third appraiser, however selected, must be a person who has not previously acted in any capacity for either Landlord or Tenant. Within thirty (30) days after the selection of the third appraiser, a majority of the appraisers will determine the Market Rate. If a majority of the appraisers cannot agree on the Market Rate within thirty (30) days after selection of the third appraiser, the high and the low appraisal will be thrown out and the middle appraisal shall be the final and binding determination of the Market Rate.

(c) <u>Amendment</u>.  The parties will execute an amendment to this Lease within fifteen (15) days after determination of the new Market Rate.

**SECTION SIX. MEMORANDUM OF LEASE.**

Contemporaneously with the execution of this Lease, or at any time or from time to time hereafter, at the request of either Landlord or Tenant, the parties will execute and deliver a Memorandum of Lease in recordable form which either party may record at its sole expense. The Memorandum of Lease shall not contain rental amounts.

**SECTION SEVEN. TENANT PAYMENTS.**

(a) <u>Minimum Monthly Rent</u>.  Tenant shall pay Landlord as rent for the Premises a sum equal to the Minimum Monthly Rent set forth in <u>Section 4</u> on or before the first (1st) day of each and every month during the Term of this Lease and continuing for the duration of the Term of this Lease. If any installment of Rent due from Tenant shall not be received by Landlord within five (5) days after the date due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Except as expressly set forth herein, any amount due to Landlord not paid within ten (10) days after written notice that such payment is past due shall bear interest at  1 ½ percent per month or any part of a month until the date such amount is paid.

(b) <u>Utilities</u>.  Tenant shall promptly pay for all utilities and other services including, but not limited to, telephone, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, for any heating in the Premises furnished to and or used in or at the Premises for any purpose, from and after the date Tenant shall have possessed the Premises, whether prior to, during or after the Term hereof.  Landlord shall not be liable for any interruption or curtailment whatsoever in the furnishing of utility services or other services to the Premises, unless caused by the gross negligence of Landlord.

(c) <u>Net Lease</u>.  This Lease is what is commonly called a "Net Lease", it being understood that Landlord shall receive the Rent set forth in this Lease free and clear of any and all impositions, taxes, liens, charges, or expenses of any nature whatsoever in connection with its ownership and leasing of the Premises except those expenses specifically designated in this Lease to be borne by Landlord. In addition to the Minimum Monthly Rent, Tenant shall pay all impositions, taxes, insurance premiums, operating costs, charges and expenses which arise or may be contemplated under any provisions of this Lease during the Term (i) when required to be made hereunder or (ii) if no payment date is specified, by the later to occur of (A) the due date for the next installment of Minimum Monthly Rent or (B) ten (10) days from demand. All of such charges, costs and expenses shall constitute additional rent, and upon the failure of Tenant to pay any of such costs, charges or expenses, Landlord shall have the same rights and remedies as otherwise provided in this Lease for the failure of Tenant to pay Rent. "Rent" shall mean Minimum Monthly Rent, additional rent, and all other amounts to be paid by Tenant to Landlord pursuant to this Lease. It is the intention of the parties hereto that Tenant shall in no event be entitled to any abatement of or reduction in Rent or additional rent payable hereunder, except as expressly provided herein. Any present or future law to the contrary shall not alter this agreement of the parties.  Landlord and Tenant acknowledge and agree that this Lease is a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic

realities of this Lease are those of a true lease, the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between landlord and tenant and has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and Tenant and Landlord each waive any claim or defense based upon the characterization of this Lease as anything other than as a "true lease".

(d) <u>Pro-Rata Rent</u>.  Rent for any period during the Term of this Lease which is for less than one (1) month shall be a pro rata portion of such monthly installment. Rent shall be payable, without deduction or offset, in lawful money of the United States to Landlord at the address set forth in <u>Section 4(a) above</u> or to such other persons or at such other places as Landlord may designate in writing.

## SECTION EIGHT. USE OF THE PREMISES.

(a) Tenant shall occupy and use the Premises as an Ambulatory Surgery Center, and all other operations incident to the conduct of the business of an Ambulatory Surgery Center, and Tenant agrees not to use the Premises for any other purpose or any immoral or unlawful purpose. Landlord agrees that, subject to the prior reasonable review and approval by Landlord and compliance with all applicable governmental requirements and any signage criteria in any covenants, conditions, and restrictions recorded prior to the date of this Lease, Tenant may erect and maintain on the Premises and the building and improvements any signs advertising Tenant's business, as Tenant may desire.

(b) Tenant shall not commit any acts on the Premises, nor use the Premises in any manner that will increase the existing rates for or cause the cancellation of any fire, liability, or other insurance policy insuring the Premises or the improvements on the Premises. Tenant shall, at Tenant's own cost and expense, comply with all requirements of Landlord's insurance carriers that are necessary for the continued maintenance at reasonable rates of fire and liability insurance policies on the Premises and the improvements on the Premises.

(c) Tenant shall not commit any waste or any public or private nuisance upon the Premises.

(d) Tenant shall comply with all laws, rules, and orders of all federal, state, and municipal governments or agencies that may be applicable to use of the Premises. Notwithstanding the Permitted Use or any other provision of this Lease, Landlord does not represent, warrant or covenant in any respect whatsoever that the Permitted Use or any element of Tenant's existing or future operations is or will be permitted under applicable zoning, codes and regulations of any governmental or quasi-governmental authority.  Tenant is solely responsible for verifying the same.

(e) Tenant shall operate Tenant's business on the Premises with due diligence and efficiency so as to maximize the gross profits that may be produced profitably. To this end Tenant shall maintain business hours and levels of personnel and advertising that in Tenant's reasonable judgment is necessary to maximize gross profits profitably consistent with the operation of the businesses on the Premises and at any other locations of Tenant's businesses.

## SECTION NINE. UTILITIES AND MEDICAL WASTE.

(a) During the Term, Tenant shall pay, before delinquency, all charges or assessments for telephone, water, sewer, gas, heat, electricity, garbage disposal, trash disposal, and all other utilities and services of any kind that may be used on the Premises.

(b) <u>Medical Waste</u>.  Tenant shall, at Tenant's sole cost and expense, directly contract for the disposal of any and all hazardous, bio-hazardous, chemical, infectious, medical and other similar types of waste generated within the Premises or otherwise resulting from Tenant's business (collectively, "<u>Medical Waste</u>").  Tenant shall immediately separate any Medical Waste from other types of office waste and store such Medical Waste in a leak-proof, moisture-proof, puncture-resistant container, or a container of sufficient strength to resist tearing, ripping or bursting in the course of normal usage and handling. Tenant shall ensure that all such generation, storage and disposal of Medical Waste is done in full compliance with all federal, state and local laws, rules and regulations pertaining to Medical Waste.  If at any time Tenant fails to dispose of any Medical Waste in a timely manner (including upon expiration or earlier termination of this Lease), Landlord shall have the right, but not the obligation, to dispose of such Medical Waste at Tenant's cost and expense plus a twenty percent (20%) administrative fee.  Tenant shall defend, indemnify and hold Landlord and Landlord's officers, agents, employees, affiliates and mortgagees harmless from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs or remediation, or other costs and expenses (including, without limitation, attorneys' fees, consultants' fees, and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way related to the generation, storage, disposal or presence of Medical Waste in the Premises or otherwise. Tenant's obligations hereunder shall survive the termination or expiration of this Lease.

## SECTION TEN. TAXES.

(a) Tenant shall pay during the Term of this Lease, in each case prior to the date the same are delinquent, all of the Real Estate Taxes and personal property taxes levied or assessed against the Premises and improvements thereon for any period, all of which is included in the Term of this Lease, and also its pro rata share of all such taxes levied or assessed thereon for any period, part of which is included in the Term of this Lease, subject to the terms of <u>Section 10(b)</u> below. As used herein, the term "**REAL ESTATE TAXES**" means all taxes and general and special assessments and other impositions in lieu thereof, as a supplement thereto and any other tax which is measured by the value of land and assessed on a uniform basis against the owners of land, including any substitution in whole or in part therefor due to a future change in the method of taxation, in each case assessed against, or allocable or attributable to, the Premises and accruing during the Term. Tenant shall pay all Real Estate Taxes directly to the collecting authority no less than fifteen (15) days prior to the delinquency date thereof and shall provide Landlord written evidence thereof. Notwithstanding the foregoing, upon the occurrence of both of the following events, Tenant shall pay Real Estate Taxes to Landlord on a monthly basis (the "Real Estate Taxes Reserve") in lieu of the applicable collecting authority: (i) delivery to Tenant of a written request therefor from Landlord, and (ii) the existence of any default or breach of this <u>Section 10(a)</u> by Tenant, or any Event of Default under any provision in this Lease (the foregoing clause (ii) may be hereinafter referred to as a "Real Estate Taxes Reserve Trigger"). If Tenant fails to pay the appropriate party (Landlord or the collecting authority, as provided herein) all Real Estate Taxes when due hereunder, then Tenant shall, without limiting any other remedies available to

Landlord, reimburse Landlord for any and all penalties or interest, or portion thereof, incurred by
Landlord as a result of such nonpayment or late payment by Tenant.

This Section shall not be deemed or construed to require Tenant to pay or discharge any tax which
may be levied by any governmental authority upon the income, profits, or business of Landlord,
including Rent due Landlord hereunder, or any personal property taxes, franchise, inheritance or
estate bases, or taxes upon inheritance or right of succession which may be levied against any
estate or interest of Landlord, even if such taxes become a lien against the Premises.

(b)  Landlord agrees that Tenant shall have the right, at Tenant's sole cost and expense, to contest
the legality or validity of any of the taxes which are to be paid by Tenant pursuant to the foregoing
provisions, and in the event of any such contest, failure on the part of Tenant to pay any such tax,
prior to the delinquency date thereof shall not constitute a default hereunder.  Tenant, upon the
final determination of such contest, shall immediately pay and discharge any judgment rendered
against it, together with all costs and charges incidental thereto.   If Tenant has not paid any tax,
assessment, or public charge required by this Lease to be paid by Tenant before its delinquency,
or if a tax, assessment, or public charge is contested by Tenant and that tax, assessment, or public
charge has not been paid within thirty (30) days after a final determination of the validity, legality,
or amount of the tax, assessment or public charge, then Landlord may, but shall not be required
to, pay and discharge the tax, assessment, or public charge. If a tax, assessment, or public charge,
including penalties and interest, are paid by Landlord, the amount of that payment shall be due
and payable to Landlord by Tenant with the next succeeding rental installment, and shall bear
interest at the rate of ten percent (10%) per annum from the date of the payment by Landlord
until repayment by Tenant.  Landlord further agrees at the request of Tenant, to execute, or join
in the execution of any instrument or documents necessary in connection with any such contest,
but at no expense to Landlord.

(c)  Landlord agrees either to (i) forward to Tenant in a timely fashion the periodic statements for
taxes, or (ii) join with Tenant in the necessary formalities to insure that such statements are sent
directly to Tenant.

**SECTION ELEVEN. LIENS.**

Any work on the Premises performed by Tenant hereunder shall be performed subject and pursuant
to the provisions of this Lease.  Upon completion thereof and Landlord's written request, Tenant
shall furnish Landlord with lien waivers confirming that all contractors, subcontractors, laborers,
and materialmen who have performed work on the Premises have been paid in full.  Such lien
waivers shall be in a form reasonably acceptable to Landlord and in accordance with applicable
laws of the State where the Premises are located. If any such lien or claim of lien shall at any time
be filed against the Premises, or Tenant's interest therein or hereunder, by reason of Tenant's
acts or omissions or because of a claim against Tenant or any contractor, subcontractor or
materialman of Tenant, Tenant shall cause the lien or claim of lien to be canceled and discharged
of record by bond or otherwise within twenty (20) days after receipt of written notice from
Landlord.  If Tenant fails to cause such lien or claim of lien to be so discharged or bonded within
such period, Tenant shall be in default hereunder, and, in addition to any other right or remedy
it may have, the Landlord may, but shall not be obligated to, discharge the same by paying the

amount claimed to be due or by procuring the discharge of such lien or claim by deposit in court or bonding, and in any such event, the Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien or claim by the lienor or claimant and to pay the amount of the judgment, if any, in favor of the lienor, with interest, costs and allowances.  Tenant shall pay as additional rent on demand any sum so paid by Landlord for the aforesaid purposes with interest as hereinafter provided and all costs and expense incurred by Landlord including, but not limited to reasonable attorney's fees in processing such discharge or in defending any such action.  **THE INTEREST OF THE LANDLORD SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS MADE BY TENANT.**

## SECTION TWELVE.  REPAIRS AND MAINTENANCE.

(a) Throughout the Term of this Lease Tenant shall at all times and at its sole cost and expense, put, keep, replace and maintain the entire Premises and all of the Improvements (including, without limitation, the roof, walls, structural and non-structural elements of the buildings, plumbing systems, electric systems, HVAC systems, all site improvements, paving, parking lots, driveways, sidewalks, signs, landscaping, any storm drainage system or sewer system, and any water retention ponds) in good repair and in good and safe order and condition, shall make all repairs and replacements thereto, both inside and outside, structural and non-structural, ordinary and extraordinary, howsoever the necessity or desirability for repairs or replacements may occur, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise, and shall use all reasonable precautions to prevent waste, damage or injury.

(b) If at any time during the Term, including renewals or extensions, Tenant fails to maintain the Premises or make any repairs or replacements as required by Section 12, Landlord may, but shall not be required to, enter the Premises and perform the maintenance or make the repairs or replacements for the account of Tenant; any sums expended by Landlord in so doing, together with interest at ten percent (10%) per annum, shall be deemed additional rent and shall be immediately due from Tenant on demand of Landlord.

(c) Except for Landlord's Work, Landlord shall not be required to make any alterations, reconstructions, replacements, changes, additions, improvements, repairs or replacements of any kind or nature whatsoever to the Premises, or any portion thereof, or to any of the Improvements at any time during the Term of this Lease.  Tenant waives any law that would require Landlord to maintain the Premises in a tenantable condition or would provide Tenant with the right to make repairs and deduct the cost of those repairs from the rent.

## SECTION THIRTEEN. LANDLORD'S WORK AND ALTERATIONS.

(a) Promptly following the Effective Date, Landlord shall commence Landlord's Work.  The Improvements shall be constructed in a good and workmanlike manner, in accordance with all applicable laws and requirements, and in accordance with local codes. Tenant acknowledges that it has approved Built-More, LLC, a Tennessee limited liability company, to construct the Improvements. The term "Improvements" shall mean the building, all sidewalks, driveways, parking areas, curbs, curb cuts, lighting, retaining walls, landscaping, fire hydrants, and related improvements, and all identification, advertising and directional signs, fixtures, and equipment to the extent described on the plans and specifications listed on Exhibit "**B**" attached hereto (the

"Scope of Work") or otherwise constructed or located on the Premises subject to the conditions and restrictions set forth in this Lease.

(b)  After the date on which Tenant first opens the Premises to the public for business, Tenant may not make alterations, additions or improvements to the Premises including the exterior, the building structure, or the storefront thereof without the prior written consent of the Landlord and such consent shall not be unreasonably delayed, withheld or conditioned. Provided, if Tenant wishes at any time during the Term to perform alterations, additions or improvements to the Premises that do not affect structural elements or building systems in any material respect and cost, on a per project basis, less than $50,000.00 ("Minor Alterations"), after at least fifteen (15) days' written notice to Landlord, Tenant shall have the right to make Minor Alterations in compliance with all applicable laws, rules and regulations without obtaining written consent of the Landlord. All alterations, additions and improvements (excluding personal property, machinery, equipment, signage, trade improvements and trade fixtures of Tenant, no part of the cost of which shall have been paid by Landlord, collectively "Tenant's Property") made by, for or at the direction of Tenant, shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease or at such time as Landlord shall re-enter and take possession of the Premises without terminating this Lease pursuant to the provisions of <u>Section 13</u> hereof. Landlord shall have no obligation to make any alterations, improvements, repairs or replacements to the Premises other than Landlord's Work.

(c)  Tenant's Property shall remain the property of Tenant.  Upon the termination or expiration of the Term, Tenant shall remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall, at its sole cost and expense, repair any damage to the Premises or the improvements caused by such removal, including patching and filling holes, ordinary wear and tear excepted. In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, or utility or electrical components located inside the walls or HVAC systems.  All other utility systems will be capped and returned to a condition compatible with code requirements at Tenant's sole cost and expense.

(d)  Any of Tenant's Property not removed from the Premises within ten (10) days following the date this Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. Landlord may possess and dispose of such property provided that Landlord shall not use or permit anyone holding under Landlord to use (a) any trademark, trade dress, trade name, millwork, copyrighted floor plan, copyrighted color palette, or sign used by Tenant in the Premises; or (b) any item that is similar to any other item protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant under this Lease.  The reasonable costs incurred by Landlord in removing and disposing of such Tenant's Property (plus 10%) shall be paid by Tenant within thirty (30) days after delivery to Tenant of an invoice therefor.

(e) Notwithstanding anything to the contrary herein, Landlord agrees that it has no lien rights or security interest in any of Tenant's trade fixtures or inventory, furniture, equipment or other personal property in the Premises or in any other items that may be used as collateral for any Tenant financing (collectively, "Collateral") and hereby waives any such rights or interest to same. Upon request by Tenant from time to time during the Term, Landlord shall provide a written statement, in a form reasonably acceptable to Tenant and Tenant's lender or lenders, as the case may be, confirming that Landlord has no such lien rights and waiving any rights or interest to the Collateral; provided that in no event shall Landlord be required to grant Tenant's lender and/or lienholder any right to occupy the Premises or other access right unless required by applicable law or agreed to otherwise in writing by Landlord, nor shall any of the foregoing give Tenant the right to collaterally assign this Lease.

(f) Subject to any covenants, conditions and restrictions and other matters of record applicable to the Premises which are disclosed in the public records or in writing to Tenant ("CC&Rs"), Tenant shall have the right to install building signs on the Premises in the maximum number and size permitted under the governmental development standards, rules and regulations that are applicable to the Premises.

## SECTION FOURTEEN. ENTRY.

Tenant shall permit Landlord or Landlord's agents, representatives, or employees to enter the Premises at all reasonable times and upon reasonable notice to inspect the Premises to determine whether Tenant is complying with the terms of this Lease and to do other lawful acts that may be necessary to protect Landlord's interest in the Premises under this Lease or to perform Landlord's duties under this Lease.

## SECTION FIFTEEN. SURRENDER OF PREMISES; HOLDING OVER

(a) On the Termination Date or the end of any extension or renewal of this Lease, Tenant shall promptly surrender and deliver the Premises to Landlord in as good condition as they were on the Commencement Date, reasonable wear and tear excepted.

(b) At the end of the Term, or any extension, should Tenant hold over for any reason, it is agreed that in the absence of a written agreement to the contrary, that tenancy shall be from monthto-month only and not a renewal of this Lease, nor an extension for any further term. Tenant shall pay Minimum Monthly Rent in an amount equal to ONE AND ONE-HALF times the Minimum Monthly Rent payable prior to the end of the Term or any extension. The month-tomonth tenancy shall be subject to every other term, covenant, and condition in this Lease that is consistent with and not contrary to a month-to-month tenancy.

## SECTION SIXTEEN.  INDEMNITY.

Without limiting or being limited by any other indemnity in this Lease, but rather in confirmation and furtherance thereof, Tenant agrees to indemnify, defend by counsel reasonably acceptable to Landlord and hold Landlord and Landlord's officers, agents, employees and affiliates harmless of, from and against any and all losses, damages, liabilities, claims, liens, costs and expenses (including, but not limited to, court costs, reasonable attorney's fees and litigation expenses) in connection with injury to or death of any person or damage to or theft, loss or loss of the use of

any property occurring in or about the Premises arising from Tenant's occupancy, or from any materially false information provided by Tenant to Landlord, or the conduct of its business or from any activity, work, or thing done, permitted or suffered by Tenant or its agents, employees or contractors in or about the Premises, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or due to any other act or omission or willful misconduct of Tenant or any of its agents, employees, contractors, assigns, subtenants, guest or invitees.

## SECTION SEVENTEEN.  INSURANCE.

Tenant shall, at its sole cost, procure and maintain, during the entire Term, at least the following types (and limits) of insurance coverages with respect to the Premises issued by insurance companies reasonably acceptable to Landlord and licensed to do business in the State of Arkansas, and subject to the following terms and conditions:

(a) Commercial general liability insurance, including (without limitation) coverage for bodily injury and death, property damage and personal injury and contractual liability as referred to below, in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00), combined single limit per occurrence for injury (or death) and damage to property; (ii) insurance on an "all risk" basis, including (without limitation) sprinkler leakage, vandalism, malicious mischief, fire, windstorm, flood and extended coverage, covering the entire Premises, and all fixtures, furnishings, removable floor coverings, equipment, signs and all other decorations or stock in trade, inventory and personal property of Tenant, in amounts not less than the full replacement value thereof; (iii) workers' compensation insurance, if required by statute, with not less than the maximum statutory limits of coverage; and (iv) business interruption or lost profits coverage, in reasonable amounts for a business of similar size and nature of Tenant operating in the geographical area of the Building.  Such policies shall:  (A) include Landlord and such other parties as Landlord may reasonably designate as loss payees (except with respect to the insurance required in clause (iv) directly above)  as a named insured thereunder, (B) be written and considered as primary insurance, neither in contribution with nor in excess of any other insurance policies that may be maintained by Landlord or any other person or entity with respect to any other portion of the Building; (C) include within the terms of the policy or by contractual liability endorsement coverage insuring Tenant's indemnity obligations under this Lease; and (D) provide that it may not be cancelled or changed without at least thirty (30) calendar days prior written notice from the company providing such insurance to each party insured thereunder.

(b) The insurance coverage to be provided by Tenant will be for a period of not less than one (1) year. At least fifteen (15) days prior to the Commencement Date, Tenant will deliver to Landlord original certificates of all such insurance, together with proof of payment of the premium therefor; thereafter, at least fifteen (15) calendar days prior to the expiration of any policy, Tenant will deliver to Landlord such original certificates as will evidence a paid-up renewal or new policy to take the place of the one expiring.

(c) Each party will look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Tenant hereby waives and releases all rights of subrogation under Tenant's insurance policies, and Tenant will

cause each such insurance policy to be properly endorsed to evidence such waiver and release of subrogation in favor of Landlord.

(d) Tenant acknowledges that Landlord will not carry insurance on the Premises or furniture, furnishings, trade fixtures, equipment installed in or made to the Premises by or for Tenant, and Tenant agrees that Tenant, and not Landlord, will be obligated to promptly repair any damage thereto or to replace the same.

(e) Any failure by Tenant to maintain continuous insurance coverage as required under the terms and conditions of this Section 17 shall constitute an immediate and automatic default by Tenant hereunder.  Provided there is no interruption in such continuous coverage, any other failure of Tenant to satisfy the terms and conditions of this Section 17 shall constitute a default hereunder only if such failure remains uncured fifteen (15) days after Landlord provides Tenant with written notice of such failure. If Tenant shall fail to procure and maintain the insurance required herein, Landlord may, but shall not be required to and shall incur no liability for doing so, procure and maintain the same through Tenant's insurance broker or otherwise, at the expense of Tenant, plus a fifteen percent (15%) administrative fee, which Tenant shall pay to Landlord upon demand.

## SECTION EIGHTEEN.  TRADE FIXTURES.

(a) Tenant shall have the right, at any time and from time to time during the Term and any renewals or extensions, at Tenant's sole cost and expense, to install and affix on the Premises items for use in Tenant's Ambulatory Surgery Center, which Tenant, in Tenant's sole discretion, deems advisable (collectively "Trade Fixtures"), provided that Tenant shall not overload the floors. Trade Fixtures installed in the Premises by Tenant shall always remain the property of Tenant and shall be removed at the expiration of the Term or any extension, provided that any damage to the Premises caused by the removal of the Trade Fixtures shall be repaired by Tenant, and further provided that Landlord shall have the right to keep any Trade Fixtures or to require Tenant to remove any Trade Fixtures that Tenant might otherwise elect to abandon.

(b) Any Trade Fixtures that are not removed from the Premises by Tenant within thirty (30) days after the Termination Date shall be deemed abandoned by Tenant and shall automatically become the property of Landlord as owner of the real property to which they are affixed.

## SECTION NINETEEN. SIGNS.

Tenant may not place, maintain, nor permit on any exterior door, wall, or window of the Premises any sign, awning, canopy, marquee, or other advertising of a permanent and irremovable nature without the express written consent of Landlord and such consent shall not with unreasonably withheld, delayed or conditioned.  Tenant shall maintain any sign, decoration, or advertising in good appearance and repair at all times during this Lease.  At the Termination Date, any of the items mentioned in this section that are not removed from the
Premises by Tenant may, without damage or liability, be removed and destroyed by Landlord at Tenant's cost.  Nothing in this provision is intended to prevent Tenant from placing or maintaining any sign, awning, canopy, marquee, or other advertising relating to Tenant's operation.

**SECTION TWENTY. DAMAGE OR DESTRUCTION**.

(a) In the event that during the Term of this Lease, the Premises shall be damaged by fire or other casualty which renders the Premises untenantable, Tenant, shall repair said damage.  Such repairs shall be commenced within sixty (60) days of the date of said damage and such repairs shall be completed within two hundred forty (240) days of said damage;  provided, however, if the Premises are damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within such time period, Tenant shall have such additional time as necessary, so long as Tenant is using diligent, good faith efforts to repair and restore the Premises.  All such work shall be approved by Landlord in advance and Landlord shall have the unfettered right to supervise all such work, in which case Tenant shall pay Landlord a construction supervision fee not to exceed 5% of the cost of such restoration.

**SECTION TWENTY ONE. CONDEMNATION.**

(a) The term "total taking" means the permanent taking of or a voluntary transfer under the threat of the exercise of the right of eminent domain or other authority of all or a portion of the Premises such that it is impossible for Tenant to occupy and operate an Ambulatory Surgery Center within the Premises in compliance with applicable laws, rules, ordinances and regulations. The term "partial taking" means the taking of only a portion of the Premises which does not constitute a total taking, Tenant can continue to operate the its business on the Premises in compliance with applicable laws, rules, ordinances and regulations.

(b) If a total taking occurs during the Term of this Lease, this Lease will terminate as of the date of the taking.  The phrase "date of the taking" means the date of taking actual physical possession by the condemning authority or such earlier date as the condemning authority gives notice that it is deemed to have taken possession.

(c) If a partial taking results in the Premises in violation of municipal parking requirements, then Tenant shall promptly restore the Premises to an architecturally fit unit in accordance with plans approved by Landlord and reopen for business.

(d) All compensation and damages awarded for a total or partial taking of the Premises, will belong to Landlord; provided, however, Tenant may make its own claim for any separate award that may be made by the condemner for Tenant's moving expenses, loss of business or for the taking of or injury to Tenant's improvements, or on account of any cost or loss Tenant may sustain in the removal of Tenant's trade fixtures, equipment, and furnishing, or as a result of any alterations, modifications, or repairs which may be reasonably required by Tenant in order to place the remaining portion of the Premises not so condemned in a suitable condition for the continuance of Tenant's occupancy, provided that no such award shall reduce the award to Landlord.

(e) If this Lease is terminated pursuant to the provisions of this Section 21, then all rentals and other charges payable by Tenant to Landlord under this Lease will be paid up to the day of the taking, and any rentals and other charges paid in advance and allocable to the period after the date of the taking will be repaid to Tenant by Landlord. Landlord and Tenant will then be released from all further liability under this Lease.

**SECTION TWENTY TWO. ASSIGNMENT AND SUBLETTING.**

Tenant shall not voluntarily or involuntarily or by operation of law, assign, transfer, mortgage or otherwise encumber this Lease, the Premises (including fixtures), or any interest of Tenant in either, in whole or in part, or sublet the Premises or any part thereof, or permit the Premises or any part thereof to be used or occupied by others, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, nor shall Tenant's leasehold interest hereunder be assignable or transferable by the voluntary act of Tenant, or anyone claiming by, through or under Tenant by reason of bankruptcy, voluntary or involuntary, or by operation of law.  Consent to any one sublease or assignment shall not be deemed a waiver of the right to consent to future sublettings and assignments.  Even though Landlord may consent to a sublease or assignment, Tenant shall not be released from liability hereunder.  Any attempt by Tenant to effectuate such sublease, assignment, transfer, mortgage or other encumbrance without Landlord's consent shall be null and void.

The transactions deemed to be restricted under the terms of this Section 22 shall include without limitation any assignment, subletting, sale or other transfer that would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate or proprietary structure; the sale or transfer of fifty percent (50%) or more of the capital stock or ownership interests of Tenant; the sale, assignment or transfer of all or substantially all of the assets of Tenant, with or without specific assignment of this Lease; or in the event that Tenant is a partnership, limited liability company, corporation or similar entity (other than one whose shares are regularly and publicly traded on a recognized stock exchange), any change in the ownership, control and/or power to vote the majority of the outstanding stock of Tenant occurs (whether direct or indirect, and whether such change is by sale, assignment, bequest, operation of law or otherwise).

To review any proposed assignment or sublease, Landlord will require thirty (30) days to review Tenant's submission of (i) the name of the entity receiving such transfer (the "Transferee"); (ii) a detailed description of the business of the Transferee; (iii) audited financial statements of the Transferee; (iv) all written agreements governing the transfer; (v) if the Transferee is an individual, a true and correct copy of the Transferee's driver's license and a completed and signed copy of Landlord's credit application; (vi) any information reasonably requested by Landlord with respect to the transfer or the Transferee; and (vii) a fee of One Thousand Dollars ($1,000.00) to compensate Landlord for certain fees and costs of administration, and other expenses incurred in connection with the review and processing of such documentation**.**  In the event that Landlord consents to Tenant's subletting of the Premises or any part thereof, or the sale, transfer or assignment of its leasehold interest, Tenant agrees to furnish to Landlord an executed copy of the sublease, sale, transfer, or assignment agreement(s) with all amendments and riders within ten (10) days of execution thereof; provided that in no event shall such sublease, sale, transfer or assignment be effective unless the assignee thereof unconditionally assumes all obligations of Tenant under this Lease.  In the event that any administrative fee, transfer fee or similar fee is paid to Tenant in connection with any such assignment or sublease, whether or not included in the assignment or sublease agreement itself, all such fees shall be disclosed to and paid over to Landlord as additional rent, and in the case of a sublease, if the rental rate for such sublease is greater than that which Tenant is obligated to pay hereunder, then Tenant shall remit to Landlord, as additional rent, the entire amount of any such excess each month.  Finally, in the

event of any assignment or subletting, it is understood and agreed that all rentals paid to Tenant by an assignee or sublessee shall be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord (to be applied as a credit and offset to Tenant's rent obligations hereunder).

**SECTION TWENTY THREE.  SUBORDINATION.**

This Lease and the rights of Tenant hereunder are and shall be subject and subordinate at all times to any ground lease, mortgage, deed of trust, or other lien created by Landlord, whether now existing or hereafter arising upon the Premises, and to all amendments, modifications, renewals, extensions, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security thereof (collectively, an "Encumbrance"). Notwithstanding anything to the contrary contained herein, any holder of such an Encumbrance (a "Holder") may subordinate, in whole or in part, such Encumbrance to this Lease on such terms and subject to such conditions as such Holder may deem appropriate in its discretion without joinder of Tenant by sending Tenant notice in writing. Tenant agrees within five (5) days of request by Landlord or any Holder to execute and deliver to Landlord or such Holder such further instruments, in form and content acceptable to the requesting party, consenting to or confirming the subordination of this Lease to any Encumbrance now existing or hereafter placed upon the Premises or any part thereof, or attorning to such Holder, and containing such other provisions, as Landlord or such Holder may request. Tenant shall, in the event of the sale or assignment of Landlord's interest in the Premises, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under, any mortgage or deed of trust made by Landlord covering the Premises, attorn to the purchaser and recognize the purchaser as Landlord under this Lease.  The subordination and attornment set forth in this Section are self-operative and no further instrument of subordination and/or attornment will be necessary unless required by Landlord or the holder of a mortgage or deed of trust.  Further, Tenant shall execute and deliver to Landlord and any Landlord's lender, within ten (10) business days after Landlord's written request therefor, an SNDA or other subordination, no disturbance and attornment agreement substantially in the form of Exhibit "**C**" hereto. In the event that the lender, mortgagee, beneficiary, or any other person, acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, this Lease shall not be terminated or affected by said foreclosure or sale, or any such proceeding, and the lender, mortgagee or beneficiary shall agree that any sale of the Premises pursuant to the exercise of any rights and remedies under the Mortgage, shall be made subject to this Lease and the rights of the Tenant hereunder and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed. Tenant agrees to attorn to the lender, beneficiary or such other person as its new landlord, and this Lease shall continue in full force and effect as a direct lease between Tenant and Lender, mortgagee, beneficiary or such other person, upon all the terms, covenants, and agreements set forth in this Lease. The parties hereto agree to execute or obtain execution of such reasonable documents as may be necessary to effectuate such subordination, non-disturbance, and attornment.

**SECTION TWENTY FOUR.  COVENANT OF TITLE AND QUIET ENJOYMENT.**

Subject to the rights of mortgagees and matters of record, Landlord hereby covenants and agrees that so long as Tenant has performed and observed all terms, conditions, covenants or obligations required under this Lease, Tenant shall have quiet enjoyment of the Premises and all appurtenances thereto. Tenant hereby acknowledges and agrees that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and its successors only with respect to breaches occurring during the ownership of Landlord's interest hereunder.

### SECTION TWENTY FIVE. DEFAULT.

Any of the following events or occurrences shall constitute a material breach of this Lease by Tenant and, after the expiration of any applicable grace period, shall constitute an event of default (each an "Event of Default"):

(a) The failure by Tenant to pay any amount in full when it is due under the Lease;

(b) The failure by Tenant to perform any obligation under this Lease, which by its nature Tenant has no capacity to cure; and such performance is deemed an immediate and automatic default under the Lease;

(c) The failure by Tenant to perform any other obligation under this Lease, if the failure has continued for a period of ten (10) days after Landlord demands in writing that Tenant cure the failure. If, however, by its nature the failure cannot be cured within ten (10) days, Tenant may have a longer period as is necessary to cure the failure, but this is conditioned upon Tenant's promptly commencing to cure within the ten (10) day period and thereafter diligently completing the cure (not to exceed ninety (90) days). Tenant shall indemnify and defend Landlord against any liability, claim, damage, loss, or penalty that may be threatened or may in fact arise from that failure during the period the failure is uncured;

(d) Any of the following: A general assignment by Tenant for the benefit of Tenant's creditors; any voluntary filing, petition, or application by Tenant under any law relating to insolvency or bankruptcy, whether for a declaration of bankruptcy, a reorganization, an arrangement, or otherwise; the abandonment, vacation, or surrender of the Premises by Tenant without Landlord's prior written consent; or the dispossession of Tenant from the Premises (other than by Landlord) by process of law or otherwise;

(e) The appointment of a trustee or receiver to take possession of all or substantially all of Tenant's assets; or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, unless the appointment or attachment, execution, or seizure is discharged within thirty (30) days; or the involuntary filing against Tenant, or any general partner of Tenant if Tenant is a partnership, of (i)a petition to have Tenant, or any partner of Tenant if Tenant is a partnership, declared bankrupt, or (ii) a petition for reorganization or arrangement of Tenant under any law relating to insolvency or bankruptcy, unless, in the case of any involuntary filing, it is dismissed within sixty (60) days;

(f) The abandonment of the Premises by Tenant; or

(g) A default occurs under the Guaranty, or any Guarantor files bankruptcy, dissolves or dies.

## SECTION TWENTY SIX. LANDLORD REMEDIES.

Upon the occurrence of an Event of Default, Landlord, in addition to any other rights or remedies available to Landlord at law or in equity, shall have the right to

(a)     terminate this Lease and all rights of Tenant under this Lease by giving Tenant written notice that this Lease is terminated, in which case Landlord may recover from Tenant the aggregate sum of (i) the worth at the time of award of any unpaid rent that had been earned at the time of termination; (ii) the worth at the time of award of the amount by which (A) the unpaid rent that would have been earned after termination until the time of award exceeds (B) the amount of the rental loss, if any, that could have been reasonably avoided; (iii) the worth at the time of award of the amount by which (A) the unpaid rent for the balance of the Term after the time of award exceeds (B) the amount of rental loss, if any, that could be reasonably avoided; (iv) any other amount necessary to compensate Landlord for all the detriment caused by Tenant's failure to perform Tenant's obligations or that, in the ordinary course of things, would be likely to result from Tenant's failure; and (v) all other amounts in addition to or in lieu of those previously set out as may be permitted from time to time by applicable Arkansas law.

As used in clauses (i) and (ii) of Section 26(a), the worth at the time of award is computed by allowing interest at the rate of ten percent (10%) per annum. As used in clause (iii) of Section 23(a), the worth at the time of award is computed by discounting that amount at the discount rate of the Federal Reserve Bank at the time of award plus one percent (1%). As used in this Section, the term rent shall include Minimum Monthly Rent and any other payments required by Tenant under this Lease.

(b)     continue this Lease, and from time to time, without terminating this Lease, either (i) recover all rent and other amounts payable as they become due; or (ii) relet the Premises or any part on behalf of Tenant on terms and at the rent that Landlord, in Landlord's sole discretion, may deem advisable, all with the right to make alterations and repairs to the Premises, at Tenant's cost, and apply the proceeds of reletting to the rent and other amounts payable by Tenant. To the extent that the rent and other amounts payable by Tenant under this Lease exceed the amount of the proceeds from reletting, the Landlord may recover the excess from Tenant as and when due.

(c)     Upon the occurrence of an Event of Default, Landlord shall also have the right, with or without terminating this Lease, to re-enter the Premises and remove all persons and property from the Premises. Landlord may store the property removed from the Premises in a public warehouse or elsewhere at the expense and for the account of Tenant.

(d)     None of the following remedial actions, alone or in combination, shall be construed as an election by Landlord to terminate this Lease unless Landlord has in fact given Tenant written notice that this Lease is terminated or unless a court of competent jurisdiction decrees termination of this Lease: any act by Landlord to maintain or preserve the Premises; any efforts

by Landlord to relet the Premises; any re-entry, repossession, or reletting of the Premises; or any re-entry, repossession, or reletting of the Premises by Landlord pursuant to this Section. If Landlord takes any of the previous remedial actions without terminating this Lease, Landlord may nevertheless at any later time terminate this Lease by written notice to Tenant.

(e)    If Landlord relets the Premises, Landlord shall apply the revenue from the reletting as follows: first, to the payment of any indebtedness other than rent due from Tenant to Landlord; second, to the payment of any cost of reletting, including without limitation finder's fees and leasing commissions; third, to the payment of the cost of any maintenance and repairs to the Premises; and fourth, to the payment of rent and other amounts due and unpaid under this Lease. Landlord shall hold and apply the residue, if any, to payment of future amounts payable under this Lease as the same may become due and shall be entitled to retain the eventual balance with no liability to Tenant. If the revenue from reletting during any month, after application pursuant to the previous provisions, is less than the sum of (i) Landlord's expenditures for the Premises during that month and (ii) the amounts due from Tenant during that month, Tenant shall pay the deficiency to Landlord with the applicable time period as provided under the  applicable Lease subsection upon demand.

(f) After the occurrence of an Event of Default, Landlord, in addition to or in lieu of exercising other remedies, may, but without any obligation to do so, cure the breach underlying the Event of Default for the account and at the expense of Tenant.  Tenant shall, upon demand, immediately reimburse Landlord for all costs, including costs of settlements, defense, court costs, and attorney's fees, that Landlord may incur in the course of any cure.

(g)    No security or guaranty for the performance of Tenant's obligations that Landlord may now or later hold shall in any way constitute a bar or defense to any action initiated by Landlord for unlawful detainer or for the recovery of the Premises, for enforcement of any obligation of Tenant, or for the recovery of damages caused by a breach of this Lease by Tenant or by an Event of Default.

(h)    The exercise by Landlord of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Landlord of any one or more of the other rights and remedies herein provided.  All remedies provided for in this Lease are cumulative and may, at the election of Landlord, be exercised alternatively, successively, or in any other manner and are in addition to any other rights provided for or allowed by law or in equity.  Landlord shall have an affirmative obligation to mitigate its damages hereunder; provided that Landlord and Tenant agree that any such duty to attempt to mitigate shall be satisfied and Landlord shall be conclusively deemed to have used objectively fair and reasonable efforts to relet the Premises by (i) advising Landlord's leasing staff of the availability of the Premises and (ii) engaging a commercial real estate agent to attempt to relet the Premises; provided further that in all events Landlord may refuse to relet the Premises if the proposed use or quality of any prospective tenant's operation or financial standing is not then appropriate for the Premises or
if Landlord determines that the proposed rent is below market, nor shall Landlord be obligated to give preference to reletting the Premises over other vacant space.

## SECTION TWENTY SEVEN. LATE CHARGE.

Tenant acknowledges that Tenant's failure to pay any installment of the Minimum Monthly Rent or any other amounts due under this Lease as and when due may cause Landlord to incur costs not contemplated by Landlord when entering into this Lease, the exact nature and amount of which would be extremely difficult and impracticable to ascertain. Accordingly, if any installment of the Minimum Monthly Rent or any other amount due under the Lease is not received by Landlord as and when due, then, without any notice to Tenant, Tenant shall pay to Landlord an amount equal to five percent (5%) of the past due amount, which the parties agree represents a fair and reasonable estimate of the costs incurred by Landlord as a result of the late payment by Tenant.

### SECTION TWENTY EIGHT. DEFAULT INTEREST.

Unless otherwise specified herein, If Tenant fails to pay any amount due under this Lease as and when due, that amount shall bear interest at the maximum rate then allowable by law from the due date until paid.

### SECTION TWENTY NINE. WAIVER OF BREACH.

Any express or implied waiver of a breach of any term of this Lease shall not constitute a waiver of any further breach of the same or other term of this Lease; and the acceptance of rent shall not constitute a waiver of any breach of any term of this Lease, except as to the payment of rent accepted.

### SECTION THIRTY. ESTOPPEL CERTIFICATES.

At any time, with at least fifteen (15) days' prior notice by Landlord, landlord shall deliver, and Tenant shall execute, acknowledge, and return to Landlord a certificate in form attached hereto as Exhibit "D".  Any certificate may be relied on by prospective purchasers, mortgagees, or beneficiaries under any deed of trust on the Premises or any part of it.

### SECTION THIRTY ONE.  SALE OR ASSIGNMENT BY LANDLORD.

Landlord shall have the right to transfer, sell and/or assign, in whole or in part, all of its rights and obligations hereunder and in the Premises, and, in such event, Landlord shall be and is hereby entirely released of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring on or after the consummation of such sale, and the purchaser at such sale or any subsequent sale, or the assignee of such assignment or any subsequent assignment, shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser or assignee, to have assumed and agreed to carry out any and all of the covenants and obligations of Landlord under this Lease, and Tenant shall look solely to such successor in interest of Landlord for the performance of such covenants and obligations.

### SECTION THIRTY-TWO.  ATTORNEYS' FEES.

If any action at law or in equity is brought to recover any rent or other sums under this Lease, or for or on account of any breach of or to enforce or interpret any of the covenants, terms, or conditions of this Lease, or for the recovery of the possession of the Premises, the prevailing party

shall be entitled to recover from the other party as part of prevailing party's costs reasonable attorney's fees, the amount of which shall be fixed by the court and shall be made a part of any judgment rendered.

## SECTION THIRTY-THREE.  SECURITY DEPOSIT.

Upon delivery of possession of the Premises to Tenant, Tenant shall deposit with Landlord the sum of  **one month's estimated Minimum Monthly Rent** as a security deposit securing the performance of Tenant's obligations under this Lease. Upon the occurrence of a default hereunder by Tenant, Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrears of Minimum Monthly Rent and/or additional rent, including, but not limited to, the cost of any damage, injury, expense, or liability caused by any default by Tenant hereunder.  Any remaining balance of the Security Deposit shall be returned by Landlord to Tenant within a reasonable period of time after the termination or expiration of this Lease and the satisfaction of Tenant's obligations hereunder. The Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Tenant shall not be entitled to receive and shall not receive any interest on the Security Deposit, and Landlord may commingle the same with other monies of Landlord.  In the event Landlord applies the Security Deposit or any portion thereof to the payment of any sum described above and this Lease is not terminated, Tenant shall immediately deposit with Landlord an amount of money equal to the amount so applied and such amount shall be deemed to be part of the Security Deposit.  In the event of a sale or transfer of Landlord's interest in the Premises or all or any portion of the Premises, Landlord shall have the right to transfer the Security Deposit to the purchaser or lessor, as the case may be, and upon any such transfer Landlord shall be relieved of all liability to Tenant for the return of the Security Deposit, and Tenant shall look solely to the new owner or lessor for the return of the Security Deposit.

## SECTION THIRTY-FOUR. AUTHORITY.

If Tenant is a corporation, trust, or general or limited partnership, all individuals executing this Lease on behalf of that entity represent that they are authorized to execute and deliver this Lease on behalf of that entity. If Tenant is a corporation, trust, or partnership, Tenant shall, prior to the execution of this Lease, deliver to Landlord evidence of that authority and evidence of due formation, all satisfactory to Landlord. If Tenant is a partnership, Tenant shall furnish Landlord with a copy of Tenant's partnership agreement and with a certificate from Tenant's attorney, stating that the partnership agreement constitutes a correct copy of the existing partnership agreement of Tenant.

## SECTION THIRTY-FIVE.  NOTICES.

Except as otherwise expressly provided by law, all notices or other communications required or permitted by this **Lease** or by law to be served on or given to either party to this **Lease** by the other party shall be in writing and shall be deemed served when personally delivered to the party to whom they are directed, or in lieu of the personal service, upon deposit in the United States Mail, certified or registered mail, return receipt requested, postage prepaid, or by express mail or courier service (e.g. Fedex), addressed to the receiving party at:

**IF TO LANDLORD:**
Jameson, LLC DBA American Development Partners
PO Box 681982
Franklin, TN 37064
Attn: Mr. Manny Butera

**IF TO TENANT:**
SARC by HIS - DRAPER, UT Inc.
The Crescent
100 Crescent Court, 7th Floor
Dallas, TX 75201

**IF TO GUARANTOR**:
Healthcare Solutions Management Group, Inc.
3 School Street, Suite 303
Glen Cove, NY 117542
Either party, Tenant or Landlord, may change the address for this Section by giving written notice of the change to the other party in the manner provided in this Section.

### SECTION THIRTY-SIX.  HEIRS AND SUCCESSORS.

This Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of Landlord and Tenant.

### SECTION THIRTY-SEVEN.  PARTIAL INVALIDITY.

Should any provision of this Lease be held by a court of competent jurisdiction to be either invalid or unenforceable, the remaining provisions of this Lease shall remain in effect, unimpaired by the holding.

### SECTION THIRTY-EIGHT. ENTIRE AGREEMENT.

This instrument constitutes the sole agreement between Landlord and Tenant respecting the Premises, the leasing of the Premises to Tenant, and the specified lease term, and correctly sets forth the obligations of Landlord and Tenant. Any agreement or representations respecting the Premises or their leasing by Landlord to Tenant not expressly set forth in this instrument are void.

### SECTION THIRTY-NINE.  TIME IS OF THE ESSENCE.

Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

### SECTION FORTY.  BROKERAGE.

Landlord and Tenant each warrant that it has had no dealings with any broker or agent about this Lease, other than N/A representing Tenant and N/A representing Landlord and covenants to pay,

hold harmless and indemnify the other from and against all cost, expense, or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiations thereof.

## SECTION FORTY-ONE.  RENT.

All monetary obligations of Tenant to Landlord under the Lease, including but not limited to the Minimum Monthly Rent shall be deemed rent.

## SECTION FORTY-TWO. AMENDMENTS.

This Lease may be modified only in writing and only if signed by the parties at the time of the modification.

## SECTION FORTY-THREE. GUARANTY.

As a condition to the effectiveness of this Lease, the obligations of Tenant under this Lease shall be guaranteed by Healthcare Solutions Management Group, Inc., a Delaware corporation ("Guarantor"), pursuant to a guaranty in form attached hereto as  Exhibit "E" ("Guaranty").

## SECTION FORTY-FOUR. MERGER

The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation of the Lease, or a termination by Landlord, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing sub tenancies or may, at the option of Landlord, operate as an assignment to a Landlord of any of the sub tenancies.

## SECTION FORTY-FIVE. FINANCIAL REPORTING.

Tenant shall submit to Landlord within sixty (60) days following the end of each calendar year during the Term and otherwise upon Landlord's reasonable request (not more than twice during any calendar year), Tenant shall deliver to Landlord complete financial statements satisfactory to Landlord in form and content (i) covering the preceding twelve (12) months and any other financial information requested by Landlord and/or Landlord's lender, including, without limitation, a profit and loss statement and balance sheet for Tenant and/or consolidated versions of the same from Tenant's parent company.  Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant or otherwise certified by Tenant. Landlord will agree to execute a commercially reasonable NDA unless the information comes from a  public company.

## SECTION FORTY-SIX. LIABILITY OF LANDLORD.

In no event shall Landlord be in default hereunder unless it has failed to cure such default within thirty (30) days after written notice (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to proceed diligently to cure such default after written notice); provided that in any event: (i) Tenant shall have no right to offset or abate rent in the event of any default by Landlord under this Lease, except to the extent offset rights are specifically provided to Tenant in this Lease; (ii) Tenant shall have no right to terminate this Lease;

and (iii) Tenant's rights and remedies hereunder shall be limited to the extent (A) Tenant has expressly waived in this Lease any of such rights or remedies and/or (B) this Lease otherwise expressly limits Tenant's rights or remedies.  It is expressly understood and agreed that any money judgment resulting from any default or other claim arising under this Lease shall be satisfied only out of Landlord's interest in the Premises, and no other real, personal or mixed property of Landlord (the term "Landlord" for purposes of this Section only shall mean any and all partners, both general and/or limited, officers, directors, shareholders and beneficiaries, if any, who comprise Landlord), wherever situated, shall be subject to levy on any judgment obtained against Landlord.  Tenant hereby waives, to the extent waivable under law, any right to satisfy a money judgment against Landlord except from Landlord's interest in the Premises.  If such interest is not sufficient for the payment of such judgment, Tenant will not institute any further action, suit, claim or demand, in law or in equity, against Landlord for or on the account of such deficiency.  Notwithstanding anything herein contained to the contrary, Tenant hereby waives, to the extent waivable under law, any right to specific performance in the event of Landlord's default referred to herein, and Tenant expressly agrees that except as provided in the immediately following sentence, Tenant's remedy shall be limited to the monetary damages referred to in this Section.  Notwithstanding the foregoing, in the event of failure by Landlord to give any consent, as provided in this Lease, Tenant's sole remedy shall be an action for specific performance at law, but in no event shall Landlord be responsible in monetary damages for failure to give such consent. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential, punitive or special damages.

**SECTION FORTY-SEVEN.  CHOICE OF LAW/VENUE; WAIVER OF TRIAL BY JURY; COUNTERCLAIMS.**

This Agreement shall be governed by and construed according to the laws of the State of Arkansas, without giving effect to its choice of law principles. The parties agree that all actions and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary agreement or any other related obligations shall be litigated solely and exclusively in the state or federal courts located in Crittenden County, Arkansas and that such courts are convenient forums. Each party hereby submits to the personal jurisdiction of such courts for purposes of any such actions or proceedings. To the extent permitted by applicable law, the parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of landlord and tenant, Tenant's use or occupancy of the Premises and/or any claim of injury or damage.  In the event Landlord commences any proceedings for nonpayment of rent or any other amounts payable hereunder, Tenant shall not interpose any counterclaim of whatever nature or description in any such proceeding, unless the failure to raise the same would constitute a waiver thereof.  This shall not, however, be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.

**SECTION FORTY-EIGHT.  COOPERATION.**

Each Party agrees to cooperate fully with the other Party and to execute and deliver such further documents, certificates, agreements, and instruments and to take such other actions as may be reasonably requested by the other Party to evidence or reflect the Contemplated Transactions and to carry out the intent and purposes of this Agreement.  The Tenant agrees, if requested by Landlord, to fully cooperate and adjust for clerical and scrivener's errors, on all documents

related to this Lease and the underlying Guaranty, if deemed necessary or desirable in the reasonable discretion of Landlord.

### SECTION FORTY-NINE.  ACQUISITION CONTINGENCY.

Tenant acknowledges that Landlord does not currently own the Premises and that this Lease and Landlord's obligations hereunder are strictly contingent upon Landlord acquiring fee simple ownership of the Premises on or before December 31, 2020 (the "Acquisition Deadline") on terms satisfactory to Landlord in its sole and absolute discretion, the foregoing being "Landlord's Acquisition Contingency".   In the event Landlord has not satisfied Landlord's Acquisition Contingency on or before Acquisition Deadline, then both Landlord and Tenant shall have the right to terminate this Lease upon written notice to the other at any time prior to Landlord's acquisition of the Premises.

**IN WITNESS WHEREOF,** the said Landlord has hereunto the day and year first above written.

JAMESON, LLC DBA AMERICAN DEVELOPMENT PARTNERS

Name: _____

Title: _____Developer_____

**IN WITNESS WHEREOF,** the said Landlord has hereunto the day and year first above written.


Signed & Delivered in the **SARC BY HSI – DRAPER, UT, INC.** presence of:


By:

Justin Smith_____

Title: Executive Chairman

**EXHIBIT "A"** <u>**LEGAL DESCRIPTION**</u>



**EXHIBIT "B"**

**<u>SCOPE OF WORK</u>**

Landlord and Tenant shall work in good faith to mutually agree on the scope of Landlord's Work, and the final, agreed plans and specifications for the same shall constitute Exhibit "B".

EXHIBIT C


**[FORM OF SNDA]**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:




**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** ("**Agreement**") is made as of the _____of the *, between *
("**Landlord**"), * ("**Tenant**"), and * ("**Lender**").


**RECITALS:**

A. Tenant is the holder of a leasehold interest in that certain real property together with all easements, rights and appurtenances thereto located in the County(ies) of  *, State of *, as legally described on **Schedule A**, attached hereto and incorporated herein by this reference ("**Leased Premises**") pursuant to that certain Lease, dated as of * between Landlord, as landlord, and Tenant, as tenant.  The Lease as amended from time to time shall hereinafter be referred to as the "**Lease**"; and

B. Lender has made or has agreed to make a loan to Landlord in the original principal amount of $*, which loan shall be secured by that certain mortgage encumbering all the Leased Premises dated as of *, and recorded, in the official records of * County(ies), State of * ("**Mortgage**"); and

C. The parties desire to subordinate the Lease to the Mortgage and to establish certain rights of quiet and peaceful possession to the Leased Premises for Tenant's benefit together with certain obligations of attornment, all in the manner hereafter provided.

The foregoing recitals are incorporated into and made an integral part of this Agreement.


**AGREEMENT:**

**NOW, THEREFORE**, in consideration of the Leased Premises and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, it is mutually agreed among the parties as follows:

1. SUBORDINATION.  Subject to the terms and conditions set forth in this Agreement, the Tenant agrees that the Lease is and shall at all times be subject to and subordinate to the lien, terms and conditions of the Mortgage and to any renewals, modifications, consolidations and extensions of the Mortgage, and all advances made thereunder.

2.  N<sub>ON</sub>-D<sub>ISTURBANCE</sub>.  So long as Tenant is not then currently in default, Lender agrees that (a) Tenant will not be made a party in any action or proceeding to foreclose the Mortgage or to remove or evict Landlord from the Leased Premises except to the extent required under applicable law in order for Lender to avail itself of and complete the foreclosure or other remedy; (b) Tenant will not be evicted or removed from the Leased Premises nor will its possession or right to possession of the Leased Premises, or any of its rights and remedies under the Lease be terminated, diminished, affected, impaired or disturbed or in any way interfered with by any action taken by Lender to enforce any rights or remedies under the Mortgage; and (c) Lender, upon succeeding to Landlord's interest in the Leased Premises, will recognize all provisions of  the Lease and Tenant as its direct tenant under the Lease for the term thereof (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease), and, subject to the limitations of liability herein contained, will be bound by and perform all of the obligations of Landlord set forth in the Lease as if said person were named therein as the landlord thereunder; provided, however, that Lender shall not be:  (i) personally liable for the payment of any sum arising under or with respect to the Lease prior to the date Lender acquires Landlord's interest in the Leased Premises, which sum it is Landlord's obligation to pay, provided, however, that the foregoing shall not in any event prevent recourse by the Tenant against all or any part of Lender's right, title and interest in and to the Leased Premises or any part thereof (including, without limitation, Lender's right, title and interest in and to the rents and other income or revenue receivable from the Leased Premises or any part thereof, or the consideration receivable from the sale or other disposition, including a condemnation, of all or any part of the Leased Premises or from any fire or other casualty affecting all or any of the improvements located on the Leased Premises); (ii) obligated to cure any default of any prior landlord (including Landlord) under the Lease which occurred prior to the date Lender acquires Landlord's interest in the Leased Premises unless such default is of a continuing nature and has not been cured prior to Lender acquiring Landlord's interest in the Leased Premises, and provided that the foregoing shall not be deemed to constitute a waiver of any other rights or remedies of Tenant under the Lease including, without limitation, any right of offset against rent or any right of termination; (iii) subject to any right of offset against rent for any event of which Lender has not received written notice from Tenant pursuant to this Agreement; (iv) bound by any payment of rent or other amount by Tenant to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease; except to the extent said payment is required by the terms, covenants, conditions or agreements contained in the Lease; (v) personally liable for any warranties of any nature whatsoever; (vi) personally liable for construction or completion of any improvements for Tenant's use and occupancy; or (viii) personally liable for any claims, offsets or defenses which Tenant might have against Landlord.

In the event that the Lender or any other person acquires title to the Leased Premises pursuant to the exercise of any remedy provided for in the Mortgage or under the law of the state where the Leased Premises is located, the Lease shall not be terminated or affected by said foreclosure or sale resulting from any such proceeding and the Lender covenants that any sale by it of the Leased Premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall include the assumption of the Lease and the obligations of the Landlord thereunder subject to the restrictions set forth herein.

3. Aᴛᴛᴏʀɴᴍᴇɴᴛ.  Tenant agrees that, if the interest of Landlord in the Leased Premises shall be transferred to and owned by Lender by reason of foreclosure or other proceeding brought by it under any present or future lien against Landlord's interest in the Leased Premises, or by any other manner, Tenant shall be bound to the Lender under all of the terms, covenants, conditions and agreements set forth in the Lease for the balance of the term thereof remaining (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease) with the same force and effect as if Lender were named therein as the landlord thereunder, and Tenant does agree to attorn to Lender as its landlord thereunder so as to establish direct privity of estate and contract between Lender and Tenant, said attornment to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto immediately upon Lender succeeding to the interest of Landlord in the Leased Premises.  The parties acknowledge and agree that the Mortgage provides that, under certain circumstances, Lender shall be entitled to collect, receive and demand payment of all or any part of the rent and other sums due and payable to Landlord under the Lease to Lender.  The parties agree that:  (a) Tenant shall be under no obligation to pay rent or any other sums due and payable to Landlord under the Lease to Lender until such time as Tenant receives written notice from Lender demanding payment of said amounts to Lender; (b) Tenant shall be entitled to rely on any such written notice from Lender and shall not incur any liability to Landlord as a result of such reliance notwithstanding the existence of any dispute between Landlord and Lender with respect to the existence of any default or the satisfaction of any condition under the Mortgage or any other document executed in connection with the transaction which is the subject of the Mortgage which would entitle Lender to collect, receive or demand payment of said amounts from Tenant; and (c) all of Lender's rights described in this sentence shall be subject to all of Tenant's rights and remedies set forth in the Lease including, without limitation, the right of offset against rent.

There shall be no merger of the fee estate in the Leased Premises and the leasehold estate in the Lease by reason of the fact that the leasehold estate in the Lease may be held, directly or indirectly, by or for the account of any person or entity who shall own the fee estate in the Leased Premises.

Tenant recognizes the Mortgage and, and that in the case of any such conveyance either the Mortgage will be paid, or the conveyance shall be made subject to the lien of the Mortgage.

Mortgagee shall be named as an additional insured under the Tenants liability insurance policies with coverage in the amount of * Dollars ($*) and as a mortgagee/loss payee under all property insurance policies covering the Leased Premises.

4. Lender's Option to Cure.  Tenant agrees to provide Lender with a copy of any written notice of default given to Landlord pursuant to the Lease.  Tenant shall not terminate the Lease unless Tenant has sent a copy of the notice of default to Lender and Lender has not rectified the particulars specified in such notice of default within the time period allowed Landlord in the Lease.

5.  DEFINITIONS.  For the purpose of this Agreement: (a) the term "foreclosure" shall be deemed to include the acquisition of Landlord's interest in the Leased Premises by foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or by deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale, or by any other means whatsoever, and (b) the term "Lender" shall be deemed to include anyone who succeeds to Landlord's interest in the Leased Premises pursuant to the Mortgage including, without limitation, any purchaser at foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or any grantee of a deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale.

6.  NOTICES.  All notices given pursuant to this Agreement shall be in writing and shall be given by personal delivery, by United States registered or certified mail, or by United States express mail or other established express delivery service (such as Federal Express), postage or delivery charge prepaid, return receipt requested, addressed to the appropriate party at the address set forth above.

The person and address to which notices are to be given may be changed at any time by any party upon written notice to the other party.  All notices given pursuant to this Agreement shall be deemed given upon receipt.  For the purpose of this Agreement, the term "receipt" shall mean any of the following:  (a) the date of delivery of the notice or other document as shown on the return receipt; (b) the date of actual receipt of the notice or other document by the person or entity specified pursuant to this section; or (c) in the case of refusal to accept delivery or inability to deliver the notice or other document, the earlier of:  (i) the date of the attempted delivery or refusal to accept delivery; (ii) the date of the postmark on the return receipt; or (iii) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

7.  **ATTORNEYS' FEES**.  If any litigation is commenced between the parties hereto concerning this Agreement or the rights or obligations of any party in relation thereto, the prevailing party in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for its attorney's fees in such litigation (including any appeal thereof), which sum shall be determined by the court in such litigation or in a separate action brought for that purpose.

8.  **SUCCESSORS AND ASSIGNS**.  This Agreement shall bind and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns, including, without limitation, the mortgagee or beneficiary under any mortgage or deed of trust on Tenant's interest in the Lease or the Leased Premises, its successors and assigns.

9.  **COUNTERPARTS**.  This Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original and all of which together shall constitute but one and the same instrument and shall be effective upon execution of one or more of such counterparts by each of the parties hereto.

10. **MISCELLANEOUS**.  If any term, covenant, condition or agreement contained in this Agreement or the application thereof to any person, firm or entity shall at any time or to any extent be deemed or found to be invalid or unenforceable by operation of law, judicial proceedings or otherwise, the remainder of this Agreement or the application of such term, covenant, condition or provision to persons or entities or to circumstances other than those as to which it is held invalid or unenforceable shall not be affected, and each remaining term, covenant, condition or provision of this Agreement or the application thereof shall be valid and enforced to the fullest extent permitted by law.  This Agreement contains the entire agreement between the parties and supersedes all prior agreements, oral or written, with respect to the subject matter hereof.  This Agreement may not be modified in any manner whatsoever except by an instrument in writing signed by each of the parties hereto.  In construing the provisions of this Agreement and whenever the context so requires, the use of a gender shall include all other genders, the use of the singular shall include the plural, and the use of the plural shall include the singular.  This Agreement shall be promptly recorded in the official land records of the county in which the Leased Premises is located. The original recorded Agreement shall be sent to Tenant.  Lender shall receive a copy of the recorded Agreement.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**EXHIBIT "D"**

**[FORM OF TENANT ESTOPPEL]**

**TENANT ESTOPPEL**

The undersigned, *, (individually, and collectively the "**Tenant**"), whose address is * represents and certifies as follows:

1. The Tenant under that certain * Lease dated * (the "**Lease**") by and between the Tenant and * (the "**Landlord**") whose address is *, covering the property commonly known as * and described therein (collectively the "**Demised Property**").

2. The Lease constitutes the only agreement, either written or oral the Tenant has with respect to the Demised Property and any right of occupancy or use thereof.

3. The Lease is in full force and effect and has not been assigned, subleased, supplemented, modified or amended, in whole or in part, except as follows: *(if none, so state)* *

4. The Tenant took possession of the Demised Property on or about *, and commenced paying rent on or about *.  The Tenant presently occupies the Demised Property and is paying rent on a current basis.  No rent has been paid by Tenant in advance except for the monthly rental that became due on *, and a security deposit in the sum of US$* *(if none, so state)* now held by the Landlord in accordance with the terms of the Lease.

5. The ***monthly base*** rental is the sum of * Dollars and * Cents (US$*). The Landlord has not agreed to reimburse the Tenant for or to pay the Tenant's rent obligation under any other lease.

6. The Lease term commenced on *, and expires on *, and there are no options to renew except: *(if **none**, so state)* *

7. The Tenant is not in default of any of its obligations under the Lease, nor has there occurred any events which with the passage of time or giving of notice or both will result in any such default.  To the actual knowledge of the Tenant, there are no defaults under the Lease by the Landlord, nor have any events occurred which, with the passage of time or giving of notice or both, will result in any such default.  The Tenant does not presently have (nor with the passage of time or giving of notice or both will have) any offset, charge, lien, claim, termination right or defense under the Lease.

8. The Tenant has no right of first offer, right of first refusal, or option to purchase, with respect to all or any portion of the Demised Property.

9. The Tenant is aware that third parties intend to rely upon this Estoppel and the statements set forth herein and that the statements and facts set forth above shall be binding on the Tenant.

The Tenant and the persons executing this Estoppel on behalf of the Tenant have the power and authority to execute and deliver this Estoppel.

**TENANT:**

By: _____

**Name:** Justin Smith

**Its:** Executive Chairman


**Guarantor:**

By: _____

**Name:** Justin Smith

**Its:** Executive Chairman

**EXHIBIT "E"**

**COMMERCIAL LEASE GUARANTY AGREEMENT**

THIS COMMERCIAL LEASE GUARANTY ("Guaranty" or "Agreement") is made by Healthcare Solutions Management Group, Inc. ("Guarantor") in favor of Jameson, LLC DBA American Development Partners, a Tennessee limited liability company, and/or its assigns ("Landlord"), in connection with that certain lease dated on or about even date herewith (the "Lease") pursuant to which Landlord is to lease to SARC by HSI - DRAPER, UT Inc. ("Tenant") those premises located

at 13775 South Pony Express Rd Draper UT 84020 (the "Demised Premises"), as more particularly described in the Lease.

RECITALS

WHEREAS, Landlord requires this Guaranty as a condition to its execution of that certain Commercial Lease and the performance of the obligations to be performed under the Lease by Landlord; and

WHEREAS, Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.      The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.      Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant (collectively, the "Guaranteed Obligations"). Guarantor's obligations under this Guaranty are irrevocable, continuing, and unconditional.

3.      Guarantor hereby agrees that, without the consent of or notice to any Guarantor and without affecting any of the obligations of Guarantor hereunder:  (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease

Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.  Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.      Guarantor hereby waives and agrees not to assert or take advantage of:  (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue

any other security or remedy before proceeding against any Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of any Guarantor or of the right of any Guarantor to proceed against Tenant for reimbursement.

5.      Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.      Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of any Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against any Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of any Guarantor.

7.      Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant.  Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court.  Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which such Guarantor may have against Tenant relating to any indebtedness of Tenant to such Guarantor and will assign to Landlord all rights of such Guarantor thereunder.  Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of such Guarantor's rights to any such payments or distributions to which such Guarantor would otherwise be entitled; provided, however, that such Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or

distribution.  If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.      Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinate any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledge that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.      Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for such Guarantor. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles. Guarantor represents and warrants that all such financial statements shall be true and correct statements of such Guarantor's financial condition.

10.     The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

11.     If this Guaranty is signed by more than one person, then all of the obligations of Guarantor arising hereunder shall be jointly and severally binding on each of the undersigned, and their respective heirs, personal representatives, successors and assigns, and the term "Guarantor" shall mean all of such persons and each of them individually.

12.     This Guaranty is for the benefit of Landlord and Landlord's successors and assigns, and in the event of an assignment of the Guaranteed Obligations, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred with such Guaranteed Obligations.  Guarantor waives notice of any transfer or assignment of the Guaranteed Obligations or any part thereof.

13.     This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof.  No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord.  The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof.  No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.    The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.  The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sub lessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sub lessee.

16.    If any or all Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of creditors,, notice of such occurrence or event shall be promptly furnished to Landlord by Guarantor or such Guarantor's fiduciary.  This Guaranty shall extend to and be binding upon Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy.

17.    <u>Notices</u>.

All notices from the Guarantor to Landlord and Landlord to Guarantor required or permitted by any provision of this Guaranty shall be in writing and sent by registered or certified mail or nationally recognized overnight delivery service and addressed as follows:

|  |  |
|---|---|
| TO LANDLORD: | Jameson, LLC DBA American Development Partners<br>PO Box 681982<br>Franklin, TN 37064<br>Attn: Manny Butera |
| TO GUARANTOR: | Healthcare Solutions Management Group, Inc.<br>3 School Street, Suite 303<br>Glen Cove, NY 117542 |

Such addresses may be changed by such notice to the other party.  Notice given as hereinabove provided shall be deemed given on the date of its deposit in the United States Mail and, unless sooner actually received, shall be deemed received by the party to whom it is addressed on the third calendar day following the date on which said notice is deposited in the mail, or if a courier system is used, on the date of delivery of the notice.

18.     Guarantor agrees to pay to Landlord on demand all reasonable costs and expenses incurred by Landlord in seeking to enforce Landlord's rights and remedies under this Guaranty, including court costs, costs of alternative dispute resolution and reasonable attorneys' fees and costs, whether or not suit is filed, or other proceedings are initiated hereon. All such reasonable costs and expenses incurred by Landlord shall constitute a portion of the Guaranteed Obligations hereunder, shall be subject to the provisions hereof with respect to the Guaranteed Obligations and shall be payable by Guarantor within ten (10) days of written demand by Landlord.

19.     **GUARANTOR AND LANDLORD HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LANDLORD ENTERING INTO THIS AGREEMENT.**

20.     Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the in which the Demised Premises is located.

21.     If any provision of this Guaranty or the application thereof to any person or circumstance shall, for any reason and to any extent, be declared to be invalid or unenforceable, neither the remaining provisions of this Guaranty nor the application of such provision to any other person or circumstance shall be affected thereby, and the remaining provisions of this Guaranty, or the applicability of such provision to other persons or circumstances, as applicable, shall remain in effect and be enforceable to the maximum extent permitted by applicable law.

22.     Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

23.     When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural.  The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

24.     If any Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms.  If any Guarantor is a corporation, Landlord, at its option, may require such Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

Notwithstanding anything in this Guaranty to the contrary and provided neither Tenant nor any Guarantor are in default or have defaulted under the Lease or this Guaranty, Guarantor shall be released from this Guaranty after either. The guarantor is subject to the guaranty for the full term of the lease. This Guaranty shall not be subject to any bankruptcy preference prior or any other disgorgement.

**THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**IN WITNESS WHEREOF,** the said Guarantor has hereunto l the day and year first above written.

Signed & Delivered in the
presence of:

HEALTHCARE SOLUTIONS
MANAGEMENT GROUP. INC.
Name: _____
Justin Smith
Title: Executive Chairman

**EXHIBIT "F"**

**COMMENCEMENT DATE AGREEMENT**

This Agreement is made and entered into as of the ___ day of _____, 20___ between [_____, a _____ _____] ("Landlord") and [_____, a _____ _____] ("Tenant"), and shall be attached to and made a part of that certain Retail Lease between Landlord and Tenant dated _____, 20___ (the "Lease").  Pursuant to the provisions of the Lease, Landlord and Tenant intending to be legally bound hereby, agree to the following:

a.    The Commencement Date of the Lease occurred on _____, 20___.

b.    Tenant agrees that, as of and through the date hereof, Landlord has fully and timely complied with and performed each and every of its obligations as set forth in the Lease and that Tenant has no claims or causes of action against Landlord whatsoever and has no right to any setoffs against any and all sums due Landlord.

IN WITNESS WHEREOF, the parties have duly executed this supplement to the Lease as of the day and year first above written

Landlord

Jameson, LLC DBA American Development Partners

PO Box 681982

Franklin, TN 37064

Attn: Mr. Manny Butera  TENANT:

SARC BY HSI – DRAPER UT Inc.

By:_____

Name:_Justin Smith_____

Title:_Executive Chairman_____

Date:_11/16/2020_____

# EXHIBIT 8

# ASSIGNMENT OF LEASE
# FOR COMMERCIAL REAL ESTATE

THIS ASSIGNMENT OF LEASE FOR COMMERCIAL REAL ESTATE ("Assignment") is made effective this 20th day of November, 2020, by and between **JAMESON LLC,** a Tennessee limited liability company (the "Assignor") and **SARC DRAPER, LLC**, a Missouri limited liability company (the "Assignee").

WHEREAS, Assignor entered into that certain **AMBULATORY SURGERY CENTER LEASE AGREEMENT** ("Lease") entered into as of 11/12/20 (the "Effective Date") by and between Jameson, LLC DBA American Development Partners, a Tennessee limited liability company ("Landlord") and SARC by HSI - DRAPER, UT Inc., a Delaware corporation ("Tenant"), relating to that certain real property commonly known as 13775 South Pony Express Road, Units 100, 110, 210, and 200, as described in the Lease; and

WHEREAS, Assignor desires to assign to Assignee, all of Assignor's rights, interests and obligations under the Lease, and in accordance with the terms and conditions of the Lease, Assignee desires to accept Assignor's rights, interests and obligations under the Lease.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. Subject to the conditions and representations herein contained, Assignor hereby assigns to Assignee all of Assignor's rights, interests, and obligations under the LEASE and represents to Assignee that the Lease is in full force and effect and that no default has occurred or is occurring under the Lease.

2. Subject to the conditions and representations herein contained, Assignee hereby accepts the assignment made herein and agrees to accept the rights, interests, and obligations of Assignor under the Lease for the purpose herein stated.

3. Assignor hereby agrees to defend, indemnify and hold Assignee harmless from any loss, cost, liability, cause of action or any other expense or fee, including attorney's fees, incurred by Assignee arising out of or in connection with Assignor's actions or omissions under the Lease prior to the Effective Date.

4. Assignee hereby agrees to defend, indemnify and hold Assignor harmless from any loss, cost, liability, cause of action or any other expense or fee, including attorney's fees, incurred by Assignor arising out of or in connection with Assignee's actions or omissions under the Lease after to the Effective Date.

5. This Assignment may be executed in counterparts, with such counterparts, when taken together constituting one and the same instrument. This Assignment may be signed and delivered by electronic means, including facsimile or email transmissions or similar, and such electronic signatures and delivery shall be deemed effective and binding for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed or caused these presents to be executed by their duly authorized managers as of the day and year first written above.

**ASSIGNOR:**

**JAMESON, LLC**

DocuSigned by:

*Manny Butera*

A2915E74254F4FE...

By: Manny Butera

Its:  Developer

**ASSIGNEE:**

**SARC Draper, LLC**

DocuSigned by:

5123C2E89701 4D2...

By: Steve Caton

Its:  Manager

# EXHIBIT 9

Exhibit "C"

**PARTIAL ASSIGNMENT AND ASSUMPTION OF LEASE**

THIS PARTIAL ASSIGNMENT AND ASSUMPTION OF LEASE (this "**Assignment**") is entered into this 1/12/2021 day of January 2021, by and between **MILLROCK INVESTMENT FUND 1, LLC,** a Utah limited liability company ("**Assignee**"); and **SARC DRAPER, LLC,** a Missouri limited liability company ("**Assignor**").

R E C I T A L S

A.      Assignor and Assignee presently own the real property described in Exhibit A, attached hereto and incorporated herein by this reference (the "**Property**"), as tenants-in-common.

C.      Assignor is the landlord under that certain AMBULATORY SURGERY CENTER LEASE AGREEMENT dated November 18, 2020 with SARC by HSI – DRAPER, UT Inc., a Delaware corporation (the "**Lease**"), which Lease relates to the Property.

D.      By this Assignment, Assignor intends to partially assign Assignor's interest in, to and under the Lease, as landlord, and Assignee intends to accept the above-described interest from Assignor.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as set forth below.

A G R E E M E N T

1.      Capitalized Terms.  All capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Lease.

2.      Assignment.  Assignor hereby partially assigns, conveys, transfers and sets over unto Assignee an undivided **2.418%** interest in Assignor's right, title and interest in, to and under the Lease, such amount being equal to Assignee's tenant-in-common interest in the Property.

3.      Assumption.  Assignee hereby assumes and agrees to perform, fulfill and comply with the obligations to be performed, fulfilled or complied with by the landlord under the Lease arising from and after the date of this Assignment in proportion to Assignee's tenant-in-common interest in the Property.  Notwithstanding anything in this Assignment to the contrary, Assignor retains in full, and Assignee does and shall not assume, any obligations to construct (as it relates to this specific assignment, renovate or expand the building, the premises or the improvements, including, without limitation, completion of the Landlord's Work, all as required by the Lease or ancillary documents ("**Construction Obligations**").  The parties agree that Assignee shall have any rights or remedies available to it at law or equity including the right of specific performance in the event Assignor fails to timely satisfy the Construction Obligations.

4.      Release and Indemnification.  Assignor does hereby indemnify, defend and hold harmless Assignee from and against any action, claim, demand or liability of whatever nature (including

DocuSign Envelope ID: 1AA0B940-3B16-4E4D-B31F-79465463B901

reasonable attorney's fees) that is made under the Lease that relates to either circumstances which occur prior to the effective date hereof or the Construction Obligations.

5.    <u>Successors and Assigns</u>.  This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors, transferees and assigns.

6.    <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts, each of which shall be an original for all purposes, but all of which shall constitute but one and the same instrument.  The parties may e-mail, telecopy, or fax signatures appearing on any portion of this Assignment, and the same shall constitute originals for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR**:

**MILLROCK INVESTMENT FUND 1, LLC**, a Utah limited liability company

By: Kevin Long
    Kevin Long
Name: E4900U07BBF29792...
Its: Manager

**ASSIGNEE**:

**SARC DRAPER LLC,** a Missouri limited liability company

By: Steve Caton
    Steve Caton
Name: 372BC2E89704B22...
Its: Manager of SARC Draper LLC

# **EXHIBIT A**

## **Legal Description**

**<u>EXHIBIT "D"</u>**

**<u>FORM TENANCY IN COMMON AGREEMENT</u>**

**EXHIBIT "E"**

**FORM DEVELOPMENT AGREEMENT**

# EXHIBIT 10

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "**Assignment**") is made this 6th day of April, 2022, by MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company ("**Assignor**") to several Tenant in Common Owners, as more particularly described in Exhibit A attached hereto and incorporated herein by this reference (each an "**Assignee**" or collectively "**Assignees**") (Assignees and Assignors are sometimes collectively referred to as the "**Parties**" or individually a "**Party**").

### R E C I T A L S

WHEREAS Assignor is and/or was the owner of real property as more particularly described in Exhibit B, attached hereto and incorporated herein by this reference (the "**Property**");

WHEREAS Assignor is the landlord under that certain AMBULATORY SURGERY CENTER LEASE AGREEMENT dated November 18, 2020 with SARC by HSI – Draper, UT Inc., a Delaware corporation (the "**Lease**"), which Lease relates to the Property;

WHEREAS, by this Assignment, Assignor intends to assign Assignor's interest in, to and under the Lease, as landlord to Assignees who have accepted an undivided interest from Assignor pursuant to the various purchase and sale agreements (collectively the "**PSA Agreements**") between Assignor and the individual Assignees;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignees agree as set forth below.

### A G R E E M E N T

1.    Capitalized Terms.  All capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Lease.

2.    Assignment.  Assignor hereby assigns, conveys, transfers and sets over unto each Assignee that certain undivided interest in Assignor's right, title and interest in, to and under the Lease as provided for under Exhibit A, such amount being equal to Assignee's tenant-in-common interest in the Property. Assignor's assignment of said interest shall be deemed to have been effective as of the date that each respective Assignee attained his/her/its ownership interest in the Property.

3.    Assumption.  Pursuant to the respective PSA Agreements, Assignees have agreed to assume and agree to perform, fulfill and comply with the obligations to be performed, fulfilled or complied with by the landlord under the Lease arising from and after the date of this Assignment in proportion to each Assignee's tenant-in-common interest in the Property. By this assignment, Assignees shall have all of Assignor's rights or remedies available to them at law or equity to enforce or otherwise enjoy the benefits of the Lease.

4.    Successors and Assigns.  This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors, transferees and assigns pursuant to the various PSA Agreements between the Parties.

1

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the date first set forth above.

**ASSIGNOR**:

**MILLROCK INVESTMENT FUND 1,**
**LLC**, a Utah limited liability company

By:
Name: Kevin G. Long
Its: Manager

## EXHIBIT A

### Schedule of Tenant in Common Owners

| Name/Entity | Percentage | Closing Date |
|---|---|---|
| NBFF Property, LLC | 2.8450% | March 11, 2022 |
| The Stewart Family Trust | 2.3705% | March 15, 2022 |
| Clear Blue Properties LLC | 1.4225% | February 17, 2022 |
| David D. Gibby | 2.3705% | March 10, 2022 |
| Derek Casari and Tina Casari | 3.096% | February 21, 2022 |
| Diane Rohr | 3.0823% | March 23, 2022 |
| Berner Oberland HV LLC | 0.7108% | March 10, 2022 |
| James Blaisdell | 2.9630% | January 8, 2021 |
| Royal Jade Restaurant Inc | 12.0910% | March 18, 2021 |
| A & A Rentals, L.C. | 2.3705% | February 17, 2022 |
| Kim D. Harding Living Trust | 7.5861% | February 25, 2022 |
| Nolan Merritt | 0.4840% | January 29, 2021 |
| QT Draper LLC | 1.9607% | February 16, 2022 |
| Wilson Real Estate II LLC | 0.5210% | February 25, 2021 |
| Wilson Real Estate VII LLC | 0.7570% | February 25, 2021 |
| Wilson Real Estate X LLC | 0.7440% | February 25, 2021 |
| Branson Fuller, LLC | 1.5108% | March 14, 2022 |
| Compostela Limited, LLC | 2.5150% | February 10, 2021 |
| Trapper Bay Properties, LLC | 3.2913% | August 13, 2021 |
| Tirrell Family Trust | 2.4059% | February 4, 2022 |
| Dana Kyle Devlin and Hilda Arline Devlin | 1.6820% | January 7, 2022 |

| | | |
|---|---|---|
| D & D Harvey Pleasant Grove, LLC | 0.3647% | April 6, 2022 |
| David Harvey and Dixie Harvey | 1.9861% | January 7, 2022 |
| David C. Harvey Family Revocable Trust | 0.5836% | April 6, 2022 |
| David Elton | 2.5254% | November 22, 2021 |
| GoGreenAge LLC | 2.6079% | August 31, 2021 |
| Jonathan Backman and Natalie Backman | 2.2760% | August 31, 2021 |
| Karl and Julie Lund Family Living Trust | 1.0788% | April 28, 2021 |
| Shinabery Enterprises Inc. | 2.2760% | November 8, 2021 |
| The Chung Li Chiu and Tsai Yen Chen Revocable Living Trust | 3.4487% | November 18, 2021 |
| M Harrington LLC | 0.8359% | February 22, 2022 |
| Mark D Harrington LLC | 1.7037% | February 22, 2022 |
| Mark David Harrington LLC | 0.7888% | February 22, 2022 |
| Patricia Brinkmann, LLC | 2.3708% | August 18, 2021 |
| Peter Pennock and Darlene Pennock | 2.2760% | December 23, 2021 |
| Raymond Bomben and Owena Jean Bomben Trust | 1.3431% | December 23, 2021 |
| Ruth E. Wise | 2.8222% | December 10, 2021 |
| Ryan M. Tominaga | 4.7309% | October 22, 2021 |
| Sylvia Skean, LLC | 2.3708% | August 18, 2021 |
| TB Peterson Holdings, LLC | 2.9027% | August 30, 2021 |

Exhibit A

| The Knight Family Trust | 3.9280% | November 19, 2021 |

Exhibit A

## EXHIBIT B

### Legal Description

Unit 100, 110, 200, 210, 220, contained within the HBA PLAZA AT DRAPER, a Utah Condominium Project as identified in the Record of Survey Map recorded May 22, 2020, as Entry No. 13278243, in Book 2020P of Plats at Page 122, and as further defined and described in the Declaration of Condominium of the HBA PLAZA AT DRAPER CONDOMINIUMS, recorded May 22, 2020, as Entry No. 13278242, in Book 10948 at Page 2671, in the office of the Recorder of Salt Lake County, Utah, and in any supplements/amendments thereto.

Together with: (a) The undivided ownership interest in said Condominium Project's Common Areas and Facilities which is appurtenant to said unit, (the referenced Declaration of Condominium providing for periodic alteration both in the magnitude of said undivided ownership interest and in the composition of the Common Areas and Facilities to which said interest relates); (b) The exclusive right to use and enjoy each of the Limited Common Areas which is appurtenant to said unit, and (c) The non-exclusive right to use and enjoy the Common Areas and Facilities included in said Condominium Project (as said project may hereafter be expanded) in accordance with the aforesaid Declaration and Survey Map (as said Declaration and Map may hereafter be amended or supplemented) and the Utah Condominium Ownership Act.

# EXHIBIT 11

**Ambulatory Surgery Center Lease Agreement**

**Tenant**

**SARC by HSI - KELLER, TX Inc.**

**Lease Guaranty**

**Healthcare Solutions Management Group, Inc.**

**Developed by American Development Partners**

## AMBULATORY SURGERY CENTER LEASE AGREEMENT

**THIS AMBULATORY SURGERY CENTER LEASE AGREEMENT** ("Lease") is entered into as of 11/18/20 (the "Effective Date") by and between Millrock Investment fund 1 LLC, a Utah limited liability company ("Landlord") and SARC by HSI - KELLER, TX Inc., a Delaware corporation ("Tenant").

### RECITALS

WHEAREAS, Landlord is the owner of, or is under contract to purchase, the land, buildings, and improvements located at 1220 Keller Parkway, Keller, Tx. and more particularly described in attached Exhibit "A" ("Premises"); and

WHEREAS, Landlord desires to lease to Tenant and Tenant desires to lease from Landlord the Premises as a walk-in clinic focused on the delivery of ambulatory care in a dedicated medical facility outside of a traditional emergency room ("Ambulatory Surgery Center").

NOW THEREFORE, for good and valuable consideration, the parties agree as follows:

### SECTION ONE. PREMISES.

Landlord leases to Tenant and Tenant leases from Landlord the Premises on the terms and conditions in this Lease. The Premises is the real property described on the attached Exhibit "**A**", and all improvements belonging to Landlord now or in the future located on the real property (including the Improvements completed pursuant to Section 13 below).

### SECTION TWO. INTIAL TERM OF LEASE/OPTIONS TO RENEW.

(a)  <u>Effective/Commencement and Termination Dates of Initial Term.</u>  The initial term of this Lease shall be for twenty (20) years (the "Initial Term").   The term of this Lease (the "Term") shall commence upon the earlier of (i) Landlord's substantial completion of the Improvements in accordance with the Scope of Work (each as defined in Section 13(a) hereof) ("Landlord's Work") and Landlord's receipt of a certificate of occupancy (or equivalent) for the Premises, or (ii) the date upon which Tenant opens to the public for business within the Premises (such earlier date being the "Commencement Date").   The termination date shall be twenty (20) years after the Commencement Date (the "Termination Date"), subject to Section 2(b) below. Should the Commencement Date fall on any day other than the 1st of the month, the Term shall be extended by any partial month thereof.   Promptly following the Commencement Date, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "F". If for whatever reason the construction has not been started on or before 270 days from the date of the building purchase the lease is considered null and void.

(b)  <u>Option Periods</u>.  Landlord grants to Tenant options to extend the Term of this Lease for three (3) consecutive five (5) year periods (each, an "Option Period") upon the same terms and conditions set forth in this Lease, at an adjusted Minimum Monthly Rent as determined prior to

the beginning of each Option Period in accordance with Section 4(c) hereof. Tenant's extension option shall be exercised by Tenant upon written notice to Landlord at least one hundred eighty (180) days but no more than two-hundred seventy (270) days prior to the expiration of the Initial Term of this Lease or any Option Period, as applicable. Notwithstanding the foregoing, the extension options described above shall be null and void and of no further force or effect if any of the following have occurred: (i) Tenant has assigned this Lease or sublet the Premises, notwithstanding the fact Landlord may have consented to such assignment or subletting; (ii) A default has occurred and is continuing, either at the time Tenant exercises the option or at the time the renewal term is scheduled to commence; or (iii) Tenant has vacated the Premises. In no event shall any Landlord's Work, improvement allowance or other monies or work be required of Landlord in connection with any such Option Period.

### SECTION THREE. DELAY IN POSSESSION

If for any reason Landlord fails to deliver or offer to deliver physical possession of the Premises to Tenant, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from the failure to deliver possession, so long as Landlord has exercised, and continues to exercise, reasonable diligence to deliver possession; provided, however, that rent shall be abated until Landlord delivers physical possession of the Premises to Tenant. Tenant's taking possession of the Premises or any portion thereof shall be conclusive evidence that (i) Landlord's Work is complete, and (ii) the Premises are in the condition required by this Lease and in good order and satisfactory condition.

### SECTION FOUR.  MINIMUM MONTHLY RENT

(a) Partial Rent - Beginning 30 days after the building is purchased the tenant will pay 50% of the scheduled rent payable in advance on the first day of each month at the following address in accordance with the rent schedule below:
(b) Full Rent - Beginning on the date that the tenant receive the full certificate of occupancy and completion of construction the tenant will pay 100% of the scheduled rent payable in advance on the first day of each month at the following address in accordance with the rent schedule below:

CAMS Realty LLC / Mountain West
C/O Mary Street
Mary.street@mtnwest.com
2015 West Grove Parkway, Suite J, Pleasant Grove, UT 84062

or at another address that Landlord may from time to time designate by written notice to Tenant. Additionally, the Lease Administrator may direct the Tenant to deposit the rent by ACH to a designated bank account

On each anniversary of the Commencement Date through and until the Termination Date of the Initial Term, the Minimum Monthly Rent shall increase annually by 2% as follows:

| YEAR | RENT | ANNUALLY |
|------|------|----------|
| 1 | $83,519.79 | $1,002,237.50 |
| 2 | $85,190.19 | $1,022,282.25 |
| 3 | $86,893.99 | $1,042,727.90 |
| 4 | $88,631.87 | $1,063,582.45 |
| 5 | $90,404.51 | $1,084,854.10 |
| 6 | $92,212.60 | $1,106,551.18 |
| 7 | $94,056.85 | $1,128,682.21 |
| 8 | $95,937.99 | $1,151,255.85 |
| 9 | $97,856.75 | $1,174,280.97 |
| 10 | $99,813.88 | $1,197,766.59 |
| 11 | $101,810.16 | $1,221,721.92 |
| 12 | $103,846.36 | $1,246,156.36 |
| 13 | $105,923.29 | $1,271,079.49 |
| 14 | $108,041.76 | $1,296,501.08 |
| 15 | $110,202.59 | $1,322,431.10 |
| 16 | $112,406.64 | $1,348,879.72 |
| 17 | $114,654.78 | $1,375,857.31 |
| 18 | $116,947.87 | $1,403,374.46 |
| 19 | $119,286.83 | $1,431,441.95 |
| 20 | $121,672.57 | $1,460,070.79 |

Notwithstanding the foregoing rent schedule, the final rent schedule for Minimum Monthly Rent will be calculated by Landlord upon completion of Landlord's Work. Minimum Monthly Rent for Year 1 will be calculated at 9% of the total cost of Landlord's Work (the "Final Rent Calculation"), including, but not limited to, the cost of land acquisitions, construction costs, pursuit and due diligence fees, design fees, development fees, and all other hard and soft costs incurred by Landlord, directly or indirectly, in connection with the acquisition and development of the Premises and completion of Landlord's Work. Landlord and Tenant agree that the Final Rent Calculation may not exceed a thirty percent (30%) increase over the Minimum Monthly Rent for Year 1 specified above. Tenants agree that the Final Rent Calculation may not exceed a thirty percent (30%) increase over the Minimum Monthly Rent for Year 1 specified above. Revisions to the schedule of the Minimum Monthly Rent, if any, will be contained in the Commencement Date Agreement.

(a)  Minimum Monthly Rent During Option Periods.

(i)  First 5-year Option Period: Market Rate (Determined pursuant to Section 5) but in no event, shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the First Option Period.

(ii) Second 5-year Option Period: Market Rate (Determined pursuant to Section 5) but in no event shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the Second Option Period

(iii) Third 5-year Option Period: Market Rate (Determined pursuant to Section 5) but in no event, shall the Minimum Monthly Rent be less than 100% of the Minimum Monthly Rent under this Lease for the period immediately preceding the commencement of the Third Option Period.

## SECTION FIVE. MARKET RATE.

(a) Market Rate Definition.  "Market Rate" shall be defined as the bona fide rates, terms and conditions then being paid by tenants in "arm's length" transactions for comparable space, for comparable uses, in comparable buildings in the same geographic submarket as the Premises within the previous six (6) month period.  To determine the Market Rate the parties must also take into consideration the quality, size, design and location of the Premises.

(b) Determination and Appraisal Process.  In the event Tenant exercises a renewal option, to initiate the negotiation, Tenant shall notify Landlord in writing of Tenant's determination of the Market Rate for the applicable Option Period (the "Tenant's Initial Determination"). Landlord shall, within fifteen (15) days following receipt of Tenant's Initial Determination, notify Tenant in writing that it accepts Tenant's Initial Determination or, if it does not, notify Tenant of Landlord's determination of the Market Rate ("Landlord's Initial Determination"). If, within fifteen (15) days after receipt by Tenant of Landlord's Initial Determination, Tenant rejects in writing Landlord's determination, the parties agree to negotiate their differences in good faith within thirty (30) days following Landlord's receipt of Tenant's notice of objection or deemed rejection.  Should the parties be unable to agree upon the Market Rate within such thirty (30) day period, the parties will each appoint a real estate appraiser who is a member of the American Institute of Real Estate Appraisers with at least five (5) years full-time commercial appraisal experience in the geographic area in which the Premises are located to determine the Market Rate.  If either Landlord or Tenant does not notify the other party in writing that it has appointed an appraiser within ten (10) days after the other party has provided written notice of its appointed appraiser, the single appraiser appointed will determine the Market Rate. If two (2) appraisers are appointed, they will meet promptly and attempt to set the Market Rate. If the two appraisers agree upon a Market Rate, such determination shall be final and binding on the parties. If they are unable to agree on the Market Rate within thirty (30) days after the date upon which the second appraiser has been appointed, the two appraisers will appoint, or request that the American Institute of Real Estate Appraisers appoint, a third appraiser meeting the qualifications stated in this paragraph and the appraisers will then notify Landlord and Tenant of such appraiser's name, address and selection within ten (10) days following the failure of the parties to agree upon the Market Rate. Landlord and Tenant will each bear one half (1/2) of the cost of the third appraiser. The third appraiser, however selected, must be a person who has not previously acted in any capacity for either Landlord or Tenant. Within thirty (30) days after the selection of the third appraiser, a majority of the appraisers will determine the Market Rate. If a majority of the appraisers cannot agree on the Market Rate within thirty (30) days after selection of the third appraiser, the high and the low appraisal will be thrown out and the middle appraisal shall be the final and binding determination of the Market Rate.

(c) <u>Amendment</u>. The parties will execute an amendment to this Lease within fifteen (15) days after determination of the new Market Rate.

## SECTION SIX. MEMORANDUM OF LEASE.

Contemporaneously with the execution of this Lease, or at any time or from time to time hereafter, at the request of either Landlord or Tenant, the parties will execute and deliver a Memorandum of Lease in recordable form which either party may record at its sole expense. The Memorandum of Lease shall not contain rental amounts.

## SECTION SEVEN. TENANT PAYMENTS.

(a) <u>Minimum Monthly Rent</u>. Tenant shall pay Landlord as rent for the Premises a sum equal to the Minimum Monthly Rent set forth in <u>Section 4</u> on or before the first (1st) day of each and every month during the Term of this Lease and continuing for the duration of the Term of this Lease. If any installment of Rent due from Tenant shall not be received by Landlord within five (5) days after the date due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Except as expressly set forth herein, any amount due to Landlord not paid within ten (10) days after written notice that such payment is past due shall bear interest at 1 ½ percent per month or any part of a month until the date such amount is paid.

(b) <u>Utilities</u>. Tenant shall promptly pay for all utilities and other services including, but not limited to, telephone, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, for any heating in the Premises furnished to and or used in or at the Premises for any purpose, from and after the date Tenant shall have possessed the Premises, whether prior to, during or after the Term hereof. Landlord shall not be liable for any interruption or curtailment whatsoever in the furnishing of utility services or other services to the Premises, unless caused by the gross negligence of Landlord.

(c) <u>Net Lease</u>. This Lease is what is commonly called a "Net Lease", it being understood that Landlord shall receive the Rent set forth in this Lease free and clear of any and all impositions, taxes, liens, charges, or expenses of any nature whatsoever in connection with its ownership and leasing of the Premises except those expenses specifically designated in this Lease to be borne by Landlord. In addition to the Minimum Monthly Rent, Tenant shall pay all impositions, taxes, insurance premiums, operating costs, charges and expenses which arise or may be contemplated under any provisions of this Lease during the Term (i) when required to be made hereunder or (ii) if no payment date is specified, by the later to occur of (A) the due date for the next installment of Minimum Monthly Rent or (B) ten (10) days from demand. All of such charges, costs and expenses shall constitute additional rent, and upon the failure of Tenant to pay any of such costs, charges or expenses, Landlord shall have the same rights and remedies as otherwise provided in this Lease for the failure of Tenant to pay Rent. "Rent" shall mean Minimum Monthly Rent, additional rent, and all other amounts to be paid by Tenant to Landlord pursuant to this Lease. It is the intention of the parties hereto that Tenant shall in no event be entitled to any abatement of or reduction in Rent or additional rent payable hereunder, except as expressly provided herein. Any present or future law to the contrary shall not alter this

agreement of the parties. Landlord and Tenant acknowledge and agree that this Lease is a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease, the business relationship created by this Lease and any related documents is solely that of a long-term commercial lease between landlord and tenant and has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and Tenant and Landlord each waive any claim or defense based upon the characterization of this Lease as anything other than as a "true lease".

(d) <u>Pro-Rata Rent</u>. Rent for any period during the Term of this Lease which is for less than one (1) month shall be a pro rata portion of such monthly installment. Rent shall be payable, without deduction or offset, in lawful money of the United States to Landlord at the address set forth in <u>Section 4(a) above</u> or to such other persons or at such other places as Landlord may designate in writing.

### SECTION EIGHT. USE OF THE PREMISES.

(a) Tenant shall occupy and use the Premises as an Ambulatory Surgery Center, and all other operations incident to the conduct of the business of an Ambulatory Surgery Center, and Tenant agrees not to use the Premises for any other purpose or any immoral or unlawful purpose. Landlord agrees that, subject to the prior reasonable review and approval by Landlord and compliance with all applicable governmental requirements and any signage criteria in any covenants, conditions, and restrictions recorded prior to the date of this Lease, Tenant may erect and maintain on the Premises and the building and improvements any signs advertising Tenant's business, as Tenant may desire.

(b) Tenant shall not commit any acts on the Premises, nor use the Premises in any manner that will increase the existing rates for or cause the cancellation of any fire, liability, or other insurance policy insuring the Premises or the improvements on the Premises. Tenant shall, at Tenant's own cost and expense, comply with all requirements of Landlord's insurance carriers that are necessary for the continued maintenance at reasonable rates of fire and liability insurance policies on the Premises and the improvements on the Premises.

(c) Tenant shall not commit any waste or any public or private nuisance upon the Premises.

(d) Tenant shall comply with all laws, rules, and orders of all federal, state, and municipal governments or agencies that may be applicable to use of the Premises. Notwithstanding the Permitted Use or any other provision of this Lease, Landlord does not represent, warrant or covenant in any respect whatsoever that the Permitted Use or any element of Tenant's existing or future operations is or will be permitted under applicable zoning, codes and regulations of any governmental or quasi-governmental authority. Tenant is solely responsible for verifying the same.

(e) Tenant shall operate Tenant's business on the Premises with due diligence and efficiency so as to maximize the gross profits that may be produced profitably. To this end Tenant shall maintain business hours and levels of personnel and advertising that in Tenant's reasonable judgment is

necessary to maximize gross profits profitably consistent with the operation of the businesses on the Premises and at any other locations of Tenant's businesses.

## SECTION NINE. UTILITIES AND MEDICAL WASTE.

(a) During the Term, Tenant shall pay, before delinquency, all charges or assessments for telephone, water, sewer, gas, heat, electricity, garbage disposal, trash disposal, and all other utilities and services of any kind that may be used on the Premises.

(b) Medical Waste. Tenant shall, at Tenant's sole cost and expense, directly contract for the disposal of any and all hazardous, bio-hazardous, chemical, infectious, medical and other similar types of waste generated within the Premises or otherwise resulting from Tenant's business (collectively, "Medical Waste"). Tenant shall immediately separate any Medical Waste from other types of office waste and store such Medical Waste in a leak-proof, moisture-proof, puncture-resistant container, or a container of sufficient strength to resist tearing, ripping or bursting in the course of normal usage and handling. Tenant shall ensure that all such generation, storage and disposal of Medical Waste is done in full compliance with all federal, state and local laws, rules and regulations pertaining to Medical Waste. If at any time Tenant fails to dispose of any Medical Waste in a timely manner (including upon expiration or earlier termination of this Lease), Landlord shall have the right, but not the obligation, to dispose of such Medical Waste at Tenant's cost and expense plus a twenty percent (20%) administrative fee. Tenant shall defend, indemnify and hold Landlord and Landlord's officers, agents, employees, affiliates and mortgagees harmless from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs or remediation, or other costs and expenses (including, without limitation, attorneys' fees, consultants' fees, and litigation expenses) of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or in any way related to the generation, storage, disposal or presence of Medical Waste in the Premises or otherwise. Tenant's obligations hereunder shall survive the termination or expiration of this Lease.

## SECTION TEN. TAXES.

(a) Tenant shall pay during the Term of this Lease, in each case prior to the date the same are delinquent, all of the Real Estate Taxes and personal property taxes levied or assessed against the Premises and improvements thereon for any period, all of which is included in the Term of this Lease, and also its pro rata share of all such taxes levied or assessed thereon for any period, part of which is included in the Term of this Lease, subject to the terms of Section 10(b) below. As used herein, the term "**REAL ESTATE TAXES**" means all taxes and general and special assessments and other impositions in lieu thereof, as a supplement thereto and any other tax which is measured by the value of land and assessed on a uniform basis against the owners of land, including any substitution in whole or in part therefor due to a future change in the method of taxation, in each case assessed against, or allocable or attributable to, the Premises and accruing during the Term. Tenant shall pay all Real Estate Taxes directly to the collecting authority no less than fifteen (15) days prior to the delinquency date thereof and shall provide Landlord written evidence thereof. Notwithstanding the foregoing, upon the occurrence of both of the following events, Tenant shall pay Real Estate Taxes to Landlord on a monthly basis (the "Real Estate Taxes Reserve") in lieu of the applicable collecting authority: (i) delivery to Tenant of a written request

therefor from Landlord, and (ii) the existence of any default or breach of this Section 10(a) by Tenant, or any Event of Default under any provision in this Lease (the foregoing clause (ii) may be hereinafter referred to as a "Real Estate Taxes Reserve Trigger"). If Tenant fails to pay the appropriate party (Landlord or the collecting authority, as provided herein) all Real Estate Taxes when due hereunder, then Tenant shall, without limiting any other remedies available to Landlord, reimburse Landlord for any and all penalties or interest, or portion thereof, incurred by Landlord as a result of such nonpayment or late payment by Tenant.

This Section shall not be deemed or construed to require Tenant to pay or discharge any tax which may be levied by any governmental authority upon the income, profits, or business of Landlord, including Rent due Landlord hereunder, or any personal property taxes, franchise, inheritance or estate bases, or taxes upon inheritance or right of succession which may be levied against any estate or interest of Landlord, even if such taxes become a lien against the Premises.

(b) Landlord agrees that Tenant shall have the right, at Tenant's sole cost and expense, to contest the legality or validity of any of the taxes which are to be paid by Tenant pursuant to the foregoing provisions, and in the event of any such contest, failure on the part of Tenant to pay any such tax, prior to the delinquency date thereof shall not constitute a default hereunder. Tenant, upon the final determination of such contest, shall immediately pay and discharge any judgment rendered against it, together with all costs and charges incidental thereto. If Tenant has not paid any tax, assessment, or public charge required by this Lease to be paid by Tenant before its delinquency, or if a tax, assessment, or public charge is contested by Tenant and that tax, assessment, or public charge has not been paid within thirty (30) days after a final determination of the validity, legality, or amount of the tax, assessment or public charge, then Landlord may, but shall not be required to, pay and discharge the tax, assessment, or public charge. If a tax, assessment, or public charge, including penalties and interest, are paid by Landlord, the amount of that payment shall be due and payable to Landlord by Tenant with the next succeeding rental installment, and shall bear interest at the rate of ten percent (10%) per annum from the date of the payment by Landlord until repayment by Tenant. Landlord further agrees at the request of Tenant, to execute, or join in the execution of any instrument or documents necessary in connection with any such contest, but at no expense to Landlord.

(c) Landlord agrees either to (i) forward to Tenant in a timely fashion the periodic statements for taxes, or (ii) join with Tenant in the necessary formalities to ensure that such statements are sent directly to Tenant.

## SECTION ELEVEN. LIENS.

Any work on the Premises performed by Tenant hereunder shall be performed subject and pursuant to the provisions of this Lease. Upon completion thereof and Landlord's written request, Tenant shall furnish Landlord with lien waivers confirming that all contractors, subcontractors, laborers, and materialmen who have performed work on the Premises have been paid in full. Such lien waivers shall be in a form reasonably acceptable to Landlord and in accordance with applicable laws of the State where the Premises are located. If any such lien or claim of lien shall at any time be filed against the Premises, or Tenant's interest therein or hereunder, by reason of Tenant's acts or omissions or because of a claim against Tenant or any contractor, subcontractor or

materialman of Tenant, Tenant shall cause the lien or claim of lien to be canceled and discharged of record by bond or otherwise within twenty (20) days after receipt of written notice from Landlord. If Tenant fails to cause such lien or claim of lien to be so discharged or bonded within such period, Tenant shall be in default hereunder, and, in addition to any other right or remedy it may have, the Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by procuring the discharge of such lien or claim by deposit in court or bonding, and in any such event, the Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien or claim by the lienor or claimant and to pay the amount of the judgment, if any, in favor of the lienor, with interest, costs and allowances. Tenant shall pay as additional rent on demand any sum so paid by Landlord for the aforesaid purposes with interest as hereinafter provided and all costs and expense incurred by Landlord including, but not limited to reasonable attorney's fees in processing such discharge or in defending any such action. **THE INTEREST OF THE LANDLORD SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS MADE BY TENANT.**

### SECTION TWELVE. REPAIRS AND MAINTENANCE.

(a) Throughout the Term of this Lease Tenant shall at all times and at its sole cost and expense, put, keep, replace and maintain the entire Premises and all of the Improvements (including, without limitation, the roof, walls, structural and non-structural elements of the buildings, plumbing systems, electric systems, HVAC systems, all site improvements, paving, parking lots, driveways, sidewalks, signs, landscaping, any storm drainage system or sewer system, and any water retention ponds) in good repair and in good and safe order and condition, shall make all repairs and replacements thereto, both inside and outside, structural and non-structural, ordinary and extraordinary, howsoever the necessity or desirability for repairs or replacements may occur, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise, and shall use all reasonable precautions to prevent waste, damage or injury.

(b) If at any time during the Term, including renewals or extensions, Tenant fails to maintain the Premises or make any repairs or replacements as required by Section 12, Landlord may, but shall not be required to, enter the Premises and perform the maintenance or make the repairs or replacements for the account of Tenant; any sums expended by Landlord in so doing, together with interest at ten percent (10%) per annum, shall be deemed additional rent and shall be immediately due from Tenant on demand of Landlord.

(c) Except for Landlord's Work, Landlord shall not be required to make any alterations, reconstructions, replacements, changes, additions, improvements, repairs or replacements of any kind or nature whatsoever to the Premises, or any portion thereof, or to any of the Improvements at any time during the Term of this Lease. Tenant waives any law that would require Landlord to maintain the Premises in a tenantable condition or would provide Tenant with the right to make repairs and deduct the cost of those repairs from the rent.

### SECTION THIRTEEN. LANDLORD'S WORK AND ALTERATIONS.

(a) Promptly following the Effective Date, Landlord shall commence Landlord's Work. The Improvements shall be constructed in a good and workmanlike manner, in accordance with all applicable laws and requirements, and in accordance with local codes. Tenant acknowledges that

it has approved Built-More, LLC, a Tennessee limited liability company, to construct the Improvements. The term "Improvements" shall mean the building, all sidewalks, driveways, parking areas, curbs, curb cuts, lighting, retaining walls, landscaping, fire hydrants, and related improvements, and all identification, advertising and directional signs, fixtures, and equipment to the extent described on the plans and specifications listed on Exhibit "**B**" attached hereto (the "Scope of Work") or otherwise constructed or located on the Premises subject to the conditions and restrictions set forth in this Lease.

(b) After the date on which Tenant first opens the Premises to the public for business, Tenant may not make alterations, additions or improvements to the Premises including the exterior, the building structure, or the storefront thereof without the prior written consent of the Landlord and such consent shall not be unreasonably delayed, withheld or conditioned. Provided, if Tenant wishes at any time during the Term to perform alterations, additions or improvements to the Premises that do not affect structural elements or building systems in any material respect and cost, on a per project basis, less than $50,000.00 ("Minor Alterations"), after at least fifteen (15) days' written notice to Landlord, Tenant shall have the right to make Minor Alterations in compliance with all applicable laws, rules and regulations without obtaining written consent of the Landlord. All alterations, additions and improvements (excluding personal property, machinery, equipment, signage, trade improvements and trade fixtures of Tenant, no part of the cost of which shall have been paid by Landlord, collectively "Tenant's Property") made by, for or at the direction of Tenant, shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease or at such time as Landlord shall re-enter and take possession of the Premises without terminating this Lease pursuant to the provisions of Section 13 hereof. Landlord shall have no obligation to make any alterations, improvements, repairs or replacements to the Premises other than Landlord's Work.

(c) Tenant's Property shall remain the property of Tenant. Upon the termination or expiration of the Term, Tenant shall remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall, at its sole cost and expense, repair any damage to the Premises or the improvements caused by such removal, including patching and filling holes, ordinary wear and tear excepted. In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, or utility or electrical components located inside the walls or HVAC systems. All other utility systems will be capped and returned to a condition compatible with code requirements at Tenant's sole cost and expense.

(d) Any of Tenant's Property not removed from the Premises within ten (10) days following the date this Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. Landlord may possess and dispose of such property provided that Landlord shall not use or permit anyone holding under Landlord to use (a) any trademark, trade dress, trade name, millwork, copyrighted floor plan, copyrighted color palette, or sign used by Tenant in the Premises; or (b) any item that is similar to any other item protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant

under this Lease. The reasonable costs incurred by Landlord in removing and disposing of such Tenant's Property (plus 10%) shall be paid by Tenant within thirty (30) days after delivery to Tenant of an invoice therefor.

(e) Notwithstanding anything to the contrary herein, Landlord agrees that it has no lien rights or security interest in any of Tenant's trade fixtures or inventory, furniture, equipment or other personal property in the Premises or in any other items that may be used as collateral for any Tenant financing (collectively, "Collateral") and hereby waives any such rights or interest to same. Upon request by Tenant from time to time during the Term, Landlord shall provide a written statement, in a form reasonably acceptable to Tenant and Tenant's lender or lenders, as the case may be, confirming that Landlord has no such lien rights and waiving any rights or interest to the Collateral; provided that in no event shall Landlord be required to grant Tenant's lender and/or lienholder any right to occupy the Premises or other access right unless required by applicable law or agreed to otherwise in writing by Landlord, nor shall any of the foregoing give Tenant the right to collaterally assign this Lease.

(f) Subject to any covenants, conditions and restrictions and other matters of record applicable to the Premises which are disclosed in the public records or in writing to Tenant ("CC&Rs"), Tenant shall have the right to install building signs on the Premises in the maximum number and size permitted under the governmental development standards, rules and regulations that are applicable to the Premises.

### SECTION FOURTEEN. ENTRY.

Tenant shall permit Landlord or Landlord's agents, representatives, or employees to enter the Premises at all reasonable times and upon reasonable notice to inspect the Premises to determine whether Tenant is complying with the terms of this Lease and to do other lawful acts that may be necessary to protect Landlord's interest in the Premises under this Lease or to perform Landlord's duties under this Lease.

### SECTION FIFTEEN. SURRENDER OF PREMISES; HOLDING OVER

(a) On the Termination Date or the end of any extension or renewal of this Lease, Tenant shall promptly surrender and deliver the Premises to Landlord in as good condition as they were on the Commencement Date, reasonable wear and tear excepted.

(b) At the end of the Term, or any extension, should Tenant hold over for any reason, it is agreed that in the absence of a written agreement to the contrary, that tenancy shall be from month to-month only and not a renewal of this Lease, nor an extension for any further term. Tenant shall pay Minimum Monthly Rent in an amount equal to ONE AND ONE-HALF times the Minimum Monthly Rent payable prior to the end of the Term or any extension. The month-to month tenancy shall be subject to every other term, covenant, and condition in this Lease that is consistent with and not contrary to a month-to-month tenancy.

### SECTION SIXTEEN. INDEMNITY.

Without limiting or being limited by any other indemnity in this Lease, but rather in confirmation and furtherance thereof, Tenant agrees to indemnify, defend by counsel reasonably acceptable

to Landlord and hold Landlord and Landlord's officers, agents, employees and affiliates harmless of, from and against any and all losses, damages, liabilities, claims, liens, costs and expenses (including, but not limited to, court costs, reasonable attorney's fees and litigation expenses) in connection with injury to or death of any person or damage to or theft, loss or loss of the use of any property occurring in or about the Premises arising from Tenant's occupancy, or from any materially false information provided by Tenant to Landlord, or the conduct of its business or from any activity, work, or thing done, permitted or suffered by Tenant or its agents, employees or contractors in or about the Premises, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or due to any other act or omission or willful misconduct of Tenant or any of its agents, employees, contractors, assigns, subtenants, guest or invitees.

### SECTION SEVENTEEN.  INSURANCE.

Tenant shall, at its sole cost, procure and maintain, during the entire Term, at least the following types (and limits) of insurance coverages with respect to the Premises issued by insurance companies reasonably acceptable to Landlord and licensed to do business in the State of Arkansas, and subject to the following terms and conditions:

(a) Commercial general liability insurance, including (without limitation) coverage for bodily injury and death, property damage and personal injury and contractual liability as referred to below, in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00), combined single limit per occurrence for injury (or death) and damage to property; (ii) insurance on an "all risk" basis, including (without limitation) sprinkler leakage, vandalism, malicious mischief, fire, windstorm, flood and extended coverage, covering the entire Premises, and all fixtures, furnishings, removable floor coverings, equipment, signs and all other decorations or stock in trade, inventory and personal property of Tenant, in amounts not less than the full replacement value thereof; (iii) workers' compensation insurance, if required by statute, with not less than the maximum statutory limits of coverage; and (iv) business interruption or lost profits coverage, in reasonable amounts for a business of similar size and nature of Tenant operating in the geographical area of the Building.  Such policies shall:  (A) include Landlord and such other parties as Landlord may reasonably designate as loss payees (except with respect to the insurance required in clause (iv) directly above)  as a named insured thereunder, (B) be written and considered as primary insurance, neither in contribution with nor in excess of any other insurance policies that may be maintained by Landlord or any other person or entity with respect to any other portion of the Building; (C) include within the terms of the policy or by contractual liability endorsement coverage insuring Tenant's indemnity obligations under this Lease; and (D) provide that it may not be cancelled or changed without at least thirty (30) calendar days prior written notice from the company providing such insurance to each party insured thereunder.

(b) The insurance coverage to be provided by Tenant will be for a period of not less than one (1) year. At least fifteen (15) days prior to the Commencement Date, Tenant will deliver to Landlord original certificates of all such insurance, together with proof of payment of the premium therefor; thereafter, at least fifteen (15) calendar days prior to the expiration of any policy, Tenant will deliver to Landlord such original certificates as will evidence a paid-up renewal or new policy to take the place of the one expiring.

(c) Each party will look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Tenant hereby waives and releases all rights of subrogation under Tenant's insurance policies, and Tenant will cause each such insurance policy to be properly endorsed to evidence such waiver and release of subrogation in favor of Landlord.

(d) Tenant acknowledges that Landlord will not carry insurance on the Premises or furniture, furnishings, trade fixtures, equipment installed in or made to the Premises by or for Tenant, and Tenant agrees that Tenant, and not Landlord, will be obligated to promptly repair any damage thereto or to replace the same.

(e) Any failure by Tenant to maintain continuous insurance coverage as required under the terms and conditions of this Section 17 shall constitute an immediate and automatic default by Tenant hereunder.  Provided there is no interruption in such continuous coverage, any other failure of Tenant to satisfy the terms and conditions of this Section 17 shall constitute a default hereunder only if such failure remains uncured fifteen (15) days after Landlord provides Tenant with written notice of such failure. If Tenant shall fail to procure and maintain the insurance required herein, Landlord may, but shall not be required to and shall incur no liability for doing so, procure and maintain the same through Tenant's insurance broker or otherwise, at the expense of Tenant, plus a fifteen percent (15%) administrative fee, which Tenant shall pay to Landlord upon demand.

## SECTION EIGHTEEN.  TRADE FIXTURES.

(a) Tenant shall have the right, at any time and from time to time during the Term and any renewals or extensions, at Tenant's sole cost and expense, to install and affix on the Premises items for use in Tenant's Ambulatory Surgery Center, which Tenant, in Tenant's sole discretion, deems advisable (collectively "Trade Fixtures"), provided that Tenant shall not overload the floors. Trade Fixtures installed in the Premises by Tenant shall always remain the property of Tenant and shall be removed at the expiration of the Term or any extension, provided that any damage to the Premises caused by the removal of the Trade Fixtures shall be repaired by Tenant, and further provided that Landlord shall have the right to keep any Trade Fixtures or to require Tenant to remove any Trade Fixtures that Tenant might otherwise elect to abandon.

(b) Any Trade Fixtures that are not removed from the Premises by Tenant within thirty (30) days after the Termination Date shall be deemed abandoned by Tenant and shall automatically become the property of Landlord as owner of the real property to which they are affixed.

## SECTION NINETEEN. SIGNS.

Tenant may not place, maintain, nor permit on any exterior door, wall, or window of the Premises any sign, awning, canopy, marquee, or other advertising of a permanent and irremovable nature without the express written consent of Landlord and such consent shall not with unreasonably withheld, delayed or conditioned.  Tenant shall maintain any sign, decoration, or advertising in good appearance and repair at all times during this Lease.  At the Termination Date, any of the items mentioned in this section that are not removed from the

Premises by Tenant may, without damage or liability, be removed and destroyed by Landlord at Tenant's cost. Nothing in this provision is intended to prevent Tenant from placing or maintaining any sign, awning, canopy, marquee, or other advertising relating to Tenant's operation.

### SECTION TWENTY. DAMAGE OR DESTRUCTION.

(a) In the event that during the Term of this Lease, the Premises shall be damaged by fire or other casualty which renders the Premises untenantable, Tenant, shall repair said damage.  Such repairs shall be commenced within sixty (60) days of the date of said damage and such repairs shall be completed within two hundred forty (240) days of said damage;  provided, however, if the Premises are damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within such time period, Tenant shall have such additional time as necessary, so long as Tenant is using diligent, good faith efforts to repair and restore the Premises.  All such work shall be approved by Landlord in advance and Landlord shall have the unfettered right to supervise all such work, in which case Tenant shall pay Landlord a construction supervision fee not to exceed 5% of the cost of such restoration.

### SECTION TWENTY ONE. CONDEMNATION.

(a) The term "total taking" means the permanent taking of or a voluntary transfer under the threat of the exercise of the right of eminent domain or other authority of all or a portion of the Premises such that it is impossible for Tenant to occupy and operate an Ambulatory Surgery Center within the Premises in compliance with applicable laws, rules, ordinances and regulations. The term "partial taking" means the taking of only a portion of the Premises which does not constitute a total taking, Tenant can continue to operate the its business on the Premises in compliance with applicable laws, rules, ordinances and regulations.

(b) If a total taking occurs during the Term of this Lease, this Lease will terminate as of the date of the taking. The phrase "date of the taking" means the date of taking actual physical possession by the condemning authority or such earlier date as the condemning authority gives notice that it is deemed to have taken possession.

(c) If a partial taking results in the Premises in violation of municipal parking requirements, then Tenant shall promptly restore the Premises to an architecturally fit unit in accordance with plans approved by Landlord and reopen for business.

(d) All compensation and damages awarded for a total or partial taking of the Premises, will belong to Landlord; provided, however, Tenant may make its own claim for any separate award that may be made by the condemner for Tenant's moving expenses, loss of business or for the taking of or injury to Tenant's improvements, or on account of any cost or loss Tenant may sustain in the removal of Tenant's trade fixtures, equipment, and furnishing, or as a result of any alterations, modifications, or repairs which may be reasonably required by Tenant in order to place the remaining portion of the Premises not so condemned in a suitable condition for the continuance of Tenant's occupancy, provided that no such award shall reduce the award to Landlord.

(e) If this Lease is terminated pursuant to the provisions of this Section 21, then all rentals and other charges payable by Tenant to Landlord under this Lease will be paid up to the day of the taking, and any rentals and other charges paid in advance and allocable to the period after the date of the taking will be repaid to Tenant by Landlord. Landlord and Tenant will then be released from all further liability under this Lease.

## SECTION TWENTY TWO. ASSIGNMENT AND SUBLETTING.

Tenant shall not voluntarily or involuntarily or by operation of law, assign, transfer, mortgage or otherwise encumber this Lease, the Premises (including fixtures), or any interest of Tenant in either, in whole or in part, or sublet the Premises or any part thereof, or permit the Premises or any part thereof to be used or occupied by others, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, nor shall Tenant's leasehold interest hereunder be assignable or transferable by the voluntary act of Tenant, or anyone claiming by, through or under Tenant by reason of bankruptcy, voluntary or involuntary, or by operation of law.  Consent to any one sublease or assignment shall not be deemed a waiver of the right to consent to future subletting and assignments.  Even though Landlord may consent to a sublease or assignment, Tenant shall not be released from liability hereunder.  Any attempt by Tenant to effectuate such sublease, assignment, transfer, mortgage or other encumbrance without Landlord's consent shall be null and void.

The transactions deemed to be restricted under the terms of this Section 22 shall include without limitation any assignment, subletting, sale or other transfer that would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other change of Tenant's corporate or proprietary structure; the sale or transfer of fifty percent (50%) or more of the capital stock or ownership interests of Tenant; the sale, assignment or transfer of all or substantially all of the assets of Tenant, with or without specific assignment of this Lease; or in the event that Tenant is a partnership, limited liability company, corporation or similar entity (other than one whose shares are regularly and publicly traded on a recognized stock exchange), any change in the ownership, control and/or power to vote the majority of the outstanding stock of Tenant occurs (whether direct or indirect, and whether such change is by sale, assignment, bequest, operation of law or otherwise).

To review any proposed assignment or sublease, Landlord will require thirty (30) days to review Tenant's submission of (i) the name of the entity receiving such transfer (the "Transferee"); (ii) a detailed description of the business of the Transferee; (iii) audited financial statements of the Transferee; (iv) all written agreements governing the transfer; (v) if the Transferee is an individual, a true and correct copy of the Transferee's driver's license and a completed and signed copy of Landlord's credit application; (vi) any information reasonably requested by Landlord with respect to the transfer or the Transferee; and (vii) a fee of One Thousand Dollars ($1,000.00) to compensate Landlord for certain fees and costs of administration, and other expenses incurred in connection with the review and processing of such documentation.  In the event that Landlord consents to Tenant's subletting of the Premises or any part thereof, or the sale, transfer or assignment of its leasehold interest, Tenant agrees to furnish to Landlord an executed copy of the sublease, sale, transfer, or assignment agreement(s) with all amendments and riders within ten (10) days of execution thereof; provided that in no event shall such sublease, sale, transfer or assignment be effective unless the assignee thereof unconditionally assumes all obligations of

Tenant under this Lease. In the event that any administrative fee, transfer fee or similar fee is paid to Tenant in connection with any such assignment or sublease, whether or not included in the assignment or sublease agreement itself, all such fees shall be disclosed to and paid over to Landlord as additional rent, and in the case of a sublease, if the rental rate for such sublease is greater than that which Tenant is obligated to pay hereunder, then Tenant shall remit to Landlord, as additional rent, the entire amount of any such excess each month. Finally, in the event of any assignment or subletting, it is understood and agreed that all rentals paid to Tenant by an assignee or sublessee shall be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord (to be applied as a credit and offset to Tenant's rent obligations hereunder).

## SECTION TWENTY THREE.  SUBORDINATION.

This Lease and the rights of Tenant hereunder are and shall be subject and subordinate at all times to any ground lease, mortgage, deed of trust, or other lien created by Landlord, whether now existing or hereafter arising upon the Premises, and to all amendments, modifications, renewals, extensions, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security thereof (collectively, an "Encumbrance"). Notwithstanding anything to the contrary contained herein, any holder of such an Encumbrance (a "Holder") may subordinate, in whole or in part, such Encumbrance to this Lease on such terms and subject to such conditions as such Holder may deem appropriate in its discretion without joinder of Tenant by sending Tenant notice in writing. Tenant agrees within five (5) days of request by Landlord or any Holder to execute and deliver to Landlord or such Holder such further instruments, in form and content acceptable to the requesting party, consenting to or confirming the subordination of this Lease to any Encumbrance now existing or hereafter placed upon the Premises or any part thereof, or attorning to such Holder, and containing such other provisions, as Landlord or such Holder may request. Tenant shall, in the event of the sale or assignment of Landlord's interest in the Premises, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under, any mortgage or deed of trust made by Landlord covering the Premises, attorn to the purchaser and recognize the purchaser as Landlord under this Lease. The subordination and attornment set forth in this Section are self-operative and no further instrument of subordination and/or attornment will be necessary unless required by Landlord or the holder of a mortgage or deed of trust. Further, Tenant shall execute and deliver to Landlord and any Landlord's lender, within ten (10) business days after Landlord's written request therefor, an SNDA or other subordination, no disturbance and attornment agreement substantially in the form of Exhibit "C" hereto. In the event that the lender, mortgagee, beneficiary, or any other person, acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, this Lease shall not be terminated or affected by said foreclosure or sale, or any such proceeding, and the lender, mortgagee or beneficiary shall agree that any sale of the Premises pursuant to the exercise of any rights and remedies under the Mortgage, shall be made subject to this Lease and the rights of the Tenant hereunder and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed. Tenant agrees to attorn to the lender, beneficiary or such other person as its new landlord, and this Lease shall continue in full force and effect as a direct lease between Tenant and Lender, mortgagee, beneficiary or such other person, upon all the terms, covenants, and agreements set forth in this Lease. The parties hereto agree to execute or obtain execution of

such reasonable documents as may be necessary to effectuate such subordination, non-disturbance, and attornment.

## SECTION TWENTY FOUR.  COVENANT OF TITLE AND QUIET ENJOYMENT.

Subject to the rights of mortgagees and matters of record, Landlord hereby covenants and agrees that so long as Tenant has performed and observed all terms, conditions, covenants or obligations required under this Lease, Tenant shall have quiet enjoyment of the Premises and all appurtenances thereto.  Tenant hereby acknowledges and agrees that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and its successors only with respect to breaches occurring during the ownership of Landlord's interest hereunder.

## SECTION TWENTY FIVE. DEFAULT.

Any of the following events or occurrences shall constitute a material breach of this Lease by Tenant and, after the expiration of any applicable grace period, shall constitute an event of default (each an "Event of Default"):

(a) The failure by Tenant to pay any amount in full when it is due under the Lease.

(b) The failure by Tenant to perform any obligation under this Lease, which by its nature Tenant has no capacity to cure; and such performance is deemed an immediate and automatic default under the Lease.

(c) The failure by Tenant to perform any other obligation under this Lease, if the failure has continued for a period of ten (10) days after Landlord demands in writing that Tenant cure the failure. If, however, by its nature the failure cannot be cured within ten (10) days, Tenant may have a longer period as is necessary to cure the failure, but this is conditioned upon Tenant's promptly commencing to cure within the ten (10) day period and thereafter diligently completing the cure (not to exceed ninety (90) days). Tenant shall indemnify and defend Landlord against any liability, claim, damage, loss, or penalty that may be threatened or may in fact arise from that failure during the period the failure is uncured.

(d) Any of the following: A general assignment by Tenant for the benefit of Tenant's creditors; any voluntary filing, petition, or application by Tenant under any law relating to insolvency or bankruptcy, whether for a declaration of bankruptcy, a reorganization, an arrangement, or otherwise; the abandonment, vacation, or surrender of the Premises by Tenant without Landlord's prior written consent; or the dispossession of Tenant from the Premises (other than by Landlord) by process of law or otherwise;

(e) The appointment of a trustee or receiver to take possession of all or substantially all of Tenant's assets; or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, unless the appointment or attachment, execution, or seizure is discharged within thirty (30) days; or the involuntary filing

against Tenant, or any general partner of Tenant if Tenant is a partnership, of (i)a petition to have Tenant, or any partner of Tenant if Tenant is a partnership, declared bankrupt, or (ii) a petition for reorganization or arrangement of Tenant under any law relating to insolvency or bankruptcy, unless, in the case of any involuntary filing, it is dismissed within sixty (60) days;

(f) The abandonment of the Premises by Tenant; or

(g) A default occurs under the Guaranty, or any Guarantor files bankruptcy, dissolves or dies.

### SECTION TWENTY SIX. LANDLORD REMEDIES.

Upon the occurrence of an Event of Default, Landlord, in addition to any other rights or remedies available to Landlord at law or in equity, shall have the right to

(a)    terminate this Lease and all rights of Tenant under this Lease by giving Tenant written notice that this Lease is terminated, in which case Landlord may recover from Tenant the aggregate sum of (i) the worth at the time of award of any unpaid rent that had been earned at the time of termination; (ii) the worth at the time of award of the amount by which (A) the unpaid rent that would have been earned after termination until the time of award exceeds (B) the amount of the rental loss, if any, that could have been reasonably avoided; (iii) the worth at the time of award of the amount by which (A) the unpaid rent for the balance of the Term after the time of award exceeds (B) the amount of rental loss, if any, that could be reasonably avoided; (iv) any other amount necessary to compensate Landlord for all the detriment caused by Tenant's failure to perform Tenant's obligations or that, in the ordinary course of things, would be likely to result from Tenant's failure; and (v) all other amounts in addition to or in lieu of those previously set out as may be permitted from time to time by applicable Arkansas law.

As used in clauses (i) and (ii) of Section 26(a), the worth at the time of award is computed by allowing interest at the rate of ten percent (10%) per annum. As used in clause (iii) of Section 23(a), the worth at the time of award is computed by discounting that amount at the discount rate of the Federal Reserve Bank at the time of award plus one percent (1%). As used in this Section, the term rent shall include Minimum Monthly Rent and any other payments required by Tenant under this Lease.

(b)    continue this Lease, and from time to time, without terminating this Lease, either (i) recover all rent and other amounts payable as they become due; or (ii) relet the Premises or any part on behalf of Tenant on terms and at the rent that Landlord, in Landlord's sole discretion, may deem advisable, all with the right to make alterations and repairs to the Premises, at Tenant's cost, and apply the proceeds of reletting to the rent and other amounts payable by Tenant. To the extent that the rent and other amounts payable by Tenant under this Lease exceed the amount of the proceeds from reletting, the Landlord may recover the excess from Tenant as and when due.

(c)    Upon the occurrence of an Event of Default, Landlord shall also have the right, with or without terminating this Lease, to re-enter the Premises and remove all persons and property from the

Premises. Landlord may store the property removed from the Premises in a public warehouse or elsewhere at the expense and for the account of Tenant.

(d)     None of the following remedial actions, alone or in combination, shall be construed as an election by Landlord to terminate this Lease unless Landlord has in fact given Tenant written notice that this Lease is terminated or unless a court of competent jurisdiction decrees termination of this Lease: any act by Landlord to maintain or preserve the Premises; any efforts by Landlord to relet the Premises; any re-entry, repossession, or reletting of the Premises; or any re-entry, repossession, or reletting of the Premises by Landlord pursuant to this Section. If Landlord takes any of the previous remedial actions without terminating this Lease, Landlord may nevertheless at any later time terminate this Lease by written notice to Tenant.

(e)     If Landlord relets the Premises, Landlord shall apply the revenue from the reletting as follows: first, to the payment of any indebtedness other than rent due from Tenant to Landlord; second, to the payment of any cost of reletting, including without limitation finder's fees and leasing commissions; third, to the payment of the cost of any maintenance and repairs to the Premises; and fourth, to the payment of rent and other amounts due and unpaid under this Lease. Landlord shall hold and apply the residue, if any, to payment of future amounts payable under this Lease as the same may become due and shall be entitled to retain the eventual balance with no liability to Tenant. If the revenue from reletting during any month, after application pursuant to the previous provisions, is less than the sum of (i) Landlord's expenditures for the Premises during that month and (ii) the amounts due from Tenant during that month, Tenant shall pay the deficiency to Landlord with the applicable time period as provided under the  applicable Lease subsection upon demand.

(f) After the occurrence of an Event of Default, Landlord, in addition to or in lieu of exercising other remedies, may, but without any obligation to do so, cure the breach underlying the Event of Default for the account and at the expense of Tenant.  Tenant shall, upon demand, immediately reimburse Landlord for all costs, including costs of settlements, defense, court costs, and attorney's fees, that Landlord may incur in the course of any cure.

(g)     No security or guaranty for the performance of Tenant's obligations that Landlord may now or later hold shall in any way constitute a bar or defense to any action initiated by Landlord for unlawful detainer or for the recovery of the Premises, for enforcement of any obligation of Tenant, or for the recovery of damages caused by a breach of this Lease by Tenant or by an Event of Default.

(h)     The exercise by Landlord of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Landlord of any one or more of the other rights and remedies herein provided.  All remedies provided for in this Lease are cumulative and may, at the election of Landlord, be exercised alternatively, successively, or in any other manner and are in addition to any other rights provided for or allowed by law or in equity.  Landlord shall have an affirmative obligation to mitigate its damages hereunder; provided that Landlord and Tenant agree that any such duty to attempt to mitigate shall be satisfied and Landlord shall be conclusively deemed to have used objectively fair and reasonable efforts to relet the Premises by (i) advising Landlord's leasing staff of the availability of the Premises and (ii) engaging a

commercial real estate agent to attempt to relet the Premises; provided further that in all events Landlord may refuse to relet the Premises if the proposed use or quality of any prospective tenant's operation or financial standing is not then appropriate for the Premises or
if Landlord determines that the proposed rent is below market, nor shall Landlord be obligated to give preference to reletting the Premises over other vacant space.

### SECTION TWENTY SEVEN. LATE CHARGE.

Tenant acknowledges that Tenant's failure to pay any installment of the Minimum Monthly Rent or any other amounts due under this Lease as and when due may cause Landlord to incur costs not contemplated by Landlord when entering into this Lease, the exact nature and amount of which would be extremely difficult and impracticable to ascertain. Accordingly, if any installment of the Minimum Monthly Rent or any other amount due under the Lease is not received by Landlord as and when due, then, without any notice to Tenant, Tenant shall pay to Landlord an amount equal to five percent (5%) of the past due amount, which the parties agree represents a fair and reasonable estimate of the costs incurred by Landlord as a result of the late payment by Tenant.

### SECTION TWENTY EIGHT. DEFAULT INTEREST.

Unless otherwise specified herein, If Tenant fails to pay any amount due under this Lease as and when due, that amount shall bear interest at the maximum rate then allowable by law from the due date until paid.

### SECTION TWENTY NINE. WAIVER OF BREACH.

Any express or implied waiver of a breach of any term of this Lease shall not constitute a waiver of any further breach of the same or other term of this Lease; and the acceptance of rent shall not constitute a waiver of any breach of any term of this Lease, except as to the payment of rent accepted.

### SECTION THIRTY. ESTOPPEL CERTIFICATES.

At any time, with at least fifteen (15) days' prior notice by Landlord, landlord shall deliver, and Tenant shall execute, acknowledge, and return to Landlord a certificate in form attached hereto as Exhibit "D". Any certificate may be relied on by prospective purchasers, mortgagees, or beneficiaries under any deed of trust on the Premises or any part of it.

### SECTION THIRTY ONE.  SALE OR ASSIGNMENT BY LANDLORD.

Landlord shall have the right to transfer, sell and/or assign, in whole or in part, all of its rights and obligations hereunder and in the Premises, and, in such event, Landlord shall be and is hereby entirely released of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring on or after the consummation of such sale, and the purchaser at such sale or any subsequent sale, or the assignee of such assignment or any subsequent assignment, shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser or assignee, to have assumed and agreed to carry out any and all of the covenants

and obligations of Landlord under this Lease, and Tenant shall look solely to such successor in interest of Landlord for the performance of such covenants and obligations.

### SECTION THIRTY-TWO. ATTORNEYS' FEES.

If any action at law or in equity is brought to recover any rent or other sums under this Lease, or for or on account of any breach of or to enforce or interpret any of the covenants, terms, or conditions of this Lease, or for the recovery of the possession of the Premises, the prevailing party shall be entitled to recover from the other party as part of prevailing party's costs reasonable attorney's fees, the amount of which shall be fixed by the court and shall be made a part of any judgment rendered.

### SECTION THIRTY-THREE. SECURITY DEPOSIT.

Upon delivery of possession of the Premises to Tenant, Tenant shall deposit with Landlord the sum of **one month's estimated Minimum Monthly Rent** as a security deposit securing the performance of Tenant's obligations under this Lease. Upon the occurrence of a default hereunder by Tenant, Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrears of Minimum Monthly Rent and/or additional rent, including, but not limited to, the cost of any damage, injury, expense, or liability caused by any default by Tenant hereunder. Any remaining balance of the Security Deposit shall be returned by Landlord to Tenant within a reasonable period of time after the termination or expiration of this Lease and the satisfaction of Tenant's obligations hereunder. The Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Tenant shall not be entitled to receive and shall not receive any interest on the Security Deposit, and Landlord may commingle the same with other monies of Landlord.  In the event Landlord applies the Security Deposit or any portion thereof to the payment of any sum described above and this Lease is not terminated, Tenant shall immediately deposit with Landlord an amount of money equal to the amount so applied and such amount shall be deemed to be part of the Security Deposit.  In the event of a sale or transfer of Landlord's interest in the Premises or all or any portion of the Premises, Landlord shall have the right to transfer the Security Deposit to the purchaser or lessor, as the case may be, and upon any such transfer Landlord shall be relieved of all liability to Tenant for the return of the Security Deposit, and Tenant shall look solely to the new owner or lessor for the return of the Security Deposit.

### SECTION THIRTY-FOUR. AUTHORITY.

If Tenant is a corporation, trust, or general or limited partnership, all individuals executing this Lease on behalf of that entity represent that they are authorized to execute and deliver this Lease on behalf of that entity. If Tenant is a corporation, trust, or partnership, Tenant shall, prior to the execution of this Lease, deliver to Landlord evidence of that authority and evidence of due formation, all satisfactory to Landlord. If Tenant is a partnership, Tenant shall furnish Landlord with a copy of Tenant's partnership agreement and with a certificate from Tenant's attorney, stating that the partnership agreement constitutes a correct copy of the existing partnership agreement of Tenant.

## SECTION THIRTY-FIVE. NOTICES.

Except as otherwise expressly provided by law, all notices or other communications required or permitted by this **Lease** or by law to be served on or given to either party to this **Lease** by the other party shall be in writing and shall be deemed served when personally delivered to the party to whom they are directed, or in lieu of the personal service, upon deposit in the United States Mail, certified or registered mail, return receipt requested, postage prepaid, or by express mail or courier service (e.g. Fedex), addressed to the receiving party at:

**IF TO LANDLORD:**
Millrock Investment fund 1 LLC
C/O Mary Street
Mary.street@mtnwest.com
2015 West Grove Parkway, Suite J, Pleasant Grove, UT 84062

**IF TO TENANT:**
SARC by HIS - KELLER, TX Inc.
The Crescent
100 Crescent Court, 7th Floor
Dallas, TX 75201

**IF TO GUARANTOR**:
Healthcare Solutions Management Group, Inc.
3 School Street, Suite 303
Glen Cove, NY 117542
Either party, Tenant or Landlord, may change the address for this Section by giving written notice of the change to the other party in the manner provided in this Section.

## SECTION THIRTY-SIX.  HEIRS AND SUCCESSORS.

This Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of Landlord and Tenant.

## SECTION THIRTY-SEVEN.  PARTIAL INVALIDITY.

Should any provision of this Lease be held by a court of competent jurisdiction to be either invalid or unenforceable, the remaining provisions of this Lease shall remain in effect, unimpaired by the holding.

## SECTION THIRTY-EIGHT. ENTIRE AGREEMENT.

This instrument constitutes the sole agreement between Landlord and Tenant respecting the Premises, the leasing of the Premises to Tenant, and the specified lease term, and correctly sets forth the obligations of Landlord and Tenant. Any agreement or representations respecting the Premises or their leasing by Landlord to Tenant not expressly set forth in this instrument are void.

## SECTION THIRTY-NINE. TIME IS OF THE ESSENCE.

Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

## SECTION FORTY. BROKERAGE.

Landlord and Tenant each warrant that it has had no dealings with any broker or agent about this Lease, other than N/A representing Tenant and N/A representing Landlord and covenants to pay, hold harmless and indemnify the other from and against all cost, expense, or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiations thereof.

## SECTION FORTY-ONE. RENT.

All monetary obligations of Tenant to Landlord under the Lease, including but not limited to the Minimum Monthly Rent shall be deemed rent.

## SECTION FORTY-TWO. AMENDMENTS.

This Lease may be modified only in writing and only if signed by the parties at the time of the modification.

## SECTION FORTY-THREE. GUARANTY.

As a condition to the effectiveness of this Lease, the obligations of Tenant under this Lease shall be guaranteed by Healthcare Solutions Management Group, Inc., a Delaware corporation ("Guarantor"), pursuant to a guaranty in form attached hereto as Exhibit "E" ("Guaranty").

## SECTION FORTY-FOUR. MERGER

The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation of the Lease, or a termination by Landlord, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing sub tenancies or may, at the option of Landlord, operate as an assignment to a Landlord of any of the sub tenancies.

## SECTION FORTY-FIVE. FINANCIAL REPORTING.

Tenant shall submit to Landlord within sixty (60) days following the end of each calendar year during the Term and otherwise upon Landlord's reasonable request (not more than twice during any calendar year), Tenant shall deliver to Landlord complete financial statements satisfactory to Landlord in form and content (i) covering the preceding twelve (12) months and any other financial information requested by Landlord and/or Landlord's lender, including, without limitation, a profit and loss statement and balance sheet for Tenant and/or consolidated versions of the same from Tenant's parent company. Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant or otherwise certified by Tenant. Landlord will agree to execute a commercially reasonable NDA unless the information comes from a public company.

## SECTION FORTY-SIX. LIABILITY OF LANDLORD.

In no event shall Landlord be in default hereunder unless it has failed to cure such default within thirty (30) days after written notice (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to proceed diligently to cure such default after written notice); provided that in any event: (i) Tenant shall have no right to offset or abate rent in the event of any default by Landlord under this Lease, except to the extent offset rights are specifically provided to Tenant in this Lease; (ii) Tenant shall have no right to terminate this Lease; and (iii) Tenant's rights and remedies hereunder shall be limited to the extent (A) Tenant has expressly waived in this Lease any of such rights or remedies and/or (B) this Lease otherwise expressly limits Tenant's rights or remedies. It is expressly understood and agreed that any money judgment resulting from any default or other claim arising under this Lease shall be satisfied only out of Landlord's interest in the Premises, and no other real, personal or mixed property of Landlord (the term "Landlord" for purposes of this Section only shall mean any and all partners, both general and/or limited, officers, directors, shareholders and beneficiaries, if any, who comprise Landlord), wherever situated, shall be subject to levy on any judgment obtained against Landlord. Tenant hereby waives, to the extent waivable under law, any right to satisfy a money judgment against Landlord except from Landlord's interest in the Premises. If such interest is not sufficient for the payment of such judgment, Tenant will not institute any further action, suit, claim or demand, in law or in equity, against Landlord for or on the account of such deficiency. Notwithstanding anything herein contained to the contrary, Tenant hereby waives, to the extent waivable under law, any right to specific performance in the event of Landlord's default referred to herein, and Tenant expressly agrees that except as provided in the immediately following sentence, Tenant's remedy shall be limited to the monetary damages referred to in this Section. Notwithstanding the foregoing, in the event of failure by Landlord to give any consent, as provided in this Lease, Tenant's sole remedy shall be an action for specific performance at law, but in no event shall Landlord be responsible in monetary damages for failure to give such consent. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential, punitive or special damages.

## SECTION FORTY-SEVEN. CHOICE OF LAW/VENUE; WAIVER OF TRIAL BY JURY; COUNTERCLAIMS.

This Agreement shall be governed by and construed according to the laws of the State of Arkansas, without giving effect to its choice of law principles. The parties agree that all actions and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary agreement or any other related obligations shall be litigated solely and exclusively in the state or federal courts located in Crittenden County, Arkansas and that such courts are convenient forums. Each party hereby submits to the personal jurisdiction of such courts for purposes of any such actions or proceedings. To the extent permitted by applicable law, the parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of landlord and tenant, Tenant's use or occupancy of the Premises and/or any claim of injury or damage. In the event Landlord commences any proceedings for nonpayment of rent or any other amounts payable hereunder, Tenant shall not interpose any counterclaim of whatever nature or description in any such proceeding, unless the failure to raise the same would constitute a waiver thereof. This shall not, however, be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.

## SECTION FORTY-EIGHT.  COOPERATION.

Each Party agrees to cooperate fully with the other Party and to execute and deliver such further documents, certificates, agreements, and instruments and to take such other actions as may be reasonably requested by the other Party to evidence or reflect the Contemplated Transactions and to carry out the intent and purposes of this Agreement.  The Tenant agrees, if requested by Landlord, to fully cooperate and adjust for clerical and scrivener's errors, on all documents related to this Lease and the underlying Guaranty, if deemed necessary or desirable in the reasonable discretion of Landlord.

## SECTION FORTY-NINE.  ACQUISITION CONTINGENCY.

Tenant acknowledges that Landlord does not currently own the Premises and that this Lease and Landlord's obligations hereunder are strictly contingent upon Landlord acquiring fee simple ownership of the Premises on or before December 31, 2020 (the "Acquisition Deadline") on terms satisfactory to Landlord in its sole and absolute discretion, the foregoing being "Landlord's Acquisition Contingency".  In the event Landlord has not satisfied Landlord's Acquisition Contingency on or before Acquisition Deadline, then both Landlord and Tenant shall have the right to terminate this Lease upon written notice to the other at any time prior to Landlord's acquisition of the Premises.

**IN WITNESS WHEREOF,** the said Landlord has hereunto the day and year first above written.

MILLROCK INVESTMENT FUND 1 LLC

Name: _____

Title: Manager

**IN WITNESS WHEREOF,** the said Landlord has hereunto the day and year first above written.


Signed & Delivered in the **SARC BY HSI – KELLER, TX, INC.** presence of:


By:

Name : Justin Smith

Title: Executive Chairman

## EXHIBIT "A" LEGAL DESCRIPTION



**EXHIBIT "B"**

**SCOPE OF WORK**

Landlord and Tenant shall work in good faith to mutually agree on the scope of Landlord's Work, and the final, agreed plans and specifications for the same shall constitute Exhibit "B".

**EXHIBIT C**

**[FORM OF SNDA]**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

 *

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** ("**Agreement**") is made as of the _____ of the *, between * ("**Landlord**"), * ("**Tenant**"), and * ("**Lender**").

**RECITALS:**

A.  Tenant is the holder of a leasehold interest in that certain real property together with all easements, rights and appurtenances thereto located in the County(ies) of  *, State of *, as legally described on **Schedule A**, attached hereto and incorporated herein by this reference ("**Leased Premises**") pursuant to that certain Lease, dated as of * between Landlord, as landlord, and Tenant, as tenant.  The Lease as amended from time to time shall hereinafter be referred to as the "**Lease**"; and

B.  Lender has made or has agreed to make a loan to Landlord in the original principal amount of $*, which loan shall be secured by that certain mortgage encumbering all the Leased Premises dated as of *, and recorded, in the official records of * County(ies), State of * ("**Mortgage**"); and

C.  The parties desire to subordinate the Lease to the Mortgage and to establish certain rights of quiet and peaceful possession to the Leased Premises for Tenant's benefit together with certain obligations of attornment, all in the manner hereafter provided.

The foregoing recitals are incorporated into and made an integral part of this Agreement.

**AGREEMENT:**

**NOW, THEREFORE**, in consideration of the Leased Premises and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, it is mutually agreed among the parties as follows:

1.  SUBORDINATION.  Subject to the terms and conditions set forth in this Agreement, the Tenant agrees that the Lease is and shall at all times be subject to and subordinate to the lien, terms and conditions of the Mortgage and to any renewals, modifications, consolidations and extensions of the Mortgage, and all advances made thereunder.

2. NON-DISTURBANCE. So long as Tenant is not then currently in default, Lender agrees that (a) Tenant will not be made a party in any action or proceeding to foreclose the Mortgage or to remove or evict Landlord from the Leased Premises except to the extent required under applicable law in order for Lender to avail itself of and complete the foreclosure or other remedy; (b) Tenant will not be evicted or removed from the Leased Premises nor will its possession or right to possession of the Leased Premises, or any of its rights and remedies under the Lease be terminated, diminished, affected, impaired or disturbed or in any way interfered with by any action taken by Lender to enforce any rights or remedies under the Mortgage; and (c) Lender, upon succeeding to Landlord's interest in the Leased Premises, will recognize all provisions of the Lease and Tenant as its direct tenant under the Lease for the term thereof (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease), and, subject to the limitations of liability herein contained, will be bound by and perform all of the obligations of Landlord set forth in the Lease as if said person were named therein as the landlord thereunder; provided, however, that Lender shall not be: (i) personally liable for the payment of any sum arising under or with respect to the Lease prior to the date Lender acquires Landlord's interest in the Leased Premises, which sum it is Landlord's obligation to pay, provided, however, that the foregoing shall not in any event prevent recourse by the Tenant against all or any part of Lender's right, title and interest in and to the Leased Premises or any part thereof (including, without limitation, Lender's right, title and interest in and to the rents and other income or revenue receivable from the Leased Premises or any part thereof, or the consideration receivable from the sale or other disposition, including a condemnation, of all or any part of the Leased Premises or from any fire or other casualty affecting all or any of the improvements located on the Leased Premises); (ii) obligated to cure any default of any prior landlord (including Landlord) under the Lease which occurred prior to the date Lender acquires Landlord's interest in the Leased Premises unless such default is of a continuing nature and has not been cured prior to Lender acquiring Landlord's interest in the Leased Premises, and provided that the foregoing shall not be deemed to constitute a waiver of any other rights or remedies of Tenant under the Lease including, without limitation, any right of offset against rent or any right of termination; (iii) subject to any right of offset against rent for any event of which Lender has not received written notice from Tenant pursuant to this Agreement; (iv) bound by any payment of rent or other amount by Tenant to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease; except to the extent said payment is required by the terms, covenants, conditions or agreements contained in the Lease; (v) personally liable for any warranties of any nature whatsoever; (vi) personally liable for construction or completion of any improvements for Tenant's use and occupancy; or (viii) personally liable for any claims, offsets or defenses which Tenant might have against Landlord.

In the event that the Lender or any other person acquires title to the Leased Premises pursuant to the exercise of any remedy provided for in the Mortgage or under the law of the state where the Leased Premises is located, the Lease shall not be terminated or affected by said foreclosure or sale resulting from any such proceeding and the Lender covenants that any sale by it of the Leased Premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall include the assumption of the Lease and the obligations of the Landlord thereunder subject to the restrictions set forth herein.

3. A<small>TTORNMENT</small>.  Tenant agrees that, if the interest of Landlord in the Leased Premises shall be transferred to and owned by Lender by reason of foreclosure or other proceeding brought by it under any present or future lien against Landlord's interest in the Leased Premises, or by any other manner, Tenant shall be bound to the Lender under all of the terms, covenants, conditions and agreements set forth in the Lease for the balance of the term thereof remaining (including any and all extensions or renewals thereof effected in accordance with any option therefor in the Lease) with the same force and effect as if Lender were named therein as the landlord thereunder, and Tenant does agree to attorn to Lender as its landlord thereunder so as to establish direct privity of estate and contract between Lender and Tenant, said attornment to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto immediately upon Lender succeeding to the interest of Landlord in the Leased Premises.  The parties acknowledge and agree that the Mortgage provides that, under certain circumstances, Lender shall be entitled to collect, receive and demand payment of all or any part of the rent and other sums due and payable to Landlord under the Lease to Lender.  The parties agree that:  (a) Tenant shall be under no obligation to pay rent or any other sums due and payable to Landlord under the Lease to Lender until such time as Tenant receives written notice from Lender demanding payment of said amounts to Lender; (b) Tenant shall be entitled to rely on any such written notice from Lender and shall not incur any liability to Landlord as a result of such reliance notwithstanding the existence of any dispute between Landlord and Lender with respect to the existence of any default or the satisfaction of any condition under the Mortgage or any other document executed in connection with the transaction which is the subject of the Mortgage which would entitle Lender to collect, receive or demand payment of said amounts from Tenant; and (c) all of Lender's rights described in this sentence shall be subject to all of Tenant's rights and remedies set forth in the Lease including, without limitation, the right of offset against rent.

There shall be no merger of the fee estate in the Leased Premises and the leasehold estate in the Lease by reason of the fact that the leasehold estate in the Lease may be held, directly or indirectly, by or for the account of any person or entity who shall own the fee estate in the Leased Premises.

Tenant recognizes the Mortgage and, and that in the case of any such conveyance either the Mortgage will be paid, or the conveyance shall be made subject to the lien of the Mortgage.

Mortgagee shall be named as an additional insured under the Tenants liability insurance policies with coverage in the amount of * Dollars ($*) and as a mortgagee/loss payee under all property insurance policies covering the Leased Premises.

4. <u>Lender's Option to Cure</u>.  Tenant agrees to provide Lender with a copy of any written notice of default given to Landlord pursuant to the Lease.  Tenant shall not terminate the Lease unless Tenant has sent a copy of the notice of default to Lender and Lender has not rectified the particulars specified in such notice of default within the time period allowed Landlord in the Lease.

5. DEFINITIONS. For the purpose of this Agreement: (a) the term "foreclosure" shall be deemed to include the acquisition of Landlord's interest in the Leased Premises by foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or by deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale, or by any other means whatsoever, and (b) the term "Lender" shall be deemed to include anyone who succeeds to Landlord's interest in the Leased Premises pursuant to the Mortgage including, without limitation, any purchaser at foreclosure or pursuant to the exercise of any power of sale contained in the Mortgage, or any grantee of a deed (or assignment) given in lieu of, or in anticipation of, foreclosure or the exercise of any such power of sale.

6. NOTICES. All notices given pursuant to this Agreement shall be in writing and shall be given by personal delivery, by United States registered or certified mail, or by United States express mail or other established express delivery service (such as Federal Express), postage or delivery charge prepaid, return receipt requested, addressed to the appropriate party at the address set forth above.

The person and address to which notices are to be given may be changed at any time by any party upon written notice to the other party. All notices given pursuant to this Agreement shall be deemed given upon receipt. For the purpose of this Agreement, the term "receipt" shall mean any of the following: (a) the date of delivery of the notice or other document as shown on the return receipt; (b) the date of actual receipt of the notice or other document by the person or entity specified pursuant to this section; or (c) in the case of refusal to accept delivery or inability to deliver the notice or other document, the earlier of: (i) the date of the attempted delivery or refusal to accept delivery; (ii) the date of the postmark on the return receipt; or (iii) the date of receipt of notice of refusal or notice of non-delivery by the sending party.

7. ATTORNEYS' FEES. If any litigation is commenced between the parties hereto concerning this Agreement or the rights or obligations of any party in relation thereto, the prevailing party in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for its attorney's fees in such litigation (including any appeal thereof), which sum shall be determined by the court in such litigation or in a separate action brought for that purpose.

8. SUCCESSORS AND ASSIGNS. This Agreement shall bind and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns, including, without limitation, the mortgagee or beneficiary under any mortgage or deed of trust on Tenant's interest in the Lease or the Leased Premises, its successors and assigns.

9. COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original and all of which together shall constitute but one and the same instrument and shall be effective upon execution of one or more of such counterparts by each of the parties hereto.

10. **MISCELLANEOUS**. If any term, covenant, condition or agreement contained in this Agreement or the application thereof to any person, firm or entity shall at any time or to any extent be deemed or found to be invalid or unenforceable by operation of law, judicial proceedings or otherwise, the remainder of this Agreement or the application of such term, covenant, condition or provision to persons or entities or to circumstances other than those as to which it is held invalid or unenforceable shall not be affected, and each remaining term, covenant, condition or provision of this Agreement or the application thereof shall be valid and enforced to the fullest extent permitted by law. This Agreement contains the entire agreement between the parties and supersedes all prior agreements, oral or written, with respect to the subject matter hereof. This Agreement may not be modified in any manner whatsoever except by an instrument in writing signed by each of the parties hereto. In construing the provisions of this Agreement and whenever the context so requires, the use of a gender shall include all other genders, the use of the singular shall include the plural, and the use of the plural shall include the singular. This Agreement shall be promptly recorded in the official land records of the county in which the Leased Premises is located. The original recorded Agreement shall be sent to Tenant. Lender shall receive a copy of the recorded Agreement.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## EXHIBIT "D"

## [FORM OF TENANT ESTOPPEL]

## TENANT ESTOPPEL

The undersigned, *, (individually, and collectively the "**Tenant**"), whose address is * represents and certifies as follows:

1. The Tenant under that certain * Lease dated * (the "**Lease**") by and between the Tenant and * (the "**Landlord**") whose address is *, covering the property commonly known as * and described therein (collectively the "**Demised Property**").

2. The Lease constitutes the only agreement, either written or oral the Tenant has with respect to the Demised Property and any right of occupancy or use thereof.

3. The Lease is in full force and effect and has not been assigned, subleased, supplemented, modified or amended, in whole or in part, except as follows: *(if none, so state)* *

4. The Tenant took possession of the Demised Property on or about *, and commenced paying rent on or about *. The Tenant presently occupies the Demised Property and is paying rent on a current basis. No rent has been paid by Tenant in advance except for the monthly rental that became due on *, and a security deposit in the sum of US$* *(if none, so state)* now held by the Landlord in accordance with the terms of the Lease.

5. The **monthly base** rental is the sum of * Dollars and * Cents (US$*). The Landlord has not agreed to reimburse the Tenant for or to pay the Tenant's rent obligation under any other lease.

6. The Lease term commenced on \*, and expires on \*, and there are no options to renew except: *(if none, so state)* \*

7. The Tenant is not in default of any of its obligations under the Lease, nor has there occurred any events which with the passage of time or giving of notice or both will result in any such default.  To the actual knowledge of the Tenant, there are no defaults under the Lease by the Landlord, nor have any events occurred which, with the passage of time or giving of notice or both, will result in any such default.  The Tenant does not presently have (nor with the passage of time or giving of notice or both will have) any offset, charge, lien, claim, termination right or defense under the Lease.

8. The Tenant has no right of first offer, right of first refusal, or option to purchase, with respect to all or any portion of the Demised Property.

9. The Tenant is aware that third parties intend to rely upon this Estoppel and the statements set forth herein and that the statements and facts set forth above shall be binding on the Tenant.

The Tenant and the persons executing this Estoppel on behalf of the Tenant have the power and authority to execute and deliver this Estoppel.

**TENANT:**

**By:** _____

**Name:** Justin Smith

**Its:** Executive Chairman

**Guarantor:**

**By:** _____

**Name:** Justin Smith

**Its:** Executive Chairman

### EXHIBIT "E"
### COMMERCIAL LEASE GUARANTY AGREEMENT

THIS COMMERCIAL LEASE GUARANTY ("Guaranty" or "Agreement") is made by Healthcare Solutions Management Group, Inc. ("Guarantor") in favor of Millrock Investment fund 1 LLC, a Utah limited liability company, and/or its assigns ("Landlord"), in connection with that certain lease dated on or about even date herewith (the "Lease") pursuant to which Landlord is to lease to SARC by HSI - KELLER, TX Inc. ("Tenant") those premises located at 1220 Keller Parkway, Keller, Tx. (the "Demised Premises"), as more particularly described in the Lease.

## RECITALS

WHEREAS Landlord requires this Guaranty as a condition to its execution of that certain Commercial Lease and the performance of the obligations to be performed under the Lease by Landlord; and

WHEREAS, Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.	The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.	Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant (collectively, the "Guaranteed Obligations"). Guarantor's obligations under this Guaranty are irrevocable, continuing, and unconditional.

3.	Guarantor hereby agrees that, without the consent of or notice to any Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease

Term: and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.	Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against any Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability

of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of any Guarantor or of the right of any Guarantor to proceed against Tenant for reimbursement.

5.      Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.      Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of any Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against any Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of any Guarantor.

7.      Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which such Guarantor may have against Tenant relating to any indebtedness of Tenant to such Guarantor and will assign to Landlord all rights of such Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of such Guarantor's rights to any such payments or distributions to which such Guarantor would otherwise be entitled; provided, however, that such Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.     Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinate any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledge that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.     Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for such Guarantor. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles. Guarantor represents and warrants that all such financial statements shall be true and correct statements of such Guarantor's financial condition.

10.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

11.    If this Guaranty is signed by more than one person, then all of the obligations of Guarantor arising hereunder shall be jointly and severally binding on each of the undersigned, and their respective heirs, personal representatives, successors and assigns, and the term "Guarantor" shall mean all of such persons and each of them individually.

12.    This Guaranty is for the benefit of Landlord and Landlord's successors and assigns, and in the event of an assignment of the Guaranteed Obligations, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred with such Guaranteed Obligations. Guarantor waives notice of any transfer or assignment of the Guaranteed Obligations or any part thereof.

13.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations,

late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.     The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.  The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sub lessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sub lessee.

16.     If any or all Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of creditors,, notice of such occurrence or event shall be promptly furnished to Landlord by Guarantor or such Guarantor's fiduciary. This Guaranty shall extend to and be binding upon Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy.

17.     <u>Notices</u>.

All notices from the Guarantor to Landlord and Landlord to Guarantor required or permitted by any provision of this Guaranty shall be in writing and sent by registered or certified mail or nationally recognized overnight delivery service and addressed as follows:

> TO LANDLORD:         Millrock Investment fund 1 LLC
>                      C/O Mary Street
>                      Mary.street@mtnwest.com
>                      2015 West Grove Parkway, Suite J, Pleasant
>                      Grove, UT 84062
>
> TO GUARANTOR:        Healthcare Solutions Management Group, Inc.
>                      3 School Street, Suite 303
>                      Glen Cove, NY 117542

Such addresses may be changed by such notice to the other party.  Notice given as hereinabove provided shall be deemed given on the date of its deposit in the United States Mail and, unless sooner actually received, shall be deemed received by the party to whom it is addressed on the third calendar day following the date on which said notice is deposited in the mail, or if a courier system is used, on the date of delivery of the notice.

18.     Guarantor agrees to pay to Landlord on demand all reasonable costs and expenses incurred by Landlord in seeking to enforce Landlord's rights and remedies under this

Guaranty, including court costs, costs of alternative dispute resolution and reasonable attorneys' fees and costs, whether or not suit is filed, or other proceedings are initiated hereon. All such reasonable costs and expenses incurred by Landlord shall constitute a portion of the Guaranteed Obligations hereunder, shall be subject to the provisions hereof with respect to the Guaranteed Obligations and shall be payable by Guarantor within ten (10) days of written demand by Landlord.

19.    **GUARANTOR AND LANDLORD HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LANDLORD ENTERING INTO THIS AGREEMENT.**

20.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the in which the Demised Premises is located.

21.    If any provision of this Guaranty or the application thereof to any person or circumstance shall, for any reason and to any extent, be declared to be invalid or unenforceable, neither the remaining provisions of this Guaranty nor the application of such provision to any other person or circumstance shall be affected thereby, and the remaining provisions of this Guaranty, or the applicability of such provision to other persons or circumstances, as applicable, shall remain in effect and be enforceable to the maximum extent permitted by applicable law.

22.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

23.    When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural.  The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

24.    If any Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms.  If any Guarantor is a corporation, Landlord, at its option, may require such Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

Notwithstanding anything in this Guaranty to the contrary and provided neither Tenant nor any Guarantor are in default or have defaulted under the Lease or this

Guaranty, Guarantor shall be released from this Guaranty after either. The guarantor is subject to the guaranty for the full term of the lease. This Guaranty shall not be subject to any bankruptcy preference prior or any other disgorgement.

**THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**IN WITNESS WHEREOF,** the said Guarantor has hereunto l the day and year first above written.

Signed & Delivered in the
presence of:

HEALTHCARE SOLUTIONS
MANAGEMENT GROUP, INC.

Name: Justin Smith

Title: Executive Chairman

By:

**EXHIBIT "F"**
**COMMENCEMENT DATE AGREEMENT**

This Agreement is made and entered into as of the ___ day of _____, 20___ between [_____, a _____ _____] ("Landlord") and [_____, a _____ _____] ("Tenant"), and shall be attached to and made a part of that certain Retail Lease between Landlord and Tenant dated _____, 20___ (the "Lease"). Pursuant to the provisions of the Lease, Landlord and Tenant intending to be legally bound hereby, agree to the following:

a.     The Commencement Date of the Lease occurred on _____, 20___.

b.     Tenant agrees that, as of and through the date hereof, Landlord has fully and timely complied with and performed each and every of its obligations as set forth in the Lease and that Tenant has no claims or causes of action against Landlord whatsoever and has no right to any setoffs against any and all sums due Landlord.

IN WITNESS WHEREOF, the parties have duly executed this supplement to the Lease as of the day and year first above written

Landlord

Millrock Investment fund 1 LLC

C/O Mary Street

Mary.street@mtnwest.com

2015 West Grove Parkway, Suite J, Pleasant Grove, UT

84062

TENANT:

SARC BY HSI – DRAPER UT Inc.

By:_____

Name: Justin Smith

Title: Executive Chairman

Date: 11-19-2020

# EXHIBIT 12

## PARTIAL ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

This PARTIAL ASSIGNMENT OF PURCHASE AND SALE AGREEMENT ("**Assignment**") is made and entered into as of this 11/19/2020 day of November, 2020 (the "**Effective Date**") by and between **MILLROCK INVESTMENT FUND 1, LLC**, a Utah limited liability company ("**Assignor**"), and **J3 HOLDINGS LLC**, a Delaware limited liability company ("**Assignee**"). Assignor and Assignee shall sometimes be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

### RECITALS

A.      Assignor, as buyer, and SCMOB 1220 KELLER PKWY, LLC, a Texas limited liability company ("**Seller**"), as seller, have entered into that certain Purchase and Sale Agreement dated as of January 6, 2020 (the "**Purchase Agreement**"), with respect to the purchase of the property commonly known as 1220 Keller Parkway, Keller, Texas, as more particularly described on Exhibit "A" attached hereto ("**Property**").

B.      Assignor, as landlord, and SARC by HSI - KELLER, TX Inc., a Delaware corporation, as tenant, entered into a certain AMBULATORY SURGERY CENTER LEASE AGREEMENT dated November 18, 2020 for the lease of land, buildings, and improvements located at the Property, as more particularly described on Exhibit "B" attached hereto (the "**Lease**").

C.      Assignor and Assignee have agreed that Assignor will assign to Assignee the right under the Purchase Agreement to purchase an undivided 2.425% interest in the Property, as provided herein.

D.      Assignor and Assignee have further agreed that Assignor will assign to Assignee an undivided 2.425% interest in Assignor's rights and interest in and to the Lease (the "**Lease Interest**"), and Assignee will assume from Assignor the proportional obligations associated with the Lease Interest at closing, subject to the terms and conditions set forth in this Agreement.

E.      Assignor and Assignee have further agreed that Assignor shall retain all other rights and obligations under the Purchase Agreement.

F.      All capitalized terms used herein, but not defined herein, shall have the meaning ascribed to such terms in the Purchase Agreement.

THEREFORE, for the consideration hereinafter specifically stated, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the following assignments and agreements are made:

### AGREEMENTS:

1.      <u>Recitals</u>. The foregoing recitals are true and correct and are incorporated herein.

2.      <u>Assignment and Acceptance of Certain Purchase Rights</u>. Assignor hereby assigns and transfers to Assignee, its successors and assigns forever, Assignor's right, title, and interest in

and to, the rights under the Purchase Agreement to purchase a 2.425% interest of the Property as a tenant in common. In consideration of the foregoing assignment, at Closing, Assignee agrees to pay a portion of the Purchase Price under the Purchase Agreement in the amount of TWO HUNDRED AND FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) ("**Assignee Purchase Price Portion**").

3. <u>Assumption of Obligations Related to Purchase Rights</u>. As further consideration of the assignment by Assignor described in the foregoing section, Assignee, for itself, its successors and assigns, hereby assumes and agrees to (collectively, the "**Assignee Obligations**"):

(i)     deliver the Assignee Purchase Price Portion to Escrow Agent at Closing by confirmed wire transfer of immediately available U.S. funds;

(ii)    execute and deliver evidence satisfactory to Escrow Agent that Assignee is duly authorized and has full power and authority to accept the conveyance and transfer of the title to the Property, including but not limited to evidence of continuing organization and active status of Assignee; and

(iii)   execute and deliver a closing statement and such other documents as may be deemed necessary or desirable by Assignee or Escrow Agent, in their reasonable discretion, to consummate the Closing, with Assignor paying all closing costs attributable to buyer under the Purchase Agreement.

Assignor agrees to cause Escrow Agent to issue, at Assignor's sole cost and expense, to Assignee a Title Policy, subject only to the Permitted Exceptions, insuring Assignee's 2.425% tenant-in-common, fee simple interest in the Real Property in the amount of $250,000.00.

4. <u>Partial Assignment and Assumption of Lease</u>. At Closing, Assignor and Assignee shall each execute and deliver to the other a Partial Assignment and Assumption of the Lease in the form attached as Exhibit "C," which shall partially assign and transfer to Assignee, its successors and assigns forever, Assignor's right interest in and to the Lease Interest, and Assignee assumes from Assignor the proportional obligations associated therewith.

5. <u>TIC Agreement</u>.  At Closing, Assignor and Assignee shall each execute and deliver to the other the Tenancy in Common Agreement in the form attached as Exhibit "D."

6. <u>Development Agreement</u>. At Closing, Assignor and Assignee shall each execute and deliver to the other the Development Agreement in the form attached as Exhibit "E."

7. <u>Assignor Reservation of Rights and Obligations Under the Purchase Agreement</u>. Assignor retains to itself, its successors and assigns forever, all of Assignor's right, title and interest in and to, all rights under the Purchase Agreement, including but not limited to the right to take any action, perform any act, or enforce any provision of the Purchase Agreement, with the exception of those rights and obligations transferred to Assignee including, but not limited to, the right to purchase a 2.425% tenant-in-common interest in the Property, the right to enforce any provision of the Purchase Agreement and such other rights as set forth in Sections 2, 3, and 4 above.  Assignor also retains and agrees to perform all other duties, obligations and liabilities under the Purchase Agreement..

8.      <u>Counterparts</u>. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. A facsimile, electronic, or portable document format (pdf) copy of this Assignment and any signatures hereon shall be considered for all purposes as an original.

9.      <u>Entire Agreement</u>. This Assignment, including the exhibits attached hereto, shall be deemed to contain all of the terms and conditions agreed upon with respect to the subject matter hereof, it being understood that there are no outside representations or oral agreements.

[EXECUTION APPEARS ON THE FOLLOWING PAGES]

IN WITNESS WHEREOF, this Assignment has been executed as of the Effective Date.

ASSIGNOR:

**MILLROCK INVESTMENT FUND 1, LLC**, a Utah limited liability company

By: _Kevin G. Long_____

Name: ~~Kevin G. Long~~

Title: _____


ASSIGNEE:

**J3 HOLDINGS, LLC,** a Delaware limited liability company

By: _John Alcantar_____

Name: ~~John Alcantar~~

Title: _____

## Exhibit "A"

## Legal Description

Lot 10, Block B, of Keller Town Center, an addition to the City of Keller, Tarrant County, Texas, according to the plat thereof recorded in Cabinet A, Slide 11945 of the Plat Records of Tarrant County, Texas.

## Exhibit "B"

Lease to be attached

## Exhibit "C"

## PARTIAL ASSIGNMENT AND ASSUMPTION OF LEASE

THIS PARTIAL ASSIGNMENT AND ASSUMPTION OF LEASE (this "**Assignment**") is entered into this day of November 2020, by and between **MILLROCK INVESTMENT FUND 1, LLC,** a Utah limited liability company ("**Assignor**"); and **J3 HOLDINGS, LLC,** a Delaware limited liability company ("**Assignee**").

## R E C I T A L S

A. Assignor and Assignee presently own the real property described in Exhibit A, attached hereto and incorporated herein by this reference (the "**Property**"), as tenants-in-common.

C.    Assignor is the landlord under that certain AMBULATORY SURGERY CENTER LEASE AGREEMENT dated November 18, 2020 with SARC by HSI - KELLER, TX Inc., a Delaware corporation (the "**Lease**"), which Lease relates to the Property.

D.    By this Assignment, Assignor intends to partially assign Assignor's interest in, to and under the Lease, as landlord, and Assignee intends to accept the above-described interest from Assignor.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as set forth below.

## A G R E E M E N T

1.    Capitalized Terms. All capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Lease.

2.    Assignment. Assignor hereby partially assigns, conveys, transfers and sets over unto Assignee an undivided 2.425% interest in Assignor's right, title and interest in, to and under the Lease, such amount being equal to Assignee's tenant-in-common interest in the Property.

3.    Assumption. Assignee hereby assumes and agrees to perform, fulfill and comply with the obligations to be performed, fulfilled or complied with by the landlord under the Lease arising from and after the date of this Assignment in proportion to Assignee's tenant-in-common interest in the Property. Notwithstanding anything in this Assignment to the contrary, Assignor retains in full, and Assignee does and shall not assume, any obligations to construct, renovate or expand the building, the premises or the improvements, including, without limitation, completion of the Landlord's Work, all as required by the Lease or ancillary documents ("**Construction Obligations**"). The parties agree that Assignee shall have any rights or remedies available to it at law or equity including the right of specific performance in the event Assignor fails to timely satisfy the Construction Obligations.

4.    Release and Indemnification. Assignor does hereby indemnify, defend and hold harmless Assignee from and against any action, claim, demand or liability of whatever nature (including

DocuSign Envelope ID: 9D8E3550-A634-4793-B905-1976F604D3C4

reasonable attorneys fees) that is made under the Lease that relates to either circumstances which occur prior to the effective date hereof or the Construction Obligations.

5.     <u>Successors and Assigns</u>.  This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors, transferees and assigns.

6.     <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which shall be an original for all purposes, but all of which shall constitute but one and the same instrument. The parties may e-mail, telecopy, or fax signatures appearing on any portion of this Assignment, and the same shall constitute originals for all purposes.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the Effective Date.

ASSIGNOR:                                ASSIGNEE:

**MILLROCK INVESTMENT FUND 1, LLC**, a Utah limited liability company

**J3 HOLDINGS, LLC,** a Delaware limited liability company

By: _Kevin G. Long_____
Name: Kevin G. Long
Its: _____

By: _John Alcantar_____
Name: John Alcantar
Its: _____

DocuSign Envelope ID: 9D8E3550-A634-4793-B0D5-1976F604D364

## EXHIBIT A

### Legal Description

Lot 10, Block B, of Keller Town Center, an addition to the City of Keller, Tarrant County, Texas, according to the plat thereof recorded in Cabinet A, Slide 11945 of the Plat Records of Tarrant County, Texas.

DocuSign Envelope ID: 9D9E3550-A634-4793-B9D5-1976F604D3C4

## EXHIBIT "D"

## FORM TENANCY IN COMMON AGREEMENT

# EXHIBIT "E"

# FORM DEVELOPMENT AGREEMENT

# EXHIBIT 13

## LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE (the "Note"), is made this 5th day of August, 2022, (the "**Effective Date**") by and among MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company (hereinafter, known as "**Lender**") and HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC., a Delaware corporation (hereinafter, known as "**Borrower**"). Borrower and Lender shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole.

### R E C I T A L S

WHEREAS, Lender or its affiliate entered into several lease agreements with Borrower and/or its affiliates for properties located at 3327 S. Division Street, Blytheville, Arkansas (the "**Blytheville Lease**"); 13775 South Pony Express Rd, Draper, Utah ("**Draper Lease**"); and 1220 Keller Parkway, Keller, Texas ("**Keller Lease**"), among others (collectively referred to as the "**Leases**"), which properties are/were/will be developed by American Development Partners ("**ADP**");

WHEREAS, the Parties contemplated securitizing the Leases in the event of a default through certain bonds issued or to be issued by Lloyd's of London (the "**Bonds**");

WHEREAS, Lender has been paying Borrower's portion of rent obligations under the Keller Lease since December, 2021;

WHEREAS, Lender or its affiliate has assigned its interests in the Draper and Keller Leases to various tenant-in-common owners (the "**TIC Owners**"), each of whom has contracted with CAMS Realty, LLC of 2015 W Grove Pkwy, Ste. J, Pleasant Grove, Utah ("**CAMS Realty**"), to act as property manager and/or lease administrator for the Leases;

WHEREAS, Lender has agreed to pay certain lease obligations under the Keller Lease on behalf of Borrower;

WHEREAS, due to certain cash flow issues known to the Parties, Borrower has incurred certain late fees or other penalties under certain of the Leases which are due and owing to the TIC Owners;

WHEREAS, CAMS Realty caused a Revised Notice of Lease Commencement letter and Commencement Date Agreement to be sent to Borrower acknowledging a lease commencement date of July 19, 2022, on the Draper Lease with pro-rated rent due thereon in the amount of $43,387.57, plus late fees of $2,169.38, plus interest penalties of $683.35;

WHEREAS, Lender desires to enter into this loan agreement with Borrower to provide relief with cash flow and to assist Borrower in its obligations under the Leases.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### PROMISSORY NOTE

FOR VALUE RECEIVED, BORROWER promises to repay to the order of Lender, the sum of Three Hundred Fifty Thousand and No/100 dollars ($350,000.00) together with interest thereon at a rate of six percent (6%) per annum.

### LOAN TERMS.

Borrower and Lender hereby further set forth their rights and obligations to one another under this Agreement and agree to be legally bound as follows.

**I.      PRINCIPAL LOAN AMOUNT.**

The Principal Loan Amount is $350,000.00.

**II.     LOAN TERMS.**

**A.      Loan Term**. The Loan term shall begin on the Effective Date and shall terminate on December 1, 2024 (the "**Maturity Date**").

**B.      Loan Repayment.** Beginning on November 1, 2022 and continuing on the first day of each month thereafter for a total period of twenty-four (24) months (the "**Amortization Period**"), Borrower shall repay the Principal Loan Amount and interest payments in accordance with the amortization schedule attached hereto at Exhibit A (each payment being an "**Amortized Payment**"). Borrower's final payment (the "**Final Payment**") shall be due on the Maturity Date and shall include all outstanding principal and accrued and unpaid interest under the loan.

**C.      Disbursements**. Lender shall make loan disbursements in the following order:

**1.**      First, for any outstanding late fees or other penalties incurred under the Leases, except as otherwise provided under Section III.B of this Agreement.

**2.**      Second, for any amounts due under the Draper Lease as they become due for a period beginning on the Effective Date and continuing through October 18, 2022 provided, however, that Borrower has timely made rental payments on all other Leases managed by CAMs for which they are the tenant for each respective month.

**3.**      Third, for any amounts due to the HOA at the Draper location through October, 2022.

**4.**      Fourth, any Principal Loan Amount remaining under this Agreement shall be used by Lender to reduce the outstanding principal balance. The Amortized Payments shall thereafter be calculated to reflect such change.

The disbursements under paragraphs (1) and (2) above shall be paid by Lender directly to CAMS Realty on behalf of Borrower.

## III.    ADDITIONAL COVENANTS.

**A.    Borrower's Obligations.** As a condition of the loan issued by Lender, Borrower further agrees as follows:

1.    **Execution of Bonds.** Within ten (10) business days of this Agreement, Borrower shall cause all leases managed by CAMs whereby the Borrower or a related entity is the Tenant.to be secured by the Bonds issued or to be issued by Lloyd's of London.

2.    **Draper Lease Commencement.** Within ten (10) business days of this Agreement, Borrower shall execute the Commencement Date Agreement on the Draper Lease and does further acknowledge that the Draper Lease's commencement date is July 19, 2022.

3.    **Draper Signage.** Borrower does hereby acknowledge that the terms of the Draper Lease control the understanding between the Parties and TIC Owners with respect to signage on the building.

4.    **Keller Rent Payments.** Borrower shall be solely responsible for any payments due under the Keller Lease on or after October 1, 2022.

5.    **Reimbursement of Blytheville Lease Payments.** On or before November 1, 2022, Borrower shall reimburse Lender for all rents or other payments (including architectural and/or design fees) made by Lender on Borrower's behalf with respect to the Blytheville location.

**B.    Lender's Obligations.** In consideration of Borrower entering into this Agreement, Lender agrees to pay any late fees incurred by Borrower for rent payments due under the Leases in the month of December 2021, , which payments shall be independent from the loan issued to Borrower herein and shall be deemed to be a separate obligations of Lender irrespective of said loan.

## IV.    ACCELERATION OF DEBT.

If any obligation under this Agreement is not met when required, the remaining unpaid principal balance and interest shall become due immediately at the option of the Lender.

## V.    PREPAYMENT.

Borrower may prepay the Promissory Note (in whole or in part) prior to the Maturity Date with no prepayment penalty. Prepayment will be applied first to accrued interest and any remainder in payment of principal.

## VI.    DEFAULT.

If any of the following events of default occur, the Promissory Note and any other obligations of the Borrower to the Lender shall become due immediately, without demand or notice:

(1) the failure of the Borrower to make any payment or perform any other obligation under this Agreement;

(2) the liquidation or dissolution of the Borrower;

(3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

(4) the application for the appointment of a receiver for the Borrower;

(5) the making of a general assignment for the benefit of the Borrower's creditors'

(6) the insolvency of the Borrower;

(7) a misrepresentation by the Borrower to the Lender in conjunction with obtaining this Agreement;

(8) the sale of a material portion of the business or assets of the Borrower.

## VII.   ATTORNEY FEES

If any obligation under this Agreement is not timely fulfilled, the breaching party promises to pay all costs associated with said breach, including reasonable attorney fees to the prevailing party.

## VIII.   SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Agreement are determined to be unenforceable, in whole or in part, for any reason, the offending portion of the provision shall be deemed to be struck and the remaining portion of the provision shall remain fully operative.

## IX.   ENTIRE AGREEMENT

This Agreement constitutes the entire understanding and agreement of the parties hereto regarding the subject matter hereof. This agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter of this agreement.

## X.   AMENDMENTS; WAIVER

This Agreement may not be altered or amended, and no right hereunder may be waived, except by an instrument executed by each of the parties hereto. No waiver of any term, provision, or condition of this agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this agreement.

## XI.   MISCELLANEOUS

All payments under this Agreement shall be paid in the legal currency of the United States.

No delay in enforcing any right of this Agreement shall be construed as a waiver of the right of a party to thereafter insist upon strict compliance with the terms of this Agreement without notice being given to the other party. All rights of the parties under this Agreement are cumulative and may be exercised concurrently or consecutively at the respective party's option.

### XII.    COUNTERPARTS

This Agreement may be executed electronically and in multiple counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument.

### XIII.    GOVERNING LAW

This Agreement shall be construed in accordance with the laws of the State of Utah. Any dispute arising hereunder may only be brought within the State of Utah. **THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION ARISING OUT OF THIS AGREEMENT.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.

**BORROWER:**
**HEALTHCARE SOLUTIONS**
**MANAGEMENT GROUP, INC.**

By: Justin Smith
Its: CFO

**LENDER:**
MILLROCK INVESTMENT FUND 1, LLC

By: Kevin C. Long
Its: Manager

## EXHIBIT A

### Amortization Schedule

| Date | Principle | Payment | Interest paid | Principle paid | Balance |
|---|---|---|---|---|---|
| 9/1/2022 | $350,000.00 | $15,435.04 | $1,750.00 | $13,685.04 | $336,314.96 |
| 10/1/2022 | $336,314.96 | $15,435.04 | $1,681.57 | $13,753.46 | $322,561.50 |
| 11/1/2022 | $322,561.50 | $15,435.04 | $1,612.81 | $13,822.23 | $308,739.27 |
| 12/1/2022 | $308,739.27 | $15,435.04 | $1,543.70 | $13,891.34 | $294,847.93 |
| 1/1/2023 | $294,847.93 | $15,435.04 | $1,474.24 | $13,960.80 | $280,887.13 |
| 2/1/2023 | $280,887.13 | $15,435.04 | $1,404.44 | $14,030.60 | $266,856.52 |
| 3/1/2023 | $266,856.52 | $15,435.04 | $1,334.28 | $14,100.76 | $252,755.77 |
| 4/1/2023 | $252,755.77 | $15,435.04 | $1,263.78 | $14,171.26 | $238,584.51 |
| 5/1/2023 | $238,584.51 | $15,435.04 | $1,192.92 | $14,242.12 | $224,342.39 |
| 6/1/2023 | $224,342.39 | $15,435.04 | $1,121.71 | $14,313.33 | $210,029.07 |
| 7/1/2023 | $210,029.07 | $15,435.04 | $1,050.15 | $14,384.89 | $195,644.17 |
| 8/1/2023 | $195,644.17 | $15,435.04 | $978.22 | $14,456.82 | $181,187.36 |
| 9/1/2023 | $181,187.36 | $15,435.04 | $905.94 | $14,529.10 | $166,658.25 |
| 10/1/2023 | $166,658.25 | $15,435.04 | $833.29 | $14,601.75 | $152,056.51 |
| 11/1/2023 | $152,056.51 | $15,435.04 | $760.28 | $14,674.76 | $137,381.75 |
| 12/1/2023 | $137,381.75 | $15,435.04 | $686.91 | $14,748.13 | $122,633.62 |
| 1/1/2024 | $122,633.62 | $15,435.04 | $613.17 | $14,821.87 | $107,811.75 |
| 2/1/2024 | $107,811.75 | $15,435.04 | $539.06 | $14,895.98 | $92,915.77 |
| 3/1/2024 | $92,915.77 | $15,435.04 | $464.58 | $14,970.46 | $77,945.31 |
| 4/1/2024 | $77,945.31 | $15,435.04 | $389.73 | $15,045.31 | $62,900.00 |
| 5/1/2024 | $62,900.00 | $15,435.04 | $314.50 | $15,120.54 | $47,779.46 |
| 6/1/2024 | $47,779.46 | $15,435.04 | $238.90 | $15,196.14 | $32,583.32 |
| 7/1/2024 | $32,583.32 | $15,435.04 | $162.92 | $15,272.12 | $17,311.20 |
| 8/1/2024 | $17,311.20 | $15,435.04 | $86.56 | $15,348.48 | $1,962.72 |

**Final Payment** shall be calculated at Maturity Date but is estimated to be equal to a principal payment of $1,962.72.

# EXHIBIT 14

**Draper Recording at 6:08**

Clip 1

Q.  So, we were told by Kevin, as you know, that you have the equipment funds of two-million-two-hundred and fifty thousand dollars. Is that correct?

A.  So, there, there's a chain of the way these equipment funds I guess flow.  Um, there's a contract between, American Development Partners and Millcreek. And then I have a contract with American Development Partners, whose pad me a development fee to develop the project. So, yes, I've been paid just under 2.3 million dollars to develop Draper. Um, now as far as that being specific for just equipment, um, that's, that was not part of my contract. They, it was paid to me as project development income.

Q.  Okay, a, can you define what your, what your, what you are actually saying about development fees? What, what would that include?

A.  Um, we, we're, brought into the project to help develop the underlying business, which is the Ambulatory Surgery Center into an operating ambulatory surgery center.

Q.  Okay, of that money, was any equipment purchased for this property?

A.  We have purchased some equipment, and I apologize, off the top of my head I can't tell you exactly what or how much.  Um, mean that is something we can follow up and figure out, but I, I can't give you an exact estimate right this second.

Q. Okay, and, in, in reference to those funds, um, we were looking for those funds to be held in a trust account, um, pending the signing of an acceptable surgery group, to, to occupy the space. Of course, unless you did not perform as agreed. And at such time, those funds, you know would be paid directly into purchasing equipment and we were looking for that to be held and secured.

A.  So, I think it would be hard for us to segregate funds like that, especially since it's paid to us as income. Um, you know for, for, for basically, for developing the project.  Um, because the, the funds that the, the development fee that's paid to us, doesn't just go to buy equipment, it also goes to pay for signage. It goes to pay for credentialling. Um, there's a number of costs to actually getting the surgery center itself up and running and open.  Um, and that's, that's, you know the reason why we're paid that, we're paid those fees.

Q. Okay, in, in your statement, you've referred to that also as income.

A. It's, also it's income, it is paid to us as a fee. It's paid to us as income.

**Draper Recording at 37:25**

**Clip 2**

Q.  ==What specific equipment has already been purchased==?

A.  ==Off the top of my head, I couldn't tell you,== but I can get you an accounting for it.

Q.  Can you tell us what specific equipment will be installed?

A.  So, the way the building is currently designed, it would be one Cardio Cath-lab and it would be two general operating rooms. So, you're going to have the equipment in the Cardio Cath-lab, you're going to have the operating room equipment, then you would have your prep room recovery, then you would have your front desk and admissions.  You're going to need med gas.  I'm trying to think of, just off the top of my head what else, you know, what else would be going in there.  You'd be looking at, you're going to have recovery units, you're going to look at counter pulsation units, you'll have beds, gurneys, wheelchairs, you know, your standard kind of DME package.  You would have, then you would have your pharmaceuticals and you would have your inventory, disposable devises, implants...

Q.  If this money was earmarked for that I'm sure you have an accounting and a list of equipment with costs of what you expect to buy and what you purchased already?

A.  There is, ya. There are budgets that are, that are all built out for all these facilities.

A.  ==And you would be able to provide that with us, to us, to provide that list to us of what money you have set aside, what equipment was purchased, the whole inventory, what you plan to purchase and proof of the money being set aside (inaudible)?==

A.  ==This is not something, I just can't pull that within a day or two.==  It'll take me a couple of days, but yes.

**Draper Recording at 1:10:00**

**Clip 3**

Q. So, let's just define that. It seems that we have a problem defining things, so what do you define, so if you owe us money.

A. I'm sorry, hold on a second, let's be clear. I don't owe you money, Healthcare Solutions does not owe you money.

Q. Oh really?

A. Sarc Draper owes you money.

Q. So, are you not talking for Sarc Draper too or for somebody else? Because the problem here is, is that things keep getting shifted to somebody besides the guy that's on the phone, and if the guy that's on the phone isn't the guy that can talk for them, then this whole thing seems like we're dancing around.

A. So here's the thing as I said before, my company is a minority investor in Sarc. We're an investor. We're shareholders. So, to be very clear what my company is saying is because the current situation that we're all in, we want to figure out a way to make this right and want to figure out a way forward. We're not the ones that created this scenario but we're also saying hey, we're the ones that are willing to step up and figure out a solution, but we can't be the only part of that solution, we need some help.

Q. I understand, so is your company the one that signed the corporate guarantee then?

A. So, I don't know which one of the corporations signed the guarantee, I do know it's related somehow. I'm not an attorney so I'm not ...

Q. Look, look, I'm not trying to play games with you Josh.

A. Ross, I just said that somehow, it's a related entity, I don't know which one, I haven't even read the…

Q. But are you here representing the company who sighed the corporate guarantee? Yes or no, it's simple. Either you are or you're not.

A. It's yes. It's part of a related entity to Healthcare Solution Holdings and that's who I'm here representing

Q. So, you're here on behalf of Healthcare Solutions Management Group, is that correct?

A. Correct, yes.

Q. Ok. So you're saying that Healthcare Solutions Management Group hasn't missed a payment, whoever signed the lease got it, but you're the guarantor on the lease, right?

A. Yes, but at this point we're not, look, at the end of the day we give a guarantee, but that guarantee hasn't been effectuated yet, same with the bond hasn't been effectuated yet.

Q. So, who's different with the entity that signed the lease, who is in charge of that? Who are the representatives of that entity?

A. So that would be Dr. Mumut.

Q.  Dr. Mumut is the signer of the lease because I don't think he is.

Bryce T.  I signed the note, signed the lease.

Q.  Right, I don't think it is the doctor.

A.  So, listen, at the end of the day it doesn't matter who signed the lease, the majority ownership of that company, control of that company, is with Dr. Mumut.  Like I said before, we told you that, we are investors, we are minority investors with that company.

Q.  Josh, didn't I ask you, didn't you say previously that you're operating your net, how to say, your net operating loss is and has been increasing?

A.  Yes.

**Draper Recording at 1:20:23**

**Clip 4**

Q.  I just want to ask you one thing. You referred to FFE in the last meeting. Can you explain what exactly is FF&E?

A.  Furniture, fixture, and equipment.

Q.  Ok, Furniture, fixture, and equipment. You had said that the money that came in, for what we believe was the equipment money that was our money is used also as income for yourself. Is that correct?

A.  No, that's not correct.  I have an agreement with American Development Partners to develop the properties. I'm paid a property development fee so that's what I'm paid to do as the medical company that's participating in the transaction.  You also have an agreement with Millcreek or Millcreek has an agreement with ADP. I'm not a party to that, neither is Millcreek party to my development agreement.  I think there are 2 different scenarios here that unfortunately they don't coordinate.

Q.  I'm just trying to define that, so what is that money again actually used for?

A.  So, technically it's paid to us as income so the money can be used for anything we see fit but our obligation, our responsibility to the project is to go out and purchase the equipment, is to develop the project, is to operate the facility.  So, there are certain deliverables that we have to American Development Partners as the underlying tenant.

Q.  So, you're saying you consider that income that can be used as you see fit.

A.  I'll give you an example.  If we go out and purchase 3.5 million dollars in of equipment for the facility does that mean I get to bill you back for another million?

Q.  That's not the question.

A.  But that's sort of what you're implying right? Because if I'm really putting 3.5 million dollars worth of equipment into these facilities, which is actually what it cost me.  So, it cost me more than you're saying that you're actually putting up for FFE. So, if you're covering FFE costs, then they should be able to bill you back, right?

Q.  I'm just repeating what you said to us.  Am I incorrect?

A.  Now I'm confused, please?

Q.  Mark, was that your last question?

Q.  That is my last question. That money is, you said is considered income and I just wanted to...

A.  It's contractual; it's income. It's not considered income.  We have a contract.

Q.  Josh, we were told that the money for the equipment has not been spent yet because you have not located anybody to come in there. So, that money should still be intact. Because you have not located a physician and so forth and so on, so there's no equipment that's been purchased yet, that's our understanding.

A.  We have purchased some equipment, we also have paid for signage, we've also paid for some of the credentialling funds, there's money that we've spend in relation to the project.  Have we spent it all?  No, I've not bought 3.5 million dollars worth of equipment yet.  Will we at some point, if we move forward – yes absolutely.

**Draper Recording at 1:27:56**

**Clip 5**

Q.  So, Josh, I have a question (unintelligible).  If somehow we decide not to go with HSH so that mean, because for our understanding before that 2.6 million, the equipment, but seems like it's not what you said. So, if we decide not to go with you, I mean HSH, that mean your company will not put everything up to the facility?  Because inside right now, they have nothing, equipment or nothing.

A.  So, as far as that goes, we're not, we're paid a fee to be the, to be a development partner in the project.  We're not, we're not specifically paid a fee to provide furniture into the, into the facility. So, I mean, I don't think so.  I don't, I mean to me that doesn't sounds like that's the way the contracts work.

Q.  But you mentioned that you guys ordered equipment, but then never deliver. So?

A.  So, we do have some equipment for the facility, I don't know exactly what we have, but basically that's equipment we bought and paid for with company funds. So, that equipment belongs to the company.

**Draper Recording at 1:52:45**

**Clip 6**

Q.  Just following up with what Jennifer said, whether you're going to call it equipment money or whatever or to finish the project money, can you work on getting that into a trust account?  I mean, I think that you know, you can go a long way towards massaging everyone's worries here that you're going to go belly up and they're going to take everything you've got in bankruptcy, you know, based on your current history and I think it would make us all feel better if we had that in a trust account.  Which, as you spend the funds for this project, they can be dispersed, you know.

A.  So, I think having the money segregated into a trust account, I think that would be difficult.  I think we can show you where it's earmarked and it is available, but it is something that I will, you know, we will definitely discuss internally, and I certainly can convey the, you know, the feeling and opinion of everybody here today.  So, it's not something that's lost on me, but I don't, that's not something I can promise you.  There's certain things that obviously are easy, this, you know this, is something that is a little bit more difficult, but I will certainly will work as hard as we can to see what we can do inside.

**Draper Recording at 1:57:02**

**Clip 7**

Q.  Here's, here's a question for you personally and I was asked not to ask this question, but me personally, it matters.  You know when I google you, personally, <mark>I see that you have a history with the SEC and specifically being charged with securities fraud and I would love to hear Josh's story behind them.</mark>

A.  So, it's a long story and just to make it short.  <mark>I made a mistake in 2008.</mark> I trusted somebody that I shouldn't have. And when the bond market imploded, I ran a very large bond shop, if you, if you read the complaint it said it was two people.  It was only two people, because I'd laid everybody off at that point.  I did business with Bear Stearns and Lehman Brothers and basically when they collapsed, I collapsed. But that's not really the reason why I got in trouble.  The reason I got in trouble was that somebody that was my, my professor in grad school, had given me my, or, undergrad and grad school, had given me first actual investment banking job, and not just as a bond trader, which was my background.  I'd lent him some money on a transaction. I didn't know the transaction went sideways and found out afterwards. <mark>I was called in for a deposition for basically everything that happened in the bond market, like everybody was.  They'd asked me some questions about the transaction where I'd lent him money and I lied.  I lied under oath.</mark> And I didn't really realize what I did.  My attorney, later on when they, they basically had said there's a real problem here and went back and looked at it.  They said you have a choice and it's real simple, what do you want to do.  Do you want to write a really big check, or do you want to become Martha Stewart, because you committed perjury, you lied, and they nailed ya.  And if you, basically, go in you have to claim the 5th, it's going to be ugly, you'll take it on the nose and if you don't do that, you're going to wind up going to jail.  So, I unfortunately, I had to sit there and get interrogated and let a lot of accusations that I absolutely could have defended myself against and I didn't have a choice.  And I paid for it greatly.  I lost my securities license and put me personally in a very bad way which I was lucky enough to recover from.  In the complaint it's 1.3 million dollars.  I was the largest loser in that investment.  That was the one thing the government never really understood.  I lost $650K personally on that investment. They actually tried to call me as a witness against myself, but that's, that's what happened.

Q.  Fair enough.  Are you still banned by FINRA from being on the board of a public company?

A.  So, I was actually never banned from being part of a public company.  I'm not allowed to own an investment bank or a bank, that's my restriction, but I'm not banned from public companies in any way.

# EXHIBIT 15

**Keller Recording at 10:55**

**Clip 1**

Q.  Kevin represented to the Keller owners that health, that Health Care Solutions Holding Group received and currently is holding 2.25 million in equipment money that was provided by Millcreek to ADP for the sole purpose, for the purpose of surgical equipment for the Keller property. Can you provide confirmation to this effect?

A.  So, the business between ADP and Millcreek, I'm privy to, to only a certain degree, so I don't want a, I don't want to a comment on something that I can't absolutely verify. What I can verify though is my relationship with ADP. Um, ADP as a national developer, we have a contract with ADP where we're paid project development income. We we're paid 2 point, just under 2.3 million dollars, um, for the development of the, the Keller project and that includes the purchase of equipment, that includes the credentialing, it includes the signage, um, you know, as, as, as the actual medical developer for the project, not the property developer, but the actual underlying business developer.  Um, there's certain obligations that we have to ADP and that, that I can confirm, that we have been paid.

Q.  Okay, so, are you confirming that there is that 2.25 somewhere, but you just, it's not, it's not with a Health Care, It's not with HSH? It's not with Millcreek so…

A.  It's, it's not, I'm assuming that the money that I, I shouldn't probably assume, but I'm assuming, that just under 2.3 million dollars that was paid to me to develop the project in Keller, was the money that came from Millcreek to ADP. But I, I don't get paid anything from, AD, I don't get paid anything from Millcreek, I get paid directly from, from ADP.

Q.  So, would you say that ADP could confirm that then?

A.  Yes.

Q.  Okay, Um…

Nancy:  So, can I just, can I ask a question?

A.  Sure.

Q.  Please Nancy.

Q.  That, that money wasn't used exclusively for equipment purchase.  Was it earmarked for that or was it for construction costs also?

A.  So. What, we're not, we, I have nothing to do with the construction side of this. So, that would be a question for ADP. Um, we, we are paid specifically to develop the project itself. Um, and, and in that role of developing that project, from the, the business side of it, the medical side of it, um, you know, we basically are paid, we take an income, as project development income, and we use those funds as we see fit.  Now, there's more than just buying equipment, you, when, when you build an ambulatory surgery center, you go through a very long and expensive credentialing process. Um, the signage that goes into the project as well, as well as, um, I am trying to think of some of the other things that would be, like a tangibles, that you would actually be spending cash on.  There's a number of consultants. There's a lot of equipment. Um, there's engineering work that's not covered in the build out, that's

actually covered for the design work of actually bringing in the medical equipment and the way it's laid out in the OR.  So, those are all things that we cover from our end.

Q.   Kevin represented to our group, that they released 2.25 million dollars to you through ADP exclusively earmarked for the purchase of surgical equipment. Is that true, or not true?

A.  So, I don't, here's the thing, Millcreek has never released funds through another party to me.

**Keller Recording at 30:56**

**Clip 2**

A.  So, not only will I have four months of getting the project really to the point of where we get a CO, another 7 months of licensing and another two months on top of that, um, so, it's about 13 months until I see, you know, basically I generate a single penny out of the facility.  Now, where I really could use some help, and this, this is, you know one of the things that, that would really be important for us would be, you know, how do we, how do we defer some of this rent. Because I, we just simply, <mark>I just simply can't afford to pay rent like that without making any revenue from the facility itself</mark>.  Um, you know, and this is probably one of those questions where I think it's hard to even give me an answer now.  But I would definitely need, I would need some runway, and I would need some assistance from you, to hoping that we could get to the point where I can actually generate revenue, so I can be a stable and sustainable, um tenant.  And I think that's really what the key is for everybody here.

Q.  So, Josh, you know, be frank with us and just go ahead and throw out a, you know, you know, a number, whatever, okay. I mean I know you have something on your mind.

A.  Sure. I mean look, in the ideal world I'd love 13 months, but do I think that's realistic, no, I don't. And that's, I, I'm trying, I'm trying to figure out what would be fair for everybody, because I, I expect you to be fair with me and I want to fair with you. So, what I'm thinking is, you know maybe there's some way to split that down the middle, maybe you can get me to 6 and half - seven months of a rent abatement. Um, I do have a few ideas though in the meantime. Um, one of the things would be, look, I'm not expecting a gift, so anything that will (inaudible) I would be willing to, you know, include into either a rent increase, um, an additional you know term for the lease itself.  So, you know, I'm not exactly sure how those economics would work, but I'm also thinking that, um, you know, maybe, instead of increasing the rent, because obviously in the beginning, you know, we still are going to be building and ramping a business. Um. maybe what we would do is, is dedicate say 10 percent of, of gross profits to going to the owners until everyone is made whole, for anything that they may have given up at this point.

**Keller Recording at 53:55**

**Clip 3**

Q. Tell us what the Keller building um, you know, was built out for. What, ==what equipment is it prepared
to have put in there, that hasn't been purchased yet?==

A. ==As far as what equipment's been bought and what equipment hasn't been bought, I, I'm not clear.==
Um, unfortunately, some down, we're still trying to unwind. Originally, that was the responsibility of Dr.
Mumut, that, that abandoned the project. Um, but I do know.  I know we have some cardio catheter
equip., cardio cath-lab equipment that's been purchased. I know there's some operating room
equipment that's purchased. I know there's some imaging, imaging, um, equipment that's been
purchased.  Um. I don't have a direct inventory list though in front of me, so I wouldn't be able to tell
you exactly what or where.

Q. If that equipment was purchased, where is it actually being held?

A. So, we have storage in, in several of our, our locations that's climate controlled and secure.

Q. ==Would we be able to get that equipment since it is part of our building.==

A. ==Um, So, technically it's not part of your building. So, I, I don't see why I would give it up.== I mean
obviously I want to work out a way forward. So, I'm certainly looking to give assurances.

Q. Okay, Kevin had told us that, that equipment was part of the building and would be the owner's
equipment.

A. So, the equipment is, actually never part of the owner's equipment. The equipment is part of my
company.  It's part of my underlying assets.  We, we purchase the equipment directly through my
company and that's, it's, it's our equipment at the end of the day.

Q. Let's, let's get Kevin to comment on that, is he still in the room. Because this is again, an, a complete
inconsistency, that we've heard time and again.

A.  I think there's a difference between the contracts and the leases that I have vs. the contracts he may
have with the, with the property developer. So, I think you have to look at 1, the contract that Kevin
would have with ADP, which I'm pretty sure would have some, you know, some carve outs for some kind
of FF&E.  And then, at the end of the day you would have to look at, you know, the leases that, that we
have, which I don't think include a TI provision. Um, and you know, any, any payment received to me
would have to, there has to be something there substantiating.  Which, which is going to be my
development agreement.  So, I don't think that Kevin is misleading you in any way.   And, I, I don't think
that I am misleading you in any way. I think it's just a matter of what part of the, the development chain
you're looking at and which, you know, which contract is governing that part of the development.

Q. Why don't you provide us with the contract, so we can actually see what you're saying?

A. I, I actually already agreed to.

A.  And ah, we delivered actually today, the ah, full contract between Millcreek and American Development Partners and all of the draws that uh, specifically call out the equipment payments, uh and when they were made.  Um and it has always been referenced to us as equipment and we have paid for it. And that's our consistent position.

Q.  So, Kevin, you still hold the position that the equipment belongs to the owners of the property?

A. Correct.

Q.  Okay, thank you.

Q. Okay, ah, so I see that, Roger, um, Roger's had his hand up for a while, so Roger, why don't you go ahead (unintelligible) and, and…

Q.  Ya. So, I guess the question, back to ah, the equipment money, I guess we're talking about that.  Ah, cause it is (unintelligible) that we have sitting somewhere.  Um, is this money set aside in some kind of account that is specifically for our property or is it just combined with all the money that you have for, um, buildouts in every other, you know project.  Um, I guess what we are getting at.  We've kind of had some talk about having it um, what was it called, like a glass box or something.  Someway of escrow account or, or being able to see that this money is sitting somewhere, you know, for this building to finish it out.  Black box.

A.  So, the company maintains a strategic preserve, which is not part of our operating budget and not part of the funds that we, we generally can um, dip into.  I guess you could say.  Um, it's a strategic preserve investment account.  Um, and, and what, what happens is we earmark the, the amount of the equipment or the, or the amount of funds we believe are, will be needed for each one of the projects that we go into.  Um, I think probably sitting in that, in that investment reserve account is, is somewhere over 80 million dollars, in um, cash or cash equivalents.  Um, and there's, there's certain budgetary ways that, that that funny, or that money is accounted for.  Um, it's not maintained in separate accounts.  I mean that would be a bit of an accounting nightmare for us.  Um, I do know that there's, there's internal budgeting that's gone into it.  Um. That's not part of its, you know it's not part of our general operating fund.  Um, so it is definitely set aside.  Um, at the same time too, I don't, you know, like I said, um there's 40 something buildings out there we're developing.  I, we don't have 40 something subaccounts that, that money's split into.

Q.  Um, Josh.  Uh.  Would you be able to um, is there a way you can provide uh, you know, proof of, of that money, that's there, that 80 million?

A.  Ya. So, one of, it's part of our, um, the quarterly financials that we are going to be filing very shortly, it is part of.  Um. So, it's been reviewed and, and you know, there's, there's the auditors review uh, for the first quarter, which is actually fourth quarter of last year.  Um, I do think there's actually a footnote that, that denotes the amount of funds that are sitting in that reserve account.  Um, as of, I think it's as of uh, December 1st or the, the end of last month.

**Keller Recording at 1:02:30**

**Clip 4**

A.  I do think there is a path forward.  I think that we can figure out any short-term loss that you have, I think we can figure out how to make everyone whole on that and get to a point where I think everyone here is actually happy with this investment.  As far as the equipment goes, at the end of the day we would have to refer back to the lease.  The lease is what governs the relationship, and I don't believe there's a TI onto the lease or anything that would convey ownership of equipment my company purchases to a landlord.

**Keller Recording at 1:27:57**

**Clip 5**

A.  I'm not looking for something for nothing.  You know. I'm not looking for a gift.  What I am looking for is some kind of work out that gets us to the point where this becomes economically viable.  And, and this is a long-term cash flow.  Which is the reason why I think everybody has made this investment. And that's, that's where I know we can get to. Unfortunately, I can't just write , write a check and make everybody whole and make all the rent payments all the way through.  Literally the company, the company would be bankrupt and there's, there's just not going to be anything left.

# EXHIBIT 16

## MULTI-UNIT DEVELOPMENT AGREEMENT

**THIS MULTI-UNIT DEVELOPMENT AGREEMENT** (this "Agreement") is entered as of July 29th 2018 (the "Effective Date"), by and between **Advance Care Medical, Inc. and Healthcare Solutions Management Group, Inc.**, each a Delaware corporation ("Tenant"), and ("Guarantor") and Jameson, LLC, a Tennessee limited liability company dba American Development Partners (together with its subsidiaries, related parties, successors-in-interests, and affiliates, "Developer"). Tenant and Developer may be referred to herein separately as a "Party" and together as the "Parties".

**WHEREAS**, Developer is a developer of real property; and

**WHEREAS**, Tenant is the operator of Advance Care Medicine Urgent Care Units, SARC by HSH Ambulatory Surgery Units, and or another medical concept.

**WHEREAS**, the Parties acknowledge that Developer shall receive a Developer's Fee (as hereinafter defined) in connection with each Qualified Project (as hereinafter defined); and

**WHEREAS**, Tenant and Developer desire to enter into a mutually beneficial multi-unit development and DEVELOPMENT plan, all on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements, promises and undertakings set forth in this Agreement and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties, intending to be bound by this Agreement, agree as follows:

1.    Definitions.  The terms have the following meanings as used in this Agreement:

    (a)    "Agreement" shall have the meaning set forth in the recitals.

    (b)    "Area Development Agreement" means the development regions dedicated by American Development Partners.

    (c)    "Building" means the building and other improvements to be constructed as part of the Project.

    (d)    "Concept" means Advance Care Medicine Urgent Care Units and SARC by HSH Ambulatory Surgery Center Units

    (e)    "Confidential Information" shall have the meaning set forth in Section 5 below.

    (f)    "Developer" shall have the meaning set forth in the recitals.

    (g)    "Developer's Fee" means a fixed overhead fee equal to ten percent (10%) of the Total Development Costs.

    (h)    "Effective Date" shall have the meaning set forth in the recitals.

    (i)    "Franchisor" means the franchisor of the Concept.

    (j)    "Landlord" means the landlord under the applicable Lease Agreement.

    (k)    "Lease Agreement" shall have the meaning set forth in Section 3 below.

1

(l)      "Party" shall have the meaning set forth in the recitals.

(m)      "Project" means a real estate project for the acquisition, development and development of real estate for use and operation as the Concept.

(n)      "Property" means real property that is the subject of the Project.

(o)      "Land Cost" means the gross purchase price paid by Landlord to acquire the Property.

(p)      "Qualified Project" means a Project that satisfies the following conditions (all as determined in the reasonable discretion of the Developer, Franchisor and Tenant):

      i.      Developer has entered into a valid and binding contract to purchase the Property.

      ii.      All material approvals from the franchisor of the Concept have been obtained.

      iii.      Developer has identified an investor to acquire the Property (the "Investor").

      iv.      The Investor has approved the Project.

      v.      The Investor has secured financing with respect to the acquisition and development of the Property, including, but not limited to, a loan commitment or equity approval.

(q)      "Rent Factor" shall have the meaning set forth in Section 3(a) below.

(r)      "Representatives" shall have the meaning set forth in Section 6 below.

(s)      "Tenant" shall have the meaning set forth in the recitals.

(t)      "Total Development Costs" means all direct or indirect costs incurred in connection with the acquisition and development of the Property and construction of the Building with respect to a Qualified Project, including, without limitation, construction costs; architectural design, engineering design; legal and accounting fees; project management expenses; assessments; permits; utility and impact fees; soils investigations; environmental studies; appraisal fees; financing fees, interest and costs; travel; bond premiums and insurance; brokerage fees and all other costs that are typically incurred in construction or development.

(u)      "Tenant" shall have the meaning set forth in the recitals.

(v)      "Exclusive developer" means the sole developer and equity source to develop Advance Care Medicine or urgent cares and SARC by HSH Ambulatory Surgery Center Units for tenant

2.      **Qualified Projects**.  During the Term of this Agreement, Developer shall use commercially reasonable efforts to present Tenant with Qualified Projects.  During the Term of this Agreement:

      (a)     Tenant shall enter into five hundred urgent care (500) Lease Agreements (the "Tenant Commitment") with an option for one hundred (100) additional units with anticipated development costs to be approximately $3,000,000.00 a unit (actual costs will vary based on individual projects) for a total initial commitment of approximately $1,500,000,000 and option for an additional $300,000,000.00

      (b)     Tenant shall enter into 100 hundred  surgery centers (100) Lease Agreements (the "Tenant Commitment") with an option for fifty (50) additional units with anticipated development costs to be approximately $9,000,000.00 a unit (actual costs will vary based on individual projects) for a total initial commitment of approximately $900,000,000.00 and option for an additional $450,000,000.00

Provided that each Lease Agreement relates to a Qualified Project. Developer has the exclusive development rights to develop single tenant Advance Care Medicine urgent care units, SARC by HSH ambulatory surgery units and or other medical concepts to be developed nationally for tenant. Tenant has the exclusive operator and tenant rights to operate any new single tenant Advance Care Medicine Urgent Care units and SARC by HSH ambulatory surgery centers nationally for developer outside of the previously noted six current operators. Tenant and or associated company reserves the right to directly fund the  capital and or participate in the capital for real estate to developer.

      3.     **Lease Agreements**. If Developer presents Tenant with a Qualified Project, then, within thirty (30) days after the date upon which Developer presents Tenant with a Qualified Project, Tenant and Landlord shall enter into a lease agreement for the Property (each, a "Lease Agreement"), which lease shall include the following terms and provisions, among others (unless otherwise agreed upon in writing by the Developer):  All total project cost including land and developer fee X Rent Factor factored at a 9 or 10 CAP to be determined per project.

      (a)     Base rent during the first year of the lease term shall be equal to the product of a percentage (the "Rent Factor") multiplied by the sum of the Total Project Cost (TPC) The Rent Factor shall be equal to, at the effective date of the applicable Lease Agreement.  The resulting initial base rent during the first year of the lease term shall equal base rent during the first year of the lease term shall be equal to the product of a percentage (the "Rent Factor") multiplied by the sum of the Total Development Costs, the Land Cost and the Developer's Fee. The Rent Factor shall be equal to, at the effective date of the applicable Lease Agreement.  The resulting initial base rent during the first year of the lease term shall equal: (Total Development Costs + Land Cost + Developer's Fee) X Rent Factor.

      (b)     Base rent shall increase two percent (2%) annually.

      (c)     The lease shall be a triple net lease.  Tenant shall pay insurance, taxes, common area maintenance charges and shall pay for and perform all maintenance with respect to the Building and the Property.

      (d)     The initial term of lease shall be 20 years with 2 renewal options of five years each.

      (e)     The term of the lease shall commence upon the date that the lease is executed by Tenant and Landlord.

      (f)     The rent commencement date shall be the date that a certificate of occupancy is issued for the Building.

      (g)     A security deposit in the amount of the first month's base rent shall be due in connection with the lease.

(h)     Guarantor - Advance Care Medical, Inc. and Healthcare Solutions Management Group, Inc. must be a dual endorsement on every contract (Meaning publicly traded company and HOLDCO) until the terms below are achieved:

(i)     Healthcare Solutions Management Group, Inc.., or the Publicly traded company will co-sign all leases for the full 20 year term nd any renewal terms.

(j)     Once the unit count or revenue amount is achieved Healthcare Diagnostic, Inc., or the Publicly traded company guaranty will expire.

(k)     HOLDCO  - Advance Care Medical, Inc. will remain on the lease the entire term of the lease

(l)     Lease Agreement shall be contingent upon Landlord acquiring fee simple title to the Property.

4.     **Term; Termination**.

(a)     The term of this Agreement ("Term") shall commence on the Effective Date and shall terminate on the earlier of (i) the date that is ten (10) years after the execution of the Area Development Agreement and (ii) the date that Tenant satisfies the Tenant Commitment (iii)

(b)     Any Party may terminate this Agreement, effective upon written notice to the other Party (the "Defaulting Party"), if the Defaulting Party:

i.     Breaches this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Defaulting Party does not cure such breach within 30 days after receipt of written notice of such breach.

ii.     Becomes insolvent or admits its inability to pay its debts generally as they become due.

iii.     Becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven business days or is not dismissed or vacated within 45 days after filing.

iv.     Is dissolved or liquidated or takes any corporate action for such purpose.

v.     Makes a general assignment for the benefit of creditors.

vi.     Has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business?

vii.     Developer will find land and submit to franchisor, capital partners and tenant for approval. It is the desire of developer to turn in a minimum of 30 sites for develop annually however developer does not control the approval by franchisor and or equity partner. Tenant must remain financially sound and profitable.

5.     **Confidential Information**.   The Parties shall maintain and receive in the strictest confidence all information (whether written or oral), which is in the nature of a trade secret or is the

confidential business information of the other Party hereto ("Confidential Information"); provided, however, the Parties shall be permitted to share the Confidential Information with any affiliate, related party or any of their respective members, managers, officer, directors, independent contractors, or employees, and its attorneys, agents and representatives. The Parties hereto shall keep confidential the existence of this Agreement and the terms and conditions contained herein as well as anything that has been revealed or discussed during the negotiations preceding this Agreement. This Section shall survive the termination of this Agreement. Notwithstanding the foregoing, no obligation of confidentiality applies to any information of either Party obtained by the other which is: (a) in the public domain, other than by a breach of this Agreement on the part of the recipient, (b) rightfully received without any obligation of confidentiality, (c) independently developed, or (d) already possessed without obligation of confidentiality.

6.    **Non-Circumvention**. Tenant and Guarantor agree that during the Term of this Agreement and for a period of 2 years thereafter, Tenant and Guarantor shall not circumvent, nor attempt to circumvent, nor permit any affiliate, related party or any of their respective members, managers, officer, directors, independent contractors, or employees (collectively, "Representatives") to circumvent, or attempt to circumvent Developer's relationship with the Franchisor or any other parties Developer introduces to Tenant or Guarantor in connection with the Qualified Projects presented during the Term or any franchisor of an Excluded Concept. For the avoidance of doubt, Tenant and Guarantor shall not enter into any area development agreements, franchise agreements or other similar agreements for the Concept or any of the Excluded Concepts without the prior written consent of the Developer, which can be withheld in Developer's sole and absolute discretion. Tenant and Guarantor acknowledge that the restrictions contained in this Section are reasonable for the protection of Developer, its relationships and business operations. The Parties expressly intend that the protections afforded by this Section shall survive any termination hereof.

7.    **Indemnification**.

(a)    Tenant and Guarantor, jointly and severally, hereby agree to indemnify, defend and hold harmless Developer and its affiliates, employees, officers, directors, partners, shareholders, members, agents, attorneys, third-party advisors, successors and permitted assigns (collectively, the "Developer Indemnified Parties") in respect of any and all claims, losses and expenses which may be incurred by the Developer Indemnified Parties arising out of: (i) any breach by Tenant or Guarantor of any of their respective representations, warranties, covenants or agreements made in this Agreement; and (ii) any action, suit, proceeding, assessment or judgment arising out of or incident to any of the matters indemnified against in this Section, including reasonable fees and disbursements of counsel (regardless of whether trial is instituted and at trial or in appellate proceedings).

(a)    Developer hereby agrees to indemnify, defend and hold harmless Tenant and Guarantor and their respective affiliates, employees, officers, directors, partners, shareholders, members, agents, attorneys, third-party advisors, successors and permitted assigns (collectively, the "Tenant Indemnified Parties") in respect of any and all claims, losses and expenses which may be incurred by the Tenant Indemnified Parties arising out of: (i) any breach by Developer of any of Developer's representations, warranties, covenants or agreements made in this Agreement; and (ii) any action, suit, proceeding, assessment or judgment arising out of or incident to any of the matters indemnified against in this Section, including reasonable fees and disbursements of counsel (regardless of whether trial is instituted and at trial or in appellate proceedings).

8.    **Remedies**. If the Tenant or Guarantor breaches or threatens to breach any provision of this Agreement, the Developer shall be entitled to seek injunctive relief in any court of competent jurisdiction for the breach or threatened breach of this Agreement in addition to any other remedies in law or equity.

Tenant will not raise the defense of an adequate remedy at law. This provision does not alter any other remedies available to either Party.

9.      **Waiver**. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

10.     **No Assignment**. This Agreement may not be assigned by Tenant or Guarantor, in whole or in part, without the prior written consent of Developer, which consent may be withheld in Developer's sole discretion. This Agreement may not be assigned by Developer, in whole or in part, without the prior written consent of Tenant, which consent will not be unreasonably withheld.

11.     **Governing Law**. This Agreement shall be construed under the substantive laws of the State of Tennessee, without regard to the conflict of law provisions and exclusive venue for any action arising under this Agreement shall lie solely in Tennessee.

12.     **Severability**. If any provision of this Agreement is inconsistent or contrary to any applicable law, rule or regulation, then said provisions shall be deemed to be modified to the extent required to comply with said law, rule or regulation and as so modified, said provision and this Agreement shall continue in full force and effect.

13.     **Attorneys' Fees**. In any action or proceeding brought to enforce any provision of this Agreement or any other document delivered pursuant to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party to the action or proceeding. For purposes of this Agreement, the "prevailing party" shall be deemed to be that party who obtains substantially the result sought, whether by settlement, mediation, judgment or otherwise, and "attorneys' fees" shall include, without limitation, the actual attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal or other legal proceeding, including mediation and arbitration.

14.     **Entire Agreement; Modifications**. This Agreement constitutes the full and complete understanding and agreement of the Parties with respect to the subject matter covered herein and supersedes all prior and contemporaneous oral or written understandings and agreements with respect thereto. This Agreement may be modified only by a written amendment signed by the authorized representatives of the Parties.

15.     **Notices**. Any notice under this Agreement will be in writing and will be deemed to have been duly given when delivered personally, or three (3) days after such notice is deposited in the United States mail, registered, postage prepaid or one (1) business day after such notice is deposited with a nationally recognized overnight courier, and addressed to each Party at such Party's address shown on the signature page to this Agreement, or to such other address as a Party may have theretofore designated in writing to the other Party.

16.     **Counterparts**. This Agreement may be executed in counterparts that together shall constitute a single agreement. Delivery of a copy of this Agreement bearing an original signature by facsimile transmission or by electronic mail in "portable document format" form shall have the same effect as physical delivery of the paper document bearing the original signature.

17.    **WAIVER OF JURY TRIAL**. EACH PARTY, AS A CONDITION OF ITS RIGHT TO ENFORCE OR DEFEND ANY RIGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT, WAIVES ANY RIGHT TO A TRIAL BY JURY AND AGREES THAT ANY ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

18.    **Further Assurances**. Each Party agrees to execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken all such further or other actions as are reasonably necessary or desirable upon the request of any other Party to more fully effectuate the purposes and intent of this Agreement.

19.    **Successors and Assigns**. This Agreement is binding on and inures to the benefit of the Parties and their respective successors and permitted assigns.

20.    **Force Majeure**. Any delay or failure of any Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's control, without such Party's fault or negligence and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars, or acts of terrorism) (each, a "Force Majeure Event"). Tenant's or Guarantor's financial inability to perform, changes in cost or availability of materials, components or services, market conditions, or supplier actions or contract disputes will not excuse performance by Tenant or Guarantor under this Section. Tenant and Guarantor shall give Developer prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. Tenant and Guarantor shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement.

21.    **Authority**. Each Party represents and warrants that (a) it has full corporate power and authority to enter into this Agreement and to perform its obligations hereunder, (b) this Agreement is the binding legal obligation of such Party, enforceable against such Party in accordance with its terms, and (c) in performing this Agreement, it will materially comply in all respects with all applicable laws and regulations.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**GUARANTOR**

Healthcare Solutions Management Group, Inc.

By: _____

Name: Justin Smith

Title: Chairman of the board

Address:

3 School St

Suite 303

Glen Cove, NY 11542

**GUARANTOR:**

Advance Care Medical, Inc.

By: _____

Name: Frederick Alger Boyer

Title: CEO

Address:

100 Crescent Court

7th Floor

Dallas, TX 75201

*[Signatures continue on the following page.]*

*[Signature Page to Multi-Unit Leasing Agreement]*

**DEVELOPER:**

JAMESON, LLC d/b/a AMERICAN DEVELOPMENT
PARTNERS

By: _____

Name:___ **Manny Butera** _____

Title: ___ **Developer** _____

Address:

PO BOX 681982
Franklin, TN 37064
Attn: Manny Butera

With copy to:

Trenam Law
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
Attn: Michael J. Reeves, Esq.
Attn: Zachary J. Chauhan, Esq.

*[Signature Page to Multi-Unit Leasing Agreement]*

# EXHIBIT 17

KEITER LAW, P.C.    364 S North County Blvd. Ste 330
Pleasant Grove, UT 84062

*Via USPS Certified Mail*

December 14, 2022

Healthcare Solutions Management Group, Inc.
3 School St., Ste. 303
Glen Cove, NY 11542

## NOTICE OF DEFAULT AND ACCELERATION OF DEBT

This firm has been retained by Millrock Investment Fund 1, LLC ("**Millrock**") to represent its interest in that certain Loan Agreement and Promissory Note ("**Agreement**") dated August 5, 2022, by and between Healthcare Solutions Management Group, Inc. ("**HSHG**") and Millrock.

In consideration of the Agreement, HSHG entered into several covenants to fulfill certain obligations, including:

(1) Executing several Bonds issued by Lloyd's of London to secure various leases managed by CAMS Realty, LLC ("**CAMS**");
(2) Execute a Commencement Date Agreement on a Draper Lease;
(3) Make lease payments on rental property located in Keller, Texas on and after October 1, 2022;
(4) Reimburse Millrock for certain rents and other payments made on HSHG's (or a related entity) behalf on or relating to a lease in Blytheville, Arkansas before November 1, 2022;
(5) Making loan payments pursuant to the Agreement's amortization schedule.

Pursuant to section VI of the Agreement, HSHG's failure to fulfill these obligations constitutes an event of default. Accordingly, Millrock hereby exercises its right to accelerate the debt and hereby demands payment of all unpaid principal and interest immediately. The total outstanding principal and interest balance due under the loan as of the date of this Notice equals $329,820.13 with a per diem rate of $53.30.

Further, as stated, HSHG has failed to pay amounts owed relating to the Blytheville Arkansas lease when due. Accordingly, Millrock further demands immediate payment of this amount in full plus interest at the statutory rate of ten percent (10%) per annum. The total outstanding balance and interest as of the date of this Notice equals $559,094.13 with a per diem rate of $151.43.

The grand total of these amounts equals $888,914.26 as of the date of this Notice. Please make payment immediately.

Nothing in this Notice waives any rights Millrock may have regarding this or other defaults. Millrock demands strict and timely compliance with all terms of the Agreement.

Sincerely,

KEITER LAW, P.C.

John E. Keiter
john@keiterlaw.com
*Attorney at Law*

CC:

→ Healthcare Solutions Management Group, Inc.
26 Reynolds St.
Springhill, LA 71075

→ Healthcare Solutions Management Group, Inc.
100 Crescent Ct.
Dallas, TX 75201

# EXHIBIT 18

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **December 27, 2022**

# HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **333-147367** | **38-3767357** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (IRS Employer Identification No.) |

**3 School St, Suite 303, Glen Cove NY 11542**
(Address of principal executive offices)

**(866) 668-2188**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a -12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d -2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e -4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| N/A | N/A | N/A |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02 – Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Change in Officers and Director Resignation*

On December 27, 2022, Justin Smith was removed as a member of the Board of Directors of Healthcare Solutions Management Group, Inc. (the "Company") effective immediately. Mr. Smith was previously appointed on April 15, 2021 as the Executive Chairman and member of the Board of Directors of the Company. Mr. Smith's removal was as a result of the Company's desire to reduce costs and increase internal efficiency and was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

On February 9, 2023. Mr. Smith was let go as the Company's Interim Chief Executive Officer and Interim Chief Financial Officer. Mr. Smith was previously appointed as the Company's Interim Chief Executive Officer and  Interim Chief Financial Officer On April 15, 2021. Mr. Smith was let go as a result of the Company's desire to reduce costs and increase internal efficiency and not as a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

On February 9, 2023, Jonathan Loutzenhiser the Company's Executive Vice President and a member of the Company's Board of Directors, agreed to act as the Company's Interim Chief Executive Officer and Interim Chief Financial Officer.  Jonathan Loutzenhiser, age 36, was previously appointed as Executive Vice President of the Company and a member of the Board of Directors of the Company on April 15, 2021. From 2013 to 2014 Mr. Loutzenhiser worked as a sports agent at Recruiting. From 2015 to 2016, Mr. Loutzenhiser served as the Chief Executive Officer at Mediplex. From 2016 to 2017, Mr. Loutzenhiser was the President of IneedMD. He serves as the Executive Vice President of Healthcare Solutions Holdings, Inc, the Company's wholly owned subsidiary ("HSH") and a member of the Board of Directors of HSH since he was appointed to such positions on October 1, 2017 and holds this position to date. Mr. Loutzenhiser graduated from Grace University with a degree in business management in 2012.

*Separation and Release Agreement*

On February 9, 2023,  the Company entered into a Separation, Release of Claims and Non-Disclosure Agreement (the "Agreement') with Justin Smith. Pursuant to the Agreement, it was agreed that the investment of $93,933,345.48 (the "Landes Investment") which was made in HSH, by Landes Capital Management LLC and Landes and Compagnie Trust Prive KB (collectively referred to herein as "Landes") which Mr. Smith also serves as the Managing Director of, will be returned to Landes in exchange for Landes returning to the Company the 1,000,000 shares of the Company's common stock  that were issued to Landes in connection to the Landes Investment.

The Agreement also contains a general release by Mr. Smith of the Company as well as its parents, subsidiaries, corporate affiliates, employees, officers, directors, owners, shareholders and agents, individually and in their official capacities. The Agreement also contains a general release by the Company of Mr. Smith.  Additionally, the Agreement also provides that the Company agrees to indemnify Mr. Smith in connection with any litigation arising out of any action, suit or proceeding by reason of his service as an executive with the Company. Further, pursuant to the Agreement, Mr. Smith agreed to keep confidential, the "Confidential Information" of the Company as such term is defined in the Agreement.

Additionally, pursuant to the Agreement, in the event of a material breach by Mr. Smith of any of the provisions of the Agreement, Mr. Smith agreed that the Company will be entitled to seek, in addition to other available remedies, an award for liquidated damages in an amount equal to $100,000.00 for each material breach. Pursuant to the Agreement, the Company agreed that in the event of a material breach by the Company  of any of the provisions of the Agreement, Mr. Smith will be entitled to seek, in addition to other available remedies, an award for liquidated damages in an amount equal to $100,000.00 for each material breach.

The foregoing description of the Agreement does not purport to be complete and is qualified in its entirety by reference to the Agreement, which is filed as Exhibit 10.1 hereto and is incorporated by reference herein.

**Item 9.01 – Financial Statement and Exhibits.**

**(d) Exhibits**

The following exhibits are filed with this report:

| Exhibit No. | Description |
| --- | --- |
| 10.1* | Separation Agreement dated February 9, 2023. |

| 104* | Cover Page Interactive Data File (formatted as Inline XBRL) |

---

\*    Filed herewith.

2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Healthcare Solutions Management Group, Inc**

Date: February 14, 2023

/s/ *Jonathan Loutzenhiser*
_____
Jonathan Loutzenhiser
Interim Chief Executive Officer and Interim Chief Financial Officer

3

**EXHIBIT 10.1**

**Separation, Release of Claims, and Non-Disclosure Agreement**

This Separation Release of Claims and Non-Disclosure Agreement ("**Agreement**") is entered into by and between Healthcare Solutions Holdings Group Inc (the "Employer"), on behalf of itself, its parent(s), subsidiaries, and other corporate affiliates, and employees, officers, directors, owners, shareholders, and agents, individually and in their official capacities, including but not limited to Josh Constantin, Jonathan Loutzenheiser, and Stuart McMahen (collectively referred to as the "**Employer Group**"), and Justin Smith the Chief Financial Officer and Interim Chief Executive Officer (the "**Executive**"), residing at 1346 Iroquois Avenue, Mayfield Heights, Ohio 44124 (the Employer and the Executive are collectively referred to as the "**Parties**"). As of February 9, 2023 (the "**Execution Date**"), the Executive has been terminated and is no longer entitled to any benefit of his employment, however this does not relieve him of his fiduciary duty owed to the company and its shareholders.

The Employee's last day of employment with the Employer is/was DATE (the "**Separation Date**"). After the Separation Date, the Executive will not represent and has not represented himself as being an employee, officer, attorney, agent, or representative of the Employer for any purpose. Except as otherwise set forth in this Agreement, the Separation Date is/was the employment cessation date for the Executive for all purposes, meaning the Executive is not entitled to any further compensation, monies, or other benefits from the Employer Group, including coverage under any benefit plans or programs sponsored by the Employer Group, as of the Separation Date.

Both parties agree that as per the terms of the Executives employment with the employer, which was predicated on an investment of $93,933,345.48, by Landes Capital Management LLC and Landes and Compagnie Trust Prive KB (known collectively herein as "Landes") which Executive also serves as the Managing Director of, the Landes Investment shall be returned. Both parties, and Landes, here by agree that the investment of $93,933,345.48 is hereby reversed and the capital shall be returned to Landes in exchange for 1,000,000 founder shares of the Employer that were issued in connection to this investment.

The Executive agrees to not seek future employment with the Employer.

    1. <u>Return of Property</u>. By March 1, 2023, the Executive must return and the Executive warrants and represents that the Executive has returned all Employer group property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other Employer group property in the Employee's possession. Executive further acknowledges and agrees that Executive no longer has access to and does not claim ownership of any of Employer group's cloud storage or social media accounts.

2.  <u>Executive Representations</u>. The Executive specifically represents, warrants, and confirms that the Employee:

(a) has not filed, nor has any reason to file, any claims, complaints, or actions of any kind against the Employer Group with any federal, state, local court, government, administrative, or regulatory agency;

(b) has not made, nor has any reason to make, any claims or allegations to the Employer Group related to discrimination, sexual harassment, or sexual abuse, and that none of the payments set forth in this Agreement are related to discrimination, sexual harassment, or sexual abuse;

(c) has been properly paid for all hours worked for the Employer Group and;

(d) has received all salary, wages, commissions, bonuses, and other compensation due to the Employee, including the Employee's final payroll check for salary/wages through and including the Separation Date; and

(e) has not engaged, nor observed, nor has any information pertaining to any member of the Employer Group, in any unlawful conduct relating to the business of the Employer Group. If any of these statements are not true, the Executive must describe in detail all occurrences of such conduct in Exhibit A attached here to and incorporated into this document.

(f)

If any of these statements are not true and are not disclosed in Exhibit A, the Executive cannot sign this Agreement and must notify the Employer immediately in writing of the statements that are not true.

2

3. <u>Release</u>.

    (a) Employee's General Release and Waiver of Claims

        In exchange for the consideration provided in this Agreement, the Executive and the Employee's heirs, executors, representatives, administrators, agents, insurers, and assigns (collectively, the "**Releasors**") irrevocably and unconditionally fully and forever waive, release, and discharge the Employer Group, including the Employer's/each member of the Employer Group's parents, subsidiaries, affiliates, predecessors, successors, and assigns, and each of its and their respective officers, directors, employees, shareholders, trustees, and partners including but not limited to Josh Constantin, Jonathan Loutzenhiser and Stuart McMahen in their corporate and individual capacities (collectively, the "**Released Parties**"), from any and all claims, demands, actions, causes of actions, judgments, rights, fees, damages, debts, obligations, liabilities, and expenses (inclusive of attorneys' fees) of any kind whatsoever, whether known or unknown (collectively, "**Claims**"), that Releasors may have or have ever had against the Released Parties, or any of them, arising out of, or in any way related to the Employee's hire, benefits, employment, termination, or separation from employment with the Employer Group by reason of any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter from the beginning of time up to and including the date of the Employee's execution of this Agreement, including, but not limited to:

        (i) any and all claims under Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA) (regarding existing but not prospective claims), the Fair Labor Standards Act (FLSA), the Equal Pay Act, the Executive Retirement Income Security Act (ERISA) (regarding unvested benefits), the Civil Rights Act of 1991, Section 1981 of U.S.C. Title 42, the Fair Credit Reporting Act (FCRA), the Worker Adjustment and Retraining Notification (WARN) Act, the National Labor Relations Act (NLRA), the Age Discrimination in Employment Act (ADEA), the Uniform Services Employment and Reemployment Rights Act (USERRA), the Genetic Information Nondiscrimination Act (GINA),, the Immigration Reform and Control Act (IRCA), the New York State Human Rights Law (NYSHRL), the New York Labor Law (NYLL) (including but not limited to the Retaliatory Action by Employers Law, the New York State Worker Adjustment and Retraining Notification Act, all provisions prohibiting discrimination and retaliation, and all provisions regulating wage and hour law), the New York Civil Rights Law, Section 125 of the New York Workers' Compensation Law, Article 23-A of the New York Correction Law, the New York City Human Rights Law (NYCHRL), and the New York City Earned Sick Leave Law (NYCESLL) all including any amendments and their respective implementing regulations, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released; however, the identification of specific statutes is for purposes of example only, and the omission of any specific statute or law shall not limit the scope of this general release in any manner;

3

(ii) any and all claims for compensation of any type whatsoever, including but not limited to claims for salary, wages, bonuses, commissions, incentive compensation, vacation, and severance that may be legally waived and released;

(iii) any and all claims arising under tort, contract, and quasi-contract law, including but not limited to claims of breach of an express or implied contract, tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, promissory estoppel, detrimental reliance, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm, wrongful or retaliatory discharge, fraud, defamation, slander, libel, false imprisonment, and negligent or intentional infliction of emotional distress; and

(iv) any and all claims for monetary or equitable relief, including but not limited to attorneys' fees, back pay, front pay, reinstatement, experts' fees, medical fees or expenses, costs and disbursements, punitive damages, liquidated damages, and penalties; and

(v) indemnification rights the Executive has against the Employer Group.

However, this general release and waiver of claims excludes, and the Executive does not waive, release, or discharge: (A) any right to file an administrative charge or complaint with, or testify, assist, or participate in an investigation, hearing, or proceeding conducted by, the Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or other similar federal, state, or local administrative agencies, although the Executive waives any right to monetary relief related to any filed charge or administrative complaint; and (B) claims that cannot be waived by law, such as claims for unemployment benefit rights and workers' compensation; and (C) indemnification rights the Executive has against the Employer; and (D) any right to file an unfair labor practice charge under the National Labor Relations Act or the Employee's rights under a collective bargaining agreement without processes; and (E) protections against retaliation under the Taxpayer First Act (26 U.S.C. § 2623(d)); and (F) any rights to vested benefits, such as pension or retirement benefits, the rights to which are governed by the terms of the applicable plan documents and award agreements.

If the Executive applies for unemployment benefits, the Employer Group shall not actively contest it. However, the Employer Group will respond truthfully, completely, and timely to any inquiries by the New York or any other state Department of Labor concerning the separation of Executive's employment.

4

(b) Specific Release of ADEA Claims

In further consideration of the benefits provided to the Executive in this Agreement, the Releasors hereby irrevocably and unconditionally fully and forever waive, release, and discharge the Released Parties from any and all Claims, whether known or unknown, from the beginning of time through the date of the Employee's execution of this Agreement, arising under the Age Discrimination in Employment Act (ADEA), as amended, and its implementing regulations. By signing this Agreement, the Executive hereby acknowledges and confirms that:

(i) the Executive has read this Agreement in its entirety and understands all of its terms;

(ii) by this Agreement, the Executive has been advised in writing to consult with an attorney of the Employee's choosing and has consulted with such counsel as the Executive believed was necessary before signing this Agreement;

(iii) the Executive knowingly, freely, and voluntarily agrees to all of the terms and conditions set out in this Agreement including, without limitation, the waiver, release, and covenants contained in it;

(iv) the Executive is signing this Agreement, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which the Executive is otherwise entitled;

(v) the Executive understands that the Executive has seven (7) days after signing this Agreement to revoke the release in this paragraph by delivering notice of revocation to Josh Constantin at the Employer Group, by email/ overnight delivery before the end of this seven-day period; and

(vi) the Executive understands that the release contained in this paragraph does not apply to rights and claims that may arise after the Executive signs this Agreement.

5

(c) Employer Group Release of Employee

In exchange for the Releasors' waiver and release of claims against the Released Parties, and non-revocation of any portion of that release, the Employer Group expressly waives and releases any and all claims against the Executive that may be waived and released by law with the exception of claims arising out of or attributable to:

(i) events, acts, or omissions taking place after the Parties' execution of the Agreement;

(ii) the Employee's breach of any terms and conditions of the Agreement; and (iii) the Employee's criminal activities or intentional misconduct occurring during the Employee's employment with the Employer Group.

4. <u>Knowing and Voluntary Acknowledgment</u>. The Executive specifically agrees and acknowledges that:

(a) the Executive has read this Agreement in its entirety and understands all of its terms;

(b) by this Agreement, the Executive has been advised to consult with an attorney before executing this Agreement and has consulted with such counsel as the Executive believed was necessary before signing this Agreement;

(c) the Executive knowingly, freely, and voluntarily assents to all of this Agreement's terms and conditions including, without limitation, the waiver, release, and covenants contained in it;

(d) the Executive is signing this Agreement, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which the Executive is otherwise entitled;

(e) the Executive is not waiving or releasing rights or claims that may arise after the Executive signs this Agreement; and

(f) the Executive understands that the waiver and release in this Agreement is being requested in connection with the Executive's separation of employment from the Employer Group.

The Executive further acknowledges that the Executive is waiving and releasing claims under the Age Discrimination in Employment Act (ADEA), as amended, and has had twenty-one (21)/forty-five (45) days to consider the terms of this Agreement and consult with an attorney of the Employee's choice, although the Executive may sign it sooner if desired and changes to this Agreement, whether material or immaterial, do not restart the 21/45-day period. Further, the Executive acknowledges that the Executive shall have an additional seven (7) days from signing this Agreement to revoke consent to Employee's release of claims under the ADEA by delivering notice of revocation to Josh Constantin at the Employer Group, by email/overnight delivery before the end of the seven-day period. In the event of a revocation by the Employee, this Agreement shall be null and void in its entirety/Employer Group shall have the option of treating this Agreement as null and void in its entirety.

6

Effective Date. This Agreement, insofar as the ADEA release, shall not become effective until the eighth (8th) day after the Executive signs, without revoking, this Agreement ("**Effective Date**").

5. <u>Post-Separation Obligations and Restrictive Covenants</u>.

(a) Acknowledgment

The Executive understands and acknowledges that by virtue of the Employee's employment with the Employer Group, the Executive had access to and knowledge of Confidential Information, was in a position of trust and confidence with the Employer Group, and benefitted from the Employer Group's goodwill. The Executive understands and acknowledges that the Employer Group invested significant time and expense in developing the Confidential Information and goodwill. The Executive further understands and acknowledges that the intellectual/artistic/proprietary or trade secrets remain the property of the Employer Group.

The Executive further understands and acknowledges that the restrictive covenants below are necessary to protect the Employer Group's legitimate business interests in its Confidential Information and goodwill and in the Employee's unique, special, or extraordinary services. The Executive further understands and acknowledges that the Employer Group's ability to reserve these for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer Group and that the Employer Group would be irreparably harmed if the Executive violates the restrictive covenants below.

(b) Confidential Information

The Executive understands and acknowledges that during the course of employment with the Employer, the Executive has had access to and learned about confidential, secret, and proprietary documents, materials, and other information, in tangible and intangible form, of and relating to the Employer Group and its businesses and existing and prospective customers, suppliers, investors, and other associated third parties ("**Confidential Information**"). The Executive further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Executive may cause the Employer to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages, and criminal penalties.

7

For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, algorithms, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, Executivelists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Employer Group or its businesses or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

The Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Executive understands and agrees that Confidential Information developed by the Executive in the course of the Employee's employment by the Employer is subject to the terms and conditions of this Agreement as if the Employer furnished the same Confidential Information to the Executivein the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that the disclosure is through no direct or indirect fault of the Executive or person(s) acting on the Employee's behalf.

8

(c) Disclosure and Use Restrictions.

(i) Executive Covenants. The Executive agrees and covenants:

(A) to treat all Confidential Information as strictly confidential;

(B) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer Group) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of any of the Employee's remaining authorized employment duties to the Employer and only after execution of a confidentiality agreement by the third party with whom Confidential Information will be shared or with the prior consent of an authorized officer acting on behalf of the Employer Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and

(C) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Employer Group, except as allowed by applicable law, as required in the performance of any of the Employee's remaining authorized employment duties to the Employer, or with the prior written consent of an authorized officer acting on behalf of the Employer Group (and then, such disclosure shall be made only within the limits and to the extent of such law, duties, or consent).

The Executive understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately and shall continue during and after the Employee's employment by the Employer until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Executive or on the Employee's behalf.

9

(ii) Permitted Disclosures. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required a subpoena or court order. The Executive shall promptly provide written notice of any such order to an authorized officer of the Employer Group.

The Executive hereby represents that he has no first-hand knowledge or information regarding any conduct, act, or omission that would constitute a violation of any law, statute, code, or regulation enacted by the federal government, its agencies, departments, or regulatory agencies. In the event the Executive makes any complaint or accusation of wrongdoing to any governmental agency, authority, department, or enforcement arm and an investigation is initiated and ultimately concluded in the Employer Group's favor, the Executive shall be responsible for all associated costs including but not limited to all attorney fees and the Executive hereby indemnifies the Employer Group for said costs. The Executive also agrees to pay as liquidated damages to the Employer Group in the amount of $100,000.00 as reasonable compensation for loss of good will and reputational harm in the commercial community and the expenditure of time and resources defending a false claim made by the employee.

(iii) Notice of Immunity Under the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement:

(A) The Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(B) If the Executive files a lawsuit for retaliation by the Employer for reporting a suspected violation of law, the Executive may disclose the Employer's trade secrets to the Employee's attorney and use the trade secret information in the court proceeding if the Employee: (1) files any document containing the trade secret under seal; and (2) does not disclose the trade secret, except pursuant to court order.

10

6. <u>Non-Disparagement</u>. The Executive agrees and covenants that the Executive shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory/or maliciously false, or disparaging remarks, comments, or statements concerning the Employer Group or its businesses, or any of its employees, officers, or directors and its/their existing and prospective customers, suppliers, investors, and other associated third parties, now or in the future.

7. <u>Indemnification of the Executive.</u> The Company agrees to indemnify Executive (and his heirs, executors, and administrators), and to advance expenses related to this indemnification, to the fullest extent permitted under applicable law and regulations, against any and all expenses and liabilities that Executive reasonably incurs in connection with or arising out of any action, suit, or proceeding in which he may be involved by reason of his service as an Executive of the Company or any of its subsidiaries or Affiliates (whether or not he continues to be an Executive at the time of incurring any such expenses or liabilities). Covered expenses and liabilities include, but are not limited to, judgments, court costs, and attorneys' fees and the costs of reasonable settlements, subject to Board approval, if the action is brought against Executive in his capacity as an Executive of the Company or any of its subsidiaries or Affiliates. Company shall, to the extent permitted by the Bylaws of the Company, in a manner as applied to other officers of the Company, indemnify, protect and hold the Executive harmless from and against any expenses, including reasonable attorneys' fees and expenses, claims, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding arising out of, or related to, the Executive's employment by the Company or any of its Subsidiaries. In the event the Company acquires a directors and officers liability insurance policies than the Company shall cause the Executive to be covered under the directors and officers liability insurance policies in reasonable amounts in accordance with the Company's standard corporate policies. The obligations of this Release will survive the term of this Agreement by a period of seven (7) years.

1. Indemnification shall extend to all known and yet known investigations and/or litigation, including but not limited to any actions brought forth by the Securi5es and Exchange Commission, the United States Department of Labor, the Illinois Department of Labor, the New York Department of Labor and the Tennessee Department of Labor.

8. <u>Confidentiality of Agreement</u>. The Executive agrees and covenants that the Executive shall not disclose any of the negotiations of, terms of, or amount paid under this Agreement to any individual or entity; provided, however, that the Executive will not be prohibited from making disclosures to the Employee's spouse or domestic partner, attorney, tax advisors, or as may be required by law provided such disclosure is pursuant to a court order or judicial subpoena.

11

2/18/23, 5:24 PM    hsmg_ex101.htm

9. <u>Remedies</u>. In the event of a breach or threatened breach by the Executive of provision of this Agreement, Executive hereby consents and agrees that money damages would not afford an adequate remedy and that Employer shall be entitled to seek a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not instead of, legal remedies, monetary damages, or other available relief.

In the event of a material breach by the Executive of any of the provisions of this Agreement, the Executive hereby acknowledges and agrees that the Employer shall be entitled to seek, in addition to other available remedies, an award for liquidated damages in an amount equal to $100,000.00 for each material breach (the "**Liquidated Damages**"). The parties acknowledge and agree that the employee's harm caused by a material breach would be impossible or very difficult to accurately estimate at the time of the breach and that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from a material breach.

If the Executive fails to comply with any of the terms of this Agreement or post-employment obligations contained in it, the Employer may, in addition to any other available remedies, reclaim any amounts paid to the Executive under the provisions of this Agreement and terminate any benefits or payments that are later due under this Agreement, without waiving the releases provided in it.

In the event of a breach or threatened breach by the Employer of provision of this Agreement, Employer hereby consents and agrees that money damages would not afford an adequate remedy and that Executive shall be entitled to seek a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages , and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not instead of, legal remedies, monetary damages, or other available relief.

In the event of a material breach by the Employer of any of the provisions of this Agreement, the Employer hereby acknowledges and agrees that the Executive shall be entitled to seek, in addition to other available remedies, an award for liquidated damages in an amount equal to $100,000.00 for each material breach (the "**Liquidated Damages**"). The parties acknowledge and agree that the employee's harm caused by a material breach would be impossible or very difficult to accurately estimate at the time of the breach and that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from a material breach.

12

The Parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

10. <u>Successors and Assigns</u>.

    (a) Assignment by the Employer Group

        The Employer Group may freely assign this Agreement at any time. This Agreement shall inure to the benefit of the Employer Group and its successors and assigns.

    (b) No Assignment by the Employee

        The Executive may not assign this Agreement in whole or in part. Any purported assignment by the Executive shall be null and void from the initial date of the purported assignment.

11. <u>Governing Law, Jurisdiction, and Venue</u>. This Agreement and all matters arising out of or relating to this Agreement and the Executive's employment or separation , whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with the laws of New York (including its statutes of limitations) without regard to any conflicts of laws principles that would require the laws of any other jurisdiction to apply. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought in any federal, state or local court located in the United States of America. The Parties hereby irrevocably submit to the non-exclusive jurisdiction of these courts and waive the defense of inconvenient forum to the maintenance of any action or proceeding in such venue.

12. <u>Entire Agreement</u>. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Employer Group and Executive relating to the subject matter hereof separation of Justin Smith and supersedes all prior and contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, regarding such subject matter.

13. <u>Modification and Waiver</u>. No provision of this Agreement may be amended or modified unless the amendment or modification is agreed to in writing and signed by the Executive and by Josh Constantin/an authorized representative of the Employer. No waiver by either Party/any Party of any breach by the/any other party of any condition or provision of this Agreement to be performed by other Party shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either/any Party in exercising any right, power, or privilege under this Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

13

14. <u>Severability</u>. If any provision of this Agreement is found by a court or arbitral authority of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, or enforceable only if modified, such finding shall not affect the validity of the remainder of this Agreement, which shall remain in full force and effect and continue to be binding on the Parties.

The Parties further agree that any such court is expressly authorized to modify any such invalid, illegal, or unenforceable provision of this Agreement instead of severing the provision from this Agreement in its entirety, whether by rewriting, deleting, or adding to the offending provision, or by making such other modifications as it deems necessary to carry out the intent and agreement of the Parties as embodied in this Agreement to the maximum extent permitted by law.

Any such modification shall become a part of and treated as though originally set forth in this Agreement. If such provision or provisions are not modified, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth in it. The Parties expressly agree that this Agreement as so modified by the court or arbitral authority shall be binding on and enforceable against each of them.

15. <u>Interpretation</u>. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph. Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

16. <u>Counterparts</u>. The Parties may execute this Agreement in counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original of this Agreement.

17. <u>No Admission of Liability</u>. Nothing in this Agreement shall be construed as an admission by the Executive or the Employer Group of any wrongdoing, liability, or noncompliance with any federal, state, city, or local rule, ordinance, statute, common law, or other legal obligation.

14

18. <u>Notices</u>. All notices under this Agreement must be given in writing by personal delivery/regular mail/receipted email at the addresses indicated in this Agreement or any other address designated in writing by either Party.

19. <u>Tolling</u>. If the Executive violates any of the post-separation obligations in this Agreement, the obligation at issue will run from the first date on which the Executive ceases to be in violation of such obligation.

2. If the Employer violates any of the post-separation obligations in this Agreement, the obligation at issue will run from the first date on which the Employer ceases to be in violation of such obligation.

20. <u>Attorneys' Fees and Costs</u>. If the Executive breaches any terms of this Agreement or the post-separation obligations articulated/referenced in it, to the extent authorized by New York law, the Executive will be responsible for payment of all reasonable attorneys' fees and costs that Employer incurred in the course of enforcing the terms of this Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

21. <u>Section 409A</u>. This Agreement is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (Section 409A), including the exceptions thereto, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service, as a short-term deferral, or as a settlement payment pursuant to a bona fide legal dispute shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, any installment payments provided under this Agreement shall each be treated as a separate payment. To the extent required under Section 409A, any payments to be made under this Agreement in connection with a separation of employment shall only be made if such separation constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, Employer Group makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall Employer Group be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executiveon account of non-compliance with Section 409A.

22. <u>Notice of Post-Separation Obligations</u>. When the Executive's employment with the Employer ceases, the Executive agrees to notify any subsequent employer of the restrictive covenants contained/referenced in this Agreement. In addition, the Executive authorizes the Employer Group to provide a copy of the restrictive covenants contained/ referenced in this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employer.

23. <u>Acknowledgment of Full Understanding</u>. THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT THE EXECUTIVEHAS FULLY READ, UNDERSTANDS, AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE ECUTIVE ACKNOWLEDGES AND AGREES THAT THE EXECUTIVEHAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT. THE EXECUTIVEFURTHER ACKNOWLEDGES THAT THE EMPLOYEE'S SIGNATURE BELOW IS AN AGREEMENT TO RELEASE EMPLOYER GROUP FROM ANY AND ALL CLAIMS THAT CAN BE RELEASED AS A MATTER OF LAW.

SIGNATURE PAGE FOLLOWS

16

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Execution Date above.

17

HEALTHCARE SOLUTIONS

By:    /s/ Jonathan Loutzenhiser
Name: Jonathan Loutzenhiser
Title: _____

EXECUTIVE

Signature: /s/ Justin Smith
Print
Name:    JUSTIN SMITH

LANDES CAPITAL MANAGEMENT LLC

Signature: /s/ Justin Smith
Print
Name:    JUSTIN SMITH
Managing Director

18

# EXHIBIT 19

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended September 30, 2021**

Or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 333-147367

# HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 38-3767357 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **3 School St, Suite 303, Glen Cove NY** | **11542** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (866) 668-2188

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐ Yes ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☐ Yes ☒ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☐ Yes ☒ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated Filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.) Yes ☐ No ☒

The aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates on March 31, 2021 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $1,578,929, computed by reference to the closing sales price of the shares of common stock on March 31, 2021, which was $0.124. The closing sales price and number of shares used to calculate the amount in the aforementioned sentence were as of March 31, 2021, and were not adjusted for the registrant's 1 for 115 reverse stock split, which was effective on October 29, 2021.

The number of shares outstanding of the registrant's common stock as of May 31, 2022, was 92,214,638 shares.

DOCUMENTS INCORPORATED BY REFERENCE — NONE

**TABLE OF CONTENTS**

**FORM 10-K**

|  |  | PAGE NO. |
|---|---|---|
| **PART I** |  |  |
| Item 1. | Business. | 3 |
| Item 1A. | Risk Factors. | 21 |
| Item 1B. | Unresolved Staff Comments. | 32 |
| Item 2. | Properties. | 32 |
| Item 3. | Legal Proceedings. | 32 |
| Item 4. | Mine Safety Disclosures. | 33 |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 34 |
| Item 6. | [Reserved] | 37 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations. | 38 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. | 41 |
| Item 8. | Financial Statements and Supplementary Data. | 41 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure. | 41 |
| Item 9A. | Controls and Procedures. | 42 |
| Item 9B. | Other Information. | 43 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections. | 43 |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance. | 44 |
| Item 11. | Executive Compensation. | 47 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 49 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence. | 51 |
| Item 14. | Principal Accounting Fees and Services. | 51 |
| **PART IV** |  |  |
| Item 15. | Exhibits, Financial Statement Schedules. | 52 |
| Item 16. | Form 10-K Summary. | 55 |
|  | Signatures. | 56 |

2

*Table of Contents*

**Part I**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Information contained in this annual report on Form 10-K contains "forward-looking statements." These forward-looking statements are contained principally in the sections titled "Business," and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and are generally identifiable by use of the words "may," "will," "should," "expect," "anticipate," "estimate," "believe," "intend" or "project" or the negative of these words or other variations on these words or comparable terminology. The forward-looking statements herein represent our expectations, beliefs, plans, intentions or strategies concerning future events, including, but not limited to: our future financial performance; the continuation of historical trends; the sufficiency of our resources in funding our operations; our intention to engage in mergers and acquisitions; and our liquidity and capital needs. Our forward-looking statements are based on assumptions that may be incorrect, and there can be no assurance that any projections or other expectations included in any forward-looking statements will come to pass. Moreover, our forward-looking statements are subject to various known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from future results, performance or achievements expressed or implied by any forward-looking statements. These risks, uncertainties and other factors include but are not limited to: the risks of limited management, labor and financial resources; our ability to establish and maintain adequate internal controls; our ability to develop and maintain a market in our securities; and our ability obtain financing, if and when needed, on terms that are acceptable. Except as required by applicable laws, we undertake no obligation to update publicly any forward-looking statements for any reason, even if new information becomes available or other events occur in the future.

As used in this annual report on Form 10-K, "HSMG," "we", "our", "us" and the "Company" refer to Healthcare Solutions Management Group, Inc., a Delaware corporation and its subsidiaries unless the context requires otherwise.

**Item 1. Business.**

**Organizational History of the Company and Business Overview**

Healthcare Solutions Management Group, Inc., a Delaware corporation, and successor in interest to Verity Delaware Inc., a Delaware corporation which was previously a Nevada corporation named Verity Corp. was incorporated on April 11, 2006 in the state of Nevada under the name Infrared Systems, International.

3

*Table of Contents*

On December 31, 2012, AquaLiv Technologies, Inc. ("ALTI") and Verity Farms II, Inc. ("Verity Farms"), a South Dakota corporation, entered into a Share Exchange Agreement. Pursuant to the Share Exchange Agreement, ALTI acquired 100% of the authorized and issued shares of Verity Farms in exchange (the "Exchange") for 4,850,000 shares of Series B Convertible Preferred Stock, par value $0.001 of ALTI, representing approximately 86% of the outstanding shares of ALTI, on a fully diluted basis, assuming conversion into common stock. As a result of the Exchange and the other transactions contemplated thereunder, Verity Farms became a wholly owned subsidiary of ALTI and ALTI acquired Verity Farms' business operations. ALTI was formed under the laws of the State of Nevada on April 11, 2006 originally under the name of Infrared Systems International "ISI" as a wholly owned subsidiary of China Sxan Biotech, Inc. ("CSBI") (then known as Advance Technologies, Inc.) to pursue a narrowly defined business objective called infrared security systems.

On April 1, 2013, the Company changed its name from AquaLiv Technologies Inc. to Verity Corp. and our stock symbol changed to VRTY. The Company was the parent of Verity Farms and Aistiva Corporation ("Aistiva") (f/k/a AquaLiv, Inc.). Verity Farms was dedicated to providing consumers with safe, high-quality, and nutritious food sources through sustainable crop and livestock production. Aistiva previously released products in the industries of water treatment, skincare, and agriculture. Verity Farms was administratively dissolved in the State of South Dakota on May 4, 2018. Aistiva was administratively dissolved on April 9, 2015, in the State of Washington.

In February 2016, all of the Company's officers and directors resigned, and the Company stopped substantially all operating activities. At such time, the Company became a "shell company," as such term is defined in Rule 12b-2 under the Exchange Act.

On November 5, 2020, we changed our Fiscal Year End from June 30 to September 30. As a result of this change, we filed a Transition Report on Form 10-K with the SEC for the three-month transition period from June 30, 2020 to September 30, 2020 on January 20, 2021.

As a result of the consummation of the Merger, as such term is defined below, on April 15, 2021, Healthcare Solutions Holdings, Inc., a Delaware corporation ("HSH"), became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. Accordingly, the Company ceased to be a shell company as of April 15, 2021.

***Merger with Healthcare Solutions Holdings, Inc.***

On June 14, 2019, the Company entered into a Merger Agreement (the "Merger Agreement") by and between the Company, Verity Merger Corp., a wholly-owned subsidiary of the Company and a Delaware corporation (the "Merger Sub"), and Healthcare Solutions Holdings, Inc., a Delaware corporation ("HSH"). Pursuant to the terms of the Merger Agreement, the parties agreed that Merger Sub would merge with and into HSH, with HSH being the surviving entity and becoming a wholly-owned subsidiary of the Company (the "Merger"). The Merger closed on April 15, 2021 (the "Closing"), at which time Merger Sub merged with and into HSH with HSH being the surviving entity, and HSH became our wholly owned subsidiary. As a result of the consummation of the Merger, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward.

4

Table of Contents

At the Closing of the Merger, Robert Stevens (the "Receiver") appointed new officers and directors of the Company. As consideration for the services of the Receiver and his team, for acting as the court-appointed receiver for the Company and its predecessor and affiliated entities, and pursuant the Merger Agreement, as amended, in August of 2020, the Receiver and certain entities, as directed by the Receiver, were issued an aggregate total of 114,599,754 pre-reverse split shares of the Company's common stock. At Closing, the aggregate Merger consideration paid to the holders of the HSH common was 1,145,997,555 pre-reverse split shares of the Company's common stock constituting 90% of the issued and outstanding shares of Company common stock immediately following the Closing.

As a result of the consummation of the Merger, on April 15, 2021, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. Accordingly, at the Closing, the Company ceased to be a shell company as of April 15, 2021.

In connection with the Merger, the Company appointed new officers and directors as described below.

On April 15, 2021, Justin Smith was appointed as the Company's Interim Chief Executive Officer, Interim Chief Financial Officer and as the Executive Chairman and member of the Board of Directors of the Company.

On April 15, 2021, Dr. Charles Balaban was appointed as a member of the Board of Directors of the Company.

On April 15, 2021, Jonathan Loutzenhiser was appointed as Executive Vice President of the Company and a member of the Board of Directors of the Company.

On April 15, 2021, Dr. Joseph Asuncion was appointed as a member of the Board of Directors of the Company and as the Company's Chief Medical Officer.

On April 15, 2021, Dr. Sadeem Mahmood was appointed as the Company's Chief of Surgery.

On April 15, 2021, Dr. Richard F. Wittock was appointed as the Company's Vice President of Clinical Affairs.

On April 15, 2021, Dr. Richard Muckerman was appointed as the Company's Vice President of Strategy and Business Development.

On April 15, 2021, Blake Moorman was appointed as the Company's Vice President of Operations.

On April 15, 2021, Robert Stevens resigned from all of his positions with the Company. The foregoing resignation was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices.

### *Prior Receivership*

The Company was previously in receivership. On May 16, 2016, pursuant to Case Number A16-733815-B, Nevada's 8th Judicial District, Business Court, appointed Robert Stevens as receiver (the "Receiver") for the Company. Creditors of the Company were required to provide claims in writing under oath on or before November 3, 2016, or they would be barred under Nevada Revised Statute §78.675. Since May 16, 2016, through the date of the Merger, the Company was operating under the direction of the Receiver. On March 5, 2018, the District Court in Clark County, Nevada approved a plan of reorganization for the Company and the discharge of the Receiver upon completion of his duties under the court order. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action was needed by the Receiver or the Company in connection with the receivership, and such that Company was no longer in receivership.

5

Table of Contents

*Change of Domicile and Plan of Conversion*

On March 15, 2019, Healthcare Solutions Management Group, Inc. was incorporated in the State of Delaware. Verity Delaware, Inc. was incorporated in the State of Delaware on March 11, 2019. Verity Merger Corp. was incorporated in the State of Delaware on March 15, 2019. On March 11, 2019, pursuant to an Agreement and Plan of Conversion, the Company, then a Nevada corporation named Verity Corp., converted into, and became Verity Delaware, Inc., a Delaware corporation in Delaware and on May 30, 2019, the conversion was completed in Nevada. As a result of the foregoing, Verity Corp. a Nevada corporation converted into and became Verity Delaware, Inc., a Delaware corporation. On May 8, 2019, pursuant to a Plan of Merger, Verity Delaware, Inc. was merged with and into Verity Merger Corp., with Verity Merger Corp. surviving, and with Healthcare Solutions Management Group, Inc. becoming a successor in interest to Verity Delaware Inc. and the parent company of Verity Merger Corp.

*Change in Fiscal Year End*

On November 5, 2020, the Company's court appointed receiver, acting under judicial order on behalf of the Board of Directors of the Company, in accordance with the Company's Bylaws, acted by written consent to change the Company's Fiscal Year End from June 30 to September 30. As a result of this change, we filed a Transition Report on Form 10-K for the three-month transition period from June 30, 2020 to September 30, 2020 on January 20, 2021.

*Impact of COVID-19*

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a global pandemic which continued to spread throughout the U.S. and the globe. In addition to the devastating effects on human life, the pandemic is continuing to have a negative ripple effect on the global economy, leading to disruptions and volatility in the global financial markets. There are no comparable events that provide guidance as to the effect the COVID-19 pandemic may have, and, as a result, the ultimate effect of the pandemic is highly uncertain and subject to change. COVID-19 has already hindered or slowed many of HSH's businesses, including but not limited to our growth and growth strategies, developments in the marketplace for products, therapies and services, financial results, research and development strategy, regulatory approvals, and competitive strengths. The direct or indirect impact of COVID-19 on our business, results of operations and/or financial condition, continues today, but HSH has thus far weathered the pandemic storm and continues to seek to improve our level of service and patient care. The extent of the ultimate impact of the pandemic on the Company's operational and financial performance will depend on various developments, including the duration and continued spread of the outbreak, which cannot be reasonably predicted at this time. Accordingly, while management reasonably expects the COVID-19 outbreak to negatively impact the Company, the related consequences and duration are highly uncertain and cannot be predicted at this time.

*Overview of Our Business Operations*

We operate through our wholly owned subsidiary HSH. HSH is an integrated healthcare company which strives to provide vital services and a high-quality of care for patients over the course of their lifetime. HSH was organized with the goal of becoming an advanced, national healthcare system in the United States, providing clinicians with state-of-the-art diagnostic and therapeutic tools, and providing patients with greater access to a higher level of care in local communities that we believe have historically been underserved by the medical industry. HSH currently conducts its operations directly through HSH, and also through its wholly owned subsidiaries within the medical industry, seeking to serve the needs of patients' and physicians alike.

HSH currently has the following wholly owned operating subsidiaries in the state of Delaware through which it operates its business:

- *Advance Care Medical Holdings, Inc.* is a Delaware, corporation ("ACM") which seeks to offer a host of comprehensive care service directly to patients;

- *HSH Surgical, Inc. is a Delaware, corporation ("HSHS")* which seeks to own and operate Ambulatory Surgery Centers; and

- *HSH Medical Services, Inc. ("HSHMS")* is a Delaware, corporation which seeks to provide ancillary services directly to physician offices and engage in sales and marketing of medical products to doctors.

6

*Table of Contents*

To date, the majority of HSH's revenues have been generated through resales and marketing of medical products which HSH has done directly at the HSH level using the trade name HSHMS. HSH has formed HSHMS in the state of Delaware, and it plans to conduct all such resale and marketing activities through HSHMS. HSH has also generated revenues through providing consulting services to Managed Service Organizations ("MSOs").

The Company has recently sought to expand its business and service offering capabilities and has shifted its focus away from medical product sales towards providing services to patients through its planned surgical and urgent care and internal medicine health facilities which it plans to conduct through ACM and HSHS. The Company expects that, going forward, revenues from its ownership interests in these facilities will comprise the majority of the Company's revenues as the Company focuses more on those areas and less on medical products. The specific products and/or services intended to be provided by each of HSH's operating subsidiaries are described in detail below.

HSH has provided consulting services to Managed Service Organizations ("MSOs") and as further described below, HSH plans to establish another wholly-owned operating subsidiary to provide MSOs with both business management, development, and operational assistance. Additionally, HSH intends to become a comprehensive medical incubator and innovation center, dedicated to accelerating development, building businesses, and improving patient outcomes

**Recent Developments**

*Name Change, Trading Symbol Change and Reverse Stock Split*

Since Healthcare Solutions Management Group, Inc. became the successor in interest to Verity Delaware Inc. a Delaware corporation which was previously a Nevada corporation named Verity Corp., the Company's current name became Healthcare Solutions Management Group, Inc.

On September 13, 2021, the Board of Directors (the "Board") of the "Company approved (i) a 1 for 115 Reverse Stock Split of the Company's common stock with any fractional shares of common stock resulting therefrom being rounded up to the nearest whole share of common stock (the "Reverse Stock Split") and (ii) a voluntary change in the Company's stock symbol from "VRTY" to a symbol selected by the Company's officers (the "Symbol Change" and together with the Reverse Stock Split, referred to herein together as the "Corporate Actions"). On the same date, 52.42 % of the Company's shareholders also approved the Corporate Actions. On September 15, 2021, the Company filed a Certificate of Amendment to its Amended and Restated Certificate of Incorporation (the "Certificate") with the Delaware Secretary of State for the Reverse Stock Split, with an effective date of the later of (i) September 29, 2021, or (ii) on a date that the Reverse Stock Split, is announced by Financial Industry Regulatory Authority ("FINRA").

The Company submitted an Issuer Company Related Action Notification regarding the Corporate Actions, as well as its prior name change to its current name to FINRA on September 15, 2021 (the name change together with the Reverse Stock Split and Symbol Change are referred to herein together as the "Corporate Actions). The Company was then notified by FINRA that the market effective date for the Corporate Actions was October 29, 2021. The new trading symbol for the Company's common stock as of October 29, 2021, was "VRTYD" and effective as of November 26, 2021 the symbol changed to "HSMD." Further, the Company's common stock now has the following CUSIP number: 42226Y 105. The reverse stock split was effective on October 29, 2021.

*Termination of Certain Agreements*

On September 14, 2021, the Company's wholly owned subsidiary, HSH terminated a consulting agreement (the "Consulting Agreement") dated October 1, 2018, between HSH and Tarun Jolly (the "Consultant"), pursuant to Section 20(e) of the Consulting Agreement, which permits HSH to terminate the Consulting Agreement any time without cause, with the termination to be effective as of September 15, 2021. Pursuant to the Consulting Agreement, the Company had engaged the Consultant to provide general business, advisory and transaction, support and consulting services to HSH in exchange for warrants to purchase shares of HSH upon the occurrence of certain milestones none of which were ever achieved.

7

Table of Contents

The Company also terminated the following non-material agreements:

On September 14, 2021, HSH terminated a Consulting Services Agreement by and between Flex Surgical Management LLC and Matt Thibaut, an individual and HSH dated September 1, 2020 (the "Agreement") pursuant to Section 17(e) of the Agreement and all other terms and conditions of the Agreement. Termination will be effective as of September 16, 2021, in accordance with the terms and provisions of the Agreement.

On September 14, 2021, HSH terminated a Field Representative Offer of Employment by and between Stephen Fertig, an individual and HSH dated August 21, 2019 (the "Offer") pursuant to Section 7 of the Offer and all other terms and conditions of the Offer. Termination will be effective as of September 16, 2021, in accordance with the terms and provisions of the Offer.

On September 14, 2021, HSH terminated an Independent Contractor Agreement by and between John Keeling, Jr., an individual and HSH dated October 22, 2018 (the "Agreement") pursuant to Section 4(4.2) of the Agreement and all other terms and conditions of the Agreement. Termination will be effective as of September 15, 2021, in accordance with the terms and provisions of the Agreement.

On September 14, 2021, HSH terminated a Consulting Services Agreement by and between BBCV Group, LLC and HSH dated October 30, 2019 (the "Agreement") pursuant to Section 6(a) of the Agreement and all other terms and conditions of the Agreement. Termination will be effective as of September 30, 2021, in accordance with the terms and provisions of the Agreement.

***Entry into Material Agreements***

*Ambulatory Surgery Center Development Agreement*

On November 26, 2021, the Company and HSH and HSH's wholly owned subsidiary HSH Surgical, Inc. ("HSHS") entered into an Ambulatory Surgery Center Development Agreement (the "Agreement") with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company (together with its subsidiaries, related parties, successors-in-interests, and affiliates, the "Developer"). The term of the Agreement is ten (10) years from November 26, 2021. Pursuant to the Agreement, the Developer agreed to use commercially reasonable efforts to present HSHS with "Qualified Projects," as such term is defined in the Agreement. During the term of the Agreement, the Developer agreed to present HSHS with ten (10) Qualified Projects per year, HSHS however is not required to accept a Qualified Project. HSHS agreed to enter into one hundred (100) Lease Agreements (the "Tenant Commitment") with an option for twenty-five (25) additional units with anticipated development costs to be approximately fourteen million dollars ($14,000,000) a unit (actual costs will vary based on individual projects) for a total initial commitment of approximately one billion four hundred million dollars ($1,400,000,000) with an option for an additional three hundred and fifty million dollars ($350,000,000); provided that each Lease Agreement relates to a Qualified Project. Pursuant to the Agreement, the Developer has the exclusive rights to develop single tenant HSH Surgical Ambulatory Surgery Center units on a nationwide basis for HSHS.

*Urgent Care Center Development Agreement*

On November 26, 2021, the Company, HSH and HSH's wholly owned subsidiary Advance Care Medical Holdings, Inc. ("ACM") entered into an Urgent Care Center Development Agreement (the "UC Agreement") with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company (together with its subsidiaries, related parties, successors-in-interests, and affiliates, the "Developer"). The term of the UC Agreement is ten (10) years from November 26, 2021. Pursuant to the UC Agreement, the Developer agreed to use commercially reasonable efforts to present ACM with "Qualified Projects," as such term is defined in the UC Agreement. During the term of the UC Agreement, the Developer agreed to present ACM with seventy-five (75) Qualified Projects per year, however ACM is not required to accept a Qualified Project. ACM agreed to enter into five hundred (500) Lease Agreements (the "Tenant Commitment") with an option for two hundred (200) additional units with anticipated development costs to be approximately four million five hundred thousand dollars ($4,500,000) a unit (actual costs will vary based on individual projects) or a total initial commitment of approximately two billion two hundred and fifty million dollars ($2,250,000,000.00) with an option for an additional nine hundred million dollars ($900,000,000); provided that each Lease Agreement relates to a Qualified Project. The developer has the exclusive rights to develop single tenant Advance Care Medical Urgent and Comprehensive Care Center units on a nationwide basis for ACM.

8

The entry into the Agreement and the UC Agreement, triggered the issuance, on December 31, 2021 by the Company of 81,000,000 shares of its common stock to the following parties in the following amounts (the "Shares").

The issuance of the Shares were triggered pursuant to:

- A management consulting agreement with Black Label Services, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- A management consulting agreement with Jackson Hole Medical Advisors, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- An employment agreement with Jonathan Loutzenhiser, dated July 15, 2018: 22,000,000 shares of common stock.

- A consulting services agreement with 168 Capital, Inc., dated October 1, 2018: 9,000,000 shares of common stock.

- A consulting services agreement with Alpha Properties LLC., dated October 1, 2018: 3,000,000 shares of common stock.

- A consulting services agreement with Stin Marketing Group LLC., dated October 1, 2018: 3,000,000 shares of common stock.

**Advance Care Medical Inc.**

HSH's wholly owned subsidiary Advance Care Medical Holdings, Inc. ("ACM") is a Delaware corporation that seeks to be a direct provider of urgent care and internal medicine services, and all comprehensive care provided by HSH is run through ACM. ACM aims to bridge the gap between urgent family care and the traditional hospital system. Through ACM, our mission is to focus on inadequately served communities and provide them more convenient quality healthcare. Our newly constructed facilities will seek to provide the highest standards of safety, comfort, and convenience for the best patient experience.

ACM plans to set up comprehensive care services that aim to combine both internal medicine practices with urgent care at numerous locations.

Each of the facilities at these locations are planned to be leased and it's planned that ACM will do the build out of the medical premises at these facilities. As described above, on November 26, 2021, the Company, HSH and ACM entered into an Urgent Care Center Development Agreement with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company.

It is planned that these facilities will be equipped with state-of the-art equipment and will be fully-staffed with Primary Care Physicians, Urgent Care Physicians and/or support staff to provide medical services. Many of these facilities are panned to be located in traditionally under-served rural communities, which we have intentionally targeted to help serve what we believe is a population in need of better medical services.

Medical services planned to be provided at these facilities will include, but are not limited to, the following:

- Allergy and Immunology
- Cardiovascular Issues
- Endocrine Issues
- Eyes, Ears, Nose and Throat
- Gastrointestinal Complaints

9

Table of Contents

- Gynecology and Women's Health
- Infectious Illnesses
- Pediatric Complaints
- Pulmonary Complaints
- Wound Care

It is planned that ACM will bill both private and government insurance for the services provided to patients at these facilities. It is also planned that ACM will accept direct payment for the above services it will provide from patients.

To date HSH has completed construction of facilities in Georgia, Illinois, and Tennessee, and HSH is in the process of completing medical equipment installations at these locations and hiring and training of staff. HSH is in the process of completing construction of facilities in Illinois, Tennessee, Georgia and Utah. The locations are set up under the following names, and the locations which are staffed, trained and ready to see patients are noted as such below:

Advance Care Medical Holdings, Inc.
Advance Care Medical Powder Springs GA, Inc.
Advance Care Medical Alpharetta I GA, Inc.
Advance Care Medical Suwanee GA, Inc.
Advance Care Medical Hiram GA, Inc.
Advance Care Medical Kennesaw GA, Inc.
Advance Care Medical Naperville IL - I, Inc. – this location is staffed, trained and ready to see patients
Advance Care Medical Romeoville IL- I, Inc.- this location is staffed, trained and ready to see patients
Advance Care Medical Buffalo Grove IL, Inc.
Advance Care Medical Aurora IL, Inc.
Advance Care Medical Carol Stream IL, Inc.
Advance Care Medical Fox River Grove IL, Inc.
Advance Care Medical St Charles IL, Inc.
Advance Care Medical Wheaton IL, Inc.
Advance Care Medical Clarksville TN, Inc. - this location is staffed, trained and ready to see patients
Advance Care Medical Columbia TN, Inc. - this location is staffed, trained and ready to see patients
Advance Care Medical Chattanooga TN, Inc.
Advance Care Medical Nolensville TN, Inc.

**HSH Surgical, Inc.**

HSH's wholly owned subsidiary HSH Surgical, Inc., (HSHS) is a Delaware corporation. HSHS is a physician-centric development and management company of multi-specialty, cardiology focused, ambulatory surgery centers. HSHS seeks to strive to become an industry-leading ambulatory surgery center ("ASC") management and development company focused on partnering with physicians and employees to create an outstanding patient experience. HSHS seeks to partner with physicians to develop, design, build, credential, and then manage ASCs for, and with, their physician partners. HSHS also seeks to work with physicians in a joint-venture relationship with local hospitals or health systems, if we determine that such a relationship is in the best interest of the physicians and the ASC.

We believe that physician partners are the lifeline of any ASC, and they should retain control of the facility while HSHS can focus on adding value by managing the business side while allowing the physician partners to focus on patient care. As such, it is planned, that HSHS, will provide 30% of the funding for an initial ASC project, and the physicians will provide 70%, resulting in HSHS being a minority 30% owner of each ASC that it will manage and develops in partnership with physicians. It is planned that HSHS will only seek to partner with top-quality, board-certified surgeons to provide the surgical services at these ASC facilities.

HSHS also aims to be a direct provider of ambulatory surgery services, and all of the ambulatory and surgery business of HSH are run through this subsidiary. Our planned ASCs are comprised of a network offering multidisciplinary options. As discussed in detail above, on November 26, 2021, the Company and HSH and HSH's wholly owned subsidiary HSH Surgical, Inc. ("HSHS") entered into an Ambulatory Surgery Center Development Agreement with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company. It is planned that our state-of-the-art facilities will provide same day out-patient surgical care including both diagnostic and preventative procedures.

*Table of Contents*

It is planned that HSHS, will have a 30% ownership interest in numerous locations set up for our planned ambulatory surgery services, the first of which SARC by HSH ASC Pine Bluff has opened and is performing procedures in Pine Bluff, AR. The remaining ownership of these entities is planned to be held by physician providers.

We plan that a wide array of surgical services will be provided through these ASC's, which are planned to include, but are not limited to, the following:

- Cardiac Surgery
- Vascular Surgery
- Bariatric Surgery
- Colon and Rectal Surgery
- Endocrine Surgery
- General Surgery
- Gynecological Surgery
- Hand Surgery
- Head and Neck Surgery
- Hernia Surgery
- Neurosurgery
- Orthopedic Surgery
- Ophthalmological Surgery
- Outpatient Surgery
- Pediatric Surgery
- Plastic and Reconstructive Surgery
- Podiatric Surgery
- Robotic Surgery (Da Vinci Robotic Surgical System)
- Thoracic Surgery
- Urologic Surgery

For each of these services, it is planned that HSHS, will bill accept both private and government insurances, and accept direct payments from patients.

To date HSHS has completed construction of a state of the art Ambulatory Surgery Center in Pine Bluff, Arkansas, and HSHS is in the process of completing construction in Utah and Texas. The locations are set up under the following names:

HSH Surgical, Inc.,
SARC by HSH, Inc.,
SARC by HSH ASC Pine Bluff, LLC
SARC by HSH ASC Blytheville, LLC
SARC by HSH ASC Draper, LLC
SARC by HSH ASC Keller, LLC
SARC by HSH ASC Lake Jackson, LLC

**HSH Medical Services, Inc.**

To date, the majority of HSH's revenues have been generated through resales and marketing of medical products which HSH has done directly at the HSH level using the trade name HSHMS. HSH does not produce or manufacture its own products or services – rather, it is a third-party reseller of medical products and services, whereby medical companies grant HSH a right, which can be exclusive or non-exclusive, to market, distribute and sell such company's medical products and services to physician customers in certain regions. In exchange, HSH receives a mark-up, which is generally twenty percent (20%) of the gross sales it makes from reselling those products and services.

11

*Table of Contents*

HSH currently sells products across the U.S. in over 18 states. HSH's customers are physicians, to which it markets and sells medical equipment, medical devices, laboratory services, and pharmacy services, as well as other services directly to its physician customers.

HSHMS was formed in the state of Delaware, and HSH plans to conduct all such resale and marketing activities through HSHMS. HSHMS is intended to focus on sales and marketing of medical products and services to doctors. All third-party products and services that will be resold by HSH are planned to be provided through this subsidiary.

HSH, now offers, and HSHMS, is planned to offer products and services in the following categories directly to physicians:

- *Medical Equipment*: examples include but are not limited to back braces with cold therapy, shoulder sling/braces, custom fit full-length knee brace, total joint kit, spine kit, pain patch and others.

- *Medical Devices*: examples include but are not limited to electrocardiogram (ecg) 3 / 6 / 12 / 18 lead units, interpretative ecg units, electroencephalogram (eeg) monitoring equipment, home sleep monitoring equipment, cardiac monitoring equipment and others.

- *Laboratory Services*: examples include but are not limited to molecular testing, pharmacogenomic testing, cancer genetic testing, breast cancer/lynch syndrome/colon, molecular pathology, respiratory testing, pathology testing, wound care testing, urine blood wellness testing and others.

- *Pharmacy Services*- examples include but are not limited to traditional mail order, specialty compounding, 503a/503b opportunities, wholesale, specialty non-opioid, pain, podiatry and others.

HSH has built strong relationships throughout the healthcare field over several years, and our sales team which has decades of medical practice relationships has helped our rolodex continue to grow through networking and current client referrals. HSH acquires its medical equipment and services by procuring and vetting various leading medical technology/manufacturing companies across the country based on availability, pricing, and overall service. The products and services are typically installed by the different vendors and serviced as required by the manufacturer(s). If these products and services require physical operation, HSH recruits the appropriate personnel to do so.

As noted above, the foregoing operations are intended to be conducted through HSHMS.

**Managed Service Organizations**

HSH has generated revenues through providing consulting services to Managed Service Organizations ("MSOs"). HSH has provided consulting services to Managed Service Organizations ("MSOs"). HSH intends to establish another wholly-owned operating subsidiary to provide Managed Service Organizations (MSOs) with both business management, development, and operational assistance. MSO physician groups operate under a single tax ID to optimize expenses against utilization of services to create a more efficient physician practice. In the past, HSH has directly provided such consulting services to MSO's. In the future HSH seeks to provide these services solely through its operating subsidiaries.

The services HSH intends to offer in through this subsidiary include:

- Facilities management;
- Operational reporting (workflow auditing);
- Billing services;
- Performance evaluations for staff;

---

12

Table of Contents

- Laboratory, Pathology, Radiology, Pharmacy, Variety of In-office Ancillary Services;
- Evaluate compliance issues and documentation systems & provide operations oversight to suggest areas of improvement;
- Review accounts payable and accounts receivable - revenue cycle and supply chain management; and
- Liaison between medical office administrators and service providers.

A core focus of HSH's MSO practice will be to provide consultation on the development and management of 100% MSO owned services in the ancillary space and provide operational support for them.

An MSO can be a gateway for providers to apply a population health lens to their practice or network with a focus on quality and outcomes, ultimately enabling the practice to better control overall the total cost of care. MSOs, administrative services organizations (ASOs), care management organizations (CMOs), population health services organizations (PHSOs) and the functions they provide, come in many shapes and sizes. The governance structure and functionality of an MSO is unique to the health system, independent practice association (IPA), ACO or health plan it is designed to serve. A provider taking risk can design or outsource an MSO for a single function/service or many functions/services depending on their needs. Many health systems are balancing the MSO type needs of a wholly owned or joint venture health plan, one or more ACOs and one or more IPAs. As a result, health systems and provider organizations are grappling with decisions about which functions they can realistically provide and how they can organize themselves to deliver these functions in a cost-effective way that allows them to capture and effectively manage as much of the premium dollar as possible.

HSH intends to work in collaboration with clients to help them understand the value of MSO infrastructure as they consider opportunities to manage risk, improve financial and clinical performance and meet the needs of all members. We plan that our subsidiaries will help clients to understand the scope of MSO service and capabilities, assess existing MSO services and capabilities and recommend solutions to optimize performance, align with market drivers, and achieve both short and long-term member management goals. We also intend to assist providers to establish their own MSO entities, including build/buy decision support, to help best control and manage risk. We will custom tailor consulting fee arrangements to the economic capabilities of our clients with both hourly payment charge options, total gross project billing, or monthly and annual retainer services.

**Healthcare Incubator & Accelerator**

HSH intends to be a comprehensive medical incubator and innovation center, with a team dedicated to accelerating development, building businesses, and improving patient outcomes. HSH's team to date has worked with clinician innovators, university tech transfer offices, and academic researchers to design, engineer, prototype, and facilitate commercialization of a broad range of innovative medical products and companies.

HSH's core management team of physicians, clinicians, and M&A subject matter experts are intended to collaborate closely with new product development teams, MedTech entrepreneurs, and medical providers seeking to accelerate time to market while reducing costs.

HSH plans to work to diligently to identify High Growth Healthcare Companies (HGHCs) that are candidates for the public market. In this capacity, we seek to:

- Leverage HSH's relationships, assets, and experience to develop HGHCs.
- Grow HGHCs by utilizing banking relationships to facilitate acquisitions.
- Assist to and launch HGHCs to public markets.

We intend to perform these operations at the HSH level, and believe that our expertise in this field will prove valuable in our ability to identify and assist promising companies in this space.

**Consulting Agreements**

HSH is currently a party to the following consulting agreements.

13

*Table of Contents*

On July 15, 2018, HSH entered into a consulting agreement (the "Consulting Agreement") with DMM Advisors, Inc. (the "Consultant") pursuant to which HSH engaged the Consultant to provide general business, management, advisory and support consulting services to HSH. As compensation under the Consulting Agreement, HSH agreed to pay the Consultant a non-refundable retainer of $100,000 per month and agreed to pay the Consultant a monthly automobile allowance of $2,500. The Consulting Agreement also provides that the Consultant will be eligible to receive awards from HSH under their stock and bonus plans once such plans are created and also eligible to be covered by liability insurance once HSH acquires same. Additionally, pursuant to the Consulting Agreement, the Consultant is eligible to receive a bonus in cash and in shares of HSH, as well as warrants to purchase shares of HSH, upon meeting certain milestones. The term of the Consulting Agreement is for a period of three (3) years and will be automatically renewed for one (1) year terms unless terminated. The Consulting Agreement can be terminated by HSH for "cause" as such term is defined in the Consulting Agreement and the Consultant can terminate the Consulting Agreement at any time for any reason by giving HSH 30 days' notice. HSH can also terminate the Consulting Agreement without cause at any time.

On October 1, 2018, HSH entered into a consulting agreement (the "Consulting Agreement") with Stin Marketing Group, LLC (the "Consultant") pursuant to which HSH engaged the Consultant to provide general business, advisory and transaction, support and consulting services to HSH. As compensation under the Consulting Agreement, HSH agreed to pay the Consultant by issuing warrants to purchase shares of HSH upon the occurrence of certain milestones. The term of the Consulting Agreement is for two (2) years and renews automatically for one (1) year terms unless terminated. The Consulting Agreement can be terminated by HSH for "cause" as such term is defined in the Consulting Agreement and the Consultant can terminate the Consulting Agreement at any time for any reason by giving HSH 30 days' notice. HSH can also terminate the Consulting Agreement without cause at any time.

On October 1, 2018, HSH entered into a consulting agreement (the "Consulting Agreement") with 168 Capital, Inc. (the "Consultant") pursuant to which HSH engaged the Consultant to provide general business, advisory and transaction, support and consulting services to HSH. As compensation under the Consulting Agreement, HSH agreed to pay the Consultant by issuing warrants to purchase shares of HSH upon the occurrence of certain milestones. The term of the Consulting Agreement is for two (2) years and renews automatically for one (1) year terms unless terminated. The Consulting Agreement can be terminated by HSH for "cause" as such term is defined in the Consulting Agreement and the Consultant can terminate the Consulting Agreement at any time for any reason by giving HSH 30 days' notice. HSH can also terminate the Consulting Agreement without cause at any time.

On October 1, 2018, HSH entered into a consulting agreement (the "Consulting Agreement") with Alpha Properties, LLC (the "Consultant") pursuant to which HSH engaged the Consultant to provide general business, advisory and transaction, support and consulting services to HSH. As compensation under the Consulting Agreement, HSH agreed to pay the Consultant by issuing warrants to purchase shares of HSH upon the occurrence of certain milestones. The term of the Consulting Agreement is for two (2) years and renews automatically for one (1) year terms unless terminated. The Consulting Agreement can be terminated by HSH for "cause" as such term is defined in the Consulting Agreement and the Consultant can terminate the Consulting Agreement at any time for any reason by giving HSH 30 days' notice. HSH can also terminate the Consulting Agreement without cause at any time.

On July 15, 2018, HSH entered into a consulting agreement (the "Consulting Agreement") with Black Label Services, Inc. (the "Consultant") pursuant to which HSH engaged the Consultant to provide general business, management, advisory and support consulting services to HSH. As compensation under the Consulting Agreement, HSH agreed to pay the Consultant a non-refundable retainer of $100,000 per month and agreed to pay the Consultant a monthly automobile allowance of $2,500. The Consulting Agreement also provides that the Consultant will be eligible to receive awards from HSH under their stock and bonus plans once such plans are created and also eligible to be covered by liability insurance once HSH acquires same. Additionally, pursuant to the Consulting Agreement, the Consultant is eligible to receive a bonus in cash and in shares of HSH, as well as warrants to purchase shares of HSH, upon meeting certain milestones. The term of the Consulting Agreement is for a period of five (5) years and will be automatically renewed for one (1) year terms unless terminated. The Consulting Agreement can be terminated by HSH for "cause" as such term is defined in the Consulting Agreement and the Consultant can terminate the Consulting Agreement at any time for any reason by giving HSH 30 days' notice. HSH can also terminate the Consulting Agreement without cause at any time.

14

Table of Contents

**Suppliers**

HSH, works with suppliers and manufacturing companies on a reseller basis. HSH utilizes its physician network to review, vet-out, and help implement new diagnostic and therapeutic treatments and devices in other physician offices. HSH is compensated by its suppliers and manufactures for the products and services that are resold through the HSH network. HSH has formed HSHMS to conduct these operations in the future.

For ACM and HSHS, "supply" will be in the form of quality medical physicians and healthcare workers that we recruit from various sources.

HSH is not materially reliant on any one supplier for its products or service offerings.

**Sales and Marketing**

HSH utilizes third-party marketing agencies for its sales and marketing activities.

On October 6, 2020, HSH entered into a Master Services Agreement (the "MSA") with GrowthMed, Inc., a California corporation ("GrowthMed"). Pursuant to the MSA, GrowthMed agreed to provide HSH with custom responsive design and initial website setup and creation services as well as maintenance services for same, webhosting, advertising, email hosting and other related services (referred to herein as the "Services"). Pursuant to the MSA, HSH agreed to compensate GrowthMed with a total build fee of $30,000, including a $15,000 build fee deposit and a maintenance fee of $3,500 for the Services. The minimum term of the MSA is for 12 months (the "Minimum Term") at which time the MSA will automatically renew for subsequent six (6) month periods until terminated by either party. Prior to the conclusion of the Minimum Term, the MSA can be terminated by either party, for any reason or no reason, upon 3 months written notice to the other party. After the conclusion of the Minimum Term, the MSA can be terminated by either party upon 30 days' notice to the other party, with such notice required to be made at least 30 days prior to the next upcoming renewal date.

On April 12, 2021, HSH terminated the MSA with GrowthMed, Inc. in accordance with the terms of the MSA, and the Termination was effective immediately pursuant to terms and provisions of the MSA.

HSH has engaged Hearst Media Services - a full-service marketing/communications and technology firm that has been delivering targeted multi-channel programs and services for more than 100 years – to assist the Company with its digital marketing strategy. HSH entered into an agreement (the "Agreement") with Hearst Media Services on February 11, 2021 for the foregoing services. There is a $13,000 set up fee and a $600 monthly rate payable by HSH to Hearst Media Services under the Agreement as compensation for the services thereunder. The foregoing description of the Agreement does not purport to be complete and is qualified in its entirety by the full text of the Agreement, a copy of which is filed as Exhibit 10.9 hereto and is incorporated by reference herein.

HSH believes that Hearst Media Services can help raise the Company's profile and create increased awareness and greater visibility of HSH in the medical industry.

**Competition**

We have experienced, and expect to continue to experience, intense competition from a number of companies. Our primary competitors are HCA Healthcare, Texas Health Resources, UT Southwestern Medical Center, Tenet, DaVita and VCA. HSH is seeking to create a paradigm shift in the healthcare industry by creating a new form of national healthcare complex that is highly efficient, provides greater access for all patients and drives superior patient outcomes. We believe that this paradigm shift will improve the financial sustainability of the American healthcare system and lead to a higher quality of care.

However, many of our competitors and potential competitors have significantly greater financial, technological, and other resources and name recognition than we do and more established distribution networks and relationships with healthcare providers. As a result, many of these companies may respond more quickly to new or emerging technologies and standards and changes in customer requirements. These companies may be able to invest more resources in research and development, strategic acquisitions, sales and marketing, patent prosecution, litigation, and financing capital equipment acquisitions for their customers.

15

Table of Contents

**Industry Overview**

HSH operates in the healthcare industry and seeks to implement and operate innovative health care models to create a patient-centered, physician-centric experience.

According to the US Bureau of Labor Statistics' Occupational Outlook Handbook dated as of September 1, 2020, employment in healthcare occupations is projected to grow 15% from 2019 to 2029, much faster than the average for all occupations, adding about 2.4 million new jobs. Healthcare occupations are projected to add more jobs than any of the other occupational groups. This projected growth is mainly due to an aging population, leading to greater demand for healthcare services.

According to a report titled "Ambulatory Surgery Centers Market by Product, By Component, By Specialty Type, and By Geography - Global Drivers, Restraints, Opportunities, Trends, and Forecast up to 2026" released by Research and Markets dated November 29, 2020, the estimated market value of Ambulatory Surgery Centers in 2020 was $1.89 billion.

Ambulatory Surgery Centers are transforming healthcare delivery as well as the market for medical devices and equipment. By focusing on routine, lower-risk procedures in a more convenient setting, ASCs can offer surgical procedures at rates 35% to 50% lower than hospitals, according to a September 2019 report published by Bain & Company.

The Urgent Care Association released its 2019 benchmarking report that showed the total number of centers had reached 9,616 as of November 2019, a 9.6% jump from the previous year. The number of Urgent Care Centers has increased steadily each year from 2013, when the total number of Urgent Care Centers was 6,100. Both Urgent Care Centers and Retail Clinics have continued to grow across the US as patients look for convenience and affordability, creating competition with traditional hospital and physician practice services.

Factors which are driving the market growth of Ambulatory Surgical Centers are an increase in the number of surgeries, a rise in the incidence of chronic diseases, and growth in the geriatric population. In addition to the above-mentioned factors, the advancements in technology, and surging demand for minimally invasive surgeries are fueling the growth of the Ambulatory Surgical Center market. The ASCs are more economical as compared to the hospitals and nursing homes as they help patients with instant medical services and quick discharge facilities.

There is a demand to reduce increasing healthcare costs and move from inpatient to outpatient surgical procedures. The rising need of IT solutions such as Telehealth, and Remote Monitoring of the patient for better management creates the market opportunity for Ambulatory Surgical Centers vendors to fulfill both the residential as well as commercial demand.

The rising number of diseases and demand for outpatient surgery has heightened the growth of the Ambulatory Surgical Centers. The ASCs are more economical as compared to the hospitals and nursing homes as they help patients with instant medical services and quick discharge facilities. Further, the vendors of Ambulatory Surgical Centers are spending huge capital in acquiring companies in order to develop innovative and technologically advanced Ambulatory Surgical Centers that can offer surgical treatment for various diseases.

The growing rate of old age population and high occurrence of chronic diseases, gastrointestinal, diabetes resulting in eye related diseases, musculoskeletal and other diseases are the major drivers behind the opening of the technologically advanced Ambulatory Surgery Centers equipped with improved pain operating methods in the United States. The US ASC market is expected to grow at a remarkable pace in future. The demand for highly advanced ambulatory surgical centers is getting stronger all across the United States on the account of positive government initiatives to develop advanced healthcare infrastructure which is further offering opportunities for various ambulatory surgical center companies to expand their presence in the United States.

16

**Governmental Regulation**

_Significant Federal and State Healthcare Laws Governing Our Business_

As a healthcare company, we are subject to various laws and regulations governing our business. For example, all of our comprehensive care locations need to be licensed with the Centers for Medicare and Medicaid Services and state medical boards along with all of the physicians and nurse practitioners that are providing the medical care. All Ambulatory Surgery Centers must also go through a complex licensing procedure with the state in which they are located as well as all of the medical staff at each location.

Our operations and relationships with healthcare providers such as doctors, MSOs, hospitals, other healthcare facilities, and healthcare professionals are subject to extensive and increasing regulation by numerous federal, state, and local government entities. These laws and regulations often are interpreted broadly and enforced aggressively by multiple government agencies, including the U.S. Department of Health and Human Services Office of the Inspector General, the U.S. Department of Justice, Centers for Medicare and Medicaid, and various state authorities. We have included brief descriptions of some, but not all, of the laws and regulations that affect our business below.

Imposition of liabilities associated with a violation of any of these healthcare laws and regulations could have a material adverse effect on our business, financial condition, and results of operations. The Company cannot guarantee that its arrangements or business practices will not be subject to government scrutiny or be found to violate certain healthcare laws. Government investigations and prosecutions, even if we are ultimately found to be without fault, can be costly and disruptive to our business. Moreover, changes in healthcare legislation or government regulation may restrict our existing operations, limit the expansion of our business, or impose additional compliance requirements and costs, any of which could have a material adverse effect on our business, financial condition, and results of operations.

_False Claims Acts_

The federal False Claims Act imposes civil liability on individuals or entities that submit false or fraudulent claims for payment to the federal government. The False Claims Act provides, in part, that the federal government may bring a lawsuit against any person whom it believes has knowingly or recklessly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim for payment approved. Private parties may initiate qui tam whistleblower lawsuits against any person or entity under the False Claims Act in the name of the government and may share in the proceeds of a successful suit.

The federal government has used the False Claims Act to prosecute a wide variety of alleged false claims and fraud allegedly perpetrated against Medicare and state healthcare programs. By way of illustration, these prosecutions may be based upon alleged coding errors, billing for services not rendered, billing services at a higher payment rate than appropriate, and billing for care that is not considered medically necessary. The government and a number of courts also have taken the position that claims presented in violation of certain other statutes, including the federal Anti-Kickback Statute or the Stark Law, can be considered a violation of the False Claims Act based on the theory that a provider impliedly certifies compliance with all applicable laws, regulations, and other rules when submitting claims for reimbursement.

Penalties for False Claims Act violations include fines ranging from $5,500 to $11,000 for each false claim, plus up to three times the amount of damages sustained by the government. A False Claims Act violation may provide the basis for the imposition of administrative penalties as well as exclusion from participation in governmental healthcare programs, including Medicare and Medicaid. In addition to the provisions of the False Claims Act, which provide for civil enforcement, the federal government also can use several criminal statutes to prosecute persons who are alleged to have submitted false or fraudulent claims for payment to the federal government.

A number of states have enacted false claims acts that are similar to the federal False Claims Act. Even more states are expected to do so in the future because Section 6031 of the Deficit Reduction Act of 2005 ("DRA"), amended the federal law to encourage these types of changes, along with a corresponding increase in state initiated false claims enforcement efforts. Under the DRA, if a state enacts a false claims act that is at least as stringent as the federal statute and that also meets certain other requirements, the state will be eligible to receive a greater share of any monetary recovery obtained pursuant to certain actions brought under the state's false claims act. The Office of Inspector General ("OIG"), in consultation with the Attorney General of the United States, is responsible for determining if a state's false claims act complies with the statutory requirements.

17

Table of Contents

*Anti-Kickback Statutes*

The federal Anti-Kickback Statute is a provision of the Social Security Act that prohibits as a felony offense the knowing and willful offer, payment, solicitation or receipt of any form of remuneration in return for, or to induce, (1) the referral of a patient for items or services for which payment may be made in whole or part under Medicare, Medicaid or other federal healthcare programs, (2) the furnishing or arranging for the furnishing of items or services reimbursable under Medicare, Medicaid or other federal healthcare programs or (3) the purchase, lease, or order or arranging or recommending the purchasing, leasing or ordering of any item or service reimbursable under Medicare, Medicaid or other federal healthcare programs. The Affordable Care Act ("ACA") amended section 1128B of the Social Security Act to make it clear that a person need not have actual knowledge of the statute, or specific intent to violate the statute, as a predicate for a violation. The OIG, which has the authority to impose administrative sanctions for violation of the statute, has adopted as its standard for review a judicial interpretation which concludes that the statute prohibits any arrangement where even one purpose of the remuneration is to induce or reward referrals. A violation of the Anti-Kickback Statute is a felony punishable by imprisonment, criminal fines of up to $25,000, civil fines of up to $50,000 per violation and three times the amount of the unlawful remuneration. A violation also can result in exclusion from Medicare, Medicaid, or other federal healthcare programs. In addition, pursuant to the changes of the ACA, a claim that includes items or services resulting from a violation of the Anti-Kickback Statute is a false claim for purposes of the False Claims Act.

Due to the breadth of the Anti-Kickback Statute's broad prohibitions, statutory exceptions exist that protect certain arrangements from prosecution. In addition, the OIG has published safe harbor regulations that specify arrangements that also are deemed protected from prosecution under the Anti-Kickback Statute, provided all applicable criteria are met. The failure of an activity to meet all of the applicable safe harbor criteria does not necessarily mean that the particular arrangement violates the Anti-Kickback Statute, but these arrangements may be subject to scrutiny and prosecution by enforcement agencies.

Some states have enacted statutes and regulations similar to the Anti-Kickback Statute, but which may be applicable regardless of the payor source for the patient. These state laws may contain exceptions and safe harbors that are different from and/or more limited than those of the federal law and that may vary from state to state.

*Federal Stark Law*

The federal Stark Law, also known as the physician self-referral law, generally prohibits a physician from referring Medicare and Medicaid patients to an entity (including hospitals) providing "designated health services," if the physician or a member of the physician's immediate family has a "financial relationship" with the entity, unless a specific exception applies. Designated health services include, among other services, inpatient and outpatient hospital services, clinical laboratory services, certain imaging services, and other items or. The prohibition applies regardless of the reasons for the financial relationship and the referral; and therefore, unlike the federal Anti-Kickback Statute, intent to violate the law is not required. Like the Anti-Kickback Statute, the Stark Law contains a number of statutory and regulatory exceptions intended to protect certain types of transactions and business arrangements from penalty. Unlike safe harbors under the Anti-Kickback Statute with which compliance is voluntary, an arrangement must comply with every requirement of a Stark Law exception, or the arrangement is in violation of the Stark Law.

The penalties for violating the Stark Law can include the denial of payment for services ordered in violation of the statute, mandatory refunds of any sums paid for such services and civil penalties of up to $15,000 for each violation, double damages, and possible exclusion from future participation in the governmental healthcare programs. A person who engages in a scheme to circumvent the Stark Law's prohibitions may be fined up to $100,000 for each applicable arrangement or scheme.

Some states have enacted statutes and regulations similar to the Stark Law, but which may be applicable to the referral of patients regardless of their payor source and which may apply to different types of services. These state laws may contain statutory and regulatory exceptions that are different from those of the federal law and that may vary from state to state.

18

Because the Stark Law and its implementing regulations continue to evolve, we do not always have the benefit of significant regulatory or judicial interpretation of this law and its regulations. There can be no assurance that the arrangements entered into by us with physicians and facilities will be found to be in compliance with the Stark Law, as it ultimately may be implemented or interpreted.

*Health Information Privacy and Security Standards*

Among other directives, the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), required the Department of Health and Human Services, or the HHS, to adopt standards to protect the privacy and security of certain health-related information. The HIPAA privacy regulations contain detailed requirements concerning the use and disclosure of individually identifiable health information by "HIPAA covered entities," which include entities like the Company, and the providers we may work with.

In addition to the privacy requirements, HIPAA covered entities must implement certain administrative, physical, and technical security standards to protect the integrity, confidentiality and availability of certain electronic health information received, maintained, or transmitted. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

The American Recovery and Reinvestment Act enacted on February 18, 2009, included the Health Information Technology for Economic and Clinical Health Act (HITECH) which modified the HIPAA legislation significantly. Pursuant to HITECH, certain provisions of the HIPAA privacy and security regulations become directly applicable to "HIPAA business associates".

Violations of the HIPAA privacy and security standards may result in civil and criminal penalties. Historically, these included: (1) civil money penalties of $100 per incident, to a maximum of $25,000, per person, per year, per standard violated and (2) depending upon the nature of the violation, fines of up to $250,000 and imprisonment for up to ten years. The passage of HITECH significantly modified the enforcement structure, creating a tiered system of civil money penalties that range from $100 to $50,000 per violation, with a cap of $1.5 million per year for identical violations. We must also comply with the "breach notification" regulations, which implement certain provisions of HITECH. Under these regulations, in addition to reasonable remediation, covered entities must promptly notify affected individuals in the case of a breach of "unsecured PHI," which is defined by HHS guidance, as well as the HHS Secretary and the media in cases where a breach affects more than 500 individuals. Breaches affecting fewer than 500 individuals must be reported to the HHS Secretary on an annual basis. The regulations also require business associates of covered entities to notify the covered entity of breaches at or by the business associate.

Many states also have laws that protect the privacy and security of confidential, personal information. These laws may be similar to or even more stringent than the federal provisions. Not only may some of these state laws impose fines and penalties upon violators, but some may afford private rights of action to individuals who believe their personal information has been misused.

*Financial Information and Privacy Standards*

In addition to privacy and security laws focused on health care data, multiple other federal and state laws regulate the use and disclosure of consumer's financial information ("Personal Information"). Many of these laws also require administrative, technical, and physical safeguards to prevent unauthorized use or disclosure of Personal Information, including mandated processes and timeframes for notification of possible or actual breaches of Personal Information to the affected individual. The Federal Trade Commission primarily oversees compliance with the federal laws relevant to us, while state laws are addressed by the state attorney general or other respective state agencies. As with HIPAA, enforcement of laws protecting financial information is increasing. Examples of relevant federal laws include the Fair Credit Reporting Act, the Electronic Communications Privacy Act, and the Computer Fraud and Abuse Act.

19

Table of Contents

_Other Federal Healthcare Compliance Laws_

We are also subject to other federal healthcare laws.

In 1995, Congress amended the federal criminal statutes set forth in Title 18 of the United States Code by defining additional federal crimes that could have an impact on our business, including "Health Care Fraud" and "False Statements Relating to Health Care Matters." The Health Care Fraud provision prohibits any person from knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program. As defined in this provision of Title 18, a "healthcare benefit program" can be either a government or private payor plan. Violation of this statute may be charged as a felony offense and may result in fines, imprisonment, or both. The ACA amended section 1347 of Title 18 to provide that a person may be convicted under the Health Care Fraud provision even in the absence of proof that the person had actual knowledge of, or specific intent to violate, the statute.

The False Statements Relating to Health Care Matters provision prohibits, in any matter involving a federal health care program, anyone from knowingly and willfully falsifying, concealing, or covering up, by any trick, scheme or device, a material fact, or making any materially false, fictitious, or fraudulent statement or representation, or making or using any materially false writing or document knowing that it contains a materially false or fraudulent statement. A violation of this statute may be charged as a felony offense and may result in fines, imprisonment, or both.

Under the Civil Monetary Penalties law of the Social Security Act, a person, including any individual or organization, may be subject to civil monetary penalties, treble damages, and exclusion from participation in federal health care programs for certain specified conduct. One provision of the Civil Monetary Penalties law precludes any person (including an organization) from knowingly presenting or causing to be presented to any United States officer, employee, agent, or department, or any state agency, a claim for payment for medical or other items or services that the person knows or should know (a) were not provided as described in the coding of the claim, (b) is a false or fraudulent claim, (c) is for a service furnished by an unlicensed physician, (d) is for medical or other items or service furnished by a person or an entity that is in a period of exclusion from the program or (e) are medically unnecessary items or services. Violations of the law may result in penalties of up to $10,000 per claim, treble damages, and exclusion from federal healthcare programs. In addition, the OIG may impose civil monetary penalties against any physician who knowingly accepts payment from a hospital (as well as against the hospital making the payment) as an inducement to reduce or limit services provided to Medicare or Medicaid program beneficiaries. Further, except as specifically permitted under the Civil Monetary Penalties law, a person who offers or transfers to a Medicare or Medicaid beneficiary any remuneration that the person knows or should know is likely to influence the beneficiary's selection of a particular provider of Medicare or Medicaid payable items or services may be liable for civil money penalties of up to $10,000 for each wrongful act.

_Other State Healthcare Compliance Provisions_

In addition to the state laws previously described, we also are subject to other state fraud and abuse statutes and regulations. Many of the states in which we operate or plan to expand to have adopted a form of anti-kickback law, self-referral prohibition, and false claims and insurance fraud prohibition. The scope of these laws and the interpretations of them vary from state to state and are enforced by state courts and regulatory authorities, each with broad discretion. Generally, state laws reach to all healthcare services and not just those covered under a governmental healthcare program. A determination of liability under any of these laws could result in fines and penalties and restrictions on our ability to operate in these states. We cannot assure that our arrangements or business practices will not be subject to government scrutiny or be found to violate applicable fraud and abuse laws.

_Licensing, Certification, Accreditation and Related Laws and Guidelines_

The providers we may work with are subject to numerous federal, state, and local licensing laws and regulations, relating to, among other things, professional credentialing, and professional ethics. Since the Company provides its services to healthcare facilities, it may indirectly be subject to laws applicable to those entities as well as ethical guidelines and operating standards of professional trade associations and private accreditation commissions, such as the American Medical Association and The Joint Commission. There are penalties for non-compliance with these laws and standards, including loss of professional license, civil or criminal fines and penalties, loss of hospital admitting privileges, and exclusion from participation in various governmental and other third-party healthcare programs. Our ability to operate profitably will depend, in part, upon our ability and the ability of the providers to obtain and maintain all necessary licenses and other approvals and operate in compliance with applicable health care laws and regulations, including any new laws and regulations or new interpretations of existing laws and regulations.

*Table of Contents*

**Intellectual Property**

The Company does not currently own any patents or trademarks. The Company expects to rely on trade secrets and proprietary know-how protection for our confidential and proprietary information, however we have not yet taken security measures to protect this information.

**Employees**

We currently have 50 full time employees, 12 consultants, 6 independently contracted sales representatives and 4 part time employees.

**Coronavirus (COVID-19)**

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a global pandemic which continued to spread throughout the U.S. and the globe. In addition to the devastating effects on human life, the pandemic is continuing to have a negative ripple effect on the global economy, leading to disruptions and volatility in the global financial markets. There are no comparable events that provide guidance as to the effect the COVID-19 pandemic may have, and, as a result, the ultimate effect of the pandemic is highly uncertain and subject to change. COVID-19 has already hindered or slowed many of HSH's businesses, including but not limited to our growth and growth strategies, developments in the marketplace for products, therapies and services, financial results, research and development strategy, regulatory approvals, and competitive strengths. The direct or indirect impact of COVID-19 on our business, results of operations and/or financial condition, continues today, but HSH has thus far weathered the pandemic storm and continues to seek to improve our level of service and patient care. The extent of the ultimate impact of the pandemic on the Company's operational and financial performance will depend on various developments, including the duration and continued spread of the outbreak, which cannot be reasonably predicted at this time. Accordingly, while management reasonably expects the COVID-19 outbreak to negatively impact the Company, the related consequences and duration are highly uncertain and cannot be predicted at this time.

**Reports to Security Holders**

We intend to furnish our shareholders' annual reports containing financial statements audited by our independent registered public accounting firm and to make available quarterly reports containing unaudited financial statements for each of the first three quarters of each year. We file Quarterly Reports on Form 10-Q, Annual Reports on Form 10-K and Current Reports on Form 8-K with the Securities and Exchange Commission in order to meet our timely and continuous disclosure requirements. We may also file additional documents with the Commission if they become necessary in the course of our company's operations.

The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that site is www.sec.gov.

**Item 1A. Risk Factors.**

YOU SHOULD CAREFULLY CONSIDER THE RISKS AND UNCERTAINTIES DESCRIBED BELOW AND THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS ANNUAL REPORT ON FORM 10-K BEFORE DECIDING WHETHER TO INVEST IN THE COMPANY'S COMMON STOCK. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE COMPANY OR THAT THE COMPANY CURRENTLY DEEMS IMMATERIAL MAY ALSO IMPAIR THE COMPANY'S BUSINESS OPERATIONS. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCUR, THE COMPANY'S BUSINESS, FINANCIAL CONDITION OR OPERATING RESULTS COULD BE MATERIALLY ADVERSELY AFFECTED. IN SUCH CASE, THE TRADING PRICE OR THE COMPANY'S COMMON STOCK COULD DECLINE AND YOU MAY LOSE PART OR ALL OF YOUR INVESTMENT. THIS ANNUAL REPORT ON FORM 10-K ALSO CONTAINS FORWARD-LOOKING STATEMENTS THAT INVOLVE RISKS AND UNCERTAINTIES. PLEASE SEE "CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS".

**Risks Related to Our Company, Business and Industry**

**The Company was previously in receivership.**

The Company was previously in receivership. On May 16, 2016, pursuant to Case Number A16-733815-B, Nevada's 8th Judicial District, Business Court, appointed Robert Stevens as receiver (the "Receiver") for the Company. Creditors of the Company were required to provide claims in writing under oath on or before November 3, 2016, or they would be barred under Nevada Revised Statute §78.675. Since May 16, 2016, through the date of the Merger, the Company was operating under the direction of the Receiver. On March 5, 2018, the District Court in Clark County, Nevada approved a plan of reorganization for the Company and the discharge of the Receiver upon completion of his duties under the court order. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action was needed by the Receiver or the Company in connection with the receivership, and such that Company was no longer in receivership.

**Our auditors have indicated that there is substantial doubt about our ability to continue as a going concern**.

Our financial statements have been prepared assuming that we will continue as a going concern, which contemplates realization of assets and the satisfaction of liabilities in the normal course of business for the twelve-month period following the date of the financial statements for the Company included elsewhere in this report. We have incurred significant operating losses since inception. Because we do not expect that existing operational cash flow will be sufficient to fund presently anticipated operations, this raises substantial doubt about our ability to continue as a going concern. Therefore, we will need to raise additional funds and is currently exploring alternative sources of financing. On September 30, 2021, we had an accumulated deficit of $29,171,161. Excluding investments of $89,823,346 which are not intended to be used for working capital, we had negative working capital of $11,168,765. The financial statements do not include any adjustments that might be necessary if we are unable to continue as a going concern. Our continuation as a going concern is dependent upon the ability to raise financing from third parties and generating revenues from operations. There is no assurance that we will be successful in doing so. For further discussion about our ability to continue as a going concern and our plan for future liquidity, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**We are an early-stage company with a limited operating history. Such limited operating history may not provide an adequate basis to judge our future prospects and results of operations.**

We have a limited operating history. HSH was formed on November 27, 2017. We have limited experience and operating history in which to assess our future prospects as a company. In addition, the market for our products and services is highly competitive. If we fail to successfully develop and offer our products and services in an increasingly competitive market, we may not be able to capture the growth opportunities associated with them or recover our development and marketing costs, and our future results of operations and growth strategies could be adversely affected. Our limited history may not provide a meaningful basis for investors to evaluate our business, financial performance, and prospects.

**We may fail to successfully execute our business plan.**

Our shareholders may lose their entire investment if we fail to execute our business plan. Our prospects must be considered in light of the following risks and uncertainties, including but not limited to, competition, the erosion of ongoing revenue streams, the ability to retain experienced personnel and general economic conditions. We cannot guarantee that we will be successful in executing our business plan. If we fail to successfully execute our business plan, we may be forced to cease operations, in which case our shareholders may lose their entire investment.

22

2/18/23, 3:05 PM hsmg_10k.htm

Table of Contents

**We have a history of losses and may have to further reduce our costs by curtailing future operations to continue as a business.**

Historically we have had operating losses and our cash flow has been inadequate to support our ongoing operations. Our ability to fund our capital requirements out of our available cash and cash generated from our operations depends on a number of factors, including our ability to gain interest in our products and services and continue growing our existing operations. If we cannot continue to generate positive cash flow from operations, we will have to reduce our costs and try to raise working capital from other sources. These measures could materially and adversely affect our ability to execute our operations and expand our business.

**The Company may suffer from lack of availability of additional funds.**

We expect to have ongoing needs for working capital in order to fund operations and to continue to expand our operations. To that end, we will be required to raise additional funds through equity or debt financing. However, there can be no assurance that we will be successful in securing additional capital on favorable terms, if at all. If we are successful, whether the terms are favorable or unfavorable, there is a potential that we will fail to comply with the terms of such financing, which could result in severe liability for our Company. If we are unsuccessful, we may need to (a) initiate cost reductions; (b) forego business development opportunities; (c) seek extensions of time to fund liabilities, or (d) seek protection from creditors. In addition, any future sale of our equity securities would dilute the ownership and control of your shares and could be at prices substantially below prices at which our shares currently trade. Our inability to raise capital could require us to significantly curtail or terminate our operations altogether. We may seek to increase our cash reserves through the sale of additional equity or debt securities. The sale of convertible debt securities or additional equity securities could result in additional and potentially substantial dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations and liquidity. In addition, our ability to obtain additional capital on acceptable terms is subject to a variety of uncertainties. In addition, if we are unable to generate adequate cash from operations, and if we are unable to find sources of funding, it may be necessary for us to sell all or a portion of our assets, enter into a business combination, or reduce or eliminate operations. These possibilities, to the extent available, may be on terms that result in significant dilution to our shareholders or that result in our shareholders losing all of their investment in our Company.

**Our acquisition strategy creates risks for our business.**

We expect that we will pursue acquisitions of other businesses, assets, or technologies to grow our business. We may fail to identify attractive acquisition candidates, or we may be unable to reach acceptable terms for future acquisitions. We might not be able to raise enough cash to compete for attractive acquisition targets. If we are unable to complete acquisitions in the future, our ability to grow our business at our anticipated rate will be impaired.

We may pay for acquisitions by issuing additional shares of our common stock, which would dilute our stockholders, or by issuing debt, which could include terms that restrict our ability to operate our business or pursue other opportunities and subject us to meaningful debt service obligations. We may also use significant amounts of cash to complete acquisitions. To the extent that we complete acquisitions in the future, we likely will incur future depreciation and amortization expenses associated with the acquired assets. We may also record significant amounts of intangible assets, including goodwill, which could become impaired in the future. Acquisitions involve numerous other risks, including:

- difficulties integrating the operations, technologies, services, and personnel of the acquired companies;

- challenges maintaining our internal standards, controls, procedures, and policies;

- diversion of management's attention from other business concerns;

- over-valuation by us of acquired companies;

23

- litigation resulting from activities of the acquired company, including claims from terminated employees, customers, former stockholders and other third parties;

- insufficient revenues to offset increased expenses associated with the acquisitions and unanticipated liabilities of the acquired companies;

- insufficient indemnification or security from the selling parties for legal liabilities that we may assume in connection with our acquisitions;

- entering markets in which we have no prior experience and may not succeed;

- risks associated with foreign acquisitions, such as communication and integration problems resulting from geographic dispersion and language and cultural differences, compliance with foreign laws and regulations and general economic or political conditions in other countries or regions;

- potential loss of key employees of the acquired companies; and

- impairment of relationships with clients and employees of the acquired companies or our clients and employees as a result of the integration of acquired operations and new management personnel.

**Our management team's attention may be diverted by recent acquisitions and searches for new acquisition targets, and our business and operations may suffer adverse consequences as a result.**

Mergers and acquisitions are time intensive, requiring significant commitment of our management team's focus and resources. If our management team spends too much time focused on recent acquisitions or on potential acquisition targets, our management team may not have sufficient time to focus on our existing business and operations. This diversion of attention could have material and adverse consequences on our operations and our ability to be profitable.

**The continued outbreak of the coronavirus may cause an overall decline in the economy as a whole and may materially harm our Company.**

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a global pandemic which continued to spread throughout the U.S. and the globe. In addition to the devastating effects on human life, the pandemic is continuing to have a negative ripple effect on the global economy, leading to disruptions and volatility in the global financial markets. There are no comparable events that provide guidance as to the effect the COVID-19 pandemic may have, and, as a result, the ultimate effect of the pandemic is highly uncertain and subject to change. COVID-19 has already hindered or slowed many of HSH's businesses, including but not limited to our growth and growth strategies, developments in the marketplace for products, therapies and services, financial results, research and development strategy, regulatory approvals, and competitive strengths. The direct or indirect impact of COVID-19 on our business, results of operations and/or financial condition, continues today, but HSH has thus far weathered the pandemic storm and continues to seek to improve our level of service and patient care. The extent of the ultimate impact of the pandemic on the Company's operational and financial performance will depend on various developments, including the duration and continued spread of the outbreak, which cannot be reasonably predicted at this time. Accordingly, while management reasonably expects the COVID-19 outbreak to negatively impact the Company, the related consequences and duration are highly uncertain and cannot be predicted at this time.

**We may be unable to scale our operations successfully.**

Our growth strategy will place significant demands on our management and financial, administrative, and other resources. Operating results will depend substantially on the ability of our officers and key employees to manage changing business conditions and to implement and improve our financial, administrative, and other resources. If the Company is unable to respond to and manage changing business conditions, or the scale of its operations, then the quality of its services, its ability to retain key personnel, and its business could be harmed.

24

Table of Contents

**The Company may suffer from a lack of liquidity.**

By incurring indebtedness, the Company subjects itself to increased debt service obligations which could result in operating and financing covenants that would restrict our operations and liquidity. This would impair our ability to hire the necessary senior and support personnel required for our business, as well carry out its acquisition strategy and other business objectives.

**Economic conditions or changing consumer preferences could adversely impact our business.**

A downturn in economic conditions in one or more of the Company's markets could have a material adverse effect on our results of operations, financial condition, business, and prospects. In addition, an economic downturn, coupled with sustained unemployment, may also impact the number of enrollees in managed care programs as well as the profitability of managed care companies, which could result in reduced reimbursement rates. The existing federal deficit, as well as deficit spending by the government as the result of adverse developments in the economy or other reasons, can lead to continuing pressure to reduce government expenditures for other purposes, including government-funded programs in which we participate, such as Medicare and Medicaid. Such actions in turn may adversely affect our results of operations. Although we attempt to stay informed of government and customer trends, any sustained failure to identify and respond to trends could have a material adverse effect on our results of operations, financial condition, business, and prospects.

**The Company's success depends upon the ability to adapt to a changing market and continued development of additional products and services.**

Although we expect to provide a broad and competitive range of products and services, there can be no assurance of acceptance by the marketplace. The procurement of new contracts by the Company may be dependent upon the continuing results achieved, upon pricing and operational considerations, as well as the potential need for continuing improvement to existing products and services. Moreover, the markets for such products and services may not develop as expected nor can there be any assurance that we will be successful in our marketing of any such services.

**The healthcare industry is competitive, and we may not be able to compete effectively.**

There are other companies and individuals currently providing similar products and services as us in the healthcare industry. We compete directly with national, regional, and local companies. Other companies could enter the market in the future and divert some or all of our business. Our competitors may have greater financial and other resources available to them. Existing or future competitors also may seek to compete with us for acquisitions, which could have the effect of increasing the price and reducing the number of suitable acquisitions, which would have an adverse impact on our growth strategy. We may be unable to successfully compete with these competitors and may expend significant resources without success.

**The requirements of remaining a public company may strain our resources and distract our management, which could make it difficult to manage our business.**

We are required to comply with various regulatory and reporting requirements, including those required by the SEC. Complying with these reporting and other regulatory requirements are time-consuming and expensive and could have a negative effect on our business, results of operations and financial condition.

**The commercial success of our products and services is dependent, in part, on factors outside our control**.

The commercial success of our products and services is dependent upon unpredictable and volatile factors beyond our control, such as the success of our competitors' products and services. Our failure to attract market acceptance and a sustainable competitive advantage over our competitors would materially harm our business.

**We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act") and if we fail to continue to comply, our business could be harmed, and the price of our securities could decline.**

25

*Table of Contents*

Rules adopted by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act require an annual assessment of internal control over financial reporting, and for certain issuers an attestation of this assessment by the issuer's independent registered public accounting firm. The standards that must be met for management to assess the internal control over financial reporting as effective are evolving and complex, and require significant documentation, testing, and possible remediation to meet the detailed standards. We expect to incur significant expenses and to devote resources to Section 404 compliance on an ongoing basis. It is difficult for us to predict how long it will take or costly it will be to complete the assessment of the effectiveness of our internal control over financial reporting for each year and to remediate any deficiencies in our internal control over financial reporting. As a result, we may not be able to complete the assessment and remediation process on a timely basis. In the event that our Chief Executive Officer or Chief Financial Officer determines that our internal control over financial reporting is not effective as defined under Section 404, we cannot predict how regulators will react or how the market prices of our securities will be affected; however, we believe that there is a risk that investor confidence and the market value of our securities may be negatively affected.

**We are currently delinquent in our SEC Reporting Obligations for the periodic reports due to be filed from June 2014 to March 2019, as well as for the periodic reports due to be filed for the quarters ended December 31, 2021, and March 31, 2022**

We are currently delinquent in our SEC Reporting Obligations for the periodic reports due to be filed from June 2014 to March 2019, as well as for the periodic reports due to be filed for the quarters ended December 31, 2021 and March 31, 2022. The Company plans to make up the foregoing reports, however, there can be no assurance that it will be able to do so as planned. If we are unable to make up such delinquent periodic reports, it may cause difficulties in FINRA processing any corporate actions submitted by the Company as well as difficulty moving up from the Expert Market to the OTC Pink Tier. Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

**Risks Related to Healthcare Regulation**

**The healthcare industry is complex and intensely regulated at the federal, state, and local levels and government authorities may determine that we have failed to comply with applicable laws or regulations.**

As a company involved in the provision of healthcare services, we are subject to a myriad of federal, state, and local laws and regulations. There are significant costs involved in complying with these laws and regulations. Moreover, if we are found to have violated any applicable laws or regulations, we could be subject to civil and/or criminal damages, fines, sanctions, or penalties, including exclusion from participation in governmental healthcare programs, such as Medicare and Medicaid. We may also be required to change our method of operations. These consequences could be the result of current conduct or even conduct that occurred a number of years ago. We also could incur significant costs merely if we become the subject of an additional investigation or legal proceeding alleging a violation of these laws and regulations. We cannot predict whether a federal, state, or local government will determine that we are not operating in accordance with law, or whether the laws will change in the future and impact our business. Any of these actions could have a material adverse effect on our business, financial condition, and results of operations.

The following is a non-exhaustive list of some of the more significant healthcare laws and regulations that affect us:

- federal laws, including the federal False Claims Act, which provide for penalties against entities and individuals which knowingly or recklessly make claims to Medicare, Medicaid, and other governmental healthcare programs, as well as third-party payors, which contain or are based upon false or fraudulent information;

- a provision of the Social Security Act, commonly referred to as the "Anti-Kickback Statute," that prohibits the knowing and willful offering, payment, solicitation or receipt of any bribe, kickback, rebate, or other remuneration, in cash or in kind, in return for the referral or recommendation of patients for items and services covered, in or in part, by federal healthcare programs such as Medicare and Medicaid;

26

Table of Contents

- a provision of the Social Security Act, commonly referred to as the Stark Law or physician self-referral law, that (subject to limited exceptions) prohibits physicians from referring Medicare patients to an entity for the provision of specific "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship with the entity, and prohibits the entity from billing for services arising out of such prohibited referrals;

- a provision of the Social Security Act that provides for criminal penalties on healthcare providers who fail to disclose known overpayments;

- a provision of the Social Security Act that provides for civil monetary penalties on healthcare providers who fail to repay known overpayments within 60 days of identification or the date any corresponding cost report was due, if applicable, and also allows improper retention of known overpayments to serve as a basis for False Claims Act violations;

- state law provisions pertaining to anti-kickback, self-referral, and false claims issues, which typically are not limited to relationships involving governmental payors;

- provisions of, and regulations relating to, the Health Insurance Portability and Accountability Act ("HIPAA") that provide penalties for knowingly and willfully executing a scheme or artifice to defraud a health-care benefit program or falsifying, concealing, or covering up a material fact or making any materially false, fictitious, or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items, or services;

- provisions of HIPAA and Health Information Technology for Economic and Clinical Health Act ("HITECH") limiting how covered entities, business associates and business associate sub-contractors may use and disclose PHI and the security measures that must be taken in connection with protecting that information and related systems, as well as similar or more stringent state laws;

- federal and state laws that provide penalties for providers for billing and receiving payment from a governmental healthcare program for services unless the services are medically necessary and reasonable, adequately, and accurately documented, and billed using codes that accurately reflect the type and level of services rendered;

- federal laws that provide for administrative sanctions, including civil monetary penalties for, among other violations, inappropriate billing of services to federal healthcare programs, payments by hospitals to physicians for reducing or limiting services to Medicare or Medicaid patients, or employing or contracting with individuals or entities who/which are excluded from participation in federal healthcare programs;

- federal and state laws and policies that require healthcare providers to enroll in the Medicare and Medicaid programs before submitting any claims for services, to promptly report certain changes in their operations to the agencies that administer these programs, and to re-enroll in these programs when changes in direct or indirect ownership occur or in response to revalidation requests from Medicare and Medicaid;

- state laws that prohibit general business entities from practicing medicine, controlling physicians' medical decisions, or engaging in certain practices, such as splitting fees with physicians; and

- provisions of the Social Security Act (emanating from the Deficit Reduction Act of 2005 (the "DRA")) that require entities that make or receive annual Medicaid payments of $5 million or more from a single Medicaid program to provide their employees, contractors and agents with written policies and employee handbook materials on federal and state false claims acts and related statutes, that establish a new Medicaid Integrity Program designed to enhance federal and state efforts to detect Medicaid fraud, waste, and abuse, and that increase financial incentives for both states and individuals to bring fraud and abuse claims against healthcare companies.

27

**Our revenue may be negatively impacted by the failure of our providers to appropriately document services they provide.**

We rely upon our providers to appropriately and accurately complete necessary medical record documentation and assign appropriate reimbursement codes for their services. If our providers have provided incorrect or incomplete documentation or selected inaccurate reimbursement codes, this could result in nonpayment for services rendered or lead to allegations of billing fraud. This could subsequently lead to civil and criminal penalties, including exclusion from government healthcare programs, such as Medicare and Medicaid. In addition, third-party payors may disallow, in whole or in part, requests for reimbursement based on determinations that certain amounts are not covered, services provided were not medically necessary, or supporting documentation was not adequate. Retroactive adjustments may change amounts realized from third-party payors and result in recoupments or refund demands, affecting revenue already received.

**Changes associated with reimbursement by third-party payors for the Company's services may adversely affect operating results and financial condition.**

The medical services industry is undergoing significant changes with third-party payors that are taking measures to reduce reimbursement rates or in some cases, denying reimbursement altogether. There is no assurance that third-party payors will continue to pay for the services provided by our providers which will have a material adverse effect on our results of operations, financial condition, business, and prospects.

**Compliance with federal and state privacy and information security laws is expensive, and we may be subject to government or private actions due to privacy and security breaches.**

We must comply with numerous federal and state laws and regulations governing the collection, dissemination, access, use, security, and confidentiality of patient health information ("PHI"), including HIPAA and HITECH. Despite our efforts to prevent security and privacy breaches, they may still occur. If any non-compliance with existing or new laws and regulations related to PHI results in privacy or security breaches, we could be subject to monetary fines, civil suits, civil penalties, or even criminal sanctions. As a result of the expanded scope of HIPAA through HITECH, we may incur significant costs in order to minimize the amount of "unsecured PHI" we handle and retain or to implement improved administrative, technical, or physical safeguards to protect PHI. We may incur significant costs in order to demonstrate and document whether there is a low probability that the PHI has been compromised in order to overcome the presumption that an impermissible use or disclosure of PHI results in a reportable breach. We may incur significant costs to notify the relevant individuals, government entities, and, in some cases, the media, in the event of a breach and to provide appropriate remediation and monitoring to mitigate the possible damage done by any such breach.

**If we are unable to effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding or affecting healthcare reform or the healthcare industry, our business may be harmed.**

Due to the importance of the healthcare industry in the lives of all Americans, federal, state, and local legislative bodies frequently pass legislation and promulgate regulations relating to healthcare reform or that affect healthcare business. It is reasonable to believe that there may be increased federal oversight and regulation of the healthcare industry in the future. We cannot assure you as to the ultimate content, timing, or effect of any healthcare reform legislation, nor is it possible at this time to estimate the impact of potential legislation on our business. It is possible that future legislation enacted by Congress or state legislatures could adversely affect our business or could change the operating environment of our providers to which we provide our products and services. It is possible that the changes to the Medicare or other governmental healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to us. Similarly, changes in private payor reimbursements could lead to adverse changes in Medicare and other governmental healthcare programs which could have a material adverse effect on our business, financial condition, and results of operations.

28

Table of Contents

**Risks Related to Our Common Stock**

**Our Common Stock Currently Trades on the Expert Market Tier of OTC Markets and is Labeled as "Delinquent SEC Reporting."**

Our common stock currently trades on the Expert Market Tier of OTC Market Group LLC's Marketplace under the symbol "HSMD" and is labeled as "Delinquent SEC Reporting" at this time. The OTC Market is a network of security dealers who buy and sell stock. The dealers are connected by a computer network that provides information on current "bids" and "asks," as well as volume information. Stock on the Expert Market is not eligible for proprietary broker-dealer quotations. All quotes in stock on the Expert Market reflect unsolicited customer orders. Unsolicited-Only stocks, such as ours, have a higher risk of wider spreads, increased volatility, and price dislocations. Investors may have difficulty selling our stock. An initial review by a broker-dealer under SEC Rule15c2-11 is required for brokers to publish competing quotes and provide continuous market making in our stock. The Expert Market serves broker-dealer pricing and investor best execution needs. Quotations in Expert Market securities are restricted from public viewing. OTC Markets Group may designate securities for quoting on the Expert Market when it is not able to confirm that the company is making current information publicly available under SEC Rule 15c2-11, or when the security is otherwise restricted from public quoting.

**Because we are currently delinquent in our SEC filings, the holders of our restricted securities will not be able to sell their securities in reliance on Rule 144.**

Because we are currently delinquent in our SEC filings, the holders of our restricted securities will not be able to sell their securities in reliance on Rule 144. Accordingly, at this time, holders of our restricted securities cannot sell those securities in reliance on Rule 144. This restriction may have potential adverse effects on future efforts to form additional capital through unregistered offerings.

**Our Common Stock is subject to risks arising from restrictions on reliance on Rule 144 by former shell companies.**

Under a regulation of the SEC known as "Rule 144," a person who beneficially owns restricted securities of an issuer and who is not an affiliate of that issuer may sell them without registration under the Securities Act provided that certain conditions have been met. One of these conditions is that such person has held the restricted securities for a prescribed period, which will be 6 months for the common stock. However, Rule 144 is unavailable for the resale of securities issued by an issuer that is a shell company (other than a business combination related shell company) or, unless certain conditions are met, that has been at any time previously a shell company.

The SEC defines a shell company as a company that has (a) no or nominal operations and (b) either (i) no or nominal assets, (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets.

As a result of the Merger as described in Items 1.01 and 2.01, the Company ceased being a shell company as such term is defined in Rule 12b-2 under the Exchange Act.

While we believe that as a result of the Merger, the Company ceased to be a shell company, the SEC, and others whose approval is required in order for shares to be sold under Rule 144 might take a different view.

Rule 144 is available for the resale of securities of former shell companies if and for as long as the following conditions are met:

(i) the issuer of the securities that was formerly a shell company has ceased to be a shell company,

(ii) the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act,

(iii) the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and

(iv) at least one year has elapsed from the time that the issuer filed current comprehensive disclosure with the SEC reflecting its status as an entity that is not a shell company known as "Form 10 Information."

29

Although the Company filed Form 10 Information with the SEC on its Current Report on Form 8-K on April 21, 2021, shareholders who receive the Company's restricted securities will not be able to sell them pursuant to Rule 144 without registration until the Company has met the other conditions to this exception and then for only as long as the Company continues to meet the condition described in subparagraph (iii), above, and is not a shell company. No assurance can be given that the Company will meet these conditions or that, if it has met them, it will continue to do so, or that it will not again be a shell company.

**The sale of the additional shares of Common Stock could cause dilution as well as the value of our Common Stock to decline.**

The sale of a substantial number of shares of our common stock, or anticipation of such sales, could make it more difficult for us to sell equity or equity-related securities in the future at a time and at a price that we might otherwise wish. Further, if we do sell or issue more common stock, any investors' investment in the Company will be diluted. Dilution is the difference between what you pay for your stock and the net tangible book value per share immediately after the additional shares are sold by us. If dilution occurs, any investment in the Company's common stock could seriously decline in value.

**Our Common Stock constitutes restricted securities and is subject to limited transferability.**

All of our common stock shares, should be considered a long-term, illiquid investment. Common. In addition, our common stock, is not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a stockholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

**Our Common Stock price may decrease due to factors beyond our control.**

The stock market from time to time has experienced extreme price and volume fluctuations, which have particularly affected the market prices for early-stage companies, and which often have been unrelated to the operating performance of the companies. These broad market fluctuations may adversely affect the market price of our stock, if a trading market for our stock ever develops. If our shareholders sell substantial amounts of their stock in the public market, the price of our stock could fall. These sales also might make it more difficult for us to sell equity, or equity-related securities, in the future at a price we deem appropriate.

The market price of our stock may also fluctuate significantly in response, but not limited to, the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner, or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market price or value of our common stock, regardless of our actual operating performance. As a result, stockholders may be unable to sell their shares, or may be forced to sell them at a loss.

**Our Common Stock is subject to the application of the "penny stock" rules which could adversely affect the market price of our common stock and increase transaction costs to sell those shares.**

30

*Table of Contents*

The SEC has adopted rule 3a51-1 which establishes the definition of a "penny stock," for the purposes relevant to us, as any equity security that has a market price of less than $5.00 per share or with an exercise price of less than $5.00 per share, subject to certain exceptions. For any transaction involving a penny stock, unless exempt, Rule 15g-9 requires:

- that a broker or dealer approve a person's account for transactions in penny stocks, and
- the broker or dealer receive from the investor a written agreement to the transaction, setting forth the identity and quantity of the penny stock to be purchased.

In order to approve a person's account for transactions in penny stocks, the broker or dealer must:

- obtain financial information and investment experience objectives of the person, and
- make a reasonable determination that the transactions in penny stocks are suitable for that person and the person has sufficient knowledge and experience in financial matters to be capable of evaluating the risks of transactions in penny stocks.

The broker or dealer must also deliver, prior to any transaction in a penny stock, a disclosure schedule prescribed by the SEC relating to the penny stock market, which, in highlight form:

- sets forth the basis on which the broker or dealer made the suitability determination and
- that the broker or dealer received a signed, written agreement from the investor prior to the transaction.

Generally, brokers may be less willing to execute transactions in securities subject to the "penny stock" rules. This may make it more difficult for investors to dispose of our common stock and cause a decline in the market value of our stock.

**The market price for our Common Stocks is particularly volatile which could lead to wide fluctuations in our share price. You may be unable to sell your Common Stock shares at or above your purchase price, or at all, which may result in substantial losses to you.**

The market for our common stock is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future. As a consequence of this enhanced risk, more risk-adverse investors may, under the fear of losing all or most of their investment in the event of negative news or lack of progress, be more inclined to sell their shares on the market more quickly and at greater discounts than would be the case with the stock of a seasoned issuer. Many of these factors are beyond our control and may decrease the market price of our common stock, regardless of our operating performance. We cannot make any predictions or projections as to what the prevailing market price for our common stock shares will be at any time, or as to what effect the sale of shares or the availability of common stock shares for sale at any time will have on the prevailing market price.

**Because we will likely issue additional shares of our Common Stock, investment in the Company could be subject to substantial dilution.**

Investors' interests in the Company will be diluted and investors may suffer dilution in their net book value per share when we issue additional shares. We are authorized to issue 1,400,000,000 shares of common stock. We anticipate that all or at least some, or potentially all, of our future funding, if any, will be in the form of equity financing from the sale of our common stock. If we do sell or issue more common stock, any investors' investment in the Company will be diluted. Dilution is the difference between what you pay for your stock and the net tangible book value per share immediately after the additional shares are sold by us. If dilution occurs, any investment in the Company's common stock could seriously decline in value.

31

Table of Contents

**FINRA sales practice requirements may also limit a stockholder's ability to buy and sell our stock.**

In addition to the "penny stock" rules described above, FINRA has adopted FINRA Rule 2111 that requires a broker-dealer to have reasonable grounds for believing that an investment is suitable for a customer before recommending the investment. Prior to recommending speculative low-priced securities to their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financial status, tax status, investment objectives and other information. Under interpretations of these rules, FINRA believes that there is a high probability that speculative low-priced securities will not be suitable for at least some customers. The FINRA requirements make it more difficult for broker-dealers to recommend that their customers buy our common stock, which may limit your ability to buy and sell our stock and have an adverse effect on the market for our shares.

**We do not intend to pay dividends for the foreseeable future.**

We have never declared or paid any cash dividends on our stock and do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all of our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of our Board of Directors.

**If we are unable to comply with the financial reporting requirements mandated by the SEC's regulations, investors may lose confidence in our financial reporting and the price of our common stock, if a market ever does develop for it, could decline.**

If we fail to maintain effective internal controls over financial reporting, our ability to produce timely, accurate and reliable periodic financial statements could be impaired. If we do not maintain adequate internal control over financial reporting, investors could lose confidence in the accuracy of our periodic reports filed under the Exchange Act. Additionally, our ability to obtain additional financing could be impaired or a lack of investor confidence in the reliability and accuracy of our public reporting could cause our stock price to decline.

## Item 1B. Unresolved Staff Comments.

Not applicable.

## Item 2. Properties.

Prior to the Merger, the Company's headquarters were located at 387 Corona St., Suite 555, Denver, CO 80218. Since the Merger, the Company no longer uses the foregoing property.

Effective as of the Closing of the Merger, the Company's principal office is located at 3 School St, Suite 303, Glen Cove, NY 11542, where it leases approximately 2,250 square feet of office space at a monthly rent of $2,500 per month. Pursuant to the terms of the lease, the monthly rent will go up to $2,575 per month starting on September 15, 2021 and will remain at this amount until September 14, 2022. The lease term ends on September 14, 2022. We believe that these facilities are adequate to support the Company's existing operations and that we will be able to obtain appropriate additional facilities or alternative facilities on commercially reasonable terms if and when necessary.

## Item 3. Legal Proceedings.

The Company may be involved in certain legal proceedings that arise from time to time in the ordinary course of its business. Legal expenses associated with any contingency are expensed as incurred. The Company's officers and directors are not aware of any threatened or pending litigation to which the Company is a party, other than the receivership as discussed below, or which any of its property is the subject and which would have any material, adverse effect on the Company.

32

**Prior Receivership**

The Company was previously in receivership. On May 16, 2016, pursuant to Case Number A16-733815-B, Nevada's 8th Judicial District, Business Court, appointed Robert Stevens as receiver (the "Receiver") for the Company. Creditors of the Company were required to provide claims in writing under oath on or before November 3, 2016, or they would be barred under Nevada Revised Statute §78.675. Since May 16, 2016, through the date of the Merger, the Company was operating under the direction of the Receiver. On March 5, 2018, the District Court in Clark County, Nevada approved a plan of reorganization for the Company and the discharge of the Receiver upon completion of his duties under the court order. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action was needed by the Receiver or the Company in connection with the receivership, and such that Company was no longer in receivership.

**Item 4. Mine Safety Disclosures.**

Not applicable.

---

33

Table of Contents

Part II

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

Our common stock currently trades on the Expert Market Tier of OTC Market Group LLC's Marketplace under the symbol "HSMD" and is labeled as "Delinquent SEC Reporting" at this time. The OTC Market is a network of security dealers who buy and sell stock. The dealers are connected by a computer network that provides information on current "bids" and "asks," as well as volume information. Stock on the Expert Market is not eligible for proprietary broker-dealer quotations. All quotes in stock on the Expert Market reflect unsolicited customer orders. Unsolicited-Only stocks, such as ours, have a higher risk of wider spreads, increased volatility, and price dislocations. Investors may have difficulty selling our stock. An initial review by a broker-dealer under SEC Rule15c2-11 is required for brokers to publish competing quotes and provide continuous market making in our stock. The Expert Market serves broker-dealer pricing and investor best execution needs. Quotations in Expert Market securities are restricted from public viewing. OTC Markets Group may designate securities for quoting on the Expert Market when it is not able to confirm that the company is making current information publicly available under SEC Rule 15c2-11, or when the security is otherwise restricted from public quoting. The common stock previously traded on the Pink Tier of OTC Market Group LLC's Marketplace. The dealers are connected by a computer network that provides information on current "bids" and "asks," as well as volume information.

The following table sets forth, for the periods indicated the high and low bid quotations for our common stock. These quotations represent inter-dealer quotations, without adjustment for retail markup, markdown, or commission and may not represent actual transactions.

The following table sets forth, for the periods indicated the high and low bid quotations for our common stock. These quotations represent inter-dealer quotations, without adjustment for retail markup, markdown, or commission and may not represent actual transactions.

| Period | High | | Low | |
|---|---|---|---|---|
| **Fiscal Year 2021** | | | | |
| First Quarter (October 1, 2020 – December 31, 2020) | $ | 0.0749 | $ | 0.0320 |
| Second Quarter (January 1, 2021 – March 31, 2021) | $ | 0.1250 | $ | 0.0610 |
| Third Quarter (April 1, 2021 – June 30, 2021) | $ | 0.1900 | $ | 0.0702 |
| Fourth Quarter (July 1, 2021 – September 30, 2021)* | $ | 11.7300 | $ | 6.4700 |

| Period | High | | Low | |
|---|---|---|---|---|
| **Fiscal Year 2020**\*\* | | | | |
| First Quarter (July 1, 2019 – September 30, 2019) | $ | 0.1300 | $ | 0.0070 |
| Second Quarter (October 1, 2019 – December 31, 2019) | $ | 0.0490 | $ | 0.0086 |
| Third Quarter (January 1, 2020 – March 31, 2020) | $ | 0.0490 | $ | 0.0230 |
| Fourth Quarter (April 1, 2020 – June 30, 2020) | $ | 0.0800 | $ | 0.0115 |

34

*Table of Contents*

| Period | High | Low |
|---|---|---|
| **Fiscal Year 2019** | | |
| First Quarter (July 1, 2018 – September 30, 2018) | $ 0.0400 | $ 0.0112 |
| Second Quarter (October 1, 2018 – December 31, 2018) | $ 0.0270 | $ 0.0088 |
| Third Quarter (January 1, 2019 – March 31, 2019) | $ 0.0140 | $ 0.0061 |
| Fourth Quarter (April 1, 2019 – June 30, 2019) | $ 0.1000 | $ 0.0065 |

―――――――

*These prices were adjusted for the Company's 1 for 115 reverse stock split, which was effective on October 29, 2021. The prices in the remainder of this table were not adjusted for the reverse stock split.

**On November 5, 2020, the Company's court appointed receiver, acting under judicial order on behalf of the Board of Directors of the Company, in accordance with the Company's Bylaws, acted by written consent to change the Company's Fiscal Year end from June 30 to September 30. The high and low bid quotations for our common stock during the period from July 1, 2020 to September 30, 2020, were $0.1950 and $0.0138, respectively.

**Name, Trading Symbol Change and Reverse Stock Split**

Since Healthcare Solutions Management Group, Inc. became the successor in interest to Verity Delaware Inc. a Delaware corporation which was previously a Nevada corporation named Verity Corp., the Company's current name became Healthcare Solutions Management Group, Inc.

On September 13, 2021, the Board of Directors (the "Board") of the "Company approved (i) a 1 for 115 Reverse Stock Split of the Company's common stock with any fractional shares of common stock resulting therefrom being rounded up to the nearest whole share of common stock (the "Reverse Stock Split") and (ii) a voluntary change in the Company's stock symbol from "VRTY" to a symbol selected by the Company's officers (the "Symbol Change" and together with the Reverse Stock Split, referred to herein together as the "Corporate Actions"). On the same date, 52.42 % of the Company's shareholders also approved the Corporate Actions. On September 15, 2021, the Company filed a Certificate of Amendment to its Amended and Restated Certificate of Incorporation (the "Certificate") with the Delaware Secretary of State for the Reverse Stock Split, with an effective date of the later of (i) September 29, 2021 or (ii) on a date that that the Reverse Stock Split, is announced by Financial Industry Regulatory Authority ("FINRA").

The Company submitted an Issuer Company Related Action Notification regarding the Corporate Actions, as well as its prior name change to its current name to FINRA on September 15, 2021 (the name change together with the Reverse Stock Split and Symbol Change are referred to herein together as the "Corporate Actions"). The Company was then notified by FINRA that the market effective date for the Corporate Actions was October 29, 2021. The new trading symbol for the Company's common stock as of October 29, 2021 was "VRTYD" and effective as of November 26, 2021 the symbol changed to "HSMD." Further, the Company's common stock now has the following CUSIP number: 42226Y 105.

**Dividends**

The Company has not declared any dividends since inception and does not anticipate paying any dividends in the foreseeable future on its common stock. The payment of dividends is within the discretion of the Board of Directors and will depend on the Company's earnings, capital requirements, financial condition, and other relevant factors. There are no restrictions that currently limit the Company's ability to pay dividends on its common stock other than those generally imposed by applicable state law.

**Equity Compensation Plans**

None.

35

**Holders**

As of May 31, 2022, we had 92,214,638 shares of our common stock par value, $.0001 issued and outstanding. There were approximately 1,671 record owners of our common stock.

**Transfer Agent and Registrar**

The Company's transfer agent Pacific Stock Transfer, located at 4045 South Spencer Street, Suite 403, Las Vegas, NV, 89119.

**Recent Sales of Unregistered Securities**

As disclosed throughout this Report the Company effected a 1 for 115 reverse stock split on October 29, 2021. The following share listed below in this section "Recent Sales of Unregistered Securities", reflected **pre-split** share totals, other than for any issuances made after October 29, 2021, which is the effective date of the split.

On August 27, 2020, the Company issued the Receiver Shares, which consisted of 38,199,918 shares each of its common stock to three parties, totaling 114,599,754 shares of common stock in the aggregate, in accordance with the Amendment and the Merger Agreement as consideration for the services provided to the Company by its receiver.

On April 15, 2021 the Company consummated the Merger, whereby 1,145,997,555 shares of the Company's common stock were issued to the holders of HSH common stock at the Exchange Ratio.

The entry into the Agreement and the UC Agreement, triggered the issuance, on December 31, 2021 by the Company of 81,000,000 shares of its common stock to the following parties in the following amounts (the "Shares").

The issuance of the Shares were triggered pursuant to:

- A management consulting agreement with Black Label Services, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- A management consulting agreement with Jackson Hole Medical Advisors, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- An employment agreement with Jonathan Loutzenhiser, dated July 15, 2018: 22,000,000 shares of common stock.

- A consulting services agreement with 168 Capital, Inc., dated October 1, 2018: 9,000,000 shares of common stock.

- A consulting services agreement with Alpha Properties LLC., dated October 1, 2018: 3,000,000 shares of common stock.

- A consulting services agreement with Stin Marketing Group LLC., dated October 1, 2018: 3,000,000 shares of common stock.

Additionally, subsequent to September 30, 2021, the Company issued 142,198 shares for consulting services.

The above issuances of shares of common stock were issued in reliance on Section 4(a)(2) of the Securities Act of 1933, as amended and the provisions of Regulation D promulgated thereunder.

**Our Securities**

**General**

Our authorized capital stock consists of 1,400,000,000 shares of common stock, par value $0.0001 per share and 10,000,000 shares of preferred stock, $0.0001 par value per share, of which 92,214,638 shares of common stock are currently outstanding; and -0- shares of preferred stock are currently outstanding, respectively, as of May 31, 2022.

36

**Common Stock**

Each holder of our common stock is entitled to one vote for each share owned of record on all matters voted upon by shareholders, and a majority vote is required for actions to be taken by shareholders. The common stock has no preemptive rights, no cumulative voting rights and no redemption, sinking fund or conversion provisions.

**Preferred Stock**

The Company is authorized to issue 10,000,000 shares of preferred stock, $0.0001 par value per share and the Company's Board of Directors is authorized to establish, from the authorized shares of preferred stock, one or more classes or series of shares, to designate each such class and series, and fix the rights and preferences of each such class of preferred stock, which shall have voting powers, preferences, participating, optional or other special rights, qualifications and limitations or restrictions as adopted by the Board of Directors prior to the issuance of any such preferred shares.

**Warrants**

There are currently no outstanding warrants of the Company.

**Options**

There are currently no options outstanding.

**Anti-Takeover Effects of Certain Provisions of Our Bylaws**

Provisions of our Bylaws could make it more difficult to acquire us utilizing a merger, tender offer, proxy contest, open market purchases, removal of incumbent directors and otherwise. These provisions, which are summarized below, are expected to discourage types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of us to first negotiate with us. We believe that the benefits of increased protection of our potential ability to negotiate with the proponent of an unfriendly or unsolicited proposal to acquire or restructure us outweigh the disadvantages of discouraging takeover or acquisition proposals because negotiation of these proposals could result in an improvement of their terms.

*Calling of Special Meetings of Stockholders.* Our Bylaws provide that special meetings of the stockholders may be called only by the Board, unless otherwise required by law.

**Item 6. [Reserved].**

Not applicable.

37

Table of Contents

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of the results of operations and financial condition of the Company for the years ended September 30, 2021 and 2020, should be read in conjunction with the other sections of this Annual Report, including "Description of Business" and the Financial Statements and notes thereto of the Company included in this Annual Report. The various sections of this discussion contain forward-looking statements, all of which are based on our current expectations and could be affected by the uncertainties and risk factors described throughout this Annual Report as well as other matters over which we have no control. See "Cautionary Note Regarding Forward-Looking Statements." Our actual results may differ materially. The Company does not undertake any obligation to update forward-looking statements to reflect events or circumstances occurring after the date of this Annual Report.*

**Organizational History of the Company and Overview**

Healthcare Solutions Management Group, Inc., a Delaware corporation, and successor in interest to Verity Delaware Inc., a Delaware corporation which was previously a Nevada corporation named Verity Corp. was incorporated on April 11, 2006 in the state of Nevada under the name Infrared Systems, International.

On December 31, 2012, AquaLiv Technologies, Inc. ("ALTI") and Verity Farms II, Inc. ("Verity Farms"), a South Dakota corporation, entered into a Share Exchange Agreement. Pursuant to the Share Exchange Agreement, ALTI acquired 100% of the authorized and issued shares of Verity Farms in exchange (the "Exchange") for 4,850,000 shares of Series B Convertible Preferred Stock, par value $0.001 of ALTI, representing approximately 86% of the outstanding shares of ALTI, on a fully diluted basis, assuming conversion into common stock. As a result of the Exchange and the other transactions contemplated thereunder, Verity Farms became a wholly owned subsidiary of ALTI and ALTI acquired Verity Farms' business operations. ALTI was formed under the laws of the State of Nevada on April 11, 2006 originally under the name of Infrared Systems International "ISI" as a wholly owned subsidiary of China Sxan Biotech, Inc. ("CSBI") (then known as Advance Technologies, Inc.) to pursue a narrowly defined business objective called infrared security systems.

On April 1, 2013, the Company changed its name from AquaLiv Technologies Inc. to Verity Corp. and our stock symbol changed to VRTY. The Company was the parent of Verity Farms and Aistiva Corporation ("Aistiva") (f/k/a AquaLiv, Inc.). Verity Farms was dedicated to providing consumers with safe, high-quality, and nutritious food sources through sustainable crop and livestock production. Aistiva previously released products in the industries of water treatment, skincare, and agriculture. Verity Farms was administratively dissolved in the State of South Dakota on May 4, 2018. Aistiva was administratively dissolved on April 9, 2015, in the State of Washington.

In February 2016, all of the Company's officers and directors resigned, and the Company stopped substantially all operating activities. At such time, the Company became a "shell company," as such term is defined in Rule 12b-2 under the Exchange Act.

On November 5, 2020, we changed our Fiscal Year End from June 30 to September 30. As a result of this change, we filed a Transition Report on Form 10-K with the SEC for the three-month transition period from June 30, 2020 to September 30, 2020 on January 20, 2021.

As a result of the consummation of the Merger, as such term is defined below, on April 15, 2021, Healthcare Solutions Holdings, Inc., a Delaware corporation ("HSH"), became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. Accordingly, the Company ceased to be a shell company as of April 15, 2021.

*Merger with Healthcare Solutions Holdings, Inc.*

On June 14, 2019, the Company entered into a Merger Agreement (the "Merger Agreement") by and between the Company, Verity Merger Corp., a wholly-owned subsidiary of the Company and a Delaware corporation (the "Merger Sub"), and Healthcare Solutions Holdings, Inc., a Delaware corporation ("HSH"). Pursuant to the terms of the Merger Agreement, the parties agreed that Merger Sub would merge with and into HSH, with HSH being the surviving entity and becoming a wholly-owned subsidiary of the Company (the "Merger"). The Merger closed on April 15, 2021 (the "Closing"), at which time Merger Sub merged with and into HSH with HSH being the surviving entity, and HSH became our wholly owned subsidiary. As a result of the consummation of the Merger, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward.

At the Closing of the Merger, Robert Stevens (the "Receiver") appointed new officers and directors of the Company. As consideration for the services of the Receiver and his team, for acting as the court-appointed receiver for the Company and its predecessor and affiliated entities, and pursuant the Merger Agreement, as amended, in August of 2020, the Receiver and certain entities, as directed by the Receiver, were issued an aggregate total of 114,599,754 shares of the Company's common stock. At Closing, the aggregate Merger

consideration paid to the holders of the HSH common was 1,145,997,393 shares of the Company's common stock constituting 90% of the issued and outstanding shares of Company common stock immediately following the Closing.

---

38

---

Table of Contents

As a result of the consummation of the Merger, on April 15, 2021, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. Accordingly, at the Closing, the Company ceased to be a shell company as of April 15, 2021.

### Prior Receivership

The Company was previously in receivership. On May 16, 2016, pursuant to Case Number A16-733815-B, Nevada's 8th Judicial District, Business Court, appointed Robert Stevens as receiver (the "Receiver") for the Company. Creditors of the Company were required to provide claims in writing under oath on or before November 3, 2016, or they would be barred under Nevada Revised Statute §78.675. Since May 16, 2016, through the date of the Merger, the Company was operating under the direction of the Receiver. On March 5, 2018, the District Court in Clark County, Nevada approved a plan of reorganization for the Company and the discharge of the Receiver upon completion of his duties under the court order. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action was needed by the Receiver or the Company in connection with the receivership, and such that Company was no longer in receivership.

### Change of Domicile and Plan of Conversion

On March 15, 2019, Healthcare Solutions Management Group, Inc. was incorporated in the State of Delaware. Verity Delaware, Inc. was incorporated in the State of Delaware on March 11, 2019. Verity Merger Corp. was incorporated in the State of Delaware on March 15, 2019. On March 11, 2019, pursuant to an Agreement and Plan of Conversion, the Company, then a Nevada corporation named Verity Corp., converted into, and became Verity Delaware, Inc., a Delaware corporation in Delaware and on May 30, 2019, the conversion was completed in Nevada. As a result of the foregoing, Verity Corp. a Nevada corporation converted into and became Verity Delaware, Inc., a Delaware corporation. On May 8, 2019, pursuant to a Plan of Merger, Verity Delaware, Inc. was merged with and into Verity Merger Corp., with Verity Merger Corp. surviving, and with Healthcare Solutions Management Group, Inc. becoming a successor in interest to Verity Delaware Inc. and the parent company of Verity Merger Corp.

### Change in Fiscal Year End

On November 5, 2020, the Company's court appointed receiver, acting under judicial order on behalf of the Board of Directors of the Company, in accordance with the Company's Bylaws, acted by written consent to change the Company's Fiscal Year End from June 30 to September 30. As a result of this change, we filed a Transition Report on Form 10-K for the three-month transition period from June 30, 2020 to September 30, 2020 on January 20, 2021.

### Impact of COVID-19

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a global pandemic which continued to spread throughout the U.S. and the globe. In addition to the devastating effects on human life, the pandemic is continuing to have a negative ripple effect on the global economy, leading to disruptions and volatility in the global financial markets. There are no comparable events that provide guidance as to the effect the COVID-19 pandemic may have, and, as a result, the ultimate effect of the pandemic is highly uncertain and subject to change. COVID-19 has already hindered or slowed many of HSH's businesses, including but not limited to our growth and growth strategies, developments in the marketplace for products, therapies and services, financial results, research and development strategy, regulatory approvals, and competitive strengths. The direct or indirect impact of COVID-19 on our business, results of operations and/or financial condition, continues today, but HSH has thus far weathered the pandemic storm and continues to seek to improve our level of service and patient care. The extent of the ultimate impact of the pandemic on the Company's operational and financial performance will depend on various developments, including the duration and continued spread of the outbreak, which cannot be reasonably predicted at this time. Accordingly, while management reasonably expects the COVID-19 outbreak to negatively impact the Company, the related consequences and duration are highly uncertain and cannot be predicted at this time.

Table of Contents

**Results of Operations**

*Comparison of Results of Operations for the Years Ended September 30, 2021 and 2020*

*Revenue and cost of sales*

For the year ended September 30, 2021, we recorded $9,248,784 in revenue compared to $3,524,334 for the year ended September 30, 2020. The increase is attributable to the establishment and opening of new locations. Included in revenue was $682,500 in related party revenue. The related party revenue was generated from the sale of medical services such as laboratory, durable medical equipment, and pharmacy services through preestablish sales channels that were accessed through the founders of the company.

Cost of sales for the year ended September 30, 2021 was $2,464,189 compared to $2,595,860 in the year ended September 30, 2020. The increase is attributable to the establishment of a new location. Included in cost of sales in September 30, 2022 and 2021 is $2,297,455 and $2,595,860, respectively in cost of goods sold, related parties. The Company is entering into a significant business growth stage and to be prepared for this expansion requires the development of significant infrastructure which was provided through certain founders and corporate officers.

*Operating Expenses*

Operating expenses for the year ended September 30, 2021 were $9,438,982 compared to $3,952,621 for the year ended September 30, 2020, an increase of $5,486,361. The increase in operating expenses in the 2021 period compared to 2020 is attributable to an increase of approximately $1,843,000 in administrative expenses and increase of approximately $4,013,000 in contractors expenses related party, offset by a decrease of approximately $370,000 of contractor expenses. The increase of $4,013,000 in contractors expenses related party is attributable to an increase in our labor costs in anticipation of generated higher revenues and the opening of additional location. The key components of general and administrative expenses are the transition expenses of the Company from the planning and development stage to transitioning into the operation of our medical facilities.

**Liquidity and Capital Resources**

As of September 30, 2021, we had $659,194 in cash and cash equivalents compared to $841,349 as of September 30, 2020.

Net cash used in operating activities for year ended September 30, 2021 was $3,575,737 compared to net cash used in operating activities of $3,132,491 for the year ended September 30, 2020.  The increase in cash used in operating activities of $443,246 is primarily attributable to an increase in accounts receivable balances offset to a lesser extent by other balance sheet changes.

Net cash used in investing activities was $1,323,696 for the year ended September 30, 2021 compared to $554,335 used in investing activities for the year ended September 30, 2020. The increase in 2021 is primarily attributable to an increase in equipment purchases

Net cash provided by financing activities for the year ended September 30, 2021 was $4,717,278 compared to $4,119,278 for the year ended September 30, 2020. The increase in 2021 is primarily attributable to an increase in notes payable related parties of approximately $807,000.

We will have significant ongoing needs for working capital to fund operations and to continue to expand our operations. To that end, we would be required to raise additional funds through equity or debt financing. However, there can be no assurance that we will be successful in securing additional capital on favorable terms, if at all. Currently all of our financing is being provided by interest free demand notes payable from related parties. There are no assurance that these related parties will continue to finance the Company. Our inability to raise capital could require us to significantly curtail or terminate our operations altogether.

The financial statements do not include any adjustments that might be necessary if the Company is unable to continue as a going concern.

40

Table of Contents

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles, or "GAAP." The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reported period. In accordance with GAAP, we base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions.

Our significant accounting policies are fully described in Note 2 to our consolidated financial statements appearing elsewhere in this Annual Report, and we believe those accounting policies are critical to the process of making significant judgments and estimates in the preparation of our consolidated financial statements.

**Off-Balance Sheet Arrangements**

None.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

Not required for smaller reporting companies.

**Item 8. Financial Statements and Supplementary Data.**

The financial statements required by this Item 8 are included elsewhere in Annual Report on Form 10-K beginning on page F-1.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

On August 24, 2020, the Company dismissed BMKR, LLP ("BMKR") as its independent registered public accounting firm engaged to audit the Company's financial statements. BMKR's dismissal was approved by the Company's receiver, acting under judicial order on behalf of the Company on August 24, 2020.

BMKR had served as the Company's independent auditors since the 2018 calendar year. BMKR's reports on the Company's financial statements for the fiscal years ended June 30, 2019 and 2018, did not contain any adverse opinions or disclaimers of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles, except that such reports included explanatory paragraphs with respect to the Company's ability to continue as a going concern.

During the fiscal years ended June 30, 2019 and 2018, respectively, and through August 24, 2020, there were no (a) disagreements (as defined in Item 304(a)(1)(iv) of Regulation S-K) with BMKR on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to BMKR's satisfaction, would have caused BMKR to make reference to the subject matter thereof in connection with its reports for such years; or (b) reportable events, as described under Item 304(a)(1)(v) of Regulation S-K.

The Company provided BMKR with a copy of the disclosures it made in its Current Report on Form 8-K disclosing the auditor change filed with the SEC on August 28, 2020 and requested that BMKR provide a letter addressed to the Securities and Exchange Commission indicating whether it agrees with such disclosures. A copy of BMKR's letter, dated August 24, 2020, was filed as Exhibit 16.1 to the Company's Form 8-K reporting the auditor change filed with the SEC on August 28, 2020.

41

Effective as of August 24, 2020, the Company engaged BF Borgers CPA PC ("Borgers") as the Company's independent registered public accounting firm for the fiscal year ended June 30, 2020.

During the fiscal years ended June 30, 2019 and 2018 and through August 24, 2020, neither the Company nor anyone on its behalf has consulted with Borgers regarding either (a) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report was provided nor oral advice was provided to the Company that Borgers concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (b) any matter that was either the subject of a disagreement (as defined in paragraph 304(a)(1)(iv) of Regulation S-K and the related instructions thereto) or a reportable event (as described in paragraph 304(a)(1)(v)) of Regulation S-K).

## Item 9A. Controls and Procedures.

*Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures.*

We carried out an evaluation as required by paragraph (b) of Rule 13a-15 and 15d-15 of the Exchange Act, under the supervision and with the participation of the Company's Interim Chief Executive Officer and Interim Chief Financial Officer, of the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act as of September 30, 2021. Based upon that evaluation, our Interim Chief Executive Officer and Interim Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of September 30, 2021.

*Report of Management on Internal Controls over Financial Reporting.*

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. As of September 30, 2021 management has not completed an effective assessment of the Company's internal control over financial reporting based on the 2013 Committee of Sponsoring Organizations (COSO) framework.

Management has concluded that as of September 30, 2021, our internal control over financial reporting was not effective to detect the inappropriate application of U.S. GAAP.

Management identified the following material weaknesses set forth below in our internal control over financial reporting:

- We did not perform an effective risk assessment or monitor internal controls over financial reporting.

- There are insufficient written policies and procedures to ensure the correct application of accounting and financial reporting with respect to the current requirements of generally accepted accounting principles in the United States and SEC disclosure requirements.

- Limited segregation of duties and oversight of work performed as well as lack of compensating controls in the Company's finance and accounting functions.

- The Company lacks sufficient in-house expertise and training in complex accounting principles and SEC reporting and disclosure requirements.

- The Company's systems that impact financial information and disclosures have ineffective information technology controls.

- The Company lacks a system of tracking obligations to identify and file income tax and other tax reports on a timely basis.

42

*Table of Contents*

A control system, no matter how well-conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Management necessarily applied its judgment in assessing the benefits of controls relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. Because of the inherent limitations in a control system, misstatements due to error or fraud may occur and not be detected.

*Changes in Internal Control over Financial Reporting.*

Other than the officer and director changes in connection with the Merger described elsewhere in this Annual Report on Form 10-K, there have been no changes in our internal control over financial reporting that occurred during the year ended September 30, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

None.

*Table of Contents*

## Part III

**Item 10. Directors, Executive Officers and Corporate Governance.**

### DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth the name and position of our current executive officers and directors.

| Name | Age | Position |
| --- | --- | --- |
| Justin Smith | 41 | Interim Chief Executive Officer, Interim Chief Financial Officer, Executive Chairman and Director |
| Jonathan Loutzenhiser | 35 | Executive Vice President and Director |
| Dr. Joseph Asuncion | 59 | Chief Medical Officer and Director |
| Dr. Charles Balaban | 72 | Director |
| Dr. Sadeem Mahmood | 58 | Chief of Surgery |
| Dr. Richard Muckerman | 70 | Vice President of Strategy and Business |
| Blake Moorman | 40 | Vice President of Operations |
| Dr. Richard F. Wittock | 49 | Vice President of Clinical Affairs |

**Justin Smith**. On April 15, 2021, Justin Smith was appointed as the Company's Interim Chief Executive Officer, Interim Chief Financial Officer and as the Executive Chairman and member of the Board of Directors of the Company. Justin Smith is a professional investment advisor for institutional clients attempting to navigate the ever-changing global financial markets. Mr. Smith graduated from John Carroll University with a Degree in Marketing Logistics and a Minor in Economics in 2004. After college, he continued to further his education by taking graduate classes while he was employed as the Assistant Director of Marketing at the telecommunications firm Broadvox. Mr. Smith was at Broadvox from January 2015 to June 2016. After leaving the private sector, Mr. Smith became a legislative assistant for the 11th Congressional District, Ohio, working in the office of the Honorable Stefanie Tubbs Jones. After leaving Congress, Mr. Smith began to work on the finance department at the Cuyahoga Metropolitan Housing Authority. From there he began a boutique firm that specialized in open-ended fund investments called the Landes Capital Group in January of 2017 where he still remains an executive to date. Currently he is the President of Landes and Compagnie Trust Prive, a Swedish asset management firm. The firm is a leading provider of independent advisory services for capital projects, including leadership in the early master planning and budgeting phase, identifying, and negotiating the services of the many professionals involved, and proactive guidance in the incorporation of responsible sustainability initiatives. He specializes in working with clients who seek a partner who can advise them through the entire lifecycle of a capital project, particularly those without the in-house resources to devote to such an undertaking. From October 1, 2017 to the present, he serves as the Executive Chairman and Director of HSH.

44

Table of Contents

**Jonathan Loutzenhiser.** On April 15, 2021, Jonathan Loutzenhiser was appointed as Executive Vice President of the Company and a member of the Board of Directors of the Company. From 2013 to 2014 Mr. Loutzenhiser worked as a sports agent at Recruiting. From 2015 to 2016, Mr. Loutzenhiser served as the Chief Executive Officer at Mediplex. From 2016 to 2017, Mr. Loutzenhiser was the President of IneedMD. He serves es as the Executive Vice President of HSH and a member of the Board of Directors of HSH since he was appointed to such positions on October 1, 2017 and holds this position to date. Mr. Loutzenhiser graduated from Grace University with a degree in business management in 2012.

**Dr. Joseph Asuncion.** On April 15, 2021, Dr. Joseph Asuncion was appointed as a member of the Board of Directors of the Company and as the Company's Chief Medical Officer. Dr. Asuncion has been serving and remains a Director of HSH since he was appointed to that position on November 7, 2019. Dr. Asuncion attended the University of Maryland where he received his BS in Biology, then received his Doctorate of Medicine at the Perpetual Help College of Medicine in the Philippines. From 2015 to 2017, Dr. Asuncion served as a director on the Board of Directors of IneedMD. From 2010 to 2020 Dr. Asuncion was a director and staff physician at Meritus Family Practice. He has dedicated himself to the practice of medicine for over 20 years. He believes in giving quality and compassionate care to patients and their families. He has also served in numerous leadership roles, which have contributed to the improvement of healthcare in his community. He also has a passionate interest in the development and clinical integration of new medications and technologies. His certifications include Diplomate of the American Academy of Family Medicine and Basic/Advanced Cardiac Life Support Provider.

**Dr. Charles Balaban.** On April 15, 2021, Dr. Charles Balaban was appointed as a member of the Board of Directors of the Company. Dr. Balaban was appointed as a Director of HSH on October 1, 2017 and serves in this capacity to date. Dr. Balaban received his D.D.S. in dentistry from the University of Toronto in 1973. Since 2015, Dr. Balaban has worked as the owner and operator of a multi-practitioner dental/surgical clinic. Dr. Balaban has been the principal of numerus rollup and M&A transaction in the dental/surgical industry dating back 25 years. He is also a serial entrepreneur and active investor in the medical device industry.

**Dr. Sadeem Mahmood.** On April 15, 2021, Dr. Sadeem Mahmood was appointed as the Company's Chief of Surgery. Interventional Cardiologist Sadeem Mahmood, M.D. earned his medical degree at Dow Medical College, University of Karachi, Pakistan. He completed his residency in Internal Medicine at the University of Medicine and Dentistry of New Jersey. He completed fellowships in Cardiology and Nuclear Cardiology at Vanderbilt University Medical Center in Nashville, TN. He is board-certified in Internal Medicine, Cardiovascular Medicine, Interventional Cardiology, and Nuclear Cardiology. Dr. Mahmood previously sat on the Board of Cardiovascular Group for St. Vincent's Hospital for a total of seven years; he is a fellow of the American College of Cardiology and is a member of the American Society of Medicine and the Arkansas Society of Medicine. Dr. Mahmood has served as a Board Certified Cardiologist at SARC, Inc. since January 2015 to the present. His true passion is his work; the joy he receives from helping his patients is the fuel that keeps him going.

**Dr. Richard C. Muckerman II.** On April 15, 2021, Dr. Richard Muckerman was appointed as the Company's Vice President of Strategy and Business Development. Dr. Muckerman was appointed interim Chief Medical Officer and National Director of Promotions and Development HSH on September 31, 2020. Dr. Muckerman attended Georgetown University where he received a B.S. in biology and then Georgetown University School of Medicine for his MD degree. He completed his residency in Obstetrics & Gynecology at Saint John's Mercy Medical Center in St. Louis which is one of the largest obstetrics hospitals in the Midwest. He is Board Certified in Obstetrics and Gynecology and is a long-standing Fellow of the American College of Obstetricians and Gynecologists - FACOG. Dr. Muckerman joined his father in the practice of obstetrics and gynecology in 1981. He has maintained an active OB/GYN private practice at St. Louis Women's Healthcare Group since 2016. Dr. Muckerman incorporated medical genetics into his OB/GYN practice in order to provide personalized preventive healthcare for his patients. He received Genomics certification from the American College of Obstetricians & Gynecologists in 2018. In collaboration with a nationally renowned genetics lab, Dr. Muckerman has developed and implemented Hereditary Cancer Risk Assessment (HCRA) and Breast Cancer Risk Assessment (BCRA) programs in many medical facilities in the St. Louis area: Medical Practices, Breast Centers, and Hospital Systems. Dr. Muckerman has been instrumental in organizing and developing ancillary services for private independent physician practices in St. Louis; in 2004, Dr. Muckerman was the Founding Physician and Medical Director of St. Louis Women's Surgery Center which was the first women's-only surgery center in the Midwest. Several years later he recognized the opportunity for the addition of G.I. ancillary services and the Women's Colonoscopy Center was developed within the Women's Surgery Center. In 2010, Dr. Muckerman was the Founding Physician and Medical Director of St. Louis Breast Center. It is the only physician owned breast imaging facility in St. Louis. Dr. Muckerman has incorporated a hereditary cancer risk assessment and breast cancer risk assessment program in the breast center. Since 2018, every breast imaging patient has been offered a comprehensive hereditary cancer risk assessment.

*Table of Contents*

**Blake Moorman.** On April 15, 2021, Blake Moorman was appointed as the Company's Vice President of Operations. Mr. Moorman was appointed Vice President of HSH on August 1, 2020. Mr. Moorman is an accomplished healthcare industry executive with 15+ years' experience driving profitability and market share for both large publicly traded healthcare companies as well as several startups. In partnership with the executive management team of HSH, Blake creates leading-edge customer support solutions in support of the organization's mission and goal of providing best-in-class products and services for healthcare providers across the US. Blake has also held a number of increasingly responsible roles in executive and general management. As a strategist and accessible leader, Blake is known for driving growth and profitability with an expertise in developing and delivering therapeutic solutions for healthcare providers, laboratories, pharmacies, and healthcare companies. Mr. Moorman earned a degree in Engineering from Texas Tech University and previously worked at Depuy Orthopedics for 2004-2013. He then was a minority partner at Pharmetrics Specialty Pharmacy which was acquired in 2015. Blake started Strategic Specialty Solutions in 2013 which grew to one of the largest pharmacy networks in the US and he ceased his positions at same in 2019.

**Dr. Richard F. Wittock III, DPM, FACFAS.** On April 15, 2021, Dr. Richard F. Wittock was appointed as the Company's Vice President of Clinical Affairs. Dr. Wittock was appointed Vice President and Chief of Podiatry of HSH on September 31, 2020. From June 2009 to April 2021, Dr. Wittock served as the President, owner and a physician at his own podiatry practice. Dr. Wittock is a native of Michigan and alumnus of Michigan Technological University. He received his doctorate from Barry University in Miami, FL, and earned Magna Cum Laude honors in both his undergraduate and doctoral degrees. His post-doctoral training included a 3-year surgical residency at the Detroit Medical Center at Wayne State University in Detroit, Michigan. He also completed a traumatology fellowship in Mainz, Germany and an external fixation fellowship in Kurgan, Russia. Dr. Wittock specializes in the following procedures: Athletic Injuries - Dr. Wittock played college football and has served as a team podiatrist for a Texas high school; External Fixation; Ankle Implants - Dr. Wittock is authorized by Depuy Orthopedics and Tornier to implant the Agility LP and Saito Talaris ankle implants.

## Committees

We do not have a standing compensation, audit or nominating committee. Rather, the board of directors perform the functions of these committees. We do not believe it is necessary for our board of directors to appoint such committees at this time because the volume of matters that come before our board of directors for consideration permits the directors to give sufficient time and attention to such matters to be involved in all decision making. Additionally, because our Common Stock is not listed for trading or quotation on a national securities exchange, we are not required to have such committees. We plan to form such committees in the future as needed.

## Director Independence

We do not have any independent directors, as such term is defined in the listing standards of The NASDAQ Stock Market, at this time. The Company is not quoted on any exchange that requires director independence requirements.

## Code of Ethics

We have not yet adopted a code of ethics that applies to all of our employees, officers, and directors, including those officers responsible for financial reporting. We expect that we will adopt a code of ethics in the near future.

46

**Family Relationships**

None.

**Involvement in Certain Legal Proceedings**

No executive officer, member of the board of directors or control person of our Company has been involved in any legal proceeding listed in Item 401(f) of Regulation S-K in the past 10 years.

**Item 11. Executive Compensation.**

No executive compensation was paid by the Company from February 2016, through the Effective Date of the Merger. In February 2016, all the Company's officers resigned, and Company stopped substantially all operating activities.

The following table summarizes all compensation recorded by us in the past two fiscal years ended September 30, 2021 for our principal executive officer or other individual serving in a similar capacity.

### *2021 Summary Compensation Table*

| Name | Year | Salary ($) | Bonus ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| **Justin Smith (1)** | 2021 | $              - | $              - | $              - | $              - |
| Executive Chairman, principal executive officer, and principal financial and accounting officer | 2020 | $              - | $              - | $              - | $              - |
| **Dr Charles Balaban (2)** | 2021 | $              - | $              - | $              - | $              - |
| Director | 2020 | $              - | $              - | $              - | $              - |
| **Jonathan Loutzenhiser (3)** | 2021 | $ 225,000.00 | $              - | $              - | $ 225,000.00 |
| Executive Vice President and Director | 2020 | $ 225,000.00 | $              - | $              - | $ 225,000.00 |
| **Dr. Joseph Asuncion (4)** | 2021 | $   120,000 | $              - | $              - | $   120,000 |
| Chief Medical Officer and Director | 2020 | $              - | $              - | $              - | $              - |
| **Dr. Sadeem Mahmood (5)** | 2021 | $              - | $              - | $              - | $              - |
| Chief of Surgery | 2020 | $              - | $              - | $              - | $              - |
| **Dr. Richard Muckerman (6)** | 2021 | $              - | $              - | $              - | $              - |
| Vice President of Strategy and business development | 2020 | $              - | $              - | $              - | $              - |
| **Dr. Richard F. Wittock (7)** | 2021 | $              - | $              - | $              - | $              - |
| Vice President of clinical operations | 2020 | $              - | $              - | $              - | $              - |
| **Blake Moorman (8)** | 2021 | $  90,000.00 | $              - | $              - | $  90,000.00 |
| Vice President of operations | 2020 | $  90,000.00 | $              - | $              - | $  90,000.00 |
| **Robert Stevens (9)** | 2021 | $              - | $              - | $              - | $              - |
| Former Receiver | 2020 | $              - | $              - | $  3,555(1) | $   3,555 |

_____

(1)  On April 15, 2021, Justin Smith was appointed as the Company's Interim Chief Executive Officer, Interim Chief Financial Officer and as the Executive Chairman and member of the Board of Directors of the Company.

47

*Table of Contents*

(2)   On April 15, 2021, Dr. Charles Balaban was appointed as a member of the Board of Directors of the Company.

(3)   On April 15, 2021, Jonathan Loutzenhiser was appointed as Executive Vice President of the Company and a member of the Board of Directors of the Company.

(4)   On April 15, 2021, Dr. Joseph Asuncion was appointed as a member of the Board of Directors of the Company and as the Company's Chief Medical Officer.

(5)   On April 15, 2021, Dr. Sadeem Mahmood was appointed as the Company's Chief of Surgery.

(6)   On April 15, 2021, Dr. Richard Muckerman was appointed as the Company's Vice President of Strategy and Business Development.

(7)   On April 15, 2021, Dr. Richard F. Wittock was appointed as the Company's Vice President of Clinical Affairs.

(8)   On April 15, 2021, Blake Moorman was appointed as the Company's Vice President of Operations.

(9)   During the fiscal year ended June 30, 2020 and prior to October 2, 2019, the Receiver incurred $3,555 in professional fees in managing the Company. On November 5, 2020, the Company's court appointed receiver, acting under judicial order on behalf of the Board of Directors of the Company, in accordance with the Company's Bylaws, acted by written consent to change the Company's Fiscal Year end from June 30 to September 30. We filed a Transition Report on Form 10-KT for the transition period from June 30 to September 30 with the SEC on January 20, 2021. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action is needed by the Receiver or the Company in connection with the receivership, and such that Company is no longer in receivership. On April 15, 2021, Robert Stevens resigned from all of his positions with the Company.

**Employment Agreements**

The Company is not a party to any employment agreements at this time.

HSH currently only has one employment agreement in place which is with Jonathan Loutzenhiser. HSH and Mr. Loutzenhiser entered into amended and restated employment agreement (the "EA") on June 1, 2018. Pursuant to the EA, HSH agreed to employ Mr. Loutzenhiser as HSH's Vice President and Mr. Loutzenhiser agreed to serve in such capacity. The term of the EA is for five (5) years from the entry date. Pursuant to the EA, HSH agreed to compensate Mr. Loutzenhiser with a base salary of $1,200,000 with 50% of same to be accrued until HSH achieves quarterly adjusted EBITDA of $900,000. The EA also includes a bonus to Mr. Loutzenhiser to be determined by HSH's board of directors. Pursuant to the EA, Mr. Loutzenhiser's employment can be terminated by HSH for "Cause" or "Good Reason" as such terms are defined in the EA.

*Outstanding Equity Awards at Fiscal Year-End*

There were no outstanding equity awards at the 2021 fiscal year-end.

*Compensation Plans*

We have not adopted any compensation plan to provide for future compensation of any of our directors or executive officers.

48

*Director Compensation*

The Company has not paid any of its directors in their capacities as such. HSH has not paid any of its directors in their capacities as such. Historically, the Company's directors have not received compensation for their service. Notwithstanding, at some point in the near future, we plan to adopt a new director compensation program pursuant to which each of our non-employee directors will receive some form of an annual retainer. We plan to reimburse our non-employee directors for reasonable travel expenses incurred in attending board and committee meetings. We also intend to allow our non-employee directors to participate in any equity compensation plans that we adopt in the future.

*Executive Compensation Philosophy*

Our Board determines the compensation given to our executive officers in their sole determination. Our Board reserves the right to pay our executives or any future executives a salary, and/or issue them shares of stock issued in consideration for services rendered and/or to award incentive bonuses which are linked to our performance, as well as to the individual executive officer's performance. This package may also include long-term stock-based compensation to certain executives, which is intended to align the performance of our executives with our long-term business strategies. Additionally, the Board reserves the right to grant performance base stock options in the future, if the Board in its sole determination believes such grants would be in the best interests of the Company.

*Incentive Bonus*

The Board may grant incentive bonuses to our executive officers and/or future executive officers in its sole discretion, if the Board believes such bonuses are in the Company's best interest, after analyzing our current business objectives and growth, if any, and the amount of revenue and profits we are able to generate each month, both of which are a direct result of the actions and ability of such executives.

*Long-Term, Stock Based Compensation*

In order to attract, retain and motivate executive talent necessary to support the Company's long-term business strategy we may award our executives and any future executives with long-term, stock-based compensation in the future, at the sole discretion of our Board, which we do not currently have any immediate plans to award.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

As of May 31, 2022, we had 92,214,638 shares of our common stock issued and outstanding. The following table sets forth information regarding the beneficial ownership of our common stock as May 31, 2022 by:

- each person known by us to be the beneficial owner of more than 5% of our common stock;

- each of our directors;

- each of our named executive officers; and

- our executive officers and directors as a group.

Unless otherwise indicated, the address for the beneficial owners listed below is c/o the Company at 3 School St, Suite 303, Glen Cove NY 11542.The percentages in the table have been calculated on the basis of treating as outstanding for a particular person, all shares of our common stock outstanding on that date and all shares of our common stock issuable to that holder in the event of exercise of outstanding rights or conversion privileges owned by that person at that date which are exercisable within 60 days of that date. Except as otherwise indicated, the persons listed below have sole voting and investment power with respect to all shares of our common stock owned by them, except to the extent that power may be shared with a spouse.

49

*Table of Contents*

| Name of Beneficial Owner: | Amount and Nature of Beneficial Ownership[2] | Percent of Class[1] |
|---|---|---|
| **Directors and Executive Officers** | | |
| Justin Smith [3] | 996,520 | 1.08 |
| Dr. Charles Balaban[4] | 22,539,450 | 24.48 |
| Jonathan Loutzenhiser[5] | 22,000,000 | 23.89 |
| Dr. Joseph Asuncion[6] | 539,450 | * |
| Dr. Sadeem Mahmood[7] | 0 | * |
| Dr. Richard F. Wittock[8] | 96,652 | * |
| Dr. Richard Muckerman[9] | 9,966 | * |
| Blake Moorman[10] | 0 | * |
| **Officers and Directors as a Group (8 persons)** | 46,185,038 | 50.16 |
| | | |
| **More than 5% Holders** | | |
| Jackson Hole Medical Advisors, Inc.[11] | 22,000,000 | 23.89 |
| 168 Capital Inc.[12] | 9,249,130 | 10.05 |

(1) Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Pursuant to Rules 13d-3 and 13d-5 of the Exchange Act, beneficial ownership includes any shares as to which a shareholder has sole or shared voting power or investment power, and also any shares which the shareholder has the right to acquire within 60 days, including upon exercise of common shares purchase options or warrants.

(2) Based on 92,076,638 shares of the Company's common stock issued and outstanding as of the date of this Annual Report.

(3) On April 15, 2021, Justin Smith was appointed as the Company's Interim Chief Executive Officer, Interim Chief Financial Officer and as the Executive Chairman and member of the Board of Directors of the Company. Justin Smith has voting and dispositive control of 996,520 shares of the Company's common stock held by Landes And Compagnie Trust Prive KB.

(4) On April 15, 2021, Dr. Charles Balaban was appointed as a member of the Board of Directors of the Company. Dr. Balaban has voting and dispositive control of 22,514,537 shares of the Company's common stock held by Black Label Services, Inc.

(5) On April 15, 2021, Jonathan Loutzenhiser was appointed as Executive Vice President of the Company and a member of the Board of Directors of the Company.

(6) On April 15, 2021, Dr. Joseph Asuncion was appointed as a member of the Board of Directors of the Company and as the Company's Chief Medical Officer. Dr. Asuncion has voting and dispositive control of 514,537 shares of the Company's common stock held by Medical Tech Group Inc.

(7) On April 15, 2021, Dr. Sadeem Mahmood was appointed as the Company's Chief of Surgery.

(8) On April 15, 2021, Dr. Richard F. Wittock was appointed as the Company's Vice President of Clinical Affairs.

(9) On April 15, 2021, Dr. Richard Muckerman was appointed as the Company's Vice President of Strategy and Business Development.

(10) On April 15, 2021, Blake Moorman was appointed as the Company's Vice President of Operations.

(11) Douglas Millar has voting and dispositive control of 22,000,000 shares of the Company's common stock held by Jackson Hole Medical Advisors, Inc.

(12) Alex Kozlovski has voting and dispositive control of 9,249,130 shares of the Company's common stock held by 168 Capital Inc.

* Less than 1%.

50

Table of Contents

## Item 13. Certain Relationships and Related Transactions, and Director Independence.

We do not have a written policy for the review, approval, or ratification of transactions with related parties or conflicted transactions.

The following includes a summary of transactions since the beginning of the 2019 fiscal year, or any currently proposed transaction, in which HSH or the Company were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or one percent of the average of their total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest (other than compensation described under "Executive Compensation"). We believe the terms obtained or consideration that we paid or received, as applicable, in connection with the transactions described below were comparable to terms available or the amounts that would be paid or received, as applicable, in arm's-length transactions.

There were notes payable and due to a former director and officer of the Company in the amount of $4,001,267 which were no longer on the books as of March 30, 2021.

The Company was previously under the control of the Receiver and the Receiver was considered a related party. During the year ended June 30, 2019, the Receiver incurred $8,838 in professional fees in managing the Company. Additionally, the Receiver extended a loan of $65,000 to the Company, which bore interest at 10% and which was forgiven on April 13, 2021, pursuant to a Loan Forgiveness Agreement.

On August 25, 2020, the parties to the Merger Agreement entered into the Amendment to the Merger Agreement pursuant to which, amongst other things, the Company agreed to issue the Receiver Shares as required by the Merger Agreement in book entry within 10 days of August 25, 2020. The Receiver Shares were issued on August 27, 2020, and consisted of a total of 114,599,754 shares of Company common stock, 38,199,918 of which were issued to Thistle Investments LLC. Jodi Stevens is the Manager of Thistle Investments LLC and has the power to vote and dispose of the shares held by Thistle Investments LLC. Jodi Stevens is the spouse of the Receiver, Robert Stevens and as such was considered a related party.

Since the inception of the Company, substantially all of the funding for Company has been provided by related parties that have extended interest free demand loans. These related parties are as follows:

(1)   BLS, Inc. is controlled by Charles Balaban, a Director of the Company

(2)   BOAM, Inc. is controlled by Charles Balaban

(3)   Healthcare Solutions DX, Inc. is controlled by Justin Smith, Chairman of the Company's Board of Directors

(4)   JHMA, Inc. is controlled by Doug Millar, head of the Company's Corporate Compliance and Regulatory Matters

(5)   Jonathan Loutzenhiser – is a Vice President of the Company.

| | Balance Due 9/30/2021 | Balance Due 9/30/2020 |
|---|---|---|
| BLS, Inc. | $ 3,997,500 | $ 3,690,000 |
| BOAM, Inc. | 582,409 | 582,409 |
| Healthcare Solutions DX, Inc. | 1,302,151 | 1,161,239 |
| JHMA, Inc. | 4,114,490 | 3,748,329 |
| Jonathan Loutzenhiser | 3,608,590 | 3,241,429 |

## Item 14. Principal Accountant Fees and Services.

The following table sets forth the fees billed or to be billed to our company for the year ended September 30, 2021, and September 30, 2020 for professional services rendered by our independent registered public accounting firm BF Borgers CPA PC was engaged by us effective as of August 24, 2020.

| Fees | 2021 | 2020 |
|---|---|---|
| Audit Fees | $ 80,000 | $ 60,000 |
| Audit-Related Fees | - | - |
| Tax Fees | - | - |
| Other Fees | - | - |

**Total Fees**                                 $     80,000    $     60,000

**Audit Fees**

Audit fees to BF Borgers CPA PC were for professional services rendered for the audit of our annual financial statements for the years ended September 30, 2021, and 2020.

**Audit-Related Fees**

During 2021 and 2020, BF Borgers CPA PC did not provide any assurance and related services that are reasonably related to the performance of the audit or review or our financial statements that are not reported under the caption "Audit Fees" above.

---

51

*Table of Contents*

**Tax Fees**

As BF Borgers CPA PC did not provide any services to us for tax compliance, tax advice and tax planning during 2021 and 2020, no tax fees were billed or paid during those fiscal years.

**All Other Fees**

BF Borgers CPA PC did not provide any products and services not disclosed in the table above during 2021 and 2020. As a result, there were no other fees billed or paid during 2021 and 2020.

**PART IV**

**ITEM 15. Exhibit And Financial Statement Schedules.**

(a) Financial Statements.

**Index to the Consolidated Financial Statements**

| Contents | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 5041) | F-1 |
| Consolidated Balance Sheets on September 30, 2021, and 2020 | F-2 |
| Consolidated Statements of Operations for the Years Ended September 30, 2021, and 2020 | F-3 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended September 30, 2021, and 2020 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended September 30, 2021, and 2020 | F-5 |
| Notes to the Consolidated Financial Statements | F-6 |

52

*Table of Contents*

**Report of Independent Registered Public Accounting Firm**

To the shareholders and the board of directors of Healthcare Solutions Management Group, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Healthcare Solutions Management Group, Inc. (the "Company") as of September 30, 2021 and September 30, 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2021 and September 30, 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

**Substantial Doubt about the Company's Ability to Continue as a Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company's minimal activities raise substantial doubt about its ability to continue as a going concern.  The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ BF Borgers CPA PC
**BF Borgers CPA PC**

We have served as the Company's auditor since 2020
Lakewood, CO
June 3, 2022

F-1

**Healthcare Solutions Management Group, Inc.**
**CONSOLIDATED BALANCE SHEETS**

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| **ASSETS** |  |  |
| Cash | $ 659,194 | $ 841,349 |
| Accounts receivable/other receivable | 825,712 | 74,622 |
| Prepaid expenses | - | 60,666 |
| Investments | 89,823,346 | 83,087,469 |
| Total current assets | 91,308,252 | 84,064,105 |
| Equipment | 1,821,081 | 587,083 |
| Total Assets | $ 93,129,332 | $ 84,651,188 |
| **LIABILITIES & STOCKHOLDERS' DEFICIT** |  |  |
| Current liabilities |  |  |
| Accounts payable | $ 22,200 | $ 109,313 |
| PPP loan | 210,500 | 210,500 |
| Notes payable | 456,000 | 465,323 |
| Receiver-certificate | - | 65,000 |
| Interest payable | - | 33,093 |
| Notes payable related party | 13,786,051 | 13,447,615 |
| Total current liabilities | 14,474,751 | 14,330,844 |
| Total liabilities | 14,474,751 | 14,330,844 |
| Stockholders' Equity |  |  |
| Common stock, par value $0.001, 1,400,000,000 shares authorized 11,072,440 and 1,107,244 |  |  |
| shares issued and outstanding as of September 30, 2021, and September 30, 2020, respectively | 11,072 | 1,107 |
| Additional paid in capital | 102,216,342 | 97,839,775 |
| Accumulated other comprehensive income | 5,598,328 | (1,137,548) |
| Retained earnings (deficit) | (29,171,161) | (26,382,990) |
| Total Stockholders' (Deficit) | 78,654,581 | 70,320,344 |
| Total Liabilities and Stockholders' (Equity) | $ 93,129,332 | $ 84,651,188 |

The accompanying notes are an integral part of these consolidated financial statements.

F-2

*Table of Contents*

**Healthcare Solutions Management Group, Inc.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

|  | Year Ended September 30, 2021 | Year Ended September 30, 2020 |
|---|---|---|
| Revenue |  |  |
| Sales | $ 8,566,284 | $ 3,524,334 |
| Sales related party | 682,500 | - |
| Total revenue | 9,248,784 | 3,524,334 |
| Cost of goods sold | 166,734 | - |
| Cost of goods sold -related party | 2,297,455 | 2,595,860 |
| Gross profit | 6,784,595 | 928,474 |
|  |  |  |
| Operating Expenses: |  |  |
| Administrative expenses | 3,491,623 | 1,648,341 |
| Contractors expenses | 203,722 | 573,706 |
| Contractors expenses related party | 5,743,637 | 1,730,574 |
| Total operating expenses | 9,438,982 | 3,952,621 |
| (Loss) from operations | (2,654,387) | (3,024,147) |
| Other income (expense) |  |  |
| Interest income (expense), net | (133,785) | (6,250) |
| Income (loss) before provision for income taxes | (2,788,171) | (3,030,397) |
| Provision for income taxes | - | - |
| Net (Loss) | $ (2,788,171) | $ (3,030,397) |
|  |  |  |
| Basic and diluted earnings(loss) per common share | $ (0.49) | $ (27.37) |
|  |  |  |
| Weighted average number of shares outstanding | 5,693,964 | 110,724 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

*Table of Contents*

**Healthcare Solutions Holdings, Inc.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Common Stock | | Additional Paid-in Capital | Accumulated Other Comp Inc | Retained Earnings | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | Value | | | | |
| Balance, September 30, 2019 | 110,724 | $ 111 | $ 94,746,578 | $ (1,137,548) | $(23,352,593) | $ 70,256,548 |
| Issuance of common stock to related party | 996,520 | 997 | 3,093,197 | | | 3,094,194 |
| Net loss | | | | | (3,030,397) | (3,030,397) |
| Balance, September 30, 2020 | 1,107,244 | $ 1,107 | $ 97,839,775 | $ (1,137,548) | $(26,382,990) | $ 70,320,344 |
| Balance, September 30, 2020 | 1,107,244 | $ 1,107 | $ 97,839,775 | $ (1,137,548) | $(26,382,990) | $ 70,320,344 |
| Discharge of debt related party | | | 4,388,165 | | | 4,388,165 |
| Issuance of shares pursuant to reverse merger and impact of reverse merger | 9,965,196 | 9,965 | (99,662) | | | (89,697) |
| Gain on extinguishment of liabilities | | | 88,064 | | | 88,064 |
| Net loss | | | | | (2,788,171) | (2,788,171) |
| Accumulated other comprehensive income | | | | 6,735,876 | | 6,735,876 |
| Balance, September 30, 2021 | 11,072,440 | $ 11,072 | $102,216,342 | $ 5,598,328 | $(29,171,161) | $ 78,654,581 |

The accompanying notes are an integral part of the consolidated financial statements.

F-4

*Table of Contents*

**Healthcare Solutions Management Group, Inc.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended September 30, 2021 | Year Ended September 30, 2020 |
|---|---|---|
| **Cash Flows From Operating Activities:** | | |
| Net Loss | $ (2,788,171) | $ (3,030,397) |
| Adjustments to reconcile net income to net cash used in operating activities | | |
| Gain on extinguishment of liabilities | 88,064 | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (751,090) | (74,622) |
| Prepaid expenses | 60,666 | (60,666) |
| Accounts payable | (87,113) | 10,483 |
| Interest payable | (33,093) | 22,711 |
| Receiver certificate | (65,000) | - |
| Net cash (used for) operating activities | (3,575,737) | (3,132,491) |
| | | |
| **Cash Flows From Investing Activities:** | | |
| Issuance of acquisition shares | (89,698) | 32,748 |
| Purchase of equipment | (1,233,998) | (587,083) |
| Net cash (used for) investing activities | (1,323,696) | (554,335) |
| | | |
| **Cash Flows From Financing Activities:** | | |
| Notes payable | (9,323) | (9,965) |
| Notes payable related party | 4,726,601 | 3,918,743 |
| Proceeds from PPP loan | - | 210,500 |
| Net cash provided by (used for) financing activities | 4,717,278 | 4,119,278 |
| | | |
| Net Increase (Decrease) In Cash | (182,154) | 432,452 |
| Cash At The Beginning Of The Period | 841,349 | 408,896 |
| Cash At The End Of The Period | $ 659,194 | $ 841,349 |
| | | |
| Supplemental disclosure of non-cash investing and financing activities: | | |
| Discharge of debt related party | $ 4,388,165 | - |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

*Table of Contents*

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 – ORGANIZATION AND BUSINESS BACKGROUND

Healthcare Solutions Management Group, Inc., a Delaware corporation, and successor in interest to Verity Delaware Inc., a Delaware corporation which was previously a Nevada corporation named Verity Corp. ("we," "us," "our" or the "Company") was incorporated on April 11, 2006 in the state of Nevada under the name Infrared Systems, International.

On April 1, 2013, the Company changed its name from AquaLiv Technologies Inc. to Verity Corp. and our stock symbol changed to VRTY.

In February 2016, all of the Company's officers and directors resigned, and the Company stopped substantially all operating activities. At such time, the Company became a "shell company," as such term is defined in Rule 12b-2 under the Exchange Act.

On June 14, 2019, the Company entered into a Merger Agreement (the "Merger Agreement") by and between the Company, Verity Merger Corp., a wholly-owned subsidiary of the Company and a Delaware corporation (the "Merger Sub"), and Healthcare Solutions Holdings, Inc., a Delaware corporation ("HSH"). Pursuant to the terms of the Merger Agreement, the parties agreed that Merger Sub would merge with and into HSH, with HSH being the surviving entity and becoming a wholly-owned subsidiary of the Company (the "Merger").

The Merger closed on April 15, 2021 (the "Closing"), at which time Merger Sub merged with and into HSH with HSH being the surviving entity, and HSH became our wholly owned subsidiary. As a result of the consummation of the Merger, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. HSH is an integrated healthcare company which strives to provide vital services and a high-quality of care for patients over the course of their lifetime. HSH was organized with the goal of becoming an advanced, national healthcare system in the United States, providing clinicians with state-of-the-art diagnostic and therapeutic tools, and providing patients with greater access to a higher level of care in local communities that it believes have historically been underserved by the medical industry. HSH currently conducts directly through HSH, and in the near future intends to, conduct various, distinct operations through its to be formed wholly owned operating subsidiaries, within the medical industry, seeking to serve the needs of patients' and physicians alike.

At the Closing of the Merger, Robert Stevens (the "Receiver") appointed new officers and directors of the Company. As consideration for the services of the Receiver and his team, for acting as the court-appointed receiver for the Company and its predecessor and affiliated entities, and pursuant the Merger Agreement, as amended, in August of 2020, the Receiver and certain entities, as directed by the Receiver, were issued an aggregate total of 114,599,754 shares of the Company's common stock. At Closing, the aggregate Merger consideration paid to the holders of the HSH common was 1,145,997,555 shares of the Company's common stock constituting 90% of the issued and outstanding shares of Company common stock immediately following the Closing.

As a result of the consummation of the Merger, on April 15, 2021, HSH became our wholly owned subsidiary and the business of HSH became the business of the Company going forward. Accordingly, at the Closing, the Company ceased to be a shell company as of April 15, 2021.

The Merger is intended to be a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and the Merger Agreement is intended to be a "plan of reorganization" within the meaning of the regulations promulgated under Section 368(a) of the Code and for the purpose of qualifying as a tax-free transaction for federal income tax purposes.

The Merger was accounted for as a reverse merger and HSH is considered the acquirer for accounting and financial reporting purposes.

The Company was previously in receivership. On May 16, 2016, pursuant to Case Number A16-733815-B, Nevada's 8th Judicial District, Business Court, appointed Robert Stevens as receiver (the "Receiver") for the Company. Creditors of the Company were required to provide claims in writing under oath on or before November 3, 2016, or they would be barred under Nevada Revised Statute §78.675. Since May 16, 2016, through the date of the Merger, the Company was operating under the direction of the Receiver. On March 5, 2018, the District Court in Clark County, Nevada approved a plan of reorganization for the Company and the discharge of the Receiver upon completion of his duties under the court order. Upon the Closing of the Merger, the reorganization of the Company described in the court order was completed and, as a result and pursuant to the court order dated March 5, 2018, the Receiver was automatically discharged and the receivership was automatically terminated such that no further action was needed by the Receiver or the Company in connection with the receivership, and such that Company was no longer in receivership.

*Table of Contents*

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Going Concern

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern, which contemplates realization of assets and the satisfaction of liabilities in the normal course of business for the twelve-month period following the date of these financial statements. On a consolidated basis, the Company has incurred significant operating losses since inception.

Because the Company does not expect that existing operational cash flow will be sufficient to fund presently anticipated operations, this raises substantial doubt about the Company's ability to continue as a going concern. Therefore, the Company will need to raise additional funds and is currently exploring alternative sources of financing. Historically, the Company has raised capital through private placements, notes payable and related party loans as an interim measure to finance working capital needs and may continue to raise additional capital through the sale of common stock or other securities and obtaining some short-term loans in order to fund its operations.

### Change in Fiscal Year End

On November 5, 2020, the Company's court appointed receiver, acting under judicial order on behalf of the Board of Directors of the Company, in accordance with the Company's Bylaws, acted by written consent to change the Company's Fiscal Year End from June 30 to September 30.

### Basis of Presentation

The accompanying consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP) under the accrual basis of accounting.

### Reverse split

On September 13, 2021, the Board of Directors of the Company approved a 1 for 115 Reverse Stock Split of the Company's common stock with any fractional shares of common stock resulting therefrom being rounded up to the nearest whole share of common stock. All share amounts referenced in this Report have been retroactively adjusted to reflect the reverse stock split for all periods presented, unless specifically stated otherwise.

### Reclassification

Certain prior period amounts have been reclassified to conform with the current period presentation.

### Use of Estimates

In preparing consolidated financial statements in conformity with accounting principles generally accepted in the United States of America, management makes estimates and assumptions that affect the reported amounts of assets and liabilities at the dates of the consolidated financial statements, as well as the reported amounts of expenses during the reporting periods. These accounts and estimates include, but are not limited to liabilities and tax provisions. Actual results could differ from these estimates.

### Basis of Consolidation

The consolidated financial statements include the financial statements of the Company and its subsidiary. All significant inter-company balances and transactions within the Company and subsidiaries have been eliminated upon consolidation.

### Cash and Cash Equivalents

Cash and cash equivalents are carried at cost and represent cash on hand, demand deposits placed with banks or other financial institutions and all highly liquid investments with an original maturity of three months or less as of the purchase date of such investments.

F-7

Table of Contents

**Revenue Recognition**

Service income is generated from the resale of 3rd party services into physician offices. Operating income is generated directly from physicians and other entities in the medical business for providing management services for them.

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASU 2014-09"). ASU 2014-09 outlines a single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. The guidance provided in Accounting Standards Codification ("ASC") Topic 606 ("ASC 606") requires entities to use a five-step model to recognize revenue by allocating the consideration from contracts to performance obligations on a relative standalone selling price basis. Revenue is recognized when a customer obtains control of promised goods or services in an amount that reflects the consideration that the entity expects to receive in exchange for those goods or services. The standard also requires new disclosures regarding the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. ASC 606 also includes Subtopic 340-40, *Other Assets and Deferred Costs – Contracts with Customers*, which requires the deferral of incremental costs of obtaining a contract with a customer. This new guidance was initially effective for annual reporting periods (including interim reporting periods within those periods) beginning after December 15, 2016 and early adoption was not permitted. However, in July 2015, the FASB voted to defer the effective date of this ASU by one year for reporting periods beginning after December 15, 2017, with early adoption permitted as of the original effective date. As a result, the effective date for the Company was January 1, 2018.

**Fair Value Measurements**

FASB ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820") defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. ASC 820 also establishes a fair value hierarchy which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. The standard describes three levels of inputs that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.

- Level 2: Inputs other than quoted prices included within Level 1 that are either directly or indirectly observable.

- Level 3: Unobservable inputs that are supported by little or no market activity, therefore requiring an entity to develop its own assumptions about the assumptions that market participants would use in pricing.

Fair value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of September 30, 2021 and September 30, 2020. The Company uses the market approach to measure fair value for its Level 1 financial assets and liabilities. The market approach uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities. The respective carrying value of certain balance sheet financial instruments approximates its fair value. These financial instruments include cash, trade receivables, related party payables, accounts payable, accrued liabilities and short-term borrowings. Fair values were estimated to approximate carrying values for these financial instruments since they are short term in nature, and they are receivable or payable on demand.

The estimated fair value of assets and liabilities acquired in business combinations and reporting units and long-lived assets used in the related asset impairment tests utilize inputs classified as Level 3 in the fair value hierarchy.

The Company determines the fair value of contingent consideration based on a probability-weighted discounted cash flow analysis. The fair value remeasurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in the fair value hierarchy. In each period, the Company reassesses its current estimates of performance relative to the stated targets and adjusts the liability to fair value. Any such adjustments are included as a component of Other Income (Expense) in the Consolidated Statements of Operations and Comprehensive Loss.

**Investments**

The Company was initially funded by Landes & Cie Private Trust based out of Sweden. In the U.S. there are certain regulatory requirements for healthcare companies in U.S. to maintain a minimum amount of capital on hand or they are subject to additional rules and regulation. Landes provided enough capital for the company so that all regulatory capital thresh holds are met.

We have identified accounting for marketable investment securities as a critical accounting policy due to the significance of the amounts included in our balance sheet. All of the securities included in investments have quoted market prices and trade actively. The Company's intention is not to actively trade its investments or to use this investment for working capital. The Company records these investments at their fair value based on quoted market prices with the unrealized gain or loss recorded in accumulated other comprehensive income, a component of stockholders' equity, net of deferred taxes.

---

F-8

Table of Contents

**Income Taxes**

The Company adopts the ASC Topic 740, "Income Taxes " regarding accounting for uncertainty in income taxes which prescribes the recognition threshold and measurement attributes for financial statement recognition and measurement of tax positions taken or expected to be taken on a tax return. In addition, the guidance requires the determination of whether the benefits of tax positions will be more likely than not sustained upon audit based upon the technical merits of the tax position. For tax positions that are determined to be more likely than not sustained upon audit, a company recognizes the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement in the financial statements. For tax positions that are not determined to be more likely than not sustained upon audit, a company does not recognize any portion of the benefit in the financial statements. The guidance provides for de-recognition, classification, penalties, and interest, accounting in interim periods and disclosure. For the years ended September 30, 2021, and 2020, the Company did not have any interest and penalties associated with tax positions. As of September 30, 2021, and September 30, 2020, the Company did not have any significant unrecognized uncertain tax positions.

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be applied to taxable income in the years in which those temporary differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the statement of income in the period that includes the enactment date. A valuation allowance is provided for deferred tax assets if it is more likely than not these items will either expire before the Company is able to realize their benefits or that future deductibility is uncertain.

**Professional Fees**

With the exception of legal fees, substantially all professional fees expensed by the Company subsequent to the appointment of the court-appointed Receiver, represent hours of work performed by him to help the Company emerge from receivership by obtaining external financing. The fees are a liability of the Company and are expensed as incurred.

**Related Parties**

The Company follows subtopic 850-10 of the FASB Accounting Standards Codification for the identification of related parties and disclosure of related party transactions.

Pursuant to Section 850-10-20, the Related parties include a). affiliates of the Company; b). entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825–10–15, to be accounted for by the equity method by the investing entity; c). trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; d). principal owners of the Company; e). management of the Company; f). other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and g). other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

The consolidated financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include a). the nature of the relationship(s) involved; b). a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c). the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and d). amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

**Commitments and Contingencies**

The Company follows subtopic 450-20 of the FASB Accounting Standards Codification to report accounting for contingencies. Certain conditions may exist as of the date the consolidated financial statements are issued, which may result in a loss to the Company, but which will only be resolved when one or more future events occur or fail to occur. The Company assesses such contingent liabilities, and such assessment inherently involves an exercise of judgment. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company evaluates the perceived merits of

any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought therein.

---

F-9

---

If the assessment of a contingency indicates that it is probable that a material loss has been incurred and the amount of the liability can be estimated, then the estimated liability would be accrued in the Company's financial statements. If the assessment indicates that a potentially material loss contingency is not probable but is reasonably possible, or is probable but cannot be estimated, then the nature of the contingent liability, and an estimate of the range of possible losses, if determinable and material, would be disclosed.

Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the guarantees would be disclosed. Management does not believe, based upon information available at this time that these matters will have a material adverse effect on the Company's consolidated financial position, consolidated results of operations or consolidated cash flows. However, there is no assurance that such matters will not materially and adversely affect the Company's business, consolidated financial position, and consolidated results of operations or consolidated cash flows.

**Accounts Receivable**

Accounts receivable are customer obligations due under normal trade terms which are recorded at net realizable value. The Company establishes an allowance for doubtful accounts based on management's assessment of the collectability of trade receivables. A considerable amount of judgment is required in assessing the amount of the allowance. The Company makes judgments about the creditworthiness of each customer based on ongoing credit evaluations and monitors current economic trends that might impact the level of credit losses in the future. If the financial condition of the customers were to deteriorate, resulting in their inability to make payments, a specific allowance will be required.

Recovery of bad debt amounts previously written off is recorded as a reduction of bad debt expense in the period the payment is collected. If the Company's actual collection experience changes, revisions to its allowance may be required. After all attempts to collect a receivable have failed, the receivable is written off against the allowance.

**Property and Equipment**

The equipment is comprised of ultrasounds, beds, stretchers, cardiac telemetry equipment, cardiac monitors, defibrillators, and other surgical equipment.

Property and equipment are stated at cost or fair value if acquired as part of a business combination. Depreciation is computed by the straight-line method and is charged to operations over the estimated useful lives of the assets. Maintenance and repairs are charged to expense as incurred. The carrying amount and accumulated depreciation of assets sold or retired are removed from the accounts in the year of disposal and any resulting gain or loss is included in results of operations. The estimated useful lives of property and equipment are as follows:

| | |
|---|---|
| Computers, software, and office equipment | 1 – 5 years |
| Surgical equipment | 7 years |
| Furniture and fixtures | 5 – 10 years |
| Leasehold improvements | Lesser of the lease term or estimated useful life |

As of September 30, 2021 and September 30, 2020 the Company had $1,821,081 and $587,083 in equipment that had not yet been placed in service.

**Subsequent Events**

The Company adopted FASB Accounting Standards Codification 855 "Subsequent Events" ("ASC 855") to establish general standards of accounting for and disclosure of events that occur after the balance sheet date, but before the financial statements are issued or available to be issued.

**Recently issued accounting standards**

The Company has reviewed all recently issued, but not yet effective, accounting pronouncements and does not believe the future adoption of any such pronouncements may be expected to cause a material impact on its consolidated financial condition or the consolidated results of its operations.

**NOTE 3. ACCOUNTS RECEIVABLE**

The following table sets forth the components of the Company's accounts receivable on September 30, 2021 and September 30, 2020:

| | September 30, 2021 | | September 30, 2020 | |
|---|---|---|---|---|
| Accounts receivable | | 825,712 | | 74,622 |
| Total accounts receivable | $ | 825,712 | $ | 74,622 |

F-10

*Table of Contents*

For the fiscal year ended September 30, 2021 and 2020, the were no customers that accounted for more than 10% of annual revenue.

**NOTE 4 – INVESTMENTS**

As of September ne 30, 2021 and September 30, 2020 the balance of investments was $89,823,346 and $83,087,469 respectively. These investment are comprised of securities that trade frequently with quoted prices. The Company's intention is not to trade these securities but rather to hold these securities to demonstrate that the Company has enough capital on hand to meet regulatory requirements for certain healthcare companies.

For the fiscal year ended September 30, 2021 the Company recorded an unrealized gains on investments of $5,598,328 compared to a unrealized loss on investments of $1,137,548 for the fiscal year ended September 30, 2020, respectively.

**NOTE 5 – RELATED PARTY TRANSACTIONS**

Since the inception of the Company, substantially all of the funding for Company has been provided by related parties that have extended interest free demand loans. These related parties are as follows:

(1)    BLS, Inc. is controlled by Charles Balaban, a Director of the Company

(2)    BOAM, Inc. is controlled by Charles Balaban

(3)    Healthcare Solutions DX, Inc. is controlled by Justin Smith, Chairman of the Company's Board of Directors

(4)    JHMA, Inc. is controlled by Doug Millar, head of the Company's Corporate Compliance and Regulatory Matters

(5)    Jonathan Loutzenhiser – is a Vice President of the Company

|  | Balance Due 9/30/2021 | Balance Due 9/30/2020 |
|---|---|---|
| BLS, Inc. | $  3,997,500 | $  3,690,000 |
| BOAM, Inc. | 582,409 | 582,409 |
| Healthcare Solutions DX, Inc. | 1,302,151 | 1,161,239 |
| JHMA, Inc. | 4,114,490 | 3,748,329 |
| Jonathan Loutzenhiser | 3,608,590 | 3,241,429 |

**NOTE 6 – DEBT**

The following tables set forth the components of the Company's notes as of September 30, 2021 and September 30, 2020

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| PPP Loans | $  210,500 | $  210,500 |
| Notes payable | 456,000 | 465,323 |
|  | $  666,500 | $  675,823 |

**NOTE 7 – SHAREHOLDERS' EQUITY**

The Company has 1,400,000,000 common shares authorized at a par value of $0.001. As of September 30, 2021, and September 30, 2020 the were 11,072,440 and 1,107,244 common shares outstanding, respectively.

On September 13, 2021, the Board of Directors of the Company approved a 1 for 115 Reverse Stock Split of the Company's common stock with any fractional shares of common stock resulting therefrom being rounded up to the nearest whole share of common stock

F-11

*Table of Contents*

On April 15, 2021 the Company consummated the Merger, whereby 9,965,196 (post-split) shares of the Company's common stock were issued to the holders of HSH common stock.

## NOTE 8 – COMMITMENTS AND CONTINGENCIES

The Company's principal office is located at 3 School St, Suite 303, Glen Cove, NY 11542, where it leases approximately 2,250 square feet of office space at a monthly rent of $2,500 per month. We believe that these facilities are adequate to support the Company's existing operations and that we will be able to obtain appropriate additional facilities or alternative facilities on commercially reasonable terms if and when necessary.

## NOTE 9 – INCOME TAXES

Due to the historical operating losses, the inability to recognize an income tax benefit, and the failure to file tax returns for numerous years, there is no provision for current or deferred federal or state income taxes for the period from inception through the period ended September 30, 2021. As of September 30, 2021 the Company had a retained earnings deficit of $29,171,161, however, the amount of that loss that could be carried forward to offset future taxes is indeterminable.

## NOTE 10 – SUBSEQUENT EVENTS

In accordance with ASC 855-10 management has performed an evaluation of subsequent events from September 30, 2021, through the date the financial statements were available to be issued and noted in subsequent events requiring disclosure except as follows:

*Ambulatory Surgery Center Development Agreement*

On November 26, 2021, the Company and HSH and HSH's wholly owned subsidiary HSH Surgical, Inc. ("HSHS") entered into an Ambulatory Surgery Center Development Agreement (the "Agreement") with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company (together with its subsidiaries, related parties, successors-in-interests, and affiliates, the "Developer"). The term of the Agreement is ten (10) years from November 26, 2021. Pursuant to the Agreement, the Developer agreed to use commercially reasonable efforts to present HSHS with "Qualified Projects," as such term is defined in the Agreement. During the term of the Agreement, the Developer agreed to present HSHS with ten (10) Qualified Projects per year, HSHS however is not required to accept a Qualified Project. HSHS agreed to enter into one hundred (100) Lease Agreements (the "Tenant Commitment") with an option for twenty-five (25) additional units with anticipated development costs to be approximately fourteen million dollars ($14,000,000) a unit (actual costs will vary based on individual projects) for a total initial commitment of approximately one billion four hundred million dollars ($1,400,000,000) with an option for an additional three hundred and fifty million dollars ($350,000,000); provided that each Lease Agreement relates to a Qualified Project. Pursuant to the Agreement, the Developer has the exclusive rights to develop single tenant HSH Surgical Ambulatory Surgery Center units on a nationwide basis for HSHS.

*Urgent Care Center Development Agreement*

On November 26, 2021, the Company, HSH and HSH's wholly owned subsidiary Advance Care Medical Holdings, Inc. ("ACM") entered into an Urgent Care Center Development Agreement (the "UC Agreement") with Jameson, LLC DBA American Development Partners, a Tennessee limited liability company (together with its subsidiaries, related parties, successors-in-interests, and affiliates, the "Developer"). The term of the UC Agreement is ten (10) years from November 26, 2021. Pursuant to the UC Agreement, the Developer agreed to use commercially reasonable efforts to present ACM with "Qualified Projects," as such term is defined in the UC Agreement. During the term of the UC Agreement, the Developer agreed to present ACM with seventy-five (75) Qualified Projects per year, however ACM is not required to accept a Qualified Project. ACM agreed to enter into five hundred (500) Lease Agreements (the "Tenant Commitment") with an option for two hundred (200) additional units with anticipated development costs to be approximately four million five hundred thousand dollars ($4,500,000) a unit (actual costs will vary based on individual projects) or a total initial commitment of approximately two billion two hundred and fifty million dollars ($2,250,000,000.00) with an option for an additional nine hundred million dollars ($900,000,000); provided that each Lease Agreement relates to a Qualified Project. The developer has the exclusive rights to develop single tenant Advance Care Medical Urgent and Comprehensive Care Center units on a nationwide basis for ACM.

F-12

*Table of Contents*

The entry into the Agreement and the UC Agreement, triggered the issuance, on December 31, 2021 by the Company of 81,000,000 shares of its common stock to the following parties in the following amounts (the "Shares").

The issuance of the Shares were triggered pursuant to:

- A management consulting agreement with Black Label Services, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- A management consulting agreement with Jackson Hole Medical Advisors, Inc., dated July 15, 2018: 22,000,000 shares of common stock.

- An employment agreement with Jonathan Loutzenhiser, dated July 15, 2018: 22,000,000 shares of common stock.

- A consulting services agreement with 168 Capital, Inc., dated October 1, 2018: 9,000,000 shares of common stock.

- A consulting services agreement with Alpha Properties LLC., dated October 1, 2018: 3,000,000 shares of common stock.

- A consulting services agreement with Stin Marketing Group LLC., dated October 1, 2018: 3,000,000 shares of common stock.

Additionally, subsequent to September 30, 2021, the Company issued 142,198 shares for consulting services.

F-13

*Table of Contents*

The following exhibits are filed as a part of this Annual Report on Form 10-K:

| Exhibit No. | Description |
|---|---|
| 2.1 | Merger Agreement dated June 14, 2019, by and among Healthcare Solutions Management Group, Inc., Verity Merger Corp. and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 20, 2019). |
| 2.2 | Amendment to Merger Agreement dated 25, 2020, by and among Healthcare Solutions Management Group, Inc., Verity Merger Corp. and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on August 28, 2020). |
| 2.3 | Amendment dated November 5, 2020, to Merger Agreement dated June 14, 2019, as amended on August 25, 2020, by and among Healthcare Solutions Management Group, Inc., Verity Merger Corp. and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 10, 2020). |
| 2.4 | Amendment dated February 16, 2021, to Merger Agreement dated June 14, 2019, as amended by and among Healthcare Solutions Management Group, Inc., Verity Merger Corp. and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 22, 2021). |
| 3.1 | Certificate of incorporation of the Company. (Incorporated by reference to Exhibit 3.1 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.2 | Bylaws of the Company. (Incorporated by reference to Exhibit 3.2 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.3 | Certificate of Conversion from NV to DE as filed with DE. (Incorporated by reference to Exhibit 3.3 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.4 | Certificate of Conversion as filed with NV. (Incorporated by reference to Exhibit 3.4 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.5 | Agreement and Plan of Conversion. (Incorporated by reference to Exhibit 3.5 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.6 | Certificate of Merger for 251 Merger. (Incorporated by reference to Exhibit 3.6 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |
| 3.7 | 251(g) Agreement and Plan of Merger. (Incorporated by reference to Exhibit 3.7 of the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on September 15, 2020). |

53

*Table of Contents*

| 3.8 | Amended and Restated Certificate of Incorporation of the Company. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 18, 2020). |
| 3.9 | Amended and Restated Bylaws of the Company. (Incorporated by reference to Exhibit 2.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 18, 2020). |
| 3.10 | Certificate of merger by and among Verity Merger Corp. and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 3.10 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 3.11 | Certificate of Amendment filed September 15, 2021. (Incorporated by reference to Exhibit 3.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 17, 2021). |
| 10.1† | Employment Agreement between Jonathan Loutzenhiser and Healthcare Solutions Holdings, Inc. (Incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.2 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and DMM Advisors, Inc. dated July 15, 2018. (Incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.3 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and Stin Marketing Group, LLC dated October 1, 2018. (Incorporated by reference to Exhibit 10.3 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.4 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and Tarun Jolly dated October 1, 2018. (Incorporated by reference to Exhibit 10.4 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.5 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and 168 Capital, Inc. dated October 1, 2018. (Incorporated by reference to Exhibit 10.5 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.6 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and Alpha Properties, LLC dated October 1, 2018. (Incorporated by reference to Exhibit 10.6 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.7 | Consulting Agreement between Healthcare Solutions Holdings, Inc. and Black Label Services dated July 15, 2018. (Incorporated by reference to Exhibit 10.7 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.8 | Master Service Agreement between Healthcare Solutions Holdings, Inc. and GrowthMed, Inc. dated October 6, 2020. (Incorporated by reference to Exhibit 10.8 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |

54

*Table of Contents*

| 10.9 | Agreement between Healthcare Solutions Holdings, Inc. and Hearst Media Services dated February 11, 2021. (Incorporated by reference to Exhibit 10.9 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| --- | --- |
| 10.10 | Lease Agreement between Healthcare Solutions Holdings, Inc. and JL International Realty, Inc. dated September 14, 2020. (Incorporated by reference to Exhibit 10.10 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.11 | Loan Forgiveness Agreement between Healthcare Solutions Holdings, Inc. and Healthcare Solutions Management Group, Inc. dated April 13, 2021. (Incorporated by reference to Exhibit 10.11 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 21, 2021). |
| 10.12 | Ambulatory Surgery Center Development Agreement dated November 26, 2021. (Incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on December 2, 2021). |
| 10.13 | Urgent Care Center Development Agreement dated November 26, 2021. (Incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on December 2, 2021). |
| 31.1* | Certification of principal executive and financial officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, as amended. |
| 32.1* | Certification of principal executive officer and principal financial officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, as amended. |
| 99.1 | Discharge Order. (Incorporated by reference to Exhibit 99.1 of the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 23, 2018). |
| 101.INS* | Inline XBRL Instance Document (the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document) |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

_____

\* Filed herewith.

**Item 16. Form 10-K Summary.**

None.

*Table of Contents*

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**HEALTHCARE SOLUTIONS
MANAGEMENT GROUP, INC.**

Dated: June 3, 2022        By: */s/ Justin Smith*

            Justin Smith
            Interim Chief Executive Officer and Interim
            Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Justin Smith*<br>Justin Smith | Interim Chief Executive Officer and Interim Chief Financial Officer and Director<br>(principal executive officer and principal financials and accounting officer) | June 3, 2022 |
| */s/ Jonathan Loutzenhiser*<br>Jonathan Loutzenhiser | Director | June 3, 2022 |
| */s/ Dr. Joseph Asuncion*<br>Dr. Joseph Asuncion | Director | June 3, 2022 |
| */s/ Dr. Charles Balaban*<br>Dr. Charles Balaban | Director | June 3, 2022 |

56

# EXHIBIT 20

1  Jo E. Mettenburg (KS Bar # 19423)
   Anthony C. Biagioli (DC Bar # 996654)
2  Attorneys for Plaintiff
   COMMODITY FUTURES TRADING COMMISSION
3  4900 Main Street, Suite 500
   Kansas City, MO  64112
4  Telephone: (816) 960-7700
   jmettenburg@cftc.gov
5  abiagioli@cftc.gov

**FILED**

**Jun 15, 2020**
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

6              **UNITED STATES DISTRICT COURT**

7              **EASTERN DISTRICT OF CALIFORNIA**

8                **SACRAMENTO DIVISION**

9  COMMODITY FUTURES TRADING
   COMMISSION,
10
11                    Plaintiff,
                                          Civil Action No.   2:20-cv-1184 TLN AC
12          v.

13 FINANCIAL TREE dba FINANCIAL
   TREE TRUST; FINANCIAL SOLUTION
14 GROUP dba FINANCIAL SOLUTION
   GROUP TRUST; NEW MONEY            **COMPLAINT FOR INJUNCTIVE RELIEF,**
15 ADVISORS, LLC; THE LAW FIRM OF    **CIVIL MONETARY PENALTIES,**
   JOHN GLENN, P.C.; JOHN D. BLACK   **RESTITUTION, DISGORGEMENT**
16 aka JOHN BARNES; CHRISTOPHER      **AND OTHER EQUITABLE RELIEF**
   MANCUSO; JOSEPH TUFO; and JOHN
17 P. GLENN,

18                    Defendants;

19 SUISSE GROUP (USA) LLC; JMC
   INDUSTRIES LLC; LANDES CAPITAL
20 MANAGEMENT, LLC; KINGDOM
   TRUST LLC; HERBERT CASWELL;
21 ANNE MANCUSO; and TYLER
   MANCUSO,
22
                    Relief Defendants.
23

24        Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

25 through its attorneys, alleges as follows:

26

27

28

                                    - 1 -

## I.    SUMMARY

1.    Since January 2015, Defendants John D. Black ("Black") and his affiliated entities Financial Tree ("Financial Tree"), Financial Solution Group ("Financial Solution"), and New Money Advisors, LLC ("New Money"); Chris Mancuso ("Mancuso"); Joseph Tufo ("Tufo"); and John Glenn ("Glenn") and his law firm The Law Firm of John Glenn, P.C. ("Glenn Law Firm") (collectively, "Defendants") have engaged in a fraudulent scheme to solicit and misappropriate money deposited with Defendants for the purported purpose of trading binary options and retail foreign currency ("forex") contracts in commodity pools.  Between June 15, 2015 and the present (the "Relevant Period"), Defendants fraudulently solicited at least approximately $14.5 million from members of the public ("pool participants") to trade binary options and forex in two commodity pools—the Financial Tree Pool (the "FT Pool") and the Financial Solution Group Pool (the "FSG Pool") (collectively, the "Black Pools").  During the Relevant Period, at least fifty-three (53) U.S. residents deposited over $6 million in this scheme, and at least an additional thirty-eight (38) non-U.S. residents deposited over $8 million in the scheme.  Defendants have traded only a small portion of funds in binary options or forex.  Instead, Defendants misappropriated the majority of pool funds and, to conceal their misappropriation, made Ponzi payments, issued false account statements and/or lulled pool participants with material misrepresentations and omissions.

2.    In the course of their fraudulent scheme and during the Relevant Period, certain Defendants made material misrepresentations to pool participants, including that:  (1) pool funds would be held in a fiduciary-protected, separate bank account and used to establish lines of credit to trade binary options and/or forex on pool participants' behalf, which would yield 10-70% monthly returns; (2) 85% of Defendants' trades were successful; and (3) Defendants' trading of pool funds was overseen by a respected accounting firm.  Defendants omitted to tell pool

participants, among other things, that the California Department of Business Oversight

("California DBO") had issued a Desist and Refrain Order to Financial Solution, Black, and

Mancuso relating to their solicitations for the Black Pools.

     3.     Instead of trading, as promised, the Defendants have misappropriated the vast

majority of pool funds.  Of the approximately $14.5 million Defendants received from pool

participants during the Relevant Period, Defendants deposited only $10,000 into U.S. trading

accounts in the name of the Black Pools.  At least some of those funds were lost trading forex.

Financial Solution and Financial Tree, by and through Black, transferred approximately $254,280

overseas to possible binary options or forex trading firms but received back only approximately

$59,239.  Defendants misappropriated at least approximately $5.1 million to make Ponzi

payments to other pool participants and at least an additional approximately $6.3 million for

unauthorized personal or business expenses.  Financial Solution and/or the Glenn Law Firm

transferred at least $800,000 to Relief Defendants Suisse Group (USA) LLC ("Suisse Group")

and JMC Industries LLC ("JMC"), and over $1 million to Relief Defendant Kingdom Trust LLC

("Kingdom"), none of whom provided legitimate services to the Black Pools or pool participants.

     4.     To conceal Defendants' misappropriation, Financial Solution, by and through

Black, created and issued false account statements that inflated and misrepresented trading returns

and the value of pool participants' interests in the Black Pools.  When pool participants requested

return of their funds, Defendants provided bogus excuses attempting to explain delays, including,

for example, false representations that Europeans' summer vacations delayed return of funds, that

storms in the Bahamas had delayed transaction processing, and that unspecified additional

obstacles were preventing return of funds.  Additionally, Defendants continued to solicit and/or

accept new pool funds, even after it was clear that Financial Solution and New Money were

failing to repay existing pool participants.

5.     The fraud is ongoing.  A pool participant contributed funds to the scheme at least as recently as January 29, 2020.  Defendants made fraudulent excuses for failure to return funds at least as recently as February 26, 2020.  Defendants still have not returned all funds owed or delivered profits to the vast majority of pool participants.

6.     By virtue of this conduct and the conduct further described herein, Defendants—either directly or as controlling persons—have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Commission Regulations ("Regulations") 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2019).

7.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

8.     Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and 7 U.S.C. § 2(c)(2)(C) to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement from Defendants and Relief Defendants, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

COMPLAINT

## II.    JURISDICTION AND VENUE

9.      The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.  Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018), subjects the forex solicitations and transactions at issue in this action to, *inter alia*, Sections 4b, 4c(b), and 4*o* of the Act, 7 U.S.C. §§ 6b, 6c(b), 6*o* (2018), as further described below.

10.    Venue lies properly in this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act and the Regulations occurred, are occurring, or are about to occur in this District, among other places.

## III.    THE PARTIES

**A.  Plaintiff**

11.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

COMPLAINT

**B. Entity Defendants**

12.     Defendant **Financial Tree** is a "Pure Trust Organization in Common Law" doing business as Financial Tree and Financial Tree Trust.  In April 2014, John Black, Trustee, executed Financial Tree's Articles of Trust.  Financial Tree's mailing address is 13389 Folsom Boulevard, Suite 300-122, Folsom, CA 95630—a UPS store.  Defendant Black is Financial Tree's Trustee.  During the Relevant Period, Financial Tree operated as a commodity pool operator ("CPO") by accepting and receiving funds from pool participants for participation in the Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Tree also operated as a commodity pool itself—the FT Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial Tree has never been registered with the Commission in any capacity.

13.     Defendant **Financial Solution Group** is a "Pure Trust Organization in Common Law" formed in April 2015 doing business as Financial Solution Group and Financial Solution Group Trust.  Financial Solution's mailing address is 13389 Folsom Boulevard, Suite 300-113, Folsom, CA 95630—the same UPS store Financial Tree utilizes for its mailing address.  Defendant Black is Financial Solution's Trustee.  During the Relevant Period, Financial Solution operated as a CPO by soliciting, accepting, and receiving funds from pool participants for participation in the Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Solution also operated as a commodity pool itself—the FSG Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial Solution has never been registered with the Commission in any capacity.

14.     Defendant **New Money Advisors, LLC** is a Nevada limited liability company formed in December 2017.  New Money's address is 1400 South Linda Street, Pahrump, Nevada 89048.  New Money's Officers are Black and Financial Tree, which Black controls.  During the

COMPLAINT

Relevant Period, New Money operated as a CPO by soliciting funds from pool participants for participation in the Black Pools.  New Money has never been registered with the Commission in any capacity.

15.     Defendant **The Law Firm of John Glenn, P.C.** is a Colorado law firm with its principal place of business at 155 East Boardwalk Drive, Suite 400, Fort Collins, CO 80525. Glenn is the Managing Partner of the Glenn Law Firm.  During the Relevant Period, the Glenn Law Firm operated as a CPO by soliciting, accepting, and receiving funds from pool participants for participation in the Black Pools.  The Glenn Law Firm has never been registered with the Commission in any capacity.

**C.  Individual Defendants**

16.     Defendant **John D. Black** is a resident of Folsom, California.  Black is also known as John Barnes.  Black created and controls Financial Tree, Financial Solution, and New Money. During the Relevant Period, Black acted as an Associated Person ("AP") for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools and supervising individuals so soliciting.  Black has never been registered with the Commission in any capacity.

17.     Defendant **Christopher Mancuso** is a resident of Irvine, California.  During the Relevant Period, Mancuso acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Mancuso has never been registered with the Commission in any capacity.

18.     Defendant **Joseph Tufo** is a resident of Antioch, California.  During the Relevant Period, Tufo acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool participants for participation in the Black Pools.  Separate from this Complaint's allegations, in 1999, the Securities and Exchange Commission issued an order against Tufo

- 7 -

relating to his role in the fraudulent offer and sale of securities to the public.  Similarly, in

November 2015, Tufo pled guilty to criminal violations of the Alabama Securities Act for

fraudulently soliciting investments in "no risk" gold trading programs where funds would

purportedly be held in an attorney's trust account.  Tufo has never been registered with the

Commission in any capacity.

19.     Defendant **John P. Glenn** is a resident of Fort Collins, Colorado.  During the

Relevant Period, Glenn acted as an AP for CPOs Financial Tree, Financial Solution, New Money,

and the Glenn Law Firm by soliciting at least one pool participant for participation in the Black

Pools.  In addition, Glenn was the Managing Partner of the Glenn Law Firm.  Glenn directed and

controlled the Glenn Law Firm's actions in all relevant respects, including the Glenn Law Firm's

activities as a CPO soliciting, receiving, and accepting funds from pool participants for

participation in the Black Pools.  Glenn used his Glenn Law Firm email address to communicate

with pool participants.  Glenn has never been registered with the Commission in any capacity.

**D.  Relief Defendants**

20.     Relief Defendant **Suisse Group (USA) LLC** is a Delaware limited liability

company with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—a

UPS store.  Herbert Caswell ("Caswell") is the Director of and controls Suisse Group.  In June

2016, Financial Solution transferred $500,000 in pool funds to a Suisse Group bank account.

Suisse Group has no legitimate claim to pool funds and did not provide any services for the Black

Pools or pool participants.

21.     Relief Defendant **JMC Industries LLC** is a Delaware limited liability company

with an address of 1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—the same

UPS store address as Suisse Group's.  During the Relevant Period, Caswell was the Managing

Member of and controlled JMC until April 2019.  In September 2016, Glenn transferred $300,000

- 8 -

in pool funds from a Glenn Law Firm bank account to JMC.  JMC has no legitimate claim to pool

funds and did not provide any services for the Black Pools or pool participants.

22.    Relief Defendant **Landes Capital Management, LLC** ("Landes") is a Wyoming

limited liability company with an address of 109 E. 17th Street #25, Cheyenne, Wyoming 82001.

In September 2016, JMC transferred $200,000 in pool funds to Landes.  Landes has no legitimate

claim to pool funds and did not provide any services for the Black Pools or pool participants.

23.    Relief Defendant **Kingdom Trust LLC** is a Wyoming limited liability company

with an address of 2123 Pioneer Ave., Cheyenne, Wyoming 82001.  Between March and October

2016, Financial Solution transferred approximately $1,050,000 in pool funds to Kingdom.  On

September 30, 2016, the BBB Jabez Foundation—which Black controls—transferred

approximately $25,000 in pool funds to Kingdom.  On October 3, 2016, Relief Defendant Tyler

Mancuso ("Tyler Mancuso") transferred approximately $25,000 in pool funds to Kingdom.

Kingdom has no legitimate claim to pool funds and did not provide any services for the Black

Pools or pool participants.

24.    Relief Defendant **Herbert Caswell** is a resident of Jacksonville, Florida.  During

the Relevant Period, including in 2016 when Financial Solution and the Glenn Law Firm

transferred funds to Suisse Group and JMC, respectively, Caswell controlled both entities as the

lone Director of Suisse Group and the lone Managing Member of JMC, commingled his personal

funds with Suisse Group and JMC Funds, and transferred Suisse Group and JMC funds to

apparent relatives and acquaintances.  Suisse Group and JMC were the alter egos of Caswell.  In

2016, Suisse Group and JMC transferred at least $150,187.33 in pool funds to bank accounts

owned by Caswell.  Caswell has no legitimate claim to pool funds and did not provide any

services for the Black Pools or pool participants.

25.     Relief Defendant **Anne Mancuso** ("Anne Mancuso") is a resident of Newport

Beach, California.  Anne Mancuso was Chris Mancuso's wife.  During the Relevant Period,

Defendant Chris Mancuso transferred at least $252,874.93 in pool funds to Anne Mancuso.  Anne

Mancuso has no legitimate claim to pool funds and did not provide any services for the Black

Pools or pool participants.

26.     Relief Defendant **Tyler Mancuso** is a resident of San Diego, California.  Tyler

Mancuso is Chris Mancuso's son.  During the Relevant Period, Defendant Chris Mancuso

transferred at least $340,087.23 in pool funds to Tyler Mancuso.  Tyler Mancuso has no

legitimate claim to pool funds and did not provide any services for the Black Pools or pool

participants.

## IV.     FACTS

**A. Defendants Used Various Corporate Entities To Defraud Pool Participants, Misappropriate Funds, and Make Ponzi Payments.**

### 1.  Black Created a Common Enterprise To Defraud Pool Participants.

27.     To operate the fraudulent scheme, Black caused to be created, and controlled, three

entities—Financial Tree, Financial Solution, and New Money.  Black has used these entities to

operate and control the Black Pools (i.e., the FSG Pool and the FT Pool).  Financial Tree has

served in three roles in Defendants' fraud—as a CPO operating and controlling the Black Pools;

as one of the Black Pools itself (the FT Pool); and as an officer of New Money.  Similarly,

Financial Solution has had a dual role in Defendants' fraud—as a CPO operating and controlling

the Black Pools; and as one of the Black Pools itself (the FSG Pool).  Black is the only employee

of the three entities.  And the only business the three entities conducted was related to

Defendants' fraud.

28.     Through Financial Solution and New Money, Black and other APs solicited funds

from pool participants for participation in the Black Pools, in which pool participant funds were

- 10 -

purportedly to be held in a protected account and used as collateral to secure separate lines of credit to trade forex and binary options.  Pool participants could participate by entering into joint venture agreements ("Agreements") with Financial Solution or New Money.  The Agreements, however, did not direct pool participants to send funds directly to the Black Pools.  Instead, the Agreements required pool participants to send funds to a Glenn Law Firm "attorney escrow account," after which the Glenn Law Firm was to pass those funds along to the Black Pools.

### 2. Black Engaged the Glenn Law Firm To Accept Pool Funds To Clothe the Fraud with a Veil of Legitimacy.

29.    In approximately August 2014, Mancuso contacted Glenn "to provide paymaster services for Mr. Black and his companies based upon his various joint ventures with his clients." Later that month, Black (on behalf of Financial Tree) and Glenn (on behalf of the Glenn Law Firm) signed a "Paymaster Agreement" providing that the Glenn Law Firm would accept funds from third parties and disburse such funds to Financial Tree in exchange for a fee.  In practice, the only service the Glenn Law Firm provided to the Black Pools was to accept and transfer pool funds.

30.    There was no legitimate business reason for pool participants to wire funds to the Glenn Law Firm, and for the Glenn Law Firm to then wire funds to Financial Tree (less Glenn's fee).  Pool participants could have just as easily wired money directly to Financial Tree.  Black engaged the Glenn Law Firm to provide a false veneer of safety and legitimacy to the Black Pools.  Glenn used his position as an attorney and Managing Partner of the Glenn Law Firm to deceive pool participants into believing that the Black Pools were legitimate and safe.

31.    During the Relevant Period, at least eighty-six (86) pool participants deposited at least $14.32 million in the Black Pools through at least 134 total wire transfers to the Glenn Law Firm's bank accounts.

COMPLAINT

32.    In addition, at least five pool participants deposited at least $190,793.73 through at least six wire transfers directly to Financial Tree or Financial Solution.

33.    Pool participants deposited funds for trading in the Black Pools at least as early as January 2, 2015, and at least as recently as January 29, 2020.

**3.  Defendants Engaged In Minimal Trading for Pool Participants.**

34.    Despite promising pool participants they would generate substantial profits trading binary options and forex, Financial Tree, Financial Solution, and New Money, in fact, engaged in only minimal trading during the Relevant Period, none of which was profitable.

35.    Specifically, on February 14, 2016, the FSG Pool, by and through Black, opened a forex trading account at Trading Firm A, a registered futures commission merchant ("FCM") and retail foreign exchange dealer ("RFED").  On March 18, 2016, Financial Solution transferred $5,000 into the FSG Pool's forex trading account at Trading Firm A.  No trading occurred in the account.  As of March 2020, the account was dormant.

36.    Likewise, on July 6, 2016, the FT Pool, by and through Black, opened a forex trading account at Trading Firm B.  On July 7, 2016, Financial Tree transferred $5,000 into the account.  The account engaged in limited forex trading, generating net losses.  On May 7, 2018, the FT Pool, at Black's direction, transferred the remaining $2,554.79 from the account, which is no longer active.

37.    In addition, during the Relevant Period, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred approximately $254,280 overseas to possible binary options and/or forex trading firms.  Financial Solution and Financial Tree received back only approximately $59,239.

**4.  Defendants Misappropriated the Vast Majority of Pool Funds To Make Ponzi Payments and for Personal Expenses.**

38.     Defendants Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made approximately 257 payments totaling approximately $4.94 million (approximately 34% of pool funds) to certain pool participants during the Relevant Period.  These were not trading profits.  As described above, very little trading—and no profitable trading—occurred at all.  Instead, these were Ponzi payments made from funds newly received from other pool participants.  Generally, Defendants made Ponzi payments only after they received a fresh infusion of pool funds from pool participants.  During the Relevant Period, on average, Ponzi payments occurred within six days following Financial Solution's or Financial Tree's receipt of funds from other pool participants.

39.     Defendants also misappropriated funds to enrich themselves.  Of the approximately $14.5 million in pool funds, Defendants redirected approximately $6.3 million (approximately 43% of pool funds) to their business or personal bank accounts.

40.     Of the approximately $14.32 million transferred to the Glenn Law Firm's bank accounts in connection with the Black Pools, Glenn misappropriated at least approximately $285,438.24 by retaining such funds in those accounts and/or transferring such pool funds to other bank accounts Glenn owned and/or controlled.  Glenn had no legal right to these pool funds. Glenn spent such funds on, among other things, expenses related to his divorce and spousal support.

41.     Of the remaining pool funds that Glenn did not misappropriate for himself, Glenn transferred approximately $13.5 million to Financial Tree and Financial Solution; approximately $300,000 to Relief Defendant JMC; at least approximately $171,292.18 in apparent Ponzi payments to pool participants; and approximately $51,503.56 to an entity owned by Mancuso.

- 13 -

42.     Upon receipt, Financial Tree, Financial Solution, and New Money did not deposit pool funds into fiduciary-protected, separate bank accounts, and did not use pool funds as collateral to obtain lines of credit to trade binary options and forex on pool participants' behalf.

43.     Instead, between June 22, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, transferred at least $1,809,117.56 of pool funds to business and personal bank accounts owned and/or controlled by Black.  Black withdrew in cash at least $367,408.57 in pool funds, and spent additional misappropriated funds on, among other things, personal travel, rent for his personal residence, legal fees, online gambling, multilevel marketing programs, food and dining expenses, and software and online advertising.

44.     Similarly, between June 22, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made at least 238 payments totaling at least approximately $3.98 million of pool funds to business and personal bank accounts owned and/or controlled by Mancuso.  Mancuso further misappropriated such funds, including by withdrawing at least approximately $1.3 million in cash, transferring at least approximately $593,000 to Relief Defendants Anne Mancuso and Tyler Mancuso, and spending additional such funds on, among other things, personal travel, limousine expenses, spa and haircare expenses, and home renovations.

45.     Likewise, between June 26, 2015 and the present, Financial Solution and Financial Tree, by and through Black and/or other employees or agents, made payments totaling at least approximately $228,000.01 in pool funds to business and personal bank accounts owned or controlled by, or affiliated with, Tufo.  Tufo further misappropriated pool funds by spending them on, among other things, automobile-related expenses, eating out, groceries, insurance premiums, office expenses, utilities, and miscellaneous household expenses.

- 14 -

**B. The California DBO Issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso.**

46.     On April 27, 2018, the California DBO issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso finding they unlawfully sold unregistered securities in California and made material misrepresentations or omissions to a pool participant in connection therewith.  Financial Solution, Black, and Mancuso did not abide by the Desist and Refrain Order and continued soliciting for the Black Pools.

**C. Defendants Made Material Misrepresentations, Omitted Material Facts, and/or Issued False Account Statements to Pool Participants.**

47.     Defendants did not disclose to pool participants any of the above conduct, including that they had traded very few pool funds in binary options or forex, that they were using pool funds to pay personal expenses and make Ponzi payments instead of keeping funds in a separate fiduciary-protected account, and that the California DBO had issued a Desist and Refrain Order to Financial Solution, Black and Mancuso.  Instead, Defendants made material misrepresentations when soliciting pool participants to participate in the Black Pools.  Financial Solution, by and through Black, issued false account statements to pool participants.  Defendants also made material misrepresentations and/or omitted material facts to pool participants when they asked for their funds to be returned or otherwise inquired about the status of their deposits in the Black Pools, and Defendants did this while continuing to solicit and/or accept funds from new pool participants.  During the Relevant Period, at least ninety-one (91) pool participants deposited at least approximately $14.5 million in the Black Pools, relying on the misrepresentations and omissions made or caused to be made by Defendants in deciding to participate, deposit more funds, and/or maintain their participation interests in the Black Pools.  Fraudulent lulling communications to existing pool participants, and fraudulent solicitations of new pool participants, are ongoing.

- 15 -

COMPLAINT

**1.   Defendants Fraudulently Solicited for the Black Pools.**

48.     Defendants made material misrepresentations and omissions to prospective and actual pool participants, including in teleconference seminars, emails, and Agreements executed with pool participants.

49.     Defendants' representations to pool participants downplayed the risk associated with the pools while promising monthly returns between 10-70%.   These Defendants' fraudulent solicitations, as illustrated by the following representative examples, included, but were not limited to, material misrepresentations that:

    a.   all pool funds would be protected in a "no risk" separate account by a fiduciary-protected bank block and returned to pool participants on a schedule prescribed by the Agreements;

    b.   traders would secure separate lines of credit to trade binary options and/or forex for the benefit of pool participants;

    c.   pool participants would receive between 10% and 70% monthly returns on their deposits as profits, depending on participation level;

    d.   more than 85% of trades had been successful; and

    e.   the Black Pools' activities were overseen by a "globally renowned and highly respected fiduciary accounting firm."

50.     These fraudulent solicitations also included, but were not limited to, the material omissions that:

    a.   the California DBO had issued a Desist & Refrain Order against Financial Solution, Black, and Mancuso;

    b.   Defendants would pay themselves approximately 43% of pool fund principal received, prior to trading any funds;

    c.   Defendants would make Ponzi payments to other pool participants using an additional approximately 34% of pool fund principal received, prior to trading any funds;

    d.   Defendants would improperly transfer pool fund principal to other third parties, prior to trading any funds;

- 16 -

e.  Defendants would trade binary options and forex with, at most, 2% of pool
fund principal received;

f.  binary options and forex trading involves significant risk of trading losses;

g.  Defendants had failed to return principal and deliver profits to other pool
participants; and

h.  at least as early as December 2016, Defendants were *expressly communicating*
to existing pool participants that Defendants were struggling to make profitable
trades (which, itself, was a misrepresentation because Defendants were not in
fact trading pool funds) and were not returning principal or delivering profits
to pool participants as promised.

51.     As an example of these fraudulent solicitations, on May 19, 2015, Mancuso

emailed potential pool participants with a subject line "EARN 10% A MONTH PLUS… NEW

10K ENTRY LEVEL…."  The email referenced "ATTORNEY ESCROW TRADE" and stated:

> WE JUST GOT PAID AGAIN FOR MAY…WE KEEP THE
> INVESTOR FUNDS IN A SEPARATE ACCOUNT.  THE TRADER
> SECURES HIS OWN LINE OF CREDIT TO DO THE TRADE…
> THIS IS ONE WAY THAT WE PROTECT THE INVESTOR
> FUNDS…**VERY SUCCESSFUL… MORE THAN 85% OF
> TRADES ARE SUCCESSFUL** . . . . PERFORMING PLATFORM
> PAYS 10% PER MONTH… FUNDS ARE WIRED TO AN ATTY.
> ESCROW AND FUNDS MUST STAY FOR AT LEAST 90 DAYS.
> CONTRACT IS FOR 1 YEAR.  Want To EARN 10% On Your Money
> each Month ?  THAT'S 120% PER YEAR."

52.     Likewise, in or around June 2015, Mancuso circulated a similar email to

prospective pool participants making similar claims, adding "YOU WILL EARN A MINIMUM

10% on your money EVERY MONTH… Funds must be wired to the Escrow Attorney here in the

USA."  Mancuso promised escalating monthly returns depending on the size of the deposit, up to

45% per month for deposits exceeding $1 million.  On approximately June 13, 2015, a pool

participant ("Pool Participant A") responded to Mancuso requesting additional information

regarding "the guarantee on your money."  Mancuso replied the next day, "[i]n this program the

funds are blocked and the trader uses his credit for the trade.  So no risk to blocked funds."

COMPLAINT

53.     Prior to Pool Participant A's initial deposit in June 2015, Mancuso told Pool Participant A in person that the program had been a "godsend," that he had received his twelfth check, and that the program would provide "consistent, monthly income without putting your principal at risk."

54.     Similarly, on December 25, 2015, Mancuso emailed potential pool participants making similar claims, and increasing promised returns to 70% per month for deposits over $3 million.

55.     On approximately July 1, 2016, Black advised Pool Participant B that he could increase his return on deposits from 10% to 13% per month—but only if he deposited an additional $25,000 in addition to his previously deposited $25,000.

56.     In approximately January 2017, Tufo solicited potential pool participants, including Pool Participant F, via email, at a teleconference seminar, and in follow-up telephone discussions.  Tufo represented to pool participants, among other things, that they could deposit $100,000 in the Black Pools and receive back $600,000 in 120 days.  Tufo referred to the opportunity as "foolproof" and "a sure thing" and claimed to have placed clients who achieved similar returns.

57.     On approximately January 17, 2017, on a telephone call, Glenn told Pool Participant F that participating in the Black Pools would be a "good deal" for Pool Participant F and that Black and Mancuso were "great guys."  On January 18, 2017, Pool Participant F transferred $100,000 to the Glenn Law Firm.  Later that day, on a telephone call, Glenn told Pool Participant F that she would receive the full amount promised in the Agreement.

58.     In approximately June 2018, Pool Participant G spoke with Black, Mancuso, Tufo, and others on a teleconference call.  Mancuso communicated that Pool Participant G's money would be safe because "you're not paying us, you're paying an attorney."  Mancuso introduced

- 18 -

COMPLAINT

Tufo as the account manager who would be Pool Participant G's principal point of contact for the opportunity. Prior to Pool Participant G's deposit of $150,000 on approximately July 9, 2018, Tufo communicated to Pool Participant G that Tufo knew many people who had successfully deposited funds with Defendants, that Pool Participant G's money would be safe, and if Pool Participant G ever wanted to cancel the Agreement, he could do so easily and would receive his money back.

59.     Throughout the Relevant Period, pool participants entered into Agreements with Financial Solution or New Money, signed by Black, containing representations that pool funds would be protected in a bank account and used only as collateral for trading binary options, forex, and other products, that pool participants would receive 10% or higher monthly returns and/or loan funding generated by trading profits, and that activities would be monitored by a global accounting firm. The Agreements directed pool participants to wire their funds to a Glenn Law Firm "attorney escrow" bank account.

60.     For example, on approximately June 18, 2015, Pool Participant B entered into an Agreement with Financial Solution, signed by Black, that stated the following:

    a.  "Client funds . . . shall be placed on deposit in a specially created, private Managed Fund Account controlled and blocked by a Fiduciary . . . . Client funds . . . will enjoy principal protection through a Fiduciary-directed bank block."

    b.  "Although funds are blocked and thereby fully protected against loss of principal at all times, the Managed Fund Account shall still financially benefit from the execution of Binary Options, Forex, and other transactions within the international capital markets . . . ."

    c.  "These financial activities are closely monitored by a globally renowned and highly respected fiduciary accounting firm . . . ."

    d.  "FSG anticipates that Client shall start to receive monthly disbursements of the investment profit after 90 days directly from FSG in an amount not less than 10 percent (10%) of the Investment each month."

- 19 -

e. "Client shall be permitted to withdraw all or part of its investment after 120 days only in the unlikely event that Client does not receive monthly profit distributions as outlined herein."

61.     As illustrative examples, pool participants entered into similar Agreements with Financial Solution or New Money (each signed by Black) dated approximately:

a.   June 28, 2015 ($75,000 deposit by Pool Participant A);

b.   July 7, 2015 (additional $25,000 deposit by Pool Participant A);

c.   October 26, 2015 (additional $15,000 deposit by Pool Participant B);

d.   October 27, 2015 ($10,000 deposit by Pool Participant C);

e.   October 27, 2015 (additional $35,000 deposit by Pool Participant A);

f.   July 7, 2016 (additional $25,000 deposit by Pool Participant B);

g.   January 13, 2017 ($100,000 deposit by Pool Participant F);

h.   May 23, 2018 ($150,000 deposit by Pool Participant D); and

i.   June 27, 2018 ($150,000 deposit by Pool Participant G).

62.     The above solicitations contained material misrepresentations and material omissions because, among other things, Defendants did not have a historical 85% success rate trading; did not segregate all pool funds in "no-risk" separate accounts protected by a Fiduciary-protected bank block; did not return pool funds to pool participants on Agreement-prescribed schedules; did not secure separate lines of credit to trade binary options and/or forex for the benefit of pool participants; did not have an accounting firm overseeing trading activities; traded, at most, only a small percentage of pool funds collected in binary options or forex; did not generate 10-70% monthly returns or turn a $100,000 deposit into $600,000 in four months; and misappropriated the vast majority of pool funds for unauthorized personal and business expenses and to make Ponzi payments.

**2. Financial Solution, By and Through Black, Issued False Account Statements.**

63.     During the Relevant Period, Financial Solution, by and through Black and/or other employees or agents, provided false account statements to pool participants.  For example, Pool Participant B received from Financial Solution and Black at least nine account statements covering the period July 2015 through December 2016 and reflecting "MO[NTHLY] PROFITS" of 10% or higher.

64.     These account statements contained material misrepresentations.  Financial Solution had not, in fact, generated any profits at all for Pool Participant B, as Financial Solution had not engaged in any profitable trading using pool funds.

65.     Between October 2015 and March 2016, Black wrote six checks on behalf of Financial Solution to Pool Participant B totaling approximately $15,120.06.  These were Ponzi payments which, combined with the false account statements and fraudulent communications from Black, incentivized additional deposits by Pool Participant B.  On approximately July 7, 2016, Pool Participant B entered into a new Agreement, increasing his participation from $25,000 to $50,000.

**3. Defendants Lulled Pool Participants with Material Misrepresentations and/or Material Omissions After Pool Participants Demanded the Return of their Funds, But Continued To Fraudulently Solicit and/or Accept New Funds for the Black Pools.**

66.     Despite making Ponzi payments to certain pool participants, Financial Solution and New Money failed to return principal plus profits as promised to most pool participants.   Of the approximately $14.5 million in total pool funds accepted from all pool participants during the Relevant Period, Financial Solution and New Money, either directly to pool participants or through Financial Tree, the Glenn Law Firm, or other employees or agents, paid back only approximately $5.1 million, in the form of Ponzi payments.

67.     In light of these failures, pool participants began to complain.  In response,

Defendants made bogus excuses regarding Financial Solution's and New Money's failures to

return pool funds, all while soliciting additional funds and/or accepting pool funds from those

very same pool participants as well as new pool participants.  Defendants continue to lull pool

participants.

        **a.  Black and Mancuso Made Material Misrepresentations and Omissions to Pool Participants Regarding Their Failure To Return Funds While Continuing To Solicit New Pool Participants.**

68.     Black and Mancuso made extensive fraudulent excuses to pool participants

regarding Defendants' failure to return funds, often in joint letters and communications from one

copying the other.  They did so to lull pool participants into believing their funds were safe and

would soon be profitable.  Despite these failures, they continued to solicit funds from new pool

participants.

69.     For example, on approximately December 23, 2016, Black and Mancuso sent a

letter to Pool Participant A, Pool Participant B, and others, stating that Financial Solution's

> trade group has held several meetings with their credit line bank in the
> past 2 weeks and the meetings have went ok but so far our status has
> not changed.  Our lead negotiator says although the talks have been
> productive and he believes we would ultimately get a successful
> resolution likely in January, but he cannot be sure of the timeline so
> they're taking the necessary steps to keep our process moving.  So out
> of an abundance of caution we have been advised to refund all the
> principal deposits starting in January 2017 and we are told this process
> should be completed by mid Feb 2017 . . . . [followed by] disbursement
> of the profits . . . .

70.     Yet in the very same letter, Black and Mancuso solicited for a "new program in the

first qtr of 2017 with new banking relationships for those that wish to continue we'll have a path

moving forward."

71.     On approximately April 4, 2017, Black and Mancuso sent a letter to Pool

Participant A and others, writing,

- 22 -

1

2   We can't express the joy we feel now that the funds are actually
    flowing . . . .  The first wires went out last week and as of today a total
3   of 25 wires have been processed to the initial investors who joined in
    2014.  Presently 15 more wires will go out this week but will need to
    skip next week April 10th-14th due to Spring Break Staff Vacations . . .
4   .

5   72.     Black and Mancuso's April 4, 2017 statements were false.  Three Ponzi payments,

6   not twenty-five, occurred in the two weeks prior to April 4, 2017.

7   73.     On approximately November 15, 2017, Black sent a letter to Pool Participant B

8
9   and others:  "We understand many of you are very frustrated & disappointed with the delay in

10  payments as are we.  Let's be clear we're not in the business of taking clients' money with the

11  intentions of not putting the money to work and not performing."  Black blamed "breach of

12  contract and nonpayment from some of our previous banking sources" for the delays, but stated

13  that through "putting in ridiculous hours," Financial Solution "hit the jackpot" by agreeing with a

14  well-funded Private Trust and a Private Bank & Trust to fund Financial Solution's "projects."

15
16  Black claimed Financial Solution would repay pool participants between November 17, 2017 and

17  ten banking days thereafter.

18  74.     On approximately December 29, 2017, Mancuso emailed Pool Participant B with a

19  subject line "GREAT NEWS!!!", promising wiring of funds by January 8-10.  However, on

20  January 11, 2018, Mancuso emailed that the "SBLC" that was purportedly essential to facilitate

21  return of funds to Pool Participant B had arrived at a Bahamian bank, but storms and rain in the

22  Bahamas had created connectivity issues delaying return of funds.

23
24  75.     On approximately September 25, 2018, Pool Participant C emailed Mancuso,

25  copying Pool Participant B and others, noting "this matter has become exhausting, comical and

26  nonsensical.  It borders on criminal.  Your last response that the matters would close in 15 days

27  has per usual been nothing but . . . another lie.  I am sick to my core of your damn lies."  The next

28  day, Mancuso replied,

No one has ever lied to you from our group not in the past not now or
ever.  Period.  We are given dates and many times those dates do not
come to fruition for many reasons... the latest date we have for funds is
now the week of October 15th… That came from the bank !!!

76.    On approximately January 1, 2019, Pool Participant D emailed Black and others,

expressing frustration at receiving "one story after the next" from Black, including "that funds

were delayed in August because the European market had fluctuation and it was their summer

vacations" and that "there was a legal issue as to why the funds did not transfer from Singapore to

Hong Kong."

77.    On approximately May 17, 2019, Mancuso emailed Pool Participant D, Pool

Participant G, Black, Tufo, and others, in response to complaints regarding delays, claiming "we

can't take funds from clients and pay other clients not even our commissions !!!"

78.    On June 17, 2019, Mancuso claimed to Pool Participant D and others that the

Desist & Refrain Order from the California DBO "WAS RESOLVED SOME TIME AGO… A

CURRENCY PROGRAM THAT WAS NOT OUR SERVICE.  THIS CLIENT RECEIVED A

REFUND BUT SOMETIMES IT'S HARD TO REMOVE ADMINISTRATIVE

PROCEEDINGS FROM THE INTERNET…"

79.    When soliciting new pool participants, Black and Mancuso omitted the material

facts that Financial Solution and New Money had failed to return funds as promised to other pool

participants, and were expressly communicating with those pool participants regarding such

failures.

**b.  Tufo Solicited New Pool Participants Knowing Financial Solution and
New Money Failed To Return Funds to Earlier Pool Participants.**

80.    Tufo knew of Financial Solution's and New Money's failure to return pool funds

and Black's and Mancuso's excuses for such failures.  While Tufo, on emails copying pool

participants, claimed to be frustrated regarding such failures and that he was attempting to help

- 24 -

resolve them, Tufo continued soliciting new pool participants—and receiving payments—while omitting information regarding such failures and excuses.

81.     For example, on approximately December 7, 2017, Tufo emailed unspecified pool participants, including Pool Participant F, stating "I am so sorry for these never ending excuses. I've suggested several times that Chris and John sell everything they own to make you whole . . . ."

82.     On approximately May 29, 2018, a person who introduced pool participants to the Black Pools emailed Tufo, copying Mancuso, Black, and Glenn, writing "Dear Joe" and complaining regarding extensive delays returning funds to pool participants.  This person stated that he recommended the Black Pools to pool participants because of Tufo and had assumed Tufo knew well with whom he was working.

83.     On approximately June 5, 2018, a person emailed Tufo, Glenn, Black, and Mancuso on behalf of Pool Participant E, asserting the four were running a fraudulent business and threatening to report them to authorities.

84.     On approximately July 20, 2018, Tufo emailed an unspecified list of recipients that appears to include Pool Participant E regarding the Black Pools.  Tufo wrote, "John and Chris have been unresponsive when I inquire . . . ."

85.     On approximately January 26, 2019, following multiple complaints by Pool Participant D, Tufo wrote to Pool Participant D, copying Black and others, "I have repeatedly asked John Black and Chris Mancuso to fulfill the terms of the contract that you signed with John Black on behalf of your company.  The delays are unacceptable."  Similarly, on approximately March 1, 2019, Tufo emailed the same group plus Mancuso, telling Black to refund Pool Participant D's money and "[i]ssue a letter of apology" to Pool Participant D.  The same day, Tufo wrote, "I called John Black.  His voicemail is full, I sent an SMS text message.  I spoke with

COMPLAINT

Chris for you a minute ago.  He said that you asked for a refund and you're going to be given a refund."  Tufo then pasted a purported communication from Mancuso stating, "We have another client being paid this month and we can take his funds from there."  The same day, a person writing on behalf of pool participants replied, "Chris, You have another client being funded this month??  How about funding Kevin or Wes or the other clients . . . you are way pass due in funding ??????"  Tufo replied that he "agree[d] that . . . [Pool Participant D's] funding is long past due."

86.    On February 26, 2020, Tufo emailed Pool Participant D and others, "From Chris . . . I was leading our weekly Gideon's Prayer Breakfast as chaplain.  By the way, my dad is in hospice in Encinitas California.  THE FUNDS ARE ABOUT 2 TO 3 WEEKS FROM DISBURSEMENT."

87.    Despite the above correspondence, Tufo nevertheless continued soliciting pool participants and accepting commissions in connection with the fraudulent scheme.  From June 5, 2018 through at least January 31, 2020, an entity controlled by Tufo accepted at least nine transfers totaling at least $58,500 in pool funds from Financial Solution and Financial Tree, by and through Black and/or other employees or agents.

88.    When Tufo solicited and communicated with pool participants, he omitted the material facts that the SEC had found him liable for, and in a separate scheme he had pled guilty to, defrauding investors; that Financial Solution and New Money had failed to return funds as promised to other pool participants; and that Black, Mancuso, Tufo and others were expressly acknowledging such failures in communications with pool participants.

       **c.  Glenn Made Material Misrepresentations and Omissions to Pool Participants and Accepted Funds from New Pool Participants Knowing Financial Solution and New Money Had Failed To Return Funds to Earlier Pool Participants.**

89.     In approximately May 2017, shortly after Financial Solution and New Money failed to deliver funds to Pool Participant F as the Agreements promised, Pool Participant F called Glenn requesting an update on her funds.  Glenn, in his capacity as an attorney and as the Managing Partner of the Glenn Law Firm, told Pool Participant F that he was in possession of Pool Participant F's money and would transfer the $600,000 she was owed by the end of the week.

90.     Glenn's May 2017 statements to Pool Participant F were false.  At no time in May 2017 or otherwise did Glenn or the Glenn Law Firm possess the $600,000 Pool Participant F was owed under her Agreement.  Defendants never paid Pool Participant F.  When Pool Participant F subsequently attempted to call Glenn, he did not answer his phone or return her calls.

91.     On approximately March 19, 2018, Glenn, in his capacity as an attorney from his Glenn Law Firm email address with his Glenn Law Firm signature block, emailed unspecified recipients regarding Pool Participant E's deposit, claiming that he had been trying to resolve with Financial Solution, Black, and Mancuso the issues returning funds.  In this communication, Glenn omitted the material fact that Glenn, himself, had misappropriated a portion of Pool Participant E's funds.

92.     On approximately April 22 and 23, 2019, and June 27, 2019, the Colorado Supreme Court, Attorney Regulation Counsel sent Glenn three separate bar complaints filed by individuals, including Pool Participant D, regarding Glenn's role in the fraud.

93.     On approximately April 26, 2019, and July 1, 2019, Glenn contacted Black and Mancuso regarding the above complaints.  On approximately May 13, 2019, Mancuso claimed

two individuals would soon receive their funds.  On approximately July 2, 2019, Mancuso wrote

to Glenn, referencing Pool Participant D,

> WE HAVE PAID DOZENS AND DOZENS OF CLIENTS
> SUCCESSFULLY OVER THE LAST 4 YEARS… SOMETIMES
> PROGRAMS RUN INTO PROBLEMS THAT DELAYS THE
> PAYOUTS.  WE CAN GET THE PRINCIPAL BACK AND WE
> HAVE ASKED FOR THIS CLIENTS MONEY AS WELL
> TYPICALLY TAKES 30 DAYS (MAYBE SOONER) TO GET THIS
> 150K RETURNED… WE ARE SORRY ABOUT THIS I HAD A
> FEELING THIS WOULD GENERATE MORE COMPLAINTS…

94.    On approximately August 3, 2019, Pool Participant D emailed Glenn, stating

Mancuso and Black "have absolutely no intention of returning our money."  On approximately

August 25, 2019, Pool Participant D forwarded Glenn correspondence regarding extensive delays,

stating, "These are the kind of people you have supported transferring our money into their

accounts for personal gains . . . . There are more victims."  On approximately September 9, 2019,

Glenn forwarded Pool Participant D from his Glenn Law Firm email account correspondence

with Black and Mancuso asserting that Pool Participant D would be paid "by month end."

95.    On approximately November 29, 2019, Pool Participant G emailed Glenn,

expressing concern regarding Glenn's involvement and that Glenn's "participation lended

credibility to . . . [Black's and Mancuso's] operation."

96.    After falsely communicating to Pool Participant F that he possessed the funds she

was owed and would pay her soon, and communicating with other pool participants and

Defendants regarding Financial Solution's and New Money's failure to return funds to pool

participants, Glenn nevertheless continued lending his name and status as an attorney—and the

credibility and safety that communicated to pool participants—to the fraudulent scheme,

accepting and misappropriating pool funds, and falsely purporting to be working with other

Defendants to facilitate return of funds.  For example, from March 19, 2018 through at least

January 29, 2020, the Glenn Law Firm accepted at least twenty-seven transfers totaling

approximately $3.2 million in pool funds, and misappropriated at least $68,406 in such funds.

**D. Defendants' Misappropriation, Misrepresentations, and Omissions Were Intentional or Reckless and Operated as a Fraud on Pool Participants.**

97.     Defendants knowingly or recklessly made statements to pool participants

containing material misrepresentations and/or omissions, and knowingly or recklessly

misappropriated pool funds.  At minimum, this conduct operated as a fraud on pool participants.

**1.   Black, Financial Tree, Financial Solution, and New Money Knowingly or Recklessly Defrauded Pool Participants.**

98.     Black controlled Financial Tree, Financial Solution, and New Money and thus

controlled the disposition of pool funds received in the Financial Tree and Financial Solution

accounts.  Thus, Financial Tree, Financial Solution, and New Money, by and through Black,

knew, or were reckless in not knowing, that such funds did not remain protected as promised, that

Financial Tree, Financial Solution, and New Money did not trade funds as promised, and that the

Agreements and other communications with pool participants did not authorize Black to

misappropriate pool funds for himself or others or to use pool funds to make Ponzi payments to

other pool participants.

99.     Similarly, Financial Solution and New Money, by and through Black, knew, or

were reckless in not knowing, that Black's communications with pool participants and the

promises in the Agreements contained the material misstatements and omissions described above.

Binary options and forex trading involves significant risk.  Because Black controlled Financial

Tree, Financial Solution, and New Money, he knew that the entities he controlled lacked the

trading history claimed and had failed to protect and trade funds or generate profits.  Black further

knew that he had misappropriated funds, that return of principal and payment of profits from

trading were not imminent, and that he was communicating with pool participants regarding such

failures at the same time he was soliciting new pool participants.  Black was aware of the

California DBO's Desist & Refrain Order prohibiting his, Financial Solution's, and Mancuso's

fraudulent solicitations.

100.    At minimum, Black's misappropriation of pool funds and the material

misstatements and omissions in his communications with pool participants operated as a fraud on

pool participants.

**2. Mancuso Knowingly or Recklessly Defrauded Pool Participants.**

101.    Mancuso knew, or was reckless in not knowing, that by accepting funds from

Black-affiliated entities, he was misappropriating pool funds.  Mancuso himself had promised

pool participants that pool funds would remain in a separate, protected account, but it was clear

this did not occur.  Mancuso extensively communicated with pool participants regarding Black's,

Financial Solution's, and New Money's failure to return principal and deliver profits, while

simultaneously accepting commissions from Black-affiliated entities, and he continued to solicit

pool participants and accept commissions thereafter.  Thus, there was no reasonable basis for

Mancuso to believe that payments he received derived from trading profits or anywhere besides

pool funds.

102.    Similarly, Mancuso knew, or was reckless in not knowing, that his

communications with pool participants contained material misstatements and omissions described

above.  Binary options and forex trading involves significant risk.  Mancuso did not analyze, and

could not have analyzed, bank statements reflecting protection of pool funds or trading statements

validating returns, because such records did not exist.  Mancuso communicated with pool

participants regarding the failure to return principal and deliver profits at the same time he was

soliciting new pool participants, and he continued soliciting new pool participants thereafter.

- 30 -

1   Mancuso was aware of the California DBO's Desist & Refrain Order prohibiting his, Financial

2   Solution's, and Black's fraudulent solicitations.

3       103.    At minimum, Mancuso's acceptance of pool funds from Black and the material

4   misstatements and omissions in his communications with pool participants operated as a fraud on

5   
6   pool participants.

7       **3.  Tufo Knowingly or Recklessly Defrauded Pool Participants.**

8       104.    Tufo knew, or was reckless in not knowing, that by accepting funds from Black-

9   and Mancuso-affiliated entities, he was misappropriating pool funds.  Tufo communicated with

10  pool participants regarding Black's, Financial Solution's, and New Money's failure to return

11  principal and deliver profits, while simultaneously accepting commissions from Black- and

12  Mancuso-affiliated entities, and he continued to solicit pool participants and accept commissions

13  thereafter.  Thus, there was no reasonable basis for Tufo to believe that payments he received

14  derived from trading profits or anywhere besides pool funds.

15  

16      105.    Similarly, Tufo knew, or was reckless in not knowing, that his communications

17  with pool participants contained material misstatements and omissions described above.  Binary

18  options and forex trading involves significant risk.  Tufo did not analyze, and could not have

19  analyzed, bank statements reflecting protection of pool funds or trading statements validating

20  returns, because such records did not exist.  Tufo communicated with pool participants regarding

21  the failure to return principal and deliver profits at the same time he was soliciting new pool

22  participants, and he continued soliciting new pool participants thereafter.  Tufo was aware of the

23  California DBO's Desist & Refrain Order prohibiting Financial Solution's, Black's, and

24  
25  Mancuso's fraudulent solicitations.

26  
27  
28

106.    At minimum, Tufo's acceptance of pool funds from Black and the material misstatements and omissions in his communications with pool participants operated as a fraud on pool participants.

**4. Glenn and the Glenn Law Firm Knowingly or Recklessly Defrauded Pool Participants.**

107.    The Glenn Law Firm, by and through Glenn, knew, or was reckless in not knowing, that he was misappropriating pool funds and participating in a Ponzi scheme. Glenn had reviewed the Agreements at the time he accepted pool funds. The Agreements stated he would accept, protect, and pass along pool funds to Financial Solution and New Money in full and did not authorize him to retain a portion of pool funds for himself. Further, Glenn knew about Financial Solution's and New Money's failure to return principal and deliver profits to pool participants through, among other means, his communications with pool participants regarding those failures and his receipt of three bar complaints from Colorado authorities. Despite that knowledge, Glenn continued accepting pool funds, retaining his cut, and passing along the remainder to Financial Solution and Financial Tree. As an attorney subject to the Colorado Rules of Professional Conduct—including rules prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation—Glenn should have been particularly sensitive to the need to avoid engaging in such conduct.

108.    Similarly, the Glenn Law Firm, by and through Glenn, knew, or was reckless in not knowing, that his communications with pool participants contained material misstatements and omissions described above. Glenn did not analyze, and could not have analyzed, bank statements reflecting protection of pool funds or trading statements validating returns, because such records did not exist. When Glenn wrote to Pool Participant F that he possessed the $600,000 she was owed and would transfer that amount to her shortly, Glenn did not possess Pool Participant F's funds; and when Glenn wrote to Pool Participant E that he was working with

- 32 -

Black and Mancuso to address failure to return funds, Glenn himself had misappropriated a portion of those funds, which Glenn omitted from his communication.  Glenn was aware of the California DBO's Desist & Refrain Order prohibiting Financial Solution's, Black's, and Mancuso's fraudulent solicitations.

109.    As an attorney, Glenn was uniquely positioned to comfort pool participants that their money was safe.  And Glenn's involvement did provide such comfort to pool participants. But rather than keeping pool funds safe, Glenn utilized his Glenn Law Firm accounts as revolving doors to receive pool funds and improperly pay them out to himself, other Defendants, and third parties.

110.    At minimum, Glenn's and the Glenn Law Firm's misappropriation of pool funds and the material misrepresentations and omissions in Glenn's communications with pool participants operated as a fraud on pool participants.

**E.  Defendants Failed To Register with the Commission.**

111.    During the Relevant Period, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm, by and through their officers, employees or agents, used the mails, electronic mails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit pool participants and prospective pool participants and/or to accept or receive funds or property from pool participants.

112.    In soliciting pool participants for the Black Pools, Defendants made no attempt to determine if they were eligible contract participants ("ECPs") as defined in Section 1(a)(18) of the Act, 7 U.S.C. § 1a(18) (2018)—i.e., individuals with $10,000,000 invested on a discretionary basis—and, upon information and belief, many, if not all, of the pool participants were not ECPs.

113.    During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs of the Black Pools because they were entities engaging in a

COMPLAINT

business that is of the nature of a commodity pool and, in connection with that business, solicited, accepted, and/or received pool funds for a pooled investment vehicle that engages in binary options transactions and/or that is not an ECP and that engages in transactions described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018), other than on or subject to the rules of a designated contract market ("retail forex transactions").

114.   During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were never registered with the Commission as CPOs.

115.   During the Relevant Period, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were not statutorily exempt or excluded from registration as CPOs and never filed any electronic or written notice with the National Futures Association that they were exempt or excluded from registration as CPOs, as required by Regulations 4.5(c) and 4.13(b)(1), 17 C.F.R. §§ 4.5(c) and 4.13(b)(1) (2019).

116.   During the Relevant Period, Black, Mancuso, Tufo, and Glenn acted as APs of CPOs because they solicited funds or property for participation in a pooled investment vehicle that engages in binary options transactions and/or that is not an ECP and engages in retail forex transactions.

117.   During the Relevant Period, Black, Mancuso, Tufo, and Glenn were never registered with the Commission as APs of CPOs.

**F. Financial Tree, Financial Solution, and the Glenn Law Firm Failed To Comply with Regulations Relating to Pool Organization and Operation.**

118.   Defendants Financial Tree and Financial Solution, while acting as CPOs of the FT Pool and the FSG Pool, respectively, failed to operate the FT Pool and FSG Pool as legal entities separate from those of the CPOs and commingled pool funds with non-pool property by transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and others which contained non-pool funds.

119.    Defendant Glenn Law Firm, while acting as CPO of the Black Pools, received and accepted pool funds into the Glenn Law Firm's attorney trust bank accounts, rather than accounts in the names of the Black Pools.  In addition, the Glenn Law Firm commingled pool funds with non-pool property by accepting pool funds into bank accounts that contained non-pool property.

**G. Financial Tree, Financial Solution, New Money, and the Glenn Law Firm Failed To Provide Pool Disclosures and Other Relevant Documents.**

120.    In addition, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm, while acting as CPOs of the Black Pools, failed to provide pool disclosure documents, account statements presented and computed in accordance with generally accepted accounting principles and containing required information, and other documents required by Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2019), including but not limited to required cautionary statements, risk disclosures, fees and expenses incurred by the Black Pools, past performance disclosures, a statement that the CPO is required to provide all pool participants with monthly or quarterly account statements, as well as an annual report containing financial statements certified by an independent public accountant.

**H. Black and Glenn Controlled Relevant Entities.**

121.    During the Relevant Period, Black was a controlling person for Financial Tree and Financial Solution.  Black is the lone Trustee of Financial Tree and Financial Solution.  Financial Tree's and Financial Solution's Articles of Trust list Black as Trustee having exclusive control of Financial Tree and Financial Solution.  Black opened bank accounts for Financial Tree and Financial Solution and was the sole signatory on these accounts (including the bank accounts to which the Glenn Law Firm's bank accounts transferred funds).  Black signed Agreements between Financial Solution and pool participants.  Black did not act in good faith or knowingly induced Financial Tree's and Financial Solution's fraudulent acts.

122.    During the Relevant Period, Black was also a controlling person for New Money. Black is the Managing Director of New Money.  New Money's registration documents with the Nevada Secretary of State list Black and Financial Tree (which Black controls) as New Money's two managers.  Black opened bank accounts for New Money and was the sole signatory on these accounts.  Agreements between New Money and pool participants list Black as New Money's Managing Director with full authority to sign on New Money's behalf.  Black did not act in good faith or knowingly induced New Money's fraudulent acts.

123.    During the Relevant Period, Glenn was a controlling person for the Glenn Law Firm.  Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other attorneys as being members of the firm.  Glenn signed the August 25, 2014 "Paymaster Agreement" with Financial Tree on behalf of the Glenn Law Firm.  Glenn opened bank accounts for each Glenn Law Firm bank account to which pool participants contributed funds.  Glenn did not act in good faith or knowingly induced the Glenn Law Firm's fraudulent acts.

**I.   Suisse Group and JMC Were Alter Egos of Caswell.**

124.    When Financial Solution and the Glenn Law Firm transferred a total of $800,000 to Suisse Group and JMC in June and September 2016, Caswell controlled both entities as the lone Director of Suisse Group and the lone Managing Member of JMC.  Suisse Group and JMC share the same UPS store mailing address and the same email address— ctkholdingsfund@gmail.com.  Caswell operated Suisse Group and JMC to receive and dissipate ill-gotten funds for his personal benefit.

125.    In the three months prior to receiving the $500,000 transfer from Financial Solution in June 2016, the Suisse Group bank account that received the transfer maintained a balance of $12.15 or lower.  After receiving the $500,000 transfer, within two days, Suisse Group transferred approximately $55,000 to JMC (owned by Caswell), approximately $30,100 to a

personal bank account owned by Caswell, and additional funds to other entities and individuals.

The next two days, Suisse Group transferred a total of approximately $415,000 to a TD

Ameritrade securities account in the name of JMC, which in turn funded a TD Ameritrade forex

trading account ("JMC Forex Account") in the same name. After incurring approximately

$50,000 in trading losses, the JMC Forex Account transferred the remaining approximately

$365,000 to JMC from June to August 2016. After dissipating the approximately $500,000 in

pool funds, the balance in the Suisse Group account that received those funds was, at its highest,

approximately $383.14, and closed in July 2016.

126.    After the JMC Forex Account transferred approximately $365,000 in pool funds to

JMC in July and August 2016, Caswell transferred approximately $88,087.33 to a checking

account Caswell controlled and otherwise dissipated the remaining funds on business and

personal expenses having nothing to do with the Black Pools. Similarly, within one week of the

Glenn Law Firm transferring $300,000 to JMC in September 2016, Caswell transferred

approximately $200,000 to Landes; withdrew approximately $1,500 in cash from this account;

transferred approximately $32,000 to personal bank accounts owned by Caswell; transferred

approximately $68,350 to various individuals including another person with the last name

"Caswell;" and made payments from this account for massages, insurance premiums, and a

mobile phone. After dissipating the pool funds, in 2016, the balance in that account was, at its

highest, approximately $155, and the account was overdrawn by December 2016.

COMPLAINT

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019)**
**(Commodity Option Fraud by Misrepresentations, Omissions, False Statements, and Misappropriation)**

**(All Defendants)**

127.   Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

128.   7 U.S.C. § 6c(b) provides, in relevant part:

> No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

129.   17 C.F.R. § 32.4 provides:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever.

130.   By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn, in connection with offers to enter into, entry into, or confirmation of the execution of commodity

- 38 -

option transactions, directly or indirectly, and knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants; and (2) deceived or attempted to deceive pool participants by any means.

131.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a) and (c).

132.    By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through Black and/or other officers, employees and agents, knowingly or recklessly made or caused to be made false account statements.

133.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through their officers, employees and agents, and Defendant Black violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(b).

134.    The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

135.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count.

Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Black is liable for Financial Tree's, Financial Solution's and New Money's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c).

136.     Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a) and (c).

137.     Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4(a)-(c).

## COUNT TWO

**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018), and Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2019)**
**(Forex Fraud by Misrepresentations, Omissions,**
**False Statements, and Misappropriation)**

**(All Defendants)**

138.     Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

139.     7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

> (2)     for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the

- 40 -

disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

140.   Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2018), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  7 U.S.C. § 1a(17) defines an eligible commercial entity ("ECE"), as an ECP that meets certain additional requirements, both financially and in its business dealings.

141.   Pursuant to Section 2(c)(2)(C)(i)(I) and (iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I) and (iv) (2018), 7 U.S.C. § 6b applies to forex transactions described herein "as if" they were a contract of sale of a commodity for future delivery because they were "offered to, or entered into with, a person that is not an" ECP.

142.   17 C.F.R. § 5.2(b) provides, in relevant part, that:

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:

(1)   To cheat or defraud or attempt to cheat or defraud any person;

(2)   Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

(3)   Willfully to deceive or attempt to deceive any person by any means whatsoever.

143.   By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn, by use of the mails or by any means or instrumentality of interstate commerce, directly or

COMPLAINT

indirectly, in connection with retail forex transactions, knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants; and (2) deceived or attempted to deceive pool participants by any means.

144.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), and the Glenn Law Firm, by and through their officers, employees and agents, and Defendants Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

145.     By reason of the conduct described above, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through Black and/or other officers, employees and agents, knowingly or recklessly made or caused to be made false account statements.

146.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and through their officers, employees and agents, and Defendant Black violated 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2).

147.     The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)-(C)  and 17 C.F.R. § 5.2(b)(1)-(3), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

148.     Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count.

COMPLAINT

Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

149.    Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

150.    Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

## COUNT THREE

**Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (2018)
(Fraud and Deceit by CPOs and APs of CPOs)**

**(All Defendants)**

151.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

152.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i) (2018), defines a CPO, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
> (I)   commodity for future delivery, security futures product, or swap; [or]
>
> (II)  agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act.]

153.    Pursuant to Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), and subject to certain exceptions not relevant here, any person who operates or solicits funds, securities, or

property for a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex CPO.

154.    Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles in retail forex "shall be subject to . . . [7 U.S.C. §] 6*o*," except in circumstances not relevant here.

155.    During the Relevant Period, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including in relevant part transactions in futures and forex; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs, as defined by 7 U.S.C. § 1a(11).

156.    During the Relevant Period, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm solicited funds, securities, or property for a pooled investment vehicle and engaged in retail forex transactions; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as retail forex CPOs, as defined by 17 C.F.R. § 5.1(d)(1).

157.    During the Relevant Period, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm were not registered with the Commission as CPOs or retail forex CPOs.

158.    Regulation 1.3, 17 C.F.R. § 1.3 (2018), defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or
> any natural person occupying a similar status or performing similar
> functions), in any capacity which involves (i) the solicitation of funds,
> securities, or property for a participation in a commodity pool or (ii) the
> supervision of any person or persons so engaged[.]

159.    Pursuant to 17 C.F.R. § 5.1(d)(2), any person associated with a CPO "as a partner,

officer, employee, consultant or agent (or any natural person occupying a similar status or

performing similar functions), in any capacity which involves:  (i) [t]he solicitation of funds,

securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision

of any person or persons so engaged" is an AP of a retail forex CPO.

160.    During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were

associated with a CPO and a retail forex CPO as a partner, officer, employee, consultant, or agent

in a capacity that involved the solicitation of funds, securities, or property for participation in a

commodity pool, or the supervision of any person or persons so engaged.  Therefore, Defendants

Black, Mancuso, Tufo, and Glenn were APs of a CPO as defined by 17 C.F.R. § 1.3 and APs of a

retail forex CPO as defined by 17 C.F.R. § 5.1(d)(2).

161.    During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were

not registered with the Commission as APs of a CPO or as APs of a retail forex CPO.

162.    7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the

Commission or not, by use of the mails or any means or instrumentality of interstate commerce,

directly or indirectly, from employing devices, schemes or artifices to defraud any client or

participant or prospective client or participant, or engaging in transactions, practices, or courses

of business which operate as a fraud or deceit upon any client or participant or prospective client

or participant.

163.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

New Money (acting as a common enterprise), the Glenn Law Firm, Black, Mancuso, Tufo, and

Glenn, through use of the mails or any means or instrumentality of interstate commerce: (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants, or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

164.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise), the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn violated 7 U.S.C. § 6$o$(1).

165.     The foregoing acts, misrepresentations, omissions, and failures occurred within the scope of the individual defendants' employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm.  Therefore, Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm are liable for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6$o$(1), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

166.     Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. § 6$o$(1).

167.     Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. § 6$o$(1).

COMPLAINT

168.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## **COUNT FOUR**

**Violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1) of the Act,
7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2018),
and Regulation 5.3(a)(2), 17 C.F.R. § 5.3(a)(2) (2019)
(Failure To Register as a CPO and Retail Forex CPO
and AP of a CPO and AP of a Retail Forex CPO)**

**(All Defendants)**

169.     Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

170.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

171.     Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states that a

>  person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not—

> . . . .

> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex agreements, contracts, or transactions].

172.     For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in 17 U.S.C. § 1a(18), and who engages in retail forex transactions.

- 47 -

173.    Except in circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(i) requires those

that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d) to register as a CPO with

the Commission.

174.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall

be

> unlawful for any person to be associated with a [CPO] as a partner,
> officer, employee, consultant, or agent . . . in any capacity that involves
>
> > (i)    the solicitation of funds, securities, or property for a
> > participation in a commodity pool or
> >
> > (ii)   the supervision of any person or persons so engaged, unless
> > such person is registered with the Commission under this
> > chapter as an [AP] of such [CPO] . . . .

175.    For the purposes of retail forex transactions, an AP of a CPO is defined in 17

C.F.R. § 5.1(d)(2) as any natural person associated with a retail forex CPO as a partner, officer,

employee, consultant, or agent (or any natural person occupying a similar status or performing

similar functions) in any capacity that involves soliciting funds, securities or property for

participation in a pooled investment vehicle or supervising persons so engaged.

176.    Except in certain circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) requires

those that meet the definition of an AP of a retail forex CPO under 17 C.FR. § 5.1(d) to register as

an AP of a CPO with the Commission.

177.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

New Money (acting as a common enterprise) and the Glenn Law Firm engaged in a business, for

compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or

similar form of enterprise, and in connection therewith, solicited, accepted, or received from

others, funds, securities, or property, either directly or through capital contributions, the sale of

stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests,

- 48 -

including retail forex transactions; therefore, Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs, as defined by 7 U.S.C. § 1a(11).

178.   Likewise by reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm operated or solicited funds, securities, or property for a pooled investment vehicle from pool participants who were not ECPs, as defined by 7 U.S.C. § 1a(18), for the purpose of trading in retail forex transactions, as defined by 17 C.F.R. § 5.1(m); thus, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as CPOs engaged in retail forex transactions, as defined by 17 C.F.R. § 5.1(d)(1).

179.   Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm, while using the mails or means of interstate commerce in connection with their business as a CPO, were not registered with the Commission as a CPO or as a CPO engaged in retail forex transactions.

180.   By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm acted as unregistered CPOs in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1), and 17 C.F.R. § 5.3(a)(2)(i).

181.   By reason of the foregoing, Defendants Black, Mancuso, Tufo, and Glenn associated with a CPO (as defined by 7 U.S.C. § 1a(11)) and a retail forex CPO (as defined in 17 C.F.R. § 5.1(d)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool and/or a pooled investment vehicle in retail forex or the supervision of persons so engaged; therefore, Defendants Black, Mancuso, and Tufo acted as APs of CPOs and CPOs engaged in retail forex transactions as defined by 17 C.F.R. §§ 1.3, 5.1(d)(2).

- 49 -

182.    By reason of the foregoing, Defendants Black, Mancuso, Tufo, and Glenn were not registered with the Commission as APs of a CPO or as APs of a CPO engaged in retail forex transactions; thus, Defendants Black, Mancuso, Tufo, and Glenn acted as unregistered APs of CPOs in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

183.    The foregoing acts, omissions, and failures occurred within the scope of Defendant Black's, Mancuso's, Tufo's, and Glenn's employment or office with Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and/or the Glenn Law Firm. Therefore, Financial Tree, Financial Solution, New Money and/or the Glenn Law Firm are liable for their acts, omissions, and failures in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

184.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's, and New Money's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

185.    Likewise, Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

186.    Each instance that Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

187.    Each instance that Defendants Black, Mancuso, Tufo, and Glenn acted as an AP of

a CPO but failed to register with the Commission as such is alleged as a separate and distinct

violation.

**COUNT FIVE**

**Violation of Regulation 4.20(a)(1), (b)-(c), 17 C.F.R. § 4.20(a)(1), (b)-(c) (2019)**
**(Failure To Operate Pool as Separate Entity; Failure To Receive Pool Participant Funds in**
**Pool's Name; Commingling of Pool Funds)**

**(Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black,**
**and Glenn)**

188.    Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

189.    Regulation 5.4, 17 C.F.R. § 5.4 (2019), states that Part 4 of the Regulations, 17

C.F.R. pt. 4 (2019), applies to any person required to register as a CPO pursuant to Part 5 of the

Regulations, 17 C.F.R. pt. 5 (2019), relating to forex transactions.

190.    17 C.F.R. § 4.20(a)(1) requires a CPO, whether registered or not, to operate its

pool as a legal entity separate from that of the CPO.

191.    17 C.F.R. § 4.20(b) prohibits CPOs, whether registered or not, from receiving pool

participants' funds in any name other than that of the pool.

192.    17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from commingling

the property of any pool it operates with the property of any other person.

193.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and

New Money (acting as a common enterprise), while acting as CPOs for the FT Pool and the FSG

Pool, failed to operate the FT Pool as a legal entity separate from Financial Tree, the CPO; failed

to operate the FSG Pool as a legal entity separate from Financial Solution, the CPO; and

commingled the property of the FT Pool and the FSG Pool with the property of others.

194.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) violated 17 C.F.R. § 4.20(a)(1), (c).

195.     By reason of the foregoing, Defendant Glenn Law Firm, while acting as CPO for the Black Pools, failed to receive pool participants' funds in the names of the Black Pools and commingled the property of the Black Pools with property of others.

196.     By reason of the foregoing, Defendant Glenn Law Firm violated 17 C.F.R. § 4.20(b)-(c).

197.     Defendant Black controls Financial Tree and Financial Solution, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's and Financial Solution's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's and Financial Solution's violations of 17 C.F.R. § 4.20(a)(1), (c).

198.     Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 17 C.F.R. § 4.20(b)-(c).

199.     Each act of failing to operate a pool as a legal entity separate from that of the CPO, improperly receiving pool participants' funds, and commingling the property of the Black Pools with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b)-(c).

COMPLAINT

## COUNT SIX

### Violation of Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21, 4.22 (2019)
### (Failure To Provide Pool Disclosures And Other Required Documents)

### (Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, and Glenn)

200.     Paragraphs 1 through 126 are re-alleged and incorporated herein by reference.

201.     17 C.F.R. § 5.4 states that 17 C.F.R. pt. 4 applies to any person required to register as a CPO pursuant to 17 C.F.R. pt. 5, relating to forex transactions.

202.     17 C.F.R. § 4.21(a)(1) provides that

> each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

203.     17 C.F.R. § 4.22(a), (c) provides that

> each commodity pool operator registered or required to be registered under the Act must periodically distribute to each participant in each pool . . . an Account Statement, which shall be presented in the form of a Statement of Operations and a Statement of Changes in Net Assets . . . . [and which] must be presented and computed in accordance with generally accepted accounting principles . . . . [and] must [also] distribute an Annual Report . . . .

204.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2019).

205.     By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm violated 17 C.F.R. § 4.21.

206.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm failed to provide to pool participants Account Statements and Annual Reports required by 17 C.F.R. § 4.22.

207.    By reason of the foregoing, Defendants Financial Tree, Financial Solution, and New Money (acting as a common enterprise) and the Glenn Law Firm violated 17 C.F.R. § 4.22.

208.    Defendant Black controls Financial Tree, Financial Solution, and New Money, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Financial Tree's, Financial Solution's, and New Money's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Black is liable for Financial Tree's, Financial Solution's and New Money's violations of 17 C.F.R. §§ 4.21, 4.22.

209.    Defendant Glenn controls the Glenn Law Firm, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Glenn Law Firm's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Glenn is liable for the Glenn Law Firm's violations of 17 C.F.R. §§ 4.21, 4.22.

210.    Each failure to furnish the required disclosure documents and account statements and reports to prospective pool participants and pool participants, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. §§ 4.21, 4.22.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.    Find that Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn violated Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b),

6k(2), 6m(1), 6*o*(1)(A)-(B), 2(c)(2)(C)(iii)(I)(cc) (2018), and Regulations 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), 32.4 (2019);

       B.      Enter an order of permanent injunction enjoining Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6*o*(1)(A)-(B), 2(c)(2)(C)(iii)(I)(cc), and 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), 32.4;

       C.      Enter an order of permanent injunction restraining and enjoining Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

              1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

              2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

              3)   Having any commodity interests traded on any Defendants' behalf;

              4)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)    Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

7)    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D.      Enter an order directing Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.      Enter an order directing Relief Defendants Suisse Group, JMC, Landes, Kingdom, Caswell, Anne Mancuso, and Tyler Mancuso, including any third-party transferee, successors, and/or alter egos thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

F.      Enter an order requiring Defendants Financial Tree, Financial Solution, New

COMPLAINT

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any successors

thereof, to make full restitution to every person who has sustained losses proximately caused by

the violations described herein, including pre-judgment and post-judgment interest;

G.      Enter an order directing Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn, as well as any successors

thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and

agreements, whether implied or express, entered into between, with or among Defendants

Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo,

and/or Glenn and any of the pool participants whose funds were received by Defendants Financial

Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, Tufo, and/or Glenn

as a result of the acts and practices that constituted violations of the Act and Regulations as

described herein;

H.      Enter an order directing Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn to pay a civil monetary penalty

assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-

1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act

Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see*

Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as

described herein;

I.      Enter an order requiring Defendants Financial Tree, Financial Solution, New

Money, the Glenn Law Firm, Black, Mancuso, Tufo, and Glenn to pay costs and fees as permitted

by 28 U.S.C. §§ 1920, 2413(a)(2) (2018); and

J.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Dated:  June 15, 2020

Respectfully submitted,

**COMMODITY FUTURES TRADING
COMMISSION**

By:  /s/ Anthony C. Biagioli
Jo E. Mettenburg (KS Bar # 19423),
jmettenburg@cftc.gov
TRIAL COUNSEL
Anthony C. Biagioli (DC Bar # 996654),
abiagioli@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
4900 Main Street, Suite 500
Kansas City, MO  64112
(816) 960-7700

- 58 -

COMPLAINT

# EXHIBIT 21

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   COMMODITY FUTURES TRADING            No.  2:20-cv-01184 TLN AC
     COMMISSION,
12
                    Plaintiff,
13                                         FINDINGS AND RECOMMENDATIONS
              v.
14
     FINANCIAL TREE dba FINANCIAL
15   TREE TRUST, et al.,

16                  Defendants.

17

18          This matter is before the Court on plaintiff Commodity Futures Trading Commission's

19   ("CFTC" or "Commission") Motion for Issuance of an Order for Final Judgment of Default,

20   Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief

21   ("Motion") against Defendants Financial Tree ("Financial Tree"), Financial Solution Group

22   ("Financial Solution"), New Money Advisors, LLC ("New Money"), The Law Firm of John

23   Glenn, P.C. ("Glenn Law Firm"), John D. Black ("Black"), Christopher Mancuso ("Mancuso"),

24   Joseph Tufo ("Tufo"), and John P. Glenn ("Glenn," and together with the Glenn Law Firm, the

25   "Glenn Defendants") (collectively, "Defendants"); and Relief Defendants Suisse Group (USA)

26   LLC ("Suisse Group"), JMC Industries LLC ("JMC"), Landes Capital Management, LLC

27   ("Landes"), Kingdom Trust LLC ("Kingdom"), Herbert Caswell ("Caswell"), Anne Mancuso

28   ("Anne Mancuso"), and Tyler Mancuso ("Tyler Mancuso") (collectively, "Relief Defendants,"

                                             1

1   and together with Defendants, the "Parties").  Plaintiff asserts that other than the Black and the

2   Glenn Defendants, who appeared in this action solely to litigate bankruptcy stay and/or default-

3   related issues but ultimately defaulted (ECF Nos. 111, 122) the defendants have each failed to

4   appear.

5        Defendants John Glenn and the Law Firm from John Glenn P.C. filed a notice of intent to

6   default (ECF No. 109) and filed a statement of non-opposition to the pending motion (ECF No.

7   127).  Two non-parties, acting in pro se, filed a "notice" in response to the motion for default

8   judgment, purportedly on behalf of defendant Kingdom Trust LLC.  ECF No. 128.

9        The undersigned issues findings and recommendations on this motion pursuant to Local

10  Rule 302(c)(19).

11                      **I.      FACTUAL AND PROCEDURAL BACKGROUND**

12       A.  <u>Procedural History</u>

13       On June 15, 2020, the CFTC filed a Complaint charging the Defendants with violating

14  Sections 4b(a)(2)(A)-(C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(cc) of the

15  Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-

16  (B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Commission Regulations ("Regulations") 4.20(a)(1),

17  (b)-(c), 4.21, 4.22, 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, 4.22,

18  5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2021).  ECF No. 1.  In addition, the Complaint alleges that

19  Relief Defendants, who were not charged with violating the Act or Regulations, received funds

20  and assets from Defendants, to which Relief Defendants held no legitimate interest or entitlement

21  and which were derived from Defendants' fraudulent and violative acts.  <u>Id.</u>  On July 2, 2020, the

22  Court entered a Statutory Restraining Order ("SRO") against the Parties that, among other things,

23  authorized the freezing of assets held in the name of or under the control or management of the

24  Parties.  ECF No. 9.

25       On July 8, 2020 and, in the case of Mancuso, July 12, 2020, the CFTC properly effected

26  service of the Summons and Complaint by personal service by private process server pursuant to

27  Rule 4 of the Federal Rules of Civil Procedure ("FRCP") on Black (and, through Black, on

28  Black's entities Financial Tree, Financial Solution, and New Money), Mancuso, Tufo, Landes

1   (through its principal, Justin Smith), Kingdom (through its principals, Michael and Ruby Handler

2   Jacobs), Anne Mancuso, and Tyler Mancuso.  ECF Nos. 13-22.  On July 22, 2020, the CFTC

3   properly effected service of the Summons and Complaint on JMC and Suisse Group.  On July 23,

4   2020, following repeated attempts to serve Caswell personally, the CFTC properly effected

5   service of the Summons and Complaint on Caswell via substitute service on Caswell's mother at

6   Caswell's usual place of abode and last known mailing address.  ECF No. 57 at 2 ¶¶ 2-3 & nn.1-2

7   (detailing completed service).

8           Other than Black and the Glenn Defendants—who appeared in this action solely to litigate

9   stay- and/or default-related issues but ultimately defaulted—the Parties have failed to appear.  All

10  Parties failed to file a responsive pleading or otherwise defend in this action, and the clerk has

11  entered default against all Parties pursuant to FRCP 55(a).  ECF Nos. 49-50, 58, 111, 122.  The

12  CFTC has moved this Court to grant final judgment by default against Defendants, order

13  permanent injunctive relief, impose restitution obligations, and impose civil monetary penalties.

14  The CFTC has further moved this Court to grant final judgment by default against Relief

15  Defendants and order disgorgement of ill-gotten funds to which they are not entitled.

16       B.  Factual Allegations

17          The following allegations are asserted in plaintiff's complaint unless otherwise specified.

18  ECF No. 1 at 6-54.  The court notes that plaintiff has submitted updated calculations regarding

19  the amount of funds returned to pool participants and aggregate pool participant losses; these

20  numbers differ from those described in the complaint and are substantiated by the declaration of

21  fraud examiner Elise Robinson (ECF No. 125-1) filed concurrently with the motion for default

22  judgment.  During the Relevant Period, pool participants contributed a total of $14,512,482.49 to

23  the Black Pools.  Defendants returned $4,370,307.18 to certain pool participants in the form of

24  Ponzi payments.  Pool participants suffered net losses of $10,495,328.38.  Of those losses,

25  $4,690,155.52 were suffered by pool participants whose contributions resulted in Tufo receiving a

26  commission.  Robinson Declaration ("Robinson Decl.," attached as Exhibit 1 to this Motion) ¶¶

27  9-11 & Ex. A.

28  ////

1    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory

2    agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1–26

3    (2018), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2021).  Defendant

4    Financial Tree is a "Pure Trust Organization in Common Law" doing business as Financial Tree

5    and Financial Tree Trust.  In April 2014, John Black, Trustee, executed Financial Tree's Articles

6    of Trust. Financial Tree's mailing address is 13389 Folsom Boulevard, Suite 300-122, Folsom,

7    CA 95630—a UPS store.  Defendant Black is Financial Tree's Trustee.  From at least June 15,

8    2015 through at least the filing of the CFTC's Complaint on June 15, 2020 (the "Relevant

9    Period"), Financial Tree operated as a commodity pool operator ("CPO") by accepting and

10   receiving funds from members of the public ("pool participants") for participation in two

11   commodity pools—the Financial Tree Pool (the "FT Pool") and the Financial Solution Group

12   Pool (the "FSG Pool") (collectively, the "Black Pools").  In addition to operating as a CPO,

13   during the Relevant Period, Financial Tree also operated as a commodity pool itself—the FT

14   Pool—because it owned a trading account in its name that traded pool funds in forex.  Financial

15   Tree has never been registered with the Commission in any capacity.

16   Defendant Financial Solution is a "Pure Trust Organization in Common Law" formed in

17   April 2015 doing business as Financial Solution Group and Financial Solution Group Trust.

18   Financial Solution's mailing address is 13389 Folsom Boulevard, Suite 300-113, Folsom, CA

19   95630—the same UPS store that Financial Tree utilizes for its mailing address.  Defendant Black

20   is Financial Solution's Trustee.  During the Relevant Period, Financial Solution operated as a

21   CPO by soliciting, accepting, and receiving funds from pool participants for participation in the

22   Black Pools.  In addition to operating as a CPO, during the Relevant Period, Financial Solution

23   also operated as a commodity pool itself—the FSG Pool—because it owned a trading account in

24   its name that traded pool funds in forex.  Financial Solution has never been registered with the

25   Commission in any capacity.

26   Defendant New Money is a Nevada limited liability company formed in December 2017.

27   New Money's address is 1400 South Linda Street, Pahrump, Nevada 89048.  New Money's

28   Officers are Black and Financial Tree, which Black controls.  During the Relevant Period, New

4

1  Money operated as a CPO by soliciting funds from pool participants for participation in the Black

2  Pools.  New Money has never been registered with the Commission in any capacity.

3      Defendant Glenn Law Firm is a Colorado law firm with its principal place of business at

4  155 East Boardwalk Drive, Suite 400, Fort Collins, CO 80525.  Glenn is the Managing Partner of

5  the Glenn Law Firm.  During the Relevant Period, the Glenn Law Firm operated as a CPO by

6  soliciting, accepting, and receiving funds from pool participants for participation in the Black

7  Pools.  The Glenn Law Firm has never been registered with the Commission in any capacity.

8      Defendant Black is a resident of Folsom, California.  Black is also known as John Barnes.

9  Black created and controls Financial Tree, Financial Solution, and New Money.  During the

10  Relevant Period, Black acted as an Associated Person ("AP") for CPOs Financial Tree, Financial

11  Solution, and New Money by soliciting pool participants for participation in the Black Pools and

12  supervising individuals so soliciting.  Black has never been registered with the Commission in

13  any capacity.

14      Defendant Mancuso is a resident of Irvine, California.  During the Relevant Period,

15  Mancuso acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by

16  soliciting pool participants for participation in the Black Pools.  Mancuso has never been

17  registered with the Commission in any capacity.

18      Defendant Tufo is a resident of Antioch, California.  During the Relevant Period, Tufo

19  acted as an AP for CPOs Financial Tree, Financial Solution, and New Money by soliciting pool

20  participants for participation in the Black Pools.  Separate from this Complaint's allegations, in

21  1999, the Securities and Exchange Commission issued an order against Tufo relating to his role in

22  the fraudulent offer and sale of securities to the public.  Similarly, in November 2015, Tufo pled

23  guilty to criminal violations of the Alabama Securities Act for fraudulently soliciting investments

24  in "no risk" gold trading programs where funds would purportedly be held in an attorney's trust

25  account.  Tufo has never been registered with the Commission in any capacity.

26      Defendant Glenn is a resident of Fort Collins, Colorado.  During the Relevant Period,

27  Glenn acted as an AP for CPOs Financial Tree, Financial Solution, New Money, and the Glenn

28  Law Firm by soliciting at least one pool participant for participation in the Black Pools.  In

1     addition, Glenn was the Managing Partner of the Glenn Law Firm. Glenn directed and controlled

2     the Glenn Law Firm's actions in all relevant respects, including the Glenn Law Firm's activities

3     as a CPO soliciting, receiving, and accepting funds from pool participants for participation in the

4     Black Pools. Glenn used his Glenn Law Firm email address to communicate with pool

5     participants. Glenn has never been registered with the Commission in any capacity.

6        Relief Defendant Landes is a Wyoming limited liability company with an address of 109

7     E. 17th Street #25, Cheyenne, Wyoming 82001. In September 2016, JMC transferred $200,000

8     in pool funds to Landes. Landes has no legitimate claim to pool funds and did not provide any

9     services for the Black Pools or pool participants.

10        Relief Defendant Kingdom is a Wyoming limited liability company with an address of

11     2123 Pioneer Ave., Cheyenne, Wyoming 82001. Between March and October 2016, Financial

12     Solution transferred approximately $1,050,000 in pool funds to Kingdom. On September 30,

13     2016, the BBB Jabez Foundation—which Black controls—transferred approximately $25,000 in

14     pool funds to Kingdom. On October 3, 2016, Tyler Mancuso transferred approximately $25,000

15     in pool funds to Kingdom. Kingdom has no legitimate claim to pool funds and did not provide

16     any services for the Black Pools or pool participants.

17        Relief Defendant Suisse Group is a Delaware limited liability company with an address of

18     1650 Margaret Street, Suite 302-326, Jacksonville, Florida 32209—a UPS store. Caswell is the

19     Director of and controls Suisse Group. In June 2016, Financial Solution transferred $500,000 in

20     pool funds to a Suisse Group bank account. Suisse Group has no legitimate claim to pool funds

21     and did not provide any services for the Black Pools or pool participants.

22        Relief Defendant JMC is a Delaware limited liability company with an address of 1650

23     Margaret Street, Suite 302-326, Jacksonville, Florida 32209—the same UPS store address as

24     Suisse Group's. During the Relevant Period, Caswell was the Managing Member of and

25     controlled JMC until April 2019. In September 2016, Glenn transferred $300,000 in pool funds

26     from a Glenn Law Firm bank account to JMC. JMC has no legitimate claim to pool funds and

27     did not provide any services for the Black Pools or pool participants.

28     ////

1      Relief Defendant Caswell is a resident of Jacksonville, Florida.  During the Relevant

2  Period, including in 2016 when Financial Solution and the Glenn Law Firm transferred funds to

3  Suisse Group and JMC, respectively, Caswell controlled both entities as the lone Director of

4  Suisse Group and the lone Managing Member of JMC, commingled his personal funds with

5  Suisse Group and JMC Funds, and transferred Suisse Group and JMC funds to apparent relatives

6  and acquaintances.  Suisse Group and JMC were the alter egos of Caswell.  In 2016, Suisse

7  Group and JMC transferred at least $150,187.33 in pool funds to bank accounts owned by

8  Caswell.  Caswell has no legitimate claim to pool funds and did not provide any services for the

9  Black Pools or pool participants.

10      Relief Defendant Anne Mancuso is a resident of Newport Beach, California.  Anne

11  Mancuso was Chris Mancuso's wife.  During the Relevant Period, Defendant Chris Mancuso

12  transferred at least $252,874.93 in pool funds to Anne Mancuso.  Anne Mancuso has no

13  legitimate claim to pool funds and did not provide any services for the Black Pools or pool

14  participants.

15      Relief Defendant Tyler Mancuso is a resident of San Diego, California.  Tyler Mancuso is

16  Chris Mancuso's son.  During the Relevant Period, Defendant Chris Mancuso transferred at least

17  $340,087.23 in pool funds to Tyler Mancuso.  Tyler Mancuso has no legitimate claim to pool

18  funds and did not provide any services for the Black Pools or pool participants.

19      Plaintiff alleges that Defendants created and operated a Ponzi scheme.  To operate the

20  fraudulent scheme, Black caused to be created, and controlled, three entities: Financial Tree,

21  Financial Solution, and New Money.  Black has used these entities to operate and control the

22  Black Pools (i.e., the FSG Pool and the FT Pool).  Financial Tree has served in three roles in

23  Defendants' fraud—as a CPO operating and controlling the Black Pools; as one of the Black

24  Pools itself (the FT Pool); and as an officer of New Money.  Similarly, Financial Solution has had

25  a dual role in Defendants' fraud—as a CPO operating and controlling the Black Pools; and as one

26  of the Black Pools itself (the FSG Pool).  Black is the only employee of the three entities.  And

27  the only business the three entities conducted was related to Defendants' fraud.

28  ////

1    Through Financial Solution and New Money, Black and other APs solicited funds from

2    pool participants for participation in the Black Pools, in which pool participant funds were

3    purportedly to be held in a protected account and used as collateral to secure separate lines of

4    credit to trade forex and binary options.  Pool participants could participate by entering into joint

5    venture agreements ("Agreements") with Financial Solution or New Money.  The Agreements,

6    however, did not direct pool participants to send funds directly to the Black Pools.  Instead, the

7    Agreements required pool participants to send funds to a Glenn Law Firm "attorney escrow

8    account," after which the Glenn Law Firm was to pass those funds along to the Black Pools.

9    In approximately August 2014, Mancuso contacted Glenn "to provide paymaster services

10   for Mr. Black and his companies based upon his various joint ventures with his clients."  Later

11   that month, Black (on behalf of Financial Tree) and Glenn (on behalf of the Glenn Law Firm)

12   signed a "Paymaster Agreement" providing that the Glenn Law Firm would accept funds from

13   third parties and disburse such funds to Financial Tree in exchange for a fee.  In practice, the only

14   service the Glenn Law Firm provided to the Black Pools was to accept and transfer pool funds.

15   There was no legitimate business reason for pool participants to wire funds to the Glenn Law

16   Firm, and for the Glenn Law Firm to then wire funds to Financial Tree (less Glenn's fee).  Pool

17   participants could have just as easily wired money directly to Financial Tree.  Black engaged the

18   Glenn Law Firm to provide a false veneer of safety and legitimacy to the Black Pools.  Glenn

19   used his position as an attorney and Managing Partner of the Glenn Law Firm to deceive pool

20   participants into believing that the Black Pools were legitimate and safe.

21   During the Relevant Period, 92 pool participants (Robinson Decl. n.2) deposited over

22   $14.32 million in the Black Pools through at least 134 total wire transfers to the Glenn Law

23   Firm's bank accounts.  In addition, at least five pool participants deposited at least $190,793.73

24   through at least six wire transfers directly to Financial Tree or Financial Solution.  Pool

25   participants deposited funds for trading in the Black Pools at least as early as January 2, 2015, and

26   at least as recently as January 29, 2020.  Specifically, on February 14, 2016, the FSG Pool, by and

27   through Black, opened a forex trading account at Trading Firm A, a registered futures

28   commission merchant ("FCM") and retail foreign exchange dealer ("RFED").  On March 18,

1   2016, Financial Solution transferred $5,000 into the FSG Pool's forex trading account at Trading

2   Firm A.  No trading occurred in the account.  As of March 2020, the account was dormant.

3       Likewise, on July 6, 2016, the FT Pool, by and through Black, opened a forex (foreign

4   exchange) trading account at Trading Firm B.  On July 7, 2016, Financial Tree transferred $5,000

5   into the account.  The account engaged in limited forex trading, generating net losses.  On May 7,

6   2018, the FT Pool, at Black's direction, transferred the remaining $2,554.79 from the account,

7   which is no longer active.  In addition, during the Relevant Period, Financial Solution and

8   Financial Tree, by and through Black and/or other employees or agents, transferred

9   approximately $254,280 overseas to possible binary options and/or forex trading firms.  Financial

10  Solution and Financial Tree received back only approximately $59,239.

11      Financial Solution and Financial Tree, by and through Black and/or other employees or

12  agents, made payments totaling $4,370,307.18 (approximately 30% of pool funds) to certain pool

13  participants during the Relevant Period.  Robinson Decl. ¶ 11.  These were Ponzi payments made

14  from funds newly received from other pool participants.  Defendants also misappropriated funds

15  to enrich themselves.  Of the approximately $14.5 million in pool funds, Defendants redirected

16  approximately $6.3 million (approximately 43% of pool funds) to various Defendants' business

17  or personal bank accounts.  Of the approximately $14.32 million transferred to the Glenn Law

18  Firm's bank accounts in connection with the Black Pools, Glenn misappropriated at least

19  approximately $285,438.24 by retaining such funds in those accounts and/or transferring such

20  pool funds to other bank accounts Glenn owned and/or controlled.  Glenn had no legal right to

21  these pool funds.  Glenn spent such funds on, among other things, expenses related to his divorce

22  and spousal support.

23      Of the remaining pool funds that Glenn did not misappropriate for himself, Glenn

24  transferred approximately $13.5 million to Financial Tree and Financial Solution; approximately

25  $300,000 to Relief Defendant JMC; at least approximately $171,292.18 in apparent Ponzi

26  payments to pool participants; and approximately $51,503.56 to an entity owned by Mancuso.

27  Upon receipt, Financial Tree, Financial Solution, and New Money did not deposit pool funds into

28  fiduciary-protected, separate bank accounts, and did not use pool funds as collateral to obtain

1   lines of credit to trade binary options and forex on pool participants' behalf, as the Agreements

2   promised.  Instead, during the Relevant Period, Financial Solution and Financial Tree, by and

3   through Black and/or other employees or agents, transferred at least $1,809,117.56 of pool funds

4   to business and personal bank accounts owned and/or controlled by Black.  Black withdrew in

5   cash at least $367,408.57 in pool funds, and spent additional misappropriated funds on, among

6   other things, personal travel, rent for his personal residence, legal fees, online gambling,

7   multilevel marketing programs, food and dining expenses, and software and online advertising.

8   Similarly, during the Relevant Period, Financial Solution and Financial Tree, by and through

9   Black and/or other employees or agents, made at least 238 payments totaling at least

10   approximately $3,977,470.20 of pool funds to business and personal bank accounts owned and/or

11   controlled by Mancuso.  Mancuso further misappropriated such funds, including by withdrawing

12   at least approximately $1.3 million in cash, transferring at least approximately $593,000 to Relief

13   Defendants Anne Mancuso and Tyler Mancuso, and spending additional such funds on, among

14   other things, personal travel, limousine expenses, spa and haircare expenses, and home

15   renovations.[1]

16        Likewise, during the Relevant Period, Financial Solution and Financial Tree, by and

17   through Black and/or other employees or agents, made payments totaling at least approximately

18   $228,000.01 in pool funds to business and personal bank accounts owned or controlled by, or

19   affiliated with, Tufo.  Tufo further misappropriated pool funds by spending them on, among other

20   things, automobile-related expenses, eating out, groceries, insurance premiums, office expenses,

21   utilities, and miscellaneous household expenses.  During the Relevant Period, pool participants

22   contributed a total of $14,512,482.49 to the Black Pools.  Defendants returned $4,370,307.18 to

23   certain pool participants in the form of Ponzi payments.  Pool participants suffered net losses of

24   $10,495,328.38.  Of those losses, $4,690,155.52 were suffered by pool participants whose

25   contributions resulted in Tufo receiving a commission.

26

---

27   [1]  The updated financial information in these paragraphs is taken from plaintiff's proposed order, which is supported by the Robinson Declaration and the Motion for Default Judgment.  ECF No.

28   125-2 ¶¶ 33-41.

As set forth above, Financial Tree, Financial Solution, and New Money, by and through its employees or agents, misappropriated and dissipated the vast majority of pool funds received, including by transferring pool funds to Black, Mancuso, Tufo, and others. However, as of July 2020, Financial Tree and Financial Solution owned trading accounts containing pool funds totaling $4,630.15, which the CFTC froze pursuant to the SRO issued by this Court (ECF No. 9). Financial Solution, Black, and Mancuso Ignored a California Department of Business Oversight ("DBO") Desist and Refrain Order to Cease Their Unlawful Activities.

On April 27, 2018, the California DBO issued a Desist and Refrain Order to Financial Solution, Black, and Mancuso finding they unlawfully sold unregistered securities in California and made material misrepresentations or omissions to a pool participant in connection therewith. Financial Solution, Black, and Mancuso did not abide by the Desist and Refrain Order and continued soliciting for the Black Pools. Defendants did not disclose to pool participants any of the above conduct, including that they had traded very few pool funds in binary options or forex, that they were using pool funds to pay personal expenses and make Ponzi payments instead of keeping funds in a separate fiduciary-protected account, and that the California DBO had issued a Desist and Refrain Order to Financial Solution, Black and Mancuso. Instead, Defendants made material misrepresentations when soliciting pool participants to participate in the Black Pools. Financial Solution, by and through Black, issued false account statements to pool participants. Defendants also made material misrepresentations and/or omitted material facts to pool participants when they asked for their funds to be returned or otherwise inquired about the status of their deposits in the Black Pools, and Defendants did this while continuing to solicit and/or accept funds from new pool participants.

Defendants made material misrepresentations and omissions to prospective and actual pool participants, including in teleconference seminars, emails, and Agreements executed with pool participants. Defendants' representations to pool participants downplayed the risk associated with the pools while promising monthly returns between 10-70%. These fraudulent solicitations, as illustrated by the following representative examples, included, but were not limited to, material misrepresentations that:

   a.   all pool funds would be protected in a "no risk" separate account by a fiduciary-protected bank block and returned to pool participants on a schedule prescribed by the Agreements;

   b.   traders would secure separate lines of credit to trade binary options and/or forex for the benefit of pool participants;

   c.   pool participants would receive between 10% and 70% monthly returns on their deposits as profits, depending on participation level;

   d.   more than 85% of trades had been successful; and

   e.   the Black Pools' activities were overseen by a "globally renowned and highly respected fiduciary accounting firm."

The fraudulent solicitations also included, but were not limited to, the material omissions that:

   a.   the California DBO had issued a Desist & Refrain Order against Financial Solution, Black, and Mancuso;

   b.   Defendants would pay themselves and other Defendants approximately 43% of pool fund principal received, prior to trading any funds;

   c.   Defendants would make Ponzi payments to other pool participants using an additional approximately 34% of pool fund principal received, prior to trading any funds;

   d.   Defendants would improperly transfer pool fund principal to other third parties, prior to trading any funds;

   e.   Defendants would trade binary options and forex with, at most, 2% of pool fund principal received;

   f.   binary options and forex trading involves significant risk of trading losses;

   g.   Defendants had failed to return principal and deliver profits to other pool participants; and

   h.   at least as early as December 2016, Defendants were expressly communicating to existing pool participants that Defendants were struggling to make profitable trades (which, itself, was a misrepresentation because Defendants were not in fact

1   trading pool funds) and were not returning principal or delivering profits to pool

2   participants as promised.

3       For example, during the Relevant Period, Black advised Pool Participant B that he could

4   increase his return on deposits from 10% to 13% per month—but only if he deposited an

5   additional $25,000 in addition to his previously deposited $25,000.  Similarly, during the

6   Relevant Period, Mancuso circulated an email to prospective pool participants making similar

7   claims, adding "YOU WILL EARN A MINIMUM 10% on your money EVERY MONTH…

8   Funds must be wired to the Escrow Attorney here in the USA."  Mancuso promised escalating

9   monthly returns depending on the size of the deposit, up to 45% per month for deposits exceeding

10  $1 million.  On approximately June 13, 2015, a pool participant responded to Mancuso requesting

11  additional information regarding "the guarantee on your money."  Mancuso replied the next day,

12  "[i]n this program the funds are blocked and the trader uses his credit for the trade.  So no risk to

13  blocked funds."

14      Also during the Relevant Period, Tufo solicited potential pool participants by stating that

15  they could earn exorbitant returns (for example, $600,000 from a $100,000 deposit in 120 days);

16  and that the Black Pools were "foolproof" and "a sure thing."  Similarly, during the Relevant

17  Period, Glenn solicited potential pool participants, communicating, among other things, that

18  participating in the Black Pools would be a "good deal" for a pool participant and that Black and

19  Mancuso were "great guys."  On January 18, 2017, that pool participant transferred $100,000 to

20  the Glenn Law Firm.  Later that day, on a telephone call, Glenn told that pool participant that she

21  would receive the full amount promised in the Agreement.

22      In approximately June 2018, a pool participant spoke with Black, Mancuso, Tufo, and

23  others on a teleconference call.  Mancuso communicated that the pool participant's money would

24  be safe because "you're not paying us, you're paying an attorney."  Mancuso introduced Tufo as

25  the account manager who would be the pool participant's principal point of contact for the

26  opportunity.  Prior to the pool participant's deposit of $150,000 on approximately July 9, 2018,

27  Tufo communicated to the pool participant that Tufo knew many people who had successfully

28  deposited funds with Defendants, that the pool participant's money would be safe, and if the pool

1     participant ever wanted to cancel the Agreement, he could do so easily and would receive his

2     money back.

3          Throughout the Relevant Period, pool participants entered into Agreements with Financial

4     Solution or New Money, signed by Black, containing representations that pool funds would be

5     deposited in a bank account where they would be "blocked and thereby fully protected against

6     loss of principal at all times" and used only as collateral for trading binary options, forex, and

7     other products; that pool participants would receive 10% or higher monthly returns and/or loan

8     funding generated by trading profits; that activities would be monitored by a global accounting

9     firm; and that pool participants could withdraw all principal after a specified period of time.  The

10    Agreements directed pool participants to wire their funds to a Glenn Law Firm "attorney escrow"

11    bank account.

12         The above solicitations contained material misrepresentations and material omissions

13    because, among other things, Defendants did not have a historical 85% success rate trading; did

14    not segregate all pool funds in "no-risk" separate accounts protected by a Fiduciary-protected

15    bank block; did not return pool funds to pool participants on Agreement-prescribed schedules; did

16    not secure separate lines of credit to trade binary options and/or forex for the benefit of pool

17    participants; did not have an accounting firm overseeing trading activities; traded, at most, only a

18    small percentage of pool funds collected in binary options or forex; did not generate 10-70%

19    monthly returns or turn a $100,000 deposit into $600,000 in four months; and misappropriated the

20    vast majority of pool funds for unauthorized personal and business expenses and to make Ponzi

21    payments.

22         During the Relevant Period, Financial Solution, by and through Black and/or other

23    employees or agents, provided false account statements to pool participants purporting to reflect

24    monthly profits.  However, these account statements contained material misrepresentations.

25    Financial Solution had not, in fact, generated any profits at all for pool participants, as Financial

26    Solution had not engaged in any profitable trading using pool funds.  False account statements,

27    combined with Ponzi payments, in at least one case incentivized additional deposits by a pool

28    participant.

1  Despite making Ponzi payments to certain pool participants, Financial Solution and New

2 Money failed to return principal plus profits as promised to most pool participants.  When pool

3 participants complained, Defendants made bogus excuses regarding Financial Solution's and New

4 Money's failures to return pool funds, all while soliciting additional funds and/or accepting pool

5 funds from those very same pool participants as well as new pool participants.

6  For example, in or about April of 2017, Mancuso and Black jointly sent a letter to pool

7 participants falsely claiming that "funds are actually flowing" and promising imminent return of

8 funds.  Mancuso forwarded to pool participants a similar letter from Financial Solution (signed by

9 Black) blaming "breach of contract and nonpayment from some of our previous banking sources"

10 but claiming to have "hit the jackpot" with a new funding source and falsely promising repayment

11 by the end of the month.  In a separate instance, Mancuso falsely claimed to a pool participant

12 that funds had arrived at a Bahamian bank, but storms and rain in the Bahamas had created

13 connectivity issues delaying return of funds.  In some cases, Mancuso communicated with pool

14 participants over the course of multiple years offering a litany of fraudulent excuses and

15 repeatedly falsely promising the imminent return of funds.  Yet at the very same time—in some

16 cases in the same communications that offered the fraudulent excuses—Black and Mancuso

17 solicited additional funds from existing and new pool participants.

18  During the Relevant Period, a pool participant emailed Mancuso and others, noting "this

19 matter has become exhausting, comical and nonsensical.  It borders on criminal.  Your last

20 response that the matters would close in 15 days has per usual been nothing but . . . another lie.  I

21 am sick to my core of your damn lies."  Mancuso replied claiming no one had lied to the pool

22 participant, that funds would arrive within a month, and that Defendants were simply at the mercy

23 of various banks.  Also during the Relevant Period, another pool participant emailed Black and

24 others, expressing frustration at receiving "one story after the next" from Black, including "that

25 funds were delayed in August because the European market had fluctuation and it was their

26 summer vacations" and that "there was a legal issue as to why the funds did not transfer from

27 Singapore to Hong Kong."  During the Relevant Period, after a pool participant confronted

28 Mancuso regarding the Desist & Refrain Order from the California DBO, Mancuso claimed to the

1   pool participant that the Order "WAS RESOLVED SOME TIME AGO… A CURRENCY

2   PROGRAM THAT WAS NOT OUR SERVICE.  THIS CLIENT RECEIVED A REFUND BUT

3   SOMETIMES IT'S HARD TO REMOVE ADMINISTRATIVE PROCEEDINGS FROM THE

4   INTERNET…"

5        Like Black and Mancuso, Tufo knew of Financial Solution's and New Money's failure to

6   return pool funds and Black's and Mancuso's excuses for such failures.  For example, during the

7   Relevant Period, Tufo emailed pool participants, stating "I am so sorry for these never ending

8   excuses.  I've suggested several times that Chris and John sell everything they own to make you

9   whole . . . ."  While Tufo, on emails to pool participants responding to their complaints, claimed

10  to be frustrated regarding such failures and that he was attempting to help resolve them, Tufo

11  continued soliciting new pool participants—and receiving payments in the form of

12  commissions—while omitting information regarding such failures and excuses.

13       Glenn also made fraudulent statements to pool participants regarding their funds, received

14  extensive complaints from pool participants regarding Defendants' broken promises, and yet

15  continued to accept funds (and misappropriate his secret, unauthorized commissions) from new

16  pool participants as if the entire business was legitimate, while omitting that other pool

17  participants were complaining about their money.  For example, during the Relevant Period,

18  shortly after Financial Solution and New Money failed to deliver funds to a pool participant as the

19  Agreements promised, the pool participant called Glenn requesting an update on her funds.

20  Glenn, in his capacity as an attorney and as the Managing Partner of the Glenn Law Firm, told the

21  pool participant that he was in possession of the pool participant's money and would transfer the

22  $600,000 she was owed by the end of the week.  But these statements were false.  At no time

23  during the Relevant Period did Glenn or the Glenn Law Firm possess the $600,000 the pool

24  participant was owed under her Agreement.  Defendants never paid the pool participant.  When

25  the pool participant subsequently attempted to call Glenn, he did not answer his phone or return

26  her calls.

27       During the Relevant Period, Glenn, in his capacity as an attorney from his Glenn Law

28  Firm email address with his Glenn Law Firm signature block, emailed unspecified recipients

16

1    regarding a pool participant's deposit, claiming that he had been trying to resolve with Financial

2    Solution, Black, and Mancuso the issues returning funds.  In this communication, Glenn omitted

3    the material fact that Glenn, himself, had misappropriated a portion of the pool participant's

4    funds.  During the Relevant Period, the Colorado Supreme Court, Attorney Regulation Counsel

5    sent Glenn three separate bar complaints filed by individuals, including a pool participant,

6    regarding Glenn's role in the fraud.

7          Separately during the Relevant Period, pool participants repeatedly emailed Glenn

8    complaining that he was participating in a fraud.  For example, one pool participant emailed

9    Glenn stating Mancuso and Black "have absolutely no intention of returning our money."

10   Thereafter during the Relevant Period, that pool participant forwarded Glenn correspondence

11   regarding extensive delays, stating, "These are the kind of people you have supported transferring

12   our money into their accounts for personal gains . . . . There are more victims."  Again, during the

13   Relevant Period, Glenn forwarded the pool participant from his Glenn Law Firm email account

14   correspondence with Black and Mancuso asserting that the pool participant would be paid "by

15   month end."  Separately during the Relevant Period, another pool participant emailed Glenn,

16   expressing concern regarding Glenn's involvement and that Glenn's "participation lended

17   credibility to  . . . [Black's and Mancuso's] operation."  As Black, Mancuso, Tufo, and Glenn

18   made those communications, each, along with the remaining Defendants, continued to solicit

19   and/or accept new funds from new and existing pool participants, and each misappropriated

20   money from those pool participants, while omitting the material facts that Defendants had failed

21   to return funds as promised to other pool participants and were expressly communicating with

22   those pool participants regarding such failures.

23         During the Relevant Period, Financial Tree, Financial Solution, New Money, and the

24   Glenn Law Firm acted as CPOs by engaging in a business that is of the nature of a commodity

25   pool and, in connection with that business, soliciting, accepting, and/or receiving funds for the

26   Black Pools.  However, Financial Tree, Financial Solution, New Money, and the Glenn Law Firm

27   failed to register with the CFTC as CPOs.  During the Relevant Period, Black, Mancuso, Tufo,

28   and Glenn acted as APs of CPOs by soliciting funds for the Black Pools, but failed to register

1   with the CFTC as APs of CPOs.  Defendants Financial Tree and Financial Solution, while acting

2   as CPOs of the FT Pool and the FSG Pool, respectively, failed to operate the FT Pool and FSG

3   Pool as legal entities separate from those of the CPOs and commingled pool funds with non-pool

4   property by transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and

5   others which contained non-pool funds.  Defendant Glenn Law Firm, while acting as CPO of the

6   Black Pools, received and accepted pool funds into the Glenn Law Firm's attorney trust bank

7   accounts, rather than accounts in the names of the Black Pools.  In addition, the Glenn Law Firm

8   commingled pool funds with non-pool property by accepting pool funds into bank accounts that

9   contained non-pool property.

10          Defendants Financial Tree, Financial Solution, New Money, and the Glenn Law Firm,

11   while acting as CPOs of the Black Pools, failed to provide pool disclosure documents, account

12   statements presented and computed in accordance with generally accepted accounting principles

13   and containing required information, and other documents required by Regulations 4.21 and 4.22,

14   17 C.F.R. §§ 4.21, 4.22 (2021), including but not limited to required cautionary statements, risk

15   disclosures, fees and expenses incurred by the Black Pools, past performance disclosures, a

16   statement that the CPO is required to provide all pool participants with monthly or quarterly

17   account statements, as well as an annual report containing financial statements certified by an

18   independent public accountant.

19          During the Relevant Period, Black was a controlling person for Financial Tree, Financial

20   Solution, and New Money.  Black is the lone Trustee of Financial Tree and Financial Solution.

21   Financial Tree's and Financial Solution's Articles of Trust list Black as Trustee having exclusive

22   control of Financial Tree and Financial Solution.  Black opened bank accounts for Financial Tree

23   and Financial Solution and was the sole signatory on these accounts (including the bank accounts

24   to which the Glenn Law Firm's bank accounts transferred funds). Black signed Agreements

25   between Financial Solution and pool participants.  Black did not act in good faith or knowingly

26   induced Financial Tree's and Financial Solution's fraudulent acts.

27          During the Relevant Period, Glenn was a controlling person for the Glenn Law Firm.

28   Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other

1   attorneys as being members of the firm.  Glenn signed the August 25, 2014 "Paymaster

2   Agreement" with Financial Tree on behalf of the Glenn Law Firm.  Glenn opened bank accounts

3   for each Glenn Law Firm bank account to which pool participants contributed funds.  Glenn did

4   not act in good faith or knowingly induced the Glenn Law Firm's fraudulent acts.  Black,

5   Mancuso, Tufo, and Glenn Acted Within the Scope of Their Employment, Office, or Agency with

6   Financial Tree, Financial Solution, New Money, and/or the Glenn Law Firm.  Black, Mancuso,

7   Tufo, and Glenn committed the acts and omissions described above within the course and scope

8   of their employment, office, or agency with Financial Tree, Financial Solution, New Money,

9   and/or the Glenn Law Firm.

10       Suisse Group and JMC Were Alter Egos of Caswell.  When Financial Solution and the

11   Glenn Law Firm transferred a total of $800,000 to Suisse Group and JMC in June and September

12   2016, Caswell controlled both entities as the lone Director of Suisse Group and the lone

13   Managing Member of JMC.  Suisse Group and JMC share the same UPS store mailing address

14   and the same email address—ctkholdingsfund@gmail.com.  Caswell operated Suisse Group and

15   JMC to receive and dissipate ill-gotten funds for his personal benefit.

16       In the three months prior to receiving the $500,000 transfer from Financial Solution in

17   June 2016, the Suisse Group bank account that received the transfer maintained a balance of

18   $12.15 or lower.  After receiving the $500,000 transfer, within two days, Suisse Group transferred

19   approximately $55,000 to JMC (owned by Caswell), approximately $30,100 to a personal bank

20   account owned by Caswell, and additional funds to other entities and individuals.  Over the next

21   two days, Suisse Group transferred a total of approximately $415,000 to a TD Ameritrade

22   securities account in the name of JMC, which in turn funded a TD Ameritrade forex trading

23   account ("JMC Forex Account") in the same name.  After incurring approximately $50,000 in

24   trading losses, the JMC Forex Account transferred the remaining approximately $365,000 to JMC

25   from June to August 2016.  After dissipating the approximately $500,000 in pool funds, the

26   balance in the Suisse Group account that received those funds was, at its highest, approximately

27   $383.14, and closed in July 2016.

28   ////

After the JMC Forex Account transferred approximately $365,000 in pool funds to JMC in July and August 2016, Caswell transferred approximately $88,087.33 to a checking account Caswell controlled and otherwise dissipated the remaining funds on business and personal expenses having nothing to do with the Black Pools.  Similarly, within one week of the Glenn Law Firm transferring $300,000 to JMC in September 2016, Caswell transferred approximately $200,000 to Landes; withdrew approximately $1,500 in cash from this account; transferred approximately $32,000 to personal bank accounts owned by Caswell; transferred approximately $68,350 to various individuals including another person with the last name "Caswell;" and made payments from this account for massages, insurance premiums, and a mobile phone.  After dissipating the pool funds, in 2016, the balance in that account was, at its highest, approximately $155, and the account was overdrawn by December 2016.

## II.        CONCLUSIONS OF LAW

A.        The CFTC Has Established Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder. See also 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (jurisdiction over civil actions commenced by the United States or by any agency authorized to sue by Act of Congress).

The Court has personal jurisdiction over the Parties because they transacted business within this District and otherwise engaged in acts and practices in violation of the Act and Regulations in this District, among other places.  Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Parties reside or transact business in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred, are occurring or are about to occur within this District, among other places.

1         B.      <u>Default Judgment is Warranted Against All Defaulting Parties</u>

2           1.  <u>Legal Standards</u>

3         In accordance with Federal Rule of Civil Procedure 55, default may be entered against a

4    party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

5    defend against the action.  <u>See</u> Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

6    automatically entitle the plaintiff to a court-ordered judgment."  <u>PepsiCo, Inc. v. Cal. Sec. Cans</u>,

7    238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing <u>Draper v. Coombs</u>, 792 F.2d 915, 924-25 (9th

8    Cir. 1986)); <u>see</u> Fed. R. Civ. P. 55(b) (governing the entry of default judgments).  Instead, the

9    decision to grant or deny an application for default judgment lies within the district court's sound

10   discretion.  <u>Aldabe v. Aldabe</u>, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this

11   determination, the court may consider the following factors: (1) the possibility of prejudice to the

12   plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4)

13   the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts;

14   (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the

15   Federal Rules of Civil Procedure favoring decisions on the merits.  <u>Eitel v. McCool</u>, 782 F.2d

16   1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily disfavored.  <u>Id.</u> at 1472.

17        As a general rule, once default is entered, well-pleaded factual allegations in the operative

18   complaint are taken as true, except for those allegations relating to damages.  <u>TeleVideo Sys., Inc.</u>

19   <u>v. Heidenthal</u>, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing <u>Geddes v. United Fin.</u>

20   <u>Group</u>, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); <u>see also</u> <u>Fair Housing of Marin v.</u>

21   <u>Combs</u>, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded allegations in the complaint

22   are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings,

23   and claims which are legally insufficient, are not established by default."  <u>Cripps v. Life Ins. Co.</u>

24   <u>of N. Am.</u>, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing <u>Danning v. Lavine</u>, 572 F.2d 1386, 1388

25   (9th Cir. 1978)); accord <u>DIRECTV, Inc. v. Huynh</u>, 503 F.3d 847, 854 (9th Cir. 2007) ("[A]

26   defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law")

27   (citation and quotation marks omitted); <u>Abney v. Alameida</u>, 334 F.Supp.2d 1221, 1235 (S.D. Cal.

28   2004) ("[A] default judgment may not be entered on a legally insufficient claim.").  A party's

1  default conclusively establishes that party's liability, although it does not establish the amount of

2  damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th

3  Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure

4  37 that the default conclusively established the liability of the defaulting party).

5        2.  Analysis

6          a.  Possibility of Prejudice to Plaintiff

7        Regarding the first Eitel factor, the CFTC will be prejudiced if default judgment is not

8  entered because it "will be deprived of the opportunity to obtain judicial resolution of its

9  claim[s]."  Sky Billiards, 2016 WL 6661175, at *5; see also Halsey v. Colonial Asset Mgmt., No.

10  5:13-cv-02025, 2014 WL 12601015, at *4 (C.D. Cal. July 17, 2014) (concluding plaintiff lacked

11  remedy in absence of default judgment where defendant failed to file responsive pleading).  The

12  CFTC has strong, congressionally mandated interests in enforcing the Act, obtaining restitution

13  and disgorgement for victims of fraud, and deterring future wrongdoing through penalties, among

14  other monetary relief.  Yet the Parties' refusal to appear and defend will continue to deprive the

15  CFTC of the opportunity to obtain judgment on the merits.  This factor thus supports a default

16  judgment.  See SEC v. Fortitude Grp., No. 16-50, 2017 WL 818604, at *2 (W.D. Pa. Feb. 10,

17  2017) (granting SEC's motion for default judgment because SEC would "be prejudiced by its

18  inability to effectively enforce federal securities laws" if motion were denied).

19          b.  Merits of Claims and Sufficiency of Complaint

20        The second and third Eitel factors also weigh in favor of default judgment.  The CFTC's

21  claims are meritorious and the allegations of the Complaint, accepted as true, are sufficient to

22  establish all defendants' liability.  Plaintiff brings six claims based on violations of the

23  Commodity Exchange Act ("the Act") and Commission Regulations ("Regulations"); each cause

24  of action is addressed individually below.  In this context, the court also evaluates the sufficiency

25  of the complaint's allegations to establish various principles of liability that pertain to the claims

26  collectively.

27  ////

28  ////

     i.   <u>Defendants Committed Commodity Option Fraud in Violation of 7 U.S.C.</u>

      <u>§ 6c(b) (2018) and 17 C.F.R. § 32.4 (2021) (Count One)</u>

   Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), provides, in relevant part, that "[n]o person shall offer to enter into, enter into or confirm the execution of any transaction involving any commodity . . . which is . . . an 'option' . . . . contrary to" CFTC Regulations. Regulation 32.4, 17 C.F.R. § 32.4 (2021), provides:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly: (a) To cheat or defraud or attempt to cheat or defraud any other person; (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) To deceive or attempt to deceive any other person by any means whatsoever.

   "Binary options" transactions are commodity option transactions under the Act and Regulations. <u>See, e.g.</u>, <u>CFTC v. Vision Fin. Partners, LLC</u>, 190 F. Supp. 3d 1126, 1130 (S.D. Fla. 2016) (denying motion to dismiss; holding that binary options are commodity options within the meaning of 7 U.S.C. § 6c(b)). Defendants' conduct occurred "[i]n or in connection with an offer to enter into, the entry into, or the confirmation of the execution of" binary options transactions. Conduct so occurs when, inter alia, a defendant solicits individuals to trade binary options. <u>See</u> <u>CFTC v. Vault Options, Ltd.</u>, No. 1:16-CV-01881, 2016 WL 5339716, at *2, *6 (N.D. Ill. July 20, 2016) (by "solicit[ing] . . . customers . . . to trade binary commodity options . . . [defendants] offered to enter into . . . binary option transactions").

   To establish that Defendants violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 through misrepresentations and omissions, the Commission must prove that (1) Defendants made misrepresentations or omissions; (2) the misrepresentations or omissions were material; and (3) Defendants acted with scienter. <u>CFTC v. R.J. Fitzgerald & Co., Inc.</u>, 310 F.3d 1321, 1328 (11th Cir. 2002); <u>Am. Bullion</u>, 2014 WL 12603558, at *4. Misappropriation and issuing false account statements also violates these provisions. <u>See, e.g.</u>, <u>Am. Bullion</u>, 2014 WL 12603558, at *7 (holding misappropriation violated 7 U.S.C. § 6c(b)) and other anti-fraud provisions of the Act and related Regulations); <u>CFTC v. Weinberg</u>, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003)

23

1  (default order) (finding false and misleading statements as to amount and location of investors'

2  money violated 7 U.S.C. § 6c(b)).

3      By the conduct described herein, Defendants Financial Tree, Financial Solution, and New

4  Money (acting as a common enterprise) and Defendant Glenn Law Firm, by and through their

5  officers, employees, and agents, and Defendants Black, Mancuso, Tufo, and Glenn, in connection

6  with offers to enter into, entry into, or confirmation of the execution of commodity option

7  transactions, directly or indirectly, and knowingly or recklessly, violated 7 U.S.C. § 6c(b) and 17

8  C.F.R. § 32.4 by, among other things, misrepresenting and omitting material facts in soliciting

9  pool participants, misappropriating funds solicited for the Black Pools, and, in the case of

10  Financial Tree, Financial Solution, and New Money (acting as a common enterprise), by and

11  through their officers, employees, and agents, and Defendant Black, by making and disseminating

12  false account statements.

13          ii.  Defendants Committed Forex Fraud in Violation of 7 U.S.C. §

14              6b(a)(2)(A)-(C) (2018) and 17 C.F.R. § 5.2(b) (2021) (Count Two)

15      7 U.S.C. § 6b(a)(2)(A)-(C) of the Act makes it unlawful

16          [f]or any person, in or in connection with any order to make, or the
17          making of, any contract of sale of any commodity for future delivery,
            or swap, that is made, or to be made, for or on behalf of, or with, any
18          other person, other than on or subject to the rules of a designated
            contract market—(A) to cheat or defraud or attempt to cheat or
            defraud the other person; (B) willfully to make or cause to be made
19          to the other person any false report or statement or willfully to enter
            or cause to be entered for the other person any false record; [or] (C)
20          willfully to deceive or attempt to deceive the other person by any
            means whatsoever in regard to any order or contract or the
21          disposition or execution of any order or contract, or in regard to any
            act of agency performed, with respect to any order or contract for or,
22          in the case of paragraph (2), with the other person[.]

23      To show that Defendants violated 7 U.S.C. § 6b(a)(2) through misrepresentations and

24  omissions, the Commission must prove the same elements as those required to prove a violation

25  under 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.  See, e.g., Am. Bullion, 2014 WL 12603558, at *5

26  (citing CFTC v. Rosenberg, 85 F. Supp. 2d 424, 445 (D.N.J. 2000)).  The Complaint establishes

27  all three elements, for the reasons described above.  Likewise, the Complaint establishes

28  violations of 7 U.S.C. § 6b(a) through misappropriation and through issuing false account

24

1    statements, for the same reasons previously explained.

2        Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2021), provides, in relevant part:

3        "[i]t shall be unlawful for any person, by use of the mails or by any
         means or instrumentality of interstate commerce, directly or
4        indirectly, in or in connection with any retail forex transaction:

5        (1) To cheat or defraud or attempt to cheat or defraud any person; (2)
         Willfully to make or cause to be made to any person any false report
6        or statement or cause to be entered for any person any false record;
         or (3) Willfully to deceive or attempt to deceive any person by any
7        means whatsoever.

8

9        17 C.F.R. § 5.2(b) adds only one additional element not found in 7 U.S.C. § 6b(a)(2)(A)-

10   (C): that a defendant's conduct must involve "use of the mails or by any means or instrumentality

11   of interstate commerce." Here, Defendants communicated with pool participants via email and

12   telephone, both instrumentalities of interstate commerce. And much money was transferred to

13   bank accounts through wire transfers or other instrumentalities of interstate commerce. Thus, the

14   Complaint establishes the additional required element.

15        iii.   Defendants Committed Fraud By Commodity Pool Operators ("CPOs")

16               and Associated Persons ("APs") of CPOs in Violation of 7 U.S.C. §

17               6o(1)(A)-(B) (2018) (Count Three)

18        Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A) (2018), defines a "commodity pool" as

19   "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading

20   in commodity interests," including for the trading of futures, binary options, or forex. 7 U.S.C. §

21   1a(11)(A)(i) defines a CPO as

22        any person engaged in a business that is of the nature of a commodity
         pool, investment trust, syndicate, or similar form of enterprise, and
23       who, in connection therewith, solicits, accepts, or receives from
         others, funds, securities, or property, either directly or through capital
24       contributions, the sale of stock or other forms of securities, or
         otherwise, for the purpose of trading in commodity interests,
25       including any—(I) commodity for future delivery, security futures
         product, or swap; [or] (II) agreement, contract, or transaction
26       described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection
         2(c)(2)(D)(i) [of the Act.]

27

28

1      Pursuant to Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2021), and subject to certain

2  exceptions not relevant here, any person who operates or solicits funds, securities, or property for

3  a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex

4  CPO.  Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2018),

5  "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment

6  vehicles in retail forex "shall be subject to . . . [7 U.S.C. §] 6o," except in circumstances not

7  relevant here.

8      During the Relevant Period, Defendants Financial Tree, Financial Solution, and New

9  Money (acting as a common enterprise) and Defendant Glenn Law Firm solicited, accepted,

10  and/or received funds for the Black Pools, and thus acted as CPOs and retail forex CPOs, as

11  defined by 7 U.S.C. § 1a(11) of the Act and 17 C.F.R. § 5.1(d)(1), respectively.  Regulation 1.3,

12  17 C.F.R. § 1.3 (2021), defines an AP of a CPO as:

13              a natural person associated with: (3) A [CPO] as a partner, officer,
14              employee, consultant, or agent (or any natural person occupying a
                similar status or performing similar functions), in any capacity which
                involves (i) the solicitation of funds, securities, or property for a
15              participation in a commodity pool or (ii) the supervision of any
                person or persons so engaged[.]
16

17      Similarly, 17 C.F.R. § 5.1(d)(2) defines as an AP of a retail forex CPO any person

18  associated with a retail forex CPO (as defined by 17 C.F.R. § 5.1(d)(1)) as:

19              a partner, officer, employee, consultant or agent (or any natural
                person occupying a similar status or performing similar functions),
20              in any capacity which involves: (i) [t]he solicitation of funds,
                securities, or property for a participation in a pooled investment
21              vehicle; or (ii) [t]he supervision of any person or persons so
                engaged[.]
22

23      During the Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were each

24  associated with one or more of the above CPOs and retail forex CPOs as a partner, officer,

25  employee, consultant, or agent in a capacity that involved the solicitation of funds for the Black

26  Pools, and/or the supervision of any person or persons so engaged.  Therefore, these Defendants

27  were APs of a CPO as defined by Regulation 1.3 and APs of a retail forex CPO as defined by

28  Regulation 5.1(d)(2).

26

Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2018), provides, in relevant part, that:

> [i]t shall be unlawful for a . . . [CPO or an AP of a CPO], by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(A)   to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Defendants violated 7 U.S.C. § 6o(1) by the same fraudulent misconduct described above. 7 U.S.C. § 6o(1) is a parallel statute to 7 U.S.C. § 6b of the Act—the same conduct that violates the latter can violate the former.  Am. Bullion, 2014 WL 12603558, at *5; Driver, 877 F. Supp. 2d at 978.  To prove a violation of 7 U.S.C. § 6o(1)(B), the Commission need not prove scienter—only that "the [violator] . . . intended to do what was done and its consequence is to defraud."  See CFTC v. Crombie, 914 F.3d 1208, 1215 (9th Cir. 2019) (citation omitted); CFTC v. Savage, 611 F.2d 270, 285 (9th Cir. 1978).

The only additional element set forth in 7 U.S.C. § 6o(1) is that Defendants' conduct must involve use of the mails or any means or instrumentality of interstate commerce, which it did as described above.  7 U.S.C. § 6o(1) of the Act applies to all CPOs and APs whether registered, required to be registered, or exempt from registration.  See Weinberg, 287 F. Supp. 2d at 1107-08 (so noting with respect to CPOs).

    iv.   <u>Defendants Failed to Properly Register with the Commission in Violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2018) and 17 C.F.R. § 5.3(a)(2) (2021) (Count Four)</u>

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), provides that it is unlawful for a CPO, unless registered, "to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO."  Similarly, Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), states that a person shall not operate or solicit funds for any pooled investment vehicle in connection with forex transactions, unless registered pursuant to Commission regulations.  Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2021), requires retail forex CPOs, as defined by 17 C.F.R. § 5.1(d)(1), to register as such with the Commission. Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018) states that APs of CPOs who are soliciting for

27

1   participation in a pool must register with the Commission.  And, except in certain circumstances

2   not relevant here, 17 C.F.R. § 5.3(a)(2)(ii) requires those that meet the definition of an AP of a

3   retail forex CPO under Regulation 5.1(d)(2) to register as an AP of a CPO with the Commission.

4   See, e.g., Am. Bullion, 2014 WL 12603558, at *7 (finding defendants who should have registered

5   but failed to register as CPOs and APs violated the Act and Regulations).

6            For the reasons described above, Defendants Financial Tree, Financial Solution, and New

7   Money (acting as a common enterprise) and the Glenn Law Firm are CPOs, and Defendants

8   Black, Mancuso, Tufo, and Glenn are APs of CPOs.  Although required by the Act and

9   Regulations, they did not register with the Commission as such.  Defendants thus violated 7

10   U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i)-(ii).

11                            v.   Defendants Financial Tree, Financial Solution, and the Glenn Law Firm

12                                 Failed to Operate Pools as Separate Entities and Commingled Pool Funds

13                                 in Violation of 17 C.F.R. § 4.20(a)(1), (b)-(c) (2021) (Count Five)

14            Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2021), requires a CPO, whether registered

15   or not, to operate its pool as a legal entity separate from that of the CPO.  See, e.g., Am. Bullion,

16   2014 WL 12603558, at *7 (finding CPOs violated 17 C.F.R. § 4.20(a)(1) and (b) when they failed

17   to operate pool as separate legal entity and received pool funds in a name other than that of the

18   pool).  17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from commingling the

19   property of any pool it operates with the property of any other person.  See, e.g., Capitol Equity

20   FX, 2017 WL 9565340, at *5 (holding that CPO violated 17 C.F.R. § 4.20(c) by commingling

21   pool funds with non-pool property).  Regulation 5.4, 17 C.F.R. § 5.4 (2021), states that Part 4 of

22   the Regulations, 17 C.F.R. pt. 4 (2021), applies to any person required to register as a CPO

23   pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2021), relating to forex transactions.

24            During the Relevant Period, Financial Tree and Financial Solution violated Regulation

25   4.20(a)(1) by failing to operate the FT Pool and FSG Pool, respectively, as a legal entity separate

26   from that of the CPO.  Financial Tree and Financial Solution violated Regulation 4.20(c) by

27   transferring pool funds into bank accounts controlled by Black, Mancuso, Tufo, and others which

28   contained non-pool property.  During the Relevant Period, the Glenn Law Firm, while acting as

1  CPO for the Black Pools, violated Regulation 4.20(b) by failing to receive pool participants'

2  funds in the names of the Black Pools and violated Regulation 4.20(c) by accepting pool funds

3  into bank accounts containing non-pool property.

4                          vi.   Defendants Financial Tree, Financial Solution, New Money, and the Glenn

5                              Law Firm Failed to Provide Pool Participants with Disclosure and Other

6                              Required Documents in Violation of 17 C.F.R. §§ 4.21, 4.22 (2021) (Count

7                              Six)

8        Regulation 5.4, 17 C.F.R. § 5.4 (2021), states that Part 4 of the Regulations, 17 C.F.R. pt.

9  4 (2021), applies to any person required to register as a CPO pursuant to Part 5 of the

10  Regulations, 17 C.F.R. pt. 5 (2021), relating to forex transactions.  Regulation 4.21(a)(1), 17

11  C.F.R. § 4.21(a)(1) (2021), provides that:

12            each commodity pool operator registered or required to be registered

13            under the Act must deliver or cause to be delivered to a prospective
          participant in a pool that it operates or intends to operate a Disclosure

14            Document for the pool prepared in accordance with §§ 4.24 and 4.25
          by no later than the time it delivers to the prospective participant a

15            subscription agreement for the pool . . .

16        Regulation 4.22(a), (c), 17 C.F.R. § 4.22(a), (c) (2021), provides that:

17            each commodity pool operator registered or required to be registered

18            under the Act must periodically distribute to each participant in each
          pool . . . an Account Statement, which shall be presented in the form

19            of a Statement of Operations and a Statement of Changes in Net
          Assets . . . [and which] must be presented and computed in

20            accordance with generally accepted accounting principles . . . . [and]
          must [also] distribute an Annual Report . . . .

21  See, e.g., Am. Bullion, 2014 WL 12603558, at *7 (finding CPOs violated Regulations 4.21 and

22  4.22 when they failed to provide a required disclosure document and account statements).

23        Defendants Financial Tree, Financial Solution, and New Money (acting as a common

24  enterprise) and the Glenn Law Firm failed to provide prospective pool participants with a pool

25  disclosure document in the form specified in Regulations 4.24 and 4.25.  Nor did these

26  Defendants provide accurate account statements presented and computed in accordance with

27  generally accepted accounting principles and containing required information, fees, and expenses

28  incurred by the Black Pools, or an annual report containing financial statements certified by an

1    independent public accountant.  Accordingly, Financial Tree, Financial Solution, New Money,

2    and the Glenn Law Firm violated 17 C.F.R. §§ 4.21, 4.22.

3            vii.   Defendants Black and Glenn Are Liable as Controlling Persons for the

4                   Unlawful Conduct of the Entities They Controlled

5            Controlling persons are liable for violations of the entities they control under certain

6    circumstances.  Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), states that a controlling person

7    of an entity is liable for the violations of that entity if the controlling person knowingly induced

8    the violations, directly or indirectly, or did not act in good faith.  "A fundamental purpose of

9    Section 13[(b)] is to allow the Commission to reach behind the corporate entity to the controlling

10   individuals of the corporation and to impose liability for violations of the Act directly on such

11   individuals as well as the corporation itself."  R.J. Fitzgerald, 310 F.3d at 1334 (citation omitted)

12   (defendant who was ultimate decision maker at firm, was ultimately responsible for compliance

13   with Act and Regulations, and reviewed and approved activities violating Act was controlling

14   person); see also Capitol Equity FX, 2017 WL 9565340, at *4 (noting that "one is a controlling

15   person when he or she has the possession, direct or indirect, of the power to direct or cause the

16   direction of the management and policies of a person . . . ." and holding that husband and wife

17   who were president and sole owner, respectively, of relevant entities and opened trading accounts

18   in entities' names were controlling persons of those entities); CFTC v. FX First, Inc., No. SACV

19   03-1454JVS (MLGx), 2007 WL 9711431, at *8–12 (C.D. Cal. Sept. 28, 2007) (applying 7 U.S.C.

20   § 13c(b) and finding controlling person liability).

21           Defendant Black was a controlling person of Financial Tree, Financial Solution, and New

22   Money during the Relevant Period.  Black caused the creation of Financial Tree, Financial

23   Solution, and New Money.  Black is the lone Trustee of Financial Tree and Financial Solution

24   and is the Managing Director of New Money.  Financial Tree's and Financial Solution's Articles

25   of Trust list Black as Trustee having exclusive control of Financial Tree and Financial Solution.

26   New Money's registration documents with the Nevada Secretary of State list Black and Financial

27   Tree (which Black controls) as New Money's two managers.  Black opened bank accounts for

28   Financial Tree, Financial Solution, and New Money and was the sole signatory on those accounts.

1 Black signed Agreements on behalf of Financial Solution and New Money. Therefore, pursuant

2 to 7 U.S.C. § 13c(b), Black is liable for all of Financial Tree's, Financial Solution's, and New

3 Money's violations of the Act and Regulations as described in Counts 1 through 6 of the

4 Complaint and above.

5        Defendant Glenn was a controlling person of the Glenn Law Firm during the Relevant

6 Period. Glenn is the Managing Partner of the Glenn Law Firm, whose website does not list other

7 attorneys as being members of the firm. Glenn signed the August 25, 2014 "Paymaster

8 Agreement" with Financial Tree on behalf of the Glenn Law Firm. Glenn opened bank accounts

9 for each Glenn Law Firm bank account to which pool participants contributed funds. Therefore,

10 pursuant to 7 U.S.C. § 13c(b), Glenn is liable for all of the Glenn Law Firm's violations of the

11 Act and Regulations as described in Counts 1 through 6 of the Complaint and above.

12            viii.   <u>Defendants Financial Tree, Financial Solution, New Money, and the Glenn</u>

13                  <u>Law Firm Are Liable For the Acts of Their Agents Black, Mancuso, Tufo,</u>

14                  <u>and/or Glenn</u>

15        Corporate entities can also be liable for the acts of individuals acting on their behalves.

16 Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2

17 (2020), state that the act, omission, or failure of any person acting for any entity within the scope

18 of his employment or office shall be deemed the act, omission or failure of such entity, as well as

19 of that person. <u>See</u> <u>R.J. Fitzgerald</u>, 310 F.3d at 1335 (imposing liability on corporate entity

20 because of acts of individuals); <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (same). During the

21 Relevant Period, Defendants Black, Mancuso, Tufo, and Glenn were officers, employees, or

22 agents of Financial Tree, Financial Solution, and New Money. Likewise, Defendant Glenn was

23 an officer, employee, or agent of the Glenn Law Firm. Therefore, pursuant to 7 U.S.C. §

24 2(a)(1)(B) and 17 C.F.R. § 1.2, Financial Tree, Financial Solution, New Money, and the Glenn

25 Law Firm are liable for each of the acts, misrepresentations, omissions, and failures of those

26 officers, employees, or agents done in the scope of their employment or office, as described in

27 Counts 1 through 6 of the Complaint and above.

28 ////

1                          ix.   <u>Defendants Financial Tree, Financial Solution, and New Money Are Liable</u>

2                               <u>for the Acts of Each Other as a Common Enterprise</u>

3        When defendants act "[a]s a common enterprise," they may be held "jointly and severally

4 liable for the acts of the common scheme." <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (citations

5 omitted); <u>see, e.g.</u>, <u>Noble Wealth</u>, 90 F. Supp. 2d at 691.  When determining whether a common

6 enterprise exists, courts consider "a variety of factors, including: common control; the sharing of

7 office space and officers; whether business is transacted through a maze of interrelated

8 companies; unified advertising; and evidence which reveals that no real distinction existed

9 between the Corporate Defendants." <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (internal citations

10 and quotations omitted) (finding two entities operated as a common enterprise because "[t]heir

11 principals are the same, their employees are the same and their customers are the same" and

12 "there is no meaningful distinction between the two entities").  Black formed, opened bank

13 accounts for, is the only employee associated with, and controls Financial Solution, New Money,

14 and Financial Tree.  Financial Solution and Financial Tree share the same address—a UPS store

15 in Folsom, California.  The only business Financial Solution, New Money, and Financial Tree

16 conducted was related to Defendants' fraud.  These facts warrant treating Financial Tree,

17 Financial Solution, and New Money as a common enterprise, thus making each individual

18 company liable for the deceptive acts and practices of the other, as reflected in Counts 1 through

19 6 of the Complaint.

20                           x.   <u>Relief Defendants Are Liable for Disgorgement</u>

21        Each Relief Defendant received ill-gotten funds with no entitlement to those funds and is

22 thus liable for disgorgement.  To support disgorgement against a relief defendant, the CFTC need

23 only demonstrate that the relief defendant received ill-gotten funds and does not have a legitimate

24 claim to those funds.  <u>SEC v. World Capital Mkt., Inc.</u>, 864 F.3d 996, 1004 (9th Cir. 2017); <u>Am.</u>

25 <u>Bullion</u>, 2014 WL 12603558, at *8 (holding Relief Defendants who received over $1 million in

26 pool funds without providing legitimate services or having legitimate claim to those funds should

27 be required to disgorge such funds).  The relief defendant must disgorge such funds even if the

28 relief defendant no longer possesses the funds.  <u>See</u> <u>World Capital Mkt.</u>, 864 F.3d at 1007

1    ("ongoing possession of the funds is not required for disgorgement").  As the Complaint

2    describes, each Relief Defendant received pool funds, either directly from Defendants or through

3    other Relief Defendants.  The Relief Defendants have no legitimate claim to pool funds and did

4    not provide any services related to the Black Pools for pool participants.  The Relief Defendants

5    are thus required to disgorge the money they received.

6              xi.   Relief Defendant Caswell Is Jointly and Severally Liable for Relief

7                    Defendants Suisse Group's and JMC's Disgorgement Obligations

8              Relief Defendant Caswell is jointly and severally liable for Relief Defendants Suisse

9    Group's and JMC's disgorgement obligations because Suisse Group and JMC were alter egos of

10   Caswell.  In the Ninth Circuit, an individual relief defendant may be held jointly and severally

11   liable for disgorgement of ill-gotten funds received by an entity relief defendant where the entity

12   is the alter ego of the individual.  See FTC v. Ivy Capital, Inc., 616 Fed. Appx. 360, 361 (9th Cir.

13   2015) (holding district court did not err in finding entity was alter ego of jointly and severally

14   liable individual where individual was 51% owner, entity funds were used to pay personal

15   expenses, and adherence to the corporate fiction would promote injustice).  Under California law,

16   to prove alter ego liability, (1) there must be "such unity of interest and ownership that the

17   separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts

18   are treated as those of the corporation alone, an inequitable result will follow."  Associated

19   Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 837 (1962) (citations omitted)

20   (identifying factors supporting alter ego liability, including commingling and personal use of

21   corporate funds and other assets, undercapitalization of the corporate entity, the disregard of legal

22   formalities and failure to maintain an arms-length relationship among related entities, and use of

23   the same office locations and employment of the same employees).

24             Here, Caswell solely owned and controlled Suisse Group and JMC.  Both entities shared

25   the same UPS store mailing address and the same email address.  Caswell transferred corporate

26   funds to himself as well as apparent relatives and friends, made payments from corporate

27   accounts for personal expenses such as massages and mobile phones, transferred pool funds from

28   Suisse Group to JMC, and, for most of 2016, maintained almost zero funds, beyond pool funds, in

1   the bank accounts that received transfers from Defendants in 2016.  It appears Caswell utilized

2   Suisse Group and JMC not for legitimate business purposes, but to receive and immediately

3   dissipate ill-gotten pool funds.  It would be inequitable for Suisse Group and JMC to avoid

4   disgorging the $800,000 they collectively received simply because Caswell transferred the money

5   elsewhere.  Thus, Suisse Group, JMC, and Caswell are jointly and severally liable for

6   disgorgement of the $800,000 on an alter ego basis.

7                      c.      Sum of Money at Stake

8          The fourth <u>Eitel</u> factor, "the amount of money at stake in relation to the seriousness of the

9   defendant's conduct" weighs in favor of a default judgment.  <u>PepsiCo, Inc. v. Los Potros Dist.</u>

10  <u>Ctr.</u>, LLC, No. CV-07-2425, 2008 WL 942283, at *3 (D. Ariz. Apr. 7, 2008).  Although the

11  amount of money at stake in this case is large, the restitution and civil monetary penalties the

12  CFTC seeks from Defendants, as well as the disgorgement the CFTC seeks from Relief

13  Defendants, are consistent with awards and penalties in similar enforcement actions.  <u>See, e.g.</u>,

14  <u>CFTC v. Driver</u>, 877 F. Supp. 2d 968, 981 (C.D. Cal. 2012) (awarding over $9.5 million in

15  restitution and a $31.8 million civil monetary penalty) aff'd 585 F. App'x 366 (9th Cir. 2014);

16  <u>CFTC v. Am. Bullion Exch. ABEX, Corp.</u> ("<u>Am. Bullion</u>"), No. SACV10-1876, 2014 WL

17  12603558, at *10-11 (C.D. Cal. Sept. 16, 2014) (entering default judgment for CFTC and

18  ordering defendants to pay a civil monetary penalty of triple the defendants' gain, which

19  exceeded $14 million, and ordering two relief defendants to disgorge $1.25 million and $110,600,

20  respectively, reflecting pool funds improperly received by those relief defendants); <u>CFTC v.</u>

21  <u>Schiera</u>, No. CV05 2660, 2006 WL 4586786, at *7, *9 (S.D. Cal. Dec. 11, 2006) (entering default

22  judgment and ordering defendants to disgorge $3 million and pay a $9 million civil monetary

23  penalty).

24         Moreover, Defendants' fraudulent conduct and registration violations constitute core

25  violations of the Act and Regulations which attack the integrity of the commodity markets.  The

26  CFTC's requested relief is therefore reasonable.  <u>See Sky Billiards</u>, 2016 WL 6661175, at *5

27  (entering default judgment and noting that the "award [was] consistent with other default

28  judgment awards in the context of [similar cases].").

                                        34

1              d.      Possibility of Factual Disputes

2          The fifth Eitel Factor, the possibility of a dispute as to material facts, weighs in favor of a

3  default judgment.  The Complaint details Defendants' fraudulent solicitations, misappropriation

4  of pool funds, and extensive efforts to conceal and prolong the scheme.  The Complaint refers to,

5  and relies heavily on, documentary evidence such as emails and account statements reflecting

6  Defendants' communications and financial activities.  Given this, the likelihood of a genuine

7  factual dispute on a material issue is exceedingly remote.  See also Sky Billiards, 2016 WL

8  6661175, at *5 (recognizing that the defendant's failure to respond "supports the conclusion that

9  the possibility of a dispute as to the material facts is minimal").[2]

10             e.      Excusable Neglect

11         As to the sixth Eitel factor, there was no excusable neglect for the defaults because all

12 Parties were properly served with the Summons and Complaint in July and August 2020.  See

13 Halsey, 2014 WL 12601015, at *4 (recognizing that proper service of process supports a finding

14 that default is not due to excusable neglect).  Since that time, Black and the Glenn Defendants

15 appeared only to litigate matters related to stay and default, then ultimately chose to default.  The

16 remaining, non-appearing Parties made no effort to appear and defend this lawsuit either pro se

17 (in the case of individual Parties) or through counsel (as permitted for individuals and required for

18 entity Parties).  Notably, this Court explicitly placed the Parties on notice of the requirements

19 under E.D. Cal. L.R. 183(a) for entities to appear through counsel.  See, e.g., ECF Nos. 48, 96

20

21 ───────────────────
   [2]  The court notes that non-parties Michael J. Jacobs and Ruby Handler Jacobs filed a "notice"
22 with the court as a "courtesy" that purports to argue the facts of this case.  ECF No. 128 at 1, 8.
   The Jacobses, who were officers of the "now defunct named Relief Defendant Kingdom Trust
23 LLC" make clear that they "speak for themselves as they are not authorized to represent nominal
   Kingdom in this action."  ECF No. 128 at 2.  Their statements as non-parties do not alter the
24 outcome of this Eitel factor because in the default judgment context, the court makes a
   determination based on the well-pleaded facts in the Complaint which, as discussed above,
25 support default judgment against Relief Defendant Kingdom in this case.  Kingdom, the actual
   party to this case, has not raised any dispute as to material facts and is inarguably in default.  ECF
26 No. 50.  The Court has previously explained that Michael Jacobs may not represent Kingdom in
   this matter.  ECF No. 48.  The Jacobses' notice is an attempt at an end-run around their inability
27 to represent Kingdom and it does not alter the court's analysis with respect to the entry of default
   judgment.
28

1   (rejecting efforts by Financial Tree, Financial Solution, New Money, and Kingdom to appear

2   through non-attorney principals).  Thus, the Parties' defaults cannot be excused.

3          f.    Policy Favoring Merits Determinations

4       Finally, the seventh Eitel factor—the general preference for deciding cases on the

5   merits—does not counsel against a default judgment here because "[d]efendant[s'] failure to

6   answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible."

7   PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (noting that the on-

8   the-merits "preference, standing alone, is not dispositive") (citation omitted).  In addition,

9   countervailing interests outweigh any residual interest in preserving the remote potential for a

10   merits decision.  "[T]he CFTC is the statutory guardian entrusted with the enforcement of the

11   congressional scheme for safeguarding the public interest in commodity futures markets."  See

12   Stephen Bronte, Advisors, LLC v. CFTC, 90 F. App'x 251, 252 (9th Cir. 2004) (internal

13   quotations and citations omitted).  Absent a default judgment, the CFTC will likely be unable to

14   secure an order of restitution and disgorgement on behalf of defrauded pool participants, deter

15   misconduct through penalties, and protect the public through permanent injunctive relief.  This

16   weighs in favor of a default judgment.

17          g.    Conclusion

18       For the reasons explained above, all Eitel factors weigh in favor of default judgment.

19   Accordingly, default judgment is appropriate in this case.  What remains is a determination of the

20   terms of relief.

21          **III.**    **RECOMMENDED TERMS OF JUDGMENT**

22     A. Permanent Injunction

23       The CFTC is authorized to seek, and the Court to impose, injunctive relief.  Section 6c of

24   the Act, 7 U.S.C. § 13a-1(a) (2018).  "The CFTC is entitled to a permanent injunction upon a

25   showing that a violation [of the Act or Regulations] has occurred and is likely to continue unless

26   enjoined."  Driver, 877 F. Supp. 2d at 981.  "Once a violation is demonstrated, the [CFTC] need

27   show only that there is some reasonable likelihood of future violations."  CFTC v. Wilson, No.

28   ////

1    11-cv-1651, 2011 WL 6398933, at *2 (S.D. Cal. Dec. 20, 2011) (quoting <u>CFTC v. Hunt</u>, 591 F.2d

2    1211, 1220 (7th Cir. 1979)).

3          The well-pleaded facts of the CFTC's Complaint, and the evidence submitted through

4    declarations, establish a long-standing pattern of sophisticated unlawful conduct.  In light of these

5    facts, the undersigned finds it highly likely that Defendants will be repeat violators of the Act and

6    Regulations unless permanently restrained and enjoined by the Court.  Defendants' repetitive

7    prior misconduct—fraudulently soliciting over ninety pool participants over five years,

8    misappropriating their money, and offering bogus excuses for failure to return funds—is highly

9    suggestive of future violations.  So too is Defendants' disregard of the California DBO's Desist &

10   Refrain Order against Black, Mancuso, and Financial Solution in April 2018 and repeated

11   complaints from pool participants to that Defendants were defrauding them.  Mancuso continued

12   falsely promising disbursement of funds to pool participants and discouraging cooperation with

13   the CFTC at least as recently as August 2020—well after being served with the SRO entered by

14   this Court.  And Tufo is a recidivist—he has been charged civilly and criminally with two prior

15   fraudulent schemes.  Defendants have shown no signs of stopping their fraud.

16         Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1,

17   Defendants should be permanently restrained, enjoined and prohibited from directly or indirectly

18   engaging in conduct in violation of Sections 4b(a)(2)(A), (C), 4c(b), 4k(2), 4m(1), 4o(1)(A)-(B),

19   and 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 6b(a)(2)(A), (C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-

20   (B), and 2(c)(2)(C)(iii)(I)(cc) (2018), and Regulations 5.2(b)(1)-(3), 5.3(a)(2), and 32.4, 17 C.F.R.

21   §§ 5.2(b)(1)-(3), 5.3(a)(2), and 32.4 (2021), including:

22         a.      Cheating or defrauding, or attempting to cheat or defraud, any other person; or

23   deceiving, or attempting to deceive, any other person by any means whatsoever; in or in

24   connection with an offer to enter into, the entry into, or the confirmation of the execution of, any

25   commodity option transaction;

26         b.      in or in connection with any order to make, or the making of, any contract of sale

27   of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or

28   with, any other person, (i) cheating or defrauding, or attempting to cheat or defraud, any other

1   person; or (ii) willfully deceiving or attempting to deceive any other person by any means

2   whatsoever in regard to any order or contract or the disposition or execution of any order or

3   contract, or in regard to any act of agency performed, with respect to any order or contract for or

4   with the other person;

5         c.     acting as a CPO or an AP of a CPO and employing any device, scheme, or artifice

6   to defraud any client or participant or prospective client or participant; or engaging in any

7   transaction, practice, or course of business which operates as a fraud or deceit upon any client or

8   participant or prospective client or participant; or

9         d.     acting as a CPO or an AP of a CPO without being registered with the CFTC.

10        Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1,

11  Defendants Financial Tree, Financial Solution, New Money, and Black should also be

12  permanently restrained, enjoined, and prohibited from directly or indirectly engaging in conduct

13  in violation of 7 U.S.C. § 6b(a)(2)(B), including willfully making or causing to be made to any

14  other person any false report or statement or willfully entering or causing to be entered for the

15  other person any false record, in or in connection with any order to make, or the making of, any

16  contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or

17  on behalf of, or with, any other person.

18        Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1,

19  Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, and

20  Glenn should also be permanently restrained, enjoined and prohibited from directly or indirectly

21  engaging in conduct in violation of 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. §§ 4.20(a)(1), (b)-(c),

22  4.21, and 4.22, including failing to properly operate any commodity pool in compliance with the

23  Act and Regulations, including but not limited to 17 C.F.R. §§ 4.20(a)(1), (b)-(c), 4.21, and 4.22.

24        Defendants should also be permanently restrained, enjoined and prohibited from directly

25  or indirectly:

26        a.     Trading on or subject to the rules of any registered entity (as that term is defined in

27             Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

28  ////

b.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for their own personal account or for any account in which they have a direct or indirect interest;

c.    Having any commodity interests traded on their behalves;

d.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e.    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f.    Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

g.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

B. <u>Restitution</u>

The CFTC is authorized to seek, and the Court to impose, equitable remedies for violations of the Act and Regulations, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(A). Restitution exists to "restore the status quo" and reflects "the difference between what defendants obtained and the amount customers received back . . . ." <u>Driver</u>, 877 F. Supp. 2d at 981; <u>see also</u> <u>CFTC v. Leighton</u>, No. 2:12-cv-04012, 2013 WL 4101874, at *9 (C.D. Cal. July 8, 2013).

Defendants Financial Tree, Financial Solution, New Money, the Glenn Law Firm, Black, Mancuso, and Glenn should be ordered to pay, jointly and severally, restitution in the amount of $10,495,328.38 ("General Restitution Obligation"), representing net pool participant losses. <u>See</u> Robinson Decl. ¶ 11 (describing losses). If the General Restitution Obligation is not paid immediately, post-judgment interest should accrue on the General Restitution Obligation

1    beginning on the date of entry of this Order and shall be determined by using the Treasury Bill

2    rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

3         Defendant Tufo should be ordered to pay, jointly and severally with the remaining

4    Defendants, restitution in the amount of $4,690,155.52 ("Tufo Restitution Obligation," and

5    together with the General Restitution Obligation [of which the Tufo Restitution Obligation is a

6    subset], the "Restitution Obligations"), representing total losses by pool participants Tufo

7    fraudulently solicited.  See Robinson Decl. ¶ 11.  If the Tufo Restitution Obligation is not paid

8    immediately, post-judgment interest should accrue on the Tufo Restitution Obligation beginning

9    on the date of entry of this Order and shall be determined by using the Treasury Bill rate

10   prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

11        Defendants Black, Mancuso, and Tufo are currently defendants in a criminal action

12   charging them, in part, for the misconduct that is at issue in this matter.  See The People of the

13   State of California v. Christopher J. Mancuso, John D. Black, and Joseph P. Tufo, Case No. 20-

14   FE-011219 (Superior Court of the State of California, County of Sacramento, filed July 22, 2020)

15   (with respect to Black, the "Black Criminal Action;" with respect to Mancuso, the "Mancuso

16   Criminal Action;" and with respect to Tufo, the "Tufo Criminal Action").  For amounts disbursed

17   to pool participants as a result of satisfaction of any restitution ordered (1) in the Black Criminal

18   Action or the Mancuso Criminal Action, Defendants should receive a dollar-for-dollar credit

19   against the General Restitution Obligation; or (2) in the Tufo Criminal Action, Defendants should

20   receive a dollar-for-dollar credit against both Restitution Obligations.  Within ten days of

21   disbursement in the Criminal Action to pool participants, Mancuso and Tufo should be ordered to

22   transmit, under a cover letter that identifies the name and docket number of this proceeding, to the

23   Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155

24   21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures

25   Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form

26   of payment to those pool participants; with a copy to Charles Marvine, Deputy Director,

27   Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO

28   64108.

To effect payment of the Restitution Obligations and the distribution of any restitution payments to pool participants, the Court should appoint the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor should be directed to receive restitution payments from Defendants and make distributions as set forth below. Because the Monitor will be acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud. Defendants should be ordered to make payments of their Restitution Obligations, and any post-judgment interest payments, under this Order to the Monitor in the name "Financial Tree Restitution Fund" and directed to send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding. Defendants should be further ordered as follows: If payment by electronic funds transfer is chosen, Defendants shall contact Daniel Driscoll or his successor at 312-781-1300 or at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; with a copy to Charles Marvine, Deputy Director, Commodity Futures Trading Commission, 2600 Grand Boulevard, Suite 210, Kansas City, MO 64108.

It should be further ordered as follows: The Restitution Obligations shall be partially satisfied by applying amounts currently frozen in conjunction with this lawsuit. See ECF No. 9 at 2 n.1, 20-21, 24-25 (SRO prohibiting the Parties from transferring, removing, dissipating, and disposing of their assets and prohibiting financial institutions and others who hold, control, or maintain custody of any of the Parties' assets from permitting the Parties to dispose of those assets); ECF No. 33 at 18-19 (Preliminary Injunction extending asset freeze until further order of the Court). All Assets, as defined in the SRO (ECF No. 9 at 2 n.1), currently frozen ("Frozen Assets") shall be applied toward any restitution award the Court may order, with the exception of

1  the Glenn Defendants' Frozen Assets.[3]  Financial Institutions and others who hold or control

2  Frozen Assets shall transfer Frozen Assets to the Monitor within three days of receiving actual

3  notice of this Order, including notice via electronic mail.  Transfers of Tufo's Frozen Assets shall

4  reduce both Restitution Obligations by the amount transferred.  Transfers of any other Frozen

5  Assets shall reduce the General Restitution Obligation by the amount transferred.  Transfers to the

6  Monitor shall follow the procedure prescribed above.

7       It should be further ordered as follows:  The Monitor shall oversee the Restitution

8  Obligations and shall have the discretion to determine the manner of distribution of such funds in

9  an equitable fashion to pool participants identified by the CFTC or may defer distribution until

10  such time as the Monitor deems appropriate.  In the event that the amount of Restitution

11  Obligations payments to the Monitor are of a de minimis nature such that the Monitor determines

12  that the administrative cost of making a distribution to eligible pool participants is impractical, the

13  Monitor may, in its discretion, treat such restitution payments as civil monetary penalty

14  payments, which the Monitor shall forward to the CFTC following the instructions for civil

15  monetary penalty payments set forth below.

16       Defendants should be ordered to cooperate with the Monitor as appropriate to provide

17  such information as the Monitor deems necessary and appropriate to identify pool participants to

18  whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of

19  any Restitution Obligations payments.  Defendants should be ordered to execute any documents

20  necessary to release funds that they have in any repository, bank, investment or other financial

21  institution, wherever located, in order to make partial or total payment toward the Restitution

22  Obligations.

23

24  [3]  On January 6, 2021, Glenn filed for bankruptcy in the United States Bankruptcy Court for the
District of Colorado ("Bankruptcy Court") (Case No. 21-10051-KHT).  As a result, there is an

25  automatic stay in place pursuant to 11 U.S.C. § 362(a) (2018) prohibiting the CFTC from
obtaining an order transferring the Glenn Defendants' assets.  See, e.g., SEC v. Miller, 808 F.3d

26  623, 630-35 (2d Cir. 2015).  In the event the automatic stay is lifted without disposing of Glenn's
Frozen Assets, or the CFTC is granted an order to lift the automatic stay for the purpose of

27  transferring or collecting Glenn's Frozen Assets, any such assets shall be transferred and applied

28  to the General Restitution Obligation pursuant to this paragraph.

42

It should be ordered that the Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the CFTC recipients specified above.

It should be further ordered as follows. The amounts payable to each pool participant shall not limit the ability of any pool participant to prove that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

It should be ordered that, to the extent that any funds accrue to the U.S. Treasury for satisfaction of the Restitution Obligations, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

C. <u>Disgorgement</u>

To support disgorgement against a relief defendant, the CFTC need only demonstrate that the relief defendant received ill-gotten funds and does not have a legitimate claim to those funds. <u>SEC v. World Capital Mkt., Inc.</u>, 864 F.3d 996, 1004 (9th Cir. 2017); <u>Am. Bullion</u>, 2014 WL 12603558, at *8 (holding Relief Defendants who received over $1 million in pool funds without providing legitimate services or having legitimate claim to those funds should be required to disgorge such funds). The CFTC has so demonstrated with respect to Relief Defendants. Relief Defendants Caswell, Suisse Group, and JMC shall pay, jointly and severally, disgorgement in the amount of eight hundred thousand dollars ($800,000) ("Caswell Disgorgement Obligation"), representing ill-gotten funds for which they did not provide legitimate services and to which they do not have a legitimate claim.

////

1    Accordingly, it is recommended that the following language be adopted:

2    Relief Defendant Landes shall pay disgorgement in the amount of
     two hundred thousand dollars ($200,000) ("Landes Disgorgement
3    Obligation"), representing ill-gotten funds for which Landes did not
     provide legitimate services and to which Landes does not have a
4    legitimate claim.

5    Relief Defendant Kingdom shall pay disgorgement in the amount of
     one million, one hundred thousand dollars ($1,100,000) ("Kingdom
6    Disgorgement Obligation"), representing ill-gotten funds for which
     Kingdom did not provide legitimate services and to which Kingdom
7    does not have a legitimate claim.

8    Relief Defendant Anne Mancuso shall pay disgorgement in the
     amount of two hundred and fifty-two thousand, eight hundred and
9    seventy-four dollars and ninety-three cents ($252,874.93) ("Anne
     Mancuso Disgorgement Obligation"), representing ill-gotten funds
10   for which Anne Mancuso did not provide legitimate services and to
     which she does not have a legitimate claim.
11

12   Relief Defendant Tyler Mancuso shall pay disgorgement in the
     amount of three hundred forty thousand, eighty-seven dollars and
13   twenty-three cents ($340,087.23) ("Tyler Mancuso Disgorgement
     Obligation"), and together with the Caswell Disgorgement
14   Obligation, Landes Disgorgement Obligation, Kingdom
     Disgorgement Obligation, and Anne Mancuso Disgorgement
15   Obligation, the "Disgorgement Obligations"), representing ill-gotten
     funds for which Tyler Mancuso did not provide legitimate services
16   and to which he does not have a legitimate claim.

17   If the Disgorgement Obligations are not paid immediately, then post-
     judgment interest shall accrue on the Disgorgement Obligations
18   beginning on the date of entry of this Order and shall be determined
     by using the Treasury Bill rate prevailing on the date of entry of this
19   Order pursuant to 28 U.S.C. § 1961 (2018).  The Relief Defendants
     shall pay their respective Disgorgement Obligations and any post-
20   judgment interest to the Monitor for satisfaction of the General
     Restitution Obligation pursuant to the procedure set forth in above,
21   resulting in a dollar-for-dollar credit against the applicable
     Restitution Obligation(s) as well as the applicable Disgorgement
22   Obligation(s).  To the extent the General Restitution Obligation has
     been satisfied at the time of a payment made, the payment will simply
23   result in a credit against the applicable Disgorgement Obligation(s),
     and the Monitor shall transfer such funds exceeding the applicable
24   Restitution Obligation to the CFTC.  If funds are to be transferred
     other than by electronic funds transfer, then the payment shall be
25   made payable to the Commodity Futures Trading Commission and
     sent to the address below:
26

27   Commodity Futures Trading Commission
     Division of Enforcement
28   C/O ESC/AMK-326; HQ RM 265

44

6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, the Monitor shall contact the email address above to receive payment instructions. To the extent any Relief Defendant's Frozen Assets are utilized to satisfy the General Restitution Obligation described above, that Relief Defendant's Disgorgement Obligation shall be reduced by the amount of that payment.

D. <u>Civil Monetary Penalty</u>

Under 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(a)(4)(ii)(D), 17 C.F.R. § 143.8(a)(4)(ii)(D) (2021), the CFTC is authorized to seek a civil monetary penalty equal to the higher of triple Defendants' monetary gain from each violation of the Act or Regulations, or $187,432 per violation. The Court may "fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent." <u>CFTC v. Trimble</u>, No. 11–cv–02887, 2013 WL 317576, at *9 (D. Colo. Jan. 28, 2013) (citing <u>Miller v. CFTC</u>, 197 F.3d 1227, 1236 (9th Cir. 1999)).

Based on Defendants' intentional and egregious conduct, civil monetary penalties reflecting three times the monetary net gain to each are appropriate. This penalty is authorized by 7 U.S.C. § 13a-1(d)(1)(A). Accordingly, the following language should be adopted:

Defendants Black, Financial Tree, Financial Solution, and New Money shall pay, jointly and severally, a civil monetary penalty ("CMP") in the amount of five million, four hundred forty-one thousand, two hundred forty-three dollars and thirteen cents ($5,441,243.13) ("Black and Black Entities CMP Obligation"), representing three times Black's gains of $1,809,117.56 and Financial Tree's, Financial Solution's, and New Money's gains of $4,630.15 received in connection with the violations described herein.

Defendant Mancuso shall pay a CMP in the amount of twelve million, one hundred forty-six thousand, nine hundred twenty-one dollars and twenty-eight cents ($12,146,921.28) ("Mancuso CMP Obligation"), representing three times Mancuso's gains received in connection with the violations described herein.

Defendant Tufo shall pay a CMP in the amount of six hundred eighty-four thousand dollars and three cents ($684,000.03) ("Tufo CMP Obligation"), representing three times Tufo's gains received in

1    connection with the violations described herein.

2    Defendants Glenn and the Glenn Law Firm shall pay, jointly and
      severally, a CMP in the amount of eight hundred fifty-six thousand,
3    three hundred fourteen dollars and seventy-two cents ($856,314.72)
      ("Glenn Defendants CMP Obligation," and together with the Black
4    and Black Entities CMP Obligation, the Mancuso CMP Obligation,
      and the Tufo CMP Obligation, the "CMP Obligations"), representing
5    three times the Glenn Defendants' gains received in connection with
      the violations described herein.

6

7    If the CMP Obligations are not paid immediately, then post-
      judgment interest shall accrue on the CMP Obligations beginning on
      the date of entry of this Order and shall be determined by using the
8    Treasury Bill rate prevailing on the date of entry of this Order
      pursuant to 28 U.S.C. § 1961 (2018).  Defendants shall pay their
9    CMP Obligations and any post-judgment interest by electronic funds
      transfer, U.S. postal money order, certified check, bank cashier's
10   check, or bank money order.  If payment is to be made other than by
      electronic funds transfer, then the payment shall be made payable to
11   the Commodity Futures Trading Commission and sent to the address
      below:

12

13                    Commodity Futures Trading Commission
                      Division of Enforcement
14                    C/O ESC/AMK-326; HQ RM 265
                      6500 S. MacArthur Blvd.
15                    Oklahoma City, OK 73169
16                    9-AMC-AR-CFTC@faa.gov

17   If payment by electronic funds transfer is chosen, Defendants shall
      contact the email address above to receive payment instructions and
18   shall fully comply with those instructions.   Defendants shall
      accompany payment of their respective CMP Obligations with a
19   cover letter that identifies the paying Defendant(s) and the name and
      docket number of this proceeding.  Defendants shall simultaneously
20   transmit copies of the cover letter and the form of payment to the
      CFTC recipients specified above.

21

22   E.  Provisions Related to Monetary Relief

23        The undersigned recommends adoption of the following additional language related to

24   monetary relief:

25        Partial Satisfaction:  Acceptance by the CFTC or the Monitor of any
          partial   payment   of   the   Parties'   Restitution   Obligations,
26        Disgorgement Obligations, or CMP Obligations shall not be deemed
          a waiver of the Parties' obligation to make further payments pursuant
27        to this Order, or a waiver of the CFTC's right to seek to compel
          payment of any remaining balance.

28

46

Asset Freeze:  On July 2, 2020 the court entered an asset freeze order prohibiting the transfer, removal, dissipation and disposal of Frozen Assets ("Asset Freeze Order").  See ECF No. 9 (July 2, 2020 SRO); ECF No. 33 (July 28, 2020 Preliminary Injunction extending asset freeze).  The Monitor shall ensure that all of Parties' Frozen Assets are collected and applied toward the Restitution Obligations, set out above.  See Driver, 877 F. Supp. 2d at 981 (applying amounts in bank accounts and futures trading account and frozen by SRO toward restitution obligation).  Once the Monitor completes the collection process and notifies the CFTC recipients described above accordingly, the Asset Freeze Order as applied to the Parties only shall be deemed lifted pursuant to the terms of this Order.

F.   Cooperation

The Parties should be ordered to cooperate fully and expeditiously with the CFTC, including the CFTC's Division of Enforcement, in this action, and in any current or future CFTC investigation or action related thereto.  The Parties should also be ordered to cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

G.   Miscellaneous Provisions

The undersigned recommends adoption of the following miscellaneous provisions, which are necessary to effectuate the judgment:

Notice:   Unless otherwise specifically required herein, notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

Charles Marvine
Deputy Director, Division of Enforcement
Commodity Futures Trading Commission
2600 Grand Boulevard, Suite 210
Kansas City, MO  64108
816-960-7743

All such notices to the CFTC shall reference the name and docket number of this action.

Notice to Defendants and Relief Defendants:

John D. Black
Financial Tree
Financial Solution Group
New Money Advisors, LLC
128 Silberhorn Drive

47

Folsom, CA 95630
Christopher Mancuso
34 Statehouse Place
Irvine, CA 92602

Joseph Tufo
4631 Shetland Way,
Antioch, CA 94531

John P. Glenn
The Law Firm of John Glenn P.C.
1400 Orange Court
Fort Collins, CO 80525

Herbert Caswell
Suisse Group (USA) LLC
JMC Industries LLC
9626 Scadlocke Road
Jacksonville, FL 32208

Kingdom Trust LLC
c/o Michael Jacobs and Ruby Handler Jacobs
800 NE Calle Davina
Albuquerque, New Mexico 87113

Landes Capital Management, LLC
/o Justin Smith
1346 Iroquois Ave.
Cleveland, Ohio 44124

Anne Mancuso
290 Ambroise
Newport Coast, CA 92657

Tyler Mancuso
290 Ambroise
Newport Coast, CA 92657

Notice to NFA:

Daniel Driscoll, Executive Vice President, COO
National Futures Association
300 S. Riverside Plaza, Suite 1800
Chicago, IL 60606-3447

All such notices to the NFA shall reference the name and docket
number of this action.

48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Change of Address/Phone:  Until such time as the Parties satisfy in full their Restitution Obligations, Disgorgement Obligations, and CMP Obligations as set forth in this Order, each Party shall provide written notice to the Commission by certified mail of any change to the Party's telephone number and mailing address within ten calendar days of the change.

Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by a Party to modify or for relief from the terms of this Order.

Injunctive and Equitable Relief Provisions:  The injunctive and equitable relief provisions of this Order shall be binding upon the Parties, upon any person under the authority or control of any of the Parties, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with the Parties.

## IV.   RECOMMENDATION

Based on the foregoing, the undersigned recommends as follows:

1.  Plaintiff's November 4, 2021 motion for default judgment, (ECF No. 126) be granted;

2.  The court enter judgment in plaintiff's favor and order the relief described above in the language specified;

3.  This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections.  Local Rule 304(d).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.

////

49

1  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57

2  (9th Cir. 1991).

3  DATED: January 3, 2022

4  _____

5  ALLISON CLAIRE
   UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 22

1

2

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    COMMODITY FUTURES TRADING                    No.  2:20-cv-01184 TLN AC
      COMMISSION,
12
                           Plaintiff,
13                                                  **ORDER**
                    v.
14
      FINANCIAL TREE dba FINANCIAL
15    TREE TRUST, et al.,

16                         Defendants.

17

18           Plaintiff, proceeding *pro se*, filed the above-entitled action.  The matter was referred to a

19    United States Magistrate Judge pursuant to Local Rule 302(c)(21).

20           On January 4, 2022, the magistrate judge filed findings and recommendations herein

21    which were served on all parties and which contained notice to all parties that any objections to

22    the findings and recommendations were to be filed within twenty-one days.  (ECF No. 129.)

23    Neither party has filed objections to the findings and recommendations.[1]

24           The Court has reviewed the file and finds the findings and recommendations to be

25    ────────────────────
      [1]      The Court notes that on February 7, 2022, non-parties Michael J. Jacobs and Ruby
26    Handler Jacobs submitted a "response" to the findings and recommendations.  (ECF No. 131.)
      The Court has reviewed their filing.  However, as the Magistrate Judge stated, their "statements
27    as non-parties do not alter the outcome" of this action.  (ECF No. 129 at 35.)  Moreover, the
      Court previously explained that Michael Jacobs may not represent Kingdom in this matter.  (*See*
28    ECF No. 48.)

                                                    1

1     supported by the record and by the magistrate judge's analysis.  Accordingly, IT IS HEREBY

2     ORDERED that:

3        1.  The findings and recommendations filed January 4, 2022, are adopted in full;

4        2.  Plaintiff's November 4, 2021, motion for default judgment, (ECF No. 126) is

5     GRANTED;

6        3.  The Court enters judgement in Plaintiff's favor and orders relief described in the

7     January 4, 2022, Findings and Recommendations; and

8        4.  This case is closed

9     DATED:  March 9, 2022

Troy L. Nunley
United States District Judge