Terry E. Welch (5819) twelch@parrbrown.com
Bentley J. Tolk (6665) btolk@parrbrown.com
Rodger M. Burge (8582) rburge@parrbrown.com
C. Chase Wilde (17546) cwilde@parrbrown.com
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; JUSTIN SMITH; STUART MCMAHEN; and BLACK LABEL SERVICES, INC.,<br><br>Defendants. | **APPENDIX OF EVIDENCE IN OPPOSITION TO DEFENDANTS JOSHUA CONSTANTIN AND STUART MCMAHEN'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:23-CV-00157-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Millrock Investment Fund 1, LLC ("Millrock") hereby files this Appendix of Evidence in Support of its Opposition to Joshua Constantin and Stuart McMahen's Motion for Summary Judgment (the "Appendix to Opposition").

| Exhibit | Title | Source |
|---------|-------|--------|
| **A** | Declaration of Kevin Long | Kevin Long |
| **B** | Declaration of Brent Smith | Brent Smith |
| **C** | Discovery Requests and Notices of Deposition | Parr Brown Gee & Loveless |
| **D** | Declaration of Bentley Tolk and attached exhibits<br>1. Involuntary Petition<br>2. Order for Relief in Involuntary Case<br>3. Order Dismissing Case<br>4. SEC Memo Order<br>5. SEC Memo Order 2<br>6. SEC Judgment<br>7. SEC Restraining Order | Bentley Tolk for his declaration; the docket for United States Bankruptcy Court, District of Delaware, 23-11458, for exhibits 1–3; and the docket for United States District Court, Southern District of New York, 11-cv-4642 for exhibits 4–7. for the exhibits attached to the declaration |

DATED 8 August 2024.

PARR BROWN GEE & LOVELESS

By: /s/ Chase Wilde
        Terry E. Welch
        Bentley J. Tolk
        Rodger M. Burge
        C. Chase Wilde

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

# EXHIBIT A

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Michael S. Wilde (14366)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
mwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment
Fund 1, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC, | **DECLARATION OF KEVIN G. LONG** |
| Plaintiff, | Case No. 2:23-cv-00157-JNP |
| v. | |
| HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; and JUSTIN ~~SMITH~~ | Judge Jill N. Parrish |
| Defendants. | |

1.    I am over the age of 18 and if called to testify could testify truthfully to the

matters stated herein.

2.      I have worked for 34 years in commercial real estate.  I have a Utah Real Estate Brokers License.  After working with Colliers International and being the founding Principal Broker of its predecessor CBC Advisors for 25 years, I left to found Millcreek Commercial, which has obtained and divided $150 millions of dollars in commercial real estate investments for its clients.

3.      I am the Manager of Millrock Investment Fund 1 Management, LLC, which is the managing member of Millrock Investment Fund 1, LLC ("Millrock").

4.      Millrock is an investment and development fund that buys and sells commercial properties and then divides and sells its fee simple title to various tenant-in-common owners (the "TIC Owners").

5.      Millrock contracted with non-party ADP to construct two surgical centers for HSMG or its subsidiaries to lease and operate in Draper, Utah ("Draper Project") and Keller, Texas ("Keller Project") (collectively, the "Surgical Centers").  Attached hereto as Exs. 1 and 2 are copies of the agreements for the construction of the Surgical Centers.

6.      In connection with construction of the Surgical Centers, Millrock was required to pay ADP $2.55 million for the Draper Project and $2.55 million for the Keller Project as an equipment allowance (collectively the "Equipment Allowance") to equip each Surgical Center, and ADP was then required to transfer the Equipment Allowance to HSMG. ADP would submit draw requests for the Equipment Allowance at various

2

points throughout the development process, and ADP would transfer those draws to HSMG. Attached hereto as Ex. 3 is a copy of the Draper construction budget. Attached hereto as Ex. 4 is a copy of the Keller construction budget.

7.      The building for the Draper Project was purchased under the budget for $4,475,460.00. During the construction of the Draper Project, total draws for the project were made in the amount of $9,539,776.89, of which $2,310,000 was designated as an Equipment Allowance under the budget. Attached hereto as Ex. 5 are copies of the Draper location settlement statement and draws.

8.      During the construction of the Keller Project, draws for the Equipment was made in the amount of $2,332,000. Attached hereto as Ex. 6 are copies of the Keller settlement statement and draws.[1]

9.      HSMG or its affiliated entities, as the lessee, signed the leases for the Surgical Centers. When one of HSMG's affiliated entities (as opposed to HSMG) signed the lease for one of the ACM Centers or the Surgical Centers, HSMG acted as the guarantor of its affiliated entity's obligations under the lease.

10.     Specifically, the Draper Lease is set forth in an Ambulatory Surgery Center Lease Agreement between ADP, as the landlord, and SARC by HSI – DRAPER, UT Inc., as the tenant, entered into on or about November 12, 2020. Smith signed the

---

[1] In the process of preparing this filing, I discovered that Millrock appears to have mistakenly been double billed on certain amounts relating to the Keller Project. Millrock and ADP are working together to remedy the problem. Consequently, Millrock paid more than the contract price, however, both Millrock and ADP agree that $2,332,000 of the total payments were for Equipment.

4869-9946-6312

Draper Lease purportedly on behalf of SARC by HSI – DRAPER, UT Inc.  Ex. 7.  Upon

information and belief, SARC by HSI – DRAPER, UT Inc. was intended to be an entity

owned or controlled by HSMG or one of its subsidiaries of affiliates, however we have

subsequently been unable to find any entity by this name.

11.     On or about November 20, 2020, ADP executed a written assignment of all of its

rights, interests, and obligations in the Draper Lease to SARC Draper, LLC.  Attached

hereto as Ex. 8 is a copy of this assignment relating to the Draper surgical center.

12.     On or about January 12, 2021, SARC Draper, LLC assigned all of its rights,

interests, and obligations in the Draper Lease to Millrock.  Attached hereto as Ex. 9 is

sample of this assignment to the TIC Owners.

13.     On or about April 6, 2022, Millrock assigned all of its rights, title, and interest in

the Draper Lease to certain of the TIC Owners.  Attached hereto as Ex. 10 is a copy of

this assignment.

14.     HSMG was the guarantor for the Draper Lease, and Smith also signed the

Guaranty on behalf of HSMG.  Ex. 7.

15.     The Keller Lease is set forth in an Ambulatory Surgery Center Lease Agreement

between Millrock, as the landlord, and SARC by HSI – KELLER, TX Inc., as the

tenant, entered into as of November 18, 2020. Smith signed the Keller Lease on behalf

of SARC by HSI – KELLER, TX Inc.  Attached hereto as Ex. 11 is a copy of this lease.

Upon information and belief, SARC by HSI – Keller, TX Inc. was intended to be an

4

entity owned or controlled by HSMG or one of its subsidiaries of affiliates, however we have subsequently been unable to find any entity by this name.

16.    HSMG was the guarantor for the Keller Lease, and Smith also signed the Guaranty on behalf of HSMG. Ex. 11.

17.    Around November 19-20, 2020, Millrock assigned its rights and interest in the Keller Lease (and certain associated purchase agreement rights in the Keller Project) to certain of the TIC Owners. Because these interests were sold to various owners in many different instruments, attached hereto as Ex. 12 is a sample of one of the assignments to a TIC owner, however other TIC Owners purchased the balance of the interest in like manner.

18.    Millrock sold its interests in the Surgical Centers to approximately 70 TIC Owners.

19.    The TIC Owners owning the interests in the Surgical Centers consist of a variety of investors, however, a substantial portion of the TIC Owners invested in the Surgical Centers using retirement funds as a means of providing cash flow in retirement.

20.    The Surgical Centers, however, never opened and the Keller Project never received a certificate of occupancy. Although the Keller, Texas project was almost completed, HSMG failed to provide the medical equipment specifications to the contractor, even though the contractor spent numerous months requesting the equipment specifications from HSMG. With regard to the Draper, Utah project, Constantin, Smith

5

and HSMG came up with various excuses for not installing equipment and thus completing the project.

21.     Starting around December 2021, HSMG failed to pay its rent obligations under the Draper or Keller Leases.

22.     HSMG represented to Millrock that its difficulties in making the lease payments were the result of COVID related delays and cash flow issues.  Millrock worked with HSMG to rectify these cash flow issues, up to and including paying the lease payments.

23.     On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement and Promissory Note (the "Millrock/HSMG Agreement") to provide HSMG cash flow to meet its rent obligations for the Draper and Keller Surgical Centers. Attached hereto as Ex. 13 is a copy of this agreement.

24.     Millrock complied with the terms of the Millrock/HSMG Agreement.

25.     Notwithstanding Millrock's attempts to assist HSMG's alleged cash flow problem, in or about September 2022, HSMG or its subsidiaries stopped making lease payments under each of their lease agreements at the Surgical Centers.

26.     On November 30, 2022, I participated in a phone call with Josh Constantin and Brent Smith.  I stated that HSMG was either the lessee or a guarantor of the lease payments and therefore liable on the leases.  During the meeting, Mr. Constantin sought to negotiate a year of free rent for each of the surgical centers.  I pushed back and indicated the TIC Owners would not be inclined to give free rent and were more likely

6

to pursue the corporate guarantee against HSMG. In response, Mr. Constantin told me, in effect: "That has not kicked in yet. You need to tell the owners they need to work with me or I will empty the corporate shell and they will have nothing to come after. This is what I do, I am very good at it."

27.    During the Call, we discussed the Equipment Funds associated with the Draper Surgical Center, discussing Millcreek filing a UCC-1 against any equipment that had been purchased with the Equipment Funds. In response, Constantin stated that he would do whatever it took to make sure that HSMG's assets, including equipment, were impossible to get to if Millrock intended to file UCC-1 filings on any equipment purchased with the Equipment Funds. Constantin further stated during the call that HSMG's single purpose subsidiary entities were set up in such a way as to make it very difficult to recover assets.

28.    In December 2022, Millrock set up a zoom call between HSMG and the TIC Owners of the Draper and Keller Surgical Centers to discuss HSMG's obligations under the leases.

29.    During the call with the Draper TIC Owners (the "Draper Meeting"), Constantin stated that the Equipment Allowance was paid to him as a "development fee" or "project development income," and that Constantin could use as he sees fit. He also stated that any equipment purchased with the Equipment Allowance belonged to HSMG. Constantin further represented during the Draper Meeting that SARC-Draper, and not

7

HSMG, owes money to the TIC Owners. He also represented that HSMG is a minority investor in SARC-Draper. Constantin stated that some equipment was purchased, but that he didn't know what had specifically been purchased. Constantin refused to commit to putting the Equipment Funds in trust. When confronted about past problems with the SEC, Constantin admitted that he "lied under oath" in a deposition. Attached hereto as Ex. 14 are transcriptions of relevant portions of the meeting with the Draper TIC Owners which accurately represent the nature and content of the meeting.

30.    During the call with the Keller TIC Owners (the "Keller Meeting"), Constantin implied that HSH possesses and controls the Equipment Funds as "project development income," and that it can use it as it sees fit. Constantin also represented that any equipment purchased with the Equipment Funds belong to Constantin and/or one of the entities that Constantin controls. Constantin further implied during the Keller meeting that Equipment Funds were pooled with money from approximately forty other projects in a general strategic reserve account containing over $80M in cash or cash equivalents. Constantin stated that HSMG could not afford to pay rent owed on the Keller Surgical Center, and that if it did, it would bankrupt the company. Attached hereto as Ex. 15 are transcriptions of relevant portions of the meeting with the Keller TIC Owners which accurately represent the nature and content of the meeting.

31.    During the meetings with the TIC Owners, Constantine indicated that HSMG's contract with ADP provided that the FFE funds would be paid to HSMG as a

8

development fee. Millrock was later provided a copy of the contract between ADP and HSMG, and while it does discuss a development fee, the fee is payable *to ADP*. There is no development fee payable to HSMG. Attached hereto as Ex. 16 is a copy of the agreement provided by HSMG. To date, HSMG has not delivered the Equipment, and has not returned, or accounted for, the Equipment Funds.

32.    On December 14, 2022, Millrock's attorney sent a Notice of Default and Acceleration of Debt (the "Notice of Default") to HSMG accelerating the amounts due under the Millrock/HSMG Agreement. Attached hereto as Ex. 17 is a copy of the Notice of Default.

33.    On or around February 14, 2023, HSMG filed a Form 8-K with the SEC indicating that Smith was removed as a member of the board effective immediately. As part of Smith's separation with the company, HSMG agreed to pay Landes Capital Management, LLC and Landes and Compagnie Trust Prive KB $93,933,345.48 in exchange for 1 million shares of HSMG. A copy of this Form 8-K is attached hereto as Exhibit 18.

34.    Based on the HSMG's most recent filing disclosing the same, the company had 92,076,638 shares outstanding, $659,194 in cash, $93,129,332 in total assets, and $14,484,751 in total liabilities. A copy of this Form 8-K is attached hereto as Exhibit 19.

35.    I have been informed that Landes Capital Management, LLC was named as a

4869-9946-6312

defendant in a lawsuit styled *Commodity Futures Trading Commission v. Financial Tree et al.*, case no. 2:20-cv-01184 in the United States District Court for the Eastern District of California.  In this action, Financial Tree was found liable on claims of Commodity Option Fraud in Violation of 7 U.S.C. § 6c(b), Forex Fraud in violation of 7 U.S.C. § 6(b)(2)(A)-(C), among other claims.  In this same action, Landes Capital Management, LLC was found liable on a claim of disgorgement for having received ill-gotten funds for which Landes did not provide legitimate services and to which Landes did not have a legitimate claim.    Copies of the Complaint, Magistrate's Findings and Recommendations, and District Court Judge's Order adopting the Magistrate's Findings and Recommendations are included herewith as Exhibits 20, 21, and 22.

36.    I am unaware of any facts that suggest that the Equipment Funds are earnings or exempt from execution.

37.    Millrock is not seeking a writ of pre-judgment attachment to hinder, delay or defraud a creditor of the Defendants.

38.    Upon information and belief, Defendants are not residents of this state or qualified to do business here.

I declare under penalty of perjury the foregoing is true and correct.


Dated this day ___7___ of March, 2023.

By: _____
      Kevin G. Long

# **EXHIBIT B**

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Michael S. Wilde (14366)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
mwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment
Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC, | **DECLARATION OF BRENT SMITH** |
| Plaintiff, | Case No. 2:23-cv-000157-JNP |
| v. | Judge Jill N. Parrish |
| HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; and JUSTIN SMITH, | |
| Defendants | |

1.    I am over the age of 18 and if called to testify could testify truthfully to the matters stated herein.

2.    I have worked for 6 years in commercial real estate.  After working with Rosco

Capital for 18 months, I pivoted efforts to co-found Millrock Investment Fund 1, LLC, which has

obtained and divided $150 million dollars in commercial real estate investments for its clients.

3.     I am a Limited Partner of Millrock Investment Fund 1, LLC.

4.     On November 30, 2022, I participated in a phone call with Josh Constantin and

Kevin Long.  Mr. Long stated that HSMG was either the lessee or a guarantor of the lease

payments and therefore liable on the leases.  During the meeting, Mr. Constantin sought to

negotiate a year of free rent for each of the surgical centers.  Mr. Long pushed back and indicated

the TIC Owners would not be inclined to give free rent and were more likely to pursue the

corporate guarantee against HSMG.  In response, Mr. Constantin said, in effect: "That has not

kicked in yet.  You need to tell the owners they need to work with me or I will empty the corporate

shell and they will have nothing to come after.  This is what I do, I am very good at it."

5.     During the Call, we discussed the Equipment Funds associated with the Draper

Surgical Center, discussing Millcreek filing a UCC-1 against any equipment that had been

purchased with the Equipment Funds.  In response, Constantin stated that he would do whatever

it took to make sure that HSMG's assets, including equipment, were impossible to get to if

Millrock intended to file UCC-1 filings on any equipment purchased with the Equipment Funds.

Constantin further stated during the call that HSMG's single purpose subsidiary entities were set

up in such a way as to make it very difficult to recover assets.

I declare under penalty of perjury the foregoing is true and correct.

2

4869-9946-6312

Dated this day __6th__ of March, 2023.

By: _____

Brent R. Smith

4869-9946-6312

**EXHIBIT C**

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
rburge@parrbrown.com

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; JUSTIN SMITH; STUART MCMAHEN; and BLACK LABEL SERVICES, INC.,<br><br>        Defendants. | **MILLROCK'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION TO DEFENDANTS JOSHUA CONSTANTIN AND STUART MCMAHEN**<br><br>Case No. 2:23-CV-00157-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Millrock Investment Fund 1, LLC ("Millrock"), by and through its counsel of

record, hereby requests that Defendants Joshua Constantin ("Constantin") and Stuart McMahen

("McMahen") (collectively, "Defendants") fully respond to the following Interrogatories,

Requests for Production of Documents and Things, and Requests for Admission within thirty

(30) days after service hereof and produce for inspection and copying at the offices of Parr

Brown Gee & Loveless, 101 South 200 East, Suite 700, Salt Lake City, Utah 84111, each

document and thing identified or referred to in the Requests for Production of Documents and

Things. **Please note, for the requests for admission, a** matter is admitted unless, within 30

**days after being served, you serve on Millrock a written answer or objection addressed to**

**the matter and signed by you or your attorney.**

## INSTRUCTIONS

1.      These interrogatories, requests for production, and requests for admission are

continuing in nature and must be timely supplemented (a) with any information or documents

subsequently identified or obtained and (b) to reflect any change in circumstances that may

render Defendants' responses incomplete, inaccurate, or misleading in any way.

2.      All documents and electronically stored information (ESI) produced in response

to a request or interrogatory must not delete any metadata.

3.      You must provide all information that is available to you and under your control,

including information in the possession of your present or former attorneys, accountants,

representatives, agents, or other persons under your control or acting on your behalf. If any

responsive information is unavailable in the full detail requested, you must set forth the

information related to the subject matter of the request in such detail as is available, including a

description of the method by which you made any estimates or conclusions.

4.      For documents or items identified or produced in response to the requests,

organize the documents to make clear the request or interrogatory to which each document is

responsive.

5.      Unless otherwise noted, construe each request independently and not by reference

2

to any other request or interrogatory for the purpose of limitation.

6.    Use of the singular in any request includes the plural.

7.    Use of masculine, feminine, or neutral genders includes each gender, as appropriate in context.

8.    If you withhold any requested information, documents, or items based on the assertion of any privilege, then you must:

a.    State the privilege relied upon and all facts giving rise to the purported privilege;

b.    Describe fully the extent to which the privilege is being asserted; and

c.    Identify the information, document, or item being withheld.

9.    If you assert any request is vague or ambiguous, please identify the vagueness or ambiguity you contend exists.

10.    All of the matters in each of the Requests for Admission will be deemed admitted unless you respond within 30 days after service of those Requests.

11.    The answer to each Request for Admission shall specifically admit or deny the matter or set forth in detail the reasons why you cannot truthfully admit or deny the matter. If objection is made to a Request for Admission, the reasons therefor shall be stated.

12.    A denial in response to a Request for Admission shall fairly meet the substance of the requested admission.

13.    In response to a Request for Admission, you may not give lack of information as a reason for failure to admit or deny unless you state that you have made reasonable inquiry and that the information known or reasonably available to you is insufficient to enable you to admit or deny.

14.    Even if you consider that a matter involving a Request for Admission presents a

3

genuine issue for trial, you may not, on that ground alone, object to the request.

<u>**DEFINITIONS**</u>

1.      "Document" means any printed, typewritten or handwritten instrument of whatever character including information created and/or stored in electronic form and includes, without limitation, correspondence, email, memoranda, agreements, letters, hand or typewritten notes, computer printouts, computer tapes, computer discs, flash drives, thumb drives, microfilm, microfiche, tape recordings, photographs, video tapes, motion pictures, plats, diagrams, surveys, voicemail, recordings and any other items of similar nature, including originals and non-identical copies.

2.      "Identify" or "identity" means the following:

     a.  With respect to a natural person, the person's full name, present employer, title, job description, business and home address and telephone numbers and his/her relationship to any or all of Defendants.

     b.  With respect to a person other than a natural person, including any business entity, identify means to include the name, address, state of formation, type of legal entity and identity of a duly authorized representative.

     c.  To identify a "document" means to state the document's title, date, author, addressees, recipients, subject matter and/or general nature, present location and custodian.  Documents should be identified whether or not they are currently in any or all of Defendants' custody or possession.

     d.  To identify a communication means to state the date and time of the communication, the place where the communication was made, the parties to the communication, and content of the communication.

3.      "Communication" is a transmission from one person to another or in the presence of another, whether written, oral, telephonic, electronic or by any other means.

4.      "Person" and "You" means the plural as well as the singular and includes without limitation any natural person as well as any firm, corporation, unincorporated association, partnership or other form of legal entity unless the context clearly indicates otherwise.

5.      "Business Entity" means a business organization or entity, including, but not limited to, each and every corporation (subchapter "S" or "C"), nonprofit corporation, professional corporation, business development corporation, business trust, cooperative association, real estate investment trust, partnership, limited partnership, limited liability company, sole proprietorship, joint venture, and similar organization or entity.

6.      "HSMG" means Healthcare Solutions Management Group, Inc.

7.      "HSH" means Healthcare Solutions Holdings, Inc.

8.      "Alleged Transfers" means the transfers that Millrock has alleged, in the Second Amended Complaint, took place from HSMG/HSH to Constantin and McMahen that are the basis for Millrock's voidable transfer claims. Specifically, the alleged transfer of $2,235,923 to Constantin and $465,000 to McMahen.

9.      "Settlement Agreements" means the purported settlement agreements between HSH and Constantin and HSH and McMahen, which are evidenced by exhibits B and E of Constantin and McMahen's Motion for Summary Judgment. *See* ECF No. 96.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  Identify each and every Business Entity (as defined above) in which you have (or have had) an ownership interest in, whether said ownership interest is or was held directly or indirectly by you, from January 1, 2018 through the present.

**INTERROGATORY NO. 2:** Identify each and every Business Entity (as defined above) in which you have acted, served, or been employed as an officer, director, legal counsel, manager, managing member, or managing partner, from January 1, 2018 through the present, regardless of any ownership interest (or lack thereof) therein.

**INTERROGATORY NO. 3:** For each Business Entity (as defined above) identified in your responses to Interrogatories Nos. 1 and 2, identify all financial institutions at which bank accounts (savings, deposit, checking, CDs, etc.) are or have been maintained since January 1, 2018 through the present, and identify the account numbers for each such account.

**INTERROGATORY NO. 4:** Identify each and every bank account (savings, deposit, checking, CD, etc.), investment account, brokerage account, and similar account, including the name of the financial institution or investment firm where it is maintained and the account number, that you have or have had access or control over, directly or indirectly, from January 1 2014 to the present.

**INTERROGATORY NO. 5:** Identify each and every trust in which you are a trustor/grantor, trustee or beneficiary.

**INTERROGATORY NO. 6:** For each trust identified in your response to Interrogatory No. 5, identify all financial institutions at which bank accounts (savings, deposit, checking, CDs, etc.) are or have been maintained since January 1, 2018 through the present, and identify the account numbers for each such account.

**INTERROGATORY NO. 7:** List all jobs, positions, titles and roles you have had with defendant Healthcare Solutions Management, Inc., and the dates you served or were employed for each such position, title, or role.

**INTERROGATORY NO. 8:** List all jobs, positions, titles and roles you have had with

6

defendant Healthcare Solutions Holdings Inc., and the dates you served or were employed for each such position.

**INTERROGATORY NO. 9:** For each Request for Admission for which your response is anything other than an unqualified admission, provide a reasonable description of the facts supporting your response.

**INTERROGATORY NO. 10:** Identify each subsidiary of HSMG, and each Business Entity that HSMG exercised substantial control over, including HSH, at any time from January 1, 2018 through the present.

**INTERROGATORY NO. 11:** Identify each subsidiary of HSH, and each Business Entity that HSH exercised substantial control over, at any time from January 1, 2018 through the present.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

Please produce the following:

**REQUEST FOR PRODUCTION NO. 1:**  Produce HSMG's general ledgers, profit and loss statements, income statements, balance sheets, cash flow statements, annual audited financials, and annual reports from January 1, 2018 through the present.

**REQUEST FOR PRODUCTION NO. 2:**  Produce HSH's general ledgers, profit and loss statements, income statements, balance sheets, cash flow statements, annual audited financials, and annual reports from January 1, 2018 through the present.

**REQUEST FOR PRODUCTION NO. 3:**  Produce the general ledgers, profit and loss statements, income statements, balance sheets, cash flow statements, annual audited financials, and annual reports from January 1, 2018 through the present for each of the Business Entities identified in Interrogatory No. 1.

**REQUEST FOR PRODUCTION NO. 4:**  Produce the general ledgers, profit and loss statements, income statements, balance sheets, cash flow statements, annual audited financials, and annual reports from January 1, 2018 through the present for each the Business Entities identified in Interrogatory No. 2.

**REQUEST FOR PRODUCTION NO. 5:**  Produce the general ledgers, profit and loss statements, income statements, balance sheets, cash flow statements, annual audited financials, and annual reports from January 1, 2018 through the present for each of the Business Entities identified in Interrogatory Nos. 10 and 11.

**REQUEST FOR PRODUCTION NO. 6:**  Produce all statements and account records of any kind from January 1, 2018 through the present for each account identified in Interrogatory No. 4.

**REQUEST FOR PRODUCTION NO. 7:**  Produce all of HSMG and HSH's meeting minutes and resolutions – including all drafts, revised drafts, and final versions – from January 1, 2018 through the present.

**REQUEST FOR PRODUCTION NO. 8:**  Produce all correspondence, communications or Documents of any kind between HSMG and Constantin, and/or between HSH and Constantin, regarding the Alleged Transfers and Settlement Agreements.

**REQUEST FOR PRODUCTION NO. 9:**  Produce all correspondence, communications or Documents of any kind between HSMG and McMahen, and/or between HSH and McMahen, regarding the Alleged Transfers and Settlement Agreements.

**REQUEST FOR PRODUCTION NO. 10:** Produce all correspondence,

communications, or Documents of any kind between HSMG and/or HSH, on the one hand, and Emannuel Butera and/or American Development Partners ("ADP"), on the other.

**REQUEST FOR PRODUCTION NO. 11:** Produce all correspondence, communications, or Documents of any kind between Constantin, on the one hand, and Emannuel Butera and/or ADP, on the other.

**REQUEST FOR PRODUCTION NO. 12:** Produce all correspondence, communications, or Documents of any kind between McMahen, on the one hand, and Emannuel Butera and/or ADP, on the other.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:** Admit Constantin had substantial control over HSMG when Constantin and McMahen secured judgments against HSMG and HSH. (*See* Exhibit H of Constantin and McMahen's Motion for Summary Judgment.)

**REQUEST FOR ADMISSION NO. 2:** Admit Constantin had substantial control over HSH when Constantin and McMahen secured judgments against HSMG and HSH. (*See* Exhibit H of Constantin and McMahen's Motion for Summary Judgment.)


DATED this 25 July 2024.


PARR BROWN GEE & LOVELESS

By: /s/ Bentley J. Tolk
      Terry E. Welch
      Bentley J. Tolk
      Rodger M. Burge
      *Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, I caused to be served a true and correct copy of the foregoing

**MILLROCK'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION TO DEFENDANTS JOSHUA CONSTANTIN AND STUART MCMAHEN** via email on the following:

Keith Woodwell
kmw@clydesnow.com
**Clyde Snow & Sessions**
201 South Main Street, #2200
Salt Lake City, Utah 84111

Justin Smith
1779 CUMBERLAND RD
CLEVELAND HEIGHTS, OH 44118
(240) 242-7709
justin.landes@gmail.com

By:  /s/Chase Wilde
*Attorney*

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
C. Chase Wilde (17546)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
rburge@parrbrown.com
cwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC, Plaintiff, | **NOTICE OF DEPOSITION OF JUSTIN SMITH** |
| v. | Case No. 2:23-CV-00157-RJS-DAO |
| HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; JUSTIN SMITH; STUART MCMAHEN; and BLACK LABEL SERVICES, INC., | Chief District Judge Robert J. Shelby |
| | Magistrate Judge Daphne A. Oberg |
| Defendants. | |

**Notice for: Justin Smith**
**1779 CUMBERLAND RD**
**CLEVELAND HEIGHTS, OH 44118**

Please take notice that, pursuant to Federal Rule of Civil Procedure 30, Plaintiff Millrock Investment Fund 1, LLC ("Millrock"), by and through its counsel of record, will take the deposition of Defendant Justin Smith on September 18, 2024, at 9:00 a.m., at 1375 East Ninth Street, One Cleveland Center, 29th Floor, Cleveland, Ohio 44114.

The deposition will be taken upon oral examination before a certified court reporter or other person authorized by law to take depositions and may be continued from day to day until completed. The deposition will be recorded by stenographic, audio, and audiovisual means.

DATED 7 August 2024.

PARR BROWN GEE & LOVELESS

By: /s/ Christian C. Wilde
      Terry E. Welch
      Bentley J. Tolk
      Rodger M. Burge
      Christian C. Wilde

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7 August 2024, I caused a true and correct copy of the

foregoing **NOTICE OF DEPOSITION OF JUSTIN SMITH** to be served via email, on the

following:

Keith Woodwell
<u>kmw@clydesnow.com</u>
**Clyde Snow & Sessions**
201 South Main Street, #2200
Salt Lake City, Utah 84111

Justin Smith
1779 CUMBERLAND RD
CLEVELAND HEIGHTS, OH 44118
(240) 242-7709
justin.landes@gmail.com

By: /s/ Christian C. Wilde
*Attorney*

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
C. Chase Wilde (17546)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
rburge@parrbrown.com
cwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC,<br>    Plaintiff,<br><br>v.<br><br>HEALTHCARE SOLUTIONS<br>MANAGEMENT GROUP, INC.;<br>HEALTHCARE SOLUTIONS HOLDINGS<br>INC.; LANDES CAPITAL MANAGEMENT,<br>LLC; LANDES AND COMPAGNIE TRUST<br>PRIVE KB; JOSHUA CONSTANTIN;<br>JUSTIN SMITH; STUART MCMAHEN; and<br>BLACK LABEL SERVICES, INC.,<br><br>    Defendants. | **NOTICE OF DEPOSITION OF<br>JOSHUA CONSTANTIN**<br><br>Case No. 2:23-CV-00157-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

**Notice for: Joshua Constantin**
**238 Solomon Drive**
**Slidell, LA 70458**

        Please take notice that, pursuant to Federal Rule of Civil Procedure 30, Plaintiff Millrock

Investment Fund 1, LLC ("Millrock"), by and through its counsel of record, will take the

deposition of Defendant Joshua Constantin on September 25, at 9:00 a.m. at Hancock Whitney Center 701 Poydras Street, Suite 5000, New Orleans, Louisiana 70139.

The deposition will be taken upon oral examination before a certified court reporter or other person authorized by law to take depositions and may be continued from day to day until completed. The deposition will be recorded by stenographic, audio, and audiovisual means.

DATED 7 August 2024.

PARR BROWN GEE & LOVELESS

By: /s/ Chase Wilde
       Terry E. Welch
       Bentley J. Tolk
       Rodger M. Burge
       C. Chase Wilde

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7 August 2024, I caused a true and correct copy of the

foregoing **NOTICE OF DEPOSITION OF JOSH CONSTANTIN** to be served via U.S. Mail,

on the following:

Keith Woodwell
<u>kmw@clydesnow.com</u>
**Clyde Snow & Sessions**
201 South Main Street, #2200
Salt Lake City, Utah 84111

Justin Smith
1779 CUMBERLAND RD
CLEVELAND HEIGHTS, OH 44118
(240) 242-7709
justin.landes@gmail.com

By: /s/ Chase Wilde
*Attorney*

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
C. Chase Wilde (17546)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
rburge@parrbrown.com
cwilde@parrbrown.com

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC,<br>        Plaintiff,<br><br>v.<br><br>HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.;<br>HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; JUSTIN SMITH; STUART MCMAHEN; and BLACK LABEL SERVICES, INC.,<br><br>        Defendants. | **NOTICE OF DEPOSITION OF STUART MCMAHEN**<br><br>Case No. 2:23-CV-00157-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

**Notice for: Stuart McMahen**
**26 Reynolds Street**
**Springhill, LA 71075**

Please take notice that, pursuant to Federal Rule of Civil Procedure 30, Plaintiff Millrock

Investment Fund 1, LLC ("Millrock"), by and through its counsel of record, will take the

deposition of Defendant Stuart McMahen on September 24, at 9:00 a.m. at Hancock Whitney Center 701 Poydras Street, Suite 5000, New Orleans, Louisiana 70139.

The deposition will be taken upon oral examination before a certified court reporter or other person authorized by law to take depositions and may be continued from day to day until completed. The deposition will be recorded by stenographic, audio, and audiovisual means.

DATED 7 August 2024.

PARR BROWN GEE & LOVELESS

By: /s/ Chase Wilde
        Terry E. Welch
        Bentley J. Tolk
        Rodger M. Burge
        C. Chase Wilde

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 7 August 2024, I caused a true and correct copy of the

foregoing **NOTICE OF DEPOSITION OF STUART MCMAHEN** to be served via U.S. Mail,

on the following:

Keith Woodwell
kmw@clydesnow.com
**Clyde Snow & Sessions**
201 South Main Street, #2200
Salt Lake City, Utah 84111

Justin Smith
1779 CUMBERLAND RD
CLEVELAND HEIGHTS, OH 44118
(240) 242-7709
justin.landes@gmail.com

By: /s/ Chase Wilde
*Attorney*

# **<u>EXHIBIT D</u>**

Terry E. Welch (5819)
Bentley J. Tolk (6665)
Rodger M. Burge (8582)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
btolk@parrbrown.com
rburge@parrbrown.com

*Attorneys for Plaintiff Millrock Investment Fund 1, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILLROCK INVESTMENT FUND 1, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HEALTHCARE SOLUTIONS MANAGEMENT GROUP, INC.; HEALTHCARE SOLUTIONS HOLDINGS INC.; LANDES CAPITAL MANAGEMENT, LLC; LANDES AND COMPAGNIE TRUST PRIVE KB; JOSHUA CONSTANTIN; JUSTIN SMITH; STUART MCMAHEN; and BLACK LABEL SERVICES, INC., <br><br> Defendants. | **DECLARATION OF BENTLEY J. TOLK** <br><br> Case No. 2:23-CV-00157-RJS-DAO <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

I, Bentley J. Tolk, declare as follows:

1.      I am over the age of 18, and if called to testify, could testify truthfully to the

matters stated herein.

2.     I am a shareholder with the law firm of Parr Brown Gee & Loveless, P.C. ("Parr Brown"), and Parr Brown and I represent Millrock Investment Fund 1, LLC ("Millrock") in the above-captioned matter.

3.     I make this declaration based upon personal knowledge and on the contents of public records and business records known to me to be obtained and/or maintained by Parr Brown in the ordinary course of business, and which I believe to be true.

4.     Based on the March 5, 2023 settlement agreements (which are attached to the Appendix of Evidence in Support of Defendants Joshua Constantin and Stuart McMahen's Motion for Summary Judgment as Exhibits E and F) between Defendant Healthcare Solutions Management Group, Inc.'s ("HSMG") wholly owned subsidiary, Healthcare Solutions Holdings, Inc. ("HSG"), and each of Constantin and McMahen, and on other facts in the possession of Millrock, Millrock brought voidable transfer claims against Constantin and McMahen in this case.

5.     Beginning in late April or May 2023, Parr Brown began preparing a petition for involuntary bankruptcy against HSMG in the United States Bankruptcy Court for the District of Delaware.

6.     On September 15, 2023, Millrock and other petitioning creditors filed a petition for involuntary bankruptcy against HSMG in the United States Bankruptcy Court for the District of Delaware. *See* Involuntary Petition, a true and correct copy of which is attached hereto as Exhibit 1.

7.     On December 19, 2023, the United States Bankruptcy Court for the District of Delaware opened HSMG's involuntary bankruptcy case ("HSMG's Bankruptcy Case") by filing

an Order for Relief in an Involuntary Case, a true and correct copy of which is attached hereto as Exhibit 2.

8.      On March 15, 2024 (the same day on which Constantin and McMahen filed their Motion for Summary Judgment), this Court entered an Order staying all case deadlines in this case until May 15, 2024. *See* Order Granting Motion to Stay and Motion for Extension of Time (ECF 97).

9.      On June 20, 2024, this Court entered an order extending the stay in this case until July 31, 2024. *See* Memorandum Decision and Order Granting Motion to Extend Stay and other Deadlines (ECF 110).

10.     On June 20, 2024, the United States Bankruptcy Court for the District of Delaware entered an Order dismissing HSMG's Bankruptcy Case because HSMG had not complied with the Bankruptcy Court's order compelling HSMG to file its schedule of assets and liabilities, its statement of financial affairs and its creditor matrix. *See* Order Dismissing Case, a true and correct copy of which is attached hereto as Exhibit 3.

11.     On June 21, 2024, Millrock filed a notice with this Court of the dismissal of HSMG's Bankruptcy Case. *See* Notice of (1) Dismissal of HSMG's Bankruptcy Case; and (2) Millrock's Proposal to Meet and Confer Regarding Amended Case Deadlines and a Proposed Amended Scheduling Order (ECF 113).

12.     Due to HSMG's bankruptcy proceedings, Millrock's concerns about the automatic stay, the possibility that the Chapter 7 trustee in HSMG's bankruptcy proceedings might take over Millrock's claims against Constantin and McMahen, and the fact that this case was stayed on two occasions, Millrock has not yet had the opportunity to conduct any substantial discovery in this case.

13.    On July 25, 2024, Millrock served its First Set of Interrogatories, Requests for

Production of Documents, and Requests for Admission to Defendants Joshua Constantin and

Stuart McMahen (the "Discovery Requests").

14.    Constantin and McMahen's responses to the Discovery Requests are due on

August 26, 2024.

15.    On August 7, 2024, Millrock served notices of deposition of Justin Smith for

September 18, 2024; Stuart McMahen for September 24, 2024; and Joshua Constantin for

September 25, 2024.

16.    Based on communications with Millrock and the facts presently available, I

anticipate that additional discovery may uncover additional evidence of the transfers that

Millrock alleges HSMG (potentially through HSH) made to Constantin and McMahen.

17.    That evidence, however, is not currently available to Millrock, because it will

likely be found in documents that are in the exclusive control of HSMG, Constantin, McMahen,

Justin Smith, Jonathan Loutzenhiser and Emanuel Butera, and of HSMG, Constantin and

McMahen's banks and financial institutions, and of other third parties (e.g., bank records,

communications, financial statements, etc.).

18.    In addition to the fact discovery it is already in the process of conducting,

Millrock anticipates that it will need to serve subpoenas for documents and depositions on

Jonathan Loutzenhiser, Emanual Butera, HSMG, the banks and other financial institutions that

Constantin and/or his related entities have used, banks and other financial institutions that

McMahen and/or his related entities have used, Constantin's related entities, McMahen's related

entities, and potential other third parties.

19.     Through said discovery, Millrock anticipates that it will learn, among other things, (i) the identity of all business entities and trusts that McMahen and Constantin have an ownership interest in, have been employed as an officer/director/manager of, or in which they are a trustor/trustee/beneficiary; (ii) for those entities and trusts, the financial institutions at which banking, investment, brokerage, and similar accounts are or have been maintained, together with account numbers; and (iii) the corporate structure, including subsidiaries and affiliates, of HSMG and HSH.

20.     The information obtained through that discovery may help confirm that Constantin and McMahen received the transfers at issue, and where the money is currently located.

21.     Millrock needs to conduct the foregoing discovery to confirm that the relevant transactions occurred, in order to rebut the argument that the alleged transactions never took place.

22.     Through the research of one of the associates in my law firm, I became aware of a case from the United States District Court, Southern District of New York, *Securities and Exchange Commission v. Constantin, et al.*, Case No. 1:11-cv-04642-MHD (the "*SEC v. Constantin* Case"), in which the U.S. Securities and Exchange Commission (the "SEC") brought an action against Constantin alleging, among things, that Constantin had "misappropriated client funds" and "knowingly prepared false account statements to cover up [his] fraud . . . ." *See* SEC Memo Order, a true and correct copy of which is attached hereto as Exhibit 4, at 1-2.

23.     In the *SEC v. Constantin* Case, the court granted summary judgment against Constantin, and Constantin did not oppose the motion for summary judgment. *See* SEC Memo Order, at 2.

24.    The Court also stated the following in connection with granting summary judgment in the *SEC v. Constantin* Case:

a.   "The litany of misrepresentations that Solomon and Constantin made to their clients is striking." *Id*. at 39.

b.   "After several clients had invested funds with Windham for purposes of purchasing stock in Leeward, Constantin diverted those funds to his own purposes. He apparently diverted $643,000.00 of client funds to Constantin Resource, which he used to pay personal and business expenses…." *Id.* at 40.

c.   "In addition, both Solomon and Constantin provided clients with misleading documents to cover up the fraudulent nature of their investment scheme. In the case of Balaban, Solomon and Constantin prepared monthly account statements that misleadingly represented Leeward holdings that Balaban did not actually have. [quotation omitted.] The account statements also set forth fictitious account values, which misled Balaban concerning the true value of his investment through Windham. [quotation omitted]. Similarly, in the case of Mier, Constantin produced a fake promissory note in an effort to convince Mier that his investment in Leeward was secure when, in fact, it was not." *Id.* at 41.

d.   "Taken as a whole, defendants' efforts to lure clients to Windham through false promises about expected returns on investment and about Windham's professional experience; Constantin's misappropriation of client funds, which he diverted to Constantin Resource, DAC, and Windham; Solomon's and Constantin's efforts to mislead clients about their actual account holdings with, among other things, phony account statements; and their distribution of Leeward Group Holdings

stock to clients in random amounts not proportionate with clients' respective investments in Leeward, in an apparent effort to cover up defendants' misconduct, all suggest the existence of a wide-sweeping fraudulent investment scheme." *Id.* at 43.

e. "It is apparent from the record that Constantin and Solomon each acted knowingly and intentionally to mislead and defraud their clients." *Id.* at 45.

f. "As to Constantin's state of mind, we find that the circumstantial evidence strongly suggests that he acted intentionally to defraud Windham's clients. In particular, we note that he directed Solomon to send clients account statements that he knew did not reflect clients' true investment holdings, that he manufactured a fake promissory note to send to Mier, that he told Mier that Leeward's book value was more than seven times the value that he knew it to be, and that he diverted client funds to his own use; all of this lends support to the conclusion that Constantin acted knowingly." *Id.* at 47.

g. "In sum, we conclude that it is beyond triable dispute that [Constantin and the other named defendants] are primarily liable for securities fraud under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b–5." *Id.* at 48.

25.     Finally, in the Final Judgment in the *SEC v. Constantin* Case, the court enjoined Constantin from violating "Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 17 (a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)." *See* SEC Judgment, a true and correct copy of which is attached hereto as Exhibit 6, at 1–2.

I declare under penalty of perjury that the foregoing is true and correct.

DATED August 8, 2024.

/s/    Bentley J. Tolk
Bentley J. Tolk

**Exhibit 1 to Tolk Declaration "Involuntary Petition"**

| Fill in this information to identify the case: |
|---|
| United States Bankruptcy Court for the: |
| District of __Delaware__ |
| (State) |
| Case number (*if known*): _____ Chapter _7_ |

☐ Check if this is an
amended filing

## Official Form 205

# Involuntary Petition Against a Non-Individual                    12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

**1. Chapter of the
Bankruptcy Code**

*Check one:*

☒  Chapter 7
☐  Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

**2. Debtor's name**    __Healthcare Solutions Management Group, Inc.__

**3. Other names you know
the debtor has used in
the last 8 years**

Include any assumed
names, trade names, or
*doing business as* names.

**4. Debtor's federal
Employer Identification
Number (EIN)**

☐ Unknown

_3_ _8_ – _3_ _7_ _6_    _7_ _3_  _5_ _7_
EIN

**5. Debtor's address**

**Principal place of business**

__26 Reynolds Street__
Number        Street

__Springhill_____        __LA__    __71075__
City                State    ZIP Code

__Webster Parish__
County

**Mailing address, if different**

_____
Number        Street

_____
P.O. Box

_____
City                State    ZIP Code

**Location of principal assets, if different from
principal place of business**

_____
Number        Street

_____
City                State    ZIP Code

| Debtor | Healthcare Solutions Management Group, Inc. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**6.** **Debtor's website** (URL)   <u>N/A. Debtor apparently does not maintain a website at this time.</u>

**7.** **Type of debtor**
- ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other type of debtor. Specify: _____

**8.** **Type of debtor's business**

*Check one:*
- ☒ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☐ None of the types of business listed.
- ☐ Unknown type of business.

**9.** **To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

- ☒ No
- ☐ Yes. Debtor_____ Relationship _____

District_____ Date filed_____ Case number, if known_____
MM / DD / YYYY

Debtor_____ Relationship _____

District_____ Date filed_____ Case number, if known_____
MM / DD / YYYY

---

**Part 3:** **Report About the Case**

**10.** **Venue**

*Check one:*
- ☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11.** **Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*
- ☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.
- ☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12.** **Has there been a transfer of any claim against the debtor by or to any petitioner?**

- ☒ No
- ☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

| Debtor | Healthcare Solutions Management Group, Inc. | Case number (if known) |
|---|---|---|
| | Name | |

## 13. Each petitioner's claim

| | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | Millrock Investment Fund 1, LLC | *** | $888,914 |
| | William T. Carrigan | *** | $32,718.05 |
| | RWDI Maplewood, L.P. | *** | $369,423.18 |
| | All American Storage, LLC | *** | $34,672.81 |
| | 934 Hollywood, L.L.C. | *** | $30,331.24 |
| | Happiness LLC | *** | $376,197.41 |
| | ACM Columbia LLC | *** | $148,905.24 |
| | Crawford Family Trust | *** | $190,376.13 |
| | Mark Machlis | *** | $63,893.62 |

*** *See,* for nature of each petitioner's claim, concurrently filed Motion of Petitioning Creditors for Order Directing Appointment of Interim Trustee Under Section 303(g) of the Bankruptcy Code

Total of petitioners' claims          $2,135,431.68

**If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.**

## Part 4:   Request for Relief

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

| Debtor | Healthcare Solutions Management Group, Inc. | Case number (if known) |
|---|---|---|
| | Name | |

**Petitioners or Petitioners' Representative**

**Name and mailing address of petitioner**

Millrock Investment Fund 1, LLC
Name

1064 S. North County Blvd, Suite 350
Number Street

Pleasant Grove              Utah              84062
City                        State             ZIP Code

**Name and mailing address of petitioner's representative, if any**

Kevin G. Long
Name

1064 S. North County Blvd, Suite 350
Number Street

Pleasant Grove              Utah              84062
City                        State             ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    09 / 07 / 2023
               MM / DD / YYYY

**✖** /s/ Kevin G. Long, Manager
Signature of petitioner or representative, including representative's title

**Attorneys**

Christopher Viceconte
Printed name

Gibbons P.C.
Firm name, if any

300 Delaware Avenue, Suite 1015
Number Street

Wilmington              DE              19801-1671
City                    State           ZIP Code

Contact phone 302-518-6300        Email CViceconte@gibbonslaw.com

Bar number    5568

State         Delaware

**✖** /s/ Christopher Viceconte  (No. 5568)
Signature of attorney

Date signed    09 /15 / 2023
               MM / DD / YYYY

| Debtor | Healthcare Solutions Management Group, Inc. | Case number *(if known)* |
|---|---|---|
| | Name | |

**Name and mailing address of petitioner**

William T. Carrigan
Name

8091 S. Mountain Oaks Circle
Number Street

| Cottonwood Heights | Utah | 84121 |
|---|---|---|
| City | State | ZIP Code |

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number Street

| | | |
|---|---|---|
| City | State | ZIP Code |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    09 / 11 / 2023
MM / DD / YYYY

✖  /s/ William T. Carrigan
Signature of petitioner or representative, including representative's title

**Attorneys**

Christopher Viceconte
Printed name

Gibbons P.C.
Firm name, if any

300 Delaware Avenue, Suite 1015
Number Street

| Wilmington | DE | 19801-1671 |
|---|---|---|
| City | State | ZIP Code |

Contact phone  302-518-6300          Email  CViceconte@gibbonslaw.com

Bar number    5568

State          Delaware

✖  /s/ Christopher Viceconte  (No. 5568)
Signature of attorney

Date signed          09 / 15 / 2023
MM / DD / YYYY

**Name and mailing address of petitioner**

RWDI Maplewood, L.P.
Name

32932 Pacific Coast Hwy, 14-388
Number Street

| Dana Point | California | 92629 |
|---|---|---|
| City | State | ZIP Code |

**Name and mailing address of petitioner's representative, if any**

Scott McCarter
Name

32932 Pacific Coast Hwy, 14-388
Number Street

| Dana Point | California | 92629 |
|---|---|---|
| City | State | ZIP Code |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    09 / 11 / 2023
MM / DD / YYYY

✖  /s/ Scott McCarter, Manager of G.P.
Signature of petitioner or representative, including representative's title

**Attorneys**

Christopher Viceconte
Printed name

Gibbons P.C.
Firm name, if any

300 Delaware Avenue, Suite 1015
Number Street

| Wilmington | DE | 19801-1671 |
|---|---|---|
| City | State | ZIP Code |

Contact phone  302-518-6300          Email  CViceconte@gibbonslaw.com

Bar number    5568

State          Delaware

✖  /s/ Christopher Viceconte (No. 5568)
Signature of attorney

Date signed          09 / 15 / 2023
MM / DD / YYYY

Debtor  Healthcare Solutions Management Group, Inc.
_____Name_____

Case number (if known)_____

---

**Name and mailing address of petitioner**

All American Storage, LLC
Name

8091 S. Mountain Oaks Circle
Number Street

Cottonwood Heights      Utah      84121
City                    State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

William T. Carrigan
Name

8091 S. Mountain Oaks Circle
Number Street

Cottonwood Heights      Utah      84121
City                    State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  09 / 11 / 2023
             MM / DD / YYYY

✖  /s/ William T. Carrigan, Owner / Managing Member
Signature of petitioner or representative, including representative's title

---

**Attorneys**

Christopher Viceconte
Printed name

Gibbons P.C.
Firm name, if any

300 Delaware Avenue, Suite 1015
Number Street

Wilmington      DE      19801-1671
City            State   ZIP Code

Contact phone 302-518-6300      Email CViceconte@gibbonslaw.com

Bar number    5568

State         Delaware

✖  /s/ Christopher Viceconte  (No. 5568)
Signature of attorney

Date signed   09 / 15 / 2023
              MM / DD / YYYY

---

**Name and mailing address of petitioner**

934 Hollywood, L.L.C.
Name

7613 S. Prospector Drive
Number Street

Salt Lake City      Utah      84121
City                State     ZIP Code

**Name and mailing address of petitioner's representative, if any**

Mark Machlis
Name

7613 S. Prospector Drive
Number Street

Salt Lake City      Utah      84121
City                State     ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  09 / 08 / 2023
             MM / DD / YYYY

✖  /s/ Mark Machlis, Managing Member
Signature of petitioner or representative, including representative's title

---

**Attorneys**

Christopher Viceconte
Printed name

Gibbons P.C.
Firm name, if any

300 Delaware Avenue, Suite 1015
Number Street

Wilmington      DE      19801-1671
City            State   ZIP Code

Contact phone 302-518-6300      Email CViceconte@gibbonslaw.com

Bar number    5568

State         Delaware

✖  /s/ Christopher Viceconte (No. 5568)
Signature of attorney

Date signed   09 / 15 / 2023
              MM / DD / YYYY

---

Debtor    <u>Healthcare Solutions Management Group, Inc.</u>                  Case number *(if known)*_____
                Name

---

**Name and mailing address of petitioner**

<u>Happiness LLC</u>
Name

<u>3375 W. Mount Ellen Way, PC307</u>
Number Street

<u>Taylorsville</u>          <u>Utah</u>          <u>84129</u>
City                    State              ZIP Code

**Name and mailing address of petitioner's representative, if any**

<u>Gabor Koltai</u>
Name

<u>3375 W. Mount Ellen Way, PC307</u>
Number Street

<u>Taylorsville</u>          <u>Utah</u>          <u>84129</u>
City                    State              ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   <u>09 / 07 / 2023</u>
              MM / DD / YYYY

✖  <u>/s/ Gabor Koltai, Managing Owner</u>
Signature of petitioner or representative, including representative's title

**Attorneys**

<u>Christopher Viceconte</u>
Printed name

<u>Gibbons P.C.</u>
Firm name, if any

<u>300 Delaware Avenue, Suite 1015</u>
Number Street

<u>Wilmington</u>          <u>DE</u>          <u>19801-1671</u>
City                    State              ZIP Code

Contact phone <u>302-518-6300</u>        Email <u>CViceconte@gibbonslaw.com</u>

Bar number      <u>5568</u>

                Delaware
State           ‾‾‾‾‾‾‾‾‾‾‾‾‾

✖  <u>/s/ Christopher Viceconte (No. 5568)</u>
Signature of attorney

Date signed      <u>09 / 15 / 2023</u>
                 MM / DD / YYYY

---

**Name and mailing address of petitioner**

<u>ACM Columbia LLC</u>
Name

<u>c/o Crown Properties, 1650 Murfreesboro Rd., Ste. 224</u>
Number Street

<u>Franklin</u>          <u>TN</u>          <u>37067-5080</u>
City                    State              ZIP Code

**Name and mailing address of petitioner's representative, if any**

<u>Andrew Braine</u>
Name

<u>Crown Properties, 1650 Murfreesboro Rd., Ste. 224</u>
Number Street

<u>Franklin</u>          <u>TN</u>          <u>37067-5080</u>
City                    State              ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   <u>09 / 13 / 2023</u>
              MM / DD / YYYY

✖  <u>/s/ Andrew Braine, President</u>
Signature of petitioner or representative, including representative's title

**Attorneys**

<u>Christopher Viceconte</u>
Printed name

<u>Gibbons P.C.</u>
Firm name, if any

<u>300 Delaware Avenue, Suite 1015</u>
Number Street

<u>Wilmington</u>          <u>DE</u>          <u>19801-1671</u>
City                    State              ZIP Code

Contact phone <u>302-518-6300</u>        Email <u>CViceconte@gibbonslaw.com</u>

Bar number      <u>5568</u>

                Delaware
State           ‾‾‾‾‾‾‾‾‾‾‾‾‾

✖  <u>/s/ Christopher Viceconte (No. 5568)</u>
Signature of attorney

Date signed      09 / 15 / 2023

                 MM / DD / YYYY

---

Debtor    Healthcare Solutions Management Group, Inc.    Case number (if known) _____
_____
Name

---

**Name and mailing address of petitioner**

Crawford Family Trust
_____
Name

9291 Darrow Drive
_____
Number Street

Huntington Beach          CA          92646
_____
City                          State          ZIP Code

**Name and mailing address of petitioner's representative, if any**

J. Kirk Crawford
_____
Name

9291 Darrow Drive
_____
Number Street

Huntington Beach          CA          92646
_____
City                          State          ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   09 / 07 / 2023
              MM / DD / YYYY

✖ /s/ J. Kirk Crawford, Trustee
_____
Signature of petitioner or representative, including representative's title

**Attorneys**

Christopher Viceconte
_____
Printed name

Gibbons P.C.
_____
Firm name, if any

300 Delaware Avenue, Suite 1015
_____
Number Street

Wilmington          DE          19801-1671
_____
City                    State          ZIP Code

Contact phone 302-518-6300      Email CViceconte@gibbonslaw.com

Bar number    5568

State         Delaware

✖ /s/ Christopher Viceconte (No. 5568)
_____
Signature of attorney

Date signed      09 / 15 / 2023

                 MM / DD / YYYY

---

**Name and mailing address of petitioner**

Mark Machlis
_____
Name

7613 S. Prospector Drive
_____
Number Street

Salt Lake City          Utah          84121
_____
City                      State          ZIP Code

**Name and mailing address of petitioner's representative, if any**

N/A
_____
Name

N/A
_____
Number Street

N/A
_____
City                    State          ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   09 / 08 / 2023
              MM / DD / YYYY

✖ /s/ Mark Machlis
_____
Signature of petitioner or representative, including representative's title

**Attorneys**

Christopher Viceconte
_____
Printed name

Gibbons P.C.
_____
Firm name, if any

300 Delaware Avenue, Suite 1015
_____
Number Street

Wilmington          DE          19801-1671
_____
City                    State          ZIP Code

Contact phone 302-518-6300      Email CViceconte@gibbonslaw.com

Bar number    5568

State         Delaware

✖ /s/ Christopher Viceconte (No. 5568)
_____
Signature of attorney

Date signed      09 / 15 / 2023

                 MM / DD / YYYY

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Healthcare Solutions Management Group, Inc.,<br><br>Involuntary Chapter 7 Debtor. | Chapter 7<br><br>Case No. |

## <u>CORPORATE OWNERSHIP STATEMENT</u>

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor 934 Hollywood, L.L.C. ("934 Hollywood"), through its undersigned counsel, hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held corporation that owns 10% or more of 934 Hollywood's membership interests.

Dated this 15th day of September, 2023.

GIBBONS P.C.

*/s/ Christopher Viceconte*
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor ACM Columbia LLC ("ACM Columbia"), through its undersigned counsel, hereby discloses that (1) its parent corporation is Crown Properties, Incorporated; and (2) there is no publicly held corporation that owns 10% or more of ACM Columbia's membership interests.

Dated this 15th day of September, 2023.

GIBBONS P.C.

/s/ Christopher Viceconte
Christopher Viceconte
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor All American Storage, LLC ("All American"), through its undersigned counsel, hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held corporation that owns 10% or more of All American's membership interests.

Dated this 15th day of September, 2023.

GIBBONS P.C.

*/s/ Christopher Viceconte*
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

## <u>CORPORATE OWNERSHIP STATEMENT</u>

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor Crawford Family Trust ("Crawford"), through its undersigned counsel, hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held corporation that owns 10% or more of the ownership interests in Crawford.

Dated this 15th day of September, 2023.

GIBBONS P.C.

*/s/ Christopher Viceconte*
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

## <u>CORPORATE OWNERSHIP STATEMENT</u>

      Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor Happiness LLC ("Happiness"), through its undersigned counsel, hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held corporation that owns 10% or more of Happiness's membership interests.

      Dated this 15th day of September, 2023.

                 GIBBONS P.C.

                 */s/ Christopher Viceconte*
                 Christopher Viceconte (No. 5568)
                 300 Delaware Avenue, Suite 1015
                 Wilmington, Delaware 19801-1671
                 (302) 518-6322
                 cviceconte@gibbonslaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

### <u>CORPORATE OWNERSHIP STATEMENT</u>

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure, Petitioning Creditor Millrock Investment Fund 1, LLC ("Millrock"), through its undersigned counsel, hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held corporation that owns 10% or more of Millrock's membership interests.

Dated this 15th day of September, 2023.

GIBBONS P.C.

*/s/ Christopher Viceconte*
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Healthcare Solutions Management Group, Inc., | Case No. |
| Involuntary Chapter 7 Debtor. | |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1010(b) and 7007.1 of the Federal Rules of Bankruptcy Procedure,

Petitioning Creditor RWDI Maplewood, L.P. ("Maplewood"), through its undersigned counsel,

hereby discloses that (1) it does not have a parent corporation: and (2) there is no publicly held

corporation that owns 10% or more of Maplewood's interests.

Dated this 15th day of September, 2023.

GIBBONS P.C.

/s/ Christopher Viceconte
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801-1671
(302) 518-6322
cviceconte@gibbonslaw.com

**Exhibit 2 to Tolk Declaration "Order for Relief in Involuntary Case"**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HEALTHCARE SOLUTIONS<br>MANAGEMENT GROUP, INC.,<br><br>        Involuntary Chapter 7 Debtor. | Chapter 7<br><br>Case No. 23-11458-JTD<br><br>**Re: D.I. 1** |

Involuntary Debtor's Last Known Address: 26 Reynolds Street, Springhill, Louisiana 71075

Involuntary Debtor's Tax-Identification (EIN) Number: 38-3767357

## <u>ORDER FOR RELIEF IN AN INVOLUNTARY CASE</u>

On consideration of the petition filed on September 15, 2023, against the above-named involuntary debtor [D.I. 1], an order for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "<u>Bankruptcy Code</u>") be and hereby is **GRANTED**.

**Dated: December 19th, 2023**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

**Exhibit 3 to Tolk Declaration "Order Dismissing Case"**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| HEALTHCARE SOLUTIONS | ) | Case No. 23-11458 (JTD) |
| MANAGEMENT GROUP, INC., | ) | |
| | ) | |
| Debtor. | ) | **Re:  D.I. 34** |

## ORDER DISMISSING CASE

The Court entered an Order on June 3, 2024 (D.I. 34), compelling the Debtor to file its Schedules of Assets and Liabilities, Statement of Financial Affairs and Creditor Matrix within fourteen days.  As of this date, Debtor has not complied with the terms of the Court's order.

IT IS THEREFORE ORDERED the case is DISMISSED.

Dated:  June 20, 2024

_____

JOHN T. DORSEY, U.S.B.J.

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0311−1 | User: admin | Date Created: 6/20/2024 |
| Case: 23−11458−JTD | Form ID: pdfodc | Total: 28 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | U.S. Trustee | USTPRegion03.WL.ECF@USDOJ.GOV |
| tr | David W. Carickhoff | carickhoff@chipmanbrown.com |
| aty | Bentley Tolk | btolk@parrbrown.com |
| aty | Christopher Vicecorte | cviceconte@gibbonslaw.com |
| aty | Dale E. Barney | dbarney@gibbonslaw.com |
| aty | David W. Carickhoff | carickhoff@chipmanbrown.com |
| aty | Katharina Earle | kearle@gibbonslaw.com |

TOTAL: 7

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | |
|---|---|
| db | Healthcare Solutions Management Group, Inc.    26 Reynolds Street    Springhill, LA 71075 |
| cr | Millrock Investment Fund 1, LLC    1064 S. North County Blvd.    Suite 350    Pleasant Grove, UT 84062 |
| cr | William T. Carrigan    8091 S. Mountain Oaks Circle    Cottonwood Heights, UT 84121 |
| cr | RWDI Maplewood L.P.    32932 Pacific Coast Hwy, 14−388    Dana Point, CA 92629 |
| cr | All American Storage, LLC    8091 S. Mountain Oaks Circle    Cottonwood Heights, UT 84121 |
| cr | 934 Hollywood, L.L.C.    7613 S. Prospector Drive    Salt Lake City, UT 84121 |
| cr | Happiness LLC    3375 W. Mount Ellen Way, PC307    Taylorsville, UT 84129 |
| cr | ACM Columbia LLC    c/o Crown Properties    1650 Murfreesboro Rd    Ste 224    Franklin, TN 37067−5080 |
| cr | Crawford Family Trust    9291 Darrow Drive    Huntington Beach, CA 92646 |
| cr | Mark Machlis    7613 S. Prospector Drive    Salt Lake City, UT 84121 |
| aty | Rick Rose    Parr Brown Gee & Loveless    101 South 200 East    Suite 700    Salt Lake City, UT 84111 |
| aty | Rick Rose    Parr Brown Gee & Loveless    101 South 200 East    Suite 700    Salt Lake City, UT 84111 UNITED STATES |
| aty | Terry E. Welch    Parr Brown Gee & Loveless    101 South 200 East    Suite 700    Salt Lake City, UT 84111 UNITED STATES |
| 18950978 | ACM Columbia LLC    1650 Murfreesboro Road    Suite 224    Franklin, TN 37067 |
| 18823862 | CAMS Realty, LLC, et al. (see attached judgment)    Mary Street / CAMS Realty    2015 W. Grove Pkwy, Suite J    Pleasant Grove, UT 84062 |
| 18823861 | Charles T. Coleman    Wright, Lindsey & Jennings    200 W. Capitol, Suite 2300    Little Rock, AR 72201 |
| 18971317 | Hilda Arline Devlin, et. al.    8680 Quail Ridge Drive    Nampa, ID 83686 |
| 18971098 | Millrock Investment Fund 1, LLC    Dale E.. Barney    Gibbons PC    One Gateway Center    Newark, NJ 07102−5310 |
| 18971094 | Nancy Mulick, personal representative, et. al.    91645 Overseas Highway    Tavernier, FL 33070 |
| 18950977 | R. Mark Donnell, Jr.    1650 Murfreesboro Road    Suite 224    Franklin, TN 37067 |
| 18976424 | Secure Self Storage,LLC by Jose & Teena Rementeria    543 Pierce Road    Medford, OR 97504 |

TOTAL: 21

**Exhibit 4 to Tolk Declaration "SEC Memo Order"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,                          :

         Plaintiff,        :    **MEMORANDUM & ORDER**

      -against-                :    **11 Cv. 4642 (MHD)**

JOSHUA CONSTANTIN et al.,             :

      Defendants.              :
--------------------------------x

**MICHAEL H. DOLINGER, U.S.M.J.:**

4/2/13


    The Securities and Exchange Commission ("SEC") brought this
civil enforcement action against defendants Joshua Constantin,
Brian Solomon, and Windham Securities, Inc.,[1] alleging that the
defendant broker-dealers misled clients about their professional
experience and qualifications, misappropriated client funds, and
knowingly prepared false account statements to cover up their
fraud, all in violation of § 17(a) of the Securities Act of 1933
("Securities Act"), 15 U.S.C. § 77q(a), and § 10(b) the
Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §
78j(b). For relief, plaintiff seeks a permanent injunction
proscribing defendants' future violation of the federal

---

[1] The SEC has also named as relief defendants two corporations,
Constantin Resource Group, Inc. ("Constantin Resource") and
Domestic Applications Corp. ("DAC"). It alleges that each
received assets derived from defendants' securities fraud.
(Compl.).

securities laws, imposition of maximum civil penalties, and an order directing defendants and relief defendants to disgorge all ill-gotten gains from defendants' misconduct. (See Pl.'s Mem. 65).

Following expiration of the discovery period, the SEC has moved for summary judgment. Defendants have not opposed.

### THE FACTUAL RECORD

In summarizing the record on plaintiff's motion, we rely on those facts stated in the SEC's Rule 56.1 statement insofar as they are supported by some proffered evidence. To the extent that the SEC has providing competent evidence, those facts are deemed not to be in dispute, since defendants have offered no contradiction.

In late 2005, Constantin Resource Group, Inc., a company wholly-owned and controlled by Joshua Constantin ("Constantin") (see Kamar Decl. Ex. 1 at 21), acquired Windham Securities, Inc. ("Windham"), a small, SEC-registered broker-dealer based in Long Island, New York. (Pl.'s Rule 56.1 Statement ¶¶ 5, 22, 46; Kamar Decl. Ex. 1 at 26, Ex. 3 at 14-15, Ex. 14 at 6).

2

Windham is an introducing broker whose trades and client accounts were managed by two clearing brokers, Penson Clearing Services and, for a period during 2008, LEK Securities Inc. (Pl.'s Rule 56.1 Statement ¶¶ 65-66, 69; Kamar Decl. Ex. 14 at 6). As a "nickel broker-dealer,"[2] Windham is not permitted to carry accounts, or to receive or hold funds or securities for its customers. See 17 C.F.R. § 240.15c3-1(a)(1), (a)(2)(iv); Fin. Indus. Regulatory Auth., SEA Rule 15c3-1(a)(2)(iv) (2008); (see also Pl.'s Rule 56.1 Statement ¶¶ 62-64).

From 2005 through 2009, Constantin served as Windham's chief executive officer ("CEO"), managing director, and registered representative. (Pl.'s Rule 56.1 Statement ¶ 6). Brian Solomon joined Windham in November 2006, as the "fixed income director," and in July 2007 became a registered representative of the company. (Kamar Decl. Ex. 4 at 57-58; Pl.'s Rule 56.1 Statement ¶ 33). Between July 2007 and approximately January 2009, Windham's staff was essentially

---

[2] A "nickel broker-dealer" is required to maintain a minimum net capital of $5,000.00, and a ratio of aggregate-indebtedness-to-net-capital of no more than fifteen-to-one. Fin. Indus. Regulatory Auth., SEA Rule 15c3-1(a)(2)(iv) (2008); (see Kamar Decl. Ex. 14 at 8).

comprised of Constantin and Solomon, plus an outside compliance
officer.[3] (Kamar Decl. Ex. 1 at 27, Ex. 2 at 27).

   Constantin oversaw general office operations, wrote all of
Windham's agreements, and managed all of the company's business
through its associated clearing firms. (Id. at Ex. 4 pp. 137-
38). He also was responsible for supervising Solomon, and
overseeing and approving all of the transactions and accounts
for Solomon's clients. (Pl.'s Rule 56.1 Statement ¶ 40; Kamar
Decl. Ex. 4 at 133, 137). Solomon's job responsibilities
included "bring[ing] clients to Windham, open[ing] accounts,
do[ing] trades and transactions… mostly trying to raise money
and find the specific type of investments for clients." (Kamar
Decl. Ex. 4 at 90). Solomon targeted clients who were
"individual investors… of a high net worth." (Id.). His job
title at the small company apparently was not fixed and varied
as needed, depending on his interactions with clients. (See id.
at Ex. 2 pp. 27, 177 (Solomon testified "I was whatever I needed
to be in order to complete the task at hand.")).

   The image of Windham that Constantin and Solomon promoted
to their clients was very different from the true nature of the

---

   [3] For a period in 2008, Windham also had a trading
representative, based in Florida. (Kamar Decl. Ex. 2 at 81, Ex.
4 at 183).

company. In practice, Constantin worked out of a small office in
Long Island, New York,[4] while Solomon worked primarily out of his
home in Santa Monica, California, and occasionally from a
temporary office space in Los Angeles. (Pl.'s Rule 56.1
Statement ¶¶ 46-47, 52; Kamar Decl. Ex. 4 at 100, 104, 107, 119-
20). During the period from approximately 2008 to May 2010,
Windham managed accounts for a client base of approximately
eight individuals. (See Kamar Decl. Ex. 1 at 182). However,
Windham promoted itself as a large, international company. The
company's letterhead, website, marketing materials, and business
cards listed offices on Park Avenue in Manhattan, Santa Monica
Boulevard in Los Angeles, and the Champs-Elysées in Paris, in
addition to the office in Long Island, New York. (Pl.'s Rule
56.1 Statement at ¶ 57; Kamar Decl. Exs. 15, 25, 29). The first
three of these offices were actually "virtual" office spaces,
which Windham had contracted to use for the receipt of mail and
as occasional meeting spaces, and which were temporary spaces,
shared with other corporate entities. (Pl.'s Rule 56.1 Statement
¶¶ 57-59; Kamar Decl. Ex. 9 at 112-18). While Constantin and
Solomon made occasional use of the Manhattan and Los Angeles
offices, neither office served as a center for Windham's

---

[4] The record suggests that Windham changed the location of
its main office several times; however, Constantin apparently
conducted business primarily from Long Island or from Manhattan.
(See, e.g., Kamar Decl. Ex. 9 at 111-116).

operations, and no one from Windham had ever conducted any business out of the purported office in Paris. (Kamar Decl. Ex. 9 at 114, 116). In addition, between late 2007 and mid-2008, Windham began operating a website with the French domain name "www.windham.fr," and Constantin and Solomon began sending emails from accounts ending in "@windham.fr." (Pl.'s Rule 56.1 Statement ¶¶ 58, 60).

On numerous occasions, Solomon lied to clients about his involvement in foreign markets, indicating, for example, that he was leaving on a business trip to Hong Kong (Kamar Decl. Ex. 46), and that he "often work[ed] the European open" (id. at Ex. 70), when in fact neither was true. (Id. at Ex. 2 p. 74, Ex. 4 p. 153; see also id. at Ex. 6 p. 17 (client testified that Solomon had boasted that his experience "went back to his workings in Europe, where he had done [investment deals] before.")).

Although Constantin and Solomon had both dropped out of college and neither had received degrees (Pl.'s Rule 56.1 Statement ¶¶ 1, 2, 13; Kamar Decl. Ex. 6 at 13, Ex. 18 at 6, Ex. 19), they each suggested to their clients and potential investors that they had graduated with degrees from well-respected schools. (Kamar Decl. Ex. 4 at 190-91 (discussing

6

Solomon's attendance at Dartmouth College), Ex. 15 (claiming Constantin "has an undergraduate degree in Economics from Fordham University where he also did his graduate work")).

Solomon frequently misrepresented Windham's investment experience and prior performance to potential investors. For example, he advised one client that he had previously worked with small companies and had "brought them to market." (Id. at Ex. 6 p. 17). He wrote to another client,

> As an example of our track record, please review the following IPO's that over the past year we have participated in the syndicates… Looking at these shows you that what we do is tangible (tangible = transactions with results you can verify).

(Id. at Ex. 70). Solomon then proceeded in the same email to list six company stocks in a chart comparing the companies' stock prices at the time of public offering and as of the date of Solomon's email. (Id.). In fact, no one at Wyndham had participated in any of those syndicates or, for that matter, had ever successfully taken a private company public. (See id. at Ex. 1 pp. 190, 192, 195, Ex. 4 p. 24). Solomon also told clients that Windham had "a floor of traders in New York" (id. at Ex. 7 p. 234), when, in fact, at the time the company did not. (Pl.'s Rule 56.1 Statement ¶¶ 221-22).

7

Constantin and Solomon promised, and otherwise encouraged clients to believe, that they could expect unreasonably large and rapid returns on their investments through Windham. (Compare Kamar Decl. Ex. 34 (Solomon suggests to client that Windham could deliver a 400% to 500% return on investment) and Ex. 35 (Solomon writes to a potential client "Investments do not wait, and we need to meet certain deadline [sic] to maintain our 500% [return] goal… If we do not hear any response from you by Tuesday, we will withdraw, close your account and be unavailable to you in the future.") with id. at Ex. 5 pp. 526, 532 (Solomon testifies "You know, I can't say that Windham had 500 percent historical returns."); see also id. at Ex. 72 (Solomon encourages client to expect a "fast profitable return."). Constantin reinforced Solomon's rosy projections, advising clients that they would be able to liquidate their investments many months before they actually ended up being able to do so (see, e.g., id. at Exs. 79, 80, 82), and promising very high returns. (See id. at Ex. 84 ("I expect the results of this transaction when completed to be nothing short of stellar and even taking into account the extra time the internal rate of return on this investment should be off the charts")). In one case, Constantin cited to a client, as a company's purported book value, a figure that was more than seven times the actual book value that he knew the company to have. (Compare id. at Ex.

8

84 p. 90 (Constantin quotes book value of "$22-$33 million") with Ex. 85 p. 1 (actual book value listed as "$3-$4.5 million")).

The SEC's complaint and motion papers highlight the stories of two Windham clients, Dr. Charles Balaban and Mr. Edward Mier-Jedrzejowicz ("Mier"), as exemplars of Windham's fraudulent investment scheme. Defendants apparently defrauded at least five additional Windham clients between 2008 and 2009. (See Pl.'s Rule 56.1 Statement ¶¶ 306-19).

**Dr. Balaban**

Dr. Charles Balaban was referred to Solomon as a potential client in May 2008. (Id. at ¶ 72). At the time, Balaban, a Canadian citizen and resident, was looking to invest $1 million of the proceeds he had received from the sale of his dental practice (id. at ¶¶ 74, 101) and informed Solomon that he was looking for an investment that would yield liquid profits in approximately one year. (Id. at ¶ 80). Solomon advised Balaban that he could earn a 200 percent annual return at Windham. (Id. at ¶ 83). Solomon also told Balaban that he had prior experience working with discounted securities (id. at ¶ 86), though Solomon later testified at his deposition that he had only ever managed

9

to purchase discounted debt securities and had never actually
succeeded in reselling them for a return on his investment.
(Kamar Decl. Ex. 4 at 188-89).

On May 21, 2008, Solomon attempted to open an account for
Balaban with Penson Clearing Services, but was told that Penson
did "not allow accounts to have Canadian mailing addresses."
(Id. at Ex. 39 p. 2; Pl.'s Rule 56.1 Statement ¶ 98). Solomon
emailed Penson a new application package, indicating that
Balaban held additional property in the United States and that
his account statements should, accordingly, be sent to an
address in Santa Monica, California. (Pl.'s Rule 56.1 Statement
¶ 99; Kamar Decl. Ex. 39). That address, which Solomon had
suggested to Penson belonged to Balaban, in fact belonged to
Solomon. (Pl.'s Rule 56.1 Statement ¶ 100).

Balaban deposited $1 million into his new Penson account on
June 5, 2008. (Id. at ¶ 101). Soon thereafter, Constantin
transferred $100,000.00 out of the account -- $50,000.00 of
which he transferred to Solomon and another $50,000.00 of which
he transferred to Constantin Resource -- as Windham's purported
ten-percent advisory fee. (Id. at ¶¶ 102-103). Balaban later
testified that he had not considered the ten-percent fee to be

10

reasonable and, in any event, "it hadn't been discussed originally." (Kamar Decl. Ex. 6 at 31).

Constantin invested some of Balaban's remaining funds in the purchase of 200,000 shares of common stock in a company called Omega World. (Id. at Ex. 6 p. 40). As of about June 27, 2008, Balaban's Penson account reflected a cash balance of approximately $670,000.00, plus the 200,000 shares in Omega World. (Id.).[5]

Solomon next advised Balaban of a potential investment opportunity in Leeward, a private insurance company that Windham was purportedly helping to take public through a reverse merger process.[6] (Pl.'s Rule 56.1 Statement ¶¶ 108-110). On July 7,

_____

[5] It is unclear exactly how much of Balaban's funds Windham invested in the purchase of Omega World stock. While there is some indication that the 200,000 shares were valued at $1.50 per share and were purchased for a total of $300,000 (see, e.g., Kamar Decl. Ex 6 at 40, Ex. 47), there is other evidence suggesting that the stocks were acquired at less than market value for $1.00 per share. (See id. at Ex. 4 pp. 200-01). If the shares were purchased for $1.00 per share, for a total of $200,000, this would leave approximately $30,000 of Balaban's $1 million investment unaccounted for, after taking into account the cash balance as of June 2008 and the Windham fee. If, however, the shares had been purchased at $1.50 per share, for a total of $300,000, there would be an excess of $70,000 in value over and above Balaban's initial $1 million investment that would seem to have appeared out of nowhere.

[6] There is some ambiguity as to what Solomon initially told Balaban about the Leeward deal. (Compare Kamar Decl. Ex. 4 at 216-17 (Solomon claims he gave Balaban only an "elevator pitch"

11

2008, Constantin transferred $600,000.00 from Balaban's Penson account into an escrow account that Windham had established for the Leeward deal. (Pl.'s Rule 56.1 Statement ¶¶ 119, 121, 125).[7] The next day, Constantin wired $150,000.00 out of the Leeward escrow account to Constantin Resource.[8] (Id. at ¶ 122). He wired another $250,000.00 from the escrow account to Leeward, purportedly for the purchase of Leeward stock in the name of DAC. (Id.). On July 17, 2008, Constantin transferred another $175,000.00 from the Leeward escrow account to Constantin Resource. (Id. at ¶ 124). Then, on July 22, 2008, Constantin transferred another $60,000.00 from Balaban's Penson account to the Leeward escrow account, from which he then transferred $84,000.00 to Constantin Resource on July 24, 2008. (Id. at ¶¶ 126-27). On October 30, 2008, Constantin transferred the balance of Balaban's funds from his Penson account -- $9,715.78 -- straight into Windham's checking account. (Id. at ¶ 129). In return for each of these transfers of funds, Balaban apparently

---

and advised him to speak further with Constantin) with Ex. 6 at 62, 81 (Balaban claims that he was never told about Leeward before his money was invested in the company, and that he never spoke to Constantin before 2009)).

[7] As noted, there is some indication that Balaban's funds were invested in Leeward without his prior approval. (Kamar Decl. Ex. 6 at 48).

[8] Constantin testified that he controlled the Leeward escrow account together with an attorney, Jesse Erwin, Esq. (Kamar Decl. Ex. 1 at 17-18, 35).

received no stock and no other form of material benefit from any of the recipients of his funds.

Penson mailed Balaban's account statements to the designated address in Santa Monica, California, which, as noted, belonged to Solomon. (Id. at ¶ 130). Solomon reviewed Balaban's Penson account statements but did not forward them to Balaban or notify Balaban of their contents, including the fact that, by July 2008, Balaban's Penson account had a cash balance of less than $10,000.00 and reflected no securities holdings or purchases. (See id. at ¶¶ 131-34).

On August 11, 2008, Constantin emailed Solomon an account statement showing 200,000 shares of Omega World stock held by LEK Securities, Inc. in Balaban's name. Solomon forwarded that account statement to Balaban (id. at ¶ 136) and indicated, "You have a second position now Leeward (the NY insurance company.) That stock is not showing in this account yet. As was the case with Omega World, it takes some time for the new stock to settle in the account." (Id. at ¶ 137).

In late August 2008, Balaban notified Solomon that he had not been receiving monthly account statements. (Id. at ¶ 139). Although Balaban completed a form titled "Consent to Electronic

13

Delivery of Documents" that Solomon had provided to him, and although Solomon regularly accessed and reviewed Balaban's accounts online, Balaban was never given online access to his Penson or LEK account statements. In addition, Solomon did not forward any of Balaban's paper Penson account statements to Balaban at his Canadian address. (See id. at ¶¶ 141-143).

Instead, at Constantin's direction, Solomon created an account statement for Balaban under Windham's logo.[9] The August 2008 Windham statement reflected a purported total account value of $1,019,740.00, including the following holdings, listed as "equities": 200,000 shares of Omega World stock and a $660,000.00 "Pre-IPO Promissory Note" in Leeward Corp. (Id. at ¶¶ 151, 162). Solomon and Constantin prepared a similar account statement for Balaban for September 2008, reflecting a purported total value of $1,039,740.00, an increase of exactly $20,000.00 from the previous month's statement. (Id. at ¶ 153). Despite their representation to Balaban that his account held Leeward securities, Constantin and Solomon knew that Balaban's Penson and LEK accounts did not reflect any Leeward holdings. (See id. at ¶ 160; Kamar Decl. Ex. 4 at 272, 275). Nonetheless, Solomon

---

[9] As the Chief Operating Officer of Penson later testified, the issuance of account statements by an introducing broker, such as Windham, that did not hold client accounts "would raise some flags about the credibility of the statements." (Kamar Decl. Ex. 11 at 19).

advised Balaban in writing that he held "660,000 shares of Leeward." (Pl.'s Rule 56.1 Statement ¶ 162; Kamar Decl. Ex. 4 at 272-73). In addition, the total asset values set forth in the Windham account statements bore no relation to the true asset values of Balaban's Penson account. (See Kamar Decl. Ex. 4 at 267).

In late 2008, Balaban began expressing to Solomon his desire to begin cashing out his investments, but Solomon advised him that the Leeward transaction was "still in progress" and encouraged Balaban to remain patient. (See id. at 288-90). Balaban indicated that around September 2008, he began to have concerns about his investment with Windham, in part because he was unable to get in touch with Solomon, despite repeated attempts to do so. (Id. at Ex. 6 pp. 70-74, 81-82). On January 16, 2009, Balaban wrote to Solomon in an email, "Is there a reason I can't get a hold of you? I want my money now and not just $335,000 but the 2M. that was originally promised." (Pl.'s Rule 56.1 Statement ¶ 191). On January 26, 2009, Solomon wrote to Balaban indicating that he had resigned from Windham on January 12 and that Balaban's account would henceforth be handled by Constantin. (Id. at ¶¶ 193-94).

15

Balaban first spoke with Constantin on February 16, 2009. (Id. at ¶ 195). Over a series of subsequent conversations, Constantin advised Balaban that he was working to increase the value of Balaban's Leeward investment, which Constantin assured him could be expected to double in value. (Id. at ¶¶ 196-97). Constantin never told Balaban that his funds had been transferred to Constantin Resource and DAC, or that Balaban did not actually have any direct holdings in Leeward. (Id. at ¶ 198; Kamar Decl. Ex. 6 at 91). As of March 23, 2012, Balaban still had not recouped any of his investment in Windham. (Kamar Decl. Ex. 6 at 216).

**Mr. Mier**

Mr. Edward Mier first spoke with Solomon on June 2, 2008 about the possibility of making a short-term investment through Windham, to be completed by no later than the end of December 2008. (Id. at ¶¶ 201-02; Kamar Decl. Ex. 7 at 25-26). Solomon advised Mier that Windham had some investment opportunities available that could meet his needs, including an investment in Leeward, which Solomon indicated to Mier was a non-public company that would become public through a reverse merger. (Id. at ¶ 203). In their early discussions, Solomon also told Mier that, based on Windham's past performance, he could expect at

16

least a 30 percent return on his investment within one year. (Id. at ¶ 204). Solomon subsequently encouraged Mier to consider investing in the Leeward insurance company, advising him that "in less than twelve months he would get his money back plus a 60 to 80 percent return." (Id. at ¶¶ 239-41).

Mier later remarked that he had been particularly impressed by Windham's apparent ties to Europe, which he had presumed to be significant, in light of Windham's internet presence based in France, as well as Solomon's repeated references to his involvement in the European markets. (See id. at ¶¶ 205-13). Mier also inferred from Solomon's reference to Windham's "investment banking division" and "trading floor" -- neither of which actually existed -- that Windham was a large company. (See Kamar Decl. Ex. 7 at 47, 234, 335-36). Solomon also advised Mier that Windham had been involved in taking at least six private companies public over the preceding year, a representation which, as noted above, was entirely false. (Pl.'s Rule 56.1 Statement ¶¶ 214, 223-24; see supra, at 6).

On September 2, 2008, Mier wired a $250,000.00 initial investment with Windham into his Penson account. (Pl.'s Rule 56.1 Statement ¶ 230). The next day, Constantin transferred $25,000.00 from Mier's account to Windham's checking account,

17

representing Windham's ten-percent fee, of which half was then transferred to Solomon as his commission on the deal. (Id. at ¶¶ 232-33). Like Balaban, Mier reports that he had not been advised of Windham's ten-percent fee. (Kamar Decl. Ex. 7 at 68).

On September 5, 2008, Constantin transferred $224,926.94 from Mier's Penson account to the Leeward escrow account. (Pl.'s Rule 56.1 Statement ¶ 248). Later that day, Constantin received an email from an analyst at Penson asking him "the reasoning behind wiring in fund[s] early this week only to wire them back out," to which Constantin replied that Mier was "buying securities direct from the company, and they will be delivering back stock." (Id. at ¶¶ 250-251). On September 8, 2008, Constantin used $200,000.00 from the Leeward escrow account to purchase Leeward shares in the name of DAC. (Id. at ¶¶ 252-53).

On September 17, 2008, Mier deposited an additional $100,000.00 into his Penson account. (Id. at ¶ 236). Constantin transferred ten percent of this amount to Windham's checking account, again as Windham's ten-percent fee. (Id. at ¶ 237). In this case, Constantin paid Solomon his five percent commission via a payment from Constantin Resource. (Id. at ¶¶ 234, 238). On September 25, 2008, Constantin transferred $89,925.00 from Mier's Penson account to the Leeward escrow account (id. at ¶

18

254), and four days later transferred $160,000.00 --
constituting 94 percent of the funds in the Leeward escrow
account -- from the escrow account to Constantin Resource. (Id.
at ¶ 255). Although no Leeward stock had been purchased in
Mier's name, Solomon represented to Mier that he was invested in
Leeward. (Id. at ¶ 256).

&bull;

On December 3, 2008, Mier met Constantin and Solomon for
lunch to discuss his account. (Id. at ¶ 264). At the lunch
meeting, Mier reiterated that he had intended for his investment
to be short-term and expressed a desire to liquidate at least
$70,000.00 to $100,000.00 of his Leeward holdings. (Id. at ¶¶
270, 272). According to Mier, Constantin and Solomon "clearly
suggest[ed] that there was an opportunity to get 70 to 100 back
as soon as possible" (Id. at ¶ 275), and Constantin allegedly
told Mier that he would provide Mier with an additional 10,000
shares of Leeward to make up for the fact that the Leeward deal
was apparently taking longer than had originally been
anticipated. (See id. at ¶¶ 271, 276). Nonetheless, Mier
apparently never received the $70,000.00 or the 10,000
additional Leeward shares that Constantin and Solomon had
promised to him on December 3, 2008. (Id. at ¶ 280; Kamar Decl.
Ex. 7 at 102-03). Mier notes that at his lunch meeting with
Constantin and Solomon, Constantin also indicated that he had

19

invested multiple millions of his own funds into the Leeward deal (see Kamar Decl. Ex. 7 at 85), which was not in fact the case. (See id. at Ex. 50).

Following Solomon's departure from Windham in January 2009, Mier began corresponding directly with Constantin about his account. (See Pl.'s Rule 56.1 Statement ¶¶ 281-283). In an email dated January 28, 2009 Mier noted, "[Solomon] sold me on an investment in Sept/Oct with over 30% gain by end Nov and ability to liquidate at that time." (Kamar Decl. Ex. 79 (all-caps omitted)). Constantin reassured him that he was "confident that [Leeward] is doing well and on track for a 30-60 day IPO." (Pl.'s Rule 56.1 Statement ¶ 284). Approximately seven months later, in August 2009, Mier contacted Penson to find out the status of his account and was told it "is closed and has a zero balance." (Id. at ¶¶ 285-87).

In January 2010, Constantin wrote to Mier in an effort to reassure him about the Leeward deal. Constantin provided Mier with significantly inflated numbers for the deal's expected returns, advising Mier that the book value for Leeward was in the range of $22 million to $33 million (Kamar Decl. Ex. 84 at 90), when the true numbers that Constantin had received from Leeward actually reflected a book value of $3 million to $4.5

20

million. (Id. at Ex. 84 at 85). Mier responded to Constantin's
email, requesting documentary proof of his investment in Leeward
(Pl.'s Rule 56.1 Statement ¶ 295), a request that he reiterated
two days later in a phone call with Constantin. (Id. at ¶ 296).


On February 23, 2010, Constantin emailed Mier a document
prepared to look like a Leeward promissory note. (Id. at ¶ 299).
In fact, as Kevin Coughlin, the president of Leeward, later
testified in his deposition, Leeward had never issued such a
document. (Kamar Decl. Ex. 3 at 39). The purported note listed
Solomon as Leeward's Loan Administrator, but as Coughlin
explained, Solomon had never worked for Leeward (id. at 44-48),
and as Solomon testified, the signature on the note did not
match his own (id. at Ex. 5 p. 501), an assertion that is
plainly supported by a visual comparison of the signature on the
note with Solomon's true signature on various other documents.
(Compare id. at Ex. 84 p. 29 with id. at Exs. 25, 88, 89).
Moreover, the address listed on the note as Leeward's address
was not, in fact, Leeward's address, but rather Constantin's
business address. (Pl.'s Rule 56.1 Statement ¶ 303).

21

**Other Investors**

Besides Balaban and Mier, five other individuals invested
funds with Windham for purposes of buying shares of Leeward.

On August 18, 2008, Solomon and Constantin directed LEK to
transfer $55,076.34 from Mr. William Goldstein's account to the
Leeward escrow account. (Kamar Decl. Ex. 90). The following day,
Constantin transferred $55,000.00 from the escrow account to
Constantin Resource. (Id. at Ex. 91).

Mr. Louis Esposito invested $50,000.00 on September 11,
2008 (id. at Ex. 50 p. 11), and Mr. Vincenzo Moreno invested
$25,000.00 on September 16, 2008. (Id. at Ex. 50 p. 11). These
funds were apparently all diverted to Constantin Resource that
same month. (Id. at Ex. 50 p. 12). Mr. Piedad Zurita's March 18,
2009 investment was apparently transferred directly to
Constantin's personal Citibank account the following day. (Id.
at Ex. 50 p. 26).

In early 2009, Mr. James Thomas transferred a total of
$20,000.00 into the Leeward escrow account, by way of two
separate wire transfers. (Id. at Ex. 50 pp. 20, 23, Ex. 92, Ex.
93 p. 2). The day after each of Thomas's payments was wired into

22

the escrow account, Constantin transferred the funds to his personal checking account. (Id. at Ex. 50 pp. 20, 23).

**Regulatory Investigations**

Around the fall of 2008, the Financial Industry Regulatory Authority ("FINRA") began investigating Windham. (Pl.'s Rule 56.1 Statement ¶ 332). Subsequently, in May 2010, the SEC began its own investigation of the company. (Id. at ¶ 336).

On May 28, 2010, shortly after Constantin received an SEC subpoena, the Leeward reverse merger finally went through, resulting in the issuance of 65 million shares of the resulting corporation, Leeward Group Holdings, Inc. (Id. at ¶¶ 336-37).

Following the merger, Balaban was issued shares pursuant to a purported "consultancy agreement," although he had never served as a consultant to any of the companies involved in the merger. (See id. at ¶ 342; Kamar Decl. Ex. 3 at 87). Windham's other clients who had invested in Leeward, including Mier, each received shares of Leeward Group Holdings from another shareholder, Charles Payne. (Pl.'s Rule 56.1 Statement at ¶ 341). Notably, the amounts of stock received by each of Windham's clients did not reflect the relative values of their

23

respective investments through Windham. (<u>Id.</u> at ¶¶ 343-46). In
fact, several investors received approximately one quarter of
the shares due to them, based on the relative amounts they had
been led to believe they had invested in Leeward. (<u>See</u> <u>id.</u> at ¶¶
343-44). The SEC argues that the distribution of these shares
was intended by Constantin to cover up defendants' fraud, and
should be regarded as a gift, rather than a return on clients'
investments. (<u>See</u> Pl.'s Mem. 42-44).

As of June 28, 2012, Leeward Group Holdings' shares were
trading at less than one cent per share. (Pl.'s Rule 56.1
Statement ¶ 349). As a result, in exchange for his investment of
$660,000.00, Balaban received 3,080,000 shares of Leeward Group
Holdings, valued at less than $30,800.00. In exchange for his
investment of $300,000.00, Mier received 1.4 million shares of
Leeward Group Holdings, valued at less than $14,000.00. Only one
investor received a number of shares that came close to
reflecting the value of his initial investment. (<u>See</u> <u>id.</u> at ¶
347).

**This Lawsuit**

The SEC filed its complaint in this court on July 6, 2011.
(Compl.). Each of defendants and relief defendants waived

24

service (see docket nos. 4, 5, 11, 12, 13) and initially appeared represented by counsel. On October 17, 2011, all parties consented to proceed under the jurisdiction of a magistrate judge, pursuant to 28 U.S.C. § 636(c). (Consent form, dated Oct. 17, 2011 (docket no. 16)). On March 8, 2012, counsel for defendant Solomon moved to withdraw, and the court granted that motion on March 19, 2012. (Endorsed Order, dated March 19, 2012 (docket no. 47)). Defendant Solomon has proceeded pro se, since that time.

As of the date of his deposition on April 20, 2012, Constantin invoked his Fifth Amendment privilege against self-incrimination. (Pl.'s Mem. at 44; Kamar Decl. Ex. 12). The discovery period closed June 18, 2012, and the SEC filed its motion for summary judgment on July 3, 2012. By endorsed order, we set the deadline for opposition to that motion as July 26, 2012. (Endorsed Order, dated July 5, 2012 (docket no. 55)). The court granted two separate extensions of the motion briefing schedule, the latest of which set the opposition deadline as September 24, 2012. (See Endorsed Orders, dated July 26, 2012 & Sept. 4, 2012 (docket nos. 56 & 57)). Nonetheless, defendants and relief defendants failed to file any opposition and, accordingly, on October 5, 2012 we deemed the motion closed to

further briefing. (See Endorsed Order, dated Oct. 5, 2012
(docket no. 58)).

## ANALYSIS

The SEC asserts claims against all defendants for violation
of § 17(a) of the Securities Act, § 10(b) of the Exchange Act,
and SEC Rule 10b-5 (Compl. 19-20), collectively known as the
antifraud provisions of the securities laws. See, e.g., SEC v.
Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 490 (S.D.N.Y. 2002),
recons. denied 2011 WL 5417106 (S.D.N.Y. Nov. 9, 2011). The SEC
also argues in the alternative that, if Constantin is not deemed
primarily liable under the antifraud provisions, he should be
deemed secondarily liable based on a theory of control-person
liability, under § 20(a) of the Exchange Act, or a theory of
aiding and abetting violations of the Exchange Act. (Compl. at
21-23). Finally, the SEC seeks equitable relief against relief
defendants Constantin Resource Group, Inc. and DAC. (Id. at 23).
We understand this to include, at a minimum, the disgorgement of
any ill-gotten gains that the relief defendants may have
received from the principal defendants' alleged fraud.

I. <u>Standard of Review</u>

Summary judgment will be granted when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). The movant bears the initial burden of informing the
court of the basis for its motion and identifying those portions
of the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, that
demonstrate the absence of a genuine issue of material fact. <u>See</u>
Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
322 (1986). In making this judgment, the court must view all
evidence in the light most favorable to the non-moving party,
<u>Overton v. N.Y. State Div. of Military & Naval Affairs</u>, 373 F.3d
83, 89 (2d Cir. 2004), and must "resolve all ambiguities and
draw all permissible factual inferences in favor of the party
against whom summary judgment is sought." <u>Sec. Ins. Co. of
Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 83 (2d
Cir. 2004). "[A]ll doubts as to the existence of a genuine issue
for trial should be resolved against the moving party," <u>Brady v.
Town of Colchester</u>, 863 F.2d 205, 210 (2d Cir. 1988) (citing
<u>Celotex</u>, 477 U.S. at 330 n. 2), but "[o]nly disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment[;]

27

[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986).

If the non-moving party has the burden of proof as to a particular issue, the movant may satisfy its initial burden by demonstrating the absence of evidence supporting an essential element of the non-moving party's claim. See, e.g., Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary matter to establish a genuine factual issue for trial. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 677-78 (2d Cir. 1997). In other words, the non-moving party is not required to defend itself against "an insufficient showing." Amaker, 274 F.3d at 681 (quoting Adickes, 398 U.S. at 161). If, however, the movant satisfies its initial burden, the burden then shifts to the opposing party to demonstrate that there is a genuine dispute of material fact. See Celotex, 477 U.S. at 323; L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 4 (2d Cir. 1985). The

28

non-movant may not simply rest on the allegations set forth in its pleading, but rather must submit "significant probative evidence tending to support" those allegations. <u>Anderson</u>, 477 U.S. at 249. In addition, under Local Rule 56.1(c), all material facts set forth in a moving party's Rule 56.1 statement that are uncontroverted are deemed to be admitted by the opposing party.

## II.  <u>Antifraud Provisions of the Securities Laws</u>

The elements of a claim under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b-5 are "[e]ssentially the same," <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999), and "[m]any courts -- including the Second Circuit -- analyze claims under both statutes together."[10] <u>SEC v. ICP Asset Mgmt., LLC</u>, 2012 WL 2359830, at *2 (S.D.N.Y. 2012).

---

[10]  The few distinctions that do exist between the antifraud provisions -- for example, the fact that there is no private cause of action under Section 17(a) of the Securities Act, <u>Finkel v. Stratton Corp.</u>, 962 F.2d 169, 175 (2d Cir. 1992), and the fact that Section 17(a) of the Securities Act covers the "offer or sale" of securities, 15 U.S.C. § 77q, while Section 10(b) of the Exchange Act and SEC Rule 10b-5 cover the "purchase or sale" of securities, 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b-5 -- are not relevant to this case, in which the SEC is asserting claims premised on fraudulent conduct in connection with the sale of securities.

To prevail on each of its claims under § 10(b) of the Exchange Act and SEC Rule 10b-5, the SEC must establish that, in connection with the purchase or sale of securities in a domestic transaction, the defendants acted with scienter, and by means of instrumentalities of interstate commerce, in employing a fraudulent device or in making a material misrepresentation or a material omission as to which they had a duty to speak. See Monarch Funding Corp., 192 F.3d at 308; SEC v. Tourre, 2012 WL 5838794, at *2 (S.D.N.Y. Nov. 19, 2012) (quoting Morrison v. Nat'l Australia Bank Ltd., 130 S.Ct. 2869, 2884 (2010)); United States v. Teyibo, 877 F. Supp. 846, 861 (S.D.N.Y. 1995), aff'd, 101 F.3d 681 (2d Cir. 1996). To prevail on its claims under subsections 17(a)(2) and 17(a)(3) of the Securities Act, the SEC must demonstrate all of the same elements, except that it need not prove that defendants acted with scienter. See Aaron v. SEC, 446 U.S. 680, 695-96 (1980).

Notably, "[t]he SEC does not need to prove investor reliance, loss causation, or damages" to prevail on any of its claims for primary liability under the securities laws. Credit Bancorp, 195 F. Supp. 2d at 490-91.

30

## III. Assessment of Plaintiff's Motion

### A. Liability

### 1. Conduct in Connection with Purchase or Sale of Securities

To constitute securities fraud, the alleged misconduct must be in connection with the offer, purchase, or sale of securities. 15 U.S.C. § 77q(a) ("offer or sale"); 15 U.S.C. § 78j(b) ("purchase or sale"); 17 C.F.R. 240.10b-5 ("purchase or sale"). Courts are directed to construe this requirement "broadly so as to encompass fraud in any part of the selling process." SEC v. Mudd, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) (quoting SEC v. Brown, 740 F. Supp. 2d 148, 164 (D.D.C. 2010)). As the Supreme Court has noted, "it is enough that the fraud alleged 'coincide' with a securities transaction." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85, (2006) (citing United States v. O'Hagan, 521 U.S. 642, 651 (1997)). In addition, as the Supreme Court held in Morrison v. Nat'l Australia Bank Ltd., the antifraud provisions of the Securities Act and the Exchange Act apply only to domestic securities transactions -- that is, those involving a purchase or sale within the United States. 130 S.Ct. at 2884-85.

31

The Securities Act and the Exchange Act both define "security" to include, <u>inter</u> <u>alia</u>, "any note, stock, treasury stock, security future, security-based swap, bond, [or] debenture," but not a note with a maturity of less than nine months from the date of issuance, except where the "context otherwise requires." <u>See</u> 15 U.S.C. §§ 77b(a)(1), 77c(a)(3), 78c(a)(10).

According to the Supreme Court, while the sale of stock in a corporation "is typical of the kind of context to which the [Securities and Exchange] Acts normally apply," <u>Landreth Timber Co. v. Landreth</u>, 471 U.S. 681, 687 (1985),

> the fact that instruments bear the label "stock" is not of itself sufficient to invoke the coverage of the Acts. Rather, we concluded that we must also determine whether those instruments possess "some of the significant characteristics typically associated with" stock… We identified those characteristics usually associated with common stock as (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value.

<u>Id.</u> at 686 (internal cites omitted).

32

In this case, defendants Solomon and Constantin encouraged their clients to invest through Windham in the purchase of stock from Omega World, a publicly traded American company, and in Leeward Insurance, a private American company. (See Kamar Decl. Ex. 2 at 60, 63). This conduct alone is sufficient to constitute conduct "in connection with" the purchase of securities. See SEC v. Shehyn, 2010 WL 3290977, at *5 (S.D.N.Y. Aug. 9, 2010) (efforts to sell pre-IPO stock in private companies is conduct in connection with the sale of securities). The fact that Windham's clients did not initially receive stock in exchange for their funds (though they did, long after they had made their investments, receive some Leeward Group Holdings stock, apparently with little relation to the amounts each client had invested) is immaterial, since the "purported buying and selling of securities is itself sufficient to satisfy the 'in connection with' requirement." In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340, 361-63 (S.D.N.Y. 2011).

The fact that Windham purported to invest client funds in the purchase of Leeward convertible promissory notes (see, e.g., Kamar Decl. Ex. 1 at 250) does not undermine our conclusion that defendants' conduct was "in connection with the sale of securities." Several courts applying the "family resemblance test" that was adopted by the Supreme Court in Reves v. Ernst &

33

<u>Young</u>, 494 U.S. 56, 64-65 (1990),[11] have held that when a
convertible note is acquired ostensibly for investment purposes,
the note should be considered a security. <u>See</u>, <u>e.g.</u>, <u>Intelligent
Digital Sys., LLC v. Visual Mgmt. Sys., Inc.</u>, 683 F. Supp. 2d
278, 284 (E.D.N.Y. 2010); <u>Leemon v. Burns</u>, 175 F. Supp. 2d 551,
559 (S.D.N.Y. 2001) ("The fact that the Note's original
principal could be converted into… common stock is a strong
factor for holding that the Note is a security.").

In this case, Windham's clients were motivated by a desire
to invest their funds for a profitable return and were led to
reasonably believe that they had indeed invested in Leeward

---

[11] Under the family-resemblance test, the court first
considers whether the note is functionally similar to any of the
following non-securities: "[a] note delivered in consumer
financing, [a] note secured by a mortgage on a home, [a] short-
term note secured by a lien on a small business or some of its
assets, [a] note evidencing a 'character loan' to a bank
customer, short-term notes secured by an assignment of accounts
receivable, ... a note which simply formalizes an open-account
debt incurred in the ordinary course of business.... [and] notes
evidencing loans by commercial banks for current operations."
<u>Reves</u>, 494 U.S. at 65. "If the note is not sufficiently similar
to one of the non-security instruments, then we must determine
whether another category of such instruments should be
judicially created by reference to the same four factors,
identified in <u>Reves</u> as follows: (1) the motivations that would
prompt a reasonable buyer and seller to enter into the
transaction; (2) the plan of distribution of the instrument; (3)
the reasonable expectations of the investing public; and (4)
whether some factor, such as the existence of another regulatory
scheme, significantly reduces the risk of the instrument,
thereby rendering application of the securities laws
unnecessary." <u>Pollack v. Laidlaw Holdings, Inc.</u>, 27 F.3d 808,
811-12 (2d Cir. 1994).

34

securities. For this reason, we conclude that, under the <u>Reves</u> test, the purported purchase of Leeward promissory notes was "in connection with" the sale of securities. In addition, we note that the blatantly fraudulent "note" that Constantin sent to Mier, which indicated a maturity date of 60 months -- <u>i.e.</u>, in excess of nine months -- clearly falls within the statutory definition of a security. 15 U.S.C. §§ 77b(a)(1), 77c(a)(3), 78c(a)(10); 17 C.F.R. 240.10b-5. Moreover, we have little doubt that even if the maturity date of this fraudulent document had been stated as less than nine months, it would not have protected defendants from the reach of the antifraud provisions of the federal securities statutes. <u>See</u> <u>Zeller v. Bogue Elec. Mfg. Corp.</u>, 476 F.2d 795, 800 (2d Cir. 1973) ("the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of 'commercial paper'").

## 2. <u>Interstate Commerce</u>

"The jurisdictional requirements of Sections 17(a) and 10(b) and Rule 10b-5 are broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings." <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846,

865 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998). In
this case, defendants' use of email and wire transfers in
connection with the sale of securities is sufficient to bring
their conduct within the jurisdictional scope of the federal
securities laws. See SEC v. Ramoil Mgmt., Ltd, 2007 WL 3146943,
at *8 (S.D.N.Y. Oct. 25, 2007); Softpoint, Inc., 958 F. Supp. at
861, 865.


### 3. Material Misrepresentation, Omission, or Fraudulent Device

Section 17(a) of the Securities Act and § 10(b) of the
Exchange Act, and SEC Rule 10b-5 "expressly prohibit
misstatements and omissions as to facts that are material." SEC
v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996).
"In the case of an omission, the duty to disclose generally
'arises when one party has information that the other [party] is
entitled to know because of a fiduciary or other similar
relation of trust and confidence between them.'" Grandon v.
Merrill Lynch & Co., Inc., 147 F.3d 184, 189 (2d Cir. 1998)
(quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)).
While the Second Circuit has held that there "is no general
fiduciary duty inherent in an ordinary broker/customer
relationship," it has recognized that a fiduciary relationship
may be formed when the client has entrusted the broker with

36

certain matters, as "in situations in which a broker has discretionary authority over the customer's account." United States v. Wolfson, 642 F.3d 293, 295 (2d Cir. 2011) (internal cites and quotations omitted) (emphasis in original). In such situations, brokers have "an affirmative duty… to use reasonable efforts to give [customers] information relevant to the affairs that have been entrusted to them." United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) (internal quotes and citations omitted) (original brackets omitted). Thus, the distinction between omissions and misrepresentations becomes "illusory in the context of a broker who has a fiduciary duty to h[is] clients." SEC v. Zandford, 535 U.S. 813, 823 (2002).

Because the evidence demonstrates that Windham's clients had entrusted defendants with discretionary control over their accounts and investments (see, e.g., Kamar Decl. Ex. 6 at 41-49 (Balaban indicates that he trusted Solomon to handle his accounts, which he had been led to believe were held at Windham), Ex. 41 (authorization form sent to client by Solomon), Ex. 50 at 23, 26 (Constantin transfers all client funds that were in escrow to his personal checking account)), we conclude that defendants entered into fiduciary relationships with their clients, see Wolfson, 642 F.3d at 295 ("the presence of a discretionary account automatically implies a general fiduciary

37

duty between a broker and customer"), which affirmatively obligated them to disclose to their clients all material information relevant the clients' Windham investments. Szur, 289 F.3d at 211. In any event, the uncontroverted evidence reflects that the defendants engaged in frequent sweeping affirmative misrepresentations, which may trigger liability absent a fiduciary responsibility. See, e.g., Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).

"Summary judgment on matters of materiality in a securities fraud case is appropriate when the omissions and misrepresentations in question are 'so obviously important to the investor, that reasonable minds cannot differ on the question of materiality.'" Credit Bancorp, 195 F. Supp. 2d at 492 (quoting SEC v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978)). "The materiality of an item of information is a mixed question of law and fact," which depends on whether the information is deemed relevant in light of controlling substantive law and would likely be given weight by the reasonable investor. Id. The relevant inquiry is whether the misrepresentation or omission would have "significantly altered the 'total' mix of information available" to the reasonable investor. First Jersey Sec., Inc., 101 F.3d at 1466 (quoting In

38

re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267–68 (2d Cir. 1993) (internal quotes omitted)).

The litany of misrepresentations that Solomon and Constantin made to their clients is striking. They misrepresented their respective educational backgrounds. (See, e.g., Kamar Decl. Ex. 4 at 190-91, Ex. 15). Solomon, in particular, overstated his own professional experience (see, e.g., id. at Ex. 6 p. 17, Ex. 46, Ex. 70), and that of Windham (see id. at Ex. 70), in order to foster a false sense of confidence among potential clients. In speaking with clients, Solomon routinely made reference to company divisions that did not exist (see, e.g., id. at Ex. 7 pp. 47, 243, 335-36), and to his active involvement in European deals that also did not exist. (Id. at Exs. 46, 70). Constantin similarly tried to bolster Windham's image as a large, international company by establishing Windham's internet presence under a French domain name (see, e.g., id. at Ex. 9 p. 153), and by advertising numerous office locations in expensive metropolitan locations where Windham did not actually maintain active offices. (See, e.g., id. at Ex. 9 pp. 114-116). Solomon expressly told clients that they could anticipate returns on their investments ranging from 200 to 500 percent (see, e.g., id. at Ex. 34), although he later acknowledged that he had no basis for such optimistic

39

projections. (Id. at Ex. 5 pp. 526, 532). And when Constantin began corresponding with Solomon's former clients, he omitted to correct those misrepresentations that Solomon had explicitly made to those clients. (See, e.g., Pl.'s Rule 56.1 Statement ¶ 198).

When clients invested funds in Windham, they were hit with a ten-percent advisory fee that had not previously been disclosed to them. (See, e.g., Kamar Decl. Ex. 7 at 68).[12] After several clients had invested funds with Windham for purposes of purchasing stock in Leeward, Constantin diverted those funds to his own purposes. He apparently diverted $643,000.00 of client funds to Constantin Resource, which he used to pay personal and business expenses (Pl.'s Rule 56.1 Statement ¶ 329), $450,000.00 to Leeward for the purchase of stock in the name of DAC (id. at ¶ 330), and additional amounts to Windham's corporate checking

---

[12] We have been unable to locate any cases in which a broker-dealer's fee was charged, as it was by defendants, as a percentage of clients' up-front investment, rather than as a markup on the sale price of securities. However, we believe that defendants' ten-percent fee off the top of clients' investments can be fairly analogized to a ten-percent markup on the price of all of Windham's transactions, and we note that "a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws." First Jersey Sec., Inc., 101 F.3d at 1469; see also Grandon, 147 F.3d at 191 (although reasonableness of a broker's markup is a fact-specific inquiry, "[i]t appears to be agreed that markups for equity securities generally should not exceed five percent of the prevailing market price.").

account. (Id. at ¶ 329; see also Kamar Decl. Ex. 1 at 35-36 (Constantin testified that he didn't keep track of individual clients' funds that went into the Leeward escrow account)).

Clients who had been reassured by Solomon that they could make short-term investments that could be liquidated after only a few months later found that they were unable to recover their funds even after several years. (See, e.g., id. at Ex. 79). In addition, both Solomon and Constantin provided clients with misleading documents to cover up the fraudulent nature of their investment scheme. In the case of Balaban, Solomon and Constantin prepared monthly account statements that misleadingly represented Leeward holdings that Balaban did not actually have. (See id. at Ex. 40). The account statements also set forth fictitious account values, which misled Balaban concerning the true value of his investment through Windham. (Id. at Ex. 6 pp. 64-66). Similarly, in the case of Mier, Constantin produced a fake promissory note in an effort to convince Mier that his investment in Leeward was secure when, in fact, it was not. (See id. at Ex. 87).

This long list of patently misleading conduct, which was carried out between 2008 and 2010, is, we note, non-exhaustive. There can be no doubt that these misrepresentations --

41

individually and collectively -- were material and would have affected the reasonable investor's choice whether to invest in securities through Windham. See, e.g., Zandford, 535 U.S. at 819; Research Automation Corp., 585 F.2d at 35 ("What reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but be diverted to [the company's] officers?"); United States v. Finnerty, 474 F. Supp. 2d 530, 543 (S.D.N.Y. 2007) ("theft constitutes securities fraud only when it is accompanied by a violation of a fiduciary duty."), aff'd, 533 F.3d 143 (2d Cir. 2008); U.S. Commodity Futures Trading Comm'n v. Rolando, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("a reasonable investor would want to know that his account statements were false and that… [defendant] provided false contact information to [] prevent the customer from receiving account statements and other communications"); Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty."); SEC v. Gallard, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue

42

did not exist… and that the money paid for those securities would be misappropriated."); Marbury Mgmt., Inc. v. Kohn, 470 F. Supp. 509, 513 (S.D.N.Y. 1979) (false statements concerning professional expertise in the securities field qualified as securities fraud), rev'd in part on other grounds, 629 F.2d 705 (2d Cir. 1980); SEC v. Wills, 472 F. Supp. 1250, 1263 (D.D.C. 1978) (actual or constructive knowledge that book value is overstated constitutes grounds for liability).

Taken as a whole, defendants' efforts to lure clients to Windham through false promises about expected returns on investment and about Windham's professional experience; Constantin's misappropriation of client funds, which he diverted to Constantin Resource, DAC, and Windham; Solomon's and Constantin's efforts to mislead clients about their actual account holdings with, among other things, phony account statements; and their distribution of Leeward Group Holdings stock to clients in random amounts not proportionate with clients' respective investments in Leeward, in an apparent effort to cover up defendants' misconduct, all suggest the existence of a wide-sweeping fraudulent investment scheme. See, e.g., SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is

43

distinct from an alleged misstatement."); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (citing WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011); Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012)).

## 4. Scienter[13]

Although "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment," Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984), "the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." Research Automation Corp., 585 F.2d at 33-34.

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." First Jersey Sec., Inc., 101 F.3d at 1467 (citing, inter alia, Ernst & Ernst v. Hochfelder, 425 U.S.

---

[13] As noted above, the SEC need only establish scienter with respect to its claims under § 10(b) of the Exchange Act, SEC Rule 10b-5, and sub-section 17(a)(1) of the Securities Act, and it need not establish scienter to prove its claims under sub-sections 17(a)(2) and 17(a)(3) of the Securities Act. See Aaron, 446 U.S. at 696-97.

44

185, 193 n. 12 (1976)). To prove scienter, "it is sufficient to show that the defendant 'intentionally engaged' in 'manipulative conduct.'" AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 221 (2d Cir. 2000) (quoting SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)). "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." SEC v. Universal Exp., Inc., 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007), aff'd sub nom. SEC v. Altomare, 300 F. App'x 70 (2d Cir. 2008). With respect to a corporate defendant, "a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).

It is apparent from the record that Constantin and Solomon each acted knowingly and intentionally to mislead and defraud their clients.[14] The record shows that Solomon routinely lied to

---

[14] In light of Constantin's invocation of his Fifth Amendment right as of April 20, 2012, plaintiff encourages the court to adopt an adverse inference as to Constantin's state of mind. (See Pl.'s Mem. 50). While it is true that, in a civil

clients about Windham's investment experience, its size and
involvement in international markets, and the amount of return
that clients could expect from their investments with Windham.
Solomon admits that he prepared account statements for clients
that reflected information that he knew to be untrue at the time
that he prepared them. (See Kamar Decl. Ex. 4 at 272, 275). To
the extent that Solomon did not have direct knowledge of the
falsity of some of the information that Constantin directed him
to include in the manufactured account statements, we conclude
that he acted recklessly in failing to verify the accuracy of
the information. See, e.g., Rolf v. Blyth, Eastman Dillon & Co.,
Inc., 570 F.2d 38, 45 (2d Cir. 1978), amended 1978 WL 4098 (2d
Cir. May 22, 1978) ("there is general agreement that [the
required intent to mislead] is present when the representation

---

action, "[a] party who asserts the privilege against self-
incrimination must bear the consequence of lack of evidence, and
the claim of privilege will not prevent an adverse finding or
even summary judgment," United States ex rel. Bilokumsky v. Tod,
263 U.S. 149, 153-54 (1991); see Wechsler v. Hunt Health Sys.,
Ltd., 2003 WL 21998980, at *2 (S.D.N.Y. Aug. 22, 2003), we
believe that the record in this case provides ample
circumstantial evidence from which to infer Constantin's state
of mind without the need to adopt an adverse inference against
him. See Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n. 30
(1983). Nonetheless, we note that to the extent that
Constantin's invocation of the Fifth Amendment precludes him
from presenting testimony as to his state of mind, see United
States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 431
(E.D.N.Y. 1995), that issue is appropriately dealt with at the
summary judgment stage. See United States v. Certain Real Prop.
& Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d
78, 81 (2d Cir. 1995) (citing United States v. 4003-4005 Fifth
Ave., 855 F. Supp. 50, 54-55 (E.D.N.Y.1994)).

46

is made without any belief as to its truth, or with reckless disregard whether it be true or false."). Solomon had access to, and regularly reviewed, his clients' accounts online (Kamar Decl. Ex. 4 at 144-46), and thus must have been aware that Constantin had transferred funds out of client accounts and had not transferred security holdings or other assets into the accounts. Thus, we conclude that the circumstantial evidence strongly suggests that Solomon acted with the requisite scienter to find him liable.

As to Constantin's state of mind, we find that the circumstantial evidence strongly suggests that he acted intentionally to defraud Windham's clients. In particular, we note that he directed Solomon to send clients account statements that he knew did not reflect clients' true investment holdings, that he manufactured a fake promissory note to send to Mier, that he told Mier that Leeward's book value was more than seven times the value that he knew it to be, and that he diverted client funds to his own use; all of this lends support to the conclusion that Constantin acted knowingly.

Because Solomon and Constantin were essentially Windham's only two employees during the relevant period, from 2008 to

47

2010, their knowing and intentional misconduct is clearly attributable to Windham, the corporate defendant.

In sum, we conclude that it is beyond triable dispute that all three named defendants are primarily liable for securities fraud under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b-5.[15]

### B. Remedies

As relief, the SEC requests (i) that defendants be permanently enjoined from future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5; (ii) that defendants be ordered to disgorge all ill-gotten gains; and (iii) that they be ordered to pay the maximum amount in civil penalties. The SEC further requests that relief defendants be ordered to disgorge all amounts that they received as a result of defendants' fraudulent misconduct. (See Pl.'s Mem. 65).

---

[15] Having concluded that Constantin is primarily liable for securities fraud, we decline to address plaintiff's alternative claims against him, alleging secondary liability premised on control-person liability or aiding and abetting violations of the Exchange Act.

## 1. **Injunctive Relief**

"[C]ourts in this district have granted permanent injunctive relief on an SEC motion for summary judgment where the fraud scheme at issue was broad in scope, long in duration, and involved a high degree of scienter." SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006) (citing cases). All of these factors are clearly present in this case.

The most "critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972). "In determining whether there is a realistic likelihood that a defendant will violate the securities laws in the future, courts look to a number of factors: (1) the degree of scienter involved; (2) the isolated or persistent nature of the past fraudulent acts; (3) the defendant's appreciation of his wrongdoing; and (4) the defendant's opportunities to commit future violations." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007).

In this case, where all members of the corporation were engaged in egregious misconduct and ongoing fraud -- indeed,

49

where the entire seeming purpose of the organization was to draw in unsuspecting clients and to take their funds -- we conclude that a permanent injunction to prevent future violations is obviously warranted.

## 2. Civil Penalties

"Section 20(d) of the Securities Act and Section 21(d)(3)(B) of the Exchange Act outline three categories -- referred to as 'tiers' -- of civil penalties. Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court." Universal Exp., Inc., 646 F. Supp. 2d at 567. The court may impose third-tier civil penalties for any violation of the Act involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that "resulted in substantial losses or created a significant risk of substantial losses." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). With respect to natural persons, the court may impose a third-tier penalty of either $100,000.00 for each violation, or the gross amount of his or her pecuniary gain resulting from the violation, whichever is greater. With respect to non-natural persons, the court may impose a third-tier penalty of either $500,000.00 for each violation, or the gross amount of his or

50

her pecuniary gain resulting from the violation, whichever is greater. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

"In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Milligan, 436 F. App'x 1, 3 (2d Cir. 2011) (quoting SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Opulentica, LLC, 479 F. Supp. 2d at 331 (quoting Moran, 944 F. Supp. at 296-97).

There is no question that the conduct of all three of the defendants involved "fraud, deceit, manipulation, [and] deliberate or reckless disregard" of the securities laws, and

51

that their misconduct resulted in significant financial losses
by their clients. Accordingly, we conclude that each of the
defendants should be subjected to third-tier civil penalties
under the Securities Act and the Exchange Act. However, as
explained below, we postpone our determination of the amounts of
civil penalties that each defendant must pay until after the
court has received supplemental submissions from the parties.


### 3. **Disgorgement**

Federal courts have the power to direct disgorgement of
ill-gotten gains to "prevent wrongdoers from unjustly enriching
themselves through violations" of the securities laws. SEC v.
Cavanagh, 445 F.3d 105, 117 (2d Cir. 2011). In this case, where
defendants misappropriated large amounts of client funds, we
conclude that disgorgement is undoubtedly appropriate. However,
supplemental submissions are required to more clearly explain
the parties' calculations as to the appropriate amount of
disgorgement.


### 4. **Relief Defendants**

"District courts may only require disgorgement of the
assets of a relief defendant upon a finding that [it] lacks a

52

'legitimate claim'" to the assets. <u>Commodity Futures Trading
Comm'n v. Walsh</u>, 618 F.3d 218, 226 (2d Cir. 2010). A relief
defendant does not have a legitimate claim to assets that it has
received as a gift, without payment of consideration. <u>Id.</u> In
contrast, a good-faith purchaser for value may not be ordered to
disgorge assets originating from a defendant's ill-gotten gains.
<u>Id.</u> at 227.

Constantin Resource is Constantin's company through which
he allegedly conducts some independent financial consulting
work. (Kamar Decl. Ex. 1 at 28). He apparently is the sole owner
of the company, serves as its sole officer and employee (<u>see</u>
Kamar Decl. Ex. 1 at 21), and is the only authorized signatory
on the company's account. (<u>Id.</u> at Ex. 2; Ex. 52).

Given Constantin's role as the sole owner and employee of
Constantin Resource, it is apparent that Constantin Resource
could not have received the ill-gotten funds from Windham in
good faith, since Constantin's personal knowledge is fairly
attributed to his corporation, Constantin Resource. Indeed,
Solomon testified that Constantin used Constantin Resource as
his personal "slush fund," noting that "[i]f we went out
drinking, the debit card said Constantin Resource Group on it"
and that loans that Constantin made to Solomon also came through

53

Constantin Resource. (Kamar Decl. Ex. 2 at 49-50; see also Ex.
52 (Constantin Resource debit account records)).

It is unclear from the record exactly what position
Constantin held at DAC during the relevant period. He was, as of
April 2008, a member of the board (Ex. 21 p. 21-4), and at some
point between April 2008 and May 2010, Constantin took over as
CEO of DAC. (See Ex. 95 p. 95-11). His ties to the company
suggest at least some basis for arguing that his knowledge as to
the illicit source of funds that DAC received from Windham
should be attributed to DAC. We believe that it is sufficient,
however, to require DAC to disgorge the assets that it acquired
from defendants' misconduct on the basis that the record does
not support, and DAC has not submitted any evidence to suggest,
that the company paid adequate consideration for its receipt of
those funds. See SEC v. China Energy Sav. Tech., Inc., 636 F.
Supp. 2d 199, 204 (E.D.N.Y. 2009). Accordingly, we conclude that
both relief defendants will be required to disgorge those assets
that each has received as ill-gotten gains of defendants'
misconduct.

## 5. **The Required Supplementation**

The discussion of disgorgement in the SEC's memorandum of law involves a relatively long, winding path of internal cross-references. (See, e.g., Pl.'s Mem. 67-68 (referring reader to pp. 40-42, which in turn directs reader to Parts III.A.3, II.A.5, III.B.1, III.B.3, and III.C)). The court's confusion in calculating defendants' and relief defendants' ill-gotten gains is further exacerbated by the fact that some of the account statements provided as evidence are not clearly legible (see, e.g., Kamar Decl. Ex. 20 pp. 3-12) and by the fact that, without a detailed explanation of the flow of funds into the Leeward escrow account, it is difficult to determine which fund transfers leaving the account should be deemed to have been fraudulent. (See id. Ex. 50).

With respect to the amounts DAC allegedly received as a result of defendants' misconduct, the SEC points to DAC's stock-purchase agreement with Leeward as evidence that the full amount of that stock purchase derived from defendants' fraud on Windham clients. (See Pl.'s Mem. 41 (citing Kamar Decl. Exs. 22 & 94) & 70). However, without evidence that DAC did not contribute any of its own funds to the stock purchase, it is difficult to conclude that the full $450,000.00 value of the stock purchase

55

agreement was taken from Windham clients. In its supplemental briefing, the SEC should more clearly explain its rationale -- including reference to supporting evidence -- for concluding that the full $450,000.00 stock purchase in DAC's name was funded by defendants' misconduct.

In sum, the SEC's supplemental submission should provide a clear explanation of the flow of funds from defrauded clients to each defendant and relief defendant, including direct references to supporting evidence. It should also include an explanation of its calculations of any prejudgment interest. Finally, if possible and where appropriate, the SEC should include more legible copies of its supporting evidence.

## CONCLUSION

For the foregoing reasons, summary judgment is granted in full against all defendants and relief defendants. Defendants are hereby permanently enjoined from future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5. In addition, defendants and relief defendants will be ordered to disgorge all ill-gotten gains arising from defendants' violations, and each defendant will be required to pay civil penalties in amounts to be determined.

The amounts that each defendant and relief defendant will be directed to pay will be determined following additional submissions by the parties. The SEC shall file its submission by no later than April 15, 2013. Defendants' opposition, if any is due by April 18, 2013, and the SEC's reply is due by April 22, 2013.


DATED:     New York, New York
           April 2, 2013


                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Memorandum and Order have been sent today to:

Preethi Krishnamurthy, Esq.
George S. Canellos, Esq.
Barry Antoine Kamar, Esq.
Wendy Beth Tepperman, Esq.
U.S. Securities and Exchange Commission
Three World Financial Center
New York, NY 10281

James Kousouros, Esq.
Law Office of James Kousouros, Esq.
260 Madison Avenue, 22 Floor
New York, NY 10016

Mr. Brian Solomon
bsolomon@solomonkeegan.com

**Exhibit 5 to Tolk Declaration "SEC Memo Order 2"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
SECURITIES AND EXCHANGE
COMMISSION,                                          :

               Plaintiff,                :        **MEMORANDUM & ORDER**

         -against-                       :        **11 Cv. 4642 (MHD)**

JOSHUA CONSTANTIN et al.,                            :

          Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MICHAEL H. DOLINGER, U.S.M.J.:**


On April 2, 2013, we issued a Memorandum and Order granting summary judgment in favor of plaintiff and ordering supplemental briefing concerning the appropriate amounts of damages to be assessed against each defendant and relief defendant. (Memorandum & Order, Apr. 2, 2013 ("April 2, 2013 M&O") (docket no. 59)). Specifically, we left open the issue of the amounts of third-tier civil penalties to be imposed on each defendant and the amounts of ill-gotten gains to be disgorged by each defendant and relief defendant. (Id. at 52-56).


Our April 2, 2013 M&O directed plaintiff to file its supplemental submission by April 15, 2013, providing the court with "a clear explanation of the flow of funds from defrauded clients to each defendant and relief defendant… [and] an

explanation of its calculations of any prejudgment interest." (Id. at 55-56). We further set the deadline for defendants and relief defendants to file their opposition as April 18, 2013. The deadline for opposition has passed with no word from any of the defendants or relief defendants.

**Relevant Factual Background**

We incorporate the factual background set forth in our April 2, 2013 M&O. In addition, as outlined in the SEC's supplemental submission, we observe that defendants received approximately $1,272,644.00 in total ill-gotten gains from seven Windham clients. (See Pl. Supplemental Mem. in Supp. of Disgorgement & Pre-Judgment Interest Calculations ("Pl. Suppl. Mem.") 1-10). Of this amount, approximately $1,127,929.00 was placed in Windham's Leeward escrow account (id.), and then misappropriated for the benefit of the various defendants and relief defendants.[1]

Constantin transferred $450,000.00 from the escrow account to Leeward Company for the purchase of stock in the name of relief defendant DAC. (Id. at 7; Kamar Decl. (docket no. 52) Ex.

---

[1] The Leeward escrow account was funded exclusively by the seven defrauded investors. (Kamar Decl. Ex. 1 at 17-19).

2

3 at 54, Ex. 50 at 6, 11). Constantin also transferred a total of $645,000.00 from the escrow account to his company, relief defendant Constantin Resource. (Pl. Suppl. Mem. at 7-8; Kamar Decl. Ex. 50 at 6, 9, 11, 12). The remainder of the escrow funds were used to benefit Constantin himself, with $23,000.00 transferred from the escrow account directly to his personal checking account, and the remaining $9,928.00 used for purposes including cash withdrawals, wire transfer fees, and legal fees, all unrelated to the Leeward securities deal and for the benefit of Constantin and Windham. (Pl. Suppl. Mem. at 10; Kamar Decl. Ex. 50 at 6, 9, 11, 12, 20, 23, 29).

In addition to the client funds misappropriated through the Leeward escrow account, clients were charged a total of $135,000.00 in purported fees. (Pl. Suppl. Mem. 3-5; Kamar Decl. Ex. 43 at 1, Ex. 75 at 3). Of this, ultimately $40,000.00 was transferred to Constantin Resource (Pl. Suppl. Mem. 3; see Kamar Decl. Ex. 45 at 6, 26), $72,500.00 was transferred to defendant Solomon (Pl. Suppl. Mem. 3-4; Kamar Decl. Ex. 45 at 5, 6, 26), and $22,500.00 was transferred to Windham. (Pl. Suppl. Mem. 4-5; Kamar Decl. Ex. 52 at 18, 19).

Constantin transferred yet another $9,715.78 from the account of one client, Charles Balaban, directly to the Windham

3

checking account. (Pl. Suppl. Mem. 4; Kamar Decl. Ex. 52 at 26).
He transferred approximately $42,000.00 of investor funds
(originally passed through the Leeward escrow account) from
Constantin Resource to Solomon. (Pl. Suppl. Mem. at 10; Kamar
Decl. Ex. 45 at 13 20, 26, 33).

Of the total $1,272,644.00 in defendants' ill-gotten gains,
$450,000.00 went to benefit relief defendant DAC (in the form of
a stock purchase); $643,000.00 went to relief defendant
Constantin Resource, in various forms; $65,145.00 went to
defendants Constantin and Windham, collectively (from purported
service fees and outright misappropriations); and $114,500.00
went to defendant Solomon (including commissions from Windham's
clients Balaban and Mier, and $42,000.00 in additional investor
funds received from Constantin Resource).

**Disgorgement**

"Where a party violates the federal securities laws, this
Court has broad discretion not only to order the disgorgement of
any ill-gotten gains, but also to determine the amount to be
disgorged. This remedy is designed to deprive wrongdoers of any
unjust enrichment and, in doing so, to deter others from
engaging in similar conduct." SEC v. Universal Exp., Inc., 646

F. Supp. 2d 552, 562-63 (S.D.N.Y. 2009), aff'd, 438 F. App'x 23 (2d Cir. 2011) (internal cites omitted); accord SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996).

"The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation,' [and] 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" Id. at 1475 (quoting SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995)). Thus, while the SEC "bears the ultimate burden of persuasion that its disgorgement figure approximates the amount of unjust enrichment, once the SEC has made a reasonable demonstration of that amount, the burden shifts to the defendant to show that the proposal is not a reasonable approximation, by 'demonstrating that he received less than the full amount allegedly misappropriated and sought to be disgorged.'" SEC v. Inorganic Recycling Corp., 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002) (quoting SEC v. Benson, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987)).

We have reviewed the SEC's supplemental submission, as well as the supporting evidence, concerning defendants' and relief defendants' respective ill-gotten gains derived from defendants' unlawful conduct, and we find the SEC's calculations and

5

analysis concerning damages to be persuasive.[2] Given that defendants and relief defendants have failed to file any opposition to the SEC's supplemental submission, we have no cause to doubt the presumptive reasonableness of plaintiff's recommended disgorgement figures.

The SEC argues that "[t]he Court should hold Constantin and Windham jointly and severally liable… because Constantin owned Constantin Resource, owned Windham through Constantin Resource, and owned all of DAC's equity after DAC fraudulently obtained Leeward shares," that were purchased with misappropriated client funds. (Pl. Suppl. Mem. 12).

As the Second Circuit has observed, "where a firm has received gains through its unlawful conduct, [and] where its owner and chief executive officer has collaborated in that conduct and has profited from the violations… it is within the discretion of the court to determine that the owner-officer [] should be subject, on a joint and several basis, to the

_____

[2] Indeed, we note that, although the SEC is "'not required to trace every dollar of proceedings... nor... required to identify misappropriated monies which have been commingled," SEC v. Anticevic, 2010 WL 3239421, at *5 (S.D.N.Y. Aug. 16, 2010) (quoting SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 214 n.22 (E.D.Mich.1991), aff'd, 12 F.3d 214 (6th Cir. 1993)), at the court's request, the SEC has, in this case, ably demonstrated the trail of the majority of misappropriated client funds to each of the defendants and relief defendants.

disgorgement order." First Jersey Sec., 101 F.3d at 1475; see SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004). In light of our prior findings concerning the close relationship between Windham, Constantin Resource, and Constantin (April 2, 2013 M&O 2, 3, 53), as well as the evidence suggesting that Constantin was the sole equity owner of DAC after DAC received the stock paid for by defendants' fraud (Kamar Decl. Ex. 95 at 11), we conclude that joint and several liability among all four of them is appropriate. Defendants Constantin and Windham are jointly and severally liable for the amount of $1,158,145.00 (constituting the full value of defendants' ill-gotten gains, less the $114,500.00 that went to Solomon). Relief defendant DAC is jointly and severally liable for $450,000.00 of the $1,158,145.00 amount that Constantin and Windham are liable to disgorge. Relief defendant Constantin Resource is jointly and severally liable for $643,000.00 of the $1,158,145.00 amount that Constantin and Windham are liable to disgorge. As for defendant Solomon, he is individually liable to disgorge $114,500.00.

## Civil Penalties

In our April 2, 2013 M&O, we set forth the standard for civil penalties under the securities fraud statutes as follows:

7

"Section 20(d) of the Securities Act and Section
21(d)(3)(B) of the Exchange Act outline three
categories -- referred to as 'tiers' -- of civil
penalties. Although each tier establishes a maximum
penalty per violation, the amount of any civil penalty
rests squarely in the discretion of the court."
Universal Exp., Inc., 646 F. Supp. 2d at 567. The
court may impose third-tier civil penalties for any
violation of the Act involving "fraud, deceit,
manipulation, or deliberate or reckless disregard of a
regulatory requirement" that "resulted in substantial
losses or created a significant risk of substantial
losses." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). With
respect to natural persons, the court may impose a
third-tier penalty of either $100,000.00 for each
violation, or the gross amount of his or her pecuniary
gain resulting from the violation, whichever is
greater. With respect to non-natural persons, the
court may impose a third-tier penalty of either
$500,000.00 for each violation, or the gross amount of
his or her pecuniary gain resulting from the
violation, whichever is greater. 15 U.S.C. §
77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

"In determining whether civil penalties should be
imposed, and the amount of the fine, courts look to a
number of factors, including (1) the egregiousness of
the defendant's conduct; (2) the degree of the
defendant's scienter; (3) whether the defendant's
conduct created substantial losses or the risk of
substantial losses to other persons; (4) whether the
defendant's conduct was isolated or recurrent; and (5)
whether the penalty should be reduced due to the
defendant's demonstrated current and future financial
condition." SEC v. Milligan, 436 F. App'x 1, 3 (2d
Cir. 2011) (quoting SEC v. Haligiannis, 470 F. Supp.
2d 373, 386 (S.D.N.Y. 2007)). "While these factors are
helpful in characterizing a particular defendant's
actions, the civil penalty framework is of a
'discretionary nature' and each case 'has its own
particular facts and circumstances which determine the
appropriate penalty to be imposed.'" Opulentica, LLC,
479 F. Supp. 2d [319,] 331 [(S.D.N.Y. 2007)] (quoting
Moran, 944 F. Supp. at 296-97).

8

(April 2, 2013 M&O, 50-51). We then went on to conclude that, in light of defendants' pattern of fraudulent misconduct and the significant financial losses that they had caused their clients, each of the defendants should be subjected to third-tier civil penalties. (Id. at 51-52).

Given the sweeping nature of defendants' fraud, "[t]he exact number of violations committed by the Defendants is nearly impossible to determine." SEC v. Invest Better 2001, 2005 WL 2385452, at *5 (S.D.N.Y. May 4, 2005). Accordingly, we conclude that defendants should be charged "a flat penalty equal to the gross amount of pecuniary gain as a result of the total number of violations." Id.; see Haligiannis, 470 F. Supp. 2d at 386.

Defendants Constantin and Windham are jointly and severally liable for civil penalties totaling $1,158,145.00. See SEC v. Pentagon Capital Mgmt. PLC, 2012 WL 1036087, at *10 (S.D.N.Y. Mar. 28, 2012) (finding joint and several liability for civil penalties permissible); SEC v. Elliott, 2011 WL 3586454, at *19 (S.D.N.Y. Aug. 11, 2011) (imposing joint and several liability for civil penalties in amount equal to disgorgement amount). Defendant Solomon is individually liable for civil penalties of $114,500.00.

9

**Prejudgment Interest**

The award of prejudgment interest in securities fraud actions, though discretionary, is well-established in our circuit. See, e.g., Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO, 955 F.2d 831, 835 (2d Cir. 1992) (citing Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77, 86-87 (2d Cir. 1980)). Specifically, the Second Circuit has held that, in light of the "remedial purpose of the [securities laws], the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants" a court may order prejudgment interest "for the entire period from the time of defendants' unlawful gains to the entry of judgment." First Jersey Sec., 101 F.3d at 1477.

In this case, that period runs from March 18, 2009 to the present for defendants Constantin and Windham; from October 17, 2008 to the present for defendant Solomon; from September 29, 2008 to the present for relief defendant Constantin Resource; and from September 8, 2008 to the present for relief defendant DAC. (See Pl. Suppl. Mem. 15).[3]

---

[3] We note, however, that the SEC's calculations of prejudgment interest, on which we rely, assume an end date of March 31, 2013. (Pl. Suppl. Mem. 2, 15 & Exs. 202, 203, 204, 205).

10

We apply the Internal Revenue Code's statutory interest rate. (Id. at 2, 15); see First Jersey Sec., 101 F.3d at 1476. Constantin and Windham are jointly and severally liable for a total of $176,577.85 in prejudgment interest. Of this total, Constantin Resource is jointly and severally liable with them for not more than $118,485.87 and DAC is jointly and severally liable with them for not more than $82,921.71.[4] (Id. at Exs. 202, 203, 204, 205). Solomon is individually liable for $20,420.10 in prejudgment interest.

## CONCLUSION

As outlined above, defendant Solomon is individually liable (1) to disgorge $114,500.00, (2) to pay civil penalties of $114,500.00, and (3) to pay prejudgment interest of $20,420.10. Defendants Constantin and Windham are jointly and severally liable (1) to disgorge $1,158,145.00, (2) to pay civil penalties of $1,158,145.00, and (3) to pay prejudgment interest of $176,577.85. Relief defendant Constantin Resource is jointly and severally liable for $643,000.00 of the $1,158,145.00 for which defendants Constantin and Windham are also liable in disgorgement. Relief defendant Constantin Resource is also

---

[4] The exact amounts of prejudgment interest owed by each relief defendant will depend on the amounts disgorged by each of them.

jointly and severally liable with Constantin and Windham for $118,485.87 of the $176,577.85 in prejudgment interest for which Constantin and Windham are liable. Relief defendant DAC is (1) jointly and severally liable for $450,000.00 of the $1,158,145.00 in disgorgement for which Constantin and Windham are liable, and (2) is jointly and severally liable for $82,921.71 of the $176,577.85 in prejudgment interest for which Constantin and Windham are liable.

Plaintiff is to submit a proposed judgment forthwith on notice to defendants.

DATED:    New York, New York
          April 24, 2013


                                    _____
                                    MICHAEL H. DOLINGER
                                    UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Memorandum and Order have been sent today to:

Preethi Krishnamurthy, Esq.
George S. Canellos, Esq.
Barry Antoine Kamar, Esq.
Wendy Beth Tepperman, Esq.
U.S. Securities and Exchange Commission
Three World Financial Center
New York, NY 10281

James Kousouros, Esq.
Law Office of James Kousouros, Esq.
260 Madison Avenue, 22 Floor
New York, NY 10016

Mr. Brian Solomon
bsolomon@solomonkeegan.com

**Exhibit 6 to Tolk Declaration "SEC Judgment"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,
                             :

            Plaintiff,      :      **FINAL JUDGMENT**

         -against-      :      **11 Cv. 4642 (MHD)**

JOSHUA CONSTANTIN, BRIAN   :
SOLOMON, and WINDHAM SECURITIES,
INC.                          :

            Defendants,     :

           and               :

CONSTANTIN RESOURCE GROUP, INC.  :
and DOMESTIC APPLICATIONS CORP.,

           Relief Defendants.
---------------------------------x

**MICHAEL H. DOLINGER, U.S.M.J.:**

    The court having granted plaintiff's motion for summary
judgment in the above-captioned matter, it is hereby ordered
that judgment shall be entered as follows:

1. Defendants and their agents, servants, employees,
   attorneys, and all persons in active concert or
   participation with them who receive actual notice of this
   Final Judgment are permanently restrained and enjoined from
   violating:

   a. Section 10(b) of the Securities Exchange Act of 1934,
      15 U.S.C. § 78j(b);

1

b. SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and

c. Section 17(a) of the Securities Act of 1933, 15 U.S.C.
   § 77q(a).

2. Defendants Joshua Constantin and Windham Securities Inc.
   are jointly and severally liable for disgorgement of
   $1,158,145.00 plus prejudgment interest in the amount of
   $176,577.85, for a total of $1,334,772.85.

3. Relief defendant Domestic Applications Corp. is jointly and
   severally liable with defendants Joshua Constantin and
   Windham Securities, Inc. for $450,000.00 of the
   $1,158,145.00 disgorgement amount, plus prejudgment
   interest covering the period from September 8, 2008 to
   March 31, 2013, applying the Internal Revenue Code's
   statutory interest rate.

4. Relief defendant Constantin Resource is jointly and
   severally liable with defendants Joshua Constantin and
   Windham Securities, Inc. for $643,000.00 of the
   $1,158,145.00 disgorgement amount, plus prejudgment
   interest covering the period from September 29, 2008 to
   March 31, 2013, applying the Internal Revenue Code's
   statutory interest rate.

2

5. Defendant Brian Solomon is liable for disgorgement of $114,500.00 plus prejudgment interest in the amount of $20,420.10, for a total of $134,920.10.

6. Defendants Joshua Constantin and Windham Securities Inc. are jointly and severally liable for civil penalties in the amount of $1,158,145.00.

7. Defendant Brian Solomon is liable for civil penalties in the amount of $114,500.00.


DATED:    New York, New York
          May 6, 2013


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:

In Re:

-v-

Case #: (          )

Dear Litigant,

Enclosed is a copy of the judgment entered in your case.

Your attention is directed to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, which requires that if you wish to appeal the judgment in your case, you must file a notice of appeal within 30 days of the date of entry of the judgment (60 days if the United States or an officer or agency of the United States is a party).

If you wish to appeal the judgment but for any reason you are unable to file your notice of appeal within the required time, you may make a motion for an extension of time in accordance with the provision of Fed. R. App. P. 4(a)(5). That rule requires you to show "excusable neglect" or "good cause" for your failure to file your notice of appeal within the time allowed. Any such motion must first be served upon the other parties and then filed with the Pro Se Office no later than 60 days from the date of entry of the judgment (90 days if the United States or an officer or agency of the United States is a party).

The enclosed Forms 1, 2 and 3 cover some common situations, and you may choose to use one of them if appropriate to your circumstances.

The Filing fee for a notice of appeal is $5.00 and the appellate docketing fee is $450.00 payable to the "Clerk of the Court, USDC, SDNY" by certified check, money order or cash. **No personal checks are accepted.**

Ruby J. Krajick, Clerk of Court

by: _____

_____, Deputy Clerk

APPEAL FORMS

U.S.D.C. S.D.N.Y. CM/ECF Support Unit                1                Revised: May 4, 2010

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

```
-------------------------------------X
                                     |
                                     |        NOTICE OF APPEAL
                                     |
            -V-                      |
                                     |
                                     |.    civ.          (   )
                                     |
-------------------------------------X
```

Notice is hereby given that _____

(party)

hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment [describe it]

entered in this action on the _____ day of _____ , _____ .

(day)    (month)    (year)

_____

(Signature)

_____

(Address)

_____

(City, State and Zip Code)

Date: _____  (   )_____-_____

(Telephone Number)

**Note:** You may use this form to take an appeal provided that it is received by the office of the Clerk of the District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM 1

## United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

——————————————————X
                                    |
                                    |          **MOTION FOR EXTENSION OF TIME**
                                    |          **TO FILE A NOTICE OF APPEAL**
             -V-                    |
                                    |
                                    |          civ.          (   )
                                    |
——————————————————X

Pursuant to Fed. R. App. P. 4(a)(5), _____ respectfully

                                                        (party)

requests leave to file the within notice of appeal out of time. _____

                                                                            (party)

desires to appeal the judgment in this action entered on _____ but failed to file a

                                                                (day)

notice of appeal within the required number of days because:

[Explain here the "excusable neglect" or "good cause" which led to your failure to file a notice of appeal within the required number of days.]


                                    _____
                                                (Signature)

                                    _____
                                                (Address)

                                    _____
                                        (City, State and Zip Code)

Date: _____        (   ) _____ - _____
                                            (Telephone Number)

**Note:** You may use this form, together with a copy of Form 1, if you are seeking to appeal a judgment and did not file a copy of Form 1 within the required time. If you follow this procedure, these forms must be received in the office of the Clerk of the District Court no later than 60 days of the date which the judgment was entered (90 days if the United States or an officer or agency of the United States is a party).

District Court will receive it within the 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM 3

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

----------------------------------------X

**AFFIRMATION OF SERVICE**

-V-

civ.          (    )

----------------------------------------X

I, _____, declare under penalty of perjury that I have

served a copy of the attached _____

_____

upon    _____

_____

whose address is: _____

_____

Date: _____
        New York, New York

_____
(Signature)

_____
(Address)

_____
(City, State and Zip Code)

FORM 4

APPEAL FORMS

FORM 2

### United States District Court
### Southern District of New York
**Office of the Clerk**
**U.S. Courthouse**
**500 Pearl Street, New York, N.Y. 10007-1213**

----------------------------------------------X
                                              |
                                              |                    **NOTICE OF APPEAL**
                                              |                           **AND**
         -V-                                  |     **MOTION FOR EXTENSION OF TIME**
                                              |
                                              |          civ.            (    )
                                              |
----------------------------------------------X

1.      Notice is hereby given that _____ hereby appeals to
                                                    (party)

the United States Court of Appeals for the Second Circuit from the judgment entered on _____.
                            [Give a description of the judgment]

2.      In the event that this form was not received in the Clerk's office within the required time

_____ respectfully requests the court to grant an extension of time in
              (party)

accordance with Fed. R. App. P. 4(a)(5).

        a.      In support of this request, _____ states that
                                                            (party)

this Court's judgment was received on _____ and that this form was mailed to the
                                                  (date)

court on _____ .
                  (date)

                                        _____
                                                    (Signature)

                                        _____
                                                    (Address)

                                        _____
                                            (City, State and Zip Code)

Date: _____            (    )  _____-_____
                                                      (Telephone Number)

**Note:** You may use this form if you are mailing your notice of appeal and are not sure the Clerk of the

APPEAL FORMS

**Exhibit 7 to Tolk Declaration "SEC Restraining Order"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,                      11CV 4642 (MHD)

                 Plaintiff - Judgment Creditor,

        - against -

JOSHUA CONSTANTIN, BRIAN SOLOMON, and
WINDHAM SECURITIES, INC.,

             Defendants - Judgment Debtors,

        - and -

CONSTANTIN RESOURCES GROUP, INC. and
DOMESTIC APPLICATIONS CORP.,

          Relief Defendants - Judgment Debtors.      **ECF CASE**

**RESTRAINING NOTICE TO DEFENDANT - JUDGMENT DEBTOR
JOSHUA CONSTANTIN
(FED. R. CIV. P. 69(a) AND NY CPLR 5222)**

TO:    **JOSHUA CONSTANTIN, a/k/a JOSHUA A. CONSTANTIN**
       3 Broadview Drive
       Huntington, NY 11743

       and

       c/o James Kousouros, Esq.
       260 Madison Avenue, 22nd Floor
       New York, NY 10016

    **WHEREAS**, in an action in the United States District Court for the Southern District of

New York, Docket Number 11 CV 4642 (MHD) (S.D.N.Y.), between the Securities and

Exchange Commission, as plaintiff, and Joshua Constantin, Brian Solomon, and Windham

Securities, Inc., as defendants, and Constantin Resources Group, Inc. and Domestic Applications

Corp., as relief defendants, who are all of the parties named in the action, a judgment was

entered on May 6, 2013 in favor of the Securities and Exchange Commission, judgment creditor, and against Joshua Constantin, judgment debtor, for disgorgement of $1,158,145.00 and prejudgment interest of $176,577.85, for a total of $1,334,772.85, which amount, together with postjudgment interest pursuant to 28 U.S.C. § 1961 at the rate of 0.11%, remains wholly due and unpaid.

**TAKE NOTICE** that pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and New York Civil Practice Law and Rules 5222(b), which is set forth in full herein, you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with any property in which you have an interest, except as therein provided.

### NEW YORK CIVIL PRACTICE LAW AND RULES

Section 5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which

has specified personal property or debt in a restraining notice shall be liable to the
owner of the property or the person to whom the debt is owed, if other than the
judgment debtor or obligor, for any damages sustained by reason of the restraint.
If a garnishee served with a restraining notice withholds the payment of money
belonging or owed to the judgment debtor or obligor in an amount equal to twice
the amount due on the judgment or order, the restraining notice is not effective as
to other property or money.

**TAKE FURTHER NOTICE that disobedience of this Restraining Notice is**

**punishable as a contempt of court.**

Dated:        New York, New York
              May 30, 2013

                                    _____
                                    JOHN J. GRAUBARD        JG-4854
                                    Senior Attorney
                                    SECURITIES AND EXCHANGE COMMISSION
Andrew M. Calamari,                 New York Regional Office
     Regional Director              3 World Financial Center, Room 400
Preethi Krishnamurthy,              New York, NY 10281-1022
     Senior Trial Counsel           Tel.:        212-336-0084
Wendy Beth Tepperman,               Fax:         212-336-1353
     Assistant Regional Director    E-mail:      graubardj@sec.gov

- 3 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2024, I caused to be served a true and correct copy of

the foregoing **APPENDIX OF EVIDENCE IN OPPOSITION TO DEFENDANTS JOSHUA**

**CONSTANTIN AND STUART MCMAHEN'S MOTION FOR SUMMARY JUDGMENT**

via email on the following:

Keith Woodwell
kmw@clydesnow.com
**Clyde Snow & Sessions**
201 South Main Street, #2200
Salt Lake City, Utah 84111

Justin Smith
1779 Cumberland Rd
Cleveland Heights, OH 44118
240.242.7709
Justin.landes@gmail.com

       /s/ Chase Wilde
       *Attorney*